## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------x    Chapter 11
In re:                                                 :    Case No. 25-11027(JKS)
                                                       :
       BEDMAR, LLC,                                    :    Hearing Date:  TBD
                                                       :    Objections Due:  July 8, 2025 at 4:00 p.m.
                                     Debtor.¹          :
-------------------------------------------------------x
```

**COBALT PROPCO 2020, LLC'S MOTION TO DISMISS DEBTOR BEDMAR, LLC'S CHAPTER 11 CASE PURSUANT TO BANKRUPTCY CODE SECTION 1112(b)**

---

[1]    The Debtor in this Chapter 11 Case, along with the last four digits of its federal tax identification number is Bedmar, LLC (5047).  The Debtor's mailing address is 3115 Merryfield Row, San Diego, CA 92121.

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT.................................................................................1

RELEVANT FACTUAL BACKGROUND ...........................................................10

    A.    COBALT'S LEASE AND GUARANTY RESTRICT TRANSFERS ....................10

    B.    DEBTOR IS CREATED AS AN SPV TO FILE BANKRUPTCY AND CAP CLAIMS..........13

LEGAL STANDARD ............................................................................................14

ARGUMENT .......................................................................................................15

    A.    LACK OF GOOD FAITH: PETITION SERVES NO VALID BANKRUPTCY PURPOSE ....................................................................................15

        1.    DEBTOR IS NOT IN IMMEDIATE FINANCIAL DISTRESS.................16

        2.    DEBTOR HAS NO INTENT TO REORGANIZE ................................19

        3.    DEBTOR HAS NO INTENT TO MAXIMIZE ESTATE VALUE............20

    B.    DEBTOR MISUSED PETITION TO GAIN A TACTICAL ADVANTAGE...........21

        1.    FILING TRIES TO EVISCERATE CONTRACTUAL RIGHTS..............21

        2.    BANKRUPTCY WAS FILED TO ENRICH EQUITY HOLDERS ..........23

    C.    NO "UNUSUAL CIRCUMSTANCES" OVERCOME LACK OF GOOD FAITH..................24

    D.    DISMISSAL WILL PREVENT PERVERSE, MARKET-WIDE INCENTIVES .....................25

CONCLUSION....................................................................................................27

# TABLE OF AUTHORITIES

**Page**

## Cases

In re 15375 Mem'l Corp. v. Bepco, L.P.,
  589 F.3d 605 (3d Cir. 2009)...................................................................................20, 24

In re Aldrich Pump LLC,
  2023 WL 9016506 (Bankr. W.D.N.C. Dec. 28, 2023) ............................................23

In re Citadel Watford City Disposal Partners, L.P.,
  603 B.R. 897 (Bankr. D. Del. 2019) .......................................................................14

In re DBMP,
  2021 WL 3552350 (Bankr. W.D.N.C. Aug. 11, 2021).............................................23

In re HBA East, Inc.,
  87 B.R. 248 (Bankr. E.D.N.Y. 1988).......................................................................21

In re HH Liquidation,
  590 B.R. 211 (Bankr. D. Del. 2018) .......................................................................14

In re Integrated Telecom Express, Inc.,
  384 F.3d 108 (3d Cir. 2004)............................................................................ passim

In re Jason Realty, L.P.,
  59 F.3d 423 (3d Cir. 1995).....................................................................................19

In re Little Creek Dev. Co.,
  779 F.2d 1068 (5th Cir. 1986) ...............................................................................16

In re LTL Mgmt., LLC,
  637 B.R. 396 (Bankr. D.N.J. 2022), rev'd and remanded, 58 F.4th 738 (3d Cir.
  2023) ......................................................................................................................21

In re LTL Mgmt., LLC,
  64 F4th 84 (3d Cir. 2023) ............................................................................... passim

Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery,
  330 F.3d 548 (3d Cir. 2003) (en banc)....................................................................19

In re Pack Liquidating, LLC et al.,
  658 B.R. 305 (Bankr. D. Del. 2024) ................................................................14, 23

<u>In re Pennysaver USA Publishing, LLC, et al.</u>,
   587 B.R. 445 (Bankr. D. Del. 2018) ....................................................................14

<u>In re Rent-A-Wreck of Am, Inc.</u>,
   580 B.R. 364 (Bankr. D. Del. 2018) .........................................................7, 16, 22

<u>Rodriguez v. F.D.I.C.</u>,
   140 S.Ct. 713 (2020).......................................................................................25

<u>In re SGL Carbon Corp.</u>,
   200 F.3d 154 (3d Cir. 1999)......................................................................15, 16

## **<u>Statutes</u>**

Bankruptcy Code section 365 .................................................................................5

Bankruptcy Code section 502(b)(6).............................................1, 2, 3, 6, 8, 16, 22

Bankruptcy Code section 1112(b) ...........................................................1, 2, 14, 19

Bankruptcy Code section § 1112(b)(2)...................................................................24

Del. Code Ann., tit 6, § 18—1002 .........................................................................14

Del. Stat. § 18-217(l)(5)...............................................................................6, 18, 23

Delaware LLC Act section 18-217 ..............................................................3, 14, 26

## **<u>Other Authorities</u>**

H.R. Rep. No. 95-595 .............................................................................16, 20, 22

S. Rep. No. 95-989..................................................................................................22

Cobalt PropCo 2020, LLC ("**Cobalt**"), by and through its undersigned counsel, hereby moves to dismiss this Chapter 11 case (the "**Chapter 11 Case**") filed by Bedmar, LLC ("**Bedmar**" or the "**Debtor**") for cause under section 1112(b) of the Bankruptcy Code.

## PRELIMINARY STATEMENT

1.      The Debtor did not exist in the week before it filed the Chapter 11 Case.  Instead, the Debtor was created on June 3 to consummate a "two-step" asset-stripping exercise under the guise of hurried "Corporate Transactions"[2] that removed assets from companies for no disclosed consideration; altered the structure of companies from C-corporations into limited liability companies (LLCs); caused certain companies to "divide" into two newly-formed entities—only to then merge with others, including two new companies that were joined to form the Debtor and wipe out guarantees;[3] and then deposited lease liabilities into the new Debtor for the sole purpose of applying the lease-rejection cap in section 502(b)(6) of the Bankruptcy Code.  The Chapter 11 Case then immediately followed, with the Debtor disclosing it needs no immediate financing but has access to an insider loan from a new parent company that will furnish just enough money to fund the bankruptcy and pay capped rejection-damage claims.[4]

---

[2]    The "**Corporate Transactions**" are referenced in the Declaration Of The Independent Manager Of the Debtor [(the "**Independent Manager**")], In Support Of Chapter 11 Petition And First Day And Other Pleadings [ECF No. 6] (the "**First Day Decl.**") ¶ 31.  Capitalized terms not defined herein have the meanings ascribed to them in Cobalt's Objection to the Debtor's Lease Rejection Motion [ECF No. 40].

[3]    See Suppl. To Decl. Of Christopher S. Sontchi, Independent Manager Of The Debtor, In Support Of Chapter 11 Petition And First Day And Other Pleadings [ECF No. 41], Exhibit A (Organization Chart) (the "**Chart**") (illustrating merger of Bedmar Holdco, LLC into Debtor); First Day Decl. ¶ 31 & n.2 ("Bedmar HoldCo, LLC … is a resulting company from the division of the Original Parent in which it was allocated the leasehold interests in the San Diego Warehouse, San Diego Office and Freemont, California sites").

[4]    Suppl. Decl. Independent Manager [ECF No. 15] ¶¶ 5-13.

2.      The Corporate Transactions trampled Cobalt's rights under its Lease and Guaranty. They transferred the Lease and Guaranty away from Cobalt's Tenant and Guarantor[5] to the Debtor in direct violation of their anti-transfer provisions, which specifically prevent the manipulation of corporate forms that the Debtor and its non-debtor affiliates seek to undertake.  This new entity has no history, no ongoing operations, and no access to corporate services.  It came into being as a result of inter-corporate transactions that removed assets and siloed liabilities.  The Debtor exists only to file bankruptcy and access section 502(b)(6) of the Bankruptcy Code.[6]

3.      Consistent with Congressional intent behind the Bankruptcy Code, the Third Circuit prohibits the misappropriation of bankruptcy process to file cases without a valid bankruptcy purpose.  There needs to be immediate financial distress.  Filing bankruptcy just to obtain a tactical advantage, as has happened here, is not permissible.  And Congress installed in the Bankruptcy Code a mechanism to prevent these types of abuses in section 1112(b).  That provision allows for the dismissal of a bankruptcy case whose filing lacks good faith.  It applies forcefully here to a Debtor trying to repeat schemes the Third Circuit resoundingly rejected in seminal decisions spanning two decades.  See In re LTL Mgmt., LLC, 64 F.4th 84 (3d Cir. 2023); In re Integrated Telecom Express, Inc., 384 F.3d 108 (3d Cir. 2004).

4.      LTL dismissed a Chapter 11 case that followed "a series of intercompany transactions … [that] split [the company] into two new entities … [one holding liabilities relating to J&J's talc litigation and the other holding] the productive business assets" to "isolat[e] the talc liabilities in a new subsidiary so that entity could file for Chapter 11 without subjecting [OldCo's]

---

[5]    See Lease Agreement between Cobalt as Landlord and Resilience Boston, Inc. as Tenant ("**Tenant**") dated September 8, 2021 (as amended, the "**Lease**") for property at 28 Crosby Drive, Beford, Massachusetts, a copy of which is attached as **Exhibit 1**; Guaranty executed by National Resilience, Inc. ("**Guarantor**") in favor of Cobalt with respect to the Lease dated September 8, 2021 (the "**Guaranty**"), a copy of which is attached as **Exhibit 2**.

[6]    First Day Decl. ¶¶ 12, 37, 38, 42.

… operating enterprise to bankruptcy proceedings." LTL, 64 F.4th at 93. The same machinations are on display in the Corporate Transactions. Integrated dismissed a debtor's case as having been filed in bad faith because it was commenced "solely to take advantage of a provision in the Bankruptcy Code that limits claims on long-term leases [11 U.S.C. § 502(b)(6)]." Integrated, 384 F.3d at 112. See also LTL, 64 F4th at 110 ("Our decision dismisses the bankruptcy filing of a company created to file for bankruptcy"). Like the LTL debtors, the Debtor here cannot meet its burden of showing good faith in the commencement of the Chapter 11 Case.

5.      The timeline of events leading up to the Chapter 11 Case and the Corporate Transactions reveal that the Debtor (and its non-debtor affiliates) (a) have the same objective as the Integrated debtor and (b) to accomplish that objective, invoked the same corporate restructuring LTL deemed to have been done in bad faith.[7] In "**early June**," [1] the Debtor's Parent (National Resilience HoldCo, Inc.) and certain subsidiaries "underwent divisions pursuant to section 18-217 of the Delaware LLC Act;" [2] "the Original Parent [National Resilience, Inc., i.e., Cobalt's Guarantor] and its main operating subsidiary [—possibly Cobalt's Tenant Resilience Boston, Inc.—] were converted from corporations to limited liability companies;" [3] "[t]hese limited liability companies subsequently engaged in divisions, which resulted in the formation of two main entities (Bedmar Holdco, LLC and Bedmar, LLC) that ultimately merged to create [the Debtor] Bedmar, LLC;" [4] the Debtor was then given "the leasehold interests" in the properties the Debtor now proposes to reject; and [5] "cash and receivables [were] allocated to [the Debtor] … calculated based on the estimated statutorily capped lease damages with respect to each of the

---

[7]    See First Day Decl. ¶ 7 ("The primary purpose of the Chapter 11 Case is to administer the orderly winddown and satisfy all allowed liabilities in connection with the Debtor's underutilized manufacturing, laboratory, and office cites"); Lease Rejection Mot. ¶ 9 ("In connection with the Corporate Transactions, the Debtor, its affiliates, and their advisors considered ways to alleviate onerous lease obligations [and] … [u]ltimately, the Debtor and its advisors determined that it was most cost effective to commence the Chapter 11 Case to seek to reject the Leases").

leases, subject to certain offsets."[8]  On **June 3**, the Debtor's sole member, Bedmar Member, Inc.—the entity that also serves as the proposed DIP-financing lender—appointed the Independent Manager.  On **June 4**, the Independent Manager facilitated certain mergers related to the Corporate Transactions, e.g., the merger of Bedmar Holdco, LLC and Bedmar, LLC to create the Debtor.[9] The Independent Manager blessed the Corporate Transactions[10] within a week of the **June 9** Petition Date.  On the Petition Date, the Debtor filed a series of motions, e.g., the DIP, Lease Rejection, and Procedures Motions, with the aim of jamming creditors with the Corporate Transactions:

- Per the DIP Motion, the Debtor did not explore any alternative financing arrangements before signing up to a $25 million loan from its insider Managing Member, Bedmar Member, Inc.  Nor is an immediate liquidity need identified or a request for interim relief made.  The proposed budget projects the first draw will not take place until nearly a month after the Petition Date on July 6, 2025.[11]

  o What is more, the Debtor currently has (a) an approximately $41.1 million receivable—sufficient to fund capped rejection damages claims (as calculated by it but disputed by the landlords) **and** (b) approximately $5.5 million in cash.[12]  Yet, as an SPV it has no payroll obligations and owes nothing to any vendors (as it has none) apart from professional fees to administer the Chapter 11 Case.  And to the extent the Debtor maintains it has to pay lease support services, those agreements also are with a non-debtor affiliate.

---

[8]  First Day Decl. ¶¶ 30–33.

[9]  See Debtors' Omnibus Reply In Support Of Rejection And DIP Motion [ECF No. 82] (the "Omnibus Reply") ¶ 2 ("Upon the Debtor's formation, the Independent Manager was appointed and is represented by independent and separate professionals from the Parent, Original Parent, and the Lender.  Neither the Independent Manager nor the Debtor's counsel has any role with respect to the divisions.  The Independent Manager and Debtor's counsel's sole involvement with respect to the division and allocation was limited to the review of governance documents related to the Debtor's formation and the merger documents with Bedmar Holdco LLC following the Debtor's formation").

[10]  First Day Dec. ¶ 4.

[11]  DIP Mot. ¶ 20 [ECF No. 14] (acknowledging Debtor did not seek to obtain financing from **any** alternative sources). A subsequent declaration from the Independent Manager indicates additional sources of financing are being explored.  See Decl. In Supp. DIP Mot. [ECF No. 15] ("**Supp. Independent Manager Decl.**") ¶¶ 8-9.  What is not explained is why they were not considered **before** the Chapter 11 Case was filed; what deadlines forced the filing of the Chapter 11 Case **before** those alternatives could explored; and by whom those deadlines are being set and why.

[12]  See Supp. Independent Manager Decl. ¶ 7; Decl. Of Douglas Wilson In Supp. DIP Mot. [ECF No. 81] ("**Wilson Decl.**") ¶¶ 10-13; Omnibus Reply ¶ 5.

- While the Debtor laments that "[d]ue to the unique circumstances and timing of this Chapter 11 Case, the Debtor was unable to seek alternative proposals to the DIP Facility from potential third party lenders in the days prior to the Petition Date,"[13] it bears emphasizing that the Debtor created those "unique circumstances" entirely of its own volition. They are the result of an effort to create an SPV to file bankruptcy and invoke a statutory cap.

- According to the Debtor's financial advisor, its post-petition search has not yielded alternative financing. One of the reasons given is that the loan extended by the so-called DIP "Lender"—who again is the Debtor's Managing Member, Bedmar Member, Inc.—converts to equity at the end of the Chapter 11 Case after the landlords have been crammed down.[14] That conversion feature confirms the extent to which the Chapter 11 Case is being run for the benefit of the Debtor's equity at the expense of its creditors.

- The Lease Rejection Motion asks to reject under section 365 of the Bankruptcy Code the Cobalt Lease to which the Debtor is not a party. Instead, the Debtor took **both** the Lease and Guaranty by a transfer from the Tenant and the Guarantor in direct violation of their anti-transfer provisions following a merger of two newly-created companies.

  - Cobalt opposed the Lease Rejection Motion but is not alone in viewing the pre-petition transactions with a skeptical eye. Several objections were filed to the Lease Rejection Motion raising many of the same concerns expressed by Cobalt.[15]

  - The Debtor's theory on why it can reject the Lease emerged with specificity for the first time in its Omnibus Reply.[16] It argues the Lease and Guaranty were never technically "transferred" and instead simply traveled with new companies created out of various divisions and mergers under the Delaware LLC Act (presumably post conversion of the Tenant and Guarantor to LLCs as part of the Corporate Transactions).[17] But the text of the Lease and Guaranty require Cobalt's consent

---

[13] See Supp. Independent Manager Decl. ¶ 9; Wilson Decl. ¶ 14.

[14] See Wilson Decl. ¶ 16 ("[N]one of the third-party lenders provided an alternative proposal … [They] consistently expressed that they would not be able to offer a proposal that would be competitive to the DIP Facility given: (1) the unsecured nature of the DIP Facility; [and] (2) the conversion of all obligations arising under the DIP Facility to membership interests in the reorganized Debtor pursuant to the Play (rather than the repayment of such obligations in cash").

[15] See ECF No. 40 (Cobalt Objection); ECF No. 64 (ARE-SD Region No. 23, LLC (Limited Response)); ECF No. 67 (92 Crowley Owner (DE) LLC (Objection)); ECF No. 69 (CEGM Alachua, LLC (Objection)); ECF No. 71 (CubicPV Inc. (Objection)); ECF No. 72 (President and Fellows of Harvard College (Objection)). Cobalt also opposed the DIP Motion and requested that its consideration also be adjourned without date while discovery concerning the Corporate Transactions proceeded. See ECF No. 39.

[16] See Omnibus Reply ¶¶ 11-14.

[17] See Id.

to such changes in control, whether by reorganization, change in structure, or operation of law.

o The Debtor's incorrect reading of the Delaware LLC Act (§ 18-217(b)) to insulate "divisions" from the Lease's and Guaranty's anti-transfer restrictions finds no support in the text of those documents. And critically, to the extent Cobalt eventually shows the Corporate Transactions constituted fraudulent transfers, the statute loses its effect.[18]

- The Procedures Motion requests permission to dispense entirely with plan solicitation and simply have the Court confirm the plan without being reviewed or voted on by creditors; to pursue confirmation of a plan that allegedly does not have an impaired, consenting class; to postpone filing the Debtor's schedules of assets of liabilities and statements of financial affairs until *after* plan confirmation, possibly so they do not reveal that the Debtor is not facing immediate financial distress; and to continue the section-341 meeting of creditors without date. Among other things, the argument that there are no impaired classes rests on the conceit that because the rejection damages are properly being capped under section 502(b)(6) of the Bankruptcy Code, creditors are being paid in full. But the cap cannot apply given the circumstances behind the filing of the Chapter 11 Case. Hence, creditors like the landlords, who the Debtor surmises might have rejection damages totaling as much as $372 million, are clearly impaired.[19]

- The Disclosure Statement contains an even more scant discussion of the Corporate Transactions than that appearing in the First Day Declaration. It also says the Debtor thinks the Cobalt Lease rejection damages are $6.6 million, a figure Cobalt strongly disputes.[20] In addition to any capped amount being higher, the lease-rejection damages for Cobalt are no less than $50 million and likely significantly larger given costs and expenses relating to the Lease.

6.    These pleadings show the Debtor was never in immediate financial distress as the Third Circuit requires to support a good-faith finding. They also reveal no reorganization is in prospect. Instead, the Debtor was invented just to file for bankruptcy and access the statutory cap to benefit its equity holders, including the Managing Member and DIP Lender, Bedmar Member,

---

[18] See Del. Stat. § 18-217(l)(5) ("In the event that any allocation of assets, debts, liabilities and duties to division companies in accordance with a plan of division is determined by a court of competent jurisdiction to constitute a fraudulent transfer, each division company shall be jointly and severally liable on account of such fraudulent transfer notwithstanding the allocations made in the plan of division; provided, however, that the validity and effectiveness of the division are not otherwise affected thereby").

[19] See Omnibus Reply ¶ 2.

[20] Disclosure Statement For Prepackaged Plan Of Reorganization Of Bedmar, LLC Under Chapter 11 Of Bankruptcy Code [ECF No. 8] (the "**Disclosure Statement**") pp. 12-13; Ex. A.

Inc., whose DIP loan converts to equity in the reorganized company. But "[t]o be filed in good faith[,] a petition must do more than merely invoke some distributional mechanism in the Bankruptcy Code. It must seek to create or preserve some value that would otherwise be lost— not merely distributed to a different stakeholder—outside of bankruptcy." Integrated, 384 F.3d at 129. See also LTL, 64 F.4th at 110 ("[G]iven Chapter 11's ability to redefine fundamental rights of third parties, only those facing financial distress can call on bankruptcy's tools to do so.").

7.      Tellingly, the Debtor intends to argue it is in immediate financial distress because its lease obligations exceed the cash and receivables its affiliates contributed on the eve of its bankruptcy filing. That is a tacit admission the Debtor **manufactured** its financial distress; the obligations it owes and cash available to fund those obligations are entirely of the Debtor's own making through the Corporate Transactions.[21] See, e.g., In re Rent-A-Wreck of Am, Inc., 580 B.R. 364, 387 (Bankr. D. Del. 2018) ("Debtors cannot fabricate the basis of a good faith filing by their desire to avoid the results of their own provocative actions.").

8.      The Debtor also argues the Chapter 11 Case provides the best alternative for the "enterprise" more generally (and hence creditors).[22] But that intent has no relevance. See, LTL, 64 F.4th at 111 ("J&J's belief that this bankruptcy creates the best of all possible worlds for it and the talc claimants is not enough, no matter how sincerely held."). The impact of the Chapter 11 Case on non-debtor affiliates is irrelevant. All that matters is the putative good faith of the Debtor. C.f., LTL, 64 F.4th at 105 (reorganizational steps created "a new entity with a unique set of assets

---

[21]  See Omnibus Reply ¶ 3 ("[T]here can be no dispute that the Debtor is in financial distress and that rejection of the Leases and entry into the DIP Facility is a sound exercise of business judgment. The Debtor's liabilities under the Leases (all of which relate to underutilized or unused Sites) exceed the Debtor's assets by nearly nine-fold").

[22]  See Omnibus Reply ¶ 3 ("[I]n the absence of the Corporate Transactions, the Original Parent was faced with the prospect of a chapter 11 filing for the entire corporate franchise—and outcome that would undoubtedly have included a rejection of the Leases (but with a likely less than full recovery on account of any rejection damages claims)"); ¶ 5 ("The Debtor is a non-operating business without the ability to pay its on-going lease obligations. The Debtor's only cash asset is a receivable of approximately $41.1 million from a non-Debtor affiliate").

and liabilities, and the elimination of another [entity].  Only the former is in bankruptcy and subject to its good-faith requirement").  If anything, arguing the bankruptcy benefits non-debtor affiliates confirms an impermissible effort to use bankruptcy to benefit the Debtor's equity holders at its creditors' expense.  They contributed just enough money to fund the Debtor's capped rejection damages claims presumably because it benefitted their equity interests.  They are hard-pressed to maintain an altruistic motivation to benefit the landlords.

9.    Strong policy considerations also militate decidedly in favor of dismissal.  If allowed to stand, the only calculation before a bankruptcy filing will be whether the costs of the case are lower than the savings achieved by applying the statutory cap.  Accessing the Bankruptcy Code's privileges requires significantly more need and rehabilitative purpose.  See, e.g., Integrated, 384 F.3d at 129 ("Taken to its logical conclusion, the [debtor's] argument is that any entity willing to undergo Chapter 11 proceedings may cap the claims of its landlord.  Nothing in the Bankruptcy Code or its legislative history suggests that § 502(b)(6) was meant to allow tenants to avoid their leases whenever the landlord's state law remedy exceeds the cap under § 502(b)(6) by an amount greater than the cost of proceeding through chapter 11").

10.    Similarly, allowing the Debtor to eviscerate the benefit of Cobalt's contractual bargains in the Lease and Guaranty through transactions conducted under the cover of darkness on the eve of the filing is antithetical to the Bankruptcy Code's purposes and injects needless uncertainty into these types of leasing arrangements.  See, e.g., Integrated, 384 F.3d at 119 ("[A] common theme and objective underlying the reorganization provisions [is] avoidance of the consequences of economic dismemberment and liquidation and preservation of ongoing values in a matter which does equity to and is fair to the rights and interests of the parties effected.  But the perimeters of this potential mark the borderline between fulfillment and perversion; between

accomplishing objectives of rehabilitation and reorganization, and the use of these statutory provisions to destroy and undermine the legitimate rights and interests of those intended to benefit from this statutory policy.").

11.    Here, Cobalt made an investment decision to enter into a lease and procure a guaranty expecting its counterparties would be two non-debtor entities, Resilience Boston, Inc. (Tenant) and National Resilience, Inc. (Guarantor).  It did so with the justified expectation that the Tenant had the financial wherewithal to comply with its lease obligations and, should it fail to do so, it could look to the Guarantor and its financial backing.[23]  Should the Chapter 11 Case stand, Cobalt will be forced to face two new unacceptable realities.  First, its guarantor is "gone" and replaced by a company merged with the Debtor.  Second, it now faces an entirely new entity with whom it never intended to transact and about whom it knows nothing—particularly its financial wherewithal.  Compelling Cobalt to accept the newly-created Debtor that absorbed the Guarantor—and setting the precedent for similar mischief going forward—will inject uncertainty into commercial lease arrangements.  Landlords and tenants reasonably expect to transact with each other; leases must run on their agreed-upon terms absent extraordinary circumstances; and applicable state law governs the leases and properties.  A bankruptcy cannot flout these principles.

12.    In short, the Debtor shows no signs of immediate financial distress or a need for rehabilitation; creditors' legitimate rights are being trampled; and letting this case stand will produce perverse market-wide consequences without furthering a valid bankruptcy purpose. Cobalt respectfully submits that Third Circuit precedents mandate the dismissal of the Chapter 11 Case for cause.

---

[23]   See **Ex. 2** at 1.

## RELEVANT FACTUAL BACKGROUND

### A.    COBALT'S LEASE AND GUARANTY RESTRICT TRANSFERS

13.    On September 8, 2021, Cobalt entered into the Lease with Resilience Boston, Inc., a biotechnology and manufacturing company, as Tenant for a property located at 28 Crosby Drive, Bedford, Massachusetts, for a ten (10)-year term.  The Lease terminates in September 2032.[24] Resilience Boston Inc. is not the Debtor, but a subsidiary of the Original Parent.  Under the Lease, Cobalt is entitled to approximately $50 million in base rent over the remaining seven (7)-year term.[25]  Cobalt invested significant capital to make the premises usable by Resilience Boston, Inc. and acceptable to it and its Guarantor.  And it transacted with Resilience Boston, Inc. at a time when the market was much stronger than it is now.

14.    Importantly, the Lease only contemplates and authorizes two types of transfers to a third party:  with Cobalt's consent pursuant to § 11.01, or with thirty (30)-day advance notice to Cobalt (along with other conditions) pursuant to § 11.04.  Specifically, Section 11.01 of the Lease states Cobalt's consent is required before the Lease can be transferred to any other party, including the Debtor:

> "[Resilience] shall not assign, sublease, transfer or encumber any interest in this Lease . . . without the prior written consent of Landlord."[26]

> Such a "Transfer" occurs when "the entity(ies) that directly or indirectly controls the voting shares/rights of [Resilience] . . . changes at any time," including "as a result of assignment, subletting, or other transfer which would occur by operation of law, merger, consolidation, reorganization, acquisition, transfer, or other change of [Resilience's] corporate, ownership, and/or proprietary structure, including,

---

[24]  First Day Decl. ¶ 14.

[25]  Cobalt is entitled to other amounts under the Lease, including reimbursements, costs, and unliquidated damages. It reserves any and all rights with respect to those amounts, both to the extent it is compelled to file a claim in the bankruptcy (should the case persist) or pursue remedies against other parties, e.g., the non-Debtor Guarantor.

[26]  **Ex. 1** (§ 11.01).

without limitation, a change in the partners of any partnership, a change in the members and/or managers of any limited liability company. . . ."[27]

15.     Alternatively, Section 11.04 of the Lease provides that Resilience may transfer the Lease to a successor without Cobalt's consent, but *only if* it meets the following conditions:

> "(a) [Resilience] must not be in Default; (b) [Resilience] must give Landlord written notice at least thirty (30) days before such Transfer; and (c) in the case of an assignment of this Lease (including an assignment to a successor to [Resilience] by merger, consolidation or the purchase of all or substantially all of [Resilience]'s assets), the Net Worth Test … must be satisfied. . . . The 'Net Worth Test' shall be deemed satisfied if the successor . . . has a tangible net worth . . . at least equal to the tangible net worth of [Resilience] as of [the execution date of the Lease] or the date immediately prior to the applicable transfer, whichever is greater."[28]

16.     Failure to comply with either process set forth in Section 11 renders the transfer voidable by Cobalt.  See **Ex. 1** § 11.01 ("Any Transfer in violation of this Section shall, at Landlord's option, be deemed a Default by [Resilience] as described in Section 16.01, and shall be voidable by Landlord.").

17.     As an express condition to the execution of the Lease, National Resilience, Inc., as the Guarantor, contemporaneously provided a Guaranty in favor of Cobalt, under which it agreed to "guarantees the complete payment, within the timeframe set forth below, to Landlord of all rental payments and other amounts payable by Tenant (and any assignee) to Landlord and Landlord's successor's [sic] and assigns under the Lease and any extensions or renewals of and amendments to the Lease on the terms and conditions set forth herein (the '**Guaranteed Obligations**')."  **Ex. 2** at 1; see also **Ex. 1** § 6.  The Guaranty provides that it "is an absolute and continuing guaranty of payment and collection of the Guaranteed Obligations."  **Ex. 2** at 1.  Like the Lease, the Guaranty contemplates and authorizes only specific types of transfers.  It provides

---

[27]  Id. (emphasis added).

[28]  Id. (§ 11.04).

that "Guarantor shall not, without the prior written consent of Landlord, assign or transfer this Guaranty or any estate or interest herein, whether directly or by operation of law.  If Guarantor violates the foregoing restriction or otherwise defaults under this Guaranty, Landlord shall have all available remedies at law and in equity against Guarantor and Tenant."  Id. at 2.

18.     The supposed transfer of the Lease tramples on Cobalt's rights under the Lease and Guaranty because Cobalt was not notified until June 9 of the Lease transfer and never consented to it.  The Debtor's assertion that transfer of the Lease pursuant to a "division" is permissible notwithstanding the various consent and notice requirements finds no support in the Lease's plain text for several reasons.  *First*, as a result of the Corporate Transactions, the entity that "directly or indirectly controls the voting shares/rights of [Resilience Boston, Inc.] changes at [some] point," therefore constituting a "transfer" under the lease, requiring the consent or advance notice requirements.  <u>Ex. 1</u> (§ 11.01).  *Second*, a "transfer" includes a change in control resulting from "merger, consolidation, reorganization, [or] acquisition."  <u>Id.</u>  By the Debtor's own characterizations, the Corporate Transactions involved a "reorganization" and a "merger"[29]— therefore constituting a transfer under the Lease.  *Third*, a "transfer" also encompasses any "change of [Resilience Boston, Inc.]'s corporate, ownership, and/or proprietary structure" *regardless* of how the transaction is labeled, including if it is styled as a "division." <u>Id.</u>  However the Debtor now chooses to characterize them, the Corporate Transactions undoubtedly reflected changes to Resilience's "corporate, ownership, and/or proprietary structure." *Finally*, a "transfer" may also occur "by operation of law."  <u>Id.</u>  Here, the Corporate Transactions must be recognized as an effective transfer under the Lease and Guaranty by operation of law.  Holding otherwise would produce absurd market-wide effects in injecting new uncertainties to commercial real estate

---

[29]  First Day Decl. ¶¶ 31, 32.

markets.  The Corporate Transactions divided and then merged companies, with the result being the Guarantor and Tenant merged into a single entity, and neither appears to exist.  If the Corporate Transactions were not recognized as a de facto transfer, that would mean a commercial tenant could unilaterally, without notice, wipe out obligations for itself and its parent entity under heavily-negotiated contracts.

19.    For the avoidance of doubt, Cobalt does not accept that its Guarantor no longer exists.  It has rights and remedies against the Guarantor (National Resilience, Inc.) and intends to exercise those rights against any and all relevant non-Debtor entities.  Any and all rights, claims, and defenses are reserved.  Nothing herein shall constitute a waiver or admission with respect to the same.

### B.    DEBTOR IS CREATED AS AN SPV TO FILE BANKRUPTCY AND CAP CLAIMS

20.    None of the numerous motions filed by the Debtor, e.g., the DIP, Procedures, or Lease Rejection Motions, fully explain the history and details of the entity restructuring that led to the formation of the Debtor—much less how and for what consideration the Debtor was allocated the interest in the Lease with Cobalt (or any other leases with other landlords), or how and to which entity liabilities for any claims or causes of actions Cobalt may have under the Lease (other than for recovery of rent) are "allocated."  At least the following can be deduced.  On June 3, six days before the Petition Date (June 9), the Debtor was created through the Corporate Transactions.  Among other things (a) a new holding company, National Resilience HoldCo, Inc., was formed ("**Parent**"); (b) the Original Parent and Guarantor (National Resilience, Inc.) and its operating subsidiary were converted from C-corporations to limited liability companies—possibly in an

effort to argue creditors have no ability to bring claims for breach of fiduciary duty;[30] (c) National Resilience HoldCo, Inc. and certain subsidiaries (including the converted National Resilience, Inc., now National Resilience, LLC) underwent divisions pursuant to section 18-217 of the Delaware LLC Act;  (d) the divisions resulted in the formation of two main entities:  Bedmar Holdco, LLC and Bedmar, LLC, and each entity was purportedly "allocated" certain leases, including Cobalt's Lease and Guaranty; and (e) Bedmar Holdco, LLC and Bedmar, LLC then merged, which resulted in the Debtor, Bedmar, LLC.

21.     The newly-constituted Debtor has no employees, no ongoing operations, and no access to corporate services.[31]  It only holds leases to which it is not a counterparty (and has no authority to reject) and is conveniently capitalized with just enough in receivables and cash to pay capped rejection-damage claims and fund professional fees.[32]  Indeed, the Debtor was created with the assumption that the statutory cap would apply before it filed for bankruptcy.[33]

## LEGAL STANDARD

22.     Bankruptcy Code section 1112(b) requires that the Court "shall" "dismiss a [Bankruptcy] case . . . for cause" unless there are "usual circumstances" precluding dismissal.  11 U.S.C. § 1112(b).[34]  Although "cause" is not specifically defined by the statute, this Circuit and

---

[30]   See In re Pack Liquidating, LLC et al., 658 B.R. 305, 318 (Bankr. D. Del. 2024) (section 18-1002 requirements "function to bar creditors from bringing the kind of derivative standing that creditors of a corporation may bring"). See also Del. Code Ann., tit 6, § 18—1002; In re Citadel Watford City Disposal Partners, L.P., 603 B.R. 897, 903 (Bankr. D. Del. 2019); In re Pennysaver USA Publishing, LLC, et al., 587 B.R. 445, 466-57 (Bankr. D. Del. 2018); In re HH Liquidation, 590 B.R. 211, 284-85 (Bankr. D. Del. 2018).

[31]   First Day Decl. ¶¶ 12, 37, 38, 42.

[32]   Id. ¶  7; Lease Rejection Mot. ¶ 9.

[33]   First Day Decl. ¶¶ 30-33.

[34]   Alternatively, the Court could convert this case to a chapter 7 case if that is "in the best interests of creditors and the estate."  11 U.S.C. 1112(b), Cobalt submits conversion is not appropriate under the circumstances.  Instead, dismissal is the prudent course when the Debtor has no substantial assets to liquidate.  See infra Section A-3; American Telecom, 304 B.R. 867 (Bankr. N.D. Ill. 2004) (dismissing case because debtor corporation had no other significant assets to liquidate apart from the debtor's antitrust counterclaim).

14

others recognize that the absence of good faith in the commencement of the case constitutes "cause" for dismissal.  Courts in this Circuit routinely dismiss cases when a debtor fails to meet its burden of showing good faith.  See, e.g., LTL, 64 F.4th at 100 ("A lack of good faith constitutes 'cause'"); Integrated, 384 F.3d at 118 ("[P]etitions are subject to dismissal … unless filed in good faith, and the burden is on the bankruptcy petitioner to establish that its petition has been filed in good faith.") (citations omitted); In re SGL Carbon Corp., 200 F.3d 154, 162 & n.10 (3d Cir. 1999) (same).

23.    The purpose of the good faith requirement is to "prevent[] abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way." Integrated, 384 F.3d at 119 (quoting SGL, 200 F.3d at 161–62).  Overall, the inquiry "must examine the totality of facts and circumstances and determine where a petition falls along the spectrum ranging from the clearly acceptable to the patently abusive." Id, 384 F.3d at 118 (cleaned up).  It involves two primary questions: (i) whether the petition serves a valid bankruptcy purpose, which requires that the debtor is in some degree of immediate "financial distress"; and (ii) whether the bankruptcy was "filed merely to obtain a tactical litigation advantage." Id. at 119–20; LTL, 64 F.4th at 101–02.

## ARGUMENT

### A.    LACK OF GOOD FAITH:  PETITION SERVES NO VALID BANKRUPTCY PURPOSE

24.    "The present purposes of the Bankruptcy Act are twofold: either to rehabilitate financially a distressed debtor or to assemble and liquidate his assets for distribution to creditors." H.R. Rep. No. 95-595, at 10.  Consistent with Congressional directives, controlling Third Circuit precedent finds a Chapter 11 petition is not filed in good faith when commenced by a "financially healthy debtor, with no intention of reorganizing or liquidating as a going concern, with no reasonable expectation that Chapter 11 proceedings will maximize the value of the debtor's estate

for creditors, and [filed] solely to take advantage of [Section 502(b)(6) of the Bankruptcy Code]." <u>Integrated</u>, 384 F.3d at 112; <u>SGL</u>, 200 F.3d at 166 ("Courts [] have consistently dismissed Chapter 11 petitions filed by financially healthy companies with no need to reorganize under the protection of Chapter 11.").  "A good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their equitable weapons . . . available only to those debtors and creditors with clean hands." <u>In re Rent-A-Wreck of Am, Inc.</u>, 580 B.R. 364, 373–74 (citing <u>SGL</u>, 200 F.3d at 161 (quoting <u>In re Little Creek Dev. Co.</u>, 779 F.2d 1068, 1072 (5th Cir. 1986))).

25.    Here, the Debtor was not, is not, and could not be in immediate financial distress; has no intent to reorganize; and has no intent to liquidate assets or otherwise maximize the value of the estate for distribution to creditors.  Indeed, any financial distress that may exist was manufactured as a pretext for filing the bankruptcy case.  It therefore cannot meet its burden of establishing a valid bankruptcy purpose necessary to show good faith.

### 1.    DEBTOR IS NOT IN IMMEDIATE FINANCIAL DISTRESS

26.    "[A] debtor who does not suffer from financial distress cannot demonstrate its Chapter 11 petition serves a valid bankruptcy purpose supporting good faith." <u>LTL</u>, 64 F.4th at 101; <u>see also</u> <u>Integrated</u>, 384 F.3d at 121 ("[G]ood faith necessarily requires some degree of financial distress on the part of a debtor.").  "Financial distress must not only be apparent, but it must be immediate enough to justify a filing." <u>LTL</u>, 64 F.4th at 102.  Moreover, mere "economic difficulties do not establish . . . financial distress." <u>Integrated</u>, 384 F.3d at 124.

27.    Here, the Debtor is capitalized with just enough cash and receivables to fulfill its only operation—"to winddown the Sites and [pay] anticipated professional fees."[35]  To that end, prior to the Petition Date, the Debtor was allocated "substantial assets, largely in the form of cash

---

[35] Wilson Decl. ¶ 12.

and receivables," including a bank balance of approximately $5.5 million.[36]  Furthermore, prior to

the Petition Date, the Debtor obtained additional letters of credit specifically reserved to meet

certain liabilities to landlords.[37]  Critically, ***non-Debtor entities*** are liable for any draws under the

letters of credit to cover damages to landlords, and the Debtor is not subject to any indemnification

obligations to the non-Debtor entities.[38]  In other words, by design, the Debtor can face no financial

distress in connection with damages flowing from rent rejection.

28.     The Debtor's first-day filings do not bother to argue it was in immediate financial

distress at the time of the filing.  Instead, the Debtor points only to its non-Debtor affiliates'

"liquidity challenges" and "underutilized" rental properties.[39]  Arguing the "enterprise" is in

distress does nothing to establish the Debtor's good faith for two reasons.  ***First***, only the Debtor's

financial condition at the time of the filing is "determinative," not that of any non-Debtor entities.

See LTL, 64 F.4th at 105-06 ("Only [the debtor's] Financial Condition is Determinative. … the

financial condition of [the predecessor] is relevant only to the extent it informs our view of the

financial condition of [the debtor] itself.").  ***Second***, even considering the financial condition of

the non-Debtor entities to the extent it informs that of the Debtor, mere "economic difficulties do

not establish … financial distress" required for good faith.  Integrated, 384 F.3d at 124; see also

id. at 115 (reversing bankruptcy court's finding that debtor "was losing a lot of money"; the

---

[36]  First Day Decl. ¶ 33 ("Notwithstanding the Original Parent's liquidity challenges, to ensure that the divisions were fair to the surviving entities, substantial assets, largely in the form of cash and receivables, were contributed to the resulting companies. I further understand that the cash and receivables allocated to Bedmar, LLC were calculated based on the estimated statutorily capped lease damages with respect to each of the leases, subject to certain offsets and/or the anticipated ability of a lessor to mitigate such claims."); Wilson Decl. ¶ 10.

[37]  [ECF No. 5] ("**Cash Management Mot.**") ¶¶ 10, 21; First Day Decl. ¶ 34.

[38]   Cash Management Motion ¶¶ 21 ("In addition, prior to the Petition Date, the Support Parties obtained letters of credit (collectively, the "**Letters of Credit**") to support the tenant obligations with respect to certain of the leases. The Support Parties will be liable for any draws under such Letters of Credit."); 25 (under the Lease Support and Use Agreement, non-Debtor entities agree to "provid[e] a waiver of any reimbursement claim in connection with the Letters of Credit upon confirmation of the Plan").

[39]  First Day Decl. ¶ 33; Omnibus Reply ¶¶ 3, 5.

financial losses as "dramatic"; the debtor "was experiencing a dramatic downward spiral"). Thus, the mere fact that National Resilience, Inc. (the Original Parent and Guarantor) had "liquidity challenges" and may regret certain long-term leases it or its subsidiaries has entered into falls short of apparent and immediate financial distress justifying the utilization of the bankruptcy process.

29.    Nor can financial distress be shown through the Debtor's recent post-first day, self-serving assertion in the Omnibus Reply that "there can be no dispute that the Debtor is in financial distress" because its lease obligations exceed the cash its affiliates contributed into the special-purpose-entity immediately before its bankruptcy filing.[40]  The Debtor caused this to happen. And, if anything, the Debtor tacitly admits financial distress has been manufactured. The Debtor's obligations and available cash to fund them are products of the Debtor's own making through the Corporate Transactions. Moreover, to the extent the Debtor is implicitly admitting its insolvency and undercapitalization, then the transfers undertaken on the eve of the bankruptcy filing are subject to challenge as fraudulent transfers. To that end, the Delaware LLC Act pursuant to which it carried out the Corporate Transactions changes the outcome.[41]

30.    Also, the Debtor has no employees or operations. Instead, it is an SPV that receives services and support from non-Debtor affiliates pursuant to the Services Agreement and from the Support Parties.[42]  Such "backstop" agreements militate against finding financial distress. See LTL, 64 F.4th at 111 ("the bigger a backstop a parent company provides a subsidiary, the less fit that subsidiary is to file;" "[t]o ignore a parent (and grandparent) safety net shielding all liability then foreseen would allow tunnel vision to create a legal blind spot").

---

[40]  Omnibus Reply ¶¶ 3, 5.

[41]  See Del. Stat. § 18-217(l)(5).

[42]  See First Day Decl. ¶¶ 37-48

31.     Accordingly, "[b]ecause [the Debtor] was not in financial distress, it cannot show its petition served a valid bankruptcy purpose and was filed in good faith under Code § 1112(b)." Id. 64 F.4th at 110; see also id. at 101 (finding no valid bankruptcy purpose "in light of the debtor's substantial equity cushion and a lack of evidence suggesting it had trouble paying debts or impaired access to capital markets").

### 2.     DEBTOR HAS NO INTENT TO REORGANIZE

32.     Absent immediate financial distress, the Court can end the inquiry and the Chapter 11 Case through dismissal.  Still, other indicia of a bad-faith filing can be found, further warranting that outcome.

33.     The Debtor has no intent to reorganize or liquidate assets to maximize the value of the estate for distribution to creditors.   At its core, Chapter 11, entitled "reorganization," is designed to permit a financially troubled company to reorganize so as to preserve an ongoing business.  See, e.g., Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 573 (3d Cir. 2003) (en banc) ("The premise of a reorganization is to ensure that the debtor emerges from bankruptcy as a viable concern."); In re Jason Realty, L.P., 59 F.3d 423, 429 (3d Cir. 1995) ("In a reorganization under Chapter 11, a bankruptcy court's objective is to preserve, if possible, an ongoing business."); see also H.R. Rep. No. 95-595, at 220 ("The purpose of a business reorganization case ... is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders.").

34.     Here, the Debtor does not purport to have any intent to reorganize or rehabilitate its business for the simple reason that the Debtor has no employees, and no business operations or objectives other than to "winddown" the leases and mitigate its liabilities to statutorily-capped damages.  As such, there is no need for the bankruptcy proceedings to preserve it as an ongoing

19

business or emerge from them as a viable concern.  See In re 15375 Mem'l Corp. v. Bepco, L.P.,
589 F.3d 605, 619 (3d Cir. 2009) (finding lack of valid bankruptcy purpose, pointing to party
"recognizing that they have no going concerns to preserve [because it had] no employees, offices,
or business other than the handling of litigation").  "Winding down" or the "dissolution" of the
Debtor "is not an objective that can be attained in bankruptcy" and is therefore not a valid
bankruptcy purpose.  Integrated, 384 F.3d at 126 (rejecting debtor's proffered purpose for "quick,
efficient, and orderly winding down" of the debtor's business operation as good faith).

### 3.   DEBTOR HAS NO INTENT TO MAXIMIZE ESTATE VALUE

35.     Given the Debtor has no intent to reorganize, in order to demonstrate a good faith
filing, the Debtor would need to demonstrate that it filed this case to maximize the value of the
estate for distribution to creditors through a liquidation.  But the Debtor cannot have any such
intention as evidenced by, among other things, its request to postpone filing schedules of assets of
liabilities and statements of financial affairs until *after* plan confirmation.  Indeed, the only assets
the Debtor holds are those that its non-Debtor affiliates specifically deigned to allocate to it and
only in a fixed amount necessary to pay capped lease rejection damages claims.  The Debtor has
no desire or ability to maximize the value of its assets.

36.     Moreover, the Debtor must show that "there is some value that otherwise would be
lost outside of bankruptcy."  In re 15375 Mem'l Corp. v. Bepco, L.P., 589 F.3d at 619.  In other
words, when the "purported benefits [of the plan] did not add or preserve value that would
otherwise be unavailable to creditors outside of bankruptcy," the Debtor fails to meet its burden of
showing a valid bankruptcy purpose.  Mem'l Corp., 589 F.3d at 620; see also Integrated, 384 F.3d
at 126 (dismissing case for lack of good faith when debtor failed to show "any efficiencies that
were realized in this bankruptcy that could not have been realized under Delaware law").

37.     That is the case here.  The Debtor does not attempt to explain the efficiencies or value that would otherwise have been inaccessible to Cobalt and other landlords in the absence of the corporate machinations that created and capitalized the Debtor.  Quite the opposite:  even based on the scant submissions to date, the Corporate Transactions and the filing of this case made Cobalt and other landlords worse off by ignoring their contractual rights and diverting the assets of National Resilience, Inc. (Guarantor, Original Parent) *away* from creditors like Cobalt.

### B.     DEBTOR MISUSED PETITION TO GAIN A TACTICAL ADVANTAGE

38.     "A finding that there exists an abusive litigation strategy, warranting dismissal of the case, is made most often in such obvious circumstances ... where there is pointed effort to exploit the Bankruptcy Code."  In re LTL Mgmt., LLC, 637 B.R. 396, 427 (Bankr. D.N.J. 2022), rev'd and remanded, 58 F.4th 738 (3d Cir. 2023), and rev'd and remanded, 64 F.4th 84 (3d Cir. 2023).  This case is an obvious example of "pointed effort to exploit the Bankruptcy Code" in two respects.

### 1.     FILING TRIES TO EVISCERATE CONTRACTUAL RIGHTS

39.     The Debtor was created for the singular reason to declare bankruptcy and invoke the landlord-cap provision.  Filing petitions for the purpose of taking advantage of specific provisions of the Bankruptcy Code "is not *per se* a valid justification" and "cannot convert a bad faith filing to a good faith one."  In re HBA East, Inc., 87 B.R. 248, 262 (Bankr. E.D.N.Y. 1988); see also Integrated, 384 F.3d at 128 ("Bankruptcy Courts have similarly dismissed Chapter 11 petitions filed merely to take advantage of other singular provisions of the Bankruptcy Code.") (collecting cases).

40.     The Debtor's corporate contortions repeat what this Circuit has held to be misappropriation of the bankruptcy process and lack of good faith in LTL and Integrated.  In each of those cases, the debtors filed for chapter 11 to take advantage of specific provisions of the

Bankruptcy Code.  In each of those cases, the Court found a lack of good faith.  And those decisions got it right:  the benefits of the Bankruptcy Code are not available to those who should not be in a place to declare bankruptcy in the first place.

41.    The landlord cap exists to protect creditors, not to enable the Debtor's equity holders to make a grab at their expense.  See H.R. Rep. No. 95-595, at 353 ("[The cap is] designed to compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors from recovering a dividend from the estate.") (emphasis added); S. Rep. No. 95-989, at 63 (same).  This provision reflects a Congressional judgment that the claims of a landlord for damages on account of a rejected lease should not be permitted to outstrip and dilute the claims of other similarly situated creditors—such as trade creditors with outstanding invoices, or others who lent to debtor on an unsecured basis.  Here, there are no other creditors benefiting from the cap that section 502(b)(6) imposes on landlords' claim—because there are simply no *other* creditors.  See, e.g., In re Rent-A-Wreck of Am, Inc, 580 B.R. at 383 (because the primary purpose of Chapter 11 is to "maximize property *available to satisfy creditors*," the good faith inquiry is "particularly sensitive" when a "petition seeks to distribute value directly from a creditor to a company's shareholders.") (quoting Integrated, 384 F.3d at 119) (emphasis in original).

42.    And as Integrated explains, section 502(b)(6) of the Bankruptcy Code was not intended to allow tenants to avoid their leases when the landlords' state law remedy exceeds the section 502(b)(6) cap by an amount greater than the cost of the chapter 11 case.  Id. at 129.  Indeed, "such a rule . . . would be antithetical to the structure and purposes of the Bankruptcy Code."  Id. Where, as here, the Debtor filed the Chapter 11 Case for the sole purpose of invoking the landlord cap to minimize damages that it and its non-Debtor affiliates would otherwise be liable for

intentional breaches of contract, the filing is "antithetical to the structure and purposes of the Bankruptcy Code," and must be rejected.

### 2.   BANKRUPTCY WAS FILED TO ENRICH EQUITY HOLDERS

43.     The Corporate Transactions appear to have been designed to shield assets from creditors and to enrich the equity holders of the Debtor's parent and affiliated entities.  Facially, they are clear exploitation of the Bankruptcy Code.

44.     Based on the First Day Declaration, it appears that certain assets of the Original Parent were transferred to certain non-Debtor entities as part of the divisional merger.  As a result, landlords who would have been creditors of the Original Parent with access to its assets for breach-of-contract claims are now limited to access only the cash and receivables allocated to the Debtor up to the statutorily-capped amount.  Also, its claims for breach of fiduciary duty now face the impediment of being lodged against a newly-formed Delaware LLC and Delaware law on this issue.  See Pack Liquidating, 658 B.R. at 318.  Thus, the Corporate Transactions will hinder and delay creditors because they took assets away from the entities liable to the landlord-creditors and handicapped their rights.  As such, they may be voidable fraudulent transfers.  If they are, the "divisions" caused by the Corporate Transactions are effectively mooted.[43]  Cobalt need not establish that to prevail but reserves all rights.  See, e.g., In re DBMP, 2021 WL 3552350 (Bankr. W.D.N.C. Aug. 11, 2021) (when "Divisive Merger had a material, negative effect on the asbestos creditors' ability to recover on their claims. . . . an action to contest the merger and its exclusive allocation of all of [pre-transaction entity's] claims to [post -transaction entity], appears to be a viable cause."); In re Aldrich Pump LLC, 2023 WL 9016506 (Bankr. W.D.N.C. Dec. 28, 2023) ("Due to the apparent negative effects of the Divisional Merger (and these ensuing bankruptcy

---

[43]   See Del. Stat. § 18-217(l)(5).

23

filings) on the legal rights of Asbestos Claimants, that Merger and its allocations may constitute avoidable fraudulent transfers.").

45.    Furthermore, the First Day Declaration indicates that the Independent Manager is "primarily concerned" with protecting non-debtors, <u>i.e.</u>, its parent and other affiliates, and principally considered "the need" for "the Debtor's affiliated entities" in evaluating the Corporate Transactions.[44]  That is not a valid bankruptcy purpose.  <u>See</u> <u>In re 15375 Mem'l Corp. v. Bepco, L.P.</u>, 589 F.3d at 624 (reversing the Bankruptcy Court's finding of good faith in part because it "failed to consider in its good faith analysis [that] the Debtors' representative was primarily concerned with protecting [non-Debtor entities], not the Debtors.").  Among other things, the Independent Manager's administration of the case is "inextricably entangled in numerous aspects" of the non-debtor affiliates' operations and objections; such "mixed allegiances prevent[] [the Independent Manager] from adequately protecting the Debtor's interests."  <u>15375 Mem'l Corp.</u>, 589 F.3d at 624.

### C.    NO "UNUSUAL CIRCUMSTANCES" OVERCOME LACK OF GOOD FAITH

46.    While the Debtor cannot meet its burden of showing good faith, this is not a rare case of "unusual circumstances" where the Debtor can save dismissal under section § 1112(b)(2) of the Bankruptcy Code.  Here, it cannot credibly be argued the Chapter 11 Case is "an act or omission" (1) "for which there exists a reasonable justification" and (2) "that will be cured within a reasonable period of time."  <u>LTL</u>, 64 F.4th at 110.  This is so because "[n]o 'reasonable justification validates" "lack of financial distress."  <u>Id.</u>  As such, the "cause" for dismissal in this case could not be overcome by any "unusual circumstances."

---

[44] First Day Decl. ¶ 4.

### D.    DISMISSAL WILL PREVENT PERVERSE, MARKET-WIDE INCENTIVES

47.    Were the Debtor's lack of good faith not enough, this Court should also dismiss for the additional reason of guarding against perverse market-wide incentives.  There will be negative consequences from giving the imprimatur of legitimacy to a proposed scheme to eliminate contractual rights and guarantor entities as a whole.

48.    Countenancing the Corporate Transactions will disrupt the operation of state law and financing in commercial real estate markets.  The Debtor's rights under the Lease (if any) presents an issue of state law, which clearly controls unless some federal interest requires a different result.  See, e.g., Rodriguez v. F.D.I.C., 140 S.Ct. 713, 718 (2020) ("As this Court has long recognized, 'Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.'"); LTL, 64 F.4th at 105 ("[S]tate-law property interests should generally be given the same effect inside and outside bankruptcy: "Property interests are created and defined by state law [u]nless some federal interest requires a different result.").  Here, the Lease is governed by Massachusetts law—not Delaware law.[45]  And the Lease specifically provides that a change of control in Resilience "as a result of any assignment, subletting, or other transfer which would occur by operation of law, merger, consolidation, reorganization, acquisition, transfer, or other change of [Resilience]'s corporate, ownership, and/or proprietary structure, including … a change in the members and/or managers of any limited liability company" **does** constitute a transfer.[46]  Thus, to the extent the Debtor argues that Delaware law entitles it to take the lease by transfer (or "allocation") without either (1) the consent of the Landlord, or else (2)

---

[45]    See **Ex. 1** ¶ 21.03 (Governing Law) ("This Lease shall be interpreted and enforced in accord with the Laws of the state or commonwealth in which the Building is located and Landlord and Tenant hereby irrevocably consent to the jurisdiction and proper venue of such state or commonwealth.").

[46]    Id. ¶ 11.01.

advance notice to the Landlord and meeting the Lease's financial criteria—notwithstanding the express terms of the Lease to the contrary—then there is tension between § 18-217 of the Delaware LLC Act and Cobalt's rights under Massachusetts law to enforce its contract.

49. As such, permitting this case to go forward will disrupt the normal operation of the commercial real estate market, where landlords and tenants are reasonably expected to follow the state law of their choice. This policy consideration is particularly important where, as here, established commercial landlords, such as Cobalt, may face similar transgressions by other lessees if the Chapter 11 Case stands. It permits a putative debtor to unilaterally and without notice eliminate bargained-for exchanges in heavily negotiated leases and guarantees. It also incentivizes commercial tenants to invoke bankruptcy anytime (a) they regret their leases and (b) their rejection-damage-savings sufficiently exceeds the administrative burn of a Chapter 11 case.

50. And the Debtor did not just frustrate contractual protections. The Corporate Transactions eliminated entire companies altogether, including particularly the Guarantor by causing it to merge into the Debtor. The negative impact that allowing such a dramatic change to a commercial-leasing arrangement will have on markets cannot be overstated. When a landlord agrees to enter into a lease with the protection of a parent-level guaranty, it reasonably expects that arrangement will stand and the corporate separateness of those entities will be respected. Bankruptcy law cannot mettle with those expectations, especially to advantage equity holders and at creditors' expense. See, e.g., LTL, 64 F.4th at 105) ("Bankruptcy Code is an amalgam of creditor-debtor tradeoffs balanced by a Congress that assumed courts applying it would respect the separateness of legal entities (and their respective assets and liabilities). The general expectation of state law and of the Bankruptcy Code . . . is that courts respect entity separateness absent compelling circumstances calling equity . . . into play.").

51.     Ultimately, the Bankruptcy Code is intended to rehabilitate entities in real financial distress.  None of its purposes are served here.

## CONCLUSION

**WHEREFORE**, Cobalt respectfully requests that the Court enter an Order (a) dismissing the Chapter 11 Case and (b) granting such other and further relief as the Court deems just and proper.

Dated: June 24, 2025
         Wilmington, Delaware

By: /s/ *Michael Busenkell*

**GELLERT SEITZ BUSENKELL & BROWN, LLC**
Michael Busenkell (No. 3933)
1201 N. Orange Street, Suite 300
Wilmington, Delaware 19801
Telephone: (302) 425-5800
Facsimile: (302) 425-5814
mbusenkell@gsbblaw.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
James C. Tecce (pro hac vice)
Eric Kay (pro hac vice)
295 Fifth Avenue
New York, New York 10016
Tel.: (212) 849 7000
jamestecce@quinnemanuel.com
erickay@quinnemanuel.com

Keith H. Forst (pro hac vice)
1300 I Street NW, Suite 900
Washington, D.C.  20005
(202) 538-8000
keithforst@quinnemanuel.com

*Counsel to Cobalt PropCo 2020, LLC*