## Exhibit 1

**Lease Agreement between Cobalt as Landlord and Resilience Boston, Inc.**

**28 CROSBY DRIVE**
**BEDFORD, MASSACHUSETTS**

**LEASE AGREEMENT**

**BETWEEN**

**COBALT PROPCO 2020, LLC**,
**a Delaware limited liability company,**
**AS LANDLORD**

**AND**

**RESILIENCE BOSTON, INC.**,
**a Delaware corporation,**
**AS TENANT**

# LEASE AGREEMENT

## TABLE OF CONTENTS

1.     **Basic Lease Information**.................................................................................1
2.     **Lease Grant.**........................................................................................5
3.     **Term and Commencement Date.**..........................................................5
4.     **Rent.**...................................................................................................7
5.     **Compliance with Laws; Use.**................................................................8
6.     **Guaranty.**...........................................................................................10
7.     **Building Services.**..............................................................................10
8.     **Alterations**........................................................................................12
9.     **Repairs and Maintenance.**..................................................................14
10.   **Entry by Landlord.**............................................................................15
11.   **Assignment and Subletting.**................................................................15
12.   **Notices.**.............................................................................................17
13.   **Indemnity and Insurance.**...................................................................18
14.   **Casualty Damage.**..............................................................................20
15.   **Condemnation.**...................................................................................21
16.   **Events of Default.**..............................................................................22
17.   **Limitation of Liability.**......................................................................24
18.   **Holding Over.**....................................................................................26
19.   **Surrender of Premises.**.......................................................................26
20.   **Subordination; Estoppel Certificate.**..................................................27
21.   **Miscellaneous.**...................................................................................28

## LEASE AGREEMENT

This Lease Agreement (this "Lease") is made and entered into as of September 8, 2021 (the "Effective Date"), by and between **COBALT PROPCO 2020, LLC**, a Delaware limited liability company ("Landlord"), and **RESILIENCE BOSTON, INC.**, a Delaware corporation ("Tenant").

1. **Basic Lease Information**.

    1.01    "Building" shall mean the building located at 28 Crosby Drive, Bedford, Massachusetts. The "Rentable Floor Area of the Building" is deemed to be 114,115 rentable square feet.

        "Property" means the Building and the parcel(s) of land on which it is located, and, at Landlord's discretion (provided that such discretion is exercised in compliance with the express terms and provisions of this Lease and Landlord's obligations hereunder), the parking facilities and other improvements, if any, serving the Building and the parcel(s) of land on which they are located.

        "Park" shall mean, collectively to the extent owned or controlled by Landlord or its affiliates from time to time, the Property and the adjacent parcels of land known as 20, 22, 24, 26, 30, 32, 24 and 36 Crosby Drive, Bedford, Massachusetts, together with the buildings and other improvements thereon, all of which is commonly known as Crosby Corporate Center.

    1.02    A "Phase Premises" shall mean each of the following spaces, each as shown on Exhibit A to this Lease:

      (a)    "First Phase Premises" shall mean a portion of the second (2nd) floor of the Building, containing approximately 28,674 rentable square feet;

      (b)    "Second Phase Premises" shall mean the balance of the second (2nd) floor of the Building, containing approximately 27,185 rentable square feet; and

      (c)    "Third Phase Premises" shall mean a portion of the first (1st) floor of the Building, containing approximately 18,061 rentable square feet.

    1.03    The "Premises" shall mean the First Phase Premises commencing as of the First Phase Premises Term Commencement Date, and collectively with the Second Phase Premises commencing as of the Second Phase Premises Term Commencement Date and the Third Phase Premises commencing as of the Third Phase Premises Term Commencement Date.

    1.04    "Rentable Floor Area of the Premises" shall mean, upon the occurrence of the last Term Commencement Date to occur, 73,920 rentable square feet in the aggregate. Notwithstanding anything to the contrary, to the extent that Tenant uses any of the penthouse space and any basement space for items that exclusively service the Premises, the floor area of the penthouse space and the basement space used exclusively for items that exclusively service the Premises shall be added to the Rentable Floor Area of the Premises, and the Base Rent, Tenant's Proportionate Share and other terms based upon the Rentable Floor Area of the Premises shall be

adjusted accordingly.  The terms and provisions of the Addendum attached to this Lease are incorporated herein by this reference.

1.05    "<u>Estimated Delivery Date</u>" with respect to each Phase Premises:

    (a)    First Phase Premises: The Effective Date

    (b)    Second Phase Premises:  August 10, 2021

    (c)    Third Phase Premises:  September 10, 2021

1.06    "<u>Term Commencement Date</u>" with respect to each Phase Premises shall mean the Delivery Date (as defined in <u>Exhibit C</u>) for such Phase Premises.

1.07    "<u>Rent Commencement Date</u>" shall mean April 10, 2022, subject to extension for any Second Phase Premises Delivery Delay or Third Phase Premises Delivery Delay (as those terms are defined in, and pursuant to, Section 3.03 below) and for any Base Building Work Delivery Delay (as that term is defined in, and pursuant to, <u>Exhibit C</u> attached hereto).

1.08    "<u>Term Expiration Date</u>":  The last day of the month within which the tenth (10th) anniversary of the Rent Commencement Date occurs (*e.g.*, if the Rent Commencement Date is April 10, 2022, then the Term Expiration Date will be April 30, 2032).

1.09    "<u>Base Rent</u>":

| *Period | Annual Base Rent | Monthly Base Rent |
|---|---|---|
| **April 10, 2022 – April 30, 2023 | $4,287,360.00 | $357,280.00 |
| May 1, 2023 – April 30, 2024 | $4,415,980.80 | $367,998.40 |
| May 1, 2024 – April 30, 2025 | $4,548,460.22 | $379,038.35 |
| May 1, 2025 – April 30, 2026 | $4,684,914.03 | $390,409.50 |
| May 1, 2026 – April 30, 2027 | $4,825,461.45 | $402,121.79 |
| May 1, 2027 – April 30, 2028 | $4,970,225.30 | $414,185.44 |
| May 1, 2028 – April 30, 2029 | $5,119,332.05 | $426,611.00 |
| May 1, 2029 – April 30, 2030 | $5,272,912.02 | $439,409.33 |
| May 1, 2030 – April 30, 2031 | $5,431,099.38 | $452,591.61 |
| May 1, 2031 – April 30, 2032 | $5,594,032.36 | $466,169.36 |

*In the event that the Rent Commencement Date does not occur on April 10, 2022 pursuant to the terms of this Lease, then there shall be a corresponding extension of each of the dates set forth above  (provided that if such Rent Commencement Date does not occur on the first day of a calendar month, the first rental period shall further include the balance of the calendar month in which the first anniversary of such Rent Commencement Date occurs).  Any such adjustment shall be memorialized in the Commencement Letter to be executed by the parties pursuant to Section 3.01.

**Subject to the Rent Waiver Period under Section 4.01 below.

1.10    "Tenant's Proportionate Share"  shall mean:

   (a)    For Expenses:  64.78% (being the proportion that the Rentable Floor Area of the
          Premises bears to the total rentable floor area in the Building); and

   (b)    For Taxes:  22.73% (being the proportion that the Rentable Floor Area of the
          Premises bears to the total rentable floor area in the Tax Parcel on which the
          Building is located, which is 325,219 rentable square feet). The "Tax Parcel"
          means, collectively, the six (6) buildings located at 20 Crosby Drive (consisting
          of approximately 78,689 rentable square feet), 22 Crosby Drive (54,067 rentable
          square feet), 24 Crosby Drive (30,036 rentable square feet), 26 Crosby Drive
          (38,863 rentable square feet), 28 Crosby Drive (114,115 rentable square feet) and
          30 Crosby Drive (9,449 rentable square feet) and the connecting corridors, all
          located in Bedford, Massachusetts, it being understood and agreed that all of the
          foregoing buildings, collectively, are treated as a single parcel for purposes of
          determining Taxes.

1.11    Tenant Work Allowance:  $16,632,000.00 (based on $225.00 per square foot of
        Rentable Floor Area of the Premises), as further described in the attached Exhibit C.

1.12    Additional Provisions:  See Exhibit F

        1. Parking; Amenities
        2. Hazardous Materials
        3. Sustainability Initiative
        4. Roof Rights
        5. pH Neutralization System
        6. Generators
        7. Negative Conditions

1.13    "Guarantor":  National Resilience, Inc., a Delaware corporation

1.14    "Brokers": CBRE and Colliers International.

1.15    "Permitted Use":  Subject to applicable Laws (as defined below), including
        applicable Town of Bedford zoning rules and regulations, and the terms set forth
        herein, general office, research and development, laboratory and GMP manufacturing
        of biologic materials suitable for human use and commercial distribution uses.
        Notwithstanding anything to the contrary in this Lease, under no circumstances shall
        Tenant use or occupy the Premises or any part thereof in a manner that includes
        activities that would qualify or be characterized or categorized as any laboratory
        biosafety level ("BSL") other than BSL1 or BSL2, and in no event shall Tenant use
        or occupy the Premises or any part thereof for vivarium uses.

1.16    "Notice Address(es)":

        For Landlord:                       For Tenant:

        Cobalt PropCo 2020 LLC              Resilience Boston, Inc.
        c/o TPG Real Estate                 9310 Athena Circle

345 California Street, Suite 300            La Jolla, CA 92037
San Francisco, CA 94104                     Attention: General Counsel
Attn:  Jacob Muller, Principal

With a copy to:                             With a copy by email to:
                                            notices@resilience.com

c/o Anchor Line Partners, LLC
One Post Office Square
Suite 3600
Boston, MA 02110
Attn:  Andrew J. Maher

With a copy to:

Nutter, McClennen & Fish, LLP
155 Seaport Boulevard
Boston, MA 02210
Attn:  Michael F. Burke, Esq.

1.17    "<u>Business Day(s)</u>" are Monday through Friday of each week, exclusive of New
        Year's Day, Presidents Day, Memorial Day, Independence Day, Labor Day,
        Thanksgiving Day and Christmas Day ("<u>Holidays</u>").  Landlord may designate
        additional Holidays that are commonly recognized by other commercial buildings in
        the area where the Building is located.  "<u>Building Service Hours</u>" are 8:00 a.m. to
        6:00 p.m. on Business Days, provided that, subject to Force Majeure and the other
        provisions of this Lease, Tenant shall have access to the Premises, the Building
        Common Areas, and those areas in which Building mechanicals that exclusively
        support the Premises are located, 24 hours per day, 365 days per year.

1.18    <u>Other Defined Terms</u>:  Other capitalized terms shall have the meanings set forth in
        this Lease and its Exhibits below.  References in this Lease to numbered Sections
        shall be deemed to refer to the numbered Sections of this Lease, unless otherwise
        specified.

1.19    <u>Exhibits</u>:  The following exhibits and attachments are incorporated into and made a
        part of this Lease:

        <u>Exhibit A</u> (Outline and Location of Premises)
        <u>Exhibit B</u> (Expenses and Taxes)
        <u>Exhibit C</u> (Work Letter)
        <u>Exhibit D</u> (Commencement Letter)
        <u>Exhibit E</u> (Building Rules and Regulations)
        <u>Exhibit F</u> (Additional Provisions)
        <u>Exhibit G</u> [Intentionally Deleted]
        <u>Exhibit H</u> (Form of SNDA)
        <u>Exhibit I</u>  (Options)
        <u>Exhibit J</u>  (Form of Guaranty)
        <u>Addendum to Lease</u>

**2.      Lease Grant.**

2.01      <u>Premises</u>.  Landlord hereby leases the Premises to Tenant and Tenant hereby leases the Premises from Landlord.  The Premises exclude the exterior faces of exterior walls, the common stairways and stairwells, elevators and elevator wells, fan rooms, electric and telephone closets, janitor closets, freight elevator vestibules, and pipes, ducts, conduits, wires and appurtenant fixtures serving other parts of the Building (exclusively or in common), and other Common Areas (as defined below) of the Building.  If the Premises include the entire rentable area of any floor, the common corridors, elevator lobby, and restroom facilities located on such full floor(s) shall be considered part of the Premises.

2.02      <u>Appurtenant Rights</u>.  During the Term, Tenant shall have, as appurtenant to the Premises, the non-exclusive rights to use in common (subject to any reasonable rules of general applicability to tenants and other users of the Building from time to time made by Landlord):  (a) the common lobbies, corridors, stairways, elevators and loading platform of the Building, and the pipes, ducts, conduits, wires and appurtenant meters and equipment serving the Premises in common with others; (b) common driveways and walkways necessary for access to the Building; (c) if the Premises include less than the entire rentable floor area of any floor, the common corridors, elevator lobby, and restroom facilities located on such floor; and (d) all other areas or facilities in or about the Building from time to time designated for general use in common by Tenant, other Building tenants, and Landlord, including, without limitation, the shared loading dock (collectively, the "<u>Common Areas</u>").  Common Areas may also include areas, facilities (including parking facilities) and amenities located within such buildings or on such land in the Park that are not part of the Property and that are designated for the general non-exclusive use and convenience of Tenant and other tenants of the Building and, to the extent applicable, of the other buildings in the Park, provided that Tenant shall in all events have the parking rights designated in this Lease regardless of whether the parking areas are designated by Landlord as Common Areas.

**3.      Term and Commencement Date.**

3.01      <u>Term</u>.  The "<u>Term</u>" of this Lease with respect to each Phase Premises shall begin at 12:01 a.m. on the applicable Term Commencement Date as set forth in Section 1.  The Term of this Lease with respect to the entire Premises shall end at 11:59 p.m. on the Term Expiration Date set forth in Section 1, unless sooner terminated or extended in accordance with the provisions of this Lease.  Promptly after the determination of each Term Commencement Date, Landlord and Tenant shall execute and deliver a commencement letter in the form attached as <u>Exhibit D</u> with respect to the applicable Phase Premises (each, a "<u>Commencement Letter</u>").  Tenant shall execute and return a Commencement Letter, or provide written objection to the statements contained in such Commencement Letter, within thirty (30) days after its delivery to Tenant.  If Tenant fails to execute and return a Commencement Letter, or provide written objection to the statements contained in such Commencement Letter, within such thirty (30) day period, and such failure continues for fifteen (15) days after Landlord gives to Tenant an additional notice of such failure, then Tenant shall be deemed to have approved of the statements contained in such Commencement Letter.

3.02      <u>Initial Tenant Work</u>.  As used herein, the "<u>Initial Tenant Work</u>" shall mean all Alterations (as defined in Section 8) to be performed, in or about the Premises that are required initially to put the Premises in condition suitable for Tenant's use and occupancy, including, without limitation, any work desired by Tenant that is listed in the "Tenant" responsibility column on the matrix attached hereto as <u>Schedule C-4</u> (the "<u>Responsibility Matrix</u>").  The Initial Tenant Work shall be performed by Tenant in accordance with, and subject to, the provisions of <u>Exhibit C</u> attached hereto. Subject to Landlord's obligations as expressly provided in <u>Exhibit C</u>, the Premises shall be leased by Tenant in their current "as is" condition and configuration without any representations or warranties by Landlord.

3.03        Delivery Condition.  Tenant acknowledges and agrees that the First Phase Premises are currently vacant and in the required Delivery Condition (as defined in Exhibit C), and that the Delivery Date for the First Phase Premises is deemed to be the Effective Date.

Landlord shall not be liable for any delay or failure to deliver possession of any Phase Premises or any other space due to the holdover or unlawful possession of such space by another party or other reason, provided, however, Landlord shall use commercially reasonable efforts to (i) obtain possession of the Second Phase Premises and the Third Phase Premises in order to perform any demolition work required therein to deliver the same in the Delivery Condition and (ii) cause the Delivery Date for each such Phase Premises to occur by the applicable Estimated Delivery Date, and Tenant shall be entitled to the remedies set forth below in this Section 3.03.

Landlord shall use best efforts to cause the Delivery Date for each of the Second Phase Premises and the Third Phase Premises to occur by the date that is thirty (30) days prior to the applicable Estimated Delivery Date.  Except as otherwise provided in this Lease, any delay in the occurrence of the Delivery Date for the Second Phase Premises or the Third Phase Premises beyond the applicable Estimated Delivery Date shall not give rise to any liability or default by Landlord or affect any of the terms of this Lease or Tenant's obligation to accept the Premises when delivered, except as follows:

(A)      If the Delivery Date for the Second Phase Premises does not occur by the Estimated Delivery Date for the Second Phase Premises of August 10, 2021, as extended by any COVID Delays and any delays caused by Tenant or Force Majeure (as so extended, the "Second Phase Premises Penalty Date") (a "Second Phase Premises Delivery Delay", and each such day of Second Phase Premises Delivery Delay, a "Second Phase Premises Delay Day"), then the Rent Commencement Date shall be extended one (1) day for each Second Phase Premises Delay Day for the period commencing on the Second Phase Premises Penalty Date and ending on the forty-fifth (45th) day after the Second Phase Premises Penalty Date, and thereafter two (2) days for each Second Phase Premises Delay Day after such initial forty-five (45) day period.

As used in this Lease, a "COVID Delay" shall mean a delay in the permitting or construction of any work required to be performed by Landlord under this Lease due to any governmental order, restriction, regulation, moratorium, mandate or protocols or any shortage of labor or materials related to the COVID-19 pandemic or any variant thereof.

In the event of a Second Phase Premises Delivery Delay that continues beyond ninety (90) days after the Second Phase Premises Penalty Date, then for the sixty (60) day period following such ninetieth (90th) day (the "Second Phase Premises Termination Period"), Tenant shall have the right to terminate this Lease by giving Landlord written notice thereof, whereupon this Lease shall terminate on the date that is thirty (30) days after Landlord's receipt of such termination notice, unless the Delivery Date for the Second Phase Premises occurs within such thirty (30) day period (as extended by any COVID Delays and any delays caused by Tenant or Force Majeure), in which event this Lease shall not terminate but shall continue in full force and effect.

(B)      If the Delivery Date for the Third Phase Premises does not occur by the Estimated Delivery Date for the Third Phase Premises of September 10, 2021, as extended by any COVID Delays and any delays caused by Tenant or Force Majeure (as so extended, the "Third Phase Premises Penalty Date") (a "Third Phase Premises Delivery Delay", and each such day of Third Phase Premises Delivery Delay, a "Third Phase Premises Delay Day"), then the Rent Commencement Date shall be extended one

(1) day for each Third Phase Premises Delay Day for the period commencing on the Third Phase Premises Penalty Date and ending on the forty-fifth (45th) day after the Third Phase Premises Penalty Date, and thereafter two (2) days for each Third Phase Premises Delay Day after such initial forty-five (45) day period.

In the event of a Third Phase Premises Delivery Delay that continues beyond ninety (90) days after the Third Phase Premises Penalty Date, then for the sixty (60) day period following such ninetieth (90th) day (the "Third Phase Premises Termination Period"), Tenant shall have the right to terminate this Lease by giving Landlord written notice thereof, whereupon this Lease shall terminate on the date that is thirty (30) days after Landlord's receipt of such termination notice, unless the Delivery Date for the Third Phase Premises occurs within such thirty (30) day period (as extended by any COVID Delays and any delays caused by Tenant or Force Majeure), in which event this Lease shall not terminate but shall continue in full force and effect.

For the avoidance of doubt, in the event that both a Second Phase Premises Delivery Delay and a Third Phase Premises Delivery Delay occurs, the Rent Commencement Date shall be subject to extension for both the Second Phase Premises Delay Days and the Third Phase Premises Delay Days as provided above. For illustration purposes only, if the Delivery Date for the Second Phase Premises is delayed beyond the Second Phase Premises Penalty Date by forty (40) days, then the number of Second Phase Premises Delay Days is forty (40), and the Rent Commencement Date is subject to extension by forty days (based on the 1-for-1 extension provided above) for such Second Phase Premises Delay Days. If in addition to such Second Phase Premises Delay Days, the Delivery Date for the Third Phase Premises is delayed beyond the Third Phase Premises Penalty Date by seventy-five (75) days, the number of Third Phase Premises Delay Days is 75, and the Rent Commencement Date shall be extended by one hundred five (105) days (based on the 1-for-1 extension provided above for the first forty-five (45) days of delay, and the 2-for-1 extension provided above for each of the thirty (30) days of delay occurring after such forty-five (45) day period) for such Third Phase Premises Delay Days. Taking into account both of the Second Phase Premises Delay Days and the Third Phase Premises Delay Days, the Rent Commencement Date shall be extended for a total of one hundred forty-five (145) days in this example.

Except as otherwise provided in this Lease, Tenant shall not be permitted to take possession of or enter any Phase Premises before the Term Commencement Date for such Phase Premises without Landlord's permission.

**4.     Rent.**

4.01     Base Rent and Additional Rent. During the Term (but subject to the following subparagraph of this Section 4.01 below), Tenant hereby covenants and agrees to pay to Landlord, without any setoff or deduction (except to the extent expressly set forth in this Lease), (a) all Base Rent (as provided in Section 1), (b) Tenant's Proportionate Share of Expenses and Taxes (as provided in Exhibit B attached hereto), and (c) all other Additional Rent due for the Term (collectively referred to as "Rent"). "Additional Rent" means all sums (exclusive of Base Rent) that Tenant is required to pay to Landlord from time to time under this Lease.

Notwithstanding the foregoing, provided that Tenant is not then in Default beyond any applicable notice and cure period under the Lease (and, if such a Default shall occur, following the cure of such Default), Landlord agrees to waive payment of the monthly amounts of Base Rent and Tenant's

Proportionate Share of Expenses and Taxes during the period commencing on the earliest Term Commencement Date to occur and ending on the date immediately preceding the Rent Commencement Date set forth in Section 1 (the "Rent Waiver Period").  In the event that the Rent Waiver Period does not end on the last day of a calendar month, then on or before the Rent Commencement Date, Tenant shall pay to Landlord the amount of the Base Rent and Tenant's Proportionate Share of Expenses and Taxes for the portion of the calendar month that follows the last day of the Rent Waiver Period, pro-rated on a per diem basis.

4.02      Manner and Timing of Payments.  Base Rent and other recurring monthly charges of Additional Rent shall be due and payable in advance on the first day of each calendar month without notice or demand.  All other items of Rent shall be due and payable by Tenant within thirty (30) days after billing by Landlord.  Rent shall be made payable to the entity, and sent to the address, that Landlord from time to time designates for such purposes and shall be paid by Tenant by good and sufficient check payable in United States of America currency or by electronic or wire transfer to an account from time to time designated by Landlord.  Landlord's acceptance of less than the entire amount of Rent shall be considered, unless otherwise specified by Landlord, a payment on account of the oldest obligation due from Tenant hereunder, notwithstanding any statement to the contrary contained on or accompanying any such payment from Tenant.  Rent for any partial month during the Term shall be prorated on a per diem basis.  No endorsement or statement on a check or letter accompanying payment shall be considered an accord and satisfaction.

5.      **Compliance with Laws; Use.**

Tenant shall use the Premises only for the Permitted Use and shall not use or permit the use of the Premises for any other purpose.  Tenant shall comply with all statutes, codes, ordinances, orders, rules and regulations of any municipal or governmental entity whether in effect now or later, including without limitation, the Environmental Health and Safety Laws (as defined in Exhibit F attached hereto) and the Americans with Disabilities Act ("Law(s)"), regarding the operation of Tenant's business and the use, condition, configuration and occupancy of the Premises and the Building systems exclusively serving the Premises (whether located inside or outside the Premises).  Tenant acknowledges that Landlord has made no representations with respect to the right to use the Premises for the Permitted Use and that Tenant shall be responsible for obtaining all licenses, permits and approvals under applicable Law, all as more particularly set forth hereinbelow.

Without limiting the generality of the foregoing, Tenant shall be solely responsible for complying with all Laws that relate to operations of Tenant's laboratory uses, and all Laws pertaining to equipment, installations and improvements used or required in connection with the operations of Tenant's laboratory uses.

Tenant shall comply with applicable laboratory practices, (including the use of safety equipment) and policies established by the Center for Disease Control and Prevention (the "CDC"), and in no event shall Tenant's use of the Premises exceed BSL-2 requirements and protocols in effect with respect to Tenant's use from time to time.  In addition, Tenant shall comply with all Good Manufacturing Practices (GMP) in order to conform to the guidelines recommended by agencies that control the authorization and licensing of the manufacture and sale of biologic, pharmaceutical, medical and other similar products.  Tenant shall store, use and dispose of Hazardous Materials in compliance with all applicable Environmental, Health and Safety Laws and shall comply with all Laws applicable to the handling, use or disposition of any Hazardous Materials in connection with the Tenant's Generator referenced in Section 4 of Exhibit F.

In addition, Tenant shall, at its sole cost and expense, promptly comply with any Laws that relate to the Base Building (defined below), but only to the extent such obligations are triggered by Tenant's use of the Premises (other than for general office use) or any Alterations in or about the Premises performed or requested by Tenant. "Base Building" shall include the structural portions of the Building, the common restrooms, the Building mechanical, electrical, and plumbing systems and equipment located in the internal core of the Building on the floor or floors on which the Premises are located (but shall exclude the two stage active pH neutralization system to be installed by Landlord pursuant to this Lease to serve the Premises (the "pH Neutralization System"), which shall constitute Tenant's Property (as defined below)). Tenant shall promptly provide Landlord with copies of any notices it receives regarding an alleged violation of Law. Except as otherwise provided herein, Tenant shall be solely responsible, at Tenant's sole cost and expense, for obtaining all operational permits, licenses and approvals required in order for Tenant to use the Premises for the Permitted Use (excluding any permits, licenses, and approvals required for the construction of the Initial Tenant Work and/or the Base Building Work, which shall be Landlord's responsibility).

If any governmental license or permit required to be obtained by Tenant shall be required for the proper and lawful conduct of Tenant's business at the Premises (including, without limitation, all permits and approvals required for the use and operation of any required wastewater treatment operator license), Tenant, at Tenant's expense, shall duly procure and thereafter maintain such license and submit the same to inspection by Landlord. Tenant, at Tenant's expense, shall at all times comply in all material respects with the terms and conditions of each such license or permit. Tenant shall provide Landlord with copies of all such licenses, permits and approvals required for Tenant's use, including any Environmental Health and Safety permits, licenses and registrations that are obtained or renewed during the Term.

Without limiting the generality of the foregoing, Tenant, at Tenant's sole cost, shall apply for, obtain, strictly comply with, and keep in force all discharge permits required by the Massachusetts Water Resources Authority (the "MWRA Permits") for the pH Neutralization System and covering all other Hazardous Materials and processes used by Tenant in its business operations at the Premises. Tenant shall provide a copy of each such MWRA Permit to Landlord, together with a written description and detailed guidelines of any laboratory operating conditions required pursuant to such MWRA Permit, within ten (10) business days after the issuance of such MWRA Permit or any amendment to modification thereto.

Tenant shall not exceed the standard density limit for the Building. Tenant shall not use or permit the use of any portion of the Premises or any equipment installed by Tenant or any party acting under or through Tenant in a manner that results in objectionable noise, odors, or vibrations emanating from the Premises and shall prevent the emanation of noxious odors, smoke, vibration, noise, water or other effects which constitute a nuisance or otherwise interfere with the safety or comfort of Landlord or of any of the other occupants of the Building. Tenant shall comply with the rules and regulations of the Building attached as Exhibit E and such other reasonable rules and regulations adopted by Landlord from time to time (and Landlord shall not discriminate against Tenant in the enforcement of such Building rules and regulations), including rules and regulations for the performance of Alterations. In the event of any conflict between the terms of this Lease and the rules and regulations, the terms of this Lease shall control. If the Premises or any portion thereof are located on a multi-tenant floor, Tenant shall cause all portions of such Premises that are visible from the Common Areas on such floors to be arranged, furnished, and lighted in a manner in which such Premises appears at all times to be occupied for the Permitted Use.

Notwithstanding anything to the contrary contained in this Lease, during the Term, subject to Tenant maintaining all licenses, permits and approvals required therefor, Tenant shall be entitled to the applicable allocation of maximum allowable chemical quantities (both in use and in storage) permitted by

MAQ Codes (defined below) as set forth on <u>Schedule F-3</u> to <u>Exhibit F</u> attached hereto.  As used herein, "<u>MAQ Codes</u>" shall mean 780 CMR – Massachusetts State Building Code 9th Edition, 527 CMR – Massachusetts Comprehensive Fire Safety Code, and NEPA 45 – Standard on Fire Protection for Laboratories Using Chemicals, 2011 Edition.

Tenant shall not use or occupy the Premises or any part thereof for vivarium uses, and Landlord covenants and agrees that, during the Term of this Lease, if any other tenant or occupant of the Building shall use or occupy any portion of the Building for vivarium uses, then (a) subject to any confidentiality requirements of such other tenant or occupant, Landlord will provide for Tenant's review, the plans and specifications for any modifications (or if not applicable, such other reasonable evidence) to ensure that the ventilation and air exchange system serving the Premises will not be adversely impacted by such vivarium use, and (b) such other tenant or occupant shall not have shared use of the loading dock serving the Premises.

**6.      Guaranty.**

Concurrently with Tenant's execution and delivery of this Lease, as a condition to the effectiveness of this Lease, Tenant shall cause Guarantor to execute and deliver to Landlord a guaranty in the form attached hereto as <u>Exhibit J</u> (the "<u>Guaranty</u>").

**7.      Building Services.**

7.01      <u>Building Services</u>.  Landlord shall furnish Tenant with the following services (the costs of which shall be included in Expenses, except for such costs that are separately metered or check metered for the Premises, all of which separately metered or check metered costs shall be paid by Tenant as provided below): (a) reasonable quantities of hot and cold water for use in the Base Building restrooms and reasonable quantities of cold water for use in the Premises; (b) 2.0 CFM supply and exhaust air for the lab space within the Premises; (c) standard janitorial service for the Common Areas nightly on Business Days (it being acknowledged and agreed that Tenant shall be solely responsible for all cleaning and janitorial services for the Premises per Section 9.01 of this Lease); (d) elevator service; (e) twenty (20) watts per square foot of electrical power, in accordance with the terms and conditions in Section 7.02; (f) access to the Building for Tenant and its employees 24 hours per day/7 days per week, subject to Force Majeure, repair situations, the terms of this Lease and such protective services or monitoring systems, if any, as Landlord may from time to time impose, including, without limitation, sign-in procedures and/or presentation of identification cards; (g) maintenance of the exterior areas of the Property, including sweeping, landscaping and snow and ice removal; and (h) such other services as Landlord reasonably determines are necessary or appropriate for the Property.  To the extent that any of the foregoing utility services for the Premises are separately metered, Tenant shall timely pay the separate charges for such services directly to the applicable utility company.  Except for electricity for lights and plugs, which shall be submetered and paid in accordance with Section 7.02 below, to the extent that any of the foregoing utility services for the Premises (including, without limitation, air handling units or other HVAC equipment serving the Premises, all non-domestic water and gas service to the Premises) or any other equipment serving the Premises, whether exclusively or in common, is not metered directly by the utility company to the Premises, the costs of such utility service shall be included in Expenses and Tenant shall pay Tenant's Proportionate Share thereof in accordance with <u>Exhibit B</u>.  If Tenant is permitted to connect any supplemental HVAC units to the Building's chilled water line, such permission shall be conditioned upon Landlord having adequate excess capacity from time to time and such connection and use shall be subject to Landlord's reasonable approval and reasonable restrictions imposed by Landlord, and Landlord shall have the right to charge Tenant a connection fee and/or a monthly usage fee, as reasonably determined by Landlord. If, at Tenant's request, Landlord, or an affiliated or third party service provider, provides any services that are not Landlord's express obligation under this Lease,

including, without limitation, any repairs which are Tenant's responsibility pursuant to Section 9 below, Tenant shall pay to the applicable service provider the cost of such services plus a reasonable administrative charge. Tenant shall have the non-exclusive right to use the loading dock for Building, subject to any reasonable rules and regulations promulgated by Landlord from time to time with respect to such use, including without limitation, any scheduling protocols.

7.02     Tenant Electricity. Tenant shall pay to Landlord, as Additional Rent, the costs of electricity used in or for the Premises (including, without limitation, air handling units or other HVAC equipment serving the Premises) and, if applicable, for any special equipment installed by or for Tenant elsewhere in the Building, by a separate charge payable by Tenant to Landlord based on check-meters installed for the Premises (or for any applicable portion thereof or equipment serving the Premises) or, for any portion of the Premises or equipment that from time to time does not have operational check-meters, based on reasonable allocations prepared by Landlord's building engineer for the space and period in question. Tenant shall make estimated monthly payments for the electricity charges hereunder, in advance on the first day of each month or partial month of the Term, based on amounts estimated by Landlord from time to time for such electricity charges, subject to periodic reconciliations based on actual check-meter readings and utility rates for the space and period in question. Without the consent of Landlord, Tenant's use of electrical service shall not exceed the Building standard usage, per square foot, as reasonably determined by Landlord, based upon the Building standard electrical design load and shall comply with any sustainability initiative standards for the Building, including as set forth on Exhibit F hereto. Landlord shall have the right to measure electrical usage by commonly accepted methods, including the installation of measuring devices such as submeters and check-meters, which to the extent not in place prior to the Effective Date shall be installed at Landlord's expense. If it is determined, for any electrical service that is not separately check-metered to Tenant, that Tenant is using electricity in such quantities or during such periods as to cause the total cost of Tenant's electrical usage, on a monthly, per-rentable-square-foot basis, to materially exceed that which Landlord reasonably deems to be standard for the Building, Tenant shall pay Landlord Additional Rent for the cost of such excess electrical usage and, if applicable, for the cost of purchasing and installing the measuring device(s). Notwithstanding the foregoing, to the extent any electricity service is from time to time metered directly by the utility company to the Premises, Tenant shall timely pay the separate charges for such electricity service directly to the applicable utility company and, if requested by Landlord from time to time, provide copies of such utility company invoices and evidence of such payments.

7.03     Interruption of Services. Landlord's failure to furnish, or any interruption, diminishment or termination of services due to the application of Laws, the failure of any equipment, the performance of maintenance, repairs, improvements or alterations, utility interruptions, the occurrence of an event of Force Majeure (defined in Section 21.06 ), or any COVID Delay shall not render Landlord liable to Tenant, constitute a constructive eviction of Tenant, give rise to an abatement of Rent, nor relieve Tenant from the obligation to fulfill any covenant or agreement, except as set forth in this Section 7.03 or, in the event of a Casualty or a Taking, except as set forth in Section 14 or Section 15, as applicable. In the event that: (i) there shall be a failure to furnish, or any interruption, diminishment or termination of services that shall render the Premises or a material portion thereof untenantable, or Tenant's access to the Premises or a material portion thereof is denied (any such event, a "Service Interruption"), and (ii) such Service Interruption shall continue for five (5) consecutive business days following receipt by Landlord of written notice (the "Service Interruption Notice") from Tenant describing such Service Interruption ("Abatement Service Interruption Cure Period"), and (iii) such Service Interruption shall not have been caused by an act or omission of Tenant or Tenant's agents, employees, contractors or invitees or a Casualty or Taking (an event that satisfies the foregoing conditions (i)-(iii) being referred to hereinafter as a "Material Service Interruption") then, Tenant, subject to the next following sentence, shall be entitled to an equitable abatement of Base Rent and Additional Rent based on the area of the Premises rendered untenantable or inaccessible by such Material Service Interruption, for

any and all days following the Material Service Interruption Cure Period that both (x) the Material Service Interruption is continuing and (y) Tenant does not use such affected areas of the Premises for a bona fide business purpose. Any efforts by Tenant to respond or react to any Material Service Interruption, including, without limitation, any activities by Tenant to remove its personal property from the affected areas of the Premises, shall not constitute a use that precludes abatement pursuant to this Section 7.03. The Abatement Service Interruption Cure Period shall be extended by reason of any delays in Landlord's ability to cure the Service Interruption in question caused by Force Majeure or any COVID Delay.

        7.04      Reservations. Without limiting the generality of the foregoing, Landlord reserves the right from time to time to modify components of the access procedures for the Building or other portions of the Property and Park, to change the number of lobby attendants, or to institute, modify, supplement, or discontinue any particular access control procedures or equipment for the Building, whether during or after business hours. Landlord does not warrant or guarantee the effectiveness of any such system or procedures. Tenant expressly disclaims any such warranty, guarantee, or undertaking by Landlord with respect thereto and acknowledges that access control procedures from time to time in effect are solely for the convenience of tenants generally and are not intended to secure the Premises or to guarantee the physical safety of any persons in or about the Premises or the Property or the Park. Tenant shall be responsible for securing the Premises, including without limitation by Tenant's installation of access card readers or other security equipment for the Premises in accordance with Section 8 and by restricting or monitoring access into and from the Premises by its employees or other invitees. At the time that any Tenant employee (or other person acting under or through Tenant) who has been issued a Building access card is terminated or otherwise ceases to work at the Premises, Tenant shall retrieve and destroy the Building access card for such person and, in accordance with the Building's standard procedures, notify the Building's property manager that such person should be removed from the active list for Building access cards.

## 8.    Alterations

        8.01      Alterations. Tenant shall not make alterations, repairs, additions or improvements or install any Cable (collectively referred to as "Alterations") in the Premises, without first obtaining the written consent of Landlord in each instance, which consent shall not be unreasonably withheld or delayed. "Cable" shall mean and refer to any electronic, fiber, phone and data cabling and related equipment that is installed by or for the exclusive benefit of Tenant or any party acting under or through Tenant. Prior to starting work on any Alterations, Tenant shall furnish Landlord with plans and specifications (which shall be in CAD format if requested by Landlord); names of contractors reasonably acceptable to Landlord (provided that Landlord may designate specific contractors with respect to Base Building and vertical Cable, as may be described more fully below); required permits and approvals; evidence of contractor's and subcontractor's insurance in amounts reasonably required by Landlord and naming as additional insureds the Landlord, the managing agent for the Building, and such other Additional Insured Parties (as defined in Section 13) as Landlord may designate for such purposes; and, solely with respect to Alterations costing more than $500,000 in the aggregate, security in the form of payment and performance bonds. Contractors for the oversight, installation, repair, connection to, and removal of vertical Cable shall be subject to Landlord's prior approval, which approval shall not be unreasonably withheld, conditioned or delayed. All Cable shall be clearly marked with adhesive plastic labels (or plastic tags attached to such Cable with wire) to show Tenant's name, suite number, and the purpose of such Cable (i) every 6 feet outside the Premises (specifically including, but not limited to, the electrical room risers and any Common Areas), and (ii) at the termination point(s) of such Cable. Changes to the plans and specifications must also be submitted to Landlord for its approval. Alterations shall be constructed in a good and workmanlike manner using materials of a quality reasonably approved by Landlord, and Tenant shall ensure that no Alteration impairs any Building system

or Landlord's ability to perform its obligations hereunder. Tenant shall reimburse Landlord for any reasonable third-party expenses incurred by Landlord in connection with the review, inspection, and coordination of Tenant's plans for Alterations and Tenant's performance thereof and pay to Landlord or its managing agent a fee for Landlord's administrative oversight and coordination of any Alterations equal to 1.0% of the hard costs of the Alterations. Upon completion, Tenant shall furnish "as-built" plans (in CAD format, if requested by Landlord) for Alterations, customary AIA completion affidavits, full and final waivers of lien, applicable certificate of occupancy for the space affected by such Alterations, and any other items required under the Building's construction rules and regulations for closing out the particular work in question. Landlord's approval of an Alteration shall not be deemed to be a representation by Landlord that the Alteration complies with Law or will not adversely affect any Building system. If any Alteration requires any change to the Base Building, any Building system, or any Common Area, then such changes shall be made at Tenant's sole cost and expense and performed, at Landlord's election, either by Tenant's contractor or a contractor engaged by Landlord.

8.02    Liens. Tenant shall not cause or permit any mechanics' or other liens to be placed upon the Property, the Premises, or Tenant's leasehold interest hereunder in connection with any work or service done or purportedly done by or for the benefit of Tenant, its subtenants, or any other party acting under or through Tenant. Tenant shall give Landlord notice at least fifteen (15) days prior to the commencement of any work in the Premises to afford Landlord the opportunity, where applicable, to post and record notices of non-responsibility. Tenant, within thirty (30) days after notice from Landlord, shall fully discharge any such lien by settlement, by bonding or by insuring over the lien in the manner prescribed by the applicable lien Law. If Tenant fails to timely discharge such lien within such period, Tenant shall be deemed in Default under this Lease and, in addition to any other remedies available to Landlord as a result of such Default by Tenant, Landlord, at its option, may bond, insure over or otherwise discharge the lien. Tenant shall reimburse Landlord for any amount paid by Landlord to discharge such lien, including, without limitation, reasonable attorneys' fees. Solely with respect to Alterations costing more than $500,000 in the aggregate, Landlord shall have the right to require Tenant to post a performance or payment bond in connection with such work. Tenant acknowledges and agrees that all such work or service is being performed for the sole benefit of Tenant and not for the benefit of Landlord.

8.03    Leasehold Improvements. All Initial Tenant Work and other leasehold improvements from time to time made in and to the Premises (collectively, "Leasehold Improvements") shall, except as expressly provided in this Lease, remain upon the Premises at the end of the Term without compensation to Tenant. Notwithstanding anything to the contrary, at the expiration or earlier termination of this Lease, Tenant shall remove from the Premises the removable pods being installed at the Premises as part of the Initial Tenant Work (the "Removable Pods") and shall repair all damage resulting from the removal of the Removable Pods and restore the Premises to the condition the same were in prior to the installation of the Removable Pods, all at Tenant's sole cost. With respect to any other Leasehold Improvements, Landlord, by written notice to Tenant at the time of Landlord's approval of the plans therefor, may require Tenant, at Tenant's expense, to remove any Leasehold Improvements or other affixed installations, including, without limitation, Tenant's Roof Equipment, installed by or on behalf of Tenant (such designated Leasehold Improvements collectively with the Removable Pods, the "Required Removables"); provided, however, that Landlord and Tenant, prior to the approval of the plans therefor, shall identify and agree upon the Initial Tenant Work that Tenant shall be required to remove at the end of the Term, such agreement not to be unreasonably withheld by either party. Notwithstanding the foregoing or anything to the contrary in this Lease, the Required Removables shall be deemed to include the following (unless Landlord expressly waives the requirement to remove the same): the Removable Pods, Tenant's Generator, specialty lab facilities or equipment, internal stairways, raised floors, private baths and showers, vaults, rolling file systems, structural alterations and modifications, any signage (including, without limitation, any Exterior Signage) and any Cable installed by or on behalf of Tenant, and such

items as may be required in connection with Tenant's decommissioning obligations set forth in Exhibit F attached hereto.  The Required Removables shall be removed, and any damage resulting from such removal shall be repaired, by Tenant before the expiration or earlier termination of this Lease in accordance with Section 19.

       8.04      Signage.  No signs, advertisements or notices shall be painted or affixed to windows, doors or other parts of the Building, except those of such color, size, style and in such places as are first approved in writing by Landlord.  Landlord, at its sole cost, shall provide Tenant with Building standard signage on the main lobby directory for the Building, and Building standard nameplate for Tenant displayed outside the entrance to the Premises.

       So long as this Lease is in full force and effect and Tenant and/or one or more transferees pursuant to a Permitted Transfer are then leasing and occupying at least fifty percent (50%) of the Premises originally leased hereunder (the "Exclusive Signage Period"), Tenant shall have the right to install, at Tenant's sole cost, exterior building façade signage on the Building (the "Exterior Signage"), subject to Landlord's prior approval, which approval shall not be unreasonably withheld, of the location, size, design and specifications, and subject to Tenant obtaining, at Tenant's sole cost, all governmental permits and approvals required therefor.  At the expiration or earlier termination of the Term, Tenant shall remove all of its signage, including any Exterior Signage, and shall repair any damage resulting from such removal, all at Tenant's sole cost.  Subject to the rights under the lease of the currently existing tenant (and its permitted transferees) to maintain the existing Building façade signage in the location where located as of the Effective Date, Landlord covenants and agrees that, during the Exclusive Signage Period, no other tenant or occupant of the Building shall be permitted to install any exterior Building façade signage.  Notwithstanding the rights of the existing tenant as set forth in the prior sentence, Landlord acknowledges and agrees that it is the intention of Landlord that the Exterior Signage of Tenant shall, in terms of size, location, and prominence, be the primary exterior Building signage (subject to Tenant obtaining all necessary governmental permits and approvals for such signage as set forth above).

## 9.     Repairs and Maintenance.

       9.01      Tenant Obligations.  Tenant, at its sole cost and expense, shall perform all maintenance and repairs to the Premises that are not Landlord's express responsibility under this Lease, and keep the Premises in good condition and repair, reasonable wear and tear excepted. Tenant's repair and maintenance obligations include, without limitation, repairs to: (a) floor covering; (b) interior partitions; (c) doors; (d) the interior side of demising walls; (e) Alterations (described in Section 8); (f) the pH Neutralization System, the Tenant's Generator, Tenant's Roof Equipment, any supplemental air conditioning units, kitchens, including hot water heaters, plumbing, and similar facilities exclusively serving the Premises or any portion thereof, whether such items are installed by Tenant or are currently existing in the Premises; and (g) any Cable.  Tenant shall maintain in effect throughout the Term maintenance contracts for any such supplemental air conditioning units or other specialty equipment exclusively serving the Premises and, from time to time upon Landlord's request, provide Landlord with a copy of such maintenance contract and reasonable evidence of its service record.  All repairs and other work performed by Tenant or its contractors, including that involving Cable, shall be subject to the terms of Section 8.01 above.  If Tenant fails to make any repairs to the Premises for more than thirty (30) days after notice from Landlord (although notice shall not be required in an emergency), Landlord may make the repairs, and, within thirty (30) days after demand, Tenant shall pay to Landlord the reasonable cost of the repairs, together with an administrative charge in an amount equal to ten percent (10%) of the cost of the repairs.

       Landlord shall have no obligation to provide any cleaning, janitorial or refuse or waste removal services in or to the Premises.  Tenant shall be responsible, at its sole cost and expense, for providing

cleaning and janitorial services to the Premises in a neat and first-class manner consistent with the cleaning standards generally prevailing in comparable buildings in the Market Area (as defined in Exhibit F) for laboratory and office space or as otherwise reasonably established by Landlord in writing from time to time, using an insured contractor or contractors selected by Tenant and approved in writing by Landlord (such approval not to be unreasonably withheld) and such provider shall not interfere with the use and operation of the Building or Property or Park by Landlord or any other tenant or occupant thereof. Tenant shall also be responsible to arrange for, at Tenant's sole cost and expense, any waste (including biomedical, hazardous and laboratory waste) and refuse removal services for Tenant's operations at the Premises. All waste (including biomedical, hazardous and laboratory waste) and refuse removal shall be performed in compliance with applicable environmental Laws using licensed laboratory waste disposal companies. All ordinary trash (i.e., non-organic and non-controlled substances that do not constitute Hazardous Materials) may be stored in common trash dumpsters provided by Landlord, but all biomedical, hazardous and laboratory waste and refuse shall be stored in the Premises and shall be removed on a daily basis. Tenant shall also cause all extermination of vermin in the Premises or resulting from Tenant's use of the Premises to be performed by companies reasonably approved by Landlord in writing and shall contract and utilize pest extermination services as reasonably necessary or as reasonably requested by Landlord.

9.02    Landlord Obligations. Landlord shall keep and maintain in good repair and working order and perform maintenance upon (a) the structural elements of the Building; (b) the mechanical (including HVAC), electrical, plumbing and fire/life safety systems serving the Building in general or serving the Premises in common with other portions of the Building; (c) the Common Areas (but specifically excluding cleaning and janitorial services for the Premises, which services are the responsibility of Tenant) in a neat and first-class manner consistent with the cleaning standards generally prevailing in comparable buildings in the Market Area; (d) the roof of the Building; (e) the exterior windows, doors and walls of the Building; and (f) the elevators serving the Building. Landlord shall also maintain, at Tenant's cost, all equipment installed by Landlord serving the Premises exclusively.

## 10.    Entry by Landlord.

Landlord may enter the Premises to inspect, show or clean the Premises or to perform or facilitate the performance of repairs, alterations or additions to the Premises or any portion of the Building. Except in emergencies or to provide Building services, Landlord shall provide Tenant with reasonable prior verbal notice of entry with an email sent simultaneously to notices@resilience.com and/or to such other email address(es) as may be provided by Tenant to Landlord from time to time for these purposes. In connection with any such entry for non-emergency work, Landlord shall use reasonable efforts not to unreasonably interfere with Tenant's use of the Premises. If reasonably necessary and if no reasonable alternatives are available, Landlord may temporarily close all or a portion of the Premises to perform repairs, alterations and additions. Any such entry by Landlord shall not constitute a constructive eviction or entitle Tenant to an abatement or reduction of Rent except as set forth in Section 7.03.

## 11.    Assignment and Subletting.

11.01    Transfers. Except in connection with a Permitted Transfer (defined in Section 11.04), Tenant shall not assign, sublease, transfer or encumber any interest in this Lease or allow any third party to use all or any portion of the Premises (in each such case, collectively or individually, a "Transfer" to a "Transferee") without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed if Landlord does not exercise its recapture rights under Section 11.02. Without limitation, it is agreed that Landlord's consent shall not be considered unreasonably withheld if the proposed Transferee (a) is a governmental entity, (b) is an occupant of the Building or Park, (c) whether or not an occupant of the Building or Park, has been in discussions with Landlord regarding the leasing of space within the Building or Park within the preceding six months, (d)

is incompatible with the character of occupancy of the Building or Park, (e) is an entity with which the payment for the sublease or assignment is determined in whole or in part based upon its net income or profits, or (f) would subject the Premises to a use which would: (i) involve a significant increase in personnel or wear upon the Building; (ii) violate any exclusive right granted to another tenant of the Building or Park, but only to the extent such use is not a Permitted Use under this Lease; (iii) require any addition to or material modification of the Premises or the Building in order to comply with building code or other governmental requirements; or (iv) involve a violation of the Permitted Use clauses of this Lease. If the entity(ies) that directly or indirectly controls the voting shares/rights of Tenant (other than through the ownership of voting securities listed on a recognized securities exchange) changes at any time, such change of ownership or control shall constitute a Transfer.  Except for so long as Tenant's stock is publicly traded (including, without limitation, the initial and follow-on offerings of Tenant's stock) on a nationally recognized stock exchange and except as expressly permitted pursuant to Section 11.04 hereof, the foregoing prohibition includes any direct or indirect change in "control" of Tenant as a result of any assignment, subletting, or other transfer which would occur by operation of law, merger, consolidation, reorganization, acquisition, transfer, or other change of Tenant's corporate, ownership, and/or proprietary structure, including, without limitation, a change in the partners of any partnership, a change in the members and/or managers of any limited liability company, and/or the sale, pledge, or other transfer of any of the issued or outstanding capital stock of any corporate Tenant.  For purposes hereof, "control" shall be deemed to be ownership of more than fifty percent (50%) of the stock or other voting interest of the controlled corporation or other business entity. Any Transfer in violation of this Section shall, at Landlord's option, be deemed a Default by Tenant as described in Section 16.01, and shall be voidable by Landlord.  In no event shall any Transfer, including a Permitted Transfer, release or relieve Guarantor from any obligation under the Guarantor, or release or relieve Tenant from any obligation under this Lease, and the Tenant originally named in this Lease shall remain primarily liable for the performance of the tenant's obligations under this Lease, as amended from time to time.

      11.02      <u>Process</u>.  Except in connection with a Permitted Transfer, Tenant shall, prior to offering or advertising the Premises or any portion thereof for a Transfer involving the assignment of this Lease or subletting of all or part of the Premises, give a written notice (the "<u>Recapture Notice</u>") to Landlord which: (i) states that Tenant desires to make a Transfer, (ii) identifies the affected portion of the Premises (the "<u>Recapture Premises</u>"), (iii) identifies the period of time (the "<u>Recapture Period</u>") during which Tenant proposes to sublet the Recapture Premises, or indicates that Tenant proposes to assign its interest in this Lease, and (iv) offers to Landlord to terminate this Lease with respect to the Recapture Premises.  Landlord shall have fifteen (15) days within which to respond to the Recapture Notice and to exercise its right to  terminate this Lease with respect to the Recapture Premises.  If Landlord exercises its right to recapture, this Lease shall automatically be amended (or terminated if the entire Premises is being assigned or sublet) to delete the Recapture Premises effective on the proposed effective date of the Transfer, although Landlord may require Tenant to execute a reasonable amendment to this Lease (and an amendment to any notice of lease of this Lease) or other document reflecting such reduction or termination. Notwithstanding anything to the contrary contained herein, if Landlord notifies Tenant that it accepts the offer contained in the Recapture Notice or any subsequent Recapture Notice, Tenant shall have the right, for a period of fifteen (15) days following receipt of such notice from Landlord to notify Landlord in writing that it wishes to withdraw such offer in which case this Lease shall continue in full force and effect.

In the event of a Transfer involving the assignment of this Lease or subletting or all or a part of the Premises in connection with which Tenant previously submitted a Recapture Notice and Landlord did not exercise its right to recapture, or in the event of a Permitted Transfer, Tenant shall provide Landlord with financial statements for any proposed Transferee (or, in the case of a change of ownership or control, for the proposed new controlling entity(ies)), a fully executed letter of intent, term sheet or other summary of the terms of the proposed Transfer, and such other information as Landlord may reasonably request.

Except with respect to Permitted Transfers, within fifteen (15) days after receipt of the required information and documentation, Landlord shall either: (a) consent to the Transfer by execution of a consent agreement in a form reasonably designated by Landlord; or (b) reasonably refuse to consent to the Transfer in writing.  Tenant shall pay to Landlord the reasonable costs and attorneys' fees incurred by Landlord in connection with such requested Transfer.

        11.03      <u>Excess Payments</u>.  In the event, if any, that (i) all rent and other consideration which Tenant receives as a result of a Transfer exceeds (ii) the Rent payable to Landlord for the portion of the Premises and Term covered by the Transfer, then Tenant shall, at Landlord's election, pay to Landlord an amount equal to fifty percent (50%) of such excess, from time to time on a monthly basis upon Tenant's receipt of such excess; provided that in determining any such excess, Tenant may deduct from the excess all reasonable and customary expenses directly incurred by Tenant in connection with such Transfer, including without limitation brokerage commissions and tenant improvement costs.  If Tenant is in Default, Landlord may require that all sublease payments be made directly to Landlord, in which case Tenant shall receive a credit against Rent in the amount of Tenant's share of payments received by Landlord.

        11.04      <u>Permitted Transfers</u>.  Tenant may assign this Lease to a successor to Tenant by merger, consolidation, or the purchase of all or substantially all of Tenant's assets, or assign this Lease or sublet all or a portion of the Premises to an Affiliate (defined below), without the consent of Landlord, provided that all of the following conditions are satisfied (a "<u>Permitted Transfer</u>"):  (a) Tenant must not be in Default; (b) Tenant must give Landlord written notice at least thirty (30) days before such Transfer; and (c) in the case of an assignment of this Lease (including an assignment to a successor to Tenant by merger, consolidation or the purchase of all or substantially all of Tenant's assets), the Net Worth Test (defined below) must be satisfied.  Tenant's notice to Landlord shall include information and documentation evidencing that the Transfer qualifies as a Permitted Transfer hereunder and that each of the above conditions has been satisfied.  If requested by Landlord, Tenant's successor resulting from an assignment shall sign and deliver to Landlord a commercially reasonable form of assumption agreement.  "<u>Affiliate</u>" shall mean an entity controlled by, controlling or under common control with Tenant.  The "<u>Net Worth Test</u>" shall be deemed satisfied if the successor to Tenant (or, Tenant, if, after the applicable transfer, Tenant remains the Tenant hereunder) has a tangible net worth computed in accordance with generally accepted accounting principles at least equal to the tangible net worth of Tenant as of the Effective Date or the date immediately prior to the applicable transfer, whichever is greater.

        11.05      <u>Prohibited Matters</u>.  Without limiting Landlord's right to withhold its consent to any transfer by Tenant, and regardless of whether Landlord shall have consented to any such transfer, neither Tenant nor any other person having an interest in the possession, use or occupancy of the Premises or any part thereof shall enter into any lease, sublease, license, concession, assignment or other transfer or agreement for possession, use or occupancy of all or any portion of the Premises which provides for rent or other payment for such use, occupancy or utilization based, in whole or in part, on the net income or profits derived by any person or entity from the space so leased, used or occupied, and any such purported lease, sublease, license, concession, assignment or other transfer or agreement shall be absolutely void and ineffective as a conveyance of any right or interest in the possession, use or occupancy of all or any part of the Premises.

## 12.    Notices.

All demands, approvals, consents or notices (collectively referred to as a "<u>notice</u>") shall be in writing and delivered by registered, express, or certified mail, with return receipt requested or with delivery confirmation requested from the U.S. postal service, or sent by overnight or same day courier service at

the party's respective Notice Address(es) set forth in Section 1.  Each notice shall be deemed to have been received on the earlier to occur of actual delivery or the date on which delivery is refused, or, if either party has vacated any Notice Address of such party without providing a new Notice Address, three (3) Business Days after notice is deposited in the U.S. mail or with a courier service in the manner described above.  Either party may, at any time, change its Notice Address (other than to a post office box address) by giving the other party written notice of the new address.

## 13.    **Indemnity and Insurance.**

13.01    <u>Indemnification</u>.  Except to the extent caused by the negligence or willful misconduct of Landlord or any Landlord Related Parties (defined below), and to the maximum extent permitted under applicable law, Tenant shall indemnify, defend and hold Landlord and Landlord Related Parties harmless against and from all liabilities, obligations, damages, penalties, claims, actions, costs, charges and expenses, including, without limitation, reasonable attorneys' fees and other professional fees (collectively referred to as "<u>Losses</u>"), which may be imposed upon, incurred by or asserted against Landlord or any of the Landlord Related Parties by any third party and arising out of or in connection with any damage or injury occurring in the Premises or any acts or omissions (including violations of Law) of Tenant, its trustees, managers, members, principals, beneficiaries, partners, officers, directors, employees and agents (the "<u>Tenant Related Parties</u>") or any of Tenant's transferees, contractors or licensees, which indemnification hereunder, for the avoidance of doubt, shall also include such Losses by reason of any failure of Tenant to keep, observe or perform any of its obligations under <u>Exhibit F</u>, or by reason of any damage to any property (including but not limited to property of any Landlord Related Party) or any injury (including but not limited to death) to any person occurring in, on, or about the Building, to the extent that such injury or damage shall arise from the operation, maintenance, testing, refueling or cleaning of the Tenant's Generator.  To the maximum extent permitted under applicable law, Tenant hereby waives all claims against and releases Landlord and its trustees, managers, members, principals, beneficiaries, partners, officers, directors, employees, Mortgagees (defined in Section 20) and agents (the "<u>Landlord Related Parties</u>") from all claims for any injury to or death of persons, damage to property or business loss in any manner related to (a) Force Majeure, (b) acts of third parties, (c) the bursting or leaking of any tank, water closet, drain or other pipe, or (d) the inadequacy or failure of any security or protective services, personnel or equipment.

13.02    <u>Tenant's Insurance</u>.  Tenant shall maintain the following coverages in the following amounts throughout the Term (and during any other periods before or after the Term during which Tenant or any Tenant Related Party enters into or occupies all or any portion of the Premises):

(a)    Commercial General Liability Insurance covering claims of bodily injury, personal injury and property damage arising out of Tenant's operations and contractual liabilities, including coverage formerly known as broad form and coverage for owners and contractor's liability, on an occurrence basis, with minimum primary limits of $1,000,000 each occurrence and $2,000,000 annual aggregate and a minimum excess/umbrella limit of $5,000,000.00.

(b)    Automobile Liability Insurance covering the ownership, maintenance and operations of any automobile or automobile equipment, whether such auto is owned, hired, or non-owned, with a combined single limit for bodily injury and property damage of not less than $1,000,000 per accident.

(c)    Property insurance covering (i) Tenant's Property (as defined below), and (ii) any Leasehold Improvements in the Premises, whether installed by or for the benefit of Tenant under this Lease or any prior lease or other agreement to which Tenant was a party or otherwise ("<u>Tenant-Insured Improvements</u>").  Such insurance shall be written on a special cause of loss form for physical loss or

damage, for the full replacement cost value (subject to reasonable deductible amounts) without deduction for depreciation of the covered items and in amounts that meet any co-insurance clauses of the policies of insurance, and shall include coverage for damage or other loss caused by fire or other peril, including vandalism and malicious mischief, theft, water damage of any type, including sprinkler leakage, bursting or stoppage of pipes, and explosion, and providing business interruption coverage for a period of one year.

(d)     Worker's Compensation and Employer's Liability or other similar insurance to the extent required by Law.

The minimum limits of insurance required to be carried by Tenant shall not limit Tenant's liability.  Such insurance shall (i) be issued by an insurance company that has an A.M. Best rating of not less than A-VIII; (ii) be in form and content reasonably acceptable to Landlord; and (iii) provide that it shall not be canceled or materially changed without thirty (30) days' prior notice to Landlord, except that ten (10) days' prior notice may be given in the case of nonpayment of premiums.  Tenant's Commercial General Liability Insurance shall (a) name Cobalt PropCo 2020 LLC, ALP Crosby Manager, LLC, CBRE, Inc., and any other party designated by Landlord ("Additional Insured Parties") as additional insureds; and (b) be primary insurance as to all claims thereunder and provide that any insurance carried by Landlord is excess and non-contributing with Tenant's insurance.  Landlord shall be designated as a loss payee with respect to Tenant's property insurance on any Tenant-Insured Improvements.  Tenant shall deliver to Landlord, on or before the Term Commencement Date and prior to the expiration dates thereof, certificates from Tenant's insurance company on the forms currently designated "ACORD 28" (Evidence of Commercial Property Insurance) and "ACORD 25-S" (Certificate of Liability Insurance) or the equivalent.  Attached to the ACORD 25-S (or equivalent) there shall be an endorsement naming the Additional Insured Parties as additional insureds which shall be binding on Tenant's insurance company and shall expressly require the insurance company to notify each Additional Insured Party in writing at least thirty (30) days before any termination or material change to the policies, except that ten (10) days' prior notice may be given in the case of nonpayment of premiums.  Notwithstanding the foregoing, if the foregoing requirement that the insurance company provide prior notice to Landlord of cancellation or material change of the applicable policy cannot reasonably be obtained based on then-prevailing insurance industry practices, Tenant shall so advise Landlord of such unavailability and shall instead provide Landlord with notice of any such cancellation or material change as provided above.  The insurance coverages set forth in (a) and (b) of this Section 13.02 shall also include coverage for the obligations of the Tenant related to the use of the Tenant's Generator referenced in Exhibit F attached to this Lease.

Tenant shall maintain such increased amounts of the insurance required to be carried by Tenant under this Section 13.02, and such other types and amounts of insurance covering the Premises and Tenant's operations therein, as may be reasonably requested by Landlord, but not in excess of the amounts and types of insurance then being required by landlords of buildings comparable to and in the vicinity of the Building.

13.03     Tenant's Property.  The pH Neutralization System, Tenant's Generator, Tenant's Roof Equipment, and all other furnishings, fixtures, equipment, and other personal property and effects of Tenant and of all persons claiming through Tenant (including, without limitation, Tenant's Roof Equipment, as defined in Exhibit F), which from time to time may be on the Premises or elsewhere in the Building or in transit thereto or therefrom (collectively, "Tenant's Property") shall be at the sole risk of Tenant to the maximum extent permitted by law and shall be kept insured by Tenant throughout the Term (and during any other periods before or after the Term during which Tenant or any Tenant Related Party enters into or occupies all or any portion of the Premises) at Tenant's expense in accordance with Section 13.02.  Tenant's Property expressly includes all lab fixtures and equipment, business fixtures and

equipment, including without limitation any security or access control systems installed for the Premises, filing cabinets and racks, removable cubicles and partitions, kitchen equipment, computers and related equipment, raised flooring, supplemental cooling equipment, audiovisual and telecommunications equipment, non-building standard signage, and other tenant equipment installations, in each case including related conduits, cabling, and brackets or mounting components therefor and any connectors to base building systems and in each case whether installed or affixed in or about the Premises, in building core areas, or elsewhere in the Building.

13.04    Landlord's Insurance.  Landlord shall carry at all times during the Term of this Lease: (i) commercially reasonable commercial general liability insurance with respect to the Building, the Property and the Common Areas, and (ii) with respect to the Building, excluding Tenant-Insured Improvements and any other leasehold improvements made by or on behalf of other tenants or occupants, special causes of loss form of property policy (formerly known as "all risk") in an amount equal to the full replacement cost of the Building (excluding footings and foundations), with customary exceptions. Any and all such insurance: (x) may be maintained under a blanket policy affecting other properties of Landlord and/or its affiliated business organizations, or by Landlord and/or its affiliated business organizations under a program of self-insurance, and (y) may be written with commercially reasonable deductibles as determined by Landlord.  Landlord may maintain such additional insurance with respect to the Property, including, without limitation, earthquake insurance, terrorism insurance, flood insurance, liability insurance and/or rent insurance, as Landlord may in its sole discretion elect.  Landlord may also maintain such other insurance as may from time to time be required by the holder of any mortgage on the Property.  The costs incurred by Landlord related to such insurance shall be included in Expenses.  The foregoing insurance policies and any other insurance carried by Landlord shall be for the sole benefit of Landlord and under Landlord's sole control, and Tenant shall have no right or claim to any proceeds thereof or any other rights thereunder.

13.05    Waiver of Subrogation.  Subject to Section 14, each party waives, and shall cause its insurance carrier to waive, any right of recovery against the other for any loss of or damage to property which loss or damage is (or, if the insurance required hereunder had been carried, would have been) covered by insurance.  For purposes of this Section 13.04 , any deductible or self-insured retention with respect to a party's insurance shall be deemed covered by, and recoverable by such party under, valid and collectable policies of insurance.

**14.    Casualty Damage.**

14.01    Casualty.  If all or any portion of the Premises becomes untenantable or inaccessible by fire or other casualty to the Premises or the Common Areas (collectively a "Casualty"), Landlord, with reasonable promptness, shall cause a general contractor selected by Landlord to provide Landlord with a written estimate of the amount of time required, using standard working methods, to substantially complete the repair and restoration of the Premises and any Common Areas necessary to provide access to the Premises ("Completion Estimate").  Landlord shall promptly forward a copy of the Completion Estimate to Tenant.  If the Completion Estimate indicates that the Premises or any Common Areas necessary to provide access to the Premises cannot be made tenantable within two hundred seventy (270) days from the date the repair is started, then either party shall have the right to terminate this Lease upon written notice to the other within ten (10) days after Tenant's receipt of the Completion Estimate.  In addition, either party, by written notice to the other party within sixty (60) days after the date of the Casualty, shall have the right to terminate this Lease if the Premises or the Building have been materially damaged (which shall mean damaged to the extent that Tenant is not able to occupy and conduct business in a material portion of the Premises which would have a material adverse effect on Tenant's ability to profitably use the Premises for the conduct of its business) and less than one (1) year of the Term remains after the date of the Casualty. Tenant, however, shall not have the right to terminate this Lease if the

Casualty was caused by the gross negligence or intentional misconduct of Tenant or any Tenant Related Parties. Furthermore, Landlord, by notice to Tenant within ninety (90) days after the date of the Casualty, shall have the right to terminate this Lease if: (1) any Mortgagee requires that the insurance proceeds be applied to the payment of the mortgage debt; or (2) a material uninsured loss to the Building or Premises occurs (provided that a loss that would have been insured if Landlord had carried the insurance required by this Lease shall not be deemed to be an uninsured loss for the purposes of this provision).  If this Lease is terminated by either party on account of any Casualty as provided in this Article 14, then Tenant shall pay to Landlord (by assignment or otherwise) the insurance proceeds paid or payable to Tenant under the policy(ies) referred to in Section 13.02(b) on account of the damage to or loss of the Leasehold Improvements in the Premises; however, from any such proceeds actually received by Tenant, Tenant shall be entitled to retain an amount equal to the unamortized portion (amortized over the initial Term on a straight-line basis) of the hard costs paid by Tenant to perform any Alterations.

14.02    Restoration.  If this Lease is not terminated, Landlord shall promptly and diligently, subject to reasonable delays for insurance adjustment or other matters beyond Landlord's reasonable control, restore the Premises and Common Areas, subject to the following provisions.  Such restoration shall be to substantially the same condition that existed prior to the Casualty, except for modifications required by Law or any other modifications to the Common Areas deemed desirable by Landlord.  Notwithstanding Section 13.04 , upon notice from Landlord, Tenant shall assign or endorse over to Landlord (or to any party designated by Landlord) all property insurance proceeds payable to Tenant under Tenant's insurance with respect to any Leasehold Improvements; provided if the estimated cost to repair such Leasehold Improvements exceeds the amount of insurance proceeds received by Landlord from Tenant's insurance carrier, the excess cost of such repairs shall be paid by Tenant to Landlord prior to Landlord's commencement of repairs.  Within fifteen (15) days after demand, Tenant shall also pay Landlord for any additional excess costs that are determined during the performance of the repairs to such Leasehold Improvements.  In no event shall Landlord be required to spend more for the restoration of the Premises and Common Areas than the insurance proceeds received by Landlord. Landlord shall not be liable for any inconvenience to Tenant, or injury to Tenant's business resulting in any way from the Casualty or the repair thereof.  During any period of time that all or any material portion of the Premises is rendered untenantable as a result of a Casualty, the Rent shall abate for the portion of the Premises that is untenantable and not used by Tenant.  Notwithstanding the foregoing, Landlord may, at its election, require Tenant to perform the restoration work for the Leasehold Improvements, in which event Tenant shall be responsible for performing the restoration work (including any revisions thereto that Tenant may wish to make, pursuant to plans approved by Landlord under Section 8) and the rent abatement period under the preceding sentence shall not exceed the period of time required to diligently perform the restoration of the existing Leasehold Improvements.

## 15.    Condemnation.

Either party may terminate this Lease if any material part of the Premises is taken or condemned for any public or quasi-public use under Law, by eminent domain or private purchase in lieu thereof (a "Taking").  Landlord shall also have the right to terminate this Lease if there is a Taking of any portion of the Building or Property which would have a material adverse effect on Landlord's ability to profitably operate the remainder of the Building.  Tenant shall also have the right to terminate this Lease if there is a Taking of any portion of the Premises which would have a material adverse effect on Tenant's ability to profitably use the Premises for the conduct of its business or if there is a Taking of any material portion of the Building or Property which would materially impair access to the Premises or reduce the parking available to serve the Premises below the amount of parking required under applicable zoning.  The terminating party shall provide written notice of termination to the other party within forty-five (45) days after it first receives notice of the Taking.  The termination shall be effective as of the effective date of any order granting possession to, or vesting legal title in, the condemning authority.  If this Lease is not

terminated, Base Rent and Tenant's Proportionate Share shall be appropriately adjusted to account for any reduction in the square footage of the Building or Premises. All compensation awarded for a Taking shall be the property of Landlord.  The right to receive compensation or proceeds are expressly waived by Tenant, provided, however, Tenant may file a separate claim for Tenant's Property and Tenant's reasonable relocation expenses, provided the filing of the claim does not diminish the amount of Landlord's award.  If only a part of the Premises or Building is subject to a Taking and this Lease is not terminated, Landlord, with reasonable diligence, will restore the remaining portion of the Premises and the Building as nearly as practicable to the condition immediately prior to the Taking.

**16.    Events of Default.**

  16.01    <u>Default</u>.  In addition to any other Default specifically described in this Lease, each of the following occurrences shall be a "<u>Default</u>": (a) Tenant's failure to pay any portion of Rent when due, if the failure continues for five (5) days after such due date ("<u>Monetary Default</u>"); (b) Tenant's failure (other than a Monetary Default) to comply with any term, provision, condition or covenant of this Lease, if the failure is not cured within thirty (30) days after written notice to Tenant provided, however, if Tenant's failure to comply cannot reasonably be cured within such thirty-(30)-day period, Tenant shall be allowed additional time (not to exceed an additional one hundred twenty (120) days) as is reasonably necessary to cure the failure so long as Tenant begins the cure within such thirty-(30)-day period and diligently pursues the cure to completion; (c) Tenant effects or permits a Transfer without Landlord's required approval or otherwise in violation of Section 11 of this Lease; (d) Tenant or Guarantor becomes insolvent, makes a transfer in fraud of creditors, makes an assignment for the benefit of creditors, admits in writing its inability to pay its debts when due or forfeits or loses its right to conduct business; (e) the leasehold estate is taken by process or operation of Law; or (f) if a receiver, guardian, conservator, trustee in bankruptcy or similar officer shall be appointed by a court of competent jurisdiction to take charge of all or any part of Tenant's or Guarantor's property and such appointment is not discharged within ninety (90) days thereafter, or if a petition including, without limitation, a petition for reorganization or arrangement is filed by Tenant or Guarantor under any bankruptcy law or is filed against Tenant or Guarantor and, in the case of a filing against Tenant or Guarantor only, the same shall not be dismissed within ninety (90) days from the date upon which it is filed.  In addition, if Landlord provides Tenant with notice of Tenant's failure to comply with any specific provision of this Lease on two (2) separate occasions during any twelve-(12)-month period, any subsequent violation of such provision within such twelve-(12)-month period shall, at Landlord's option, constitute a Default by Tenant without the requirement of any further notice or cure period as provided above.  All notices sent under this Section shall be in satisfaction of, and not in addition to, any notice required by Law.

  16.02    <u>Remedies</u>.  Upon the occurrence of any Default, Landlord may, immediately or at any time thereafter, elect to terminate this Lease by notice of termination, by entry, or by any other means available under law and may recover possession of the Premises as provided herein.  Upon termination by notice, by entry, or by any other means available under law, Landlord shall be entitled immediately, in the case of termination by notice or entry, and otherwise in accordance with the provisions of law to recover possession of the Premises from Tenant and those claiming through or under the Tenant.  Such termination of this Lease and repossession of the Premises shall be without prejudice to any remedies which Landlord might otherwise have for arrears of rent or for a prior breach of the provisions of this Lease.  Tenant waives any statutory notice to quit and equitable rights in the nature of further cure or redemption, and Tenant agrees that upon Landlord's termination of this Lease Landlord shall be entitled to re-entry and possession in accordance with the terms hereof.  Landlord may, without notice, store Tenant's personal property (and those of any person claiming under Tenant) at the expense and risk of Tenant or, if Landlord so elects, Landlord may sell such personal property at public auction or auctions or at private sale or sales after thirty (30) days' notice to Tenant and apply the net proceeds to the earliest of installments of rent or other charges owing Landlord.  Tenant agrees that a notice by Landlord alleging

any default shall, at Landlord's option (the exercise of such option shall be indicated by the inclusion of the words "notice to quit" in such notice), constitute a statutory notice to quit.  If Landlord exercises its option to designate a notice of default hereunder as a statutory notice to quit, any grace periods provided for herein shall run concurrently with any statutory notice periods.  Tenant further agrees that it shall not interpose any counterclaim or set-off in any summary proceeding or in any action based in whole or in part on non-payment of Rent, unless Tenant would have no right to commence an independent proceeding to seek to recover on account of such claim.

16.03    Reimbursement of Expenses.  In the case of termination of this Lease pursuant to this Section 16, Tenant shall reimburse Landlord for all expenses arising out of such termination, including without limitation, all costs incurred in collecting amounts due from Tenant under this Lease (including reasonable attorneys' fees, costs of litigation and the like); and all Landlord's other reasonable expenditures necessitated by the termination.  The reimbursement from Tenant shall be due and payable immediately from time to time upon notice from Landlord that an expense has been incurred, without regard to whether the expense was incurred before or after the termination.

16.04    Damages.  Landlord may elect by written notice to Tenant within two (2) years following such termination to be indemnified for loss of rent by a lump sum payment representing the then present value of the amount of rent and additional charges which would have been paid in accordance with this Lease for the remainder of the Term minus the then present value of the aggregate fair market rent and additional charges payable for the Premises for the remainder of the Term (if less than the rent and additional charges payable hereunder), estimated as of the date of the termination, and taking into account reasonable projections of vacancy and time required to re-lease the Premises.  (For the purposes of calculating the rent which would have been paid hereunder for the lump sum payment calculation described herein, the last full year's Additional Rent under Section 4 is to be deemed constant for each year thereafter.  The Federal Reserve discount rate (or equivalent) shall be used in calculating present values.) Should the parties be unable to agree on a fair market rent, the matter shall be submitted, upon the demand of either party, to the Boston, Massachusetts office of the American Arbitration Association, with a request for arbitration in accordance with the rules of the Association by a single arbitrator who shall be an MAI appraiser with at least ten years' experience as an appraiser of major lab and life-science buildings in the Market Area.  The parties agree that a decision of the arbitrator shall be conclusive and binding upon them.  If and for so long as Landlord does not make the election provided for in this Section 16.04 above, Tenant shall indemnify Landlord for the loss of rent by a payment at the end of each month which would have been included in the Term, representing the excess of the rent which would have been paid in accordance with this Lease (i.e., Base Rent and Additional Rent that would have been payable to be ascertained monthly) over the rent actually derived from the Premises by Landlord for such month (the amount of rent deemed derived shall be the actual amount less any portion thereof attributable to the expenses incurred by Landlord in attempting to relet the Premises or parts thereof (including advertisements, brokerage commissions, Tenant's allowances, costs of preparing space, and the like).

In lieu of the damages, indemnity, and full recovery by Landlord of the sums payable under the foregoing provisions of this Section 16.04, Landlord may, by written notice to Tenant within six months after termination under any of the provisions contained in Section 16 and before such full recovery, elect to recover, and Tenant shall thereupon pay, as liquidated damages under this Section 16.04, an amount equal to (i) the aggregate of the Base Rent and Additional Rent for the twelve-month period ending one year after the termination date (or, if lesser, for the balance of the Term had it not been terminated), plus (ii) the amount of Base Rent and Additional Rent of any kind accrued and unpaid at the time of termination, and minus (iii) the amount of any recovery by Landlord under the foregoing provisions of this Section 16 up to the time of payment of such liquidated damages (but reduced by any amounts of reimbursement under Section 16.03).  The amount under clause (i) represents a reasonable forecast of the

minimum damages expected to occur in the event of a breach, taking into account the uncertainty, time and cost of determining elements relevant to actual damages, such as fair market rent, time and costs that may be required to re-lease the Premises, and other factors.  Liquidated damages hereunder shall not be in lieu of any claims for reimbursement under Section 16.03.

Landlord shall use commercially reasonable efforts to mitigate any damage suffered by Landlord resulting from the termination of this Lease as a result of a Default by Tenant, but any obligation imposed upon Landlord by the terms of this Lease or applicable law to relet the Premises after any termination of the Lease shall be subject to the reasonable requirements of Landlord to lease to high quality tenants on such terms as Landlord may from time to time deem appropriate and to develop the Building in a harmonious manner with an appropriate mix of uses, tenants, floor areas and terms of tenancies, and the like, and Landlord shall not be obligated to relet the Premises to any party to whom Landlord or its affiliate may desire to lease other available space in the Building.

16.05     Curative Action.  If Tenant is in Default of any of its non-monetary obligations under this Lease, Landlord shall have the right, but not the obligation, to perform any such obligation.  Tenant shall reimburse Landlord for the cost of such performance upon demand, together with an administrative charge equal to ten percent (10%) of the cost of the work performed by Landlord.

16.06     Claims in Bankruptcy.  Nothing herein shall limit or prejudice the right of Landlord to prove and obtain in a proceeding for bankruptcy, insolvency, arrangement or reorganization, by reason of the termination, an amount equal to the maximum allowed by a statute or law in effect at the time when, and governing the proceedings in which, the damages are to be proved, whether or not the amount is greater to, equal to, or less than the amount of the loss or damage which Landlord has suffered.

16.07     Late Charges and Fees.  If Tenant does not pay any Rent when due hereunder, then without notice and in addition to all other remedies hereunder, Tenant shall pay to Landlord an administration fee in the amount of three percent (3%) of the unpaid Rent, plus interest on such unpaid amount at the rate of one and one half percent (1.5%) per month from the date such amount was due until the date paid (which interest, as accrued to date, shall be payable from time to time upon Landlord's demand); provided, however, in no event shall such interest exceed the maximum amount permitted to be charged by applicable law.  Notwithstanding the foregoing, Tenant shall be entitled to a grace period of five (5) days for the first late payment of Rent in any twelve-(12)-month period prior to the imposition of the foregoing amounts.  In addition, Tenant shall pay to Landlord a reasonable fee for any checks returned by Tenant's bank for any reason.

16.08     Enforcement Costs.  Tenant shall pay to Landlord, as Additional Rent, the costs and expenses, including reasonable attorneys' fees, incurred in enforcing any obligations of Tenant under this Lease with which Tenant has failed to comply.

16.09     General.  The repossession or re-entering of all or any part of the Premises shall not relieve Tenant of its liabilities and obligations under this Lease.  No right or remedy of Landlord shall be exclusive of any other right or remedy, and each right and remedy shall be cumulative and in addition to any other right and remedy now or subsequently available to Landlord at law or in equity.  Without limiting the generality of the foregoing, in addition to the other remedies provided in this Lease, Landlord shall be entitled to the restraint by court order of the violation or attempted or threatened violation of any of the provisions of this Lease or of applicable Law or to a decree compelling specific performance of any such provisions.

**17.     Limitation of Liability.**

17.01     <u>Landlord's Liability</u>. Tenant agrees from time to time to look only to Landlord's interest in the Building for satisfaction of any claim against Landlord hereunder or under any other instrument related to the Lease (including any separate agreements among the parties and any notices or certificates delivered by Landlord) and not to any other property or assets of Landlord.  If Landlord from time to time transfers its interest in the Building, then from and after each such transfer Tenant shall look solely to the interests in the Building of each of Landlord's transferees for the performance of all of the obligations of Landlord hereunder (or under any related instrument).  The obligations of Landlord shall not be binding on any direct or indirect partners (or members, trustees or beneficiaries) of Landlord or of any successor, individually, but only upon Landlord's or such successor's interest in the Building, it being specifically agreed that no beneficiary of any trust of which any person from time to time holding Landlord's interest is trustee, nor any such trustee, nor any member, manager, partner, director or stockholder nor Landlord's managing agent shall ever be personally liable hereunder.  If Landlord shall refuse or fail to provide any consent or approval for any matter for which Landlord's consent or approval is required under this Lease or is otherwise requested by Tenant, Landlord shall not be liable for damages as a result thereof, and Tenant's sole remedy to enforce any alleged obligation of Landlord to provide such consent or approval shall be an action for specific performance, injunction, or declaratory relief.

17.02     <u>Tenant's Liability</u>.  Landlord agrees to look solely to Tenant's assets and property for the satisfaction of any liability of Tenant or any Tenant-Related Parties under this Lease, provided that nothing herein shall restrict or limit Landlord's rights to pursue its rights against the Guarantor under the Guaranty.  This Section 17.02 shall not limit any right that Landlord might otherwise have to obtain injunctive or other equitable relief against Tenant.  Landlord and Tenant specifically agree that in no event shall: (i) any officer, director, trustee, employee or representative of Tenant or any of the other Tenant-Related Parties ever be personally liable for any obligation under this Lease, or (ii) Tenant or any of the other Tenant-Related Parties be liable for loss of profits, loss of business, or indirect or special or consequential or punitive damages from whatever cause, except as expressly provided under Article 18 of this Lease, and except that nothing in this Section 17.02 shall limit or affect any liability or obligation which Tenant may have pursuant to the express indemnification provisions of this Lease.

17.03     <u>Assignment of Rents</u>.

(a)     With reference to any assignment by Landlord of Landlord's interest in this Lease, or the rents payable hereunder, conditional in nature or otherwise, which assignment is made to the holder of a mortgage on property which includes the Premises, Tenant agrees that the execution thereof by Landlord, and the acceptance thereof by the holder of such mortgage shall never be treated as an assumption by such holder of any of the obligations of Landlord hereunder unless such holder shall, by notice sent to Tenant, specifically otherwise elect and, except as aforesaid, such holder shall be treated as having assumed Landlord's obligations hereunder only upon foreclosure of such holder's mortgage and the taking of possession of the Premises.

(b)     In no event shall the acquisition of Landlord's interest in the Property by a purchaser which, simultaneously therewith, leases Landlord's entire interest in the Property back to the seller thereof be treated as an assumption by operation of law or otherwise, of Landlord's obligations hereunder, but Tenant shall look solely to such seller–lessee, and its successors from time to time in title, for performance of Landlord's obligations hereunder.  In any such event, this Lease shall be subject and subordinate to the lease to such purchaser provided that the landlord under such lease agrees to recognize this Lease and, so long as Tenant is not in Default hereunder, not to disturb Tenant's possession hereunder in the event of any termination of such lease.  For all purposes, such seller–lessee, and its successors in title, shall be the Landlord hereunder unless and until Landlord's position shall have been assumed by such purchaser–lessor.

(c)    Except as provided in paragraph (b) of this Section 17.02, in the event of any transfer of title to the Property by Landlord, Landlord shall thereafter be entirely freed and relieved from the performance and observance of all covenants and obligations hereunder thereafter occurring.  Tenant hereby agrees to enter into such agreements or instruments as may, from time to time, be requested in confirmation of the foregoing.

17.04    <u>Landlord Default</u>.  In the event Tenant alleges that Landlord is in default under any of Landlord's obligations under this Lease, Tenant agrees to give any Mortgagee (as defined in Section 20), by one of the methods specified in Section 12, a copy of any notice of default which is served upon the Landlord concurrently with the giving of such notice to Landlord, provided that prior to such notice, Tenant has been notified, in writing (whether by way of notice of an assignment of lease, request to execute an estoppel letter, or otherwise), of the address of any such Mortgagee.  Tenant further agrees that Mortgagee shall be permitted, but shall not be obligated, to cure such default within the same period of time that is available to Landlord to cure such default plus an additional thirty (30) days (except as may otherwise be agreed to by Mortgagee under an SNDA, as defined below), and Mortgagee's curing of any of Landlord's defaults shall be treated as performance by Landlord.  Except as may be expressly provided in this Lease, in no event shall Tenant have the right to terminate the Lease nor shall Tenant's obligation to pay Base Rent or other charges under this Lease abate based upon any default by Landlord of its obligations under the Lease.  In no event shall Landlord or any Landlord Related Party ever be liable to Tenant for loss of profits, loss of business, or indirect or special or consequential or punitive damages from whatever cause.

## 18.    **Holding Over.**

If Tenant fails to surrender all or any part of the Premises in the condition required under this Lease (including, without limitation, the decommissioning requirements set forth in <u>Exhibit F</u>) at the expiration or earlier termination of this Lease, any such occupancy of all or any part of the Premises after such expiration or termination shall be that of a tenancy at sufferance.  Any such occupancy after such expiration or termination shall be subject to all the terms and provisions of this Lease, except that Tenant shall pay an amount for such occupancy equal to two times the Rent due for the month immediately preceding the holdover, and increasing to three times the Rent due for the month immediately preceding the holdover in the event of any failure by Tenant to comply with the decommissioning requirement set forth in <u>Exhibit F</u> that continues for more than thirty (30) days after the expiration or earlier termination of this Lease.  No holdover by Tenant or payment by Tenant after the expiration or earlier termination of this Lease shall be construed to extend the Term or prevent Landlord from immediate recovery of possession of the Premises by summary proceedings or otherwise, and Tenant shall be considered to be a tenant at sufferance during any such holdover period.  In addition, if as a result of any such holdover that continues for greater than thirty (30) days, Landlord is unable to deliver possession of space to a new tenant or owner to perform improvements therein for a new tenant due to Tenant's failure to timely vacate all or part of the Premises or Landlord otherwise suffers damages or losses, Tenant shall be liable to Landlord for all damages and losses that Landlord suffers from the holdover.

## 19.    **Surrender of Premises.**

At the expiration or earlier termination of this Lease or Tenant's right of possession hereunder, Tenant shall remove all Tenant's Property from the Premises, remove all Required Removables (if any) under Section 8.03, remove all signage installed by or on behalf of Tenant, complete the decommissioning requirement set forth in <u>Exhibit F</u>, and quit and surrender the Premises to Landlord, broom clean, and in good order, condition and repair, ordinary wear and tear and damage which Landlord is obligated to repair hereunder excepted.  Tenant shall repair any damage caused by the removal of Tenant's Property or Required Removables or Tenant's signage.  If Tenant fails to remove any of Tenant's Property or to

restore or repair the Premises to the required condition as provided herein upon the expiration of the Term of this Lease (or, as applicable, within two (2) days after any earlier termination of this Lease or Tenant's right to possession hereunder), then Landlord, at Tenant's sole cost and expense, shall be entitled, but not obligated, to remove and store Tenant's Property and/or perform such restoration or repair of the Premises. Landlord shall not be responsible for the value, preservation, or safekeeping of Tenant's Property, and Tenant shall pay to Landlord, upon demand, the expenses and storage charges so incurred. If Tenant fails to remove Tenant's Property from the Premises or storage, within thirty (30) days after notice, Landlord may deem all or any part of Tenant's Property to be abandoned and, at Landlord's option, title to Tenant's Property shall vest in Landlord or Landlord may dispose of Tenant's Property in any manner Landlord deems appropriate.

**20.     Subordination; Estoppel Certificate.**

20.01     <u>Subordination to Mortgages</u>. This Lease is and shall be subject and subordinate to any mortgage(s), deed(s) of trust, deeds to secure debt, ground lease(s), or other lien(s) now or subsequently arising upon the Premises, the Building or the Property, and to all renewals, modifications, refinancings, and extensions thereof (collectively referred to as a "<u>Mortgage</u>"). The party having the benefit of a Mortgage shall be referred to as a "<u>Mortgagee</u>". This clause shall be self-operative, but upon request from Landlord or a Mortgagee, Tenant shall execute a subordination agreement in favor of the Mortgagee in such Mortgagee's standard form, with such commercially reasonable changes as Tenant may request that are acceptable to Mortgagee for other comparable leases in the Building or Park. As an alternative, any Mortgagee shall have the right at any time to subordinate its Mortgage to this Lease. Upon request, Tenant, without charge, shall attorn to any successor to Landlord's interest in this Lease. In the event Mortgagee enforces it rights under the Mortgage, Tenant, at Mortgagee's option, will attorn to Mortgagee or its successor; provided, however, that Mortgagee or its successor shall not be liable for or bound by (i) any payment of any Rent installment which may have been made more than thirty (30) days before the due date of such installment, (ii) any act or omission of or default by Landlord under this Lease (but Mortgagee, or such successor, shall be subject to the continuing obligations of landlord under the Lease arising from and after such succession, but only to the extent of Mortgagee's, or such successor's, interest in the Property as provided in Section 17), (iii) any credits, claims, setoffs or defenses which Tenant may have against Landlord, or (iv) any obligation under this Lease to maintain a fitness facility at the Building, if any. Tenant, upon the reasonable request by Mortgagee or such successor in interest, shall execute and deliver an instrument or instruments confirming such attornment. Simultaneously with the execution of this Lease, Landlord shall obtain from the existing Mortgagee, a subordination, non-disturbance and attornment agreement in such Mortgagee's standard form as attached hereto as <u>Exhibit H</u> (an "<u>SNDA</u>"). In addition, Landlord shall use commercially reasonable efforts to provide Tenant with an SNDA in favor of Tenant from any future Mortgagee on such Mortgagee's standard form.

20.02     <u>Modification of Lease</u>. If any Mortgagee requires a modification of this Lease, which modification will not cause an increased cost or expense to Tenant or in any other way materially and adversely change the rights and obligations of Tenant hereunder, Tenant agrees that this Lease may be so modified and agrees to execute whatever documents are reasonably required therefor and to deliver the same to Landlord within ten (10) Business Days following a request therefor.

20.03     <u>Estoppel Certificate</u>. Tenant shall, within fifteen (15) Business Days after receipt of a written request, execute and deliver a commercially reasonable estoppel certificate addressed to Landlord and any parties reasonably requested by Landlord, such as a current or prospective Mortgagee or purchaser of the Building. Without limitation, such estoppel certificate may include a certification as to the status of this Lease and any particular obligations thereunder, the existence of any defaults, and the amount of Rent that is then due and payable.

20.04     <u>Tenant Information</u>.  Upon Landlord's request from time to time at any time (provided that this obligation shall not apply to Tenant or Guarantor to the extent that Tenant or Guarantor, as applicable, shall be a public company with financials publicly available and accessible online), Tenant shall provide to Landlord, within thirty (30) days after Landlord's reasonable request, the financial statements for Tenant and Guarantor for its most recent fiscal year and fiscal quarter, but only if and to the extent (and in the form) previously prepared by Tenant and Guarantor in connection with their normal business activities, except that (a) in the event of a Default, then Tenant shall provide to Landlord, within thirty (30) days after Landlord's request, financial statements for Tenant and Guarantor for its most recent fiscal year and fiscal quarter, whether or not the same have been previously prepared in connection with their normal business activities, and (b) in the event Landlord requests financials in connection with a sale or financing, which request shall not be made more than one time in any year, then Tenant shall use commercially reasonable efforts to provide to Landlord within thirty (30) days after Landlord's request, and shall in all events provide to Landlord not later than sixty (60) days after Landlord's request, financial statements for Tenant and Guarantor for its most recent fiscal year and/or fiscal quarter as may be reasonably required for such sale or financing, whether or not the same have been previously prepared in connection with their normal business activities, provided that Landlord shall reimburse Tenant for reasonable costs (not to exceed $20,000.00) incurred by Tenant in preparing such financial statements pursuant to this clause (b).  Financial statements shall be prepared and certified by a certified public accountant to the extent previously prepared by a certified public accountant for Tenant and Guarantor in connection with their normal business activities, but if not previously prepared and certified by a certified public accountant then financial statements shall be prepared and certified by Tenant's or Guarantor's chief financial officer, as applicable.  If requested by Tenant, such financial statements shall be furnished pursuant to a confidentiality agreement in a form provided by Landlord and reasonably acceptable to Tenant for such purpose.

21.     **Miscellaneous.**

21.01     <u>Measurement of Floor Area</u>.  Landlord and Tenant stipulate and agree that the Rentable Floor Area of the Premises originally leased to Tenant shall be conclusively deemed to be as specified in Section 1 and that the Rentable Floor Area of the Building is as specified in Section1 as of the date hereof.  Any change in the Rentable Floor Area of the Premises on account of expansion shall be conclusively deemed to be as specified in any applicable expansion provisions under <u>Exhibit I</u> (if any) or in any amendment hereafter executed by Landlord and Tenant in connection with such expansion (if any).  Any other change in the Rentable Floor Area of the Premises on account of casualty, condemnation, or the like shall be determined in accordance with the measurement standard that was originally used to determine the stipulated Rentable Floor Area for the space in question.  Any change in the Rentable Floor Area of the Building on account of casualty, condemnation, or the like shall be determined from time to time by Landlord based on area computations supplied by Landlord's architect, which determinations shall be conclusive.  References in this Lease to floor area measurements and square footage shall mean Rentable Floor Area unless the reference explicitly provides otherwise.

21.02     <u>Notice of Lease</u>.  Tenant shall not record this Lease or any memorandum or notice without Landlord's prior written consent in Landlord's sole discretion; provided, however, that Landlord agrees to consent to the recording of a memorandum or notice of this Lease, at Tenant's cost and expense and in a form reasonably satisfactory to Landlord, if the initial term of this Lease together with any extension terms granted hereunder (if any) exceed, in the aggregate, the applicable statutory period for notice of leases in the state in which the Building is located.  If this Lease is terminated before the Term expires, upon Landlord's request the parties shall execute, deliver and record an instrument acknowledging such termination date of this Lease, and Tenant appoints Landlord its attorney-in-fact in its name and behalf to execute the instrument if Tenant shall fail to execute and deliver the instrument after Landlord's request therefor within ten (10) Business Days.

21.03     <u>Governing Law, Etc.</u>  This Lease shall be interpreted and enforced in accordance with the Laws of the state or commonwealth in which the Building is located and Landlord and Tenant hereby irrevocably consent to the jurisdiction and proper venue of such state or commonwealth.  This Lease contains all of the agreements and understandings between Landlord and Tenant with respect to the Premises and supersedes all prior writings and dealings between them with respect thereto, including all lease proposals, letters of intent and other documents.  Neither party is relying upon any warranty, statement or representation not contained in this Lease.  If any term or provision of this Lease shall to any extent be void or unenforceable, the remainder of this Lease shall not be affected.  This Lease may be amended only by a writing signed by all of the parties hereto.  The titles are for convenience only and shall not be considered a part of the Lease.  Where the phrases "persons acting under Tenant" or "persons claiming under Tenant" or similar phrases are used, such persons shall include subtenants, sub-subtenants, and licensees, and all employees, agents, independent contractors and invitees of Tenant or of such other parties.  The enumeration of specific examples of or inclusions in a general provision shall not be construed as a limitation of the general provision.  If Tenant is granted any extension option, expansion option, or other right or option, the exercise of such right or option (and notice thereof) must be irrevocable to be effective, time always being of the essence to the exercise of such right or option; and if Tenant purports to condition the exercise of any option or to vary its terms in any manner, then the option granted shall be void and the purported exercise shall be ineffective.  Unless otherwise stated herein, any consent or approval required hereunder may be given or withheld in the sole absolute discretion of the party whose consent or approval is required.  Nothing herein shall be construed as creating the relationship between Landlord and Tenant of principal and agent, or of partners or joint venturers, or any relationship other than landlord and tenant.  If there is more than one Tenant or if Tenant is comprised of more than one party or entity, the obligations imposed upon Tenant shall be joint and several obligations of all such parties and entities, any requests or demands from any one person or entity comprising Tenant shall be deemed to have been made by all such persons or entities, and notices to any one person or entity comprising Tenant shall be deemed to have been given to all such persons and entities.  Tenant's covenants contained in this Lease are independent and not dependent, and Tenant hereby waives the benefit of any statute or judicial law to the contrary.  Except as otherwise expressly set forth in this Lease, Tenant's obligation to pay Rent shall not be discharged or otherwise affected by any law or regulation now or hereafter applicable to the Premises, or any other restriction on Tenant's use, or any casualty or taking, or any failure by Landlord to perform any covenant contained herein, or any other occurrence; and no termination or abatement remedy that is not expressly provided for in this Lease for any breach or failure by Landlord to perform any obligation under this Lease shall be implied or applicable as a matter of law.

21.04     <u>Representations</u>.  Tenant represents and warrants to Landlord, and agrees, that each individual executing this Lease on behalf of Tenant is authorized to do so on behalf of Tenant and that the entity(ies) or individual(s) constituting Tenant or Guarantor, or which may own or control Tenant or Guarantor, or which may be owned or controlled by Tenant or Guarantor, or any of Tenant's or Guarantor's affiliates, or any of their respective partners, members, shareholders or other equity owners, and their respective employees, officers, and directors are not and at no time will be (i) in violation of any Laws relating to terrorism or money laundering, or (ii) among the individuals or entities with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Assets Control ("<u>OFAC</u>") of the Department of the Treasury (including those named on OFAC's Specially Designated Nationals and Blocked Persons List for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx or any replacement website or other replacement official publication of such list) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, known as Executive Order 13224), or other governmental action and Tenant will not Transfer this Lease to, contract with or

otherwise knowingly engage in any dealings or transactions or be otherwise associated with such persons or entities.

21.05    <u>Waiver of Trial by Jury; No Other Waiver</u>.  Landlord and Tenant hereby waive any right to trial by jury in any proceeding based upon a breach of this Lease.  No failure by either party to declare a default immediately upon its occurrence, nor any delay by either party in taking action for a default, nor Landlord's acceptance of Rent with knowledge of a default by Tenant, shall constitute a waiver of the default, nor shall it constitute an estoppel.  The delivery of keys to Landlord or to Landlord's property manager shall not operate as a termination of this Lease or a surrender of the Premises.

21.06    <u>Time Periods</u>.  Whenever a period of time is prescribed for the taking of an action by Landlord or Tenant (other than the payment of Rent), the period of time for the performance of such action shall be extended by the number of days that the performance is actually delayed due to strikes, acts of God, shortages of labor or materials, war, terrorist acts, pandemics, civil disturbances and other causes beyond the reasonable control of the performing party ("<u>Force Majeure</u>").

21.07    <u>Transfer of the Property</u>.  Landlord shall have the right from time to time to transfer and assign, in whole or in part, all of its rights and obligations under this Lease and in the Building and Property.  Upon transfer, Landlord shall be released from any further obligations hereunder and Tenant agrees to look solely to the successor in interest of Landlord for the performance of such obligations, to the extent that any successor pursuant to a voluntary, third party transfer (but not as part of an involuntary transfer resulting from a foreclosure or deed in lieu thereof) shall have assumed Landlord's obligations under this Lease from and after the date of the transfer.

21.08    <u>Submission</u>.  The submission of this Lease to Tenant or a summary of some or all of its provisions for examination does not constitute a reservation of or option for the Premises or an offer to lease, and no legal obligations shall arise with respect to the Premises or other matters herein unless and until such time as this Lease is approved by the Mortgagee (which approval shall be obtained prior to execution of this Lease by Landlord and Tenant), and is executed and delivered by Landlord and Tenant.

21.09    <u>Brokers</u>.  Landlord and Tenant each represents that it has dealt directly with and only with the Broker (described in Section 1) as a broker, agent or finder in connection with this Lease.  Tenant shall indemnify and hold Landlord and the Landlord Related Parties harmless from all claims of any other brokers, agents or finders claiming to have represented Tenant in connection with this Lease. Landlord shall indemnify and hold Tenant and the Tenant Related Parties harmless from all claims of any brokers, agents or finders claiming to have represented Landlord in connection with this Lease.  Landlord shall be solely responsible for payment of any commission due to the Broker in connection with this Lease pursuant to a separate agreement or agreements.  Any assistance rendered by any agent or employee of Landlord in connection with this Lease or any subsequent amendment or modification or any other document related hereto has been or will be made as an accommodation to Tenant solely in furtherance of consummating the transaction on behalf of Landlord, and not as agent for Tenant.

21.10    <u>Survival</u>.  The expiration of the Term, whether by lapse of time, termination or otherwise, shall not relieve either party of any obligations that accrued prior to or which, pursuant to the express provisions of this Lease, survive such expiration or termination and may continue to accrue after the expiration or termination of this Lease.

21.11    <u>Quiet Enjoyment</u>.  This Lease is subject to all easements, restrictions, agreements, and encumbrances of record to the extent in force and applicable.  Landlord covenants that Tenant, on

paying the Rent and performing the tenant obligations in this Lease, shall peacefully and quietly have, hold and enjoy the Premises, free from any claim by Landlord or persons claiming under Landlord, but subject to all of the terms and provisions hereof, provisions of Law, and rights of record to which this Lease is or may become subordinate.  This covenant is in lieu of any other so called quiet enjoyment covenant, either express or implied.  This covenant shall be binding upon Landlord and its successors only during its or their respective periods of ownership of the Building.

21.12    Reservations.  This Lease does not grant any rights to light or air over or about the Building.  Landlord excepts and reserves exclusively to itself any and all rights not specifically granted to Tenant under this Lease.  Landlord reserves the right to make changes to the Park, Property, Building and Common Areas as Landlord deems appropriate, provided that the same does not materially adversely impact Tenant's access to, or use of, the Premises.  Wherever this Lease requires Landlord to provide a customary service or to act in a reasonable manner (whether in incurring an expense, establishing a rule or regulation, providing an approval or consent, or performing any other act), this Lease shall be deemed also to provide that whether such service is customary or such conduct is reasonable shall be determined by reference to the practices of owners of buildings that (i) are comparable to the Building in size, age, class, quality and location, and (ii) at Landlord's option, have been, or are being prepared to be, certified under the U.S. Green Building Council's Leadership in Energy and Environmental Design (LEED) rating system or a similar rating system.

21.13    REIT Provisions.  Tenant and Landlord intend that all amounts payable by Tenant to Landlord shall qualify as "rents from real property," and will otherwise not constitute "unrelated business taxable income" or "impermissible tenant services income," all within the meaning of Section 856(d) of the Internal Revenue Code of 1986, as amended (the "Code") and the U.S. Department of Treasury Regulations promulgated thereunder (the "Regulations"). In the event that Landlord determines that there is any risk that any amount payable under this Lease may not qualify as "rents from real property" or will otherwise constitute impermissible tenant services income within the meaning of Section 856(d) of the Code and the Regulations, Tenant agrees to (a) cooperate with Landlord by entering into such amendment or amendments as Landlord deems necessary to qualify all amounts payable under this Lease as "rents from real property," and (b) permit (and, upon request, to acknowledge in writing) an assignment of the obligation to provide certain services under this Lease, and, upon request, to enter into direct agreements with the parties furnishing such services (which shall include, but not be limited to, a taxable REIT subsidiary of Landlord). Notwithstanding the foregoing, Tenant shall not be required to take any action pursuant to the preceding sentence (including acknowledging in writing an assignment of services pursuant thereto) if such action would result in (i) Tenant incurring more than de minimis additional liability under this Lease, or (ii) more than a de minimis negative change in the quality or level of Building operations or services rendered to Tenant under this Lease. For the avoidance of doubt: (A) if Tenant does not acknowledge in writing an assignment as described in clause (b) above (it being agreed that Tenant shall not unreasonably withhold, condition or delay such acknowledgment so long as the criteria in clauses (i) and (ii) hereinabove are satisfied), then Landlord shall not be released from liability under this Lease with respect to the services so assigned; and (B) nothing in this Section  shall limit or otherwise affect Landlord's ability to assign its entire interest in this Lease to any party as part of a conveyance of Landlord's ownership interest in the Building.

21.14    Execution.  This Lease may be executed in one or more counterparts and, when executed by each party, shall constitute an agreement binding on all parties notwithstanding that all parties are not signatories to the original or the same counterpart provided that all parties are furnished a copy or copies thereof reflecting the signature of all parties.  Transmission by email of a pdf copy of the signed counterpart of the Lease shall be deemed the equivalent of the delivery of the original, and any party so delivering a pdf copy of the signed counterpart of the Lease by email transmission shall in all events deliver to the other party an original signature promptly upon request.

Landlord and Tenant have executed this Lease as a sealed Massachusetts instrument in two or more counterparts as of the Effective Date of this Lease set forth above.

**LANDLORD:**

**COBALT PROPCO 2020, LLC,**
**a Delaware limited liability company**

By:    ALP Crosby Manager LLC, a Massachusetts
       limited liability company, its appointed
       representative

       By: _____
       Name:  Brian Chaisson
       Title:  Manager

**TENANT:**

**RESILIENCE BOSTON, INC.,**
a Delaware corporation

By:_____
Name:
Title:

Landlord and Tenant have executed this Lease as a sealed Massachusetts instrument in two or more counterparts as of the Effective Date of this Lease set forth above.

**LANDLORD:**

**COBALT PROPCO 2020, LLC**,
**a Delaware limited liability company**

By:   ALP Crosby Manager LLC, a Massachusetts
       limited liability company, its appointed
       representative

       By:_____
       Name:
       Title:

**TENANT:**

**RESILIENCE BOSTON, INC.,**
a Delaware corporation

By:_____
Name:
Title:

**EXHIBIT A**

**OUTLINE AND LOCATION OF PREMISES**

      This Exhibit is attached to and made a part of the Lease Agreement (the "Lease") by and between **COBALT PROPCO 2020, LLC**, a Delaware limited liability company ("Landlord"), and **RESILIENCE BOSTON, INC.**, a Delaware corporation ("Tenant"), for space in the Building located at 28 Crosby Drive, Bedford, Massachusetts.

**Exhibit A** is intended only to show the general layout of each Phase Premises as of the beginning of the Term of this Lease.  The depiction of interior windows, cubicles, modules, furniture and equipment in this Exhibit is for illustrative purposes only, but does not mean that such items exist.  Landlord is not required to provide, install or construct any such items.  It does not in any way supersede any of Landlord's rights set forth in the Lease with respect to arrangements and/or locations of public parts of the Building and changes in such arrangements and/or locations.  It is not to be scaled; any measurements or distances shown should be taken as approximate.  The inclusion of elevators, stairways, electrical and mechanical closets, and other similar facilities for the benefit of occupants of the Building does not mean such items are part of the Premises.

[See Attached Floor Plans]

First Phase Premises



Second Phase Premises



SECOND FLOOR
28 CROSBY DRIVE, BEDFORD, MA
LEASE EXHIBIT - MAY 11, 2021
27,185 RSF

Third Phase Premises



**EXHIBIT B**

**EXPENSES AND TAXES**

This Exhibit is attached to and made a part of the Lease Agreement (the "<u>Lease</u>") by and between **COBALT PROPCO 2020, LLC**, a Delaware limited liability company ("<u>Landlord</u>"), and **RESILIENCE BOSTON, INC.**, a Delaware corporation ("<u>Tenant</u>"), for space in the Building located at 28 Crosby Drive, Bedford, Massachusetts.

1.      **Payments.**

1.01      <u>Expenses and Taxes</u>.  From and after the Term Commencement Date, Tenant shall pay (a) Tenant's Proportionate Share of Expenses (defined below), for each calendar year during the Term ("<u>Tenant's Share of Expenses</u>"), and (b) Tenant's Proportionate Share of Taxes (defined below) for each Fiscal Year during the Term ("<u>Tenant's Share of Taxes</u>").  Landlord shall provide Tenant with a good faith estimate of the Tenant's Share of Expenses for each calendar year and of the Tenant's Share of Taxes for each Fiscal Year during the Term.  On or before the first day of each month, Tenant shall pay to Landlord a monthly installment equal to one-twelfth of Landlord's estimate of both the Tenant's Share of Expenses and Tenant's Share of Taxes.  If Landlord determines that its good faith estimate of the Tenant's Share of Expenses or of the Tenant's Share of Taxes was incorrect by a material amount, Landlord may from time to time provide Tenant with a revised estimate.  After its receipt of the revised estimate, Tenant's monthly payments shall be based upon the revised estimate.  If Landlord does not provide Tenant with an estimate of the Tenant's Share of Expenses by January 1 of a calendar year or the Tenant's Share of Taxes by July 1 of a Fiscal Year, then Tenant shall continue to pay monthly installments based on the previous year's estimate(s) until Landlord provides Tenant with the new estimate.  Upon delivery of the new estimate, an adjustment shall be made for any month for which Tenant paid monthly installments based on the previous year's estimate.  Tenant shall pay Landlord the amount of any underpayment within thirty (30) days after receipt of the new estimate.  Any overpayment shall be refunded to Tenant within thirty (30) days or credited against the next due future installment(s) of Additional Rent.  Appropriate adjustments shall be made for any portion of a year at the beginning or end of the Term or for any year during which changes occur in the percentage of occupancy of the Building or in the Rentable Floor Area to which Landlord furnishes particular services.

1.02      <u>Reconciliation</u>.  As soon as is practical following the end of each (a) calendar year, Landlord shall furnish Tenant with a statement of the actual Expenses (as defined below) and Tenant's Share of Expenses for the prior calendar year, and (b) Fiscal Year, Landlord shall furnish Tenant with a statement of the actual Taxes and Tenant's Share of Taxes for the prior Fiscal Year.  If the estimated Tenant's Share of Expenses for the prior calendar year is more than the actual Tenant's Share of Expenses for the prior calendar year, or if the estimated Tenant's Share of Taxes for the prior Fiscal Year is more than the actual Tenant's Share of Taxes for the prior Fiscal Year, as the case may be, then Landlord shall either provide Tenant with a refund or apply any overpayment by Tenant against Additional Rent due or next becoming due; provided that, if the Term expires before the determination of the overpayment, then Landlord shall refund any overpayment to Tenant after first deducting the amount of Rent due.  If the estimated Tenant's Share of Expenses for the prior calendar year is less than the actual Tenant's Share of Expenses for the prior calendar year, or if the estimated Tenant's Share of Taxes for the prior Fiscal Year is less than the actual Tenant's Share of Taxes for the prior Fiscal Year, as the case may be, then Tenant shall pay Landlord, within thirty (30) days after its receipt of the statement of Expenses or Taxes, any underpayment for the prior calendar year (for Expenses) or for the prior Fiscal Year (for Taxes), as the case may be.  Except in the event of an audit pursuant to Section 4, below, Landlord's annual statement with respect to Expenses and Taxes shall be binding upon, and may not be disputed by, Tenant unless the statement is incorrect and is disputed by Tenant, within sixty (60) days after Tenant's receipt of

Landlord's statement, by a notice to Landlord specifically stating the grounds for dispute. Except as set forth in Section 4, below, Tenant's failure so to dispute Landlord's statement shall constitute a waiver of Tenant's right to dispute the statement. Notwithstanding any dispute concerning any Landlord's statement, payments shall be made by the parties in accordance with Landlord's statement at the time and in the manner set forth above, and if necessary there shall be a further adjustment between the parties at the time the dispute is resolved.

## 2.    **Property Operating Expenses.**

2.01    "Expenses" means all costs and expenses incurred in each calendar year in connection with operating, maintaining, repairing, and managing the Building, the Property and the Park. It is understood that the Building is part of the Park and is operated along with all or some of the other portions of the Park, and that the Expenses for the Building include shared costs and expenses which are allocated among the Building and other portions of the Park based upon the proportionate usage or benefit derived from the shared facilities, as reasonably determined by Landlord. Expenses include, without limitation: (a) all labor and labor related costs, including wages, salaries, bonuses, taxes, insurance, uniforms, training, retirement plans, pension plans and other employee benefits; (b) management fees not to exceed four percent (4%) of gross revenues of the Building; (c) the cost of equipping, staffing and operating an on-site and/or off-site management office for the Building (including, without limitation, the market rental for the management office located in the Building), provided if the management office services one or more other buildings or properties, the shared costs and expenses of equipping, staffing and operating such management office(s) (including, without limitation, such market rental) shall be equitably prorated and apportioned between the Building and the other buildings or properties; (d) costs of accounting and IT services (which shall be equitably prorated between the Building and other buildings or properties to which such services are provided); (e) the cost of services (including the items described in Section 7.01); (f) rental and purchase cost of parts, supplies, tools and equipment; (g) insurance premiums and deductibles; (h) electricity, gas and other utility costs; and (i) the amortized cost of any capital repairs, replacements or improvements which are Permitted Capital Expenditures (as defined below) (collectively, "Capital Expenditures") (as distinguished from replacement parts or components installed in the ordinary course of business). The cost of Capital Expenditures shall be amortized by Landlord over the lesser of the Payback Period (defined below) or the useful life of the Capital Expenditure as reasonably determined by Landlord. The amortized cost of Capital Expenditures may, at Landlord's option, include actual interest incurred by Landlord to finance the cost of the Capital Expenditure. "Payback Period" means the reasonably estimated period of time that it takes for the cost savings resulting from a Capital Expenditure to equal the total cost of the Capital Expenditure. Landlord, by itself or through an affiliate, shall have the right to directly perform, provide and be compensated for any services under the Lease, provided that the Expenses associated with such services are not greater than those which would be incurred if such services were provided by an unaffiliated third party. If Landlord incurs Expenses for the Building, Property or Park together with one or more other buildings or properties, whether pursuant to a reciprocal easement agreement, common area agreement or otherwise, the shared costs and expenses shall be equitably prorated and apportioned between the Building, Property or Park and the other buildings or properties.

2.02    Exclusions. Expenses shall not include: depreciation; principal and interest payments of mortgage and other non-operating debts of Landlord; the cost of repairs or other work to the extent Landlord is reimbursed by insurance or condemnation proceeds, refunds, rebates or otherwise, and any expenses for repairs or maintenance to the extent covered by warranties, guaranties and service contracts; costs in connection with leasing space in the Building or Park, including brokerage commissions, lease concessions, rental abatements, and construction allowances granted to specific tenants, and advertising and other fees and costs incurred in procuring tenants; costs incurred in connection with the sale, financing or refinancing of the Building or the Park; fines, interest and penalties incurred due to the late

payment of Taxes or Expenses; organizational expenses associated with the creation and operation of the entity which constitutes Landlord, including without limitation tax, legal and accounting expenses related thereto; any penalties or damages that Landlord pays to Tenant under this Lease or to other tenants in the Building or the Park under their respective leases or costs incurred in connection with any disputes between Landlord and its employees, or between Landlord and other tenants or occupants, or in connection with negotiations with prospective tenants; salaries and benefits of personnel above the grade of property manager; ground lease rent; costs of electricity provided to tenants' premises, if and to the extent that Tenant is charged for such electricity services under other provisions of this Lease; costs of special services that are separately chargeable to Tenant and other tenants; and charitable or political contributions; the cost of items which, by generally accepted accounting principles, would be capitalized on the books of Landlord or are otherwise not properly chargeable against income, except to the extent such capital item is (A) required by any Law, (B) reasonably projected to reduce Expenses, or (C) reasonably expected to improve the management and/or operation of the Building (collectively, "Permitted Capital Expenditures"); Taxes (as defined below) or any inheritance, estate, succession, gift, franchise, rental, income or profit tax, capital stock tax, capital levy or excise, or any income taxes arising out of or related to the ownership and operation of the Building or the Park or imposed on Landlord; increases in premiums for insurance when such increase is directly attributable (as evidenced by a written notice by the insurance company) to the particular use of the Building or the Park by Landlord or any other tenant of the Building or the Park; costs resulting from the failure of Landlord to comply with Laws; or costs incurred in connection with the sale, financing or refinancing of the Building or the Park.

      2.03    <u>Adjustments</u>.  If at any time during a calendar year the Building is not at least 95% occupied and receiving Landlord services hereunder (or if a service provided by Landlord to tenants of the Building generally is not provided by Landlord to particular tenant(s) due to self-provided services or other circumstances), Expenses shall, at Landlord's option, be determined as if the Building had been 95% occupied (and all services provided by Landlord to tenants of the Building generally had been provided by Landlord to tenants occupying 95% of the entire Building) during that calendar year.  This "gross up" treatment shall be applied only with respect to variable Expenses arising from services provided to Common Areas or to space in the Building being occupied by tenants (which services are not provided exclusively to vacant space or provided exclusively only to some tenants, as opposed to tenants of the Building generally) in order to allocate equitably such variable Expenses to the tenants receiving the benefits thereof.

## 3.    Property Taxes.

      "<u>Taxes</u>" shall mean:  (a) all real property taxes and other assessments on the Building and/or Property, including, but not limited to, gross receipts taxes, assessments for special improvement districts and business improvement districts, governmental charges, fees and assessments for police, fire, traffic mitigation or other governmental service of purported benefit to the Property, taxes and assessments levied in substitution or supplementation in whole or in part of any such taxes and assessments and the Property's share of any real estate taxes and assessments under any reciprocal easement agreement, common area agreement, or similar agreement as to the Property; (b) all personal property taxes for property that is owned by Landlord and used in connection with the operation, maintenance and repair of the Property; and (c) all costs and fees reasonably incurred in connection with seeking reductions in any tax liabilities described in (a) and (b), including, without limitation, any costs reasonably incurred by Landlord for compliance, review and appeal of tax liabilities.  Without limitation, Taxes shall be determined without regard to any "green building" credit except to the extent such "green building" credits are the result of Expenses for which Tenant is required to pay, and actually paid, as part of Tenant's Share of Expenses net of the costs incurred by Landlord in obtaining such credits, and shall not include any income, capital levy, transfer, capital stock, franchise, excise, gift, estate, or inheritance tax. If a change in Taxes is obtained for any year of the Term during which Tenant paid Tenant's

Proportionate Share of any Tenant's Share of Taxes, then Taxes for that year will be retroactively adjusted and Landlord shall provide Tenant with a credit, if any, based on the adjustment after deduction of all costs and fees incurred by Landlord in obtaining such reduction in Taxes to the extent such costs and fees are not already included in Taxes.  Tenant shall pay Landlord the amount of Tenant's Proportionate Share of any such increase in the Tenant's Share of Taxes within thirty (30) days after Tenant's receipt of a statement from Landlord.

**4.      Audit Rights**.

Within ninety (90) days after receiving Landlord's annual reconciliation statement of Expenses (the "Review Notice Period"), Tenant may give Landlord written notice ("Review Notice") that Tenant intends to review Landlord's records of the Expenses for the calendar year to which the statement applies, identifying, with a reasonable degree of specificity, the information that Tenant desires to review (the "Request for Information").  Within a reasonable time after Landlord's receipt of a timely Request for Information and executed Audit Confidentiality Agreement (referenced below), Landlord, as determined by Landlord, shall forward to Tenant, or make available for inspection on site at such location deemed reasonably appropriate by Landlord, such records (or copies thereof) for the applicable calendar year that are reasonably necessary for Tenant to conduct its review of the information appropriately identified in the Request for Information.  Within sixty (60) days after any particular records are made available to Tenant (such period is referred to as the "Objection Period"), Tenant shall have the right to give Landlord written notice (an "Objection Notice") stating in reasonable detail any objection to Landlord's statement of Expenses for that year which relates to the records that have been made available to Tenant.  If Tenant provides Landlord with a timely Objection Notice and it is determined that Expenses for the calendar year are less than reported, then Landlord shall provide Tenant with a credit against the next installment of Rent in the amount of the overpayment by Tenant, provided that Landlord shall have the right to dispute in good faith such determination.  If Tenant provides Landlord with a timely Objection Notice and it is determined that Expenses for the calendar year are greater than reported, Tenant shall pay Landlord the amount of any underpayment within thirty (30) days.  If Tenant fails to give Landlord an Objection Notice with respect to any records that have been made available to Tenant prior to expiration of the Objection Period applicable to the records which have been provided to Tenant, Tenant shall be deemed to have approved Landlord's statement of Expenses with respect to the matters reflected in such records and shall be barred from raising any claims regarding the Expenses relating to such records for that year.  If Tenant fails to timely provide Landlord with a Review Notice and the Request for Information Period described above, Tenant shall be deemed to have approved Landlord's statement of Expenses and shall be barred from raising any claims regarding the Expenses for that year.

If Tenant retains an agent to review Landlord's records, the agent must be with a reputable certified public accounting firm licensed to do business in the Commonwealth of Massachusetts mutually acceptable to both parties in their reasonable judgment.  Tenant shall be solely responsible for all costs, expenses and fees incurred for the audit, and Tenant shall not directly or indirectly engage such agent or any other party in connection with such review whose compensation or fees are charged in whole or in part on a contingency basis.  The records and related information obtained by Tenant shall be treated as confidential, and applicable only to the Building, by Tenant and its auditors, consultants and other parties reviewing such records on behalf of Tenant (collectively, "Tenant's Auditors"), and, prior to making any records available to Tenant or Tenant's Auditors, Landlord may require Tenant and Tenant's Auditors to each execute a confidentiality agreement in a form reasonably provided by Landlord ("Audit Confidentiality Agreement") in accordance with the foregoing.  In no event shall Tenant be permitted to examine Landlord's records or to dispute any statement of Expenses unless Tenant has paid and continues to pay all Rent when due.

**EXHIBIT C**

**WORK LETTER**

C.1     <u>Acceptance of Existing Condition</u>.  Subject only to Landlord's obligation to deliver the Second Phase Premises and the Third Phase Premises in the Delivery Condition and Landlord's obligation to perform the Base Building Work, Tenant has inspected, and is satisfied with, the existing, "as-is" condition of the Premises, including any existing improvements and Base Building elements now located therein.

Any Initial Tenant Work shall be constructed by Tenant in accordance with, and subject to, the terms and conditions set forth in Section 8 of the Lease and this <u>Exhibit C</u>, at Tenant's expense (subject to reimbursement from the Allowances as provided below).  (In the event of any inconsistencies between Section 8 and this <u>Exhibit C</u> with respect to the Initial Tenant Work, the provisions of this <u>Exhibit C</u> shall govern and control.) Landlord shall not be responsible for any aspects of the design or construction of Initial Tenant Work, the correction of any defects therein, or any delays in the completion thereof.

C.2     <u>Delivery Condition Work and Base Building Work</u>.  The "<u>Delivery Date</u>" (a) with respect the First Phase Premises, shall mean the Effective Date, as provided in Section 3.03 of the Lease, and (b) with respect to each the Second Phase Premises and the Third Phase Premises, shall mean the date on which the Landlord provides Tenant access to the applicable Phase Premises, vacant and demolished (the "<u>Delivery Condition</u>"), for Tenant to commence performance of the Initial Tenant Work. As used herein, "demolished" shall mean that any existing flooring, ceiling, interior partitions, fixtures and wiring in the applicable Phase Premises are removed.

In addition, Landlord shall perform, at its expense, the base building work necessary to provide operable air supply (which shall mean 2 CFM of supply and exhaust air) for the Premises (the "<u>Base Building Work</u>").

Subject to Force Majeure and any delays caused by Tenant ("<u>Tenant Delays</u>"), Landlord shall use best efforts to cause the Delivery Date for each of the Second Phase Premises and the Third Phase Premises to occur by the date that is thirty (30) days prior to the applicable Estimated Delivery Date.

Notwithstanding that Landlord shall provide Tenant access to the applicable Phase Premises in the Delivery Condition on the applicable Delivery Date, Tenant acknowledges and agrees that Landlord shall continue to have access to the applicable Phase Premises (including, without limitation, in the ceilings of the applicable Phase Premises and the roof of the Building) beyond the applicable Delivery Date for the purposes of performing the Base Building Work and other work related to Landlord's base building obligations, concurrently with Tenant's performance of the Initial Tenant Work therein.  Landlord and Tenant shall coordinate on the concurrent performance of their respective work in order to minimize any delay or interference with the other party's work.

Notwithstanding anything to the contrary, Landlord anticipates that it will Substantially Complete (as defined below) (a) (i) the Base Building Work for the First Phase Premises and the Third Phase Premises (the "<u>First and Third Phase Premises Base Building Work</u>") and (ii) the installation of the pH Neutralization System for the Premises in accordance with Section 5 of <u>Exhibit F</u> attached hereto, on or about October 31, 2021, and (b) the Base Building Work for the Second Phase Premises (the "<u>Second Phase Premises Base Building Work</u>") on or about December 31, 2021.  Landlord shall also use reasonable efforts to deliver the freight elevator serving the Premises on or about December 15, 2021. Notwithstanding anything to the contrary, any delay in the Substantial Completion of the Base Building Work or any portion thereof by any particular date, or any delay in the installation of the pH

Neutralization System by any particular date, or any delay in the delivery of the freight elevator by any particular date, shall not give rise to any liability or default by Landlord or affect any of the terms of this Lease; except as follows:

(A)     If the First and Third Phase Premises Base Building Work is not Substantially Complete by the later of (y) October 31, 2021, as extended by any COVID Delays and any delays caused by Tenant or Force Majeure and (z) the date on which Tenant has completed the Initial Tenant Work and is ready to use 2 CFM of supply and exhaust air for purposes of conducting its business as defined in this Lease (such later date, the "First and Third Phase Premises Base Building Work Penalty Date") (a "First and Third Phase Premises Base Building Work Delivery Delay", and each such day of First and Third Phase Premises Base Building Work Delivery Delay, a "First and Third Phase Premises Base Building Work Delay Day"), then the Rent Commencement Date shall be extended one (1) day for each First and Third Phase Premises Base Building Work Delay Day for the period commencing on the First and Third Phase Premises Base Building Work Penalty Date and ending on the forty-fifth (45th) day after the First and Third Phase Premises Base Building Work Penalty Date, and thereafter two (2) days for each First and Third Phase Premises Base Building Work Delay Day after such initial forty-five (45) day period.  In the event of a First and Third Phase Premises Base Building Work Delivery Delay that continues beyond ninety (90) days after the First and Third Phase Premises Base Building Work Penalty Date, then for the sixty (60) day period following such ninetieth (90th) day (the "First and Third Phase Premises Base Building Work Termination Period"), Tenant shall have the right to terminate this Lease by giving Landlord written notice thereof, whereupon this Lease shall terminate on the date that is thirty (30) days after Landlord's receipt of such termination notice, unless the First and Third Phase Premises Base Building Work is Substantially Complete within such thirty (30) day period (as extended by any COVID Delays and any delays caused by Tenant or Force Majeure), in which event this Lease shall not terminate but shall continue in full force and effect.

(B)     If the Second Phase Premises Base Building Work is not Substantially Complete by the date that is thirty (30) days after the First and Third Phase Premises Base Building Work Penalty Date (the "Second Phase Premises Base Building Work Penalty Date") (a "Second Phase Premises Base Building Work Delivery Delay", and each such day of Second Phase Premises Base Building Work Delivery Delay, a "Second Phase Premises Base Building Work Delay Day"), then the Rent Commencement Date shall be extended one (1) day for each Second Phase Premises Base Building Work Delay Day for the period commencing on the Second Phase Premises Base Building Work Penalty Date and ending on the forty-fifth (45th) day after the Second Phase Premises Base Building Work Penalty Date, and thereafter two (2) days for each Second Phase Premises Base Building Work Delay Day after such initial forty-five (45) day period.  In the event of a Second Phase Premises Base Building Work Delivery Delay that continues beyond ninety (90) days after the Second Phase Premises Base Building Work Penalty Date, then for the sixty (60) day period following such ninetieth (90th) day (the "Second Phase Premises Base Building Work Termination Period"), Tenant shall have the right to terminate this Lease by giving Landlord written notice thereof, whereupon this Lease shall terminate on the date that is thirty (30) days after Landlord's receipt of such termination notice, unless the Second Phase Premises Base Building Work is Substantially Complete within such thirty (30) day period (as extended by any COVID Delays and any delays caused by Tenant or Force Majeure), in which event this Lease shall not terminate but shall continue in full force and effect.

For the avoidance of doubt, any Second Phase Premises Delay Days for a Second Phase Premises Delivery Delay, any Third Phase Premises Delay Days for a Third Phase Premises Delivery Delay, any First and Third Phase Premises Base Building Work Delay Days for a First and Third Phase Premises Base Building Work Delivery Delay, and any Second Phase Premises Base Building Work Delay Days for a Second Phase Premises Base Building Work Delivery Delay shall not be aggregated for the purposes of the termination rights hereunder; rather, any termination right hereunder shall accrue only if there is a

Second Phase Premises Delivery Delay exceeding ninety (90) days, or if there is separately a Third Phase Premises Delivery Delay exceeding ninety (90) days, or if there is separately a First and Third Phase Premises Base Building Work Delivery Delay exceeding ninety (90) days, or if there is separately a Second Phase Premises Base Building Work Delivery Delay exceeding ninety (90) days.  (For illustration purposes, if the Delivery Date for the Second Phase Premises occurs on the twenty-fifth (25th) day after the Second Phase Premises Penalty Date, the Delivery Date for the Third Phase Premises occurs on the twenty-fifth (25th) day after the Third Phase Premises Penalty Date, the First and Third Phase Premises Base Building Work is Substantially Complete on the twenty-fifth (25th) day after the First and Third Phase Premises Base Building Work Penalty Date, and the Second Phase Premises Base Building Work is Substantially Complete on the twenty-fifth (25th) day after the Second Phase Premises Base Building Work Penalty Date, the Tenant shall not have any right to terminate this Lease pursuant to this paragraph or Section 3.03 of the Lease.)

For purposes hereof, "Substantially Complete" and "Substantial Completion" shall mean that the applicable work by Landlord under this Paragraph C.2 has been completed, other than minor punchlist-type items the completion of which will not materially delay or interfere with Tenant's occupancy of the Premises for the regular conduct of business.  All such punchlist-type items shall be promptly completed by Landlord at Landlord's sole cost and expense and without material interference with Tenant's occupancy and use of the Premises for the conduct of its business.

C.3    Tenant's Construction Documents.  Tenant shall submit to Landlord the final construction documents for the Initial Tenant Work in accordance with the requirements for the Construction Documents set forth in Schedule C-3 (the "Construction Documents") in a form suitable for Landlord's approval, which approval shall not be unreasonably withheld or conditioned.  Landlord hereby confirms its approval of Jacobs Engineering as Tenant's architect for the Initial Tenant Work.  Tenant shall also retain, or cause its architect to retain, the services of the electrical and mechanical engineers engaged by Landlord for the Building or such other experienced engineers as are otherwise reasonably approved by Landlord, as well as Landlord's structural engineer if any portion of Initial Tenant Work affects structural components of the Building.  Even if any such architect or engineers may have been otherwise engaged by Landlord in connection with the Building, Tenant shall be solely responsible for the liabilities and expenses of all architectural and engineering services relating to the Initial Tenant Work (subject to reimbursement from the Allowances as provided below) and for the adequacy and completeness of the Construction Documents submitted to Landlord.  The Construction Documents shall comply with the Building's construction rules and regulations, including without limitation those designed to maintain a uniform exterior appearance of the Building.  Landlord shall review and approve (or provide comments on) the Construction Documents within ten (10) Business Days after the same are delivered to Landlord, provided that Landlord reserves the right to reasonably extend such review period in the event that the Construction Documents require Landlord to review, or to cause its third-party engineer to review, structural elements or other special elements of the Initial Tenant Work.  In the event Landlord fails to approve (or provide comments on) the Construction Documents within such review period, the Construction Documents shall be deemed approved by Landlord.  Tenant shall, after receipt of Landlord's comments, cause the Construction Documents to be corrected or revised to address Landlord's comments and resubmitted to Landlord for its review and approval, which approval shall not be unreasonably withheld or conditioned.  Landlord shall review and approve (or provide comments on) such resubmitted Construction Documents within five (5) Business Days after the same are delivered to Landlord and, if Landlord fails to approve (or provide comments on) the resubmitted Construction Documents within such time period, the resubmitted Construction Documents shall be deemed approved by Landlord.

After Landlord's approval of the Construction Documents, Tenant shall prepare a reasonably detailed estimate of the total Allowance Costs (as defined below) (the "Budget") and shall deliver a copy

thereof to Landlord for Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed.

C.4     <u>Tenant Work Allowance</u>.  Landlord shall perform the Base Building Work and any demolition work required to deliver the Second Phase Premises and the Third Phase Premises in the Delivery Condition at Landlord's sole expense.  Landlord shall provide Tenant with an allowance for the costs ("<u>Allowance Costs</u>") of designing and constructing the Initial Tenant Work in the Premises for Tenant's initial occupancy (including, without limitation, the so-called soft costs for architectural and engineering fees, furniture, fixtures, equipment (collectively, "<u>Soft Costs</u>"), subject to the Soft Costs Cap, as defined below) in an amount not to exceed the Tenant Work Allowance set forth in Section 1 of the Lease (such amount, collectively with any Additional Allowance (as defined below) elected by Tenant, the "<u>Allowance</u>").  Tenant may requisition not more than twenty-five percent (25%) of the Tenant Work Allowance (*i.e.*, $4,158,000.00) (the "<u>Soft Costs Cap</u>") for the preparation of the Construction Documents and other Soft Costs incurred by Tenant, by submitting invoices therefor to Landlord from time to time (but not more often than one time in any 30-day period), and Landlord shall reimburse Tenant for Landlord's Pro-Rata TI Share (as defined below) of such properly requisitioned Soft Costs from the Allowance, provided that the aggregate disbursements shall not exceed the Soft Costs Cap.  All construction and design costs for the Premises in excess of the Allowance (such excess being referred to as the "<u>Excess Tenant Work Costs</u>"), shall be paid for entirely by Tenant, and Landlord shall not provide any reimbursement therefor.  The Allowance shall be disbursed as requisitioned by Tenant but in no event more often than one time in any 30-day period.  For each disbursement, Tenant shall submit a requisition package to Landlord, with an itemization of the costs being requisitioned, a certificate by an officer of Tenant that all such costs are Allowance Costs and have been incurred and paid for by Tenant, and appropriate back-up documentation including, without limitation, customary AIA forms of progress payment certifications and lien releases (in a customary form provided or reasonably approved by Landlord), and copies of paid invoices and bills, and Landlord shall disburse Landlord's Pro Rata TI Share of each requisition.  As used herein, the "<u>Landlord's Pro Rata TI Share</u>" shall mean (a) for the period until the Pari Passu Funding Date (as hereinafter defined), an amount equal to fifty percent (50%) of the requisition, less ten percent (10%) of each payment to be retained pending final completion and receipt of the Close-Out Materials, subject to an interim reconciliation as of the Pari Passu Funding Date so that Tenant receives the portion of the Allowance that Tenant would have been entitled to receive if such funding had occurred after the Pari Passu Funding Date, and (b) from and after the Pari Passu Funding Date, the percentage that the Allowance bears to the total estimated Allowance Costs as shown on the approved Budget, less ten percent (10%) of each payment to be retained pending final completion and receipt of the Close-Out Materials, subject to a final reconciliation of the Allowance upon completion of the work.  As used herein, the "<u>Pari Passu Funding Date</u>" shall mean the later of (I) the Landlord's approval of the Budget and (II) the expiration of all of the following periods without a termination by Tenant under Section 3.03 of the Lease or Paragraph C.2 of this <u>Exhibit C</u>:  (w) the Second Phase Premises Termination Period, (x) the Third Phase Premises Termination Period, (y) the First and Third Phase Premises Base Building Work Termination Period, and (z) the Second Phase Premises Base Building Work Termination Period.  Landlord shall fund the final ten percent (10%) of the Allowance within thirty (30) days after Tenant's submission to Landlord of the Close-Out Materials.  The "<u>Close-Out Materials</u>" shall mean the requisition package for the final amount of the Allowance as provided above, together with (i) a final AIA certificate from Tenant's architect evidencing substantial completion of the Initial Tenant Work  in accordance with the approved Construction Documents, (ii) a set of "as built" or final record plans for such work, (iii) final lien waivers for such work from all contractors, subcontractors, and other parties who would be entitled to a lien on the Property if not paid, (iv) a certificate of occupancy for the Premises after the performance of such work, and (v) any other items required under the Building's construction rules and regulations (a copy of which is available upon request) for closing out the particular work in question.

If requested by Tenant concurrently with Tenant's delivery of the Budget, Landlord will make available to Tenant an additional improvement allowance not to exceed $50.00 per rentable square foot of the Premises (i.e., $3,696,00.00) (the "Additional Allowance").  Any Additional Allowance funded by Landlord may only be used both for the hard construction costs incurred for the Initial Tenant Work and for any Soft Costs.  Disbursement of the Additional Allowance shall be subject to the same procedure and requirements for disbursement of the Tenant Work Allowance set forth above.  If Tenant submits a completed requisition package for any portion of the Additional Allowance to be utilized, commencing with the first monthly installment of Base Rent due under this Lease, Base Rent shall be increased, by an amount equal to the monthly payment required to repay in full a loan in an amount equal to the portion of such Additional Allowance so advanced to Tenant by Landlord pursuant to this paragraph, with interest at the rate of 8% per annum, in equal monthly installments over the initial Term.

In addition to the Allowance, within thirty (30) days following Landlord's receipt of invoices evidencing the cost of the initial test-fit plan for the Initial Tenant Work, Landlord shall pay to Tenant an amount not to exceed $.15 per square foot of Rentable Floor Area of the Premises towards the cost of such test-fit plan (the "Concept Plan Allowance").

The Tenant Work Allowance, the Concept Plan Allowance, and if applicable, the Additional Allowance, are collectively referred to herein as the "Allowances".  The Allowances must be used within twelve (12) months following the last Term Commencement Date to occur or shall be deemed forfeited with no further obligation by Landlord with respect thereto.  In addition, Landlord shall have no obligation to disburse any portion of the Allowances at any time when there exists a Default under the Lease (or for so long as an event or condition has occurred which with notice and the passage of time would constitute such a Default), until such time as the Default (or the event or condition) has been cured by Tenant.

C.5     Tenant's Performance of the Work.  Tenant shall submit the approved Construction Documents to the municipal building department and apply for all permits and approvals required to perform the Initial Tenant Work, and, prior to or simultaneously with such submission, Tenant shall submit the Construction Documents to Landlord for Landlord's approval in accordance with the terms of Paragraph C.3.  The parties acknowledge and agree that the approval of the Construction Documents by the municipal building department and by the Landlord will occur on a parallel track, and in no event shall approval of the Construction Documents by the municipal building department limit Landlord's right to approve the Construction Documents pursuant to Paragraph C.3 (it being acknowledged that, if and to the extent necessary, Tenant shall modify any such municipal building department applications to incorporate revisions based on Landlord's comments made pursuant to Landlord's review and approval of the Construction Documents as provided hereunder).  The Initial Tenant Work shall be performed and constructed by Tenant in accordance with the approved Construction Documents, in compliance with applicable Laws and all permits and approvals for the Initial Tenant Work, and the provisions of the Lease, including without limitation the terms and conditions of Section 8 thereof and the Building's construction rules and regulations (a copy of which is available upon request).  Any structural work (to the extent, if any, required to reinforce portions of the floor of the Premises for Tenant's filing rooms or similar uses requiring additional support) or other work affecting Base Building systems or areas outside the Premises shall be done only after obtaining Landlord's reasonable prior approval of Construction Documents therefor under Section 8 of the Lease and of the manner in which such work shall be performed under Section 8 of the Lease, specifically including any Landlord requirements concerning access to adjacent tenant areas or Building core areas.  All Cabling shall be installed in accordance with Section 8.01 of the Lease.  Landlord shall not be responsible for any aspects of the design or construction of the Initial Tenant Work or other Tenant installations in or about the Premises, the correction of any defects therein, or any delays in the completion thereof.  After the Construction Documents have been approved by Landlord, any change in the work shown thereon, whether material or not, shall be made only after Tenant shall have submitted revised Construction Documents to Landlord for its review and

approval in accordance with the provisions applicable to resubmitted Construction Documents in Paragraph C.3 above.  Tenant shall pay to Landlord or its managing agent a fee for Landlord's administrative oversight and coordination of the Initial Tenant Work in an amount equal to one percent (1%) of the hard costs of the Initial Tenant Work.  In addition, Tenant shall pay to Landlord the costs of Building services or facilities (such as electricity, HVAC, fire alarm plug ins/outs, freight elevator usage, and cleaning) used by Tenant in connection with its performance of the Initial Tenant Work, in each case at Building standard rates charged to tenants generally.  Any such costs shall constitute Allowance Costs that may be requisitioned from time to time from the Allowance as provided in Paragraph C.4.
.

C.6    <u>Access.</u>  Tenant's access to the applicable Phase Premises for the performance of the Initial Tenant Work hereunder and its installation of wiring, furniture, equipment, and personal property prior to commencing the regular conduct of business in such Phase Premises shall be subject in each case to the terms and conditions of Section 8 of the Lease, including without limitation (i) Landlord's reasonable approval of the Construction Documents for the Initial Tenant Work in accordance with Paragraph C.3 above, (ii) Landlord's reasonable approval of Tenant's contractors in accordance with Section 8 of the Lease, (iii) Landlord's receipt from Tenant of copies of all necessary permits for the applicable Initial Tenant Work, and (iv) customary insurance certificates from Tenant's contractors, subcontractors, and other parties acting under or through Tenant with respect to the applicable work in accordance with Section 8 of the Lease.  Tenant shall be responsible for any damage to the Premises caused by Tenant or its employees, agents, contractors, subcontractors, material suppliers and laborers.  Any entry into any Phase Premises by Tenant (or its contractors, subcontractors, or other persons acting under Tenant) prior to the applicable Term Commencement Date shall be subject to all of the provisions of the Lease that are applicable to the Premises during the Term, except for the obligation to pay Base Rent, Expenses and Taxes, which obligation shall not commence until the Rent Commencement Date.

C.7    <u>Authorized Representatives</u>.  Tenant hereby designates Gary Schoenhouse to serve as Tenant's Authorized Representative, who shall have full power and authority to act on behalf of Tenant on any matters relating to the Initial Tenant Work.  Tenant may from time to time change the Tenant's Authorized Representative or designate additional Tenant's Authorized Representative(s) by written notice delivered to Landlord in accordance with the Lease.

Landlord hereby designates John Bangs to serve as Landlord's Authorized Representative, who shall have full power and authority to act on behalf of Landlord on any matters relating to the Initial Tenant Work.  Landlord may from time to time change the Landlord's Authorized Representative or designate additional Landlord's Authorized Representative(s) by written notice delivered to Tenant in accordance with the Lease.

Schedule C-1

[Intentionally Deleted]

Schedule C-2

[Intentionally Deleted]

Schedule C-3

<u>Requirements for Construction Documents for Initial Tenant Work</u>

      1.      <u>Preparation of Construction Documents</u>.  The Construction Documents shall include all architectural, mechanical, electrical, fire protection, plumbing and structural drawings and detailed specifications for the Initial Tenant Work, as applicable, and shall show and/or specify all work necessary to complete the Initial Tenant Work including all cutting, fitting, and patching and all connections to the mechanical and electrical systems and other components of the Building as well as any re-balancing and re-commissioning scope that is necessary to address Base Building systems affected by the Initial Tenant Work.  Where the Initial Tenant Work interfaces with Base Building, the Initial Tenant Work design shall visually integrate with the Base Building in a manner and with materials and finishes that are compatible with the Base Building in that area.  Landlord reserves the right to reject Construction Documents which in its reasonable opinion fail to comply with this provision.  The Construction Documents shall include but not be limited to:

      (a)     <u>Major Work Information</u>:  A list of any items or matters which might require structural modifications to the Building, including but not limited to the following:

      (1)     Location and details of special floor areas exceeding the applicable floor load for such area of the Building;

      (2)     Location and weights of storage files, batteries, HVAC units and technical areas;

      (3)     Location of any special soundproofing requirements;

      (4)     Existence of any extraordinary HVAC requirements necessitating perforation of structural members;

      (5)     Existence of any requirements for heavy loads, dunnage or other items affecting the structure; and

      (6)     Any significant electrical upgrade or installation to support new tenant work (PODS)

      (b)     <u>Plans Submission</u>:  Two (2) blackline drawings and one (1) CAD disk (subject to Tenant's architect's and its consultants' and subconsultants' reasonable conditions for re-use) showing all architectural, mechanical and electrical systems, including cutsheets (where reasonably requested by Landlord), specifications and the following:

CONSTRUCTION PLANS:

      (1)     All partitions shall be shown; indicate ratings of all partitions; indicate all non-standard construction and details referenced;

      (2)     Dimensions for partition shall be shown to face of drywall; critical tolerances and $\pm$ dimensions shall be clearly noted;

      (3)     All plumbing fixtures or other equipment requirements and any equipment requiring connection to Building plumbing systems shall be noted.

REFLECTED CEILING PLAN:

      (1)     Layout suspended ceiling grid pattern in each room, describing the intent of the ceiling working point, origin and/or centering; and

      (2)     Locate all ceiling-mounted lighting fixtures and air handling devices including air dampers, fan boxes, etc., lighting fixtures, supply air diffusers, wall switches, down lights, special lighting fixtures, special return air registers, special supply air diffusers, and special wall switches.

TELECOMMUNICATIONS AND ELECTRICAL EQUIPMENT PLAN:

(1)    All telephone outlets required;
(2)    All electrical outlets required; note non-standard power devices and/or related equipment;
(3)    All electrical requirements associated with plumbing fixtures or equipment; append product data for all equipment requiring special power, temperature control or plumbing considerations;
(4)    Location of telecommunications equipment and general layout of conduits; and
(5)    Components and design of antennas, if any, (including associated equipment) as installed, in sufficient detail to evaluate weight, bearing requirements, wind-load characteristics, power requirements and the effects on Building structure, moisture resistance of the roof membrane and operations of pre-existing telecommunications equipment, to the extent known or based on information provided by Landlord.

DOOR SCHEDULE:
(1)    Provide a schedule of doors, sizes, finishes, hardware sets and ratings; and
(2)    Non-standard materials and/or installation shall be explicitly noted.

HVAC:
(1)    Areas requiring special temperature and/or humidity control requirements;
(2)    Heat emission of equipment (including catalogue cuts where reasonably required by Landlord or, where unavailable, based on engineer's assumptions therefor), such as CRTs, copy machines, etc.;
(3)    Special exhaust requirements for conference rooms, pantry, toilets, etc.;
(4)    Any extension of system beyond demised space; and
(5)    Any specialty exhaust system required by Tenant that cannot be supported by base building gang exhaust system.

ELECTRICAL:
(1)    Special lighting requirements;
(2)    Power requirements and special outlet requirements of equipment;
(3)    Security requirements;
(4)    Supplied telephone equipment and the necessary space allocation for same;
(5)    Any extensions of tenant equipment beyond demised space; and
(6)    Load study confirming compliance with the leased space's allowable watts per square foot.

PLUMBING:
(1)    Remote toilets;
(2)    Pantry equipment requirements;
(3)    Remote water and/or drain requirements such as for sinks, ice makers, etc.; and
(4)    Special drainage requirements, such as those requiring holding or dilution tanks.

ROOF:
Detailed plan of any existing and proposed roof equipment, if any, showing location and elevations of all equipment.

SPECIAL SERVICES:
Equipment cuts (where reasonably requested by Landlord), power requirements, heat emissions, raised floor requirements, fire protection requirements, security requirements, and emergency power.

2.    <u>Plan Requirements</u>.  The Construction Documents shall be fully detailed and fully coordinated with each other and with the Base Building design, shall show complete dimensions, and shall have designated thereon all points of location and other matters, including special construction details and finish schedules.  Tenant and its architect shall be solely responsible for ascertaining all existing field conditions.  Any plans in Landlord's files, if any, that are provided to Tenant shall be without any representation or warranty.   All drawings shall be uniform size, shall incorporate the standard electrical and plumbing symbols, and be at a scale of 1/8" = 1'0" or larger.  Materials and/or installation shall be explicitly noted and adequately specified to allow for performing Landlord review, securing a building permit, pursuing construction pricing, and performing construction.  All equipment and installations shall be made in accordance with standard materials and procedures unless a deviation outside of industry standards is shown on the Construction Documents and approved by Landlord.  To the extent practicable, a concise description of products, acceptable substitutes (if any), and installation procedures and standards shall be provided to the extent customary.  Product cuts (where reasonably requested by Landlord) must be provided and special mechanical or electrical loads noted.  Landlord's approval of the plans, drawings, specifications or other submissions in respect of any work, addition, alteration or improvement to be undertaken by or on behalf of Tenant shall create no liability or responsibility on the part of Landlord for their completeness, design sufficiency or compliance with requirements of any applicable laws, rules or regulations of any governmental or quasi-governmental agency, board or authority.

3.    <u>Change Orders</u>.  The Construction Documents shall not be changed or modified by Tenant after approval by Landlord without the further approval in writing by Landlord, which approval shall not be unreasonably withheld or delayed as provided in the Lease.

Schedule C-4

<u>Responsibility Matrix</u>

| DESCRIPTION | RESPONSIBILITIES | | |
|---|---|---|---|
| | Landlord Base Bldg | Tenant | Notes |
| **OVERALL** | | | |
| LEED Certification of tenant spaces. (If desired by tenant.) | | X | |
| Base Building permit and construction in accordance with requirements of Massachusetts State Building Code, 9th Edition (780CMR). | X | | |
| Tenant area permit and construction in accordance with requirements of Massachusetts State Building Code, 9th edition (780CMR). | | X | |
| Mold Mitigation / Remediation: Upon testing and mutual agreement of Tenant's and Landlord's environmental consultants, Landlord will mitigate / remediate  found SMG in the basement and the first and second floors during the initial construction phase of the Core &Shell and Tenant fit out projects. | X | | |
| **SITEWORK** | | | |
| All site work from the Building face to back of curb, sidewalks, parking, exterior lighting, landscaping. | X | | |
| Outdoor Short-term Bike Parking | X | | |
| Telephone and internet services to main demarcation room from local exchange carrier | X | | |
| Domestic sanitary sewer connection to street | X | | |
| Roof storm drainage | X | | |
| Primary and secondary electrical service | X | | Being installed as part of Core and Shell project |

| | | | |
|---|:---:|:---:|---|
| Natural Gas service | X | | |
| Domestic water service to Building | X | | |
| Fire protection water service to Building | X | | |
| New " Tenant Utility Yard Space" located at North end of building. Space will contain GMP HVAC / Exhaust equipment, and bulk gas storage tanks. Proper screening, and possible sound mitigation, of new Yard space will be required so as not to impact other tenants / buildings. | | X | |
| **LANDSCAPING** | | | |
| | | | |
| | | | |
| | | | |
| **STRUCTURE** | | | |
| Reinforced concrete slabs with live load capacity of 100 psf (typical areas) | X | | |
| Structural enhancements for specific Tenant load requirements | | X | |
| Upgrade structural reinforcing to meet vibration criterion required by Tenant | | X | |
| Typical Floor to roof height framing: approximately 14'-9" | X | | |
| Column bay spacing: approximately 30'-0" by 30'-0" | X | | |
| Structural framing dunnage above roof for Base Building equipment and reinforcement of the existing structure to support the dunnage. | X | | |
| Modifications to structural framing dunnage above roof for Tenant equipment subject to Landlord review and approval | | X | |
| Framed openings for Tenant utility risers in addition to Base Building within pre-allocated Base Building areas subject to Landlord review and approval | X | | |
| Miscellaneous metals items and/or concrete pads for Base Building equipment | X | | |

| | | | |
|---|:---:|:---:|---|
| Miscellaneous metals items and/or concrete pads for Tenant equipment | | X | |
| Addition of lateral bracing elements and structural reinforcing to comply with building code requirements | X | | |
| Infill skylight with metal roof decking and new roof membrane | X | | Resilience design has determined the requirement that all existing skylights will need to be infilled. LL will perform this work as part of the Core and Shell fit out |
| Structural requirements for elevator addition | X | | New freight elevator being installed as part of Core and Shell fit out |
| **ROOFING** | | | |
| Single-ply white EPDM  roofing system with rigid insulation with 20 year warranty | X | | |
| Roofing penetrations for Base Building equipment/systems | X | | |
| Roofing penetrations for Tenant Fit-out equipment/systems, installed by Base Building roofing subcontractor | | X | |
| Walkway pads to Base Building equipment | X | | |
| Walkway pads to Tenant equipment | | X | |
| Roofing alterations due to Tenant changes within Building penthouse, installed by Base Building roofing subcontractor | | X | |
| **EXTERIOR** | | | |
| Building exterior envelope | X | | |
| Base Building Entrance | X | | |
| Loading dock overhead door | X | | |
| Penthouse enclosure for Base Building rooftop equipment | X | | |
| **COMMON AREAS** | | | |
| Accessible main entrance. Entrance vestibule will include accessible full glass aluminum framed entrance doors with integrated security hardware, and  walk-off grid floor. | X | | |
| Common Area Restrooms provide by LL | X | | |

| | | |
|---|---|---|
| Common area shower rooms and locker rooms available for tenant use | X | |
| Common area collaboration space including seating | X | |
| Interior signage for all Base Building rooms (as required by Code) | X | |
| Janitor's closet in core areas | X | |
| Electrical closet in core areas.  Electrical closets can be used for Tenant utility meters, and tenant-provided electrical equipment, subject to coordination with Base Building equipment, and conformance to all Code requirements. | X | |
| Loading dock area with raised dock platform and transition ramps | X | |
| Doors, frames, and hardware at common areas | X | |
| Floor in penthouse and portion of basement floor within the area where Tenant's equipment and the pH Neutralization System will be located to be epoxy coated | X | |
| Floor drains in basement area | X | |
| **WINDOW TREATMENT** | | |
| Furnish and install Building Standard window treatment including blocking in Tenant areas.  Building Standard is manual, light-filtering roller shades, similar or equal to those manufactured by Draper (color TBD). | X | |
| Window sills as applicable in Tenant areas | X | |
| **TENANT AREAS** | | |
| Drywall and finishes at inside face of exterior walls (fire-rated) | X | |
| Drywall and finishes at inside face of exterior walls (non fire-rated) | X | |
| Finishes at inside face at Tenant side of core partitions | X | |
| Additional toilet rooms within Tenant Premises | | X |
| Electrical closets within Tenant Premises per fit-out design | | X |
| Tel/data rooms for interconnection with Tenant tel/data per fit-out design | | X |
| Tenant kitchenette areas | | X |

| | | | |
|---|---|---|---|
| Modifications to core areas to accommodate Tenant requirements | | X | Upon review / approval by LL |
| **FIRE PROTECTION** | | | |
| Fire service entrance including fire department connection, alarm valve, and back flow protection. | X | | |
| Base Building area distribution piping and as is condition throughout floor plate | X | | |
| All relocated heads within Tenant Premises to meet tenant fit out requirements | | X | |
| Modification of sprinkler piping and head locations to suit future Tenant layout and hazard index | | X | |
| Specialized extinguishing systems | | X | |
| Pre-action dry-pipe systems (if required) within Tenant Premises | | X | |
| Fire extinguisher cabinets within Base Building areas | X | | |
| Fire extinguisher cabinets within Tenant Premises | | X | |
| **PLUMBING** | | | |
| Domestic water service with backflow prevention base building | X | | |
| Domestic water distribution within Tenant Premises including reduced pressure backflow preventer | | X | |
| Base Building restroom plumbing fixtures compliant with accessibility requirements | X | | |
| Hot water generation for Base Building restrooms and shower | X | | |
| Tenant restroom plumbing fixtures compliant with accessibility requirements (in addition to those provided by the Base Building) | | X | |
| Wall hydrants within Base Building areas (where required by Code) | X | | |
| Storm drainage system | X | | |
| Sanitary waste and vent service for Base Building areas | X | | |
| Sanitary waste and vent service for Tenant Premises | | X | |
| Hot water generation for Tenant sinks | | X | |
| **NATURAL GAS** | | | |

| | | | |
|---|---|---|---|
| Natural gas service to Building | X | | |
| Natural gas service to Base Building boilers, water heaters, and generator | X | | |
| Natural gas service, pressure regulator, vent and meter for Tenant equipment | | X | |
| Natural gas piping from Tenant meter to Tenant Premises or Tenant equipment area | | X | |
| Natural gas pipe distribution within Tenant Premises | | X | |
| **HEATING, VENTILATION, AIR CONDITIONING** | | | |
| Central gas fired boiler plant | X | | |
| Hot water pipe risers | X | | |
| Hot water pipe distribution within Tenant Premises | | X | |
| Reheat coils within Tenant Premises | | X | |
| Reheat coils within Base Building areas | X | | |
| Building Management System (BMS) for Base Building Equipment | X | | |
| BMS (compatible with Landlord's system) within Tenant Premises monitoring Tenant infrastructure | | X | |
| 100% OA supply air ventilation system with heat recovery | X | | |
| Vertical supply air duct distribution | X | | |
| Supply air duct distribution, VAV terminals, fan coil units, equipment connections, insulation, air terminals, dampers, hangers, etc. within Tenant Premises | | X | |
| Supply air duct distribution, VAV terminals, equipment connections, insulation, air terminals, dampers, hangers, etc. within Base Building areas | X | | |
| Lab exhaust fans associated with LL Core and Shell project | X | | |
| Vertical exhaust air duct risers. BOD Exhaust Air at  92K CFM | X | | |
| Exhaust air duct distribution, air valves, dampers, etc. within Tenant premises | | X | |

| | | | |
|---|:---:|:---:|---|
| Restroom exhaust for Base Building area restrooms | X | | |
| Restroom exhaust for new restrooms built within Tenant Premises | | X | |
| Electric room ventilation system for Base Building electrical closets | X | | |
| Electric room ventilation system for electrical closets within Tenant Premises | | X | |
| Tenant Data/IT Room supplemental cooling | | X | |
| Additional/dedicated cooling equipment or modifications to Landlord Fitout for Tenant requirements | | X | |
| Landlord will install split HVAC system to condition basement space as contemplated, or at Tenant's election, in lieu of furnishing and installing such HVAC system, Landlord will provide $50,000.00 (which is the cash equivalent of such contemplated HVAC system) to Tenant to apply towards Tenant's cost of furnishing and installing such HVAC system to condition basement space as desired by Tenant.  Landlord will also install, at its expense, electric heat in the basement to heat the basement space. | X | | |
| Area on SW corner of roof (Column lines 5-7 and J-F) slated for future HVAC Landlord equipment will now  be allotted to Resilience for possible future HVAC equipment required for their premises. | | X | |
| **ELECTRICAL** | | | |
| Electrical utility service to switchgear in main electrical room | X | | |
| Standby power generation | X | | 5 watts / SF provided by Landlord |
| Standby power distribution to  / within tenant premises | | X | |
| Lighting and power distribution for Base Building areas | X | | |
| Lighting and power distribution for Tenant Premises | | X | |
| Check metering for tenant electrical lighting and plug loads. | | X | Meter specification to be provided by Landlord to Tenant |
| Life safety emergency lighting/signage, panels and etc. for Base Building area | X | | |

| | | |
|---|---|---|
| Life safety emergency lighting/signage, panels, etc. for Tenant premises | | X | |
| Upon review / approval of design Landlord will provide space in mechanical PH for the installation of Tenants UPS room. | | X | |
| **FIRE ALARM** | | | |
| Base Building expandable addressable fire alarm system ready for connection by Tenant. | X | | |
| Detection and annunciation devices in Building Common areas. | X | | |
| Fire alarm sub panels and devices for Tenant Premises with integration into Base Building system | | X | |
| Detection, annunciation and all wiring in Tenant areas and as required to connect to the Base Building system. | | X | |
| Alteration to fire alarm system to facilitate Tenant program | | X | |
| **TELEPHONE/DATA** | | | |
| Underground local exchange carrier service to primary demarcation room | X | | |
| Tenant tel/data room | | X | |
| Tel/Data cabling from demarcation room and/or intermediate distribution frame rooms to Tenant tel/data room | | X | |
| Fiber optic service for Tenant use | | X | |
| Tenant Tel/Data infrastructure including, but not limited to, servers, computers, phone systems, switches, routers, etc. | | X | |
| Provisioning of circuits and service from service providers | | X | |
| Audio visual systems and support | | X | |
| Station cabling from Tenant tel/data room to all Tenant locations, within the suite and exterior to the suite, if needed | | X | |
| **SECURITY** | | | |
| Card access and at door phone Main Building entrance and loading dock | X | | |
| Card access at other Building entries | X | | |

| | | | |
|---|---|---|---|
| Card access and door phone into each Tenant Premises and Exclusive Utility Yard | | X | |
| Card access within Tenant premises on separate Tenant installed and managed system | | X | |
| Video camera coverage of Tenant Premises on separate Tenant installed and managed system | | X | |
| **LAB SERVICES** | | | |
| Two stage active pH neutralization system | X | | To be initially installed by Landlord then maintained by Tenant. License to operate will be held by Tenant. |
| Lab waste and vent pipe distribution serving Tenant Premises per proposed Spec Fit-out | | X | |
| Non-potable hot water generation for Tenant premises | | X | |
| Lab compressed air pipe distribution within Tenant Premises for specific points of use based on the fit-out design | | X | |
| Tenant lab vacuum system | | X | |
| RO or RO/DI water generator and vertical water riser | | X | |
| Manifolds, piping, and other requirements including cylinders, not specifically mentioned above | | X | |

**EXHIBIT D**

**COMMENCEMENT LETTER**

(EXAMPLE)

| | |
|---|---|
| Date | _____ |
| Tenant<br>Address | Resilience Boston, Inc.<br>_____<br>_____<br>_____ |

Re:     Commencement Letter with respect to that certain Lease dated as of September ___, 2021, by and between **COBALT PROPCO 2020, LLC**, a Delaware limited liability company**,** as Landlord, and **RESILIENCE BOSTON, INC.**, a Delaware corporation, as Tenant, for approximately 73,920 rentable square feet on the first (1st) and second (2nd) floors of the Building located at 28 Crosby Drive, Bedford, Massachusetts.

Lease Id: _____
Business Unit Number: _____

Dear     _____:

In accordance with the terms and conditions of the above referenced Lease, Tenant accepts possession of the Premises and acknowledges:

1.     The Term Commencement Date with respect to the [Second Phase Premises] [Third Phase Premises] is _____.  [The Rent Commencement Date of the Lease is _____.] [RENT COMMENCEMENT DATE TO BE INCLUDED ONLY IN COMMENCEMENT LETTER FOR THE FINAL PHASE PREMISES DELIVERED TO TENANT BY LANDLORD. IF BASE BUILDING WORK IS NOT COMPLETED AT THAT TIME, THIS STATEMENT SHALL BE QUALIFIED TO REFLECT POSSIBLE EXTENSION OF THE RENT COMMENCEMENT DATE FOR BASE BUILDING WORK DELAYS.]

2.     [The Term Expiration Date of the Lease is _____.] [TO BE INCLUDED ONLY IN COMMENCEMENT LETTER FOR THE FINAL PHASE PREMISES DELIVERED TO TENANT BY LANDLORD. IF BASE BUILDING WORK IS NOT COMPLETED AT THAT TIME, THIS STATEMENT SHALL BE QUALIFIED TO REFLECT POSSIBLE EXTENSION OF THIS DATE FOR BASE BUILDING WORK DELAYS.]

Please acknowledge the foregoing and your acceptance of possession by signing this Commencement Letter in the space provided and returning a fully executed counterpart to my attention.  Tenant's failure to execute and return this letter, or to provide written objection to the statements contained in this letter, within thirty (30) days after the date of this letter, which failure continues for fifteen (15) days after Landlord gives Tenant an additional notice of such failure**,** shall be deemed an approval by Tenant of the statements contained herein.

Sincerely,

_____
Authorized Signatory

Acknowledged and Accepted:


      Tenant:        **RESILIENCE BOSTON, INC.**


      By:         _____
      Name:      _____
      Title:       _____
      Date:      _____

**EXHIBIT E**

**BUILDING RULES AND REGULATIONS**

This Exhibit is attached to and made a part of the Lease Agreement (the "Lease") by and between **COBALT PROPCO 2020, LLC**, a Delaware limited liability company ("Landlord"), and **RESILIENCE BOSTON, INC.**, a Delaware corporation ("Tenant"), for space in the Building located at 28 Crosby Drive, Bedford, Massachusetts.  Capitalized terms used but not defined herein shall have the meanings given in the Lease.

The following rules and regulations shall apply, where applicable, to the Premises, the Building, the parking facilities (if any), the Property and the appurtenances.  In the event of a conflict between the following rules and regulations and the remainder of the terms of the Lease, the remainder of the terms of the Lease shall control.

1.      Sidewalks, doorways, vestibules, halls, stairways and other similar areas shall not be obstructed by Tenant or used by Tenant for any purpose other than ingress and egress to and from the Premises.  No rubbish, litter, trash, or material shall be placed, emptied, or thrown in those areas.  At no time shall Tenant permit Tenant's employees to loiter in Common Areas or elsewhere about the Building or Property.

2.      Plumbing fixtures and appliances shall be used only for the purposes for which designed and no sweepings, rubbish, rags or other unsuitable material shall be thrown or placed in the fixtures or appliances.

3.      No signs, advertisements or notices shall be painted or affixed to windows, doors or other parts of the Building, except those of such color, size, style and in such places as are first approved in writing by Landlord.  All tenant identification and suite numbers at the entrance to the Premises, whether on multi-tenant or single-tenant floors, shall be subject to Landlord's prior approval in writing, which approval shall not be unreasonably withheld, and shall be installed by Landlord, at Tenant's cost and expense, using the standard graphics for the Building. Except in connection with the hanging of lightweight pictures and wall decorations, no nails, hooks or screws shall be inserted into any part of the Premises or Building except by the Building maintenance personnel without Landlord's prior approval, which approval shall not be unreasonably withheld.

4.      Landlord may provide and maintain in the first floor (main lobby) of the Building an alphabetical directory board or other directory device listing tenants and no other directory shall be permitted unless previously consented to by Landlord in writing.

5.      Tenant shall not place any lock(s) on any door in the Premises or Building without Landlord's prior written consent, which consent shall not be unreasonably withheld, and Landlord shall have the right at all times to retain and use keys or other access codes or devices to all locks within and into the Premises.  A reasonable number of keys and/or access cards to the locks on the entry doors in the Premises shall be furnished by Landlord to Tenant at Tenant's cost and Tenant shall not make any duplicate keys or access cards.  All keys and access cards shall be returned to Landlord at the expiration or early termination of the Lease.

6.      All contractors, contractor's representatives and installation technicians performing work in the Building and all third party vendors providing services to tenants or other occupants in the Building (such as special event caterers and liquor providers) shall be subject to Landlord's prior approval (which

approval shall not be unreasonably withheld), shall be required to provide customary certificates of insurance (in form and substance reasonably approved by Landlord for the applicable work or service and naming Landlord and other designated parties as additional insureds), and shall comply with Landlord's standard rules, regulations, policies and procedures, which may be revised from time to time. Landlord has no obligation to allow any particular telecommunication service provider to have access to the Building or to the Premises. If Landlord permits access, Landlord may condition the access upon the payment to Landlord by the service provider of fees assessed by Landlord in Landlord's sole discretion.

7. Movement in or out of the Building of furniture or office equipment, or dispatch or receipt by Tenant of merchandise or materials requiring the use of elevators, stairways, lobby areas or loading dock areas, shall be performed in a manner and restricted to hours reasonably designated by Landlord. Tenant shall obtain Landlord's prior approval by providing a detailed listing of the activity, including the names of any contractors, vendors or delivery companies, which approval shall not be unreasonably withheld. Tenant shall assume all risk for damage, injury or loss in connection with the activity.

8. Landlord shall have the right to approve the weight, size, or location of heavy equipment or articles in and about the Premises, which approval shall not be unreasonably withheld; provided that approval by Landlord shall not relieve Tenant from liability for any damage in connection with such heavy equipment or articles.

9. Corridor doors, when not in use, shall be kept closed.

10. Tenant shall not: (a) make or permit any improper, objectionable or unpleasant noises, odors, or vibrations in the Building, or otherwise interfere in any way with other tenants or persons having business with them; (b) solicit business or distribute or cause to be distributed, in any portion of the Building, handbills, promotional materials or other advertising; or (c) conduct or permit other activities in the Building not expressly permitted under the Lease that might, in Landlord's reasonable judgment, constitute a nuisance.

11. No animals, other than any service animals required for particular individuals, shall be brought into the Building or kept in or about the Premises.

12. No inflammable, explosive or dangerous fluids or substances shall be used or kept by Tenant in the Premises, Building or about the Property, except to the extent expressly permitted under the Lease, and provided that the same are being used by Tenant in a safe manner and in accordance with all applicable Laws. Except to the extent expressly permitted under the Lease, Tenant shall not, without Landlord's prior written consent, which consent may be withheld in Landlord's sole discretion, use, store, install, spill, remove, release or dispose of, within or about the Premises or any other portion of the Property, any asbestos-containing materials or any solid, liquid or gaseous material now or subsequently considered toxic or hazardous under the provisions of 42 U.S.C. Section 9601 et seq., M.G.L. c. 21C, M.G.L. c. 21E or any other applicable environmental Law which may now or later be in effect. Tenant shall comply with all Laws pertaining to and governing the use of these materials by Tenant and shall remain solely liable for the costs of abatement and removal.

13. Tenant shall not use or occupy the Premises in any manner or for any purpose which might injure the reputation or impair the present or future value of the Premises or the Building. Tenant shall not use, or permit any part of the Premises to be used for lodging, sleeping or for any illegal purpose.

14.     Tenant shall not take any action which would violate Landlord's labor contracts or which would cause a work stoppage, picketing, labor disruption or dispute or interfere with Landlord's or any other tenant's or occupant's business or with the rights and privileges of any person lawfully in the Building ("Labor Disruption").  Tenant shall take the actions necessary to resolve the Labor Disruption, and shall have pickets removed and, at the request of Landlord, immediately terminate any work in the Premises that gave rise to the Labor Disruption, until Landlord gives its written consent (which consent may be withheld in Landlord's sole discretion) for the work to resume.  Tenant shall have no claim for damages against Landlord or any of the Landlord Related Parties nor shall the Term Commencement Date of the Term be extended as a result of the above actions.

15.     Tenant shall not install, operate or maintain in the Premises or in any other area of the Building, electrical equipment that would overload the electrical system beyond its capacity for proper, efficient and safe operation as determined solely by Landlord.  Except as permitted in the Lease, Tenant shall not furnish cooling or heating to the Premises, including, without limitation, the use of electric or gas heating devices, without Landlord's prior written consent, which consent will be withheld in Landlord's sole discretion.  Tenant shall not use more than its proportionate share of telephone lines and other telecommunication facilities available to service the Building.

16.     Tenant shall not operate or permit to be operated a coin or token operated vending machine or similar device (including, without limitation, telephones, lockers, toilets, scales, amusement devices and machines for sale of beverages, foods, candy, cigarettes and other goods), except for machines for the exclusive use of Tenant's employees and invitees.

17.     Bicycles and other vehicles are not permitted inside the Building or on the walkways outside the Building, except in areas designated by Landlord.

18.     Landlord may from time to time adopt systems and procedures for the security and safety of the Building and Property, their occupants, entry, use and contents.  Tenant, its agents, employees, contractors, guests and invitees shall comply with Landlord's systems and procedures.

19.     Landlord shall have the right to prohibit the use of the name of the Building, any photographs or other graphic representations of the Building, or any other publicity by Tenant that in Landlord's sole opinion may impair the reputation of the Building or its desirability.  Upon written notice from Landlord, Tenant shall refrain from and discontinue such publicity immediately.

20.     The Building is a non-smoking building.  Neither Tenant nor its employees, contractors, agents, guests, or invitees shall smoke or permit smoking of (i) any form of tobacco-related products (including, but not limited to pipes, cigars, cigarettes and similar products), (ii) vaporized products via electronic cigarettes (or any similar products and technological evolutions or innovations thereof), or (iii) any other plant-based or synthetic products which emit substances into the air at any time either in the Premises, in any other part of the Building, around the entrances to the Building, or in any other exterior area of the Property.  Notwithstanding the foregoing, Landlord may, at its election in its sole discretion from time to time, designate any exterior area of the Property (if any) as a permitted smoking area of tobacco-related products.

21.     Landlord shall have the right to designate and approve standard window coverings for the Premises and to establish rules to assure that the Building presents a uniform exterior appearance.  Tenant shall ensure, to the extent reasonably practicable, that window coverings are closed on windows in the Premises while they are exposed to the direct rays of the sun.

22.     Deliveries to and from the Premises shall be made only at the times in the areas and through the entrances and exits reasonably designated by Landlord.  Tenant shall not make deliveries to or from the Premises in a manner that might interfere with the use by any other tenant of its premises or of the Common Areas, any pedestrian use, or any use which is inconsistent with good business practice.

23.     The Common Area cleaning work of cleaning personnel shall not be hindered by Tenant.

**EXHIBIT F**

**ADDITIONAL PROVISIONS**

   This Exhibit is attached to and made a part of the Lease Agreement (the "<u>Lease</u>") by and between **COBALT PROPCO 2020, LLC**, a Delaware limited liability company ("<u>Landlord</u>"), and **RESILIENCE BOSTON, INC.**, a Delaware corporation ("<u>Tenant</u>"), for space in the Building located at 28 Crosby Drive, Bedford, Massachusetts.  Capitalized terms used but not defined herein shall have the meanings given in the Lease.

1. <u>Parking; Amenities</u>.

  a. <u>Parking</u>.

    i. During the Term, Tenant shall have the right to lease from Landlord, and Landlord shall lease to Tenant, or cause the operator (the "Operator") of the surface parking lots within the Park (the "Parking Facilities") to lease to Tenant, at no additional cost, two hundred twenty-one (221) unreserved parking spaces (based on a ratio of 3 spaces per 1,000 rentable square feet of the Premises) in the Parking Facilities (the "Spaces") for the use of Tenant and its employees**.**  If requested by Landlord, Tenant shall execute and deliver to Landlord the standard parking agreement used by Landlord or the Operator in the Parking Facilities for such Spaces.

    ii. Tenant shall not have the right to lease or otherwise use more than the number of unreserved Spaces set forth above.

    iii. Except for particular spaces and areas designated by Landlord or the Operator for reserved parking, all parking in the Parking Facilities shall be on an unreserved, first-come, first-served basis.

    iv. Neither Landlord nor the Operator shall be responsible for money, jewelry, automobiles or other personal property lost in or stolen from the Parking Facilities regardless of whether such loss or theft occurs when the Parking Facilities or other areas therein are locked or otherwise secured.  Except as caused by the negligence or willful misconduct of Landlord and without limiting the terms of the preceding sentence, Landlord shall not be liable for any loss, injury or damage to persons using the Parking Facilities or automobiles or other property therein, it being agreed that, to the fullest extent permitted by law, the use of the Spaces shall be at the sole risk of Tenant and its employees.

    v. Landlord or its Operator shall have the right from time to time to designate the location of the Spaces and to promulgate reasonable rules and regulations regarding the Parking Facilities, the Spaces and the use thereof, including, but not limited to, rules and regulations controlling the flow of traffic to and from various parking areas, the angle and direction of parking and the like.  Tenant shall comply with and cause its employees to comply with all such rules and regulations and all reasonable additions and amendments thereto.

    vi. Tenant shall not store or permit its employees to store any automobiles in the Parking Facilities without the prior written consent of Landlord, which consent may be withheld in Landlord's sole discretion.  Except for emergency repairs, Tenant and its employees shall not perform any work on any automobiles while located in the

Parking Facilities.  If it is necessary for Tenant or its employees to leave an automobile in the Parking Facilities overnight, Tenant shall provide Landlord with prior notice thereof designating the license plate number and model of such automobile.

vii.    Landlord or the Operator shall have the right to temporarily close the Parking Facilities or certain areas therein in order to perform necessary repairs, maintenance and improvements to the Parking Facilities.

viii.   Tenant shall not assign or sublease any of the Spaces without the consent of Landlord in Landlord's sole discretion.  Landlord shall have the right to terminate Tenant's parking rights with respect to any Spaces that Tenant desires to sublet or assign.

ix.    In the future, Landlord may elect to provide parking cards or keys to control access to the Parking Facilities. In such event, Landlord shall provide Tenant with one card or key for each Space that Tenant is leasing hereunder, provided that Landlord shall have the right to require Tenant or its employees to place a deposit on such access cards or keys and to pay a fee for any lost or damaged cards or keys.

b.   <u>Amenities</u>.  If and for so long as Landlord, in its discretion, provides amenities for the shared use of Park occupants (any such shared amenities, collectively, the "<u>Amenities</u>"), Tenant shall have the non-exclusive right to use such Amenities, subject to availability and to any reasonable rules and regulations promulgated by Landlord (including, without limitation, allocation of amenities to various tenants) from time to time with respect thereto and generally applicable to the users thereof (including, without limitation, any reservation system managed by property management).  Tenant acknowledges and agrees that the reasonable costs and expenses of operating and maintaining the Amenities as applicable shall be included in Expenses, but only to the extent the Amenities are reasonably intended for the shared use and enjoyment of the Tenant and its employees and other Park occupants, and that its users of the Amenities shall be subject to usage fees and charges at prevailing market rates or otherwise at rates generally applicable to the users thereof.  Tenant further acknowledges and agrees that Landlord shall have no obligation to provide or maintain any Amenities.

2.    <u>Hazardous Materials</u>.

(a)    <u>Hazardous Materials</u>. As used herein, the term "<u>Hazardous Materials</u>" shall mean any wastes, materials or substances (whether in the form of liquids, solids, aerosols or gases, and whether or not air-borne), specifically including live organisms, viruses and fungi, medical waste and so-called "bio-hazard" materials, which are or are deemed to be (i) pollutants or contaminants, or which are or are deemed to be hazardous, toxic, ignitable, reactive, corrosive, infectious, dangerous, harmful or injurious, or which present a risk to public health or to the environment, or which are or may become regulated by or under the authority of any applicable local, state (including, without limitation, Chapter 21E of the General Laws of the Commonwealth of Massachusetts and 780 CMR 307) or federal laws, judgments, ordinances, orders, rules, regulations, codes or other governmental restrictions, guidelines or requirements, any amendments or successor(s) thereto, replacements thereof or publications promulgated pursuant thereto, including, without limitation, any such items or substances which are or may become regulated by any of the Environmental, Health and Safety Laws (as hereinafter defined); (ii) listed as a chemical known to the Commonwealth of Massachusetts to cause cancer or reproductive toxicity; or (iii) a pesticide, petroleum, including crude oil or any fraction thereof, asbestos or an asbestos-containing material, a polychlorinated biphenyl, radioactive material, urea formaldehyde, biohazard material, mold, fungus, virus, living organisms or other medical waste.

(b)      Environmental, Health and Safety Laws. In addition to the laws referred to in Section 2(a) above, the term "Environmental, Health and Safety Laws" shall be deemed to include, without limitation, 33 U.S.C. Section 1251 et seq., 42 U.S.C. Section 6901 et seq., 42 U.S.C. Section 7401 et seq., 42 U.S.C. Section 9601 et seq., the Emergency Planning and Community Right to Know Act (EPCRTKA) 42 U.S.C. § 11001-11050 and all local, state and federal laws, judgments, ordinances, orders, rules, regulations, codes and other governmental restrictions, guidelines and requirements, any amendments and successors thereto, replacements thereof and publications promulgated pursuant thereto, which deal with or otherwise in any manner relate to, Hazardous Materials, air or water quality, air emissions, soil or ground conditions, environmental, health and safety, including, but not limited to, industrial hygiene, soil, water, or environmental conditions or other environmental, health and safety matters of any kind.  In addition to the foregoing, Tenant shall comply with all terms, conditions and guidelines contained in all licenses, permits and approvals applicable to Tenant's laboratory uses and agrees to further acknowledge such agreement to so comply in writing upon request of Landlord.

(c)      Use of Hazardous Materials; Licenses; Audit Reports. Tenant agrees that during the Term of this Lease, there shall be no use, presence, disposal, storage, generation, leakage, treatment, manufacture, import, handling, processing, release, or threatened release of Hazardous Materials on, from or under the Premises, the Building or the Property (individually and collectively, "Hazardous Use") except for Hazardous Materials which are typically used in the operation of offices or laboratories, provided that such Hazardous Materials are stored, used and disposed of in strict compliance with all applicable Environmental, Health and Safety Laws and with all BSL-2 requirements and protocol, as well as good scientific and laboratory practices, and that subject to the provisions of this Section 2(c) below, the use, storage, handling, processing or generation of any and all Hazardous Materials shall have been approved in writing by Landlord in advance.  Tenant represents and warrants that the list attached hereto as Schedule F-1 is a complete list of all Hazardous Materials and quantities which will be used and stored by Tenant in the Premises as of the Term Commencement Date, which list of Hazardous Materials and quantities is hereby approved by Landlord. Tenant shall not use or permit to exist in the Premises any Hazardous Materials other than those listed on Schedule F-1 (the "Permitted Hazardous Materials and Quantities"); provided, however, that, subject to the following provisions of this Section 2, Tenant may make reasonable adjustments to the types of Hazardous Materials and quantities used or stored in the Premises, as required by Tenant's business operations, so long as:

(i)      such types and quantities of Hazardous Materials are materially consistent with the types and quantities of the Permitted Hazardous Materials and Quantities and are necessary to Tenant's business and are otherwise stored, used and disposed of in strict compliance with all applicable Environmental, Health and Safety Laws and with good scientific and laboratory practices; and

(ii)      Tenant has obtained and maintains all licenses, permits, registrations and consents required by applicable law (including, without limitation, Environmental, Health and Safety Laws) (collectively, the "Required Permits") to use or store all such types and quantities of Hazardous Materials in the Premises; and

(iii)      Within five (5) Business Days of Landlord's written request, Tenant shall have provided Landlord with a revised, updated Schedule F-1 reflecting the reasonable adjustments made by Tenant, and which shall constitute a complete list of all Hazardous Materials and quantities used and stored by Tenant in the Premises as of the date of such revised, updated Schedule F-1.

Notwithstanding the foregoing, under no circumstances shall Tenant use or permit to exist in the Premises, or obtain any license, permit, registration or consent from any Governmental Authority (as defined below) permitting Tenant to use or store in the Premises, any of the Hazardous Materials or classes thereof listed and/or identified on Schedule F-2 attached hereto.

Tenant shall promptly provide Landlord with copies of any and all licenses, permits, registrations or consents relating to the use, storage or disposal of Hazardous Materials that are obtained, modified or renewed during the Term.  In addition, Tenant shall complete a Hazardous Materials audit checklist, in a form reasonably acceptable to Landlord, at least annually or at sooner intervals upon Landlord's written request if Landlord has reason to believe that Tenant has violated the provisions of this Section 2 or other provisions of the Lease governing Hazardous Materials.  In addition, Tenant shall not permit the imposition of any lien by Governmental Authority or other party to secure payment for damages caused by, or the recovery of any costs or expenses for, the cleanup, remediation, investigation, transportation, disposal, release or threatened release of any Hazardous Material.  Tenant also shall provide Landlord with prompt written notice in reasonable detail of (i) any release or threatened release at, on, under or from the Premises, Building or Property of which Tenant becomes aware which would reasonably be expected to exceed reportable quantities or give rise to a violation of any Environmental, Health and Safety Laws, or which could result in a legal obligation to investigate or remediate Hazardous Materials pursuant to Environmental, Health and Safety Laws or any provisions of this Lease; (ii) any notice received by Tenant, or of which Tenant has knowledge, from any Governmental Authority in connection with any such release or any violation of Environmental, Health and Safety Laws, or in connection with the presence or alleged presence of any Hazardous Materials at the Premises, Building or Property; or (iii) any incurrence of expense by any Governmental Authority or other party in connection with the assessment, containment, disposal or removal of any Hazardous Materials located at, on, in, or under, or emanating from the Premises.

Within five (5) Business Days of Landlord's request from time to time, Tenant shall provide Landlord with an updated list of all Hazardous Materials, including quantifies used and such other information as Landlord may reasonably request, used or stored by Tenant in the Premises or otherwise in the Property.  Notwithstanding the foregoing, with respect to any of Tenant's Hazardous Materials which Tenant does not properly handle, store or dispose of in compliance with all applicable Environmental, Health and Safety Laws, all BSL-2 requirements and protocols, and good scientific and laboratory practices, in Landlord's reasonable judgment, Tenant shall, upon written notice from Landlord, no longer have the right to bring such Hazardous Materials into, or use or store such Hazardous Materials in, the Premises, the Building or the Property until Tenant has demonstrated, to Landlord's reasonable satisfaction, that Tenant has implemented programs to thereafter properly handle, use, store or dispose of such Hazardous Materials. For the purposes of this Section 2(c), the term Hazardous Use shall include Hazardous Use(s) on, from or under the Premises by Tenant or any of its directors, officers, employees, shareholders, partners, licensees, invitees, agents, contractors or occupants (collectively, "Tenant's Parties"), whether known or unknown to Tenant, and whether occurring and/or existing during or prior to the commencement of the Term of this Lease.

(d)     Compliance.  During the Term of this Lease, Tenant, at its sole cost and expense, shall comply with, and shall not be in violation of, any Environmental, Health and Safety Laws.  Without limiting the generality of the foregoing, Tenant shall comply with the allocation of maximum control areas under MAQ Codes set forth on Schedule F-3 attached hereto.

(e)     Inspection and Testing by Landlord. Landlord shall have the right at all times during the term of this Lease to (i) inspect the Premises and to (ii) conduct tests and investigations to determine whether Tenant is in compliance with the provisions of this Section. Except in case of emergency, Landlord shall give reasonable notice to Tenant before conducting any inspections, tests, or investigations. The cost of all such inspections, tests and investigations shall be borne by Tenant if Tenant is in breach of this Section 2 or other provisions of the Lease governing Hazardous Materials.  Neither any action nor inaction on the part of Landlord pursuant to this 2(e) shall be deemed in any way to release Tenant from, or in any way modify or alter, Tenant's responsibilities, obligations, and/or liabilities incurred pursuant to this Section 2.

(f)     Decommissioning.  On or before the date that Tenant, and anyone claiming by, through or

under Tenant, vacates the Premises, and immediately prior to the time that Tenant delivers the Premises to Landlord, Tenant shall, to the reasonable satisfaction of Landlord:

(i)       cause the Premises to be decommissioned and decontaminated in accordance with the regulations of the U.S. Nuclear Regulatory Commission and/or the Massachusetts Department of Public Health for the control of radiation, cause the Premises to be released for unrestricted use by the Radiation Control Program of the Massachusetts Department of Public Health for the control of radiation, and deliver to Landlord the report of a certified industrial hygienist stating that he or she has examined the Premises (including visual inspection, Geiger counter evaluation and airborne and surface monitoring) and found no evidence of residual radioactive materials, radiation above natural background levels, or violation of any Environmental Health and Safety Laws; and deliver to Landlord the report of a certified industrial hygienist confirming, in substance, that he or she has examined the Premises (including visual inspection, onsite screening and laboratory analysis) and found no evidence that the Premises contains any Hazardous Materials, no building materials or components have been adversely impacted by Hazardous Materials, or is otherwise in violation of any Environmental Health and Safety Law;

(ii)      provide Landlord with a completed and executed Laboratory Decommissioning Checklist in the form of Schedule F-4,

(iii)     decommission all laboratory space in and about the Premises, including without limitation, to the extent required to deliver a complete Laboratory Decommissioning Checklist, and otherwise in accordance with applicable laws and best practices for similarly used laboratory space, and to the reasonable satisfaction of Landlord and the satisfaction of any Governmental Authority involved in the closure,

(iv)      terminate all licenses, permits, registrations and consents obtained by Tenant for the use or storage of Hazardous Materials at the Premises,

(v)       remove from the Premises and dispose of all universal waste, Hazardous Materials stored in the Premises in compliance with applicable laws (including, without limitation, all Environmental, Health and Safety Laws),

(vi)      decontaminate all surfaces and fixed equipment in the Premises,

(vii)     review and remediate and properly dispose of any specific Hazardous Materials that may be associated with any laboratory fixtures used by Tenant in the Premises, and

(viii)    provide to Landlord a copy of its most current universal, chemical, radiological and biological waste removal manifests and a certification from Tenant executed by an officer of Tenant that no Hazardous Materials or other potentially dangerous or harmful chemicals brought onto the Premises from and after the date that Tenant first took occupancy of the Premises remain in the Premises.

(g)       Indemnification. Tenant shall indemnify, hold harmless, and, at Landlord's option (with such attorneys as Landlord may approve in advance and in writing), defend Landlord and Landlord's officers, directors, shareholders, partners, members, managers, employees, contractors, property managers, agents and mortgagees and other lien holders, from and against any and all Losses (including without limitation, any costs of cleanup, remediation, removal and restoration) arising from or related to: (a) any violation or alleged violation by Tenant or any of Tenant's Parties of any of the requirements, ordinances, statutes, regulations or other laws referred to in this Section 2, including, without limitation, the

Environmental, Health and Safety Laws; (b) any breach of the provisions of this Section 2 by Tenant or any of Tenant's Parties; or (c) any Hazardous Use on, about or from the Premises of any Hazardous Material approved by Landlord under this Lease (including in connection with the Tenant's Generator). The indemnification of Landlord by Tenant includes, without limitation, reasonable costs incurred in connection with any investigation of site conditions or any cleanup, remedial, removal or restoration work required by any federal, state or local governmental agency or political subdivision because of Hazardous Material present in the soil or ground water on or under the Premises based upon the circumstances identified in the first sentence of this subsection (g). The indemnification and hold harmless obligations of Tenant under this subsection (g) shall survive any termination of this Lease.

3.  <u>Sustainability Initiative</u>. Tenant acknowledges that Landlord may elect, in Landlord's sole discretion, to implement energy efficient and environmentally sustainable practices (collectively, the "<u>Sustainability Initiative</u>") and, in furtherance of same may pursue an environmental sustainability monitoring and certification program such as Energy Star, Green Globes-CIEB, Leadership in Energy and Environmental Design ("<u>LEED</u>"), or similar programs ("<u>Green Certification</u>"). Tenant acknowledges that in order to further its Sustainability Initiative or pursue Green Certification, Landlord may be required to provide information, including a copy of this Lease (redacted if necessary to remove confidential information) and historical and current data regarding energy use, materials, procedures and systems operation within the Building and/or Premises to the Green Building Certification Institute ("<u>GBCI</u>") or to another certification body or agency, in order to demonstrate compliance with various program requirements. Tenant agrees that throughout the Term of this Lease: (i) Landlord may furnish a copy of this Lease (redacted as necessary) and other information provided from Tenant to Landlord as reasonably necessary to comply with Green Certification requirements; (ii) Tenant shall cooperate in good faith to maintain and provide Landlord with historical and current data regarding energy use, materials, procedures and systems operation by Tenant or within the Premises as Landlord shall reasonably require in order to meet the Sustainability Initiative, including without limitation documentation Tenant (or its consultant or contractor) has or may submit to obtain a "Green Certification" for the Premises; and (iii) Tenant shall cooperate with Landlord and comply with the Sustainability standards including, without limitation, all monitoring and data collection, maintenance, access, documentation and reporting requirements set forth therein. Tenant will make available to Landlord, upon Landlord's request, any information in Tenant's possession or control concerning matters necessary or desirable in its efforts to obtain or maintain Green Certification. Landlord's Sustainability Initiative may include, without limitation, matters addressing operations and maintenance, including, without limiting: chemical use; indoor air quality; energy efficiency; water efficiency; recycling programs; exterior maintenance programs; and systems upgrades to meet green building energy, water, indoor air quality, and lighting performance standards. Tenant's construction and maintenance methods and procedures, material purchases, and disposal of waste shall be in compliance with minimum standards and specifications of Landlord's Sustainability Initiative as Landlord may establish from time to time, in addition to all applicable Laws. Tenant shall use proven energy and carbon reduction measures, including energy efficient bulbs in task lighting; use of lighting controls; daylighting measures to avoid overlighting interior spaces; closing shades to avoid over heating the space; turning off lights and equipment at the end of the work day; and purchasing ENERGY STAR® qualified equipment, including but not limited to lighting, office equipment, commercial and residential quality kitchen equipment, vending and ice machines; and/or purchasing products certified by the U.S. EPA's Water Sense® program. Before closing and leaving the Premises at any time, Tenant shall use reasonable efforts to turn off all lights, electrical appliances and mechanical equipment that are not otherwise required to remain on.

4.  <u>Roof Rights</u>.

(a)      Subject to availability, any existing encumbrances and the terms and conditions hereof, Tenant shall have the right, at no additional charge, but otherwise subject to the terms and conditions of this Lease, to use certain surface space on the roof of the Building, in a location designated by Landlord and reasonably acceptable to Tenant, within an area not to exceed Tenant's Proportionate Share of available roof space (the "<u>Roof Area</u>"), for the purpose of installing (in accordance with Article 8), operating and maintaining Tenant's Generator (if Landlord designates the location therefor on the roof), antennas, satellite dishes, telecommunications equipment, supplemental HVAC devices and the like (collectively, the "<u>Tenant's Roof Equipment</u>") approved by Landlord.

(b)      Tenant shall install Tenant's Roof Equipment at its sole cost and expense, at such times and in such manner as Landlord may reasonably designate and in accordance with all of the provisions of this Lease, including without limitation Article 8.  Tenant shall not install or operate Tenant's Roof Equipment until it receives prior written approval of the plans for such work (including the manner in which the Tenant's Roof Equipment are attached to the roof of the Building and the manner in which any cables are run to and from the Tenant's Roof Equipment) in accordance with Article 8.  Landlord may withhold approval if the installation or operation of Tenant's Roof Equipment reasonably would be expected to damage the Base Building.  Tenant shall be solely responsible for obtaining all necessary governmental and regulatory approvals and for the cost of installing, operating, maintaining and removing the Tenant's Roof Equipment.  In addition, if any additional structural supports or other modifications to the Base Building are required to support Tenant's Roof Equipment, or if such alterations and/or the installation of Tenant's Roof Equipment triggers any other work required to comply with applicable Laws, Tenant shall be solely responsible, at Tenant's sole cost, for all such work.  Furthermore, if required by any governmental approvals or if at any time Landlord, in its sole but reasonable discretion, deems it necessary, Tenant shall provide and install, at Tenant's sole cost and expense, appropriate aesthetic screening, reasonably satisfactory to Landlord, for the Tenant's Roof Equipment.

Tenant shall engage Landlord's roofer before beginning any rooftop installations or repairs of Tenant's Roof Equipment, whether under this Section 4 or otherwise, and shall always comply with any roof warranty governing the protection of the roof and modifications to the roof.  Tenant shall use reasonable efforts to obtain a letter from Landlord's roofer following completion of such work stating that the roof warranty remains in effect, if applicable.  Tenant, at its sole cost and expense, shall inspect the Roof Area periodically (and at least once per year) and correct any loose bolts, fittings or other appurtenances and shall repair any damage to the roof caused by the installation or operation of Tenant's Roof Equipment.  Tenant shall pay Landlord following a written request therefor, with the next payment of Rent, (i) all applicable taxes or governmental charges, fees, or impositions imposed on Landlord because of Tenant's use of the Roof Area and (ii) the amount of any increase in Landlord's insurance premiums as a result of the installation of Tenant's Roof Equipment.

(c)      Tenant agrees that the installation, operation and removal of Tenant's Roof Equipment shall be at its sole risk.  Tenant shall indemnify and defend Landlord and the Landlord Parties against any liability, claim or cost, including reasonable attorneys' fees, incurred in connection with the loss of life, personal injury, damage to property or business or any other loss or injury (except to the extent due to the negligence or willful misconduct of Landlord or a Landlord Related Party) arising out of the installation, use, operation, or removal of Tenant's Roof Equipment by Tenant or its employees, agents, contractors, or invitees, including any liability arising out of Tenant's violation of this Section 4.  Landlord assumes no responsibility for interference in the operation of Tenant's Roof Equipment caused by other tenants' equipment, or for interference in the operation of other tenants' equipment caused by Tenant's Roof Equipment.  The provisions of this Section 4 shall survive the expiration or earlier termination of this Lease.

(d)     Upon the expiration or earlier termination of the Lease, Tenant, at its sole cost and expense, shall (i) remove such items of Tenant's Roof Equipment designated as Required Removables by Landlord at the time of Landlord's approval of the plans therefor, from the Roof Area in accordance with the provisions of this Lease and (ii) leave the Roof Area in good order and repair, reasonable wear and tear excepted.  If Tenant does not remove the Tenant's Roof Equipment designated as Required Removables when so required, Landlord may remove and dispose of it and charge Tenant for all costs and expenses incurred.

(e)     It is understood and agreed that the installation, maintenance, operation and removal of the Tenant's Roof Equipment and aesthetic screening, if any, is not permitted to damage the Building or the roof thereof, nor interfere with the use of the Building and roof by Landlord.  Tenant shall be responsible for any damage to the roof or any other part of the Building caused by Tenant or any of its agents, contractors or representatives in the exercise of Tenant's rights under this Section 4.  If Tenant's Roof Equipment (i) causes physical damage to the Base Building, (ii) materially interferes with any telecommunications, mechanical or other systems located at or servicing the Building, or (iii) interferes with any other service provided to other tenants in the Building, in each case in excess of that permissible under F.C.C. or other regulations (to the extent that such regulations apply and do not require such tenants or those providing such services to correct such interference or damage), Tenant shall within five (5) Business Days of notice of a claim of interference or damage cooperate with Landlord or any other tenant or third party making such claim to determine the source of the damage or interference and effect a prompt solution at Tenant's expense (if Tenant's Roof Equipment caused such interference or damage).  If Tenant shall fail to cooperate with Landlord in resolving any such interference, Landlord may at any time thereafter (i) if such failure continues for thirty (30) days after notice from Landlord, declare a Default and/or (ii) relocate the item(s) of Tenant's Roof Equipment in dispute.

(f)     Based on Landlord's good faith determination that such a relocation is necessary, Landlord reserves the right to cause Tenant to relocate Tenant's Roof Equipment located on the roof to comparably functional space on the roof by giving Tenant prior notice of such intention to relocate.  Landlord agrees to pay the reasonable cost of moving Tenant's Roof Equipment to such other space, taking such other steps necessary to ensure comparable functionality of Tenant's Roof Equipment, and finishing such space to a condition comparable to the then condition of the current location of Tenant's Roof Equipment.  Tenant shall arrange for the relocation of Tenant's Roof Equipment within sixty (60) days after Landlord's notice.  In the event Tenant fails to arrange for said relocation within the sixty (60) day period, Landlord shall have the right to arrange for the relocation of Tenant's Roof Equipment at Landlord's expense.

(g)     Tenant agrees that if Landlord makes or plans to make any repairs, alterations, modifications, additions or improvements to the Building (including any repairs or replacement of the roof or other components of the Base Building) that will require an adjustment or modification to the Roof Area or removal of the Tenant's Roof Equipment in order to perform such work, Tenant shall be responsible, at Landlord's cost, for the removal and storage of such Tenant's Roof Equipment and any re-installation thereof in the Roof Area after completion of such work by Landlord.  Landlord shall give Tenant at least ninety (90) days' prior written notice of any request for such removal of the Tenant's Roof Equipment, except in cases of emergency in which event such prior notice as is reasonable under the circumstances shall be given.

(h)     Notwithstanding anything to the contrary herein, the Tenant's Roof Equipment may be used only in direct support of Tenant's operations at the Premises, and Tenant shall not be permitted to license or grant other parties the right to use the same, nor shall Tenant allow its service providers to use the Roof Area and/or Tenant's Roof Equipment to provide services to any other party, or to facilitate the provision of services by any other service provider.  Landlord hereby reserves the right to grant roof

rights to other tenants or telecommunications service providers from time to time. Tenant shall also cooperate with any uniformly applied reasonable rooftop management policy and any telecommunications management policy which Landlord may implement for the Building.

Tenant's rights under this Section 4 are personal to the original Tenant and any Permitted Transferees.

5.      pH Neutralization System.  Landlord shall install, at Landlord's sole cost, the pH Neutralization System with a single riser serving both floors of the Premises in a location designated by Landlord on the approximate southwest side of the Building. Tenant shall have the right to connect to and use the pH Neutralization System (which shall be a dedicated system for the Premises serving exclusively the Premises and not a Building system), subject to the following conditions:

(a)      Tenant's use of the pH Neutralization System shall be at Tenant's sole risk to the extent permitted pursuant to applicable Laws.

(b)      Tenant's use of the pH Neutralization System shall be undertaken by Tenant in compliance with all applicable Laws and Tenant shall obtain any and all permits, including, but not limited to the MWRA Permit, required in connection with such use by Tenant.  For the avoidance of doubt, Tenant shall hold the MWRA Permit and all other permits and licenses required in connection with Tenant's use of the pH Neutralization System.

(c)      Initially, the pH Neutralization System shall be located on the approximate southwest side of the Building.  Thereafter, during the Term of this Lease, the pH Neutralization System may be relocated by Landlord to another area in the Building, provided that such relocated pH Neutralization System shall provide comparable functionality and utility to the pH Neutralization System initially installed as part of the Initial Tenant Work.

(d)      The costs to operate, maintain, repair and replace the pH Neutralization System shall be at Tenant's sole cost and expense.

(e)      The use of the pH Neutralization System shall be subject to the rules and regulations for the Building.

(f)      Tenant shall not introduce any substances or materials into the pH Neutralization System which (x) are in violation of the terms of the MWRA Permit, (y) are in violation of applicable Laws, or (z) would interfere with the proper functioning of the pH Neutralization System.

6.      Generators.

a.  Building Generator.

i.  Landlord shall install a multi-tenant emergency generator  for the non-exclusive use of the tenants and other occupants of the Building (the "Building Generator"). Landlord shall be responsible for the operation, maintenance, repair and replacement of the Building Generator, and such costs shall be included in Expenses. Notwithstanding anything to the contrary, Tenant's Proportionate Share of Expenses for the Building Generator  may be equitably adjusted by Landlord based upon variances in allocation between office space and lab space in Tenant's and other Building tenants' respective premises.

    ii.   Landlord shall provide Tenant with back-up generator capacity of five (5) watts per rentable square foot of lab space in its Premises.  Landlord's sole obligation for providing emergency back-up power or alternative sources of power to Tenant shall be to provide the Building Generator with not less than such stated capacity.

    iii.   Notwithstanding Tenant's non-exclusive right to use the Building Generator in common with other Building tenants, Tenant hereby acknowledges and agrees that it shall do so at Tenant's sole risk and Landlord shall not in any way be liable or responsible to Tenant for any loss, damage or expense which Tenant may sustain or incur if the Building Generator should fail to operate properly or as intended or if the quality, character or supply of electrical energy therefrom is changed or is no longer available or suitable for Tenant's requirements, Tenant hereby holding Landlord harmless for all of such loss, damage and expense.

b.   <u>Tenant's Generator</u>.

    i.   Tenant shall have the right to install, at Tenant's sole cost, a back-up generator on the Property and associated diesel facilities and related components (collectively, the "<u>Tenant's Generator</u>"), in the locations reasonably designated therefor by Landlord, subject to Landlord's prior written approval of Tenant's plans and specifications therefor, which approval shall not be unreasonably withheld, conditioned or delayed. Tenant shall also have the non-exclusive right to access those portions of the Building and the Property (including, without limitation, the roof of the Building, if applicable), to the extent necessary for the installation, operation, maintenance, and repair of the Tenant's Generator.  Landlord shall have no obligations to Tenant with respect to the installation, operation, repair, maintenance or replacement of the Tenant's Generator, except that if Landlord designates a location on the ground (instead of the roof) for the Tenant's Generator, then Landlord shall provide the concrete pad for the same.  Tenant shall be responsible, at Tenant's sole cost and expense, for maintaining, testing, refueling and cleaning the Tenant's Generator, all in compliance with applicable Laws.  Tenant shall, at its own cost and expense, enter into a regularly scheduled preventive maintenance/service contract with a maintenance contractor approved by Landlord for servicing the Tenant's Generator (and a copy thereof shall be furnished to Landlord).  The service contract must include all services suggested by the equipment manufacturers in the operation/maintenance manual or required by applicable government laws, ordinances, rules and regulations.  If Tenant fails to maintain such maintenance/service contract in effect and such failure continues for thirty (30) days after notice by Landlord to Tenant, Landlord may, upon notice to Tenant, enter into such a maintenance/service contract on behalf of Tenant or perform the work and, in either case, charge Tenant the cost thereof along with a reasonable amount for Landlord's overhead.

    ii.   Tenant acknowledges and agrees that access to any portion of the Tenant's Generator located outside of the Premises shall be subject to coordination with the Landlord for such access.  Tenant shall at all times comply with any and permits and approvals issued by applicable governmental authorities with respect to the use of the Tenant's Generator.  Tenant's use of the Tenant's Generator shall not at any time:  (i) affect the waterproofing of the roof; or (ii) cause any interference with (w) the Building's operating or mechanical systems, (x) the operations of any tenant in the Building, including any tenant's roof deck use, (y) any telecommunications equipment in or on

the Building (A) of any telecommunications service provider which makes its services available generally to the tenants of the Building or (B) serving a larger portion of the Building than the Premises. Tenant shall also cooperate with any rooftop management policy which Landlord may implement for the Building, provided that such policy does not materially decrease Tenant's rights or materially increase Tenant's obligations under this Lease. Tenant shall not be charged any Additional Rent as a result of the installation of the Tenant's Generator, unless Tenant damages any portion of the Building or the roof in connection with its installation, operation, maintenance, or repair of such Tenant's Generator. Pursuant to Section 8.03 of the Lease, Tenant's Generator shall be deemed a Required Removable unless Landlord expressly waives the requirement for Tenant to remove the same.

7.     <u>Negative Conditions</u>. In light of the fact that the Premises are in a multi-tenant Building, Tenant shall not perform any act or carry on any practice or operate any machinery or equipment which may injure the Premises or any other part of the Building, or cause any odors or vibrations, or noise (including, but without limitation, the use of grinders), or constitute a nuisance or menace to any other occupant or other persons in the Building, and Tenant shall prevent any odors, smoke, vibration, noise, water or other objectionable emissions from emanating from the Premises and shall prevent the emanation of strong odor, smoke, vibration, noise, water or other undesirable effects which might constitute a nuisance or otherwise unreasonably interfere with the safety, comfort or convenience of Landlord or of any of the other occupants of the Building (a "<u>Negative Condition</u>"). Upon Landlord's written notice to Tenant that such a Negative Condition exists, Tenant shall thereafter promptly undertake actions to remedy such Negative Condition (which actions may include the installation, operation, maintenance and inspection of odor, noise, vibration, water and/or smoke control devices, and the establishment of effective control procedures to eliminate such odors, noise, vibration, smoke, water or other objectionable emissions) within five (5) Business Days following receipt of such notice, or such longer period of time as is reasonably necessary to remedy such Negative Condition so long as Tenant promptly undertakes to remedy any such condition within such five (5) Business Days and diligently and continuously pursues such remedy to completion. Tenant shall cease the activity causing the Negative Condition upon receipt of Landlord's notice until the Negative Condition has been remedied. The means Tenant uses to prevent such migration may include but not be limited to: (i) operating the HVAC systems, including any special exhaust systems, under negative pressure, (ii) sealing all openings in the demising walls, (iii) providing continuous waterproof base (per Landlord's criteria) along the demising walls in the showers (if any), kitchen and laboratory areas in the Premises, and (iv) placing machines or equipment in settings of cork, rubber or spring type noise and vibration eliminators. If any such Negative Condition is not so remedied, Landlord may, at its discretion either: (i) cure such Negative Condition and add any cost and expense incurred by Landlord therefor to the next installment of Base Rent due under this Lease, and Tenant shall then pay such amount as additional rent hereunder, or (ii) treat Tenant's failure to remedy such Negative Condition as a Default if the Negative Condition continues for thirty (30) days after notice of the same is given by Landlord to Tenant and Tenant is not diligently and continuously pursuing the remedy of the same, entitling Landlord to any of its remedies pursuant to the terms of this Lease.

Schedule F-1

**INITIAL LIST OF APPROVED HAZARDOUS MATERIALS AND QUANTITIES**

| Hazardous Material | Quantities (Estimated Gallons per month) | Quantities (Estimated Pounds per month) |
|---|---|---|
| Acetic acid | $\leq 5$ | |
| Acetone | $\leq 2.5$ | |
| Acetonitrile | $\leq 22$ | 183 |
| Chloroform | $\leq 0.026$ | 0.3 |
| Crystal Violet, Gram Iodine <Povidone-Iodine or Potassium Iodine> | $\leq 0.5$ | |
| DECON-GLASS® Sterile Cleaner | $\leq 5$ | |
| DECON-SPORE 200 Plus® | $\leq 1$ | |
| Dibutylammonium Acetate (as ammonium acetate) | $\leq 0.528$ | 5 |
| Ethanol | $\leq 53$ | 442 |
| Ethidium bromide | $\leq 0.0026$ | 0.03 |
| Formic Acid | $\leq 0.528$ | 5 |
| Hexafluoro-2-methyl-2-propanol | $\leq 0.528$ | 5 |
| Hexafluoro-2-propanol | $\leq 0.528$ | 5 |
| Hexylamine | $\leq 0.528$ | 5 |
| Hexylammonium Acetate (as ammonium acetate) | $\leq 0.528$ | 5 |
| Hydrogen peroxide solution 30% | $\leq 2$ | |
| Hypo-Chlor® 0.52%- RTU | $\leq 5$ | |
| Isopropanol | $\leq 10.567$ | 88 |
| LPH®se | $\leq 5$ | |
| Liquid Nitrogen | TBD * | |
| Methanol | $\leq 13.2$ | 110 |
| Paraformaldehyde 16% | $\leq 1$ | |
| Peridox RTU | $\leq 5$ | |
| Phenol | $\leq 0.026$ | 0.3 |
| Phenol Red | $\leq 2.5$ | |
| Sodium azide | $\leq 0.25$ | |
| Sodium Hypochlorite (10)% | $\leq 10$ | |
| Spor-Klenz® | $\leq 10$ | |
| Steri-Perox 6%- RTU | $\leq 10$ | |
| Tributylammonium Acetate (as ammonium acetate) | $\leq 0.52$ | 5 |
| Triethylamine | $\leq 0.528$ | 5 |
| Triethylammonium Acetate | $\leq 0.528$ | 5 |

| | | |
|---|---|---|
| Trifluoroacetic Acid | ≤0.264 | 3 |
| Tripropylamine | ≤0.528 | 5 |
| Trypan Blue | ≤0.026 | 0.3 |
| Vesphene® IIse | ≤ 1 | |
| | | |
| | | |
| | **Total** | |

Schedule F-2

## PROHIBITED HAZARDOUS MATERIALS

1)      **Selected biological agents and toxins** (Select Agents) as defined by the Federal Select Agent Program (http://www.selectagents.gov/) which have the potential to pose a severe threat to public, animal or plant health or to animal or plant products <u>and</u> require registration to possess, use or transfer.  Select Agents are regulated under 7CFR Part 331, 9 CFR Part 121 and 42 CFR Part 73, and may also be regulated by the Town of Bedford.

2)      **Chemicals that present a high level of security risk** under the April 2007 Department of Homeland Security – Chemical Facilities Anti-Terrorism Standards (CFATS) regulation (http://www.dhs.gov/identifying-facilities-covered-chemical-security-regulation), that are at or above the applicable Screening Threshold Quantity.

3)      **The following chemicals:**

**Perchloric Acid**
**Picric Acid**
**Pyrophoric Material**: As defined in 780 CMR as a chemical with an auto ignition temperature in air, at or below a temperature of 130°F (54.4°C).
**Oxidizer Class 3**: As defined in 780 CMR as an oxidizer that will cause a severe increase in the burning rate of combustible materials with which the oxidizer comes in contact or that will undergo vigorous self-sustained decomposition due to contamination or exposure to heat.

**Toxic Gas:** As defined in 527 CMR as a gas that has a median lethal concentration (LC50) in air of more than 200 parts per million, but not more than 2,000 parts per million by volume of gas or vapor, or 2 milligrams per liter but no more than 20 milligrams per liter of mist, fume, or dust, when administered by continuous inhalation for 1 hour (or less if death occurs within 1 hour) to albino rats weighing between 0.44 lb. and 0.66 lb. (200 and 300 grams) each.

**Corrosive Gas:** As defined in 527 CMR as a gas that causes visible destruction of or irreversible alterations in living tissue by chemical action at the site of contact.

4)      **Radioactive Materials and Devices:** as regulated in 105 CMR 120 Radiation Control Program.

5)      <u>Explosive Materials:</u>  as defined in 18 USC 841(e) of the Federal explosives statutes in United States Code, CHAPTER 40 – IMPORTATION, MANUFACTURE, DISTRIBUTION AND STORAGE OF EXPLOSIVE MATERIALS.

6)      <u>Oxidizer Class 4</u>: As defined in 780 CMR as an oxidizer that can undergo an explosive reaction due to contamination or exposure to thermal or physical shock. Additionally, the oxidizer will enhance the burning rate and is capable of causing spontaneous ignition of combustibles.

7)     Organic Peroxides: As defined in 780 CMR.

**Unclassified detonable**: Organic peroxides which are capable of detonation. These peroxides present an extremely high explosion hazard through rapid explosive decomposition.

**Class I:** Class I organic peroxides are capable of deflagration, but not detonation. These peroxides present a high explosion hazard through rapid decomposition.

8)     Unstable (reactive) materials: As defined in 780 CMR.

**Class 4**: Materials that in themselves are readily capable of detonation or explosive decomposition or explosive reaction at normal temperatures and pressures. This class includes, among others, materials that are sensitive to localized thermal or mechanical shock at normal temperatures and pressures.

**Class 3:** Materials that in themselves are capable of detonation or explosive decomposition or explosive reaction, but that require a strong initiating source or that must be heated under confinement before initiation. This class includes, among others, materials that are sensitive to thermal or mechanical shock at elevated temperatures and pressures.

9)     Water-reactive materials: As defined in 780 CMR.

**Class 3:** Materials which react explosively with water without requiring heat or confinement.

10)    Cryogenic liquids (flammable or oxidizing): As defined in 780 CMR as any liquid that   has a boiling point below -200°F (-129°C).

11)    Highly Toxic Gas:  As defined in 527 CMR as a chemical that has a median lethal concentration (LC50) in air of 200 parts per million by volume or less of gas or vapor, or 2 milligrams per liter or less of mist, fume, or dust, when administered by continuous inhalation for 1 hour (or less if death occurs within 1 hour) to albino rats weighing between 0.44 lb. and 0.66 lb. (200 and 300 grams) each.

12)    Unstable (reactive) gas:  As defined in 527 CMR as a gas that, in the pure state or as commercially produced, will vigorously polymerize, decompose, or condense; become self-reactive; or otherwise undergo a violent chemical reaction under condition of shock, pressure, or temperature.

13)    Pyrophoric gas:  As defined in 527 CFR as a gas with an auto ignition temperature in air, at or below a temperature of 130°F (54.4°C).

<u>Schedule F-3</u>

Chemical Storage Allocation

[See Attached]

## 28 Crosby Drive - Bedford, MA

### OPTION 1 - FIREPROOF STEEL FRAMING SUPPORTING 2ND FLOOR

This option is likely the most costly and most disruptive for existing tenants.



| | | | | |
|---|---|---|---|---|
| **2** | 360 gal | 360 gal | 360 gal | 1,080 gal |
| **1** | 480 gal | 480 gal | 480 gal | 1,920 gal |

Control Area Total: 3,000 gal

—— 1-hour construction

—— 2-hour construction

Notes:
- Representative quantities provided for Class I flammable liquids.

©Jacobs 2021

F-17

## 28 Crosby Drive - Bedford, MA

### OPTION 2 - WHOLE BUILDING CONTROL AREA

This option is likely the most restrictive for future 2nd Floor tenants.

| 2 | No more than 360 gal | Total: 480 gal |
|---|---|---|
| 1 | No more than 480 gal | |

Control Area Total: 480 gal

••••••• 0-hour construction

Notes:
- Representative quantities provided for Class I flammable liiquids.
- Total MAQ within Multi-Story Control Area cannot exceed 100% of the MAQs (480 gal) and quantities on each level cannot exceed the MAQ for that level.

©Jacobs 2021

F-18

# 28 Crosby Drive - Bedford, MA

## OPTION 3 - STORAGE ROOM CONTROL AREAS

This option is likely the least intrusive to existing tenants while provides better flexibility for future tenants than option 2



Control Area Total: 1,920 gal

·········· 0-hour construction

——— 1-hour construction

——— 2-hour construction

Notes:
- Representative quantities provided for Class I flammable liquids.

©Jacobs 2021

Schedule F-4

# Tenant Laboratory Decommissioning Checklist

T

**enant Name:**_____ **Tenant Location:**_____

### *Waste Management*

*If you used and/or stored the following materials, please put a "✓" in the "used and/or stored" box. Indicate the disposal vendor and date of final removal from the laboratory.*

| Item | Used and/or Stored | Disposal Vendor Name | Removal Date |
|------|--------------------|-----------------------|--------------|
| Hazardous (Chemical) Waste | | | |
| Gas Cylinders | | | |
| Biological Waste and Sharps | | | |
| Animal Carcasses and Waste | | | |
| Radioactive Waste | | | |
| Controlled Substances | | | |
| Select Agents | | | |

### *Permits and Licenses*

*If you possessed any of the following permits and/or licenses, please put a "✓" in the "Applicable" box. Indicate the date you requested termination of the permit or license, and whether confirmation has been received from the regulatory agency.*

| Permit or License | Regulatory Agency | Applicable? | Date of Termination Request | Confirmation from Regulator Received? |
|-------------------|-------------------|-------------|-----------------------------|----------------------------------------|
| **Recombinant DNA Permit** | Town of Bedford | | | |
| **Biosafety Permit** | Town of Bedford | | | |
| **Laboratory Animal Use Permit** | Town of Bedford | NOT APPLICABLE | | |
| **Flammables Permit** | Town of Bedford | | | |
| **Wastewater Discharge Permit** | Massachusetts Water Resources Authority | | | |
| **Hazardous Waste Generator ID#** | Massachusetts Department of Environmental Protection | | | |
| **Radiation Control License** | Massachusetts Department of Public Health | | | |

| Controlled Substances Registration | Massachusetts Department of Public Health & United States Drug Enforcement Agency | NOT APPLICABLE | | |
|---|---|---|---|---|
| Select Agent Registration | United States / Department of Agriculture or Homeland Security | | | |

*Laboratory Decontamination Survey*

| | | |
|---|---|---|
| Were all fixed surfaces in the laboratory such as benches, fume hoods, sinks, cold rooms and warm rooms decontaminated with a disinfectant or other efficacious decontaminant? | YES | NO |
| If "YES", briefly describe the decontaminants used, specific to the hazardous materials in use and storage in the laboratory. | | |
| Did you use any mercury-containing equipment such as thermometers, or elemental mercury? | YES | NO |
| If "YES", briefly describe: | | |
| If "YES", have you had the sink traps tested for mercury contamination?  If "YES", attach results. | YES | NO |
| If the results of the mercury test indicated the presence of mercury, did you have it removed and decontaminated?  If "YES", attach documentation. | YES | NO |
| Did you use any perchlorates in the chemical fume hoods? | YES | NO |
| If "YES", indicate the location of the fume hood(s): | | |
| If "YES", have you had the fume hood(s) tested for perchlorate residues?  If "YES", attach results. | YES | NO |
| If the results of the perchlorate test indicated the presence of residues, did you have the fume hood and associated ductwork decontaminated?  If "YES", attach documentation. | YES | NO |
| Is there any equipment remaining in the laboratory that will not be removed, such as but not limited to biosafety cabinets, incubators, or freezers? | YES | NO |
| If "YES", briefly describe the equipment and the methods used to decontaminate the equipment: | | |
| During the lease period, was there ever a chemical spill in the laboratory? | YES | NO |
| If "YES", please provide information on the material and quantity involved in the spill, and approximate date of the spill: | | |

**Print Name of Person Completing This Form:** _____

**Print Name of Company Officer:** _____

**Signature of Company Officer:** _____

**Date:** _____

**EXHIBIT G**

**[INTENTIONALLY DELETED]**

**EXHIBIT H**

**FORM OF SNDA**

[See Attached]

Drafted, drawn & prepared for or by,

Recording requested by, and

When recorded return to:

WELLS FARGO BANK,

NATIONAL ASSOCIATION

40 West 57th Street, 21st Floor
New York, New York 10019
Attention: Loan Administration
Loan No.:  33-0955857

---

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

---

Parties to the Document:

TENANT:

OWNER:

[GUARANTOR: ]

LENDER:                    WELLS FARGO BANK, NATIONAL ASSOCIATION

---

Property:

---

[Form Date 5/23/17]

LEGAL02/32448714v3

**SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**

Tenant's Trade Name: _____

**NOTICE:  THIS SUBORDINATION AGREEMENT RESULTS IN YOUR LEASEHOLD ESTATE IN THE PROPERTY BECOMING SUBJECT TO AND OF LOWER PRIORITY THAN THE LIEN OF THE MORTGAGE (DEFINED BELOW).**

This SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT ("<u>Agreement</u>") is made as of _____, 20___, by and between _____, a _____ ("<u>Tenant</u>"), and WELLS FARGO BANK, NATIONAL ASSOCIATION (together with its successors and assigns, "<u>Lender</u>"), with reference to the following facts and intentions of the parties:

**R E C I T A L S**

A.  _____, a _____ ("Owner") is or is about to become the owner of the land and improvements commonly known as _____ and more specifically described in Exhibit A attached hereto ("Property") and the owner of the landlord's interest in the Lease identified in Recital B below.

B.  Tenant is the owner of the tenant's interest in that lease dated _____, which has been amended by instrument(s) dated _____ and which was originally executed by _____, as landlord, and by _____, as tenant. (Said lease and the referenced amendment(s) thereto are collectively referred to herein as the "Lease").

C.  Owner, as borrower or as co-borrower with one or more other co-borrower(s), has applied to Lender for a loan ("Loan"), which will be secured by, among other things, a mortgage, deed of trust, trust indenture, or deed to secure debt encumbering the Property ("Mortgage") and an assignment of leases and rents ("Assignment of Leases") covering the Property.

D.  As a condition to making the Loan to Owner, Lender has required that Tenant furnish certain assurances to, and make certain agreements with, Lender, as set forth below.  Tenant has agreed that the Lease shall be subject and subordinate to the Mortgage held by Lender, provided Tenant is assured of continued occupancy of the Property under the terms of the Lease as hereinafter provided.

THEREFORE, the parties agree as follows:

1.  **SUBORDINATION**.

    1.1  **Subordination**.  The Lease and all of the terms, covenants, and provisions thereof, and all rights, remedies and options of Tenant thereunder (including, without limitation, any preferential rights contained in the Lease, or otherwise existing, to acquire any or all of the Property, or any superior leasehold interest therein) are and shall at all times continue to be subject and subordinate in all respects to the terms, covenants, and provisions of the Mortgage as of the date hereof, and to the lien thereof, including without limitation, all renewals, increases, modifications, spreaders, consolidations, replacements, and extensions thereof and to all sums secured thereby and advances made thereunder with the same force and effect as if the Mortgage had been executed, delivered, and recorded prior to the execution and delivery of the Lease.  Tenant acknowledges that Owner will execute and deliver to Lender an assignment of the Lease as security for the Loan, and Tenant hereby expressly consents to such assignment.  Tenant agrees that if there is a default by Owner in the performance and observance of any of the terms of the Loan, Lender may, at its option, demand all rents due under the Lease be paid by Tenant directly to Lender at the address specified by Lender.  Tenant agrees that upon Lender's written request for payment of rent directly to Lender, Tenant will timely remit any and all payments due under the Lease directly to, and payable to the order of, Lender.  Such payments to Lender will constitute performance of Tenant's

payment obligations under the Lease.  [Tenant acknowledges and agrees that it has no right or option of any nature whatsoever, whether pursuant to the Lease or otherwise, to purchase the leased premises or the Property, or any portion thereof or any interest therein, and to the extent that Tenant has had, or hereafter acquires, any such right or option, the same is hereby acknowledged to be and is hereby waived and released as against Lender.]  [Tenant and Owner acknowledge and agree that Tenant's [preferential] [purchase option] rights as contained in Section___ of the Lease are subject and subordinate to the Mortgage pursuant to the terms of this Section 1.1.]

1.2     **Condition Precedent**.  Lender would not make the Loan without this Agreement.

1.3     **Entire Agreement**.  This Agreement shall be the whole agreement and only agreement with regard to the subordination of the Lease to the Mortgage, and shall supersede and cancel, but only insofar as would affect the priority between the Mortgage and the Lease, any prior agreements as to such subordination, including, without limitation, those provisions, if any, contained in the Lease which provide for the subordination of the Lease to a deed or deeds of trust, a mortgage or mortgages, a deed or deeds to secure debt or a trust indenture or trust indentures.

1.4     **Disbursements**.  Lender, in making disbursements pursuant to the Note, the Mortgage or any loan agreements with respect to the Property, is under no obligation or duty to, nor has Lender represented that it will, see to the application of such proceeds by the person or persons to whom Lender disburses such proceeds, and any application or use of such proceeds for purposes other than those provided for in such agreement or agreements shall not defeat this agreement to subordinate in whole or in part.

1.5     **Subordination**.  Tenant intentionally and unconditionally subordinates all of Tenant's right, title and interest in and to the Property, to the Mortgage and understands that in reliance upon, and in consideration of, this subordination, specific loans and advances are being and will be made by Lender and, as part and parcel thereof, specific monetary and other obligations are being and will be entered into which would not be made or entered into but for said reliance upon this subordination.

2.      **NON-DISTURBANCE AND ATTORNMENT**.

2.1     **Non-Disturbance**.  Notwithstanding anything to the contrary contained in the Lease, so long as there shall exist no breach, default or event of default (beyond any period given to Tenant in the Lease to cure such default) on the part of Tenant under the Lease at the time of any foreclosure of the Mortgage, Lender agrees that the leasehold interest of Tenant under the Lease shall not be terminated by reason of such foreclosure, but rather the Lease shall continue in full force and effect and Lender shall recognize and accept Tenant as tenant under the Lease subject to the provisions of the Lease.  Nothing contained herein shall prevent Lender from naming Tenant in any foreclosure or other action or proceeding initiated by Lender pursuant to the Mortgage to the extent necessary under applicable Law in order for Lender to avail itself of and complete the foreclosure or other remedy.

2.2     **Attornment**.  Notwithstanding anything to the contrary contained in the Lease, should title to the leased premises and the landlord's interest in the Lease be transferred to Lender or any other person or entity ("New Owner") by foreclosure of the Mortgage, by conveyance instrument in-lieu of foreclosure of the Mortgage, or otherwise, Tenant agrees, for the benefit of New Owner and effective immediately and automatically upon the occurrence of any such transfer, that:  (a) Tenant shall pay to New Owner all rental payments required to be made by Tenant pursuant to the terms of the Lease for the remainder of the term of the Lease; (b) Tenant shall be bound to New Owner in accordance with all of the provisions of the Lease for the remainder of the term of the Lease; (c) Tenant shall attorn to New Owner as its landlord, such attornment to be effective and self-

operative without the execution of any further instruments; (d) Tenant shall promptly execute and deliver to New Owner (upon New Owner's request) an appropriate agreement of attornment to New Owner and any subsequent titleholder of the Property; (e) New Owner shall not be subject to any claims, offsets or defenses which Tenant might have against any prior landlord (including Owner) unless expressly provided for in the Lease; (f) New Owner shall complete any construction work required to be done by any prior landlord (including Owner) pursuant to the provisions of the Lease and shall be obligated to reimburse Tenant for any construction work done by Tenant as provided in the Lease, including the payment of the Allowances (as such term is defined in the Lease) in accordance with the terms of the Lease; (g) New Owner shall not be required to make any repairs to the Property or the leased premises required as a result of fire or other casualty or by reason of condemnation unless New Owner shall be obligated under the Lease to make such repairs and then shall be obligated to finance the completion of such repairs only to the extent of casualty insurance proceeds or condemnation awards received; (h) New Owner shall not be required to make any capital improvements to the Property or to the leased premises which Owner may have agreed to make, but had not completed, or to perform or provide any services not related to possession or quiet enjoyment of the leased premises, provided, however, that if New Owner elects not to perform such capital improvements Tenant shall have all rights and remedies available under the Lease; (i) New Owner shall not be liable for any act, omission or default of any prior landlord (including Owner) unless such act, omission or default arises out of a continuing or present responsibility of the landlord pursuant to the terms of the Lease; (j) New Owner shall not be bound by any rent or additional rent which Tenant might have paid for more than the current month or any security deposit or other prepaid charge paid to any prior landlord (including Owner) unless actually received by New Owner; (k) New Owner shall not be bound by any amendment or modification of the Lease made without its written consent, which consent shall not be unreasonably withheld; and (l) New Owner shall not be liable for any obligations of landlord (including Owner) arising under the Lease following any subsequent transfer of the title to the leased premises by New Owner.

3.    **LEASE DEFAULTS**.  In the event Owner shall fail to perform or observe any of the terms, conditions or agreements in the Lease, Tenant shall give written notice thereof to Lender concurrently with the notice of same given by Tenant to Owner, and Lender shall have the right (but not the obligation) to cure such default within the same period of time as is available to Owner to cure such default, provided, however, in the case of any non-monetary default, Lender shall be given such additional, reasonable period as may be required for Lender to cure such default, provided that Lender confirms in writing to Tenant that Lender intends to cure such default, and provided further that Lender promptly commences and diligently and continuously prosecutes such cure to completion.  Tenant will accept performance by Lender of any term of the Lease required to be performed by Owner with the same force and effect as though performed by Owner, although Lender shall in no event be required to do so.

4.    **OBLIGATIONS AND LIABILITY OF LENDER**.  Lender shall have no obligations nor incur any liability with respect to any warranties of any nature whatsoever, whether pursuant to the Lease or otherwise, including, without limitation, any warranties respecting use, compliance with zoning, hazardous wastes or environmental laws, Owner's title, Owner's authority, habitability, fitness for purpose or possession.  Furthermore, in the event that Lender shall acquire Owner's interest in the Property, Lender shall have no obligation, nor incur any liability, beyond Lender's interest in the Property, and Tenant shall look exclusively to such interest of Lender in the Property for the payment and discharge of any obligations or liability imposed upon Lender hereunder, under the Lease (or under any new lease with Tenant), and Lender is hereby released and relieved of any other obligations or liability hereunder, under the Lease or under any such new lease.  Lender shall not, either by virtue of the Mortgage, the Assignment of Leases or this Agreement, be or become a mortgagee in possession or be or become subject to any liability or obligation under the Lease or otherwise until Lender shall have acquired the Owner's interest in the Property, by foreclosure or otherwise, and then such liability or obligation of Lender under the Lease (as modified by the terms of this Agreement) shall extend only to those liabilities or obligations accruing subsequent to the date that Lender has acquired Owner's interest in the Property.  Without limiting the

generality of the foregoing, neither the Mortgage, the Assignment of Leases nor this Agreement shall, prior to Lender's acquisition of Owner's interest in the Property, by foreclosure or otherwise, operate to place responsibility for the control, care, management or repair of the Property upon Lender or impose upon Lender responsibility for the carrying out of any of the terms or conditions of the Lease, and Lender shall not be responsible or liable for any waste committed on either the leased premises or the Property by any party whatsoever, for any dangerous or defective condition of the Property or for any negligence in the management, upkeep, repair or control of either the leased premises or the Property. Notwithstanding anything contained in this Agreement or the Lease to the contrary, upon Lender's transfer or assignment of Lender's interests in the Loan, the Lease (or any new lease executed pursuant to this Agreement), or the Property, Lender shall be deemed released and relieved of any obligations under this Agreement, the Lease (or any new lease executed pursuant to this Agreement), and with respect to the Property.

5.  **MISCELLANEOUS**.

5.1  **Reliance by Lender**.  Tenant acknowledges that the representations and agreements made by Tenant to and with Lender herein constitute a material inducement to Lender to make the Loan, and that Lender would not make the Loan in the absence of this Agreement.

5.2  **Heirs, Successors and Assigns**.  The covenants herein shall be binding upon, and inure to the benefit of, the heirs, successors and assigns of the parties hereto.  Whenever necessary or appropriate to give logical meaning to a provision of this Agreement, the term "Owner" shall be deemed to mean the then current owner of the Property and the landlord's interest in the Lease.

5.3  **Addresses; Request for Notice**.  So long as the Mortgage remains outstanding and unsatisfied, Tenant will mail or deliver to Lender, at the address and in the manner herein below provided, a copy of all notices given to the Owner by Tenant under and pursuant to the terms and provisions of the Lease.  All notices and other communications that are required or permitted to be given to a party under this Agreement shall be in writing and shall be sent to such party, either by personal delivery, by overnight delivery service, by certified first class mail, return receipt requested, or by facsimile transmission, to the address or facsimile number below.  All such notices and communications shall be effective upon receipt of such delivery or facsimile transmission.  The addresses and facsimile numbers of the parties shall be:

| Owner: | Tenant: | Lender: |
|---|---|---|
| [*NAME OF LANDLORD HERE:* | [*NAME OF TENANT HERE:* | Wells Fargo Bank, National Association c/o Wells Fargo Commercial Mortgage Servicing 401 S. Tryon Street, 8th Floor Charlotte, North Carolina 28202 |
| Tel. No.: | Tel. No.: | |
| Fax No.: | Fax No.: | Facsimile No.: 704-715-0034 |

provided, however, any party shall have the right to change its address for notice hereunder by the giving of written notice thereof to the other party in the manner set forth in this Agreement.

5.4  **Invalid or Inoperative Provisions**.  If any portion or portions of this Agreement shall be held invalid or inoperative, then all of the remaining portions shall remain in full force and effect, and, so far as is reasonable and possible, effect shall be given to the intent manifested by the portion or portions held to be invalid or inoperative.

5.5  **GOVERNING LAW; JURISDICTION**.

a.  THE PARTIES AGREE THAT THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE WHERE THE PROPERTY IS LOCATED WITHOUT REFERENCE TO THE CHOICE OF LAW PRINCIPLES THEREOF, AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.  TO THE FULLEST EXTENT PERMITTED BY LAW, OWNER AND TENANT HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVE ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT.

b.  ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER, OWNER OR TENANT ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE COUNTY WHERE THE PROPERTY IS LOCATED, AND EACH PARTY HERETO WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.

5.6  **Counterparts**.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute and be construed as one and the same instrument.

5.7  **Section Headings**.  Section headings in this Agreement are for convenience only and are not to be construed as part of this Agreement or in any way limiting or applying the provisions hereof.

5.8  **Attorneys' Fees**.  If any legal action, suit or proceeding is commenced between Tenant and Lender regarding their respective rights and obligations under this Agreement, the prevailing party shall be entitled to recover, in addition to damages or other relief, costs and expenses, reasonable attorneys' fees and court costs (including, without limitation, expert witness fees).  As used herein, the term "prevailing party" shall mean the party which obtains the principal relief it has sought, whether by compromise settlement or judgment.  If the party which commenced or instituted the action, suit or proceeding shall dismiss or discontinue it without the concurrence of the other party, such other party shall be deemed the prevailing party.

5.9  **Binding Nature**.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors, successors-in-title and assigns.  When used herein, the term "Owner" refers to the landlord under the Lease and Owner and to any successor to the interest of landlord or Owner under the Lease and "Lender" refers to Lender and to any assignee or subsequent holder of the note secured by the Mortgage (whether by assignment, secondary market transaction, or otherwise) and Lender's servicer of the Loan, if any.

6.  **INCORPORATION**.  Exhibit A, the Owner's Consent and the Lease Guarantor's Consent are attached hereto and incorporated herein by this reference.

**[Signature Pages to Follow]**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**NOTICE:  THIS AGREEMENT CONTAINS A PROVISION WHICH ALLOWS THE OWNER TO OBTAIN A LOAN, THE PROCEEDS OF WHICH MAY BE EXPENDED FOR PURPOSES OTHER THAN THE IMPROVEMENT OF THE PROPERTY.**

**LENDER:**

**WELLS FARGO BANK, NATIONAL ASSOCIATION**

By:_____

Name:_____

[Authorized Signor]

*[Revise State Form Notary per State Requirements (Where Property is Located) for Each Signature Block]*

STATE OF _____        §

                                §

COUNTY OF _____        §

The foregoing instrument was acknowledged before me on _____, 20___, by _____, as Authorized Signor of WELLS FARGO BANK, NATIONAL ASSOCIATION, on behalf of said national association.

Given under my hand and official seal, this _____ day of _____, 20___.

_____

NOTARY PUBLIC

My Appointment Expires:                [Notarial Seal]

_____

**TENANT:**

_____,

a _____

By: _____
Name: _____
Title: _____

[*Revise State Form Notary per State Requirements (Where Property is Located) for Each Signature Block*]

STATE OF _____        §

                                 §

COUNTY OF _____         §

The foregoing instrument was acknowledged before me on _____, 20___, by
_____, the _____ of _____,
a _____, on behalf of said _____.

_____
NOTARY PUBLIC, State of _____

Printed Name: _____

My Appointment Expires: _____

[Notary Seal]

**IT IS RECOMMENDED THAT, PRIOR TO THE EXECUTION OF THIS AGREEMENT, THE PARTIES CONSULT WITH THEIR ATTORNEYS WITH RESPECT HERETO.**

## OWNER'S CONSENT

The undersigned, which owns or is about to acquire the Property and the landlord's interest in the Lease, hereby consents to the execution of the foregoing SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, and to implementation of the agreements and transactions provided for there-in.

<u>**OWNER**</u>:

_____,

a _____

By:_____
Name:_____
Title:_____


_____ [*Revise State Form Notary per State Requirements (Where Property is Located) for Each Signature Block*]

STATE OF _____        §

                                §

COUNTY OF _____        §

The foregoing instrument was acknowledged before me on _____, 20___, by _____, the _____ of _____, a _____, on behalf of said _____.

_____
NOTARY PUBLIC, State of _____

Printed Name:_____

My Appointment Expires:_____

[Notary Seal]

## LEASE GUARANTOR'S CONSENT

[The undersigned ("Lease Guarantor") hereby: (a) consents to the foregoing SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, and to the transactions contemplated thereby; (b) reaffirms its obligations under the Lease Guaranty ("Lease Guaranty") dated _____ and acknowledges the same to be in full force and effect; and (c) acknowledges and approves the assignment to Lender of the Lease Guaranty. Lease Guarantor further reaffirms that its obligations under the Lease Guaranty are separate and distinct from Tenant's obligations under the Lease.]

[*OPTIONAL:  FOR USE WHERE LEASE GUARANTOR EXECUTED THE LEASE UNDER A SIMPLE LEGEND READING "GUARANTOR", "LEASE GUARANTIED" OR WORDS OF LIKE IMPORT, WITH NO FURTHER OR ADDITIONAL PROVISIONS ELABORATING UPON THE NATURE AND EXTENT OF THE GUARANTY OR THE OBLIGATIONS TO WHICH IT IS INTENDED TO APPLY*]

[The undersigned ("Lease Guarantor") hereby: (a) consents to the foregoing SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, and to the transactions contemplated thereby; (b) acknowledges to Lender that by its separate execution of the Lease, the undersigned intended to and did give a guaranty ("Lease Guaranty") of the due and timely performance by Tenant of each and every obligation undertaken in the Lease by Tenant; (c) acknowledges and approves the assignment to Lender of the Lease Guaranty; and (d) reaffirms its obligations under the Lease Guaranty and acknowledges the same to be in full force and effect.  Lease Guarantor further reaffirms that its obligations under the Lease Guaranty are separate and distinct from Tenant's obligations under the Lease.]

AGREED:

Dated: _____, 20__

<b><u>LEASE GUARANTOR</u></b>:

_____,
a _____

By:_____
Name:_____
Title:_____

[*Revise State Form Notary per State Requirements (Where Property is Located) for Each Signature Block*]

STATE OF _____     §

                                                    §

COUNTY OF _____     §

       The foregoing instrument was acknowledged before me on _____, 20___, by _____, the _____ of _____, a _____, on behalf of said _____.

                                    _____

                                    NOTARY PUBLIC, State of _____

                                    Printed Name:_____

                                    My Appointment Expires:_____

[Notary Seal]

**EXHIBIT A**

**PROPERTY/ADDRESS INFORMATION**

Property Address:

**LEGAL DESCRIPTION OF LAND**
**[Attached]**

## <u>EXHIBIT I</u>

## <u>OPTIONS</u>

This Exhibit is attached to and made a part of the Lease Agreement (the "<u>Lease</u>") by and between **COBALT PROPCO 2020, LLC**, a Delaware limited liability company ("<u>Landlord</u>"), and **RESILIENCE BOSTON, INC.**, a Delaware corporation ("<u>Tenant</u>"), for space in the Building located at 28 Crosby Drive, Bedford, Massachusetts.  Capitalized terms used but not defined herein shall have the meanings given in the Lease.

1.        <u>Extension Options</u>.  Tenant shall have one (1) option (the "<u>First Extension Option</u>") to extend the initial Term for one (1) extension term of five (5) years commencing at the expiration of the initial Term (the "<u>First Extension Term</u>").  Any extension of the Term for the First Extension Term shall be applicable to the entire Premises (as the same may be expanded).  If Tenant fails timely to exercise the First Extension Option, Tenant shall have no further extension rights hereunder.  If Tenant timely exercises the First Extension Option as provided below, the Term shall be extended for the First Extension Term, and Tenant shall pay Base Rent for the Premises during the First Extension Term, in accordance with the terms and conditions of Section 4.02 of the Lease, at a Base Rent rate equal to the Fair Market Rent Rate (as defined below) for the Premises for the First Extension Term as determined in accordance with the provisions of this Section set forth below, but in no event less than the rate in effect immediately prior to the First Extension Term.  Time is of the essence with respect to Tenant's timely exercise of the First Extension Option as provided herein.  Any notice exercising the First Extension Option must be unconditional and irrevocable in order to be effective.  Except as set forth herein, Tenant's lease of the Premises during the First Extension Term shall be on all of the terms and conditions in effect for the Premises immediately prior to such extension, except that Tenant shall have only one option to extend the Term after the end of the First Extension Term as set forth below.  Additionally, Tenant shall have one (1) option (the "<u>Second Extension Option</u>," and together with the First Extension Option, as applicable, an "<u>Extension Option</u>") to extend the Term beyond the First Extension Term for one (1) additional extension term of five (5) years commencing at the expiration of the First Extension Term (the "<u>Second Extension Term</u>," and together with the First Extension Term, as applicable, an "<u>Extension Term</u>").  Any extension of the Term for the Second Extension Term shall be applicable to the entire Premises (as the same may be expanded).  If Tenant fails timely to exercise the Second Extension Option, Tenant shall have no further extension rights hereunder.  If Tenant timely exercises the Second Extension Option as provided below, the Term shall be extended for the Second Extension Term, and Tenant shall pay Base Rent for the Premises during the Second Extension Term, in accordance with the terms and conditions of Section 4.02 of the Lease, at a Base Rent rate equal to the Fair Market Rent Rate for the Premises for the Second Extension Term as determined in accordance with the provisions of this Section set forth below, but in no event less than the rate in effect immediately prior to the Second Extension Term.  Time is of the essence with respect to Tenant's timely exercise of the Second Extension Option as provided herein.  Any notice exercising the Second Extension Option must be unconditional and irrevocable in order to be effective.  Except as set forth herein, Tenant's lease of the Premises during the Second Extension Term shall be on all of the terms and conditions in effect for the Premises immediately prior to such extension, except that Tenant shall have no further option to extend the Term after the end of the Second Extension Term.

The procedures for Tenant to exercise an Extension Option, and for the applicable Extension Rent Rate (as defined below) applicable to the applicable Extension Term to be determined, are as follows:

I-2

(a)    <u>Tenant's Exercise Notice</u>.  If Tenant wishes to exercise the First Extension Option, Tenant shall so notify Landlord no more than fifteen (15) months, and no less than twelve (12) months, prior to the date the initial Term is then scheduled to expire.  If Tenant wishes to exercise the Second Extension Option, Tenant shall so notify Landlord no more than fifteen (15) months, and no less than twelve (12) months, prior to the date the First Extension Term is then scheduled to expire.  Failure by Tenant timely to send a notice under this subparagraph (a) shall constitute an irrevocable waiver of Tenant's right to extend the Term.

(b)    <u>Landlord's Response</u>.  If Tenant timely delivers a notice under subparagraph (a) above, Landlord shall furnish Tenant with Landlord's estimate of the Base Rent rate equal to the Fair Market Rent Rate (as defined below) for the Premises for the applicable Extension Term (once determined pursuant to the terms and provisions set forth below, the "<u>Extension Rent Rate</u>", which in no event shall be less than the Base Rent rate in effect immediately prior to the applicable Extension Term) no later than thirty (30) days following Landlord's receipt of such notice.  Within thirty (30) days after Landlord furnishes its estimate of the Extension Rent Rate to Tenant under the preceding sentence, Tenant shall, by written notice delivered to Landlord, either (i) give Landlord notice accepting Landlord's estimate of the Extension Rent Rate for the applicable Extension Term, or (ii) give Landlord notice disputing Landlord's estimate of such applicable Extension Rent Rate, which notice under clause (ii) shall state Tenant's estimate of such applicable Extension Rent Rate.  Failure timely to give a notice disputing Landlord's estimate of such applicable Extension Rent Rate shall constitute an acceptance of Landlord's determination of such applicable Extension Rent Rate.

(c)    <u>Arbitration</u>.  If Tenant disputes Landlord's determination of the applicable Extension Rent Rate under subparagraph (b)(ii) above, the parties shall use good faith efforts to resolve such dispute for a period of thirty (30) days after such dispute notice is delivered.  If, after such thirty (30) day period, the dispute over such Extension Rent Rate is not resolved, then either party may cause the matter of the Fair Market Rent Rate to be submitted to arbitration as set forth below, by giving notice of such submission to the other party.  Each of Landlord and Tenant, within twenty (20) days after notice of such submission to arbitration, shall appoint as an arbitrator a commercial real estate broker with at least ten (10) years' experience as a broker for comparable commercial laboratory buildings in the Route 128 suburban market in Massachusetts (the "<u>Market Area</u>"), and shall give notice of such appointment to the other party.  If either Landlord or Tenant shall fail timely to appoint an arbitrator, the other may apply to the Boston Office of the American Arbitration Association ("<u>AAA</u>") for appointment of such an arbitrator five (5) Business Days after notice of such failure to the delinquent party if such arbitrator has not then been appointed.  The two arbitrators shall, within five (5) Business Days after appointment of the second arbitrator, appoint a third arbitrator who shall be similarly qualified.  If the two arbitrators are unable to agree timely on the selection of the third arbitrator, then either arbitrator on behalf of both may request such appointment from the Boston office of the AAA.  The arbitration shall be conducted in accordance with the commercial arbitration rules of the AAA insofar as such rules are not inconsistent with the provisions of this Lease (in which case the provisions of this Lease shall govern).  The arbitrators shall be charged to reach a majority written decision in accordance with the standards for Fair Market Rent Rate, within thirty (30) days after the third arbitrator is appointed, and if the arbitrators are unable to reach such a majority decision, the Fair Market Rent Rate shall be deemed to be the average of the two closest determinations made and simultaneously issued by the three arbitrators.  The arbitrators shall have no authority or jurisdiction to make any other determination of such amount.  Each party shall bear the costs of its appointed arbitrator; otherwise, the cost of the arbitration (exclusive of each party's witness and

I-3

attorneys' fees, which shall be paid by such party) shall be borne equally by the parties. If the AAA shall cease to provide arbitration for commercial disputes in Boston, the second or third arbitrator, as the case may be, shall be appointed by any successor organization providing substantially the same services, and in the absence of such an organization, by a court of competent jurisdiction under the arbitration act of The Commonwealth of Massachusetts. For any period during which the applicable Extension Rent Rate is in dispute hereunder, Tenant shall make payment on account of the applicable Extension Rent Rate at the rate estimated by Landlord as such Extension Rent Rate, and the parties shall adjust for overpayments or underpayments within thirty (30) days after the decision of the arbitrators is announced.

(d)     <u>Fair Market Rent Rate</u>. The "<u>Fair Market Rent Rate</u>" for the Extension Term in question shall mean the annual fair market rent per square foot for the Premises for a term coterminous with the applicable Extension Term under the terms of this Lease, as though the Premises were in the condition then existing or in such better condition as such space is required to be maintained hereunder. In making such determination, reference shall be made to lease transactions for comparable first-class laboratory and life science space in the Building and comparable commercial laboratory buildings in the Market Area, and appropriate adjustments to the rent rates in such comparable transactions shall be made for any relevant factors, including, without limitation, the timing of the transaction, the location and condition of the space, the quality of the Building, and any free rent, tenant improvements or other tenant concessions (or the lack thereof). Without limiting the generality of the foregoing adjustments, if the rent rate in a comparable transaction was determined based on a percentage discount to fair market rent, then the amount of such discount shall be disregarded (i.e., added back into the rental rate) for purposes of determining the Fair Market Rent Rate hereunder.

(e)     <u>Confirmatory Instrument</u>. If Tenant shall exercise an Extension Option in accordance with this Section, the provisions of this Section shall be self-operative, but upon request by either party after determination of the Extension Rent Rate for the applicable Extension Term, the parties shall execute an agreement specifying the Extension Rent Rate for the applicable Extension Term and acknowledging the extension of the Term.

(f)     <u>General</u>. Notwithstanding any provision of this Section to the contrary, the Extension Options shall be void, at Landlord's election, if (i) Tenant is in default hereunder, after any applicable notice and cure periods have expired, at the time Tenant elects to extend the Term or at the time the Term would expire but for such extension, or (ii) at the time of Tenant's exercise of the Extension Option more than fifty percent (50%) of the Premises is subleased (other than pursuant to a Permitted Transfer), or an assignment of the Lease (other than in connection with a Permitted Transfer) is then in full force and effect.

2.     <u>Right of First Offer</u>. As used herein, the "<u>First Offer Space</u>" shall mean any of the following spaces or any part thereof that Landlord from time to time during the initial Term determines is available for lease to a third party in accordance with and subject to the provisions of this Section 2: (x) any other space in the Building, (y) any space in the building located at 26 Crosby Drive, and (z) any space in the building located at 36 Crosby Drive (the "<u>36 Crosby Building</u>").

(a)     <u>Landlord's ROFO Notice</u>. Subject to the Superior Rights (as defined below), before hereafter entering into a lease for all or any part of the First Offer Space with a third party (other than the then existing tenant or other occupant of such space or parties with Superior Rights), Landlord shall give

I-4

Tenant a notice (each, a "Landlord's ROFO Notice") specifying (A) the location and Rentable Floor Area of the part of the First Offer Space designated by Landlord for offer to Tenant hereunder (each, an "Offered Space") and (B) the terms on which Landlord would be willing to lease such Offered Space, including the rent for the Offered Space, which shall be at the Fair Market Rent Rate, as reasonably determined by Landlord, and the length of the term for such Offered Space. Landlord reserves the right to offer all or part of the First Offer Space in such size and configuration for the applicable Offered Space specified in any Landlord's ROFO Notice hereunder as Landlord determines in its sole discretion.

Notwithstanding anything in this Section 2 to the contrary, Tenant's rights of first offer hereunder with respect to any applicable First Offer Space shall be subject and subordinate to the "Superior Rights", which shall include and refer to Landlord's right from time to time to lease all or part of the applicable First Offer Space to (i) any tenant with existing rights of first offer or other rights to lease such First Offer Space as of the Effective Date, (ii) any existing tenant of such First Offer Space, including the right of any such tenant to renew or extend the term of its lease or expand the premises of its lease, and the right of Landlord and any tenant to enter into an extension of such tenant's lease (whether an extension or renewal right is currently contained in such tenant's lease or otherwise), (iii) with respect only to the First Offer Space in the 36 Crosby Building, the right of Ocular Therapeutix, Inc. ("Ocular"), an existing tenant of a portion of the 36 Crosby Building, to renew or extend the term of its lease or expand the premises of its lease to include additional portions of the 36 Crosby Building (including the right to lease the entire 36 Crosby Building), and the right of Landlord and Ocular to enter into an amendment of Ocular's lease or other agreement pursuant to which Ocular extends the term of its lease or expands its premises in the 36 Crosby Building (even if Ocular's lease does not currently contain any such right to extend the term of its lease or expand its premises), and (iv) after such time as Tenant has rejected (or is deemed to have rejected) a Landlord's ROFO Notice for an Offered Space hereunder, any tenant that is granted rights for all or part of such Offered Space in the initial lease for such space entered into by Landlord in accordance with the provisions of this Section 2.

(b)    Tenant's Response. Within ten (10) Business Days after receipt of Landlord's ROFO Notice, Tenant shall, by written notice delivered to Landlord, either (i) reject Landlord's ROFO Notice, or (ii) unconditionally and irrevocably accept Landlord's offer to lease the Offered Space from Landlord, for its own use, on the terms set forth in Landlord's ROFO Notice. The failure by Tenant to timely respond as aforesaid shall be deemed Tenant's rejection of Landlord's ROFO Notice for the Offered Space under clause (i).

If Landlord's ROFO Notice is rejected under clause (i) above (or deemed rejected by Tenant's failure to timely respond), then Landlord may enter into any lease for all or part of the Offered Space on such terms and conditions (including without limitation extension rights with respect to the Offered Space or any portion thereof) as Landlord determines in its sole discretion; provided, however, that for a period of one (1) year after Tenant's rejection or deemed rejection of Landlord's ROFO Notice, Landlord may not enter into any lease for all or part of such Offered Space at an effective rent (after taking into account any tenant improvement allowance, free rent and other economic items) that is less than ninety-five percent of the effective rent under Landlord's ROFO Notice to Tenant, without again offering such space to Tenant at such lesser effective rent in accordance with this Section.

(c)    Confirmatory Instrument. If the applicable offer to lease an Offered Space is accepted as provided under this Section above, the Offered Space shall, subject to the provisions set forth below and

I-5

without further action by the parties, be leased by Tenant on the accepted terms and otherwise on all of the terms of the Lease in effect immediately prior to such expansion, provided that, at the request of either party, Landlord and Tenant shall promptly execute and deliver an agreement confirming such expansion of the Premises and the estimated date the Premises are to be expanded pursuant to this Section with a provision for establishing the effective date of such expansion based on actual delivery.  Landlord's failure to deliver, or delay in delivering, all or any part of such leased Offered Space, for any reason, shall not give Tenant any right to terminate the Lease and shall not affect the validity of the Lease.

(d)    <u>General</u>.  Notwithstanding any provision of this Section to the contrary, Tenant's rights under this Section shall be void, at Landlord's election, if (i) Tenant is in default hereunder, after any applicable notice and cure periods have expired, at the time Landlord would otherwise give a Landlord's ROFO Notice to Tenant hereunder or at the time Tenant makes any election with respect to the First Offer Space under this Section or at the time the First Offer Space would be added to the Premises, or (ii) any Transfer has occurred under Article 11 of the Lease (other than a Permitted Transfer).

**EXHIBIT J**

**FORM OF GUARANTY**

    This Exhibit is attached to and made a part of the Lease Agreement (the "<u>Lease</u>") by and between **COBALT PROPCO 2020, LLC**, a Delaware limited liability company ("<u>Landlord</u>"), and **RESILIENCE BOSTON, INC.**, a Delaware corporation ("<u>Tenant</u>"), for space in the Building located at 28 Crosby Drive, Bedford, Massachusetts.  Capitalized terms used but not defined herein shall have the meanings given in the Lease.

**GUARANTY**

    As a material inducement to Landlord to enter into that certain Lease Agreement dated _____, 2021, between **RESILIENCE BOSTON, INC.**, a Delaware corporation, as tenant ("<u>**Tenant**</u>"), and **COBALT PROPCO 2020, LLC**, a Delaware limited liability company, as landlord ("<u>**Landlord**</u>"), for certain premises located at 28 Crosby Drive, Bedford, Massachusetts (the "<u>**Lease**</u>"), **NATIONAL RESILIENCE, INC.**, a Delaware corporation ("<u>**Guarantor**</u>"), hereby guarantees the complete payment, within the timeframe set forth below, to Landlord of all rental payments and other amounts payable by Tenant (and any assignee) to Landlord and Landlord's successor's and assigns under the Lease and any extensions or renewals of and amendments to the Lease on the terms and conditions set forth herein (the "<u>**Guaranteed Obligations**</u>").  In the event of any default by Tenant in the payment of the Guaranteed Obligations, Landlord may give written notice to Guarantor in accordance with the provisions of this Guaranty which written notice to Guarantor (the "<u>**Default Notice**</u>") must specifically identify the dollar amount of the Guaranteed Obligations that are the subject of the default (the "<u>**Guaranteed Demand Amount**</u>") and must clearly state Landlord's intention to enforce Guarantor's obligations under this Guaranty to pay the Guaranteed Demand Amount.  If the Guaranteed Demand Amount is not paid in full by Tenant by the expiration of any notice and/or grace period afforded Tenant under the Lease and provided that no less than 30 days have passed since the Landlord delivered the aforementioned Default Notice to Guarantor, Landlord may deliver an additional written notice thereof to Guarantor (the "<u>**Demand Notice**</u>"), advising Guarantor that the Guaranteed Demand Amount remains unpaid. If Landlord delivers a Demand Notice to Guarantor pursuant to the foregoing with respect to a Guaranteed Demand Amount, Guarantor shall pay to Landlord the entire unpaid Guaranteed Demand Amount not later than 10 business days following delivery of the Demand Notice to Guarantor. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Lease.  This Guaranty is an absolute and continuing guaranty of payment and collection of the Guaranteed Obligations.  In the event of a default by Tenant in the payment of the Guaranteed Obligations and notice to Guarantor as set forth above, Guarantor shall be liable, jointly and severally, with Tenant for payment of the Guaranteed Demand Amount.

    Until all of the Guaranteed Obligations have been discharged in full, Guarantor shall have no right of subrogation against Tenant.  Landlord may, without notice or demand and without affecting Guarantor's liability hereunder, from time to time, compromise, extend, renew or otherwise modify any or all of the terms of the Lease by amendment, novation or otherwise (including a new lease, to the extent a court of competent jurisdiction determines any of the foregoing constitutes a new lease), or fail to perfect, or fail to continue the perfection of, any security interests granted under the Lease.  Without limiting the generality of the foregoing, if Tenant elects to increase the size of the leased premises, extend or renew the lease term, or otherwise expand Tenant's rental obligation under the Lease, Tenant's execution of such lease documentation shall constitute Guarantor's consent thereto (and such increased rental obligation under the Lease shall constitute a Guaranteed Obligation hereunder); Guarantor hereby waives any and all rights to consent thereto.  Guarantor waives any right to participate in any security

now or hereafter held by Landlord. Guarantor hereby waives all presentments, demands for payment and notices of nonpayment (except with respect to Default Notices and Demand Notices as set forth above), protests, notices of protest, dishonor and notices of acceptance of this Guaranty, and waives all notices of existence, creation or incurring of new or additional obligations from Tenant to Landlord. Guarantor further waives all defenses afforded guarantors based on suretyship or impairment of collateral under applicable Laws, other than payment in full of the Guaranteed Obligations. The liability of Guarantor under this Guaranty will not be affected by (a) the release or discharge of Tenant from, or impairment, limitation or modification of, Tenant's obligations under the Lease in any bankruptcy, receivership, or other debtor relief proceeding, whether state or federal and whether voluntary or involuntary; or (b) the rejection or disaffirmance of the Lease in any such proceeding; or (c) the cessation of the liability of Tenant under the Lease via a bankruptcy or insolvency proceeding.

Guarantor shall not, without the prior written consent of Landlord, assign or transfer this Guaranty or any estate or interest herein, whether directly or by operation of law. If Guarantor violates the foregoing restriction or otherwise defaults under this Guaranty, Landlord shall have all available remedies at law and in equity against Guarantor and Tenant. Without limiting the generality of the foregoing, Landlord may declare an immediate Default under the Lease. Any and all remedies set forth in this Guaranty: (A) shall be in addition to any and all other remedies Landlord may have at law or in equity, (B) shall be cumulative, and (C) may be pursued successively or concurrently as Landlord may elect, subject to Landlord's compliance with the notice requirements set forth above. The exercise of any remedy by Landlord shall not be deemed an election of remedies or preclude Landlord from exercising any other remedies in the future.

Guarantor represents and warrants, as a material inducement to Landlord to enter into the Lease, that (a) this Guaranty has been duly executed and delivered and constitutes a legally enforceable obligation of Guarantor; (b) there is no action, suit or proceeding pending or, to Guarantor's knowledge, threatened against or affecting Guarantor, at law or in equity, or before or by any governmental authority, which might result in any materially adverse change in Guarantor's business or financial condition; (c) execution of this Guaranty will not render Guarantor insolvent; (d) Guarantor expects to receive substantial benefits from Tenant's financial success; and (e) this Guaranty may reasonably be expected directly or indirectly to benefit Guarantor.

Guarantor shall pay to Landlord all reasonable out-of-pocket costs incurred by Landlord in enforcing this Guaranty (including, without limitation, reasonable attorneys' fees and expenses). The obligations of Tenant under the Lease to execute and deliver estoppel and financial statements, as therein provided, shall be deemed to also require the Guarantor hereunder to do so and provide the same relative to Guarantor following written request by Landlord, but subject in all events to the terms and conditions of the Lease. All notices and other communications given pursuant to, or in connection with, this Guaranty shall be delivered in the same manner required in the Lease. All notices or other communications addressed to Guarantor shall be delivered at the address set forth below or to such other address as may be designated by Guarantor from time to time by notice given to Landlord in the manner required in the Lease. This Guaranty shall be binding upon the heirs, legal representatives, successors and assigns of Guarantor and shall inure to the benefit of Landlord's successors and assigns.

This Guaranty will be governed by and construed in accordance with the laws of the state in which the Premises (as defined in the Lease) are located. The proper place of venue to enforce this Guaranty will be the county or district in which the Premises are located. In any legal proceeding regarding this Guaranty, including enforcement of any judgments, Landlord (by acceptance of this Guaranty) and Guarantor each irrevocably and unconditionally (a) submits to the jurisdiction of the courts of law in the county or district in which the Premises are located; (b) accepts the venue of such courts and waives and agrees not to plead any objection thereto; and (c) agrees that (1) service of process may be

effected in any state of the United States of America in a manner in accordance with the laws of the Commonwealth of Massachusetts (including, in addition to such courts, any United States federal court sitting in the Commonwealth of Massachusetts), and (2) nothing herein will affect the rights of Landlord and Guarantor, respectively, to effect service of process in any other manner permitted by applicable law.

Guarantor acknowledges that it and its counsel have reviewed and revised this Guaranty and that the rule of construction to the effect that any ambiguities are to be resolved against the drafting party will not be employed in the interpretation of this Guaranty or any document executed and delivered by Guarantor in connection with the transactions contemplated by this Guaranty.

The representations set forth herein will continue and survive the termination of the Lease or this Guaranty.  The masculine and neuter genders each include the masculine, feminine and neuter genders.  This instrument may not be changed, modified, discharged or terminated orally or in any manner other than by an agreement in writing signed by Guarantor and Landlord.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAWS, GUARANTOR AND LANDLORD (BY ACCEPTANCE OF THIS GUARANTY) EACH KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON THIS GUARANTY, ARISING OUT OF, UNDER, OR IN CONNECTION WITH THE LEASE, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN), OR ACTION BETWEEN LANDLORD AND GUARANTOR OR ANY EXERCISE BY LANDLORD OR GUARANTOR OF ANY OF THEIR RESPECTIVE RIGHTS UNDER THIS GUARANTY OR IN ANY WAY RELATING TO THE PREMISES.  THIS WAIVER IS A MATERIAL INDUCEMENT FOR LANDLORD AND TENANT TO ENTER INTO THE LEASE.  THIS WAIVER SURVIVES THE EXPIRATION OR TERMINATION OF THE LEASE AND THIS GUARANTY.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]

Executed as of the Effective Date of the Lease.

**NATIONAL RESILIENCE, INC.**, a Delaware corporation

By: _____

Name: _____

Title: _____

Guarantor's Address:

_____

_____

## ADDENDUM TO LEASE

This Addendum is attached to and made a part of the Lease Agreement (the "Lease") by and between **COBALT PROPCO 2020, LLC**, a Delaware limited liability company ("Landlord"), and **RESILIENCE BOSTON, INC.**, a Delaware corporation ("Tenant"), for space in the Building located at 28 Crosby Drive, Bedford, Massachusetts.  Capitalized terms used but not defined herein shall have the meanings given in the Lease.

1.     Tenant's Exclusive Areas.

    a.     Roof Space for HVAC.  Subject to the terms and conditions herein, and notwithstanding any provisions to the contrary in Paragraph 4 of Exhibit F to this Lease, certain portions of the roof of the Building as shown in green on Schedule 1 attached hereto (the "Reserved Roof Space") shall be reserved for Tenant's potential installation of an additional air handler and exhaust fans serving the Premises (collectively, the "Rooftop Additional HVAC Equipment").

In consideration for Landlord's agreement to reserve the Reserved Roof Space for Tenant's potential installation of the Rooftop Additional HVAC Equipment, Landlord shall have the right to cause the balance of the leasable space in the Building (the "Remaining Leasable Space") to be leased by Tenant and added to the Premises, subject to the terms and conditions herein (the "Put Option").  At such time as the lease to InfraredX, Inc., the existing tenant of the Remaining Leasable Space, terminates or expires, Landlord shall have the right, at Landlord's sole option, to give written notice thereof to Tenant and cause the Remaining Leasable Space to be leased by Tenant (the "Put Option Notice"), in which event the Remaining Leasable Space shall be added to the Premises, effective as of the date that is one hundred twenty (120) days after the date of the Put Option Notice (the "Remaining Leasable Space Commencement Date"), upon all of the same terms and conditions of the Lease, including, without limitation, the obligation to pay Rent for the Remaining Leasable Space at the same rate then payable for the original Premises, provided that the amount of the Allowances for the Remaining Leasable Space shall be prorated based on the size of the Remaining Leasable Space and the length of the remaining Term of the Lease.  If at the time that Landlord delivers a Put Option Notice, Tenant has not used the Reserved Roof Space for the installation of the Rooftop Additional HVAC Equipment, then Tenant may elect to waive and release all of its rights to the Reserved Roof Space by delivering written notice thereof to Landlord within thirty (30) days after receipt of the Put Option Notice, time being of the essence with respect to such notice from Tenant to Landlord, and upon any such timely notice, (i) Tenant shall not be required to lease the Remaining Leasable Space, (ii) the Put Option Notice shall be deemed null and void, (iii) the right of Tenant to elect to use the Reserved Roof Space shall be null and void, and (iv) Landlord's right to require Tenant to lease the Remaining Leasable Space under this Addendum shall terminate.  If, however, either (A) Tenant has used the Reserved Roof Space for the installation of the Rooftop Additional HVAC Equipment or (B) Tenant has not used the Reserved Roof Space for such purpose but failed to respond to a Put Option Notice with a written notice waiving and releasing all of its rights to the Reserved Roof Space within thirty (30) days after receipt of the Put Option Notice, then the Remaining Leasable Space automatically shall be leased by Tenant and added to the Premises on the terms provided herein without the need for any additional action or documentation, provided that either Landlord or Tenant may request that an amendment to the Lease be executed by the parties in order to memorialize the updated Rent and other terms, in which case Landlord and Tenant agree to the ministerial

act of executing the same, but the failure to execute such amendment shall not affect the obligations of Landlord to lease the Remaining Leasable Space to Tenant, the obligations of Tenant to pay Rent with respect to the Remaining Leasable Space, and the obligations of both Landlord and Tenant to comply with all other terms and provisions of the Lease with respect to the leasing of the Remaining Leasable Space by Tenant effective as of the Remaining Leasable Space Commencement Date.

b.     Basement Space for HVAC and Other Equipment.  Tenant shall have, as appurtenant to the Premises, certain dedicated space in the basement of the Building for (i) additional HVAC equipment (the "Basement Additional HVAC Equipment"), which Basement Additional HVAC Equipment shall be furnished and installed by Landlord (or in lieu thereof, furnished and installed by Tenant, subject to a $50,000.00 contribution by Landlord) in accordance with the Responsibility Matrix (it being acknowledged and agreed that the area occupied by such Basement Additional HVAC Equipment shall not be added to the Rentable Floor Area of the Premises and shall not be subject to Section 1.04 of the Lease), and (ii) subject to Section 1.04 of the Lease, additional Tenant equipment in support of its manufacturing operations in the Premises (the "Basement Manufacturing Support Equipment").  Upon request, Landlord shall provide MEP plans showing all available basement space for Tenant's use and Tenant may choose the size and location of the basement space it requires from all such available space.  Subject to the terms of the Lease regarding Alterations, Tenant shall have the right to cage its equipment or construct a room around its equipment located in the basement. Alternatively, upon Tenant's request, Landlord shall install, at Landlord's expense, a card access system controlling access to the entire basement, and card access shall be made available to necessary personnel of both Landlord and Tenant so that each can access their respective equipment in the basement; provided that Tenant shall not damage or interfere with the operations of any equipment of Landlord or other party in the basement, and Landlord shall not damage or interfere with the operations of any equipment of Tenant in the basement.

c.     Penthouse Space for UPS.  Subject to Section 1.04 of the Lease, Tenant shall have, as appurtenant to the Premises, the exclusive right to use a portion of the penthouse (the "Exclusive Penthouse Space") for the installation, operation, maintenance, repair and replacement of a backup uninterruptible power supply (UPS) system for the Premises. Upon request, Landlord shall provide MEP plans showing all available penthouse space for Tenant's use and Tenant may choose the size and location of the penthouse space it requires from all such available space.  Subject to the terms of the Lease regarding Alterations, Tenant shall have the right to cage its equipment or construct a room around its equipment located in the penthouse.  Alternatively, upon Tenant's request, Landlord shall install, at Landlord's expense, a card access system controlling access to the entire penthouse, and card access shall be made available to necessary personnel of both Landlord and Tenant so that each can access their respective equipment in the penthouse; provided that Tenant shall not damage or interfere with the operations of any equipment of Landlord or other party in the penthouse, and Landlord shall not damage or interfere with the operations of any equipment of Tenant in the penthouse.

d.     Utility Yard Space.  Subject to all applicable Laws, Tenant shall have, as appurtenant to the Premises, the exclusive right to use the area immediately adjacent to the Building on the north as shown in green on Schedule 2 attached hereto (the "Exclusive Utility Yard") for the installation, operation, maintenance, repair and replacement of Tenant's Specialty Systems (as defined below).  Landlord represents to the best of Landlord's knowledge

that (i) the parking spaces can be eliminated and included in the Exclusive Utility Yard without violating zoning or other applicable laws and without violating the provisions of the existing tenant's lease (provided that any such eliminated parking spaces shall be deducted from Tenant's allotment of Spaces as set forth below), and (b) the proposed use of the Exclusive Utility Yard is permitted under applicable zoning requirements. Tenant shall be solely responsible, at Tenant's sole cost and expense, for obtaining, maintaining and complying with all permits, licenses and approvals required in order for Tenant to use the Exclusive Utility Yard for such uses. Furthermore, if elected by Tenant, or if required by Landlord in its sole but reasonable discretion, or if required by any governmental approvals, Tenant shall provide and install, at Tenant's sole cost and expense, appropriate aesthetic screening, reasonably satisfactory to Landlord, for the Exclusive Utility Yard. Tenant shall in all events have the right to install, at Tenant's sole cost and expense, fencing and related improvements to limit access to the Exclusive Utility Yard to Tenant and Tenant Related Parties. Notwithstanding anything to the contrary in the Lease, the number of parking spaces located within the Exclusive Utility Yard shall be deducted from Tenant's allotment of Spaces under Section 1 of Exhibit F to the Lease provided that such parking spaces are permitted to be included within the Exclusive Utility Yard.

Tenant shall have the right to install (i) the Rooftop Additional HVAC Equipment on the Reserved Roof Space, (ii) the Basement Manufacturing Support Equipment in the basement, (iii) the UPS System in the Exclusive Penthouse Space, and (iv) equipment and improvements described in Schedule 3 attached hereto within the Exclusive Utility Yard (all of the items in the foregoing clauses (i), (ii), (iii) and (iv), and collectively with any other systems or equipment installed by or on behalf of Tenant in accordance with the terms and conditions in the Lease, the "Tenant's Specialty Systems"). Tenant shall be responsible, at Tenant's sole cost, for all permitting, installation, testing, refueling, cleaning, repairs and replacements of the Tenant's Specialty Systems, all in compliance with applicable Laws.

The Reserved Roof Space, the Exclusive Penthouse Space and the Exclusive Utility Yard (collectively, the "Tenant's Exclusive Areas") shall not constitute a part of the Common Areas, and Tenant shall be responsible for all cleaning and maintenance of the Tenant's Exclusive Areas and for all permitting for the use of the Tenant's Exclusive Areas for the purposes allowed herein.

2.   Mold Mitigation and Remediation. If during the Term, any mold is discovered in the basement, the first (1st) floor and/or the second (2nd) floor of the Building, and such mold was not caused by an act or omission of Tenant or any of the Tenant Related Parties, then Landlord, at Landlord's sole cost (which cost shall not be included in Expenses), shall promptly commence (in all events not more than ten (10) days after receipt of notice) and perform (or cause to be performed) all mitigation and remediation of such mold as required to comply with all applicable Laws and industry-standard requirements for Tenant's operations, such work to be diligently prosecuted to completion and, in all events, completed within such time period, if any, as may be required by applicable Laws.

In the event of any conflict between this Addendum and the Lease, the terms and provisions of this Addendum shall control.

<u>Schedule 1</u>

Location of Reserved Roof Space



Schedule 2

Location of Exclusive Utility Yard



<u>Schedule 3</u>

Equipment and Improvements in Exclusive Utility Yard

Tenant shall have the right to install, maintain and use within the Exclusive Utility Yard: bulk CO2, LN2 tanks, O2 cylinders with manifold, distribution filters and raw material sample valves for CO2, O2 and N2 (supplied by same tank as LN2), GMP air handler supporting cell therapy GMP areas on the first floor of the Premises, and redundant exhaust fans for cell therapy GMP areas. Subject to Landlord confirming that the FAR for the Property and Park will not be affected, Tenant shall have the right to cover the areas within which such equipment is located to protect the same from weather, including without limitation the air handlers and exhaust fans. Tenant shall also have the right to install a concrete pad for the fill trucks for the bulk gases and a filling station outside the fence area to connect the filling hose.  It is agreed that the bulk gas tanks and cylinders may not be owned by Tenant, and may be leased from the bulk gas supplier per agreement between Tenant and the bulk gas supplier.

5145278.28