## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| BEDMAR, LLC,[1] | Case No.: 25-11027 (JKS) |
| Debtor. | **Objection Deadline: July 16, 2025 at 4:00 p.m. (ET)**<br>**Hearing Date: July 29, 2025 at 9:30 a.m. (ET)** |
|  | **Related Docket No.: 92, 111** |

### JOINT MOTION OF (I) PRESIDENT AND FELLOWS OF HARVARD COLLEGE, (II) 92 CROWLEY OWNER (DE) LLC, AND (III) CEGM ALACHUA, LLC TO DISMISS THE CHAPTER 11 CASE OF BEDMAR, LLC; AND JOINDER TO COBALT PROPCO 2020, LLC'S AND UST'S MOTIONS TO DISMISS DEBTOR BEDMAR, LLC'S CHAPTER 11 CASE PURSUANT TO BANKRUPTCY CODE SECTION 1112(b)

President and Fellows of Harvard College ("Harvard"), 92 Crowley Owner (DE) LLC ("92 Crowley"), and CEGM Alachua, LLC ("Alachua" and together with Harvard and 92 Crowley, the "Landlords"), by and through their undersigned counsel, hereby file this (i) motion to dismiss (the "Motion") the chapter 11 case of Bedmar, LLC (the "Debtor"); and (ii) joinder to (a) Cobalt PropCo 2020, LLC's *Motion to Dismiss Debtor Bedmar, LLC's Chapter 11 Case Pursuant to Bankruptcy Code Section 1112(b)* [D.I. 92] (the "Cobalt Motion") and (b) the *Motion of the United States Trustee to Dismiss or Convert the Debtor's Chapter 11 Case* [D.I. 111] (the "UST Motion"). In support of this Motion, the Landlords respectfully state as follows:

### PRELIMINARY STATEMENT

1.  The chapter 11 case commenced by Bedmar, LLC should be dismissed because it was filed in bad faith. Third Circuit precedent dictates this result.

2.  "[T]he importance of full and honest disclosure cannot be overstated." *Ryan Ops. G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996). Not only do parties in

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number is: Bedmar, LLC (5047). The Debtor's mailing address is 3115 Merryfield Row, San Diego, CA 92121.

interest need access to all relevant facts and circumstances to determine whether to support a debtor's reorganization efforts, but "[t]his preference for public access is rooted in the public's first amendment right to know about the administration of justice.  It helps safeguard the 'integrity, quality, and respect in our judicial system.'"  *Orion Pictures Corp. v. Video Software Dealers Assoc.*, 21 F.3d 24, 26 (2d Cir. 1994) (citations omitted).

3.      This case highlights the abuses that arise from operating in the dark.  Through a tangled web of undisclosed prepetition transactions, the Debtor asks this Court and all parties in interest to accept at face value that Bedmar, LLC, an entity formed on the eve of bankruptcy, validly holds several unexpired leases and related guaranty liabilities, and just enough cash, along with a so-called receivable owing from an undisclosed debtor to the Debtor, to satisfy one capped rejection damages claim per landlord under section 502(b)(6) of the Bankruptcy Code.  The Debtor believes those will be the only allowed claims against its estate.

4.      The Debtor fails to acknowledge that there is no statutory collapsing doctrine. Despite pursuing divisions under Section 18-217 of the Delaware Limited Liability Company Act (the "LLCA"), this Court must view each step of the Corporate Transactions, if they are ever even fully disclosed, independently to ascertain whether any step involved a fraudulent transfer.  If so, each of the Debtor and its non-Debtor affiliates are jointly and severally liable to the Landlords for the full amount of all damages arising out of the Leases and Guaranties (as defined below).

5.      The Debtor cannot deny, and in fact boasts, that the creation of the Debtor and formulation of this chapter 11 case was to ring-fence the larger enterprise's lease and lease guaranty liabilities just to take advantage of the section 502(b)(6) cap.[2]  The Debtor is abusing the

---

[2]      *See* June 25, 2025 deposition transcript of Christopher S. Sontchi ("Sontchi Depo. Tr."), at 84:12–15:

Q.      So was the whole purpose of the division to put the leases in there so that they could be capped?

A.      Yes.  I don't think we've hidden that.

2

bankruptcy process to shield its non-Debtor affiliates' assets from the Landlords for the sole benefit of the Debtor's equity holders and non-Debtor affiliates. Binding Third Circuit precedent dictates that this case be dismissed.

6.      For the reasons set forth below, as well as in the Cobalt Motion and the UST Motion, in which the Landlords hereby join, there is ample cause to dismiss the Debtor's chapter 11 case under section 1112(b) of the Bankruptcy Code. Rather than restate the arguments in the Cobalt Motion and the UST Motion, the Landlords file this separate Motion to highlight issues specific to the Leases and the nuances of the LLCA and other relevant state law.

## LIMITED BACKGROUND

### A.  The Harvard Lease

7.      On June 1, 1992, the Massachusetts Turnpike Authority, as landlord, entered into that certain lease agreement for the premises known as 500 Soldiers Field Road, Allston, MA with Allston Landing Limited Partnership, as tenant, and Genzyme Corporation, as guarantor (the "Harvard Lease"). The building on the premises is a specialized pharmaceutical manufacturing facility which used and may still contain potentially hazardous substances. On July 26, 1995, the Harvard Lease was amended to, among other things, revise the boundaries of the premises. On December 22, 1997, the Harvard Lease was again amended to, among other things, revise the adjusted rents and development plans affecting the premises. On October 22, 2002, Harvard, as the successor in interest to Massachusetts Turnpike Authority,[3] entered into that certain Consent and Agreement with Allston Landing Limited Partnership, as tenant, and Genzyme Corporation, as subtenant and guarantor.

---

Excerpts from the Sontchi Depo. Tr. are attached to this Motion as **Exhibit B**.

[3]      Harvard acquired the Harvard Lease as part of a larger land acquisition from the Massachusetts Turnpike Authority in 2000.

8.      On March 1, 2021, Harvard and Allston Landing Limited Partnership entered into that certain Assignment and Assumption of Lease, Amendment and Consent Agreement (the "Harvard Lease Assignment Agreement") with Resilience Boston, Inc., a Delaware corporation, as tenant.  Contemporaneously, on March 1, 2021, National Resilience, Inc. delivered that certain Guaranty with respect to the Harvard Lease (the "Harvard Lease Guaranty").   The Harvard Lease Guaranty was a material inducement to Harvard's consent to the assignment to Resilience Boston, Inc.

9.      Section 5.1.11 (Transfer – Assignment and Subletting) of the Harvard Lease provides, in relevant part:

> Tenant shall not offer to make or enter into negotiations with respect to a transfer to any party which would be of such business reputation, management expertise or creditworthiness as to be inappropriate as a tenant for the Permitted Uses of the Premises, nor shall Tenant propose a transfer extending beyond the Term.  Tenant shall not assign this Lease, or subject or license the Premises or any portion thereof, or advertise the Premises for assignment or subletting or permit the occupancy of all or any portion of the Premises by anybody other than Tenant (all of the foregoing actions are collectively referred to as a "transfer") without obtaining, on each occasion (except for sublettings to Affiliates (defined below) or assignments in connection with Permitted Financings, each of which shall be permitted without consent), the prior consent of Landlord, not to be unreasonably withheld.

10.     Section 5 of the Harvard Lease Guaranty provides, in relevant part, "No assignment or transfer of the Lease shall operate to extinguish or diminish the liability of Guarantor under the Guaranty."

**B.  The 92 Crowley Lease**

11.     On October 26, 2022, 92 Crowley entered into that certain NNN Lease Agreement (the "92 Crowley Lease") with Resilience US, Inc., as tenant.  Effective as of on October 22, 2022,

4

National Resilience, Inc. delivered that certain Guaranty of Resilience US, Inc.'s obligations under the 92 Crowley Lease (the "92 Crowley Lease Guaranty").

12.     Section 11.01 (Transfers) of the 92 Crowley Lease provides:

Tenant shall not assign, sublease, transfer, mortgage, charge, debenture (floating or otherwise), or encumber any interest in this Lease or allow any third party (other than Tenant's contractors performing work in accordance with this Lease) to use all or any portion of the Premises (in each such case, collectively or individually, a "Transfer" to a "Transferee") without the prior written consent of Landlord. Landlord shall not unreasonably withhold, condition or delay its consent to (a) a sublet of a portion of the Premises consisting of less than 25% of the Building in the aggregate at any one time during the term or (b) an assignment of the Lease in its entirety.

Without limitation, it is agreed that Landlord's consent shall not be considered unreasonably withheld if the proposed Transferee (a) is a governmental entity, (b) is incompatible with the character of occupancy of a first class life sciences laboratory and office building used for biomanufacturing and activities reasonably related thereto, (c) is an entity with which the payment for the sublease or assignment is determined in whole or in part based upon its net income or profits, (d) would subject to a use that would involve a violation of the Permitted Use clauses of this Lease, or (e) if there is any other reasonable ground not stated above for withholding consent.

If the control of Tenant (other than through the issuance or transfer of ownership of voting securities listed on a recognized exchange, or a merger with a special purpose acquisition company that results in Tenant or an affiliate of Tenant becoming a publicly traded company on a recognized securities exchange) changes at any time, whether by a merger, amalgamation, or other similar corporate reorganization involving Tenant, a change in a partnership if the change results in a change in the effective control of Tenant, such change of control shall constitute a Transfer …

For purposes of this Section 11.01, "control" shall mean the direct ownership of at least a 50% beneficial interest of Tenant or the power and authority to direct the business and affairs of Tenant (by reason of ownership of beneficial interests, contract or otherwise).  Except in connection with, or resulting in, a change of control pursuant to the immediately preceding sentence, the issuance of additional, or transfers of, ownership interests, directly or indirectly, in Tenant shall not be deemed to be a Transfer.

Any Transfer in violation of this Section, shall, at Landlord's option, if not rescinded by Tenant within ten (10) days after Landlord's demand thereof, be deemed a Default by Tenant as described in Section 16.01; provided, that if

5

Landlord is prohibited or prevented from providing any such demand under applicable Law, then such Transfer in violation of this Section shall be a Default by Tenant as described in Section 16.01.  In no event shall any Transfer, including a Succession Event, release or relieve Tenant from any obligation under this Lease, and the Tenant originally named in this Lease shall remain primarily liable for the performance of the tenant's obligations under this Lease, as amended from time to time.

13.    Section 4 of the 92 Crowley Lease Guaranty provides, in relevant part:

The liability of Guarantor hereunder shall in no way be limited or impaired by, and Guarantor hereby assents to and agrees to be bound by, any amendment or modification of the provisions of the Lease to or with Landlord by Tenant or any person who succeeds Tenant's interest under the Lease.  In addition, the liability of Guarantor under this Guaranty shall in no way be limited or impaired by … (ii) any assignment, sublease, or other transfer of any interest in the Lease from time to time (Guarantor hereby agreeing that its obligations under this Guaranty shall continue in full force and effect with respect to the Lease as the same may hereafter be assigned, subleased, or otherwise transferred from time to time) ….

**C.  The Alachua Lease**

14.    On November 6, 2020, Alachua Copeland Park Investments II, LLC, as Landlord, entered into that certain Lease with Ology Bioservices, Inc., as Tenant (the "Alachua Lease" and together with the Harvard Lease and the 92 Crowley Lease, the "Leases").  Alachua is the successor in interest to Alachua Copeland Park Investments II, LLC.  On December 15, 2021, National Resilience, Inc., as Guarantor, signed a guaranty of Tenant's performance under the Alachua Lease (the "Alachua Lease Guaranty" and together with the Harvard Lease Guaranty and the 92 Crowley Lease Guaranty, the "Guaranties") in exchange for Alachua's consent to the transfer of a controlling interest in Tenant.

15.    On May 12, 2022, Ology Bioservices, Inc. changed its name to Resilient Government Services, Inc.  On May 21, 2025, Resilient Government Services, Inc. changed its name to Alachua Government Services Inc. ("AGSI").

6

16.    On June 3, 2025, AGS HoldCo LLC was organized in Delaware. Contemporaneously, on June 3, 2025, the Independent Manager of the Debtor purported to take assignment of the Alachua Lease pursuant to an assignment agreement (the "Alachua Assignment Agreement").[4]

17.    Section 24(A) ("Transfer") of the Alachua Lease provides:

> **Tenant shall not** sublet all or any part of the Premises or **assign, transfer, mortgage or pledge its interest in this Lease, or** except as set forth in this Lease, **any change in ownership (directly or indirectly) or control of Tenant (directly or indirectly) (collectively, a "Transfer")**, whether voluntarily, involuntarily or by operation of law, **without the prior written consent of Landlord**, which consent shall not be unreasonably withheld, conditioned or delayed.  The parties agree by way of example only and without limitation that it shall be reasonable for Landlord to withhold its consent to any Transfer if the assignee or subtenant ("Transferee") is financially unable to fulfill the obligations of the "tenant" under this Lease or proposed to use the Premises for other than a Permitted Use …
>
> No such Transfer shall release Tenant or any guarantor from liability under this Lease unless the parties otherwise agree in writing[.] Any attempted Transfer without Landlord's consent shall constitute a default by Tenant and shall be voidable at Landlord's option ….

(emphasis added).

18.    For any Transfer under Section 24(A), AGSI is required to give Alachua written notice of the proposed terms, including "(i) the name and legal composition of the proposed Transferee; (ii) a current financial statement of the Transferee; and (iii) the nature of the proposed Transferee's business to be carried on in the Premises."  Alachua Lease, ¶ 24(B) ("Notice of Transfer").  The financial condition of the proposed transferee is a reasonable ground for Alachua to refuse consent to the assignment.  *Id.*

---

[4]    Ori Solomon, Executive Vice President, Chief Legal & Administrative Officer executed the Alachua Assignment Agreement on behalf of AGSI.

19.    AGSI is not required to obtain Landlord's approval for "Intra-Corporate Transfers," which is defined as, inter alia, an assignment of the Lease to:

> (1) any corporation or entity which has and continues to have the power to direct Tenant's day-to-day management and operations, or any corporation or entity whose management and operations are controlled by Tenant; (2) any corporation or entity a majority of whose voting stock is owned by Tenant; (3) any corporation or entity holding a majority of the outstanding shares of voting stock in Tenant; (4) any corporation or entity in which or with which Tenant, its successors or assigns, is merged or consolidated, in accordance with applicable statutory provisions for merger or consolidation, so long as the liabilities of the entities participating in such merger or consolidation are assumed by the surviving entity of such merger or created by such consolidation; (5) any corporation or entity acquiring all or substantially all of Tenant's assets or shares in Tenant; or (6) any successor to a successor of Tenant becoming such by either of the methods described in sub-clauses (4) or (5) above.

Alachua Lease, ¶ 24(C) ("Intra-corporate Transfers").

20.    For a Transfer that is not exempt from Landlord's written approval and as to which consent is not obtained, AGSI remains "fully liable for all obligations to be performed" under the lease agreement.  Alachua Lease, ¶ 24(D) ("Continuing Liability").

21.    The Alachua Lease Guaranty provides that National Resilience, Inc. "promises and agrees to pay" Alachua for Tenant's default or non-performance of any agreements and covenants contained in the Alachua Lease.  The Alachua Lease Guaranty provides that: "**Guarantor's obligations hereunder shall not be assigned** or delegated, but this Guaranty shall pass to, and be fully binding upon, any successors, heirs, assigns and/or trustees of Guarantor." (emphasis added). The Guaranty is absolute and unconditional, continuing for Alachua's benefit notwithstanding "Tenant's bankruptcy, insolvency, or ability to perform," or "any assignment of the Lease or sublease of the Premises, with or without consent of Landlord . . . ."  The Guaranty is to be construed under Florida law.

8

### D.  The "Corporate Transactions"

22.    Almost a month into this chapter 11 case, the mechanics of the so-called "Corporate Transactions" resulting in Bedmar, LLC and its non-Debtor affiliates remain shrouded.  Neither the Debtor nor any non-Debtor affiliate has come forth to explain in detail or otherwise exhibit the steps taken and consideration exchanged in each step of the Corporate Transactions.  From the limited public filings, statements made at hearings before this Court, the initial deposition of the Debtor's Independent Manager, and information obtained through initial discovery, the non-Debtor affiliates represent that the following Corporate Transactions occurred at some point immediately prior to the Petition Date:

A.    Conversion of National Resilience, Inc. into National Resilience, LLC
B.    Formation of Bedmar Member, Inc. as the 100% owner of Resilience US, Inc.
C.    Conversion of Resilience US, Inc. into Resilience US, LLC
D.    Renaming of Resilience Government Services, Inc. as Alachua Government Services, Inc.
E.    Division of Resilience US, LLC into (i) certain non-Debtor LLCs, (ii) Bedmar, LLC, (iii) AGS Holdco, LLC, and (iv) Resilience US, LLC
F.    Division of National Resilience, LLC into Bedmar Holdco, LLC and National Resilience, LLC with Bedmar Holdco, LLC owning 51% of AGS Holdco, LLC
G.    Merger and contribution of Bedmar Holdco, LLC into Bedmar, LLC, with Bedmar, LLC owning 51% of AGS Holdco, LLC
H.    Assignment of Alachua Lease to Bedmar, LLC

23.    Among myriad other issues, the Debtor has failed to provide any information regarding (i) any transaction affecting Resilience Boston, Inc., (ii) which entity funded Bedmar, LLC, (iii) which entity funded the receivable (and what transaction gave rise to a receivable in favor of Bedmar, LLC) purportedly held by Bedmar, LLC and the source of such funds, (iv) how and why Bedmar Holdco, LLC and then Bedmar, LLC was allocated 51% of AGS Holdco, LLC, and (v) National Resilience, Inc.'s status as a guarantor of another lease for premises not alleged to constitute property of the estate.

24.     Notably, despite testifying to the importance of establishing an independent ability to investigate the Corporate Transactions, the Independent Manager has no knowledge or understanding of the Corporate Transactions and, upon information and belief, has not commenced any such investigation.[5]  The Independent Manager testified that his only interactions with respect to the Corporate Transactions were with respect to Steps G and H above, and then only through counsel, and that otherwise he only understood the end result: one entity holding lease obligations and lease guaranty obligations with just enough "receivables" to pay one proposed capped rejection damages claim per landlord.[6]

25.     Under the non-Debtor affiliates' theory of the case, as part of the divisions in Steps E and F above, the liabilities and obligations under the Leases and Guaranties were assigned, allocated, or otherwise transferred to the Debtor under Section 18-217 of the LLCA.  Further, in the non-Debtor affiliates' view, due to the contribution and merger of Bedmar Holdco, LLC into Bedmar, LLC, through which Bedmar, LLC assumed extraordinary guaranty liabilities and for which Bedmar, LLC received no disclosed consideration, the Debtor now purports to be *both* the tenant and the guarantor under the Leases, expecting to extinguish the entire class of guaranty liabilities.[7]

26.     As it stands, the Debtor's disclosures are woefully deficient.  The Debtor has failed to provide support, justification, or evidence for any one of the steps listed above.  Rather, the Debtor apparently asks the landlords (the Debtor's only admitted creditors), the Office of the

---

[5]     Sontchi Depo. Tr. at 37:14–18.  This is especially concerning as the Independent Manager executed the Alachua Assignment Agreement on the same day as his appointment.

[6]     *Id.*, 42:1–12.

[7]     During his deposition, the Independent Manager refused to opine about or otherwise did not know whether the Landlords have two claims against Bedmar, LLC, given its purported status as both tenant and guarantor under the Leases.  Sontchi Depo. Tr. 90:10–20.

United States Trustee for Region 3 (the "UST"), and the Court to take at face value that each of the steps in the Corporate Transactions was undertaken in good faith and without an intent to hinder, or delay, or defraud creditors, was for reasonably equivalent value, did not occur when any of the non-Debtor affiliates and their predecessors in interest were insolvent or were rendered insolvent as a result, and complied with the LLCA and other applicable state law. Indeed, there is no statutory collapsing doctrine, so this Court must view each step of the Corporate Transactions, if they are ever even fully disclosed, independently to ascertain whether any step involved a fraudulent transfer. Under the LLCA, if any step constituted a fraudulent transfer, then the Debtor and all non-Debtor affiliates are jointly and severally liable for the obligations of the Debtor. Not being in bankruptcy, no non-Debtor affiliate may benefit from the cap on rejection damage claims under section 502(b)(6) of the Bankruptcy Code.

### E. Procedural History

27.     On June 9, 2025 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On June 20, 2025, each of the Landlords filed an objection to the Debtor's motion to reject [D.I. 4] (the "Rejection Motion") all of the unexpired leases allocated to the Debtor [D.I. 67, 69, 72]. On June 25, 2025, Harvard filed a supplemental objection to the Rejection Motion [D.I. 102], to address certain nuances under the LLCA with respect to the Harvard Lease.

28.     On June 26, 2025, the Court held a hearing on the Rejection Motion. After hearing argument, among other things, the Court adjourned the Rejection Motion, set July 3, 2025, as the deadline for the Landlords to file a joinder or their own motions to dismiss the chapter 11 case, and directed expedited discovery with respect thereto.

29.     As of the filing of this Motion, the Landlords have served discovery on the Debtor and a number of non-Debtor parties, requested documents to be produced by July 8, 2025, and are working to schedule depositions of the Debtor, the non-Debtor affiliates and certain individual officers of the non-Debtor affiliates.[8]  Accordingly, and necessarily given the procedural posture here, the Landlords do not have the benefit of discovery prior to filing this Motion and reserve the right to supplement and otherwise reply to any objections to this Motion with information gained from the discovery process.

## JURISDICTION AND VENUE

30.     The Court has jurisdiction to consider this Motion to dismiss the chapter 11 case of the Debtor pursuant to section 1112(b) of the Bankruptcy Code under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b).

31.     Venue of this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

32.     Under Rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware, the Landlords do not consent to entry of a final judgment or order with respect to this Motion if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## RELIEF REQUESTED

33.     By this Motion, the Landlords seek entry of an order, substantially in the form of the order attached hereto as **Exhibit A**, dismissing the Debtor's chapter 11 case under section 1112(b) of the Bankruptcy Code.

---

[8]      *See* D.I. 129.

1619137073.8

## BASIS FOR RELIEF REQUESTED

### A.  The Bankruptcy Court lacks jurisdiction over the Leases.

34.     As a threshold matter, this Court lacks subject matter jurisdiction over the Leases. As discussed throughout this Motion, the Debtor has failed to fully explain, much less demonstrate through evidence the chain of events that purportedly result in each Lease landing at the Debtor. This Court must make a preliminary determination as to whether the Leases constitute property of the Debtor's estate under section 541 of the Bankruptcy Code.

35.     While the Landlords cannot speak to certain of the other purported landlords in this case, if the Leases and other similarly situated leases are not property of the estate, this Debtor has no prospect of rehabilitation, reorganization, or even liquidation—this Court must dismiss the chapter 11 case for cause under section 1112(b) of the Bankruptcy Code.  Even assuming arguendo that certain Leases or other leases (with tenants not party to this Motion) are property of the estate, there is ample cause to dismiss this chapter 11 case because the case was not filed in good faith.

36.     Section 541 of the Bankruptcy Code provides that all legal and equitable interests of a debtor become property of the estate upon the commencement of a case under the Bankruptcy Code.  11 U.S.C. § 541(a)(1).  State law governs whether certain property becomes property of a debtor's estate.  *See, e.g.*, *Musso v. Ostashko*, 468 F.3d 99, 105 (2d Cir. 2006) (citing *Butner v. United States*, 440 U.S. 48, 54 (1979)).  This Court has exclusive jurisdiction over disputes regarding whether the Leases constitute property of the Debtor's estate.  *See, e.g.*, *In re New Century Holdings, Inc.*, 387 B.R. 95, 105 (Bankr. D. Del. 2008).

37.     Similar to a motion seeking authorization of a sale of estate property, the Debtor has the burden to show what constitutes property of the estate.  *See, e.g.*, *Carnival Corp. v. DeCurtis Holdings LLC* (*In re DeCurtis Holdings LLC*), Nos. 23-10548 (JKS), 23-50413 (JKS),

2023 Bankr. LEXIS 1973, at *27–28 (Bankr. D. Del. Aug. 9, 2023) (noting that debtor bears the burden of proof in a sale motion and "must identify, through admissible evidence, what exactly it seeks to sell."); *In re Whitehall Jewelers Holdings, Inc.*, No. 08-11261(KG), 2008 Bankr. LEXIS 2120, at *15 (Bankr. D. Del. July 28, 2008) (noting that debtors have the "heavy" burden to show what is property of the estate before the confirmation of a sale.)

38.      Because the Debtor cannot satisfy its burden that the Leases are property of the estate, this Court has no subject matter jurisdiction to abrogate, cap, or otherwise modify the rights, claims, and obligations of non-Debtor parties to the Leases and Guaranties.  It follows that this Court has no jurisdiction to adjudicate any motion concerning the Leases, including the Rejection Motion, or consider the adequacy of the disclosure statement or confirmation of the Debtor's plan of reorganization.

**B.  The Corporate Transactions violate the Leases and the Guaranties.**

39.      The "Corporate Transactions" violate the terms of the Leases and Guaranties and should be voided, if not void.[9]  As discussed above, the Debtor's disclosures are woefully deficient. As of the filing of this Motion, the Debtor has failed to provide sufficient information as to any one step of the Corporate Transactions.  Absent evidence to the contrary, the Landlords conclude that neither the Leases nor the Guaranties are property of the Debtor's estate.

40.      First, the Harvard Lease is between Harvard and Resilience Boston, Inc.  Nowhere in the Debtor's public filings or information obtained through initial discovery to date does the Debtor detail what happened to Resilience Boston, Inc., or even if it is still active.  Next, Section

---

[9]      Alternatively, since the Corporate Transactions involve fraudulent transfers, the Court should determine that the Debtor and its non-Debtor affiliates are jointly and severally liable for the obligations arising under the Leases and the Guaranties.  Furthermore, the non-Debtor affiliates are liable for damages caused to the Landlords for their part in the Corporate Transactions that breached the Leases and Guaranties or are fraudulent transfers, among other causes of action.

5.1.11 of the Harvard Lease both requires landlord consent to any assignment and prohibits the tenant from transferring the Harvard Lease to any party which would be of such business reputation, management expertise or creditworthiness as to be inappropriate as a tenant under the Harvard Lease.  Not only did Resilience Boston, Inc. fail to obtain Harvard's prior consent to any assignment, but Harvard was not even informed that the Harvard Lease somehow materialized at Bedmar, LLC until the Petition Date.

41.     Second, the purported formation of Bedmar Member, Inc. as the 100% owner of Resilience US, Inc. constitutes a change of control or transfer under the 92 Crowley Lease.  Section 11.01 of the 92 Crowley Lease provides that a transfer is deemed to occur upon a change of at least 50% of the beneficial ownership interest of Resilience US, Inc., as tenant.  Given the lack of disclosures,[10] the Landlords only know that Bedmar Member, Inc. was formed at some point prepetition as a direct or indirect equity holder in Resilience US, Inc. and is now described as the "sole member" of the Debtor and an "indirect wholly-owned subsidiary" of National Resilience Holdco, Inc.  Sontchi Decl., ¶¶ 8–9.

42.     To the extent that Bedmar Member, Inc. either (i) took ownership of greater than 50% of the beneficial ownership interest of Resilience US, Inc. or (ii) obtained the power and authority to direct the business and affairs of Resilience US, Inc., then a change of control and a transfer under Section 11.01 of the 92 Crowley Lease occurred.  The Debtor has thus far failed to provide evidence affirming or denying this change of control.  Notwithstanding, Section 11.01 of the 92 Crowley Lease confirms that Resilience US, Inc., as tenant, remains liable to 92 Crowley in spite of a transfer in violation of the 92 Crowley Lease.  National Resilience, Inc. additionally

---

[10]     In fact, for over three months prior to the Petition Date, 92 Crowley had sought information from Resilience US, Inc. and its affiliates regarding an update to the enterprise's business plan; Resilience US, Inc. failed to meaningfully respond.

remains liable as guarantor under Section 4 of the 92 Crowley Guaranty.  92 Crowley, and the other Landlords, reserve all rights to exercise remedies against Resilience US, Inc. and National Resilience, Inc. for any and all defaults under the 92 Crowley Lease, as well as to assert causes of action for damages suffered against all of the non-Debtor affiliates and others.

43.    Third, AGSI's attempted assignment of the Alachua Lease under the Alachua Assignment Agreement is ineffective, because, under section 24(A) of the Alachua Lease, Alachua did not consent—indeed, was never even asked to consent—to any change in the ownership or control of AGSI, or any assignment of AGSI's interest in the Lease.[11]  By the Alachua Lease's terms, AGSI is required to obtain Alachua's consent prior to "any change in ownership (directly or indirectly) or control of Tenant (directly or indirectly)[.]"  Consequently, Resilience US, LLC's attempt to allocate "all equity interests" in AGSI to AGS HoldCo, LLC constitutes a change in ownership or control in AGSI that first requires Alachua's written consent.  *See* Alachua Lease ¶ 24(A).  Similarly, although the Alachua Assignment Agreement states that AGS HoldCo, LLC owns 100% of AGSI's stock, the circumstances around when and how AGS HoldCo, LLC purchased or otherwise obtained that interest is a mystery.  Nevertheless, because a change in 100% of the stock ownership in AGSI constitutes a change in its control or ownership, section 24(A) of the Alachua Lease requires that AGSI first obtain Alachua's written consent before that transaction can be consummated.  Furthermore, under any interpretation of the Alachua Lease, changes in the ownership or control of AGSI always require Alachua's consent, as the term "Transfer," is defined in section 24(A) of the Alachua Lease to include changes in ownership and control, is not used in section 24(C).

---

[11]    Under applicable Florida law, lease provisions requiring a landlord's consent prior to the assignment of a tenant's leasehold interest are enforceable, subject only to the exercise of good faith and commercial reasonableness.  *See Fernandez v. Vazquez*, 397 So. 2d 1171, 1174 (Fla. 3d DCA 1981); *see also Speedway SuperAmerica, LLC v. Tropic Enters.*, 966 So. 2d 1, 4 (Fla. 2d DCA 2007).

44.     Notwithstanding the conclusory recital in the Alachua Assignment Agreement, AGSI's purported assignment to the Debtor did not constitute an "Intra-corporate Transfer," as defined by section 24(C) and, therefore, required Alachua's consent.  According to the the Debtor's organizational chart attached to the Independent Manager's supplement first day declaration [D.I. 41], AGS Holdco, LLC owns 100% of AGSI.  The Debtor purportedly owns 51% of the voting interests in AGS Holdco, LLC.[12]  Given this structure, none of subsections (1)–(6) of section 24(C) apply.  The Debtor has not submitted any evidence that it "has and continues to have the power to direct" AGSI's day-to-day management and operations, nor could it feasibly have such power when the Debtor has no employees or operations.  The Debtor does not own the majority of the outstanding shares of voting stock or membership interests of AGSI—AGS Holdco, LLC does.  Similarly, AGSI does not own any voting stock or membership interests in Debtor, nor did AGSI merge with Debtor.  Non-debtor AGSI's attempt to assign the Alachua Lease was, therefore, ineffective and is voidable by Alachua.

45.     Even if section 24(c) of the Alachua Lease did permit assignment without notice or consent (it does not), AGSI remains liable for performance of the Alachua Lease pursuant to section 24(D) ("Continuing Liability"), which provides that,"[n]otwithstanding the exercise of Tenant's rights arising under subparagraph 24(C) above, Tenant shall remain fully liable for all obligations to be performed by Tenant under this Lease, unless otherwise agreed in Landlord's sole discretion."

46.     In addition, Florida law prohibits National Resilience, Inc. from assigning or otherwise transferring its contractual duty under the Alachua Lease Guaranty.  Special guarantees

---

[12]     There is no information in the record as to why the Debtor was allocated only 51% of the voting interests in AGS Holdco, LLC or what assets are owned by that entity other than 100% of the ownership of AGSI or the consideration exchanged therefor.

1619137073.8

(as is the case here) are not assignable by the guarantor unless agreed in writing by the creditor.

*See Brunswick Corp. v. Creel*, 471 So. 2d 617, 618 (Fla. 5th DCA 1985).  The Alachua Lease

Guaranty unequivocally states that "Guarantor's obligations hereunder shall not be assigned or

delegated . . . ."  Alachua reserves all rights to void the assignment and exercise remedies against

AGSI, as Tenant, and National Resilience, Inc., as Guarantor, and all entities and parties involved

in the Corporate Transactions.

### C. The Debtor bears the burden to prove that the Corporate Transactions do not constitute fraudulent transfers.

47.    Section 18-217(*l*)(4) of the LLCA provides:

Each of the debts, liabilities and duties of the dividing company shall without further action be allocated to and be the debts, liabilities and duties of such division company as is specified in the plan of division as having such debts, liabilities and duties allocated to it, in such a manner and basis and with such effect as is specified in the plan of division, and no other division company shall be liable therefor, *so long as the plan of division does not constitute a fraudulent transfer under applicable law*, and all liens upon any property of the dividing company shall be preserved unimpaired, and all debts, liabilities and duties of the dividing company shall remain attached to the division company to which such debts, liabilities and duties have been allocated in the plan of division, and may be enforced against such division company to the same extent as if said debts, liabilities and duties had originally been incurred or contracted by it in its capacity as a domestic limited liability company.

(emphasis added).

48.    Section 18-217(*l*)(5) further provides:

In the event that any allocation of assets, debts, liabilities and duties to division companies in accordance with a plan of division is *determined by a court of competent jurisdiction to constitute a fraudulent transfer, each division company shall be jointly and severally liable* on account of such fraudulent transfer notwithstanding the allocations made in the plan of division; provided, however, the validity and effectiveness of the division are not otherwise affected thereby.

(emphasis added).

49.     The Delaware Code only contains seven instances of the term "fraudulent transfer," and six of those instances are in the division provisions.  This evidences the legislature's keen focus on balancing the freedom to contract against potential abuses.  The language of the two quoted provisions is clear.  When challenged, a dividing company must affirmatively prove that its intended divisions and allocations do not constitute fraudulent transfers under applicable law. *See, e.g.*, *In re DBMP LLC*, No. 20-30080, 2021 WL 3552350, at *26 (Bankr. W.D.N.C. Aug. 11, 2021) ("Thus, if a corporation uses a divisional merger to dump its liabilities into a newly created 'bad' company which lacks the ability to pay creditors while its 'good' twin corporation walks away with the enterprise's assets, a fraudulent transfer avoidance action lies."); *In re Aldrich Pump LLC*, No. 20-30608 (JCW), 2021 WL 3729335, at *29 (Bankr. W.D.N.C. Aug. 23, 2021) (same).

50.     Section 18-217 of the LLCA does not authorize a dividing company to collapse steps in transactions.  Rather, 18-217(*l*)(5) expressly refers to "any allocation".  It follows that each step of a divisive merger must not constitute a fraudulent transfer.  The Debtor has failed even to allege, much less produce any evidence for the Court to conclude that each of the Corporate Transactions is not a fraudulent transfer.  Accordingly, each of the Debtor and its non-Debtor affiliates that participated in the divisive merger is jointly and severally liable for obligations and damages arising under the Leases and Guaranties and the Corporate Transactions.[13]

51.     Fraudulent transfer law is state specific.  Massachusetts law governs the Harvard Lease and the 92 Crowley Lease, and their respective guaranties.  Florida law governs the Alachua Lease and its guaranty.  Under the circumstances, the text of the LLCA requires that the Debtor

---

[13]     Damages include any damage to any of the premises demised under any of the Leases and the Landlords resulting from Debtor's and the non-Debtor affiliates' abandonment of the premises without delivering or providing the keys, codes, life safety status and instructions, hazardous material removal or decommissioning certifications and other relevant and necessary information to the Landlords, including all costs to secure, maintain and otherwise carry the premises from the date of Debtor's and its non-Debtor affiliates' abandonment.

prove that each of the Corporation Transactions is not fraudulent under M.G.L.A. 109A § 5 or F.S.A. § 726.105.  To date, the Debtor has submitted no evidence, and for that matter, not stated argument, to support this conclusion.  There is no evidence in the record that the unilateral, nonconsensual transfers of the Leases and Guaranties were undertaken without the actual intent to hinder, or delay, or defraud creditors or, as the enterprise was insolvent, were for reasonably equivalent value.  In fact, the opposite is true.

52.     As set forth in greater length in the Cobalt Motion and the UST Motion, this case is about advancing the interests of non-Debtor affiliates.  The Independent Manager of the Debtor admitted this during his deposition.  *See* Sontchi Depo Tr. 36:8–18:

> Q.     So when you say the purpose being restructuring, the purpose was to help restructure the business side of National Resilience.  That means companies -- you're referring to companies other than Bedmar, LLC; is that correct?

> A.     Yes.  So you have an enterprise that has a number of corporations in it.  That enterprise is struggling.  Part of the reason that enterprise is struggling, maybe the main reason, is that it overexpanded and it has too many leases that are either empty or unprofitable or unused.

53.     To do so, non-Debtor affiliates transferred the leases without the consent of the respective landlords to a party without the financial wherewithal to pay all of the administrative costs of a chapter 11 case.  Likewise, the Independent Manager admitted that the Debtor has no employees or operations—the Debtor cannot be said to have the operational capacity to comply with the terms of the Leases.  Further, there remains an open question as to whether the Debtor or its non-Debtor affiliates intended the merger of Bedmar Holdco, LLC into Bedmar, LLC to extinguish the Landlords' respective claims against the Guarantor.  Certainly, to the extent each Landlord has two claims—under each respective guaranty and lease—the Debtor and its non-Debtor affiliates who were intended to be shielded by this exercise failed to allocate sufficient cash

to pay both claims, capped or not, or to provide adequate funding to pay for the proper delivery of the premises to the Landlords.

**D.   The Delaware Limited Liability Act preserves the anti-transfer provisions of the Harvard Lease.**

54.      6 Del. C. § 18-217(o) provides:

All limited liability companies formed prior to August 1, 2018, shall be governed by this section; provided, that if the dividing company is a party to any written contract, indenture or other agreement entered into prior to August 1, 2018, that, by its terms, restricts, conditions or prohibits the consummation of a merger or consolidation by the dividing company with or into another party, or the transfer of assets by the dividing company to another party, then such restriction, condition or prohibition shall be deemed to apply to a division as if it were a merger, consolidation or transfer of assets, as applicable.

55.      The intent of the Delaware legislature is clear.  Parties transacting prior to the enactment of the LLCA did so with a mutual understanding of the legal landscape.  The legislature included this temporal cutoff—a rare limiting principle in both the LLCA and Delaware law generally—to keep the status quo for pre-enactment transactions and preserve the benefits of parties' bargains.  The legislature included a similar cutoff in 12 Del. C. § 3825(o) as to Delaware statutory trusts that are parties to pre-August 1, 2020 agreements in the context of DST divisive mergers.

56.      The Harvard Lease is a 1992 lease.  Even assuming arguendo that the Debtor demonstrates that any of the Corporate Transactions, let alone the divisions, do not constitute fraudulent transfers, the Debtor cannot scrub Section 5.1.11 from the Harvard Lease.  Section 18-217(o) of the LLCA expressly preserves the Harvard Lease's anti-transfer provisions.  The purported transfers violate the Harvard Lease and should be deemed void.

## **RESERVATION OF RIGHTS**

57.     Nothing in this Motion is intended to be, or should be construed as, a waiver by the Landlords of any of their respective rights under the Leases, the Guaranties, other agreements, documents and instruments related to the Leases and Guaranties, the Bankruptcy Code, or applicable law, all of which rights, claims, and causes of action are expressly reserved.  The Landlords additionally reserve all rights, claims, defenses, and other causes of action with respect to the proposed DIP financing motion, the Debtor's motion to approve its disclosure statement, the Debtor's proposed prepackaged plan, the Rejection Motion, or any other motion or application related thereto.  As noted above, the Landlords have served discovery on the Debtor and certain non-Debtor affiliates.  The Landlords reserve the right to supplement this Motion and otherwise reply to any objections or other responses hereto with information gained through discovery.

**WHEREFORE**, the Landlords respectfully request that this Court enter an order, substantially in the form of the proposed order attached to this Motion as **Exhibit A**, dismissing the Debtor's chapter 11 case, and grant such other and further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Left Blank]*

1619137073.8

Dated:  July 3, 2025
         Wilmington, Delaware

Respectfully submitted,

**DLA PIPER LLP (US)**

 _/s/ Stuart M. Brown_
Stuart M. Brown (DE #4050)
Aaron S. Applebaum (DE #5587)
Matthew S. Sarna (DE #6578)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5662
Facsimile: (302) 397-2462
Email: stuart.brown@us.dlapiper.com
       aaron.applebaum@us.dlapiper.com
       matthew.sarna@us.dlapiper.com

*Counsel for the Landlords*

1619137073.8