## **EXHIBIT B**

**Deposition Transcript Excerpts**

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

--------------------------------x

In re:                          :  Chapter 11

    BEDMAR, LLC,                  :  Case No.

               Debtor,   :  25-11027 (JKS)

--------------------------------x

VIDEOTAPED DEPOSITION OF CHRISTOPHER S. SONTCHI

Wednesday, June 25, 2025

2:24 p.m. Eastern Daylight Time

REPORTER:     Sherry L. Brooks,

              Certified LiveNote Reporter

NOTARY:       Wendy Gibson

-------------------------------------------------------

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, DC  20036

(202) 232-0646

Page 36

1      Q.    And that restructuring of the business

2  side would include entities other than Bedmar, LLC;

3  is that correct?

4            MR. STEARN:  Object to form.

5      A.    Bedmar, LLC isn't -- Bedmar, LLC has no

6  business.

7            BY MR. TECCE.

8      Q.    So when you say the purpose being

9  restructuring, the purpose was to help restructure

10  the business side of National Resilience.  That means

11  companies -- you're referring to companies other than

12  Bedmar, LLC; is that correct?

13      A.    Yes.  So you have an enterprise that has a

14  number of corporations in it.  That enterprise is

15  struggling.  Part of the reason that enterprise is

16  struggling, maybe the main reason, is that it

17  overexpanded and it has too many leases that are

18  either empty or unprofitable or unused.

19            The idea was to use the code, the

20  bankruptcy code, a filing, to reject those leases,

21  which you can do in bankruptcy; pay those claims in

22  full, which you can do in bankruptcy; subject to the

23  lease rejection cap, which you can do in bankruptcy;

24  pay all of your administrative claims, and exit

Page 37

1    bankruptcy through a plan.

2             There was never any secret about that.

3    How we got to the place where Bedmar, LLC came to be

4    and where it had these leases, these seven leases and

5    -- two or three subleases plus the guarantys, I

6    believe -- how we got there was really not my

7    concern.

8             My concern going in was whether that was

9    something that I was comfortable being a part of.

10   And based on my understanding of the situation, my

11   understanding of the law, my understanding of the

12   procedures involved, I felt that it was appropriate

13   provided that certain things happened.

14            One of them would be that I would be truly

15   independent.  I would have the ability, if necessary,

16   to take an investigation or action in connection with

17   whatever process got us to the point where Bedmar,

18   LLC existed; that I would have independent counsel;

19   that I would have independent financial advisors;

20   that all claims -- all allowed claims would be paid

21   in full; that all admin claims would be paid.

22            And the fundamental start of that whole

23   analysis was that I got comfortable that the

24   beginning business enterprise on a global basis was

1      A.     They do not get their breach damages as it
2  would occur outside of bankruptcy, but they do get
3  their allowed claim.
4      Q.     Do you know how it was decided what assets
5  and liabilities would be allocated to Bedmar, LLC?
6      A.     Well, the only liabilities allocated to
7  Bedmar, LLC are the guarantys and the leases.  I
8  think I just answered that.
9             As to assets, that was a negotiation or at
10 least the amount was a negotiation between RLF and
11 Latham Watkins, I believe.
12     Q.     So was the whole purpose of the division
13 to put the leases in there so that they could be
14 capped?
15     A.     Yes.  I don't think we've hidden that.
16     Q.     Was there any discussion that you recall
17 about the possibility that the restructuring would
18 delay or complicate the landlord's efforts to collect
19 on their claims?
20             MR. STEARN:  Object to form.
21     A.     I don't understand the question.
22             BY MR. SILVERMAN:
23     Q.     Was there any discussion about the
24 possibility that the restructuring effort would delay

Page 90

1    Corporate Transactions?

2          A.    I assume it -- Latham & Watkins, yeah.

3          Q.    Earlier I had asked you who the guarantor

4    was and I believe your answer was Bedmar, LLC; is

5    that correct?

6          A.    It is now, yes.  Yeah.

7          Q.    So Bedmar, LLC is the tenant and the

8    guarantor?

9          A.    Yes.

10          Q.    And does that mean that the landlords have

11    two claims?

12               MR. STEARN:  Object to form to the extent

13    it seeks a legal conclusion.

14          A.    I don't know.  I'd have to think about it.

15    --

16               MR. SILVERMAN:  Okay.

17          A.    -- which I'm not going to do right now.

18    I'm sorry.  I'm not going to do right now and I may

19    never answer that question because it was a legal

20    conclusion, but I guess my answer is I don't know.

21               MR. SILVERMAN:  Thank you.  No more

22    questions.

23               MR. TECCE:  Can I ask you just a follow-up

24    questions?  I know that I closed the record, but it's