IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 25-11027 (JKS) |
| BEDMAR, LLC, | : | Hearing Date: July 29, 2025 |
| | : | |
| Debtor.[1] | : | |

---

**COBALT PROPCO 2020, LLC'S SUR-SUR REPLY (I) IN SUPPORT OF MOTION TO DISMISS DEBTOR BEDMAR, LLC'S CHAPTER 11 CASE PURSUANT TO BANKRUPTCY CODE SECTION 1112(B) AND (II) IN RESPONSE TO SUR-REPLY**

Cobalt PropCo 2020, LLC ("**Cobalt**") submits this sur-sur-reply in support of its Motion to Dismiss [ECF No. 92] and in response to the Debtor's Sur-Reply[2] and respectfully represent as follows:

**PRELIMINARY STATEMENT**

1.  The Debtor filed the Sur-Reply on the eve of trial claiming it had to respond to fraudulent-transfer arguments. According to the Debtor, these assertions first appeared in the Movants' Replies. Cobalt disputes the Debtor's need to file a Sur-Reply; its characterization of Cobalt's fraudulent-transfer arguments (including when the Debtor claims they were raised initially); and its view of the significance of fraudulent-transfer issues to the disposition of the Motion To Dismiss.

---

[1] The Debtor in this Chapter 11 Case, along with the last four digits of its federal tax identification number is Bedmar, LLC (5047). The Debtor's mailing address is 3115 Merryfield Row, San Diego, CA 92121.

[2] See Debtor's Sur-Reply (I) In Response To Fraudulent Transfer Arguments Raised In Replies Filed by (A) Cobalt PropCo 2020, LLC, And (B) The Presidents And Fellows of Harvard College, 92 Crowley Owner (DE) LLC And CEGM Alachua, LLC, And (II) In Further Support Of Its Omnibus Objection To Motions To Dismiss [ECF No. 302, Ex. A] (the "**Sur-Reply**"). Capitalized terms not defined herein have the meanings ascribed to them in Cobalt's Motion To Dismiss and in its Omnibus Reply in Support of Motion to Dismiss [ECF No. 286] (the "**Reply**").

2.    *First*, the Debtor did not need to file a sur-reply. Cobalt's Motion To Dismiss argued that the formation of Bedmar, LLC may have involved fraudulent transfers and that the applicability of the Delaware LLC Act requires the absence of them.[3] The Debtor and Non-Debtor Affiliates obviously understood this. To use their metric, the phrase "fraudulent transfer" appears seven (7) times in the Debtor's Omnibus Objection and fifteen (15) times in the Non-Debtors' Affiliates' objection—which dedicated an entire argument section to this point.[4]

3.    *Second,* the Debtor overstates the importance of the fraudulent-transfer argument to the Motions to Dismiss. Allegations of fraudulent transfer are not and have never been the lynchpin of the Motion to Dismiss. The argument is a supplemental one, behind Cobalt's contentions that (a) the filing lacks a valid bankruptcy purpose because it, <u>inter alia</u>, focuses on non-Debtor Affiliates;[5] (b) the Debtor either was in financial distress on purpose or its assets ($41.4 million) equal its liabilities (scheduled at $32.9 million);[6] (c) the alleged financial distress of non-Debtor Affiliates is irrelevant;[7] (d) the Debtor's filing just to invoke section 502(b)(6) of the Bankruptcy Code is not good faith under <u>Integrated</u>;[8] (e) under <u>LTL</u>, good faith is absent when a company engages in corporate machinations (even if done in compliance with applicable state law) to allocate liabilities to a new-created entity to shield affiliate companies from them;[9] (f) eviscerating state-law rights under leases by virtue of the filing violates <u>LTL</u>;[10] and (g) funding

---

[3]    Motion To Dismiss ("MTD") ¶¶ 5 & n. 18; 29; 44.

[4]    Non-Debtor Affiliates' Objection [ECF No. 221] ¶¶ 90-95 ("The Allocations To The Debtor And Bedmar HoldCo, LLC Are Vested Property Rights And Are Not Void Or Voidable As Fraudulent Conveyances").

[5]    MTD ¶¶ 8, 9, 45, Reply ¶¶ 1, 3, 26.

[6]    MTD ¶¶ 6, 7, 27, 28, Reply ¶¶ 3, 8, 12-15, 23.

[7]    MTD ¶¶ 8, 9, 28, Reply ¶¶ 7, 9, 11, 33-34.

[8]    MTD ¶¶ 3-4, 9-10, 26-34, 41-42; Reply ¶¶ 4, 20, 25.

[9]    MTD ¶¶ 3, 4, 40, Reply ¶¶ 5, 20, 37.

[10]   MTD ¶¶ 4, 5, 10, 11, 47, 48, 49, 50; Reply ¶¶ 3, 5, 18, 36-40.

administrative costs just to invoke the Bankruptcy Code's redistributive provisions violates Integrated and Rent-A-Wreck.[11] The Chapter 11 Case can be dismissed on each of these grounds independently without considering whether a single transaction was a fraudulent transfer. It bears emphasizing that neither Integrated nor LTL involved a fraudulent transfer. In point of fact, Cobalt's reply crystalizes its position that the fraudulent-transfer point supplies an *additional* feature of the Chapter 11 Case that *further* warrants dismissal.[12]

4. *Finally,* whatever has been alleged about fraudulent transfer, it hardly warrants a 20-page exposition on the law of fraudulent transfers accompanied by the Debtor's counsel's report to the Independent Manager. Actually, the Debtor appears to have filed the Sur-Reply to get the report before the Court. This was its second effort in less than a week after it attached the report to a discovery letter a few days before.[13] Given *their* focus on the Corporate Transactions and fraudulent-transfer issues, the Debtor (in the Sur-Reply) and Non-Debtor Affiliates (in their objection to the motions to dismiss) in sum and substance propose to change the definition of "cause" under section 1112(b) of the Bankruptcy Code to require Cobalt to disprove the existence of fraudulent transfers to prevail on the Motion To Dismiss. That is not the law. Regardless, the Debtor's contentions regarding the Corporate Transactions, the formation of Bedmar, and their respective fraudulent-transfer implications are wrong.

---

[11] MTD ¶¶ 6, 8, 9, 24; Reply ¶¶ 2891 n.5, 18, 24, 34-35.

[12] See Reply ¶ 20 ("*Even without the fraudulent-transfer issue*, the Bedmar case runs afoul of Integrated and LTL. They prohibit filing just to take advantage of the cap (Integrated) and using corporate machinations to isolate liabilities and protect non-debtor affiliates from bankruptcy (LTL). *But the Bedmar facts are actually worse than those in Integrated and LTL*; while objectionable features of both of those cases are on display here, *the Bedmar Chapter 11 Case involves an additional bad fact: that the bankruptcy filing is required to remedy what otherwise are fraudulent transfers*. Absent the cap, the Debtor was insolvent at the time of the transfer: the wide chasm between liabilities ($392 million) and assets ($41.4 million) remains and is *not* reasonably equivalent value. Bedmar, LLC needs section 502(b)(6) to bring the disparity into balance") (emphasis added)

[13] See ECF No. 289 (letter to the Court attaching counsels' report to Independent Manager).

## ARGUMENT

### A. CREATION OF BEDMAR LLC WAS LIKELY A FRAUDULENT TRANSFER

5.  While the Debtors focus on the entirety of the Corporate Transactions, the one transaction that invites examination is the creation of the Debtor, Bedmar LLC, less than a week prior to filing with significant lease liabilities ($372 million) and a modicum of assets ($41.4 million) designed around the statutory cap. These facts likely support both actual-intent and constructive fraudulent transfer claims.

#### 1. ACTUAL-INTENT CLAIM

6.  The creation of Bedmar, LLC for the specific purpose of capping landlord lease rejection claims and leaving only that amount of assets to pay capped claims likely supports an "actual-intent" claim, i.e., that the transfers were made with the intent to hinder and delay creditors like the landlords in contravention of Delaware state law. See 6 Del. C. § 1304(a)(1). Several of the "badges" applicable to such claims are present here. See In re FTX Trading Ltd., 2024 WL 4562675, at *7 (Bankr. D. Del. Oct. 23, 2024). Courts need not find all, or even a majority, of badges. See In re Our Alchemy, LLC, 642 B.R. 155, 164 (Bankr. D. Del. 2022). Moreover "the confluence of several [badges] in one transaction generally provides conclusive evidence of an actual intent." In re Fedders N. Am., 405 B.R. 527, 545 (Bankr. D. Del. 2009).

7.  Here, Bedmar, LLC was formed to remove assets from the reach of landlords and to cap their claims. These allocations were agreed to among insiders, and were not arm's-length transactions. Actually, disproportionate allocations and insolvency were both engineered. When "the parties allocate a creditor's claim to an inadequately capitalized or insolvent corporation, that creditor will have the right to challenge [the transaction] as a fraudulent transfer." In re DBMP LLC, 2021 WL 3552350, at *26 (Bankr. W.D.N.C. Aug. 11, 2021) (finding fraudulent transfer where Debtor "dump[ed] its liabilities into a newly created 'bad' company" while preserving

valuable assets elsewhere). See also In re Fundamental Long Term Care, Inc., 501 B.R. 784, 791 (Bankr. M.D. Fla. 2013) (avoidance claims lie where third parties "place Debtor and THMI's assets beyond the reach of creditors, either through various avoidable transfers or by and through a fraudulent creation of assertedly separate entities to house the removed assets and operations"); In re Aldrich Pump LLC, 2021 WL 3729335, at *29 (Bankr. W.D.N.C. Aug. 23, 2021) ("[I]f a corporation uses a divisional merger to dump its liabilities into a newly created 'bad' company that lacks the ability to pay creditors while its 'good' twin walks away with the enterprise's assets, a fraudulent transfer avoidance action lies.").

### 2. CONSTRUCTIVE FRAUDULENT TRANSFER CLAIM

8. A transfer becomes constructively fraudulent when (i) made "for less than reasonably equivalent value" and when (ii) "the debtor was, or was rendered, insolvent thereby." See In re Plassein Int'l Corp., 2008 WL 1990315, at *5 (Bankr. D. Del. May 5, 2008) (quoting 6 Del. C. § 1304(a)(2)(b)). The Third Circuit takes a practical approach to assessing reasonably equivalent value: "[a] party receives reasonably equivalent value" when "it gets 'roughly the value it gave.'" In re Opus E., LLC, 528 B.R. 30, 84 (Bankr. D. Del. 2015) (quoting Fedders, 405 B.R. at 547). It further utilizes a totality-of-circumstances test, examining factors including "the good faith of the parties" and "whether the transaction was at arms' length." In re Charys Holding Co., 443 B.R. 628, 637 (Bankr. D. Del. 2010).

9. While Bedmar, LLC received some consideration, the value of the liabilities allocated to it ($372 million) were more than nine (9) times the value of the assets it received ($41.4 million). This exchange, among insiders without any arm's-length negotiations, does not constitute "reasonably equivalent value" under any interpretation of the term. See 6 Del. C. § 1304(b)(8).

10. Also, by design Bedmar, LLC was rendered insolvent at the time it incurred the lease obligations through the allocations. Id. § 1304(b)(9). For the purposes of evaluating solvency, "courts evaluate transfers from the creditors' perspective, measuring value ... at the time of the transfer." DeGiacomo v. Sacred Heart Univ., Inc., 942 F.3d 55, 59 (1st Cir. 2019); ASARCO LLC v. Am. Mining Corp., 396 B.R. 278, 337 (S.D. Tex. 2008) ("All jurisdictions agree that courts should measure the value of the property transferred and the consideration received at the time of the transfer"). Bedmar, LLC became insolvent at the moment it was allocated $372 million of obligations and $41.4 million in assets.

11. Similarly, the merger of Bedmar HoldCo, LLC into Bedmar, LLC may support a claim as it purported to extinguish Cobalt's guaranty claim without providing any consideration in return. See In re Aldrich Pump LLC, 2023 WL 9016506 (Bankr. W.D.N.C. Dec. 28, 2023) (recognizing that divisional mergers with "apparent negative effects" on creditors' legal rights "may constitute avoidable fraudulent transfers").

### B.  CORPORATE TRANSACTIONS WERE LIKELY FRAUDULENT TRANSFERS

12. Looking beyond the creation of Bedmar, LLC to the Corporate Transactions more generally leads to the same conclusion. The Resilience companies were converted to limited liability companies and split to remove assets from the landlords' reach with the intent to hinder or delay them within the meaning of 6 Del. Code § 1304(a)(1).

13. And, the Resilience enterprise structured the Corporate Transactions among entities it controlled. This means each party to the plan of division and allocation as well as the merger was "an insider." See 6 Del. C. § 1304(b)(1); accord In re Nilhan Devs., LLC, 2021 WL 1539354, at *21 (Bankr. N.D. Ga. Apr. 19, 2021) (recognizing "corporations with common ownership are affiliates and, therefore, insiders of each other").

**1.    THERE IS NO BASIS TO COLLAPSE TRANSACTIONS**

14.    The Debtor asks the Court to collapse the various steps in the Corporate Transactions.[14]  The Debtor's request appears designed to distract from the only relevant inquiry for the purpose of assessing whether *the Debtor* has carried *the Debtor's* burden of showing good faith.  The Court need not make any determination whether the transactions that preceded the Debtor's formation constitute fraudulent transfers as part of the good faith inquiry.

15.    While the Corporate Transactions might be indicative of a lack of good faith, e.g., by ringfencing assets beyond the landlords' reach, the Court need not review each and every one and make a determination whether it supports a claim for fraudulent transfer.  Section 1112(b) of the Bankruptcy Code does not place that burden on Cobalt and the other movants.

16.    In any event, if the fraudulent transfer issue becomes relevant at a later time, the Corporate Transactions fail to meet the elements necessary to invoke the collapsing doctrine.  When determining the existence of a fraudulent transfer, courts must "evaluate each transfer as a separate transaction." Maxus Liquidating Trust v. YPF S.A. (In re Maxus Energy Corp.), 641 B.R. 467, 531–32 (Bankr. D. Del. 2022).  The Third Circuit recognizes a narrow exception, permitting courts to "collapse" multi-step transactions and treat them as "one integrated transaction," but only if specific criteria are met. Giuliano v. Schnabel (In re DSI Renal Holdings, LLC), 574 B.R. 446, 466 (Bankr. D. Del. 2017).  Courts consider three Mervyn factors to determine whether collapsing is appropriate: (i) whether all of the parties involved had knowledge of the multiple transactions, (ii) whether each transaction was dependent or conditioned on other transactions, and (iii) whether each transaction would have occurred on its own. In re Trib. Co., 464 B.R. 126, 165 (Bankr. D. Del. 2011) (quoting In re Mervyn's Holdings, LLC, 426 B.R. 497 (Bankr. D. Del. 2010)).  Failing

---

[14]    Sur-Reply ¶ 31.

to satisfy even a single factor can foreclose use of the collapsing doctrine. See, In re Trib. Co., 464 B.R. at 165-67 (declining to apply collapsing doctrine to multiple transactions because only two of the three Mervyn factors were satisfied); see also In re Mervyn's Holdings, LLC, 426 B.R. 96, 104 (Bankr. D. Del. 2010).

17. The Corporate Transactions cannot be collapsed because the Corporate Transactions were not "actually dependent on each other" and certain transactions would have occurred absent others. See Trib. Co., 464 B.R. at 165-66 (two related transaction steps were not "actually dependent on each other" because each step could "stand alone if necessary."). This is true even if the transaction documents contemplate closing all related transactions. Id. at 166. The Debtor and Non-Debtor Affiliates' own testimony confirms as much.[15]

18. The Debtor attempts to distinguish Tribune by arguing that the "[Corporate Transactions] were never intended to stand alone." See Sur Reply ¶ 42. This argument misunderstands the legal standard. The dependence factor turns on "what is required to happen"—"rather than what will probably happen." Trib. Co., 464 B.R. at 167. Put differently, a transaction is independent unless it is required to effectuate other transactions.

19. Here, unlike typical collapsing doctrine cases involving negotiations between counterparties, the non-Debtor Affiliates structured the Corporate Transactions among entities they controlled. Resilience could have easily created an integrated transaction, but chose to create

---

[15] See Montone Decl. ¶ 13 [ECF No. 227] ("In connection with these repositioning and financing efforts, the NR Group engaged in an internal reorganization of its entity structure consisting of certain corporate transactions (collectively, the 'Corporate Transactions'). This process consisted of five independent parts—each of which was independent of the other parts and only one of which included the entity divisions that are now being challenged in the Motions to Dismiss"); Sontchi Depo Tr. 53:2-5 ("Q: And if that merger didn't happen, would you have had two debtors? Is that what would have happened?" A: I think so. Q: Are there any reasons other than having a single debtor that Bedmar Holdco, LLC and Bedmar, LLC merged? A: None that I can recall, as I sit here today").

independent transactions. The Debtor cannot now claim they were mutually dependent to invoke an "equitable tool." In re Syntax-Brillian Corp., 573 F. App'x 154, 160 (3d Cir. 2014).

### 2. EVEN IF COLLAPSED, CORPORATE TRANSACTIONS ARE FRAUDULENT TRANSFERS

20. Collapsing does not alter the overarching principal that there must be reasonably equivalent value allocated to the Debtor. Examination of the "substance" of the Corporate Transactions reveals that their net effect was the creation of an insolvent Debtor that could not fulfil its lease obligations without filing for bankruptcy, invoking the statutory cap, and supposedly eliminating guaranty claims.

21. The Debtor fails to confront numerous cases finding fraudulent transfers in exactly these circumstances. See, e.g., In re DBMP LLC, 2021 WL 3552350, at *26 (Bankr. W.D.N.C. Aug. 11, 2021) ("If a corporation uses a divisional merger to dump its liabilities into a newly created 'bad' company which lacks the ability to pay creditors while its 'good' twin corporation walks away with the enterprise's assets, a fraudulent transfer avoidance action lies."); In re Fundamental Long Term Care, Inc., 501 B.R. 784, 791 (Bankr. M.D. Fla. 2013) (avoidance claims lie where third parties "place Debtor and THMI's assets beyond the reach of creditors, either through various avoidable transfers or by and through a fraudulent creation of assertedly separate entities to house the removed assets and operations"); In re Aldrich Pump LLC, 2021 WL 3729335, at *39 (Bankr. W.D.N.C. Aug. 23, 2021) ("[I]f in a merger with multiple survivors, the parties allocate a creditor's claim to an inadequately capitalized or insolvent corporation, that creditor will have the right to challenge the merger as a fraudulent transfer.").

22. The Debtor asserts without support that the Corporate Transactions did not diminish estate assets and did not divert value from creditors. Still, it spends very little time

substantiating that conclusion. Instead, the Debtor gestures to the report of Mr. Alhale.[16] Mr. Alhale's expert report makes several assumptions favorable to the Debtor's position.

23.    The divisional analysis portion of Mr. Alhale's expert report[17] addresses whether the recoveries of unsecured creditors of NR and RUS (as each term is defined in the Alhale Report), respectively, immediately before the Divisions (as defined in the Alhale Report) would have been less than or equal to the recoveries of unsecured creditors of Bedmar Holdco, LLC and Bedmar, LLC, respectively, immediately after the Divisions. It purports to show that the anticipated creditor recoveries on their claims against NR and RUS are less than the anticipated recoveries that would have been received from Bedmar Holdco, LLC and Bedmar, LLC immediately after the Divisions. Once again, the Alhale Report' divisional analysis depends on certain assumptions most favorable to the Debtor and non-Debtor Affiliates. Ultimately, it is impossible to accurately predict what the impact of the Corporate Transactions are on creditors, especially absent full disclosure of the non-Debtor Affiliates' assets and liabilities as well as an investigation of the merits of anticipated secured claims.

### C.    DEBTOR'S FILING CANNOT VALIDATE TRANSFERS

24.    The Debtor begins its fraudulent transfer analysis not by weighing the value allocated to the Debtor through allocation of assets and liabilities, but by presenting vague claims regarding the "substance" of a fraudulent transfer and what the Debtor believes to be an appropriate remedy. This approach inverts the fraudulent transfer analysis: the determination of whether a

---

[16]    See Expert Report of Morris Alhale (the "**Alhale Report**").

[17]    The parties agreed that this Sur-Sur-Reply will not address evidence and arguments from the Motion to Dismiss Hearing. In light of the Court's ruling (1) excluding the expert report and testimony of Mr. Alhale to the extent it concerns evidence of the enterprise financial condition and the alternative scenario and projected recoveries under such hypothetical alternative scenario and the financial condition of the pre-transaction entities, and (2) declining to admit the Report to the Independent Manager for its truth, this Sur-Sur-Reply will not respond to arguments of the Debtor in its Sur-Reply to the extent they rely on the truth of the now-excluded portion of Mr. Alhale's expert opinions and the Report to the Independent Manager.

fraudulent transfer occurred should be based on the elements of a fraudulent transfer, not the Debtor's speculation as to appropriate remedy. See <u>Mellon Bank, N.A. v. Metro Commc'ns, Inc.</u>, 945 F.2d 635, 646 (3d Cir. 1991), <u>as amended</u> (Oct. 28, 1991) ("The touchstone [of a fraudulent conveyance] is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred"); <u>United States v. West</u>, 299 F. Supp. 661, 664 (D. Del. 1969) ("Every conveyance obligation incurred by a person who is or will be thereby rendered insolvent is made and every fraudulent as to creditors").

25. In its discussion of remedies, the Debtor cites no case for the proposition that restitution of creditor recovery provides the exclusive remedy for a fraudulent transfer, and it is not supported by the text of either the Bankruptcy Code nor state law statutes that outline the elements of a fraudulent transfer and appropriate remedies. The cases the Debtor cite concern situations in which an already established corporate Debtor is found to have made a fraudulent transfer.[18] Here, when the fraudulent transfer resulted in the creation of the Debtor, the resulting harm and remedy are different.

26. "Various remedies are possible where the allocation of a liability in a merger constitutes a fraudulent transfer." <u>In re Aldrich Pump LLC</u>, 2021 WL 3729335, at *29 (Bankr. W.D.N.C. Aug. 23, 2021). One way courts address inequity arising from a fraudulent transaction is to void the illegal transaction. See <u>In re Cybergenics Corp.</u>, 226 F.3d 237, 241–42 (3d Cir. 2000) (creditors are authorized to seek avoidance of a fraudulent transfer or obligation); <u>United States v. Tabor Ct. Realty Corp.</u>, 803 F.2d 1288, 1301 (3d Cir. 1986) ("Here, the district court found that only by voiding the entire amount could the creditors be placed in the same position they held

---

[18] See <u>ASARCO LLC v. Americas Mining Corp.</u>, 404 B.R. 150, 173 (S.D. Tex. 2009) (established debtor transferred shares to affiliate); <u>Foxmeyer Corp. v. Gen. Elec. Capital Corp. (In re Foxmeyer Corp.)</u>, 296 B.R. 327, 342 (Bankr. D. Del. 2003)) (established Debtor transferred assets in a transaction designed to divert value from creditors).

before the November 26, 1973 misuse of the loans."); Fini v. J.W. Boudreau Corp., 86 Mass. App. Ct. 1116, 18 N.E.3d 1135 (2014) (voiding fraudulent transfer). This is also a remedy endorsed in Delaware's fraudulent conveyance statute. Del. C. 6 § 1307. ("In an action for relief against a transfer or obligation under this chapter, a creditor…may obtain: (1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim").

27. Voiding the division and merger that created the Debtor is particularly appropriate here, where the reversal of the transaction would return the value diverted from Cobalt and the other landlords by restoring the guarantees and redressing the Debtor's lack of good faith in filing. See, e.g., United States v. Tabor Ct. Realty Corp., 803 F.2d 1288, 1301 (3d Cir. 1986) ("[I]f we extract from the fraudulent actors every advantage which they derived from their fraud and restore the creditor to the position which lawfully belonged to it at the time the fraud was perpetrated and give it all rights which, but for the fraud, it had under the law, we feel that equity would adequately be done.") (quotation omitted).

28. The appropriate means by which to compensate creditors for lost value stemming from the Corporate Transactions can and will be litigated at another of time. Regardless of remedy, the existence of this fraudulent transfer forecloses any finding of good faith. Not only does the Debtor's filing serve no valid bankruptcy purpose, but ratification of the Debtor's bankruptcy filing would also legitimize avoidable transfers. See In re Hodges, 1991 WL 11002458, at *3 (Bankr. S.D. Ga. Jan. 11, 1991) (a debtor may not "circumvent and frustrate this creditor's efforts to enforce this legal obligation through a technicality of the [bankruptcy code]"); In re Pinnacle Land Grp., LLC, 2018 WL 4348051, at *11 (Bankr. W.D. Pa. Sep. 10, 2018) (dismissing bankruptcy case because it was an "attempt[] to further that scheme by seeking the Court's

imprimatur of a plan of reorganization that effectively consummates the fraud and "patently advances the illicit machinations").

## CONCLUSION

**WHEREFORE**, Cobalt respectfully requests that the Court enter an Order (a) dismissing the Chapter 11 Case and (b) granting such other and further relief as the Court deems just and proper.

Dated: August 1, 2025
      Wilmington, Delaware

By: /s/ *Michael Busenkell*

**GELLERT SEITZ BUSENKELL & BROWN, LLC**
Michael Busenkell (No. 3933)
1201 N. Orange Street, Suite 300
Wilmington, Delaware 19801
Telephone: (302) 425-5800
Facsimile: (302) 425-5814
mbusenkell@gsbblaw.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
James C. Tecce (pro hac vice)
Eric Kay (pro hac vice)
295 Fifth Avenue
New York, New York 10016
Tel.: (212) 849 7000
jamestecce@quinnemanuel.com
erickay@quinnemanuel.com

*Counsel to Cobalt PropCo 2020, LLC*