UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE: | . Chapter 11 |
|  | . |
|  | . Case No. 25-11027(JKS) |
| BEDMAR, LLC, | . |
|  | . 824 Market Street |
|  | . Wilmington, Delaware 19801 |
| Debtor. | . |
| . . . . . . . . . . . . . . . | . Tuesday, July 29, 2025 |

TRANSCRIPT OF HEARING ON MOTIONS TO DISMISS - VOLUME 1
BEFORE THE HONORABLE J. KATE STICKLES
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:            Michael J. Merchant, Esq.
                           Amanda R. Steele, Esq.
                           Robert J. Stearn, Jr., Esq.
                           Robert C. Maddox, Esq.
                           RICHARDS, LAYTON & FINGER, PA
                           One Rodney Square
                           920 North King Street
                           Wilmington, Delaware 19801

                           Heather Lambert, Esq.
                           WILSON, SONSINI, GOODRICH
                            & ROSATI, P.C.
                           222 Delaware Avenue, Suite 800
                           Wilmington, Delaware 19801

For the U.S. Trustee:      Timothy J. Fox, Jr., Esq.
                           OFFICE OF THE U.S. TRUSTEE
                           844 King Street, Suite 2207
                           Wilmington, Delaware 19801


(Appearances Continued)

Audio Operator:            Electronically Recorded
                           by Sean Moran, ECRO

Transcription Company:     Reliable
                           1007 N. Orange Street
                           Wilmington, Delaware 19801
                           (302)654-8080
                           Email:  gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:   (Continued)

```
For the President
and Fellows of Harvard
College, 92 Crowley
Owner (DE) LLC, and
CEGM Alachua, LLC
(collectively, the
"Landlords"):                  Stuart M. Brown, Esq.
                               R. Craig Martin, Esq.
                               Aaron Applebaum, Esq.
                               Roxanne Eastes, Esq.
                               DLA PIPER, LLP (US)
                               1201 North Market Street
                               Suite 2100
                               Wilmington, Delaware 19801

                               Marc A. Silverman, Esq.
                               DLA PIPER, LLP (US)
                               1251 Avenue of the Americas
                               27th Floor
                               New York, New York 10020

                               Virginia Callahan, Esq.
                               DLA PIPER, LLP (US)
                               Harbor East
                               650 South Exeter Street
                               Suite 1100
                               Baltimore, Maryland 21202


For Bedmar Member, Inc.,
et al:                         Curtis S. Miller, Esq.
                               MORRIS, NICHOLS, ARSHT
                                & TUNNELL, LLP
                               1201 North Market Street
                               16th Floor
                               Wilmington, Delaware 19899

                               Elizabeth Marks, Esq.
                               LATHAM & WATKINS, LLP
                               200 Clarendon Street
                               Boston, Massachusetts 02116

                               Amy C. Quartarolo, Esq.
                               LATHAM & WATKINS, LLP
                               355 South Grand Avenue, Suite 100
                               Los Angeles, California 90071


(Appearances Continued)
```

APPEARANCES:  (Continued)

For Orchard Therapeutics
North America:                    Stephanie Slater Ward, Esq.
                                  FOX ROTHSCHILD, LLP
                                  919 North Market Street
                                  Suite 300
                                  Wilmington, Delaware 19801

                                  Meredith Mitnick, Esq.
                                  GOODWIN PROCTER, LLP
                                  620 Eighth Avenue
                                  New York, New York 10018

For Cobalt PropCo 2020,
LLC:                              James C. Tecce, Esq.
                                  QUINN, EMANUEL, URQUHART
                                   & SULLIVAN, LLP
                                  295 Fifth Avenue
                                  New York, New York 10016

INDEX

| | PAGE |
|---|---|
| Motion of Cobalt Propco 2020, LLC to Exclude Expert Report and Testimony of Morris Alhale Under Daubert [Docket No. 301]<br>-and-<br>United States Trustee's Motion to Exclude Expert Testimony of Morris Alhale [Docket No. 298] | 8 |
| Marth Witness Dispute | 18 |
| [SEALED] Motion for Leave (The Debtor's Motion for Entry of an Order Granting Leave to File Debtor's Surreply (I) in Response to Fraudulent Transfer Arguments Raised in Replies Filed by (A) Cobalt Propco 2020, LLC, and (B) the President and Fellows of Harvard College, 92 Crowley Owner (DE) LLC and CEGM Alachua, LLC, and (II) in Further Support of Its Objection to Motions to Dismiss) [Docket No. 302] | 23 |
| Opening Statement by Mr. Tecce | 28 |
| Opening Statement by Mr. Brown | 36 |
| Opening Statement by Mr. Fox | 41 |
| Opening Statement by Mr. Merchant | 43 |

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR BEDMAR MEMBER, INC. | | | | |
| ANDREW MONTONE | 55 | 100 | 161 | |
| FOR THE DEBTOR | | | | |
| RENE WEIDMAN | 170 | 185 | 198 | |
| CHRISTOPHER S. SONTCHI | 209 | 235 | | |

(Continued)

INDEX
(Continued)

| EXHIBIT | | EVID. |
|---|---|---|
| J-1 | Resilience 2.0 - April 2025 PowerPoint Presentation | 93 |
| J-6 | Merger Agreement (June 4, 2025) | 223 |
| J-7 | National Resilience, Inc. - Plan of Division (June 3, 2025) | 93 |
| J-8 | Resilience US - Plan of Division (June 3, 2025) | 93 |
| J-9 | Lease Cap Analysis | 179 |
| J-45 | Schedules of Assets and Liabilities | 181 |
| D/BMI-61 | Form of Pledge Agreement | 100 |
| D/BMI-62 | Intercompany Note - SPV (May 12, 2025) | 100 |
| D/BMI-97 | SPV - Unit Subscription Agreement.pdf | 100 |
| D/BMI-99 | National Resilience – Corporation Transactions | 93 |
| D/BMI-108 | Limited Liability Company Agreement of Bedmar, LLC | 215 |
| D/BMI-112 | Lease Abstract Report - 800 Corporate Way Fremont, CA | 180 |
| D/BMI-113 | Lease Abstract Report - 3115 Merryfield Row San Diego, CA | 180 |
| D/BMI-114 | Lease Abstract Report - 10792 Roselle Street San Diego, CA | 180 |
| D/BMI-115 | Lease Abstract Report – 13141 NW Nano Court, Ology Process Development Bldg, Copeland Alachua, FL | 180 |
| D/BMI-116 | Lease Abstract Report - 500 Soldiers Field Rd., Allston, MA | 180 |
| D/BMI-117 | Lease Abstract Report - 92 Crowley Drive, Marlborough, | 180 |
| D/BMI-118 | Lease Abstract Report - 28 Crosby Drive, Bedford, MA | 180 |
| M-12 | Montone Ex. 14 - Email from W. Marth to D. Chang re: request for stockholder consent | 100 |
| M-13 | Montone Ex. 12 - Email from Resilience Comms to All Employees re: An Update on our CDMO Strategy | 100 |
| M-14 | Montone Ex. 11 - Email from R. Nelson to D. Oetting re: Lunate Q | 100 |
| M-15 | Montone Ex. 7 - Intercompany Loan Terms Sheet | 100 |
| M-16 | Montone Ex. 8 - Subscription Agreement Terms Sheet | 100 |

(Continued)

INDEX
(Continued)

| EXHIBIT | | EVID. |
|---|---|---|
| M-17 | Montone Ex. 4 - Email from A. Montone to D. Oetting et al. re: data room access | 100 |
| M-22 | Montone Ex. 5 - Meeting minutes of Resilience Capital Alternatives Committee of BOD | 100 |
| M-23 | Montone Ex. 5 - Portage Point Partners Project Osiris strategic committee meeting slide deck | 100 |
| M-27 | Montone Ex. 10 - Email from W. Marth to R. Nelsen re: Resilience Bridge Financing Terms | 100 |
| M-39 | Montone Ex. 6 - Resilience SPV 2025 Series A Preferred Financing terms sheet | 100 |
| M-43 | Montone Ex. 13 - Email from W. Marth to M. Lagarde re: News | 100 |
| M-45 | Montone Ex. 9 - Email from O. Solomon to S. Walker et al. re: Resilience Bridge Financing Terms (QIA) | 100 |
| M-49 | Email from W. Marth to O. Solomon et al re: TPs for Board Members | 100 |
| M-50 | Email from W. Marth to S. Toub et al. re: Project Osiris | 100 |
| M-55 | Email from O. Solomon to S. Toub et al. re: Project Osiris Supplemental Q&A w/ attachment "Resilience Project Osiris Supplemental Q&A on Financial Position" | 100 |
| M-56 | Project Osiris Supplemental Q&A with comments | 100 |
| M-57 | Email from D. Hoadley to S. Billings et al. re: final comms package w/ attachment "Resilience Supplemental Q&A to Stakeholder Questions on Financial Position" | 100 |
| M-58 | Project Osiris Communications Strategy | 100 |

1    (Proceedings commence at 9:33 a.m.)

2         THE COURT:  Good morning, everyone.  Please be

3    seated.  Good morning.

4         MR. MERCHANT:  Good morning, Your Honor.  Michael

5    Merchant of Richards, Layton & Finger on behalf of Bedmar,

6    LLC.

7         We're obviously here today on the pending motions

8    to dismiss.  Those are the only matters forward today.

9         There are certain preliminary matters that I think

10   the parties have agreed, you know, subject to the Court's

11   consent, to address up front, I think the first of which is

12   the motion in limine.

13        THE COURT:  Uh-huh.

14        MR. MERCHANT:  So that being said, I believe that

15   the DLA landlords filed that motion, and I'll cede the podium

16   to them.

17        THE COURT:  Okay.

18     (Participants confer)

19        MR. MERCHANT:  Somebody filed that motion, and I

20   will cede the podium to them, Your Honor.

21     (Laughter)

22     (Participants confer)

23        MR. TECCE:  Good morning, Your Honor.

24        THE COURT:  Good morning.

25        MR. TECCE:  For the record, it's James Tecce of

1    Quinn Emanuel on behalf of Cobalt.  I'm here on our Daubert

2    motion to exclude the testimony of Mr. Alhale, which is our

3    motion filed at ECF Number 301.

4           Your Honor, we have moved to exclude Mr. Alhale's

5    testimony because, to our mind, the hearing today is to

6    consider the debtor's good faith filing.  And so the relevant

7    question is whether the debtor has a legitimate bankruptcy

8    purpose, and among those considerations is the debtor's

9    financial distress.

10          And the independent manager, Your Honor, has a

11   financial advisor, its own financial advisor, the Douglas

12   Wilson Companies.

13          The debtor clearly understands the importance of an

14   independent financial advisor.  But today, for purposes of

15   demonstrating good faith, the debtor intends to rely on a

16   report that was prepared by a financial advisor hired by the

17   debtor's equity owners, the entities we call "the Resilience

18   enterprise" or the nondebtor affiliates in our papers.

19          And this particular advisor, which is Portage Point

20   Partners, is the very same consulting advisor that engineered

21   this debtor into existence.  It was Portage Point Partners

22   that worked with counsel to set the plug figure of assets to

23   be contributed into the newly created Bedmar, LLC, to pay

24   what the nondebtor affiliates considered to be the capped

25   lease claims.

1          The nondebtor affiliates have now hired the same

2    consulting firm to prepare a made-for-litigation report that

3    offers, supposedly, expert opinion on why the debtor filed

4    the case in good faith based on the consulting expert's work.

5          THE COURT:  So, Mr. Tecee, I don't mean to

6    interrupt you, but I am going to interrupt you.  I have read

7    the papers, and so I'm prepared to rule, unless the parties

8    want to make really brief statements in support of their

9    position.

10          MR. TECCE:  Thank you very much, Your Honor.  So --

11          THE COURT:  And I don't mean to be rude.

12          MR. TECCE:  No, it's okay.

13          THE COURT:  But --

14          MR. TECCE:  We have a long day.

15          I think we've made our position clear.  We don't

16    submit -- we don't think the nondebtor affiliates' financial

17    distress is relevant.  We there's an issue with the identity

18    of the --

19          THE COURT:  Let me ask you one question.

20          MR. TECCE:  Uh-huh.

21          THE COURT:  What about with respect to fraudulent

22    transfer?

23          MR. TECCE:  The -- to our mind, Your Honor -- okay.

24    Fraudulent transfer is relevant for the Bedmar, LLC entity.

25    Okay?

1          There are a series of corporate transactions that

2     involve the splitting of the companies and the allocation as

3     between the different Resilience entities.  Okay?  We are

4     focused on the Bedmar, LLC entity.  And from our perspective,

5     $372 million of liabilities against $41.4 million of assets

6     speaks for itself.  It's a fact, so --

7          THE COURT:  Okay.

8          MR. TECCE:  Does that answer your question?

9          THE COURT:  Yes.

10          MR. TECCE:  I -- there's a lot of confusion about

11     whether -- we don't seek -- we don't think it's appropriate.

12     I think this is very important, actually, because this was in

13     the opening.  And I'll take your -- a minute with your time.

14          THE COURT:  No --

15          MR. TECCE:  We don't intend to litigate whether

16     every step of the transactions is a fraudulent transfer.

17     Those claims should be preserved.  They're purported to be

18     released under the plan.  That's a separate issue.  But we

19     are focused on the creation of this debtor and this debtor's

20     financial condition and those two numbers, if that makes

21     sense.  Thank you.

22          MR. FOX:  Good morning, Your Honor.  May it please

23     the Court, Tim Fox --

24          THE COURT:  Good morning.

25          MR. FOX:  -- on behalf of the U.S. Trustee.

1           Just rising to see if Your Honor has any questions

2     regarding the U.S. Trustee's motion in limine as to the same

3     topic.  Obviously, the U.S. Trustee believes that that expert

4     testimony does not fit within the relevant case law,

5     especially in light of the focus on an alternative scenario.

6           But, again, if Your Honor has any questions -- I

7     know you indicated you're prepared to rule on it -- I'm happy

8     to address those at this time.

9           THE COURT:  Well, let me ask you this, Mr. Fox.

10    What about the argument that the movants argue that the

11    debtor manufactured its own financial distress?  Is that

12    relevant to -- in terms of the testimony here today?

13          MR. FOX:  I don't believe it is because the focus

14    of the expert testimony, in its two buckets, are:

15          One, the alternative scenario, which is a

16    counterfactual that, had "the Resilience enterprise," as we

17    referred to it, filed a series of Chapter 11 petitions, Your

18    Honor, the movants wouldn't be here objecting on the basis

19    that the petition wasn't in good faith.

20          And then, second, the comparison of the pre-

21    division to the post-division items is informed by the actual

22    facts and doesn't require expert opinion testimony for Your

23    Honor to be assisted in making a decision on whether the

24    petition was filed in good faith and whether or not cause

25    exists under 1112 for dismissal or conversion.

1          THE COURT:  Okay.  Thank you.

2          MR. FOX:  Thank you, Your Honor.

3          MS. QUARTAROLO:  Good morning, Your Honor.

4          THE COURT:  Good morning.

5          MS. QUARTAROLO:  Amy Quartarolo, Latham & Watkins,

6    on behalf of the nondebtor affiliates.

7          Obviously, Your Honor has read the papers and is

8    prepared to rule.

9          I -- one point that I wanted to highlight briefly

10   because I think it goes to one of the points that Your Honor

11   spoke about with Mr. Tecee, you know, movants rely on the LTL

12   case for the motion to dismiss and also for the motions in

13   limine.  They claim that, under the LTL case, the financial

14   condition of nondebtors is not relevant.

15         We think they're ignoring some certain of the

16   language in the LTL case, in which Judge Ambro, writing on

17   behalf of the Third Circuit, found that, while it is the

18   financial distress of the debtor that is determinative, the

19   financial condition of affiliates is, in fact, relevant to

20   the extent it informs the view of the financial condition of

21   the debtor.

22         For that reason alone, we think this is the -- and

23   the opinions that are offered by Mr. Alhale, the alternative

24   scenario as well as the fraudulent transfer piece, speaks

25   directly to the issues that are before the Court in

1  connection with the motions to dismiss.

2        We think that the relevant standard for Daubert is

3  easily satisfied here.  They really only challenged the "fit"

4  prong.  His methodologies, his credentials are not credibly

5  in dispute.  And we believe that we should be able to proceed

6  with presenting argument, as well as evidence, to challenge

7  the various issues that they've raised in connection with the

8  motions to dismiss.

9        I'm happy to address any questions that Your Honor

10  has.

11        THE COURT:  I don't have any questions.  Well,

12  actually I have a question, I believe, for Mr. Stearn, is the

13  one who made the argument, I have a question for.

14        MS. QUARTAROLO:  Thank you, Your Honor.

15        THE COURT:  Thank you.

16        MR. STEARN:  I'm glad to hear that, Your Honor.

17  And good morning.  May it please the Court, Bob Stearn from

18  Richards, Layton & Finger on behalf of the debtor.

19        I think the first thing I should do is ask Your

20  Honor:  What is your question of me?

21        THE COURT:  My question has to do with -- and I

22  believe -- and I don't want to put words in your mouth, but

23  there's a reference in your pleadings to the independent

24  manager's intent in improving the bank -- approving the

25  bankruptcy filing.

1           MR. STEARN:  Yes, ma'am.

2           THE COURT:  How is this report relevant to that?

3           MR. STEARN:  Well, we've argued there's three

4    reasons why, in our view, the report of Mr. Alhale is

5    relevant to this proceeding; the independent manager's intent

6    was the third one.  Let me take that first.

7           So you will hear testimony from Mr. Sontchi,

8    presumably today, the debtor's independent manager, that the

9    Resilience enterprise's financial condition was an important

10   fact for him, supporting his determination that the Bedmar

11   filing would be a good faith filing, and he'll explain why

12   when he testifies.  Mr. Alhale's testimony corroborates Mr.

13   Sontchi's conclusions.

14          But there's two other -- even separate and apart

15   from that, if you ignore that completely, there's two other

16   really critical reasons why, and Your Honor asked questions

17   about both these issues.

18          It's important that Your Honor hear Mr. Alhale

19   because the position that the landlords are representing

20   today is really interesting.  On the one hand, they argue

21   that the movant's -- excuse me -- that the debtor's financial

22   condition is the only relevant issue.  But on the other hand,

23   they raise a number of issues that can only be determined by

24   reference to the financial condition of the Resilience

25   entities.  Two examples are those which Your Honor raised.

1    The movants argue that, because the debtor's

2  bankruptcy filing was supposedly manufactured, this filing

3  was in bad faith.  But Your Honor, you can only determine

4  whether the debtor's financial condition or financial

5  distress was, quote/unquote, "manufactured" by reference to

6  the materials from which the debtor was constructed, and that

7  would be the assets and liabilities of the Resilience

8  enterprise.  And Mr. Alhale will testify about those assets

9  and liabilities, demonstrating to you that the Resilience

10  enterprises also were financial distress.  So you can't have

11  something being manufactured where a condition already

12  existed.

13    Second, the movants argue that the corporate

14  transactions were a fraudulent transfer, thereby further

15  evidencing the debtor's supposed bad faith.  But Your Honor,

16  as we've argued in the motion to dismiss briefing, the

17  corporate transactions cannot be fraudulent transfers if the

18  creditors were no worse off after the transactions.  And Mr.

19  Alhale's opinion demonstrates that they were not worse off.

20    So, for these reasons, we think it's critical that

21  Your Honor hear this evidence.  I mean, there's no basis to

22  exclude it.  There's important reasons to consider it.

23    And Your Honor, let's be candid.  A motion to

24  dismiss a bankruptcy case is a very significant event, and it

25  should be heard on a full record, and that's all we're asking

1    Your Honor to do.  Thank you, Your Honor.

2                    THE COURT:  Okay.  Thank you.

3                    All right.  The Court should exclude expert

4    testimony if the debtor or the nondebtor affiliates fail to

5    bear their burden of proving:

6                    One, the expert is qualified to offer the proposed

7    opinion;

8                    Two, the expert's opinions are based on reliable

9    data and methods, or the proposed testimony will be relevant

10   and helpful to the trier of fact.

11                   The movants do not contest the expert's

12   qualifications as an expert or his methodology.  The motions

13   both assert that the opinions and testimony are irrelevant

14   and have no bearing on the issues presented for consideration

15   in the motions to dismiss.

16                   The motions to dismiss assert the debtor did not

17   file the Chapter 11 case in good faith because the debtor was

18   not in financial distress on the petition date, and the

19   filing does not serve a valid bankruptcy purpose.

20                   Based on the motions before the Court, as well as

21   the response, the Alhale report and the testimony focused on

22   several topics.  I'm going to rule on each of those topics in

23   turn.  And I note the Court has not seen the report.

24                   Evidence regarding whether there was a fraudulent

25   transfer in the formation of the debtor, the Court finds the

report and testimony on this topic relevant to the landlord

objectors' arguments that the corporate transactions resulted

in fraudulent transfers.

Evidence that the debtor manufactured its own

financial distress is part and parcel of the fraudulent

transfer argument and, therefore, relevant.

The report reportedly contains evidence of the

enterprise financial condition and the alternative scenario

and projected recoveries under this such hypothetical

alternative scenario.  The Court finds that the report and

the testimony on this topic are not relevant.  Debtor has

acknowledge the financial distress of the debtor --

nondebtors does not determine the debtor's ability to file.

Likewise, the financial condition of the pre-

transaction entities to understanding the independent

manager's intent in approving the bankruptcy filing is also

not relevant to the issues before the Court.

Mr. Sontchi is relevant testimony regarding the

filing.

So those are the Court's rulings with respect to

the motion.

MR. STEARN:  Thank you, Your Honor.

THE COURT:  Okay.  The next dispute, I believe --

and correct me if I say the name incorrectly -- the Marth

witness dispute.  Is that dispute live or have the parties

1    resolved the issue?

2              MR. SILVERMAN:  It's live, Your Honor.

3              THE COURT:  Pardon?

4              MR. SILVERMAN:  It's live.

5              THE COURT:  Okay.  Well, let me ask you a question

6    with respect to that issue.

7              Do the DLA landlords -- have the parties agreed

8    with respect to the emails that I believe -- and correct me

9    if I'm wrong -- that the nondebtor affiliates offered to

10   admit into evidence?

11             MR. SILVERMAN:  I believe --

12             MS. MARKS:  Yes.

13             MR. SILVERMAN:  Yes.  Okay.

14             MS. MARKS:  Yes, Your Honor.  We're not objecting

15   to those emails coming in, they may come in.

16             THE COURT:  Okay.

17             MR. SILVERMAN:  Okay.  So, with that, Your Honor,

18   we would still ask him to be compelled to attend trial, as he

19   was at the center of the good faith inquiry here, the intent

20   and the valid bankruptcy purpose.

21             This is all about whether Resilience ring-fenced a

22   liability in debtor to take advantage of the cap.  That's

23   whether this is a valid bankruptcy purpose or not.  Marth,

24   the CEO of Resilience, is at the center of that.  He said it

25   just hours after.  He was talking about what he did hours

1   after.

2           THE COURT:  Is this testimony duplicative of the

3   30(b)(6) witness?

4           MR. SILVERMAN:  I mean, Mr. Montone said he could

5   not speak to mister -- what Mr. Marth was saying.  He offered

6   his opinion on, you know, what he thought those words meant,

7   but he did not say -- and he said specifically that I could

8   not address those types of questions.

9           THE COURT:  And it's your position that testimony

10  from the witness would aid the Court in a fashion that the

11  email information does not?

12          MR. SILVERMAN:  Yes, Your Honor, if you believe it

13  is helpful.  And we do believe that live testimony is -- you

14  know, is -- would be better than reading it off the page.

15          There's more, too.  I think the debtor --

16  Resilience has talked to us about why we didn't raise this

17  earlier.  Well, as Your Honor knows, we were seeking

18  documents.  We just got some this weekend from the PR firm to

19  him on talking points, such as, you know, isn't this what J&J

20  and other companies have done to ring-fence and shed

21  liabilities, isn't this just a maneuver to allow Resilience

22  to presume their equity at the expense of creditors.  I mean,

23  these are questions that Mr. Marth was answering.

24          THE COURT:  Okay.  Well, I guess my question is --

25  you identified him as a witness on July 21st.  Why was he

1   never subpoenaed?

2          MR. SILVERMAN:  He was subpoenaed as a deposition.

3   The Resilience entities refused to accept the subpoena and

4   refused to put him up as a witness.  We reserved rights on

5   that at that time because we did not know how important he

6   was or what documents he would have.

7          We went through depositions.  We got more

8   documents, including on Sunday, from the PR firm giving him

9   answers to questions.

10          THE COURT:  Okay.  Thank you.

11          MS. QUARTAROLO:  Your Honor, again, for the record

12   Amy Quartarolo of Latham & Watkins on behalf of the nondebtor

13   affiliates.

14          We're here before the Court today, ready to start

15   trial.  The landlords seek to compel the nondebtor

16   affiliate's CEO for the first time to testify.

17          There's no dispute that Mr. Marth is beyond the

18   subpoena power of this Court.  He doesn't reside within 100

19   miles of this courthouse, he does not work within 100 miles

20   of this courthouse, and he is not located within 100 miles of

21   this courthouse.

22          If the landlords legitimately believed that Mr.

23   Marth was essential to the motions to dismiss, they would

24   have deposed him.

25          There's been discussion about Mr. Marth.  He was

1  identified as a custodian a month ago.  We had agreed to

2  accept service of a deposition subpoena over the July 4th

3  holiday.  They never moved forward with scheduling his

4  deposition.

5          We, of course, understand that document discovery

6  in this case, as the Court is well aware, has continued over

7  the course of the last several weeks.  But that doesn't

8  unveil some new issue that means that Mr. Marth is a new

9  witness that would warrant consideration of this on the eve

10  of trial.

11          As Your Honor also alluded to, Mr. Montone is the

12  debtor's CFO.  He will -- he is here today, he is prepared to

13  testify

14          And to the extent there's documents that Mr. Marth

15  may have sent, we've agreed that those can come into the

16  record, this Court can consider them.  There is no need to

17  compel the witness, Mr. Marth, to testify.  And certainly

18  there's no support in the cases that are in the DLA letter

19  that suggest that this Court should deviate from the normal

20  hundred-mile rule for subpoena power to compel a witness to

21  testify.

22          For all those reasons -- excuse me -- reasons, Your

23  Honor, unless the Court has any questions, we would ask that

24  the Court deny that request.

25          THE COURT:  You don't dispute that Federal Courts

1　have concluded that the subpoena authority, pursuant to Rule

2　45, extends to directors and officers of, for example,

3　Delaware courts -- of Delaware directors and officers?

4　　　　　MS. QUARTAROLO:  We do dispute that the hundred-

5　mile limit is not in play.  We think that the hundred-mile

6　limit for jurisdiction is, in fact, in play, including for

7　directors and officers of a Delaware corporation.

8　　　　　There are -- we will concede that there are cases

9　that come out all across the spectrum.  Obviously, those are

10　fact-intensive cases, and we don't -- we think that the cases

11　that suggest that courts have -- that could compel are

12　certainly not on all fours with the case here, and that the

13　weight of authority suggests that the hundred-mile

14　jurisdictional limit under Rule 45 is generally in place and

15　should be in place here.

16　　　　　THE COURT:  Okay.  Thank you.

17　　　　　MR. SILVERMAN:  Your Honor, if you'd like me to

18　respond to the --

19　　　　　THE COURT:  You can respond.

20　　　　　MR. SILVERMAN:  -- jurisdictional point?

21　　　　　As Your Honor pointed out, he is employed by a

22　Delaware corporation.  It's clear.  He is the most

23　knowledgeable here.  He's in control of the debtor.  And he

24　can be compelled to be on a remote Zoom, which puts the place

25　of compliance where he is.

23

1          And unless you have any questions, I'll --

2          THE COURT:  I don't have any questions.

3          MR. SILVERMAN:  Thank you.

4          MR. STEARN:  I'm sorry to rise, Your Honor.

5          THE COURT:  No --

6          MR. STEARN:  Bob Stearn on behalf of the debtor.

7          Certainly, there's no evidence that the witness in

8    question is in control of, quote/unquote, "the debtor."

9    That's all I want to raise.

10          THE COURT:  Through this Court's jurisdiction over

11   a Delaware corporation, the Court can compel the biological

12   person who serves as a director, officer, or managing agent

13   to appear as a witness at trial or for a deposition at a

14   particular location.  And other federal courts have concluded

15   that subpoena authority, pursuant to Rule 45, extends to

16   officers and directors of a respondent corporation,

17   irrespective of territorial limits.

18          So I am going to direct or authorize the issuance

19   of the subpoena for Mr. Marth to appear.  The parties should

20   confer with respect to that appearance, whether it be by Zoom

21   or in person.

22          With respect to the surreply, is that the last

23   item, I believe?

24          MR. APPLEBAUM:  Yes, Your Honor.

25          THE COURT:  Okay.  Although this surreply raises

1    new legal arguments, I find that the speed and evolving

2    nature of this litigation leads to additional arguments and

3    the response may aid the Court.  But to avoid any prejudice,

4    I'm going to allow the movants an appropriate amount of time

5    to file sur-surreplies, and those will be the last pleadings

6    on this issue, absent further order of the Court.

7          So I realize we're in trial.  I'm not sure when

8    parties can get those to the Court, but perhaps you can

9    confer at a break and set forth a schedule for the Court.

10         MR. APPLEBAUM:  Thank you, Your Honor.  Just

11   briefly, Aaron Applebaum from DLA Piper on behalf of the 92

12   Crowley, Harvard, and CEGM Alachua.

13         I just want to raise that the surreply is not only

14   a surreply, but it also attaches a forty-five-page, what's

15   called the "Report to the Independent Manager," which is a

16   disputed exhibit, which we didn't -- which was produced after

17   we had filed our last reply.  And so -- and we oppose that

18   coming in.  It also relies on parts of the Alhale expert

19   report, which the Court has just said would not come in.

20         So I think we -- there are parts of that that are

21   troublesome from that perspective as well.  So we need to

22   address that, and perhaps parts of that surreply need to be -

23   -

24         THE COURT:  Redacted.

25         MR. APPLEBAUM:  -- redacted or stricken based on

1  that, as well.

2          THE COURT:  Okay.

3          MR. APPLEBAUM:  Thank you, Your Honor.

4          MR. STEARN:  I hate to do this, Your Honor.  But to

5  the extent that there are arguments made that go beyond our

6  surreply, what I just heard from Mr. Applebaum about why

7  certain parts of the surreply may need to be not considered

8  because of what Your Honor ruled today -- I mean, I'm still

9  digesting the impact of what Your Honor ruled today.

10          THE COURT:  Right.

11          MR. STEARN:  But I don't know that we would agree

12  with that.

13          So to the extent that argument is raised on that

14  issue, we would just want a brief ability to respond to that

15  issue.  We don't want the briefing to go on ad nauseam --

16          THE COURT:  Right.

17          MR. STEARN:  -- but we would need to respond to

18  that.

19          THE COURT:  Let's do this.  Why don't the parties

20  confer?  It is not a today issue, necessarily.  So why -- at

21  a break, why don't the parties confer and see if they can

22  consensually come to agreement how to proceed with respect to

23  that?  If not, bring the issues back to me, and I'll make

24  further ruling.

25          MR. STEARN:  We will, Your Honor.  Thank you very

1   much.

2           THE COURT:  Okay.  Thank you.

3           MR. APPLEBAUM:  Thank you, Your Honor.

4       (Participants confer)

5           THE COURT:  Okay.  I think that we've addressed all

6   the opening issues.  Is that correct?

7       (No verbal response)

8           THE COURT:  I would like the parties, before we

9   even begin, to tell me -- I know you were going to confer

10  about opening statements and timing and that type of thing.

11      (Participants confer)

12          MR. TECCE:  I believe, Your Honor, we had an

13  agreement that opening statements would be 18 minutes per

14  side, although we're not sure we are going to take all that

15  time.

16          THE COURT:  Okay.

17          MR. TECCE:  And closing statements would be an hour

18  and a quarter a side, and I think we have those agreements.

19          MR. STEARN:  That's my understanding, as well, Your

20  Honor.  Bob Stearn for the debtors.

21          THE COURT:  Okay.  And you've agreed on the order

22  of witnesses?

23          MR. TECCE:  We have and --

24          THE COURT:  And sequestering witnesses or whether -

25  -

1      MR. TECCE:  Yeah.

2      THE COURT:  -- they are or are not going to be?

3  Any open issues?

4      MR. TECCE:  Correct.  So we -- I think we've agreed

5  on order of witnesses, that we're going to start with Mr.

6  Montone, then we're going to go to Ms. Weidman, and then

7  we're going to go to Mr. Sontchi, and then we're going to go

8  to Mr. Alhale, and then we're going to go to ...

9      (Participants confer)

10     MR. TECCE:  Mr. Madden.  And I think Alhale and

11  Madden were tomorrow.

12     THE COURT:  Okay.  All right.  And let me just make

13  one public service announcement.  I understand that there is

14  a court reporter who is on Zoom who is recording this.  So I

15  just want to make everyone aware of that.

16     MR. TECCE:  Thank you.

17     (Participants confer)

18     MR. TECCE:  Oh, I guess the -- we haven't discussed

19  it because it was just ruled, but I guess the intention is to

20  have Mr. Marth testify before the expert testimony.

21     THE COURT:  Okay.  Is it Alhale Or Alhale?

22     Participants:  Alhale.  Alhale.

23     (Participants confer)

24     MS. QUARTAROLO:  Your Honor, it's Mr. Alhale.

25     THE COURT:  Okay.  Thank you.

1        (Pause in proceedings)

2            MR. STEARN:  Your Honor, like nature, I guess I

3    abhor a vacuum; and, since no one was standing to speak, I

4    guess I will.

5            I believe, subject to confirmation by everyone in

6    the courtroom, it's time for opening statements and that the

7    movants would go first.

8            THE COURT:  Okay.  And let me just say, I'd ask the

9    parties to keep track of your own time.  I don't have a

10   courtroom timer, so ...

11           MR. STEARN:  I'll make sure and keep track of

12   movants' time, Your Honor.

13       (Laughter)

14           THE COURT:  Thank you.  That's most helpful, Mr.

15   Stearn.

16       (Participants confer)

17           MR. TECCE:  Okay.  All right.  We go first.  Okay.

18       (Participants confer)

19           MR. STEARN:  Your time is running, Mr. Tecce.

20       (Participants confer)

21           MR. TECCE:  Good morning again, Your Honor.  Thank

22   you.  James Tecce on behalf of Cobalt.

23           Your Honor, it's important to remember at the

24   beginning to set the stage why we're here.  Stated simply,

25   we're here to determine whether the debtor, which is a single

entity called Bedmar, LLC, filed its Chapter 11 case in good

faith.

One would expect, for a single debtor, that the

hearing would be very simple.  The debtor would present

evidence from its chief financial officer or its chief

restructuring officer or someone with that type of

relationship to the company to discuss how the company found

itself in Chapter 11.

One would expect that person to speak to market

forces that caused it to be distressed and file for Chapter

11, and to the company's plan to reorganize and rehabilitate

it.  And the one to whom I'm referring in these admittedly

soapbox statements is the United States Court of Appeals for

the Third Circuit.

The Third Circuit has made very clear what it

expects the a debtor to show to avail itself of the

protections and the re-distributive provisions of the

Bankruptcy Code.  It makes clear in Integrated when it says

you cannot file for the single purpose of invoking 502(b)(6).

It makes clear in LTL when it says you cannot separate a

GoodCo and a BadCo to shield assets from creditors in a

bankruptcy.

And courts interpreting these decisions more

recently, like Judge Silverstein's Rent-A-Wreck, read them --

and specifically Integrated -- to say you cannot simply fund

1  the administrative costs of a Chapter 11 case just to get its

2  re-distributive provisions.

3      (Participants confer)

4      MR. TECCE:  That -- is not -- yet, Your Honor, that

5  is what you're going to hear from the debtor that Bedmar, LLC

6  is a synthetic [sic] company that came into existence at the

7  planning of lawyers and financial advisors hired by the

8  Resilience enterprise that owns Bedmar, LLC; that Bedmar, LLC

9  is a special purpose vehicle.  It has no history, no

10  operations and no employees, and it exists for a single

11  purpose, which is to cram the landlords with a statutory

12  lease rejection cap.

13      The evidence will show that the intended

14  beneficiaries are the debtor's owners, the Resilience

15  enterprise, or the "nondebtor affiliates," as we call them,

16  and their long-time equity owners, Your Honor, funds called

17  8VC and Arch Ventures, who are funding this endeavor.

18      Instead of hearing about the bankruptcy purposes of

19  the debtor, you're going to hear that the debtor exists

20  because the Resilience enterprise, in consultation with its

21  legal and financial advisors, has concluded that this is in

22  the best interests of the enterprise.

23      And this is a family of companies that do not have

24  the gumption to file for bankruptcy themselves, where surely

25  their equity is at risk.  And yet, they want the benefits of

1    the Code's protections.  So, at the conclusion of this trial,

2    Your Honor, there will be no doubt that this case is being

3    run for the benefit of Resilience shareholders.

4         You will learn that these investors have been

5    shareholders from the founding of the company, Arch and 8VC.

6    You will learn that they recently put $250 million in so-

7    called "loans" into the company.  It's -- the most recent

8    contribution, which is $145 million in bridge financing,

9    principally from Arch and 8VC, was extended for the purpose

10   of financing the restructuring of the leases in Chapter 11.

11   And the evidence will show that that financing was sized so

12   that it would be just enough to pay the capped claim lease

13   rejection damages and to fund the administrative costs of the

14   bankruptcy.  And the evidence will show that the CEO

15   considered this his legal tool to rid Resilience of its toxic

16   sites and maximize shareholder value.

17        And to this point, Your Honor, the debtor and the

18   nondebtor affiliates would like to focus on other issues,

19   like the financial condition of nondebtor entities, but none

20   of this changes the history of the case.  The independent

21   manager was installed on June 3rd.  Six days later, the

22   debtor determined to file Bedmar, LLC for bankruptcy on June

23   9th.  And it tried, on the first day of the case, to move to

24   reject the leases and it filed a plan with very broad

25   releases of all claims, including fraudulent transfer claims

1    against the nondebtor affiliates.

2         Now, on the question of fraudulent transfers, much

3    has been said, Your Honor, but I -- it is a very simple

4    point, from our perspective.  It's not about whether every

5    individual transfer, allocation, and split in the corporate

6    transactions, every conversion to the LLC, every split

7    between National Resilience HoldCo, LLC, the creation of

8    those entities, it's not about whether or not each one of

9    those steps is a fraudulent transfer.  They are relevant to

10   the extent that they show an intent to create a GoodCo and a

11   BadCo.  They're relevant for that purpose.

12        Okay.  And the creation of Bedmar, LLC and the

13   assets that were allocated to that entity at 41.4 million and

14   the liabilities that were allocated to it at 372 million,

15   that is relevant as a facially fraudulent transfer.  And I

16   don't know that that factor is even going to be disputed

17   because it can't be disputed.  It's not a transfer for

18   reasonably equivalent value when you put $372 million of

19   liabilities down for $41.5 million of assets.  And it can't

20   be argued that the company is insolvent.  That's the

21   extent of our fraudulent transfer.

22        Now the debtor may say well, it's okay because we

23   did it under the LLC Act and -- but the point is it is a

24   fraudulent transfer.  And the only way it doesn't become a

25   fraudulent transfer is if the cap applies and we go to the

amount of the liabilities as they appear on the schedules.

And so, here, I do believe the debtor has a schizophrenic position.  On the one hand, it says that it was in financial distress because of the three seventy-two versus the 41.4.  On the other hand, it says, I have an unimpaired plan and I'm going to pay you in full because the only thing you're entitled to is what the Bankruptcy Code says you get, per the cap.

So if you take the first position, it's clearly a fraudulent transfer.  And there is one point, which is perhaps the LLC Act allows it, we don't think it does.  Okay?  Because the L-L -- and again, I'm only talking about the creation of the company and the three seventy-two versus forty-one four.  The act says, if it's a fraudulent transfer, the act doesn't apply.  But even if the act doesn't apply, it's relevant to the good faith finding of whether the company should have been filing for bankruptcy or not.

The second point is that, if it is a fraudulent transfer -- and the only way it doesn't become a fraudulent transfer is if the cap applies -- then the Code is not being properly applied because, at the time of the transfer, which was on or about June 3rd, at the time that $372 million of liabilities were allocated to an entity with 41.5 million -- $41.4 million in assets, the Bankruptcy Code did not apply.  And the cap did not apply until the company filed for

1  bankruptcy and the lease was rejected.  And value is

2  determined on the date of transfer, not what happens five

3  days later or ten days later.

4        And so, if that is true, then the only way the

5  fraudulent transfer does not stand is if the company files

6  for bankruptcy and brings that three seventy-two down to the

7  capped amount.  And if that is true, then the bankruptcy is

8  being used for that purpose; and it is inappropriate to

9  cleanse a fraudulent transfer and that is not a basis to find

10  good faith.

11        So, Your Honor, I conclude my opening with this.

12  This is a critical case.  It is true, it's important.  We've

13  raised very serious issues.  I don't play down a motion to

14  dismiss for good faith.  And we don't -- when we say "good

15  faith," Your Honor, those are words that cases use.  It

16  doesn't go to people; it goes to a legal standard.  And I

17  want to be very clear about that.  I think it has been pretty

18  clear so far.  But it's not about people; it's about events

19  and as they happened.

20        But it bears emphasizing, Your Honor, that this

21  case is outside of the mass tort context.  Okay.  And if you

22  look at LTL and those types of cases where they split GoodCo

23  and BadCo, this was a mechanic that was applied -- attempted

24  to be applied in the mass tort context.  Well, this is a

25  dispute about residential -- or commercial real estate, so

1   there's no tort issues here.

2           And this is the first time that the LLC Act has

3   been used to split as a way around LTL.  But it doesn't --

4   again, the issue is whether or not you create a GoodCo and a

5   Badco, and the creation is done to shield assets from the

6   reach of creditors.  And that is exactly happened here.

7   Assets were shielded from the reach of the landlords.

8           Integrated would say no to invoking the cap and

9   filing simply for that purpose.  Rent-A-Wreck would say no to

10  the use of Chapter 11 by simply funding the administration of

11  the case to invoke the re-distributive provisions, which we

12  will show is what happened here.

13          And the real question is, Your Honor:  What will

14  the Bedmar case be cited for?  I respectfully submit, Your

15  Honor, that it should be cited for the proposition that, when

16  you have the components of Integrated, LTL, and Rent-A-Wreck,

17  when a special purpose vehicle is manufactured into existence

18  with just enough to pay capped damages and the administrative

19  costs of a bankruptcy, when its formation was designed to

20  redistribute assets and shield creditors from them in a

21  bankruptcy case by way of something that is clearly a

22  fraudulent transfer, and when the bankruptcy is required to

23  bring that transaction into balance by applying the cap, then

24  good faith is lacking.  And I respectfully submit, Your

25  Honor, that the Bedmar case should be cited for that

1  proposition.

2          THE COURT:  Thank you.

3          MR. TECCE:  Thank you for listening.

4          MR. BROWN:  Pause, Your Honor, so I am not deducted

5  for commute time.

6      (Laughter)

7          THE COURT:  Pardon?

8          MR. BROWN:  I don't want my time to be deducted for

9  my commute.

10          Your Honor, Stuart Brown, DLA Piper, on behalf of

11  the DLA Piper "landlord clients," clients, as they have been

12  referred to, but 92 Crowley, CEGM Alachua, and the President

13  and Fellows of Harvard College.

14          Your Honor, Mr. Tecce took a lot of my notes and

15  included them in his opening, and so I'll try not to repeat

16  his comments; and I join in his comments in regard.

17          My focus, Your Honor, is more on what does Your

18  Honor need to do today in order to grant the motions to

19  dismiss.  And I'm going to pause a little bit, so I can cull

20  out from what I otherwise was going to say, without repeating

21  what Mr. Tecce said.

22          Your Honor, one thing that Mr. Tecce left out of

23  his remarks was, not only is Bedmar, LLC a case to cap the

24  lease claims, it also is a case to extinguish guarantee

25  claims.  And we shouldn't forget that the allocation included

1    the guarantees in the Bedmar HoldCo, LLC, which was then

2    merged into Bedmar, LLC.  And so now we've got a single

3    entity through the division that could not have passed muster

4    under Owens Corning's substantive consolidation analysis, and

5    now we've got the guarantees and the leases combined in a

6    single Bedmar, LLC.

7         Your Honor, this case can be determined based on

8    the debtor's admissions.  The debtor admits -- excuse me,

9    Your Honor.  The debtor admits that it was formed for the

10   purpose of filing a bankruptcy case to take advantage of the

11   lease cap.  It also admits and, through its plan, evidences

12   its intent to extinguish the guarantee claims under the

13   single recovery rule.

14        Your Honor, this case should be viewed through the

15   legal lens through which motions to dismiss as primarily

16   under the Third Circuit's decision in LTL Management

17   involving mass tort claims allocated to LTL from J&J and

18   agreement to fund resolution of those claims in full.  Citing

19   In Re LTL Management, the most recent Third Circuit decision

20   that was decided on July 25th, 2024, a year ago.  If Your

21   Honor wants more of that cite, I'm happy to provide it.

22             THE COURT:  No, thank you.

23             MR. BROWN:  The Court states there, quote:

24             "Well established Third Circuit case law bars a

25             bankruptcy absent financial distress."

1          At 3., citing Integrated Telecom.

2          And Integrated Telecom stands for the proposition

3     that, if the debtor is in financial distress, the case can

4     still be dismissed if the purpose is to take advantage of a

5     single code provision.

6          In LTL, the courts below and the Third Circuit

7     focused on the mass tort litigation faced by J&J and

8     concluded LTL, the debtor, was not in financial distress,

9     despite the mass tort litigation against J&J.  Financial

10    distress is measured at the debtor, there LTL; and, here,

11    Bedmar.  Quote:

12          "We do not discern financial distress at LTL."

13          At 9.

14          To resolve the motions to dismiss, Your Honor, you

15    need go no further beyond the simple fact:  Bedmar was not in

16    financial distress.  Binding Third Circuit precedent in

17    Integrated and LTL instruct this Court to dismiss this single

18    purpose case as a filing lacking in good faith.  Your Honor

19    need make no further findings or conclusions.  The case

20    should be dismissed without any fanfare, full stop.

21          As Mr. Tecce indicated, a dismissal for lack of

22    good faith alone says nothing about the individuals or the

23    entities involved in devising or implementing the scheme.  It

24    simply means that this debtor, Bedmar, LLC, filed the case

25    with no bankruptcy purpose and not in financial distress.  It

1  never operated, it never had an employee.  It has no funding

2  or budget to pay rent, utilities, tax obligations under the

3  leases.  It has no revenue whatsoever, never had cash flow

4  and will never have cash flow, and has no assets to sell.  It

5  has absolutely no indicia of a business.

6          Its only source of funding is from its affiliates

7  that stand to benefit from removing lease and guarantee

8  liabilities from the nondebtor affiliates' balance sheets,

9  but have admitted to funding Bedmar sufficiently to permit it

10  to pay in full the cap lease rejection claims and taking

11  advantage of the single recovery rule if the plan gets

12  confirmed.  There simply is no bankruptcy purpose in the

13  Bedmar case, and the case should be dismissed as a filing

14  lacking in good faith.

15          Despite Bedmar being insolvent immediately upon

16  formation and allocation of lease liabilities and less value

17  in cash, Bedmar, nevertheless, was not in financial distress,

18  which is not equivalent to solvency or insolvency.  The cases

19  use different terms for different purposes.  And that is

20  because Bedmar was funded with enough value to pay the capped

21  lease, legally allowable claims in full, so the case was

22  filed lacking good faith.  The evidence will show without

23  question that the case was filed with a sole purpose to take

24  advantage of the 502(b)(6) lease cap and extinguish the

25  guarantee claims, which debtor argues a single recover rule

1    extinguishes, to the detriment of landlords and for the

2    benefit of debtors' owners and affiliates;

3         That the scheme was intended to remove the hurdles

4    in the path for existing equity to retain their interest in

5    the go forward Resilience enterprise without risk of

6    application of the absolute priority rule or a forced sale of

7    profitable operations of NRI;

8         And that Bedmar was insolvent upon inception, and

9    which insolvency deepened upon the merger of Bedmar HoldCo

10   into Bedmar, but that it was funded with enough value to pay

11   the debtor's estimate of the lease rejection claims in full.

12        As a result of Resilience's intent fully to pay the

13   capped landlord claims, it created a situation without

14   financial distress.

15        The Court need not be the first to interpret and

16   then consider application of the divisional merger sections

17   of the Delaware Limited Liability Company Act to these facts.

18   This would be the very first case that I'm aware of and that

19   all folks on this side of the room have researched to address

20   the new Delaware limited liability company divisional merger

21   sections, or to otherwise consider all the other complex

22   issues in this case.

23        The Court should dismiss, based on debtor's

24   admission of a single purpose and lack of financial distress

25   in line with binding Third Circuit precedent.  Thank you,

1  Your Honor.

2         If Your Honor has any question ...

3         THE COURT:  No.  Thank you, Mr. Brown.

4         Mr. Fox.

5         MR. FOX:  Good morning, Your Honor.  May it please

6  the Court, Tim Fox on behalf of the United States Trustee.

7          I understand my time is almost out, but with

8  respect to that, I was prepared for that outcome.

9    (Laughter)

10        MR. FOX:  A couple of points that I'd offer in

11 addition to what the other movants have relayed to the Court.

12 I think there are two main areas that the Court can focus on

13 as the evidence is produced at trial here.

14        The first dovetails with what Mr. Brown was just

15 citing to the Court, in terms of applying LTL and Integrated

16 Telecom.  If you take those two Third Circuit decisions in

17 tandem, you must reach the conclusion that filing a

18 bankruptcy for the purpose of using Section 502(b)(6) as a

19 sword against landlord creditors is inappropriate, and not an

20 exercise of good faith.  And that is especially true when you

21 layer on the LTL divisional merger creation of a BadCo and a

22 GoodCo that, likewise, was not subject to a finding of good

23 faith.

24        The second category that I would cite to Your Honor

25 as we prepare to hear the evidence, is that the Primestone

1   factors for determining whether or not a case should be

2   dismissed also are satisfied here on the facts that we'll

3   produce here during the trial.

4           While this isn't a true two-party dispute, in that

5   there are seven landlord creditors, again, the evidence will

6   show that the dispute is essentially the debtor trying to

7   minimize its liabilities to those seven creditors and using a

8   series of transaction to engineer a result that they wouldn't

9   be able to accomplish outside of the filing of the Chapter 11

10  case, and for the purposes of obtaining a strategic

11  litigation advantage.

12          So, Your Honor, in conclusion for my opening

13  remarks, this case should be dismissed as not one filed in

14  good faith.  And we look forward to addressing any questions

15  Your Honor has throughout the course of the trial.  Thank

16  you.

17          THE COURT:  Thank you.

18          MR. STEARN:  Your Honor, for the record, Bob Stern

19  as your official timekeeper.  That was 21 minutes.

20      (Participants confer)

21          MS. MITNICK:  This is Meredith Mitnick on behalf of

22  -- from Goodwin Proctor on behalf of Orchard Therapeutics.

23          I just wanted to let the Court know that we had

24  originally filed a joinder to the -- Cobalt's motion to

25  dismiss.  But since then, we have come to an agreement with

1    the debtor and the nondebtor affiliates, subject to full

2    documentation, so that obviates our joinder.  I just wanted

3    to give the Court that update.

4            THE COURT:  Okay.  Thank you.  I appreciate that.

5    Thank you.

6            MR. MERCHANT:  The debtors are fine with people

7    going over for those types of representations, Your Honor.

8        (Laughter)

9            MR. MERCHANT:  Good morning again.  Michael

10   Merchant, of Richards, Layton & Finger, on behalf of the

11   debtor.

12           We're happy to be before Your Honor today to

13   address these motions, not because we're happy to be dealing

14   with motions to dismiss.  Obviously, we were hopeful to be

15   here seeking confirmation of our proposed plan.  But because

16   there's been much said about the debtor and the motivations

17   behind the filing of these -- this case, we welcome the

18   opportunity to finally respond.

19           Indeed, there have been references to operating in

20   the dark, shrouds of secrecy, and other accusations of the

21   debtor being less than forthcoming with regards to the nature

22   of pre-petition transactions.  With all due respect, Your

23   Honor, we submit that we've been nothing but transparent

24   regarding the pre-petition transactions in connection with

25   this case.

1      They were discussed in Mr. Sontchi's first-day

2 declaration, something that he absolutely insisted upon in

3 preparing for this case.

4      Additionally, I was before Your Honor at the first-

5 day hearing on June 11th, and my first words to the Court

6 referenced the transactions and our intent to address any

7 questions from parties-in-interest regarding the same.

8      And something to keep in mind is that the debtor's

9 good faith was not at issue at the time that the Chapter 11

10 petition was filed; it only became an issue upon the filings

11 of the motions to dismiss.  And in response to such filings,

12 the debtors and their nondebtor affiliates have been

13 forthcoming with information and documents relating to the

14 transactions, and in connection with discovery and related

15 pleadings filed with the Court.  And we understand that now

16 that good faith has been put at issue, it is the debtor's

17 burden to establish that the case was filed in good faith,

18 and that is exactly what we intend to do.

19      The standard in the Third Circuit for determining

20 whether a petition was filed in good faith is straightforward

21 and should not be in dispute.  Yet, the landlord movants have

22 either attempted to add to the standard or have

23 mischaracterized case law to suit their means.

24      To establish good faith, there are two relevant

25 inquiries:

1          One, whether the petition serves a valid bankruptcy

2    purpose;

3          And two, whether the case was filed merely to

4    obtain a tactical litigation advantage.

5          We know from LTL and the other cases in this

6    circuit that a valid bankruptcy purpose assumes that the

7    debtor is in financial distress.  The case law is clear that

8    only the debtor's financial distress is relevant for purposes

9    of this analysis.  I think the parties have agreement on

10   that.

11         As the evidence will show, the debtor was in

12   financial distress because the outstanding reserve rent over

13   the life of the leases far exceeded the amount of the

14   debtor's cash and receivables as of the petition date.  The

15   debtor's going forward operations related solely to the wind

16   down and orderly surrender of the cites; and, therefore, the

17   debtor had no opportunity to generate additional cash.

18         Unlike what we saw in LTL, the debtor's liabilities

19   are actual contractual liabilities under leases of

20   nonresidential real property for sites they have surrendered

21   and have sought to reject, as opposed to contingent un-

22   matured tort liabilities in LTL, which the Court could not

23   foresee the debtor having to pay in the foreseeable future.

24         Also unlike LTL, where there was a 81.5-billion-

25   dollar funding arrangement in place, there is no commitment

1   from the debtor's parent to provide additional funding with

2   respect to the debtor's lease obligations.  Indeed, the

3   evidence will clearly demonstrate that, as of the petition

4   date, the debtor was in financial distress.

5        The objecting landlords' view that the debtor is

6   not in financial distress because there's no evidence of the

7   landlords exercising any defaults prior to the petition date

8   is unreasonable.  The proposition that this landlord group

9   would sit on its rights in the face the nonpayment of rent is

10  inconsistent with the aggressive nature by which they've

11  conducted themselves in this case.  Moreover, the suggestion

12  that the debtor should have played out the string by paying

13  every last dollar on rent obligations with respect to

14  underutilized or unoccupied locations is simply nonsensical

15  and inconsistent with the applicable law.

16       Your Honor will also hear that the -- from the

17  movants that the Court should ignore the debtor's balance

18  sheet because the debtors manufactured their financial

19  distress.  As an initial matter, the debtor didn't

20  manufacture anything because the corporate transactions were

21  implemented at the parent level before the debtor came into

22  existence.

23       Second, Mr. Alhale's testimony will show that each

24  of the dividing entities was balance sheet insolvent before

25  the divisions, and that the debtor is the least insolvent of

1    the resulting entities.  Financial distress cannot be viewed

2    as manufactured or it existed to a greater degree pre-

3    divisions.

4         The movants like to use the GoodCo and BadCo

5    dichotomy because it suits the narrative that they are trying

6    to spin.  But unfortunately, what we have here is

7    DistressedCo followed by a somewhat less DistressedCo.

8         Based on their papers, we anticipate the movants

9    making several other arguments on the financial distressed

10   element that we find equally without merit, which we intend

11   to address in connection with our closing argument.

12        After establishing that a debtor is in financial

13   distress, applicable precedent requires that the debtor

14   establish that the Chapter 11 petition serves a valid

15   bankruptcy purpose.  As an initial matter, Your Honor, we

16   think this element is inextricably intertwined with the

17   showing of financial distress.  We submit this is so because,

18   in the cited cases where the Court has found the absence of a

19   proper bankruptcy purpose, there was a lack of financial

20   distress.

21        I have already alluded to the differences between

22   this case and LTL.

23        Integrated is the other Third Circuit case

24   repeatedly referenced by the parties.  In Integrated, the

25   debtor had 105 million in cash, and potential liabilities

1    were roughly one-third of that amount.  Thus, the mere

2    presence of insolvency seems to support a finding of proper

3    bankruptcy purpose.  And indeed, here,  the debtor's

4    financial distress has created a bank -- a proper bankruptcy

5    purpose.

6            Again, as the evidence will show, the remaining

7    reserve rent liabilities under the seven leases far exceed

8    the aggregate amount of cash and receivables on hand as of

9    the petition date.  The debtor had not paid due rent and had

10   surrendered possession of the premises with regards to each

11   of the leases.

12           In the absence of bankruptcy relief and the

13   implementation of the automatic stay, there likely would have

14   been a race to the courthouse to be first in line to obtain a

15   judgment against the debtor's limited assets.  That is

16   exactly what the bankruptcy process was intended to address:

17   Distribution problems arising when individual creditor

18   remedies harms the creditors as a whole because there is not

19   enough assets to go around.

20           The filing of this case allows for an orderly

21   process of addressing disputes related to purported rejection

22   damages claims and implementing a distribution structure

23   whereby all claimants will be paid their full capped claim

24   amounts.

25           The last factor, Your Honor, litigation tactic.

1    This is not a two-party dispute or a situation where the

2    parties were litigating pre-petition, so we do not believe

3    this element is applicable here.  Moreover, where a valid

4    bankruptcy purpose exists, as is the case here, case law

5    suggests that the Court does not need to look at this factor.

6         Moreover, the Third Circuit specifically noted in

7    PPI that a filing to take advantage of 502(b)(6) did not

8    constitute bad faith.  So how could it be viewed as a

9    disqualifying litigation tactic?

10        Going outside the applicable precedent, the movants

11   have asserted a number of additional theories as to why bad

12   faith is present.  For example, the movants have argued that

13   bad faith exists because the debtor is attempting to use the

14   bankruptcy filing to remedy what otherwise are fraudulent

15   transfers.  We fully intend to address this contention in

16   argument, as we believe movant's position flips the Delaware

17   division statute on its head.

18        Indeed, the statute makes clear that properly

19   allocated -- property allocated under a plan of division is

20   validly vested as allocated.  It's only if the allocations

21   are later determined by a court of competent jurisdiction to

22   have been fraudulent transfers there could be joint and

23   several liability amongst the dividing and resulting company,

24   but it does not unwind the divisions or invalidate the

25   resulting company.

1        In fact, cases like LTL, upon which movants rely,

2   make very clear the general expectation that the bankruptcy

3   court will respect entity separateness and the state law

4   divisions, absent compelling circumstances calling them into

5   play.  The Third Circuit respected the pre-petition

6   transactions that were consummated consistent with state law

7   in LTL, and we submit that the Court should take the same

8   approach here.

9        The movants would have the Court believe that the

10  dividing company, or perhaps the debtor, has to affirmatively

11  prove that the divisions and allocations do not constitute

12  fraudulent transfers.  That is not what the law requires.

13  This is a confirmation issue to be considered in the context

14  of proposed releases and not a motion to dismiss issue.

15       Moreover, there is no authority that has been cited

16  for the proposition that the existence of a fraudulent

17  transfer is a basis for dismissal.  Fraudulent transfer

18  claims are dealt with in just about every bankruptcy case,

19  whether preserved or not preserved pursuant to the plan, to

20  the extent they exist.  We don't believe they exist here, but

21  that's an issue for another day.

22       Nevertheless -- and this is why the testimony that

23  the Court will hear from Mr. Alhale is so important and for

24  the reasons set forth in our surreply -- the divisions cannot

25  be fraudulent transfers if the creditor recoveries post-

1    divisions are greater than they were before.

2    Movants also argue that the bad faith exists

3    because the divisions purportedly violated anti-transfer or

4    assignment or change in control provisions in the respective

5    leases.  We, again, dispute this assertion.  The debtors and

6    Bedmar Member have addressed these arguments in their papers

7    and will again do so in connection with the argument on the

8    motions to dismiss.

9    And finally, the United States Trustee relies on

10   the so-called "Primestone factors" in arguing that the cases

11   were not filed in good faith.  We submit that the U.S.

12   Trustee's reliance upon the Primestone factors is misplaced

13   in light of more recent precedent from the Third Circuit on

14   the dismissal standard.  That being said, we believe that the

15   evidence submitted, when applied to the Primestone factors,

16   will heavily weigh in favor of denying the motions.

17   More specifically, the debtor submits that the

18   evidence will show, among other things:

19   This is not a single asset case.

20   The case does not -- was not predicated upon a two-

21   party dispute; the debtor has several creditors, each

22   asserting significant claims.

23   This is not a case where the debtor had no cash to

24   distribute.  The debtor held cash and receivables of

25   approximately $42 million on the petition date.

1    There was no previous bankruptcy petition filed.

2    There was nothing improper about the conduct of the

3    debtor or their affiliates pre-petition.  The fact that the

4    landlords do not like the outcome of the corporate

5    transactions does not make them improper.

6    And finally, that the subjective intent of the

7    independent manager in authoring -- authorizing the filling

8    was nothing nefarious, but instead, a decision to pursue a

9    bankruptcy strategy for addressing underutilized and

10   burdensome leases in a manner that would provide for payment

11   of capped landlord claims in full.

12   And again, if the Third Circuit in PPI acknowledged

13   that attempting to address the lease liabilities under

14   502(b)(6) did not constitute bad faith, how can it constitute

15   improper subjective intent under the Primestone factors?

16   Your Honor, the last point I wanted to note out in

17   response to Mr. Brown's opening statement, there is another

18   case where the Delaware divisional statute was implemented;

19   it was the Padda case (phonetic) before Judge Silverstein.  I

20   just wanted to point that out as I was involved in that case,

21   as well.

22   THE COURT:  Okay.  Thank you.

23   MR. MERCHANT:  Thank you, Your Honor.  That

24   concludes my opening statement.

25   THE COURT:  Does that conclude the opening

53

1    statements?

2         MR. MERCHANT:  I believe that's it for opening

3    statements, Your Honor.

4         THE COURT:  Okay.

5         MR. MERCHANT:  So I think we can turn to the

6    evidence.

7         THE COURT:  Let me ask if the parties need a quick

8    comfort break before we begin with evidence.  Was that a yes?

9      (Participants confer)

10        MR. STEARN:  I'm sorry, Your Honor, I was rudely

11   chatting.  Can I ask --

12        THE COURT:  No.

13     (Laughter)

14        MR. STEARN:  Can you to repeat your question?

15        THE COURT:  I said does anyone wish to have a

16   comfort break before we start with evidence?

17        UNIDENTIFIED:  Yes.

18        MR. STEARN:  I'm always in favor of a break, Your

19   Honor.

20        THE COURT:  I heard a yes.  Okay.  Because there's

21   a lot of people here, I think we should probably take ten

22   minutes to be realistically -- realistic, so let's start back

23   at 10:45.  Okay?

24        MR. STEARN:  Thank you, Your Honor.

25        THE COURT:  Thank you.

1          PARTICIPANTS:  Thank you, Your Honor.  Thank you,

2      Your Honor.

3          (Recess taken at 10:34 a.m.)

4          (Proceedings resume at 10:45 a.m.)

5          THE COURT:  Okay.  Please be seated.

6          (Participants confer)

7          MS. MARKS:  Good morning, Your Honor.  Betsy Marks

8      from Latham & Watkins on behalf of the nondebtor affiliates.

9          The first witness will be Mr. Andrew Montone.

10          THE COURT:  Okay.  Could I please remind you to

11      implement the broadcast protocol?

12          THE ECRO:  Due to our Court's broadcast policy,

13      parties on Zoom that are listening in audio only, you're

14      going to be placed in the Zoom waiting room during the

15      testimony.  You'll be readmitted once the testimony is

16      concluded.

17          MS. MARKS:  And Your Honor, we have some witness

18      binders.  May we pass those out?

19          THE COURT:  Yes.

20          MS. MARKS:  And would the Court like one, as well,

21      for the --

22          THE COURT:  Yes, please.

23          (Participants confer)

24          MS. MARKS:  May we approach, Your Honor?

25          THE COURT:  Yes.

1          MS. MARKS:  Thank you.

2          THE COURT:  And could you ensure my law clerk has

3     one, as well?  Thank you.

4          THE ECRO:  Sir, can you raise your right hand?

5       ANDREW MONTONE, WITNESS FOR BEDMAR MEMBER, INC., AFFIRMED

6          THE ECRO:  Can you please state your full name and

7     spell your last name for the record?

8          THE WITNESS:  My name is Andrew Montone, M-o-n-t-o-

9     n-e.

10         THE CLERK:  Thank you.

11         MS. MARKS:  Good morning.  Good morning, Your

12    Honor.

13                      DIRECT EXAMINATION

14    BY MS. MARKS:

15    Q    Good morning, Mr. Montone.

16         Where are you currently employed?

17    A    I am employed by Resilience US, LLC.

18    Q    And what is your role at Resilience US, LLC?

19    A    My title is Senior Vice President, Chief Financial

20    Officer, and Treasurer.

21    Q    Do you have a role at any other affiliates of Resilience

22    US, LLC?

23    A    Yes, I hold the same titles at National Resilience

24    HoldCo, Inc.; National Resilience, LLC; and Bedmar Member,

25    Inc.

1   Q    Are you a director at any entities within Resilience?

2   A    Yes, I am a director at Bedmar Member, Inc.

3   Q    And is it okay if I refer to these entities simply as

4   "Resilience" or "the company"?

5   A    Yes.

6   Q    Do you have any role at the debtor, Bedmar, LLC?

7   A    I do not have any role at the debtor.

8   Q    So, for clarity, if I refer to "Resilience" or "the

9   company," I'm not going to include the debtor.  Okay?

10  A    Okay.

11  Q    Let's talk about your tenure at Resilience.

12       When did you become Chief Financial Officer?

13  A    I took the interim Chief Financial Officer role starting

14  in June 2024, and then, in January of 2025, was named the

15  full-time CFO.

16  Q    And prior to that, did you have a different role at

17  Resilience?

18  A    Yes, prior to the interim role, I was Vice President of

19  Finance and Corporate Controller.

20  Q    When did you join Resilience?

21  A    I joined Resilience in October of 2020.

22  Q    And can you briefly describe your employment history

23  before Resilience?

24  A    Sure.  I started my career as an auditor, a CPA, in

25  public accounting at PricewaterhouseCoopers in Boston.  I was

1    there for over a decade before moving into industry,

2    corporate finance in varying roles of increasing

3    responsibility before joining Resilience.

4    Q    And do you hold any advanced degrees or certifications?

5    A    Yes, I do.

6    Q    What are those?

7    A    I have my MBA in Business Administration and I'm an

8    active certified public accountant in the State of

9    Massachusetts.

10   Q    When was Resilience formed?

11   A    Resilience was formed in the middle of 2020.

12   Q    Have you been with the company since its inception?

13   A    I -- I joined shortly after its inception, within six

14   months of its -- of its formation.

15   Q    And what was the company's business focus when it was

16   formed?

17   A    Initially, the company was formed with two primary

18   goals:

19        The first was to increase capabilities and capacity for

20   U.S. domestic manufacturing.

21        And the second was to invest and develop innovations in

22   new manufacturing technologies.

23   Q    Is that still the company's focus today?

24   A    Generally, we are still focused in that area; however,

25   our primary focus today is on direct manufacturing.  We do

1   not invest or focus as much on the innovation side.

2   Q    How was Resilience initially funded?

3   A    Resilience was funded with preferred equity of about $2

4   billion, initially.

5   Q    And who were the initial equity investors?

6   A    We have over 50 institutional investors.  Our 2 primary

7   are Arch Ventures and 8VC.

8   Q    Can you briefly describe Resilience's corporate

9   structure when it was formed?

10  A    Sure.  Initially, National Resilience, Inc. was formed.

11  It was -- it served as both the parent, as well an operating

12  entity.

13       Shortly thereafter, we created a U.S. operating entity,

14  initially, called Resilience Boston, Inc, and then later

15  renamed to Resilience US, Inc.

16  Q    And we'll talk more about the corporate structure and

17  how it has changed a little later.  But for now, I'd like to

18  ask you how Resilience expanded and grew its business after

19  its formation in 2020.

20  A    Okay.

21  Q    Please go ahead.

22  A    Sure.  So we acquired -- post 2020, we acquired two the

23  stock of two companies.  One was a manufacturing facility

24  down in -- based out of Alachua, Florida, that was called

25  Ology Biosciences, Inc.  That was in April of 2021.

1      We also did a full acquisition of a smaller R&D company

2   that was called SwiftScale.

3      Outside of that, we acquired numerous sites in North

4   America through both acquisition ownership, entering into

5   lease agreements, and a combination of owning and then

6   entering subsequent sale and leaseback transactions.

7   Q    Was that entity you acquired, Ology Bioservices, Inc.,

8   was that later renamed to Alachua Government Services, Inc.?

9   A    Yes, it was.

10      MS. MARKS:  At this point I would like to introduce

11   an exhibit.

12      And Your Honor, I was actually remiss.  I was going

13   to move in all of the exhibits at the beginning, and I

14   forgot, so if I could do that now.  Both parties have reached

15   large consensus on all exhibits on all of our lists.  There

16   are a few exhibits that were objected to that we've agreed to

17   take off.  But at this point, I would move in the exhibits

18   that we've agreed to from each party's list if that's okay.

19      THE COURT:  Okay.  Well, let me ask, do you have an

20   updated list of what you actually agreed to?

21      MS. MARKS:  So I -- it would be easier to tell you

22   what we've withdrawn because we are withdrawing just a few

23   exhibits and all the rest are going to go into evidence.

24      THE COURT:  Okay.  And let me ask another question,

25   and that is:  Do you intend on relying on all of these

1    exhibits?

2              MS. MARKS:  So I believe both parties have a

3    handful that they're going to ask witnesses about.  Not all

4    of the exhibits will be shown to witnesses, but we believe

5    that they're important to be in the record.

6              THE COURT:  Okay.

7              MS. MARKS:  And Your Honor, if it would be easier

8    for the Court, we can compile one list of everything and

9    submit that if that's easier.

10             THE COURT:  That would be -- that would be great.

11   I would ask that you compile a list of -- one singular list,

12   maybe at lunchtime, and then tell me that the parties are in

13   agreement as to those exhibits, so there's no question.  And

14   then I would ask that you file that on the docket.

15             MS. MARKS:  Thank you, Your Honor.

16             So, for now, since the exhibits are not in

17   evidence, I would like to introduce Exhibit J-1.  This should

18   be Tab A in the binder.  And this is -- the Bates Number is

19   RES001694.

20   BY MS. MARKS:

21   Q    Mr. Montone, do you recognize this slide deck?

22   A    I do.

23   Q    What is it?

24   A    This was a management-prepared slide deck that we used

25   to facilitate discussions with potential bridge financiers.

1    Q    And let's take a look at Slide 2.

2         What is reflected on this slide, generally?

3    A    Generally, this was the Resilience network of sites

4    prior to any corporate transactions.

5    Q    And what were these various sites intended to be used

6    for?

7    A    We acquired sites with varying capabilities, primarily

8    they would fall into three categories:

9         Commercial manufacturing sites;

10        Sites that performed process and analytical development

11   services;

12        And then also some straight R and -- research and

13   development facilities.

14   Q    Okay.  And you testified earlier that some sites were

15   purchased, some were leased, and there were sale leasebacks

16   for some of them?

17   A    That's correct.

18   Q    To help orient the Court, which of the sites on this map

19   involve the leases that are at issue in this Chapter 11 case?

20   A    Those would be Marlborough and Bedford at the top,

21   Allston, and Alachua.

22   Q    And we heard from Orchard earlier.  Are there some sites

23   on here that the company has reached settlements with?

24   A    Yes.  We've settled for both of our sites in the San

25   Diego area, what we refer to as Merryfield and Roselle, as

1    well as our site in Fremont, California.

2    Q    Did all of the sites on this map become operational?

3    A    No, they did not.

4    Q    And focusing on the sites at issue in this case on the

5    eastern side of the map, which ones are not operational?

6    A    Marlborough and Bedford never became operational.

7         Allston was operational as a manufacturing facility for

8    a period of time and then transitioned to do some minor

9    process and analytical development work.

10        And Alachua was operational as a process and analytical

11   development lab.

12   Q    And why have certain sites never become operational?

13   A    Ultimately, with the change in the economic winds, if

14   you will, the -- attracting customers to fill the capacity at

15   some of these sites never materialized.

16   Q    For the leases for the sites at issue in this case or, I

17   guess, really for all of the leased sites, are they long-term

18   leases or short-term leases?

19   A    All leases are considered long term.

20   Q    Why did Resilience acquire so many sites and enter into

21   long-term leases if it did not yet have sufficient customer

22   bases to become operational at these facilities?

23   A    Ultimately, as I mentioned, our -- one of our primary

24   goals was to increase capacities in -- for U.S. domestic

25   manufacturing.  So, initially, with the funds that we raised,

1    we went out and acquired a lot of capacity.  We were trying

2    to be able to provide multiple different capabilities across

3    these sites, and it required significant build-out.

4        So we invested a lot of money in acquisition and build-

5    out of these sites with the business plan of, we will build

6    it and the customers will come.  And again, as I mentioned,

7    for a lot of these locations and sites, the customers --

8    customers never materialized.

9    Q    And why do you think that is?

10   A    Again, post 2020, with the increases in both interest

11   rates as well as inflation, as well as the impact that --

12   that we saw on the biotech industry, again, there was -- the

13   demand for all the capacity that we had just was not there.

14   Q    Did Resilience always pay its rent under the leases even

15   for the sites it never operated?

16   A    Yes, we did.

17   Q    And the slide's title states:

18            "Future State.  Resilience 2.0 focuses on growing

19            Cincinnati and Toronto, maintaining upside in cell

20            therapy and existing all underperforming assets."

21       Do you see that?

22   A    I do.

23   Q    What does "Resilience 2.0" mean?

24   A    This was just an internal naming convention --

25   convention to distinguish a reduced site organization.

1    Q    Why was Resilience focused on growing Cincinnati and

2    Toronto?

3    A    Ultimately, those two sites we did have either an

4    existing customer base or visibility into signing customers

5    that would ultimately lead to a potential path for

6    profitability at both of those sites.

7    Q    And some of the documents in the record in this case

8    refer to the West Chester site.  Is that the Cincinnati site?

9    A    Yes, when we refer to "Cincinnati," there's -- there's

10   actually two sites.  We own a facility, a manufacturing

11   facility in West Chester, Ohio, just outside Cincinnati; and

12   then, about ten miles away, we lease a building in Blue Ash,

13   Ohio.

14   Q    What does the title mean when it refers to "exiting all

15   underperforming assets"?

16   A    Ultimately, it was just our way of explaining how we

17   would potentially seek different strategies for exiting our

18   underperforming sites.

19   Q    And let's talk about the expenses associated with the

20   sites.

21        Are the rental payments on the leased sites the only

22   cost associated with those sites?

23   A    No, they are not.

24   Q    Generally, what kinds of other costs does Resilience

25   have with respect to its sites?

1    A    For -- for operating sites, additional costs would

2    include utilities, informational technology, security,

3    insurance, taxes, materials, and staffing costs.

4    Q    What about the sites that are not operational; are the

5    rent payments the primary cost for those sites?

6    A    No, they are not.  I -- I would say the same costs I

7    just mentioned, maybe absent the staffing cost.

8    Q    All right.  Let's talk more about the company's

9    operations.

10        You testified that Resilience initially raised

11   approximately two point billion -- 2 billion in equity

12   funding?

13   A    Correct.

14   Q    Was that enough for the company to achieve

15   profitability?

16   A    It was not.

17   Q    Why not?

18   A    Ultimately, the acquisitions that we made, as well

19   significant capital expenditures in -- in ramp-up, a lot of

20   the aforementioned costs, a lot of the funds were utilized

21   for that before we even had any customers or any customer

22   work at these sites.

23   Q    When did it become apparent that the 2 billion in

24   initial equity funding would not be sufficient?

25   A    Around the middle of 2022.

1   Q    And what did Resilience do at that time in the middle of

2   2022?

3   A    At that point, we assessed really strategies for two

4   different things:

5        One was a strategy to seek additional financing.

6        And the other was strategies to try exit our

7   underperforming sites, initially trying to sell and/or

8   sublease, and in certain cases we were able to terminate some

9   of our leases.

10  Q    Did those efforts to sell or sublease sites, were those

11  successful?

12  A    They were not.

13  Q    And you mentioned "fund raising."  At some point did

14  Resilience receive a loan from the government?

15  A    We did.

16  Q    What was the amount of that loan?

17  A    The total amount of the loan -- it was a loan from the

18  Department of Defense -- was 410 million.  However, we were

19  only funded 246 million of that amount.

20  Q    Why did the Department of Defense make a loan to

21  Resilience?

22  A    We entered into a financing agreement.  The program was

23  under the Operation Warp Speed.  At that time, you know,

24  bringing back domestic manufacturing was also a priority of

25  the U.S. Government.

1    Q    Who was the borrower on that loan?

2    A    The -- there were co-borrowers on that loan.  At the

3    time, it was National Resilience, Inc. And Resilience US,

4    Inc.

5    Q    And why didn't all of the funding from the Department of

6    Defense materialize?

7    A    The second tranche, the remaining 164 million, were tied

8    to certain revenue achievements, top-line revenue

9    achievements that we were not able to hit.

10   Q    Was that loan sufficient to satisfy Resilience's

11   liquidity needs?

12   A    It was not.

13   Q    So what did Resilience do next?

14   A    Following the -- the initial tranche of the DFC loan,

15   the DOD loan, we ultimately started seeking other alternative

16   methods for financing.

17   Q    And you referenced "DFC."  I know there are references

18   in the record to both DOD, Department of Defense.  What is

19   DFC?

20   A    So the loan we're -- was -- it was a DOD, Department of

21   Defense loan; the DFC administers the loan.

22   Q    What time period was this that you sought additional

23   funding after the DOD loan?

24   A    So this would have been towards the end of 2023 and into

25   early 2024.

1    Q    And were those fund raising efforts successful at that

2    time?

3    A    They were not.

4    Q    At some point in 2024, did Resilience raise additional

5    debt capital from its existing investors?

6    A    We did.

7    Q    And were those existing investors the only investors

8    willing to put more money into Resilience at that time?

9    A    Yes.  At the time, we reached out to numerous of our

10   existing investors; and, ultimately, about five or six were

11   willing to put additional capital in.

12   Q    How much capital was put in; what was the amount of that

13   loan?

14   A    It was $112 million.

15   Q    And what was the form of the loan?

16   A    We issued -- the company issued convertible notes.

17   Q    And which entity was the issuer of those convertible

18   notes?

19   A    At the time, it was National Resilience, Inc.

20   Q    Was that loan meant to be long-term funding?

21   A    No.  It was purely meant for a much needed cash infusion

22   on a short-term basis, while we still pursued long-term

23   financing.

24   Q    How did those convertible notes affect the company's

25   shareholders?

1    A    You know, ultimately, I think it was a bit of a

2    positive, as well as a negative; you know, positive in the

3    fact that we got the -- you know, a short-term liquidity

4    infusion, but now also added a priority debt into the stack

5    that would sit above any of the preferred or common

6    shareholders at the time.

7    Q    At some point, did Resilience engage an investment

8    banker to assist with a more formal debt raise process to

9    look for long-term financing?

10   A    We did.

11   Q    And when was that?

12   A    So in -- in late '23, early 2024, I had mentioned, while

13   we didn't have an advisor, we did get pretty far with a

14   potential long-term financing partner.  Ultimately, that fell

15   apart, and the primary reasons stated were we had significant

16   operating costs and burn, particularly at the underutilized

17   sites, for which we were not able to -- to generate any

18   offset in customer revenue.

19       Following that and then following the infusion of the

20   convertible notes, we hired JPMorgan as an advisor.  This was

21   in August of 2024.

22   Q    And how did the fund raising effort with JPMorgan turn

23   out?

24   A    Ultimately, that did not materialize, either.

25   Q    And what is your understanding of why?

1    A    It was the same reasons and feedback that we had

2    received on the first funding that did not materialize; we

3    had too much operating cost and too much operating burn from

4    our underutilized sites.

5    Q    What did the company decide to do at that point, when

6    the JPMorgan process failed?

7    A    At that point, raising long-term financing with our

8    current footprint was proven to be next to impossible, so we

9    took a step back and assessed what our potential options were

10   to move forward.

11   Q    And around what time period are we in now?

12   A    This was roughly, you know, early to mid March 2025.

13   Q    And what did the company do in March?

14   A    At that time, we had hired three different advisors to

15   help strategize our next steps.

16   Q    And who were the advisors?

17   A    We hired Latham & Watkins to assist in some legal

18   advisory and potential structuring.

19        We hired Portage Point Partners to help with development

20   of long-term financial projections and cash liquidity

21   scenarios.

22        And we hired Jefferies as an investment banker to help

23   us seek some additional long-term financing.

24   Q    At the time that the company hired those advisors in

25   March, what was the company's cash position?

1    A     In March, at that time, we had about 100 million in

2    cash.

3    Q     And how much longer could the company have lasted with

4    that amount of cash?

5    A     Given our burn rate at the time, it would have lasted

6    about two to three months.

7    Q     Did Resilience and its advisors consider different

8    strategic alternatives?

9    A     We did.

10   Q     And how many strategic alternatives did you consider?

11   A     I mean, ultimately, it came down to two potential

12   alternatives.

13   Q     What were they?

14   A     One would have been a full Chapter 11 filing for the

15   entire company; and the other was the strategy that led to,

16   ultimately, the corporate transactions that were undertaken.

17   Q     Which of those two strategies did the company ultimately

18   decide to pursue?

19   A     The -- the - we pursued the latter, engaging in the

20   corporate transactions, but only after we had at least

21   verbally secured some additional funding to effectuate that

22   process.

23   Q     And why did the company select that strategy; why not

24   the whole company filing?

25   A     Yeah.  Ultimately, when the company looked at both

1    options, we believed that this was a best case scenario for

2    all parties involved.  It allowed -- again, once we were able

3    to -- to secure the financing -- which I know we'll get to --

4    it allowed us to pay calculated lease cap claims for the

5    rejection damages, as well as gave the remaining Resilience

6    affiliates the opportunity to potentially raise long-term

7    financing that was much needed for the other sites.

8    Q    And you said you needed to raise additional funding to

9    effectuate the strategy?

10   A    Yes.

11   Q    And was Resilience able to raise the funds it needed?

12   A    We are still in process of doing so, but we were able to

13   raise the initial funding to effectuate the process.

14   Q    And is this the bridge financing effort that began in

15   April 2025?

16   A    Yes, it is.

17   Q    How much in bridge financing was initially raised?

18   A    Initially, we raised around 135 million.

19   Q    And when did you raise that amount?

20   A    That was in May of 2025.

21   Q    What was the company's cash position when those funds

22   came in?

23   A    Just prior to those -- receiving those funds, we had

24   roughly 15 million in cash.

25   Q    Fifteen million in mid May down from 100 million at the

1   end of March?

2   A    Correct.

3   Q    Okay.  So what was Resilience's plan if that bridge

4   financing had not come in in May?

5   A    Ultimately, the strategy that led to the corporate

6   transactions was predicated on us raising that bridge

7   financing.  So, absent that bridge financing, we would have

8   had to have gone with the other alternative which would have

9   been a full Chapter 11 filing for the entire company.

10           MS. MARKS:  Okay.  I would like to introduce

11   Exhibit B-99.  This is Bates-stamped RES2007.

12           THE COURT:  It's not in this binder.

13           MS. MARKS:  I believe it should be tucked in the

14   front pocket of your binder.

15           THE COURT:  Oh, okay.

16           MS. MARKS:  So this -- yeah, this was a late

17   addition so this should be in the front pocket of everyone's

18   binder.

19           THE COURT:  Okay.  This doesn't -- what is the

20   Bates on this?

21           MS. MARKS:  The Bates for this is RES2007, and this

22   exhibit is B-99.

23           THE COURT:  B, as in boy, 99?

24           MS. MARKS:  Yes.  That's --

25           THE COURT:  Okay.

1          MS. MARKS:  That's like --

2          THE COURT:  Thank you.

3          MS. MARKS:  -- Bedmar --

4          THE COURT:  Okay.  Thank you.

5          MS. MARKS:  Okay.  If you could just scroll, Mitch,

6     quickly through this.

7          This exhibit was produced in discovery.  This is a

8     step chart that describes the transactions.  The transactions

9     are complicated, Your Honor.  So to assist the Court, we've

10    created a demonstrative that we believe more simply walks

11    through these corporate transactions.  So the other side, I

12    believe, has consented that we may use that demonstrative,

13    and I would like to pull up the first slide on that now.

14         THE COURT:  Okay.  Any objection?

15         MR. TECCE:  No objection, Your Honor.  Thank you.

16         THE COURT:  Thank you, Mr. Tecce.

17         Anyone else?

18    (No verbal response)

19         THE COURT:  Okay.  You may proceed.

20         MS. MARKS:  Thank you, Your Honor.

21    BY MS. MARKS:

22    Q    So, using this slide, could you briefly describe how the

23    bridge financing worked?

24    A    Yes.  So, you know, again, prior to any of our corporate

25    transactions, the company created a special purpose vehicle

1  named Resilience SPV2025, LLC, where the common units were

2  owned by National Resilience, Inc.  And we sold Series A

3  preferred units in exchange for cash to certain existing

4  investors.

5  Q    Did the SPV then loan funds to National Resilience, Inc.

6  and Resilience US, Inc.?

7  A    Yes, it did.

8  Q    And could you tell us a little more about that, those

9  loans?

10 A    Sure.  So they were entered into an intercompany loan

11 agreement between the Resilience SPV and National Resilience,

12 Inc., and Resilience US, Inc.

13 Q    Were those secured loans?

14 A    Yes, they were.

15 Q    What were they secured by?

16 A    Ultimately, these loans were secured by the unencumbered

17 personal property throughout the remainder of the network,

18 primarily personal property in our West Chester, Ohio

19 facility.

20 Q    And how much of the bridge financing was used for the

21 corporate transactions that preceded this Chapter 11 filing?

22 A    Ultimately, we earmarked around $65 million of the

23 initial bridge financing.

24 Q    What was the rest of the bridge financing for?

25 A    The remainder of the bridge financing was to -- again,

1    at the time we had -- only had 15 million in cash, so

2    continued operations, as well as capital spend.

3    Q    And who provided the initial 135 million in bridge

4    financing in May?

5    A    It came from our two primary shareholders, Arch ventures

6    and 8VC.

7    Q    What is your understanding as to why they were willing

8    to provide the bridge financing?

9    A    My understanding was, in order to help effectuate the

10   process of winding down the sites and the corporate

11   transactions, they were willing to provide that funding.

12   Q    Okay.  Was this Chapter 11 filing and the lease

13   rejections a formal condition of the bridge financing?

14   A    It was not formal in the sense of -- it was not written

15   into the loan doc -- to the, you know, preferred sale

16   documents.  However, it was generally understood that a

17   portion of these funds would used to -- would be used to

18   effectuate the process.

19   Q    Okay.  To your knowledge, would the bridge investors

20   have been willing to invest in Resilience in May if there

21   wasn't some strategy to exit the underutilized sites?

22   A    Not without a strategy, no.

23   Q    How did the -- how did this bridge financing affect the

24   shareholders?

25   A    Again, I'd say there were some positives and negatives.

1  The positives were it provided an infusion of liquidity that

2  was --

3          MR. SILVERMAN:  Objection.  Foundation for the --

4  his testimony as to the investors' state of mind.

5          MS. MARKS:  Your Honor, the -- I asked how this

6  bridge financing affects the shareholders.  The question was

7  not about the state of mind of the investors.

8          MR. SILVERMAN:  Foundation on the shareholders'

9  deal and what the deal was with the shareholders.

10          MS. MARKS:  Not --

11          THE COURT:  You can rephrase the question.

12          MS. MARKS:  Okay.

13  BY MS. MARKS:

14  Q    So, Mr. Montone, I'm not focusing on the shareholders'

15  intent.

16      Financially, how did the bridge financing affect the

17  shareholders?

18  A    Again --

19          MR. SILVERMAN:  Same objection.  There's been no

20  testimony on the shareholders -- the deal with the

21  shareholders or evidence supporting the deal of the

22  shareholders.

23          MS. MARKS:  Your Honor, we heard in opening

24  argument that -- they argued that the evidence will show that

25  this case and the transactions were intended to benefit Arch

1    and 8VC, and so this testimony goes directly to how the

2    shareholders Arch and 8VC were impacted.

3              THE COURT:  Counsel, you may reply.  He's just

4    testified about the two of them.

5              MR. SILVERMAN:  We would think that the Arch -- the

6    investors would need to testify to these subjects.  Without

7    putting in some sort of underlying evidence --

8              MS. MARKS:  Well, Your Honor, maybe I could set

9    this up so there's no foundational issue.

10             THE COURT:  Okay.

11   BY MS. MARKS:

12   Q    Mr. Montone, you're C -- chief financial officer --

13   A    Yes.

14   Q    -- of Resilience?

15   A    Yes.

16   Q    And you were involved in these transactions, including

17   involved in putting together the bridge financing?

18   A    Yes.

19   Q    Are you familiar with the terms of the bridge financing?

20   A    Yes.

21   Q    Do you have an understanding as to how the terms of the

22   bridge financing affect the shareholders of the company?

23   A    Yes.

24   Q    How do the terms of the bridge financing affect the

25   shareholders?

1    A    Again, these would sit senior in priority to any

2    preferred or common shareholders in a -- in a liquidation or

3    settlement.  So, again, ultimately, the cash infusion helped

4    the company at the time, but now we layered in another layer

5    of significant debt that sat -- sat above preferred and

6    common shareholders.

7    Q    Based on this bridge financing from May, the 2024

8    convertible notes and the Department of Defense loan from

9    2023, approximately how much debt needs to be repaid before

10   equity can recover?

11   A    Depending upon what our -- the final raise is in the

12   bridge financing -- as I mentioned, it's still ongoing -- it

13   could be between 1.5 and 2 billion.

14   Q    And just in laymen's terms, does that mean that

15   Resilience would have to sell its assets for more than 1.5 or

16   $2 billion for the shareholders to recover anything?

17   A    Yes.

18   Q    Okay.  So let's go back, and I'd like to talk more about

19   the transactions that preceded this Chapter 11 case.  And the

20   transactions are complicated, so let's break it down into

21   manageable bites.

22       Can you categorize the transactions into a certain

23   number of steps that were taken?

24   A    Yes.  The way we describe it is really in a series of

25   five steps.

1    Q    What transactions occurred in step one?

2    A    So, in step one of the corporate transactions,

3    initially, we created a pure holding company.  As I mentioned

4    at the beginning of my testimony, the -- National Resilience,

5    Inc. was a parent company as well as an operating entity.

6    So, to effectuate a long-term financing process, we created a

7    pure holding company, National Resilience HoldCo, Inc.

8         Following that, our two C corps, National Resilience,

9    Inc. and Resilience US Inc., were transferred to LLCs.  Those

10   were National Resilience, LLC and Resilience US, LLC.

11        And then finally, we put a C corp between National

12   Resilience, LLC and Resilience US, LLC, and that was Bedmar

13   Member, Inc.

14   Q    Okay.  Thank you.

15             MS. MARKS:  If we could please display

16   Demonstrative Slide 2.

17   BY MS. MARKS:

18   Q    Does this corporate structure chart reflect the

19   transactions that you just described in step one?

20   A    Yes, it does.

21   Q    Okay.  And I think you testified why the HoldCo was

22   created at the top.

23        When that holding company, National Resilience HoldCo,

24   Inc., was created, what happened to the shares and the notes

25   previously held in National Resilience, Inc.?

1    A    They were transferred to National Resilience HoldCo,

2    Inc.

3    Q    Why did National Resilience, Inc. and Resilience US,

4    Inc. convert into LLCs?

5    A    As I understand it, in order to effectuate the

6    divisions, the subsequent divisions, they needed to be LLCs

7    and not C corps.

8    Q    And why was Bedmar Member, Inc. formed to serve as the

9    sole member of Resilience US, LLC?

10   A    Based on advice from some of our tax advisors, we needed

11   a C corp between the two entities, so we created Bedmar

12   Member, Inc.

13           MS. MARKS:  If we could flip to the next slide.

14   Q    What transactions occurred next in step two?

15   A    Step two transactions included the division of both

16   National Resilience, LLC and Resilience US, LLC.

17   Q    And can you walk us through those divisions?

18   A    Sure.

19        National Resilience, LLC was divided into two entities:

20   National Resilience, LLC and Bedmar HoldCo, LLC.

21        And Resilience US, LLC was simultaneously divided into

22   five different LLCs.  Those were Bedmar, LLC; AGS HoldCo,

23   LLC; ENM, LLC; RTP Operating, LLC; and Resilience US, LLC.

24   Q    Does this chart reflect the company after those

25   divisions?

1    A    Yes, it does.

2    Q    Why was Resilience US, LLC divided into five LLCs and

3    National Resilience into two LLCs?

4    A    Yeah.  Ultimately, we were pursuing different strategies

5    for our different sites and leases, and dividing into five

6    provided us the most flexibility and optionality for the next

7    steps.

8                MS. MARKS:  And let's take a look back at that map

9    at J-1.

10   BY MS. MARKS:

11   Q    Prior to the divisions, what sites did Resilience US,

12   LLC operate?

13   A    Resilience US, LLC operated Marlborough and Bedford,

14   Allston, Philadelphia, Research Triangle Park, and

15   Cincinnati.

16   Q    And prior to the divisions, what sites did National

17   Resilience, LLC operate?

18   A    National Resilience, LLC operated Fremont and our two

19   sites in San Diego.

20   Q    Did any of the sites with a lease have a guarantee

21   associated with the lease?

22   A    Yes, they did.

23   Q    Which are those sites?

24   A    Again, those were Marlborough and Bedford, Allston,

25   Research Triangle Park, the Alachua pad lease, and our

1   facility up in Toronto.

2   Q    Prior to the transactions, which entity was the

3   guarantor on those -- or the guarantor on those leases?

4   A    National Resilience, Inc.

5   Q    So were different LLCs created at the divisions because

6   the company had different strategies for each of these sites,

7   the leases and guarantees?

8   A    Yes.

9   Q    Okay.  So now let's walk through the allocations of

10  assets and liabilities that occurred in the divisions.  And

11  to help us do that I'm going to use the plans of division

12  from those transactions.

13          MS. MARKS:  I'd like to move into evidence Exhibit

14  J-8.  This is at RES000487.

15  BY MS. MARKS:

16  Q    Mr. Montone, is this the plan of division for Resilience

17  US, LLC?

18  A    It is.

19  Q    Are you familiar with this document?

20  A    I am.

21          MS. MARKS:  Let's take a look at Page 10.

22  Q    And if we blow up that title at the top, are the

23  allocations to the five resulting LLCs reflected in this

24  Schedule 1 to the plan of division?

25  A    Yes, they are.

1    Q    And does this Section A on Page 10 reflect the

2    allocations to the Resilience US, LLC entity?

3    A    Yes, it does.

4    Q    And if we look at Page 11, does Section B reflect the

5    allocations to ENM, LLC?

6    A    Yes, it does.

7    Q    On Page 13, does Section C reflect the allocations to

8    Research Triangle Park, or RTP, LLC?

9    A    Yes, it does.

10   Q    And on Page 13, does Section D reflect the allocations

11   to Bedmar, LLC?

12   A    Yes, it does.

13   Q    On Page 15, does Section E reflect the allocations to

14   AGS HoldCo, LLC?

15   A    Yes, it does.

16   Q    So let's go back.  Let's focus on the allocations to

17   Bedmar, LLC in Section D at the bottom of page 13.

18       In little -- in, let's see, Subpart (i), what was

19   allocated in this item?

20   A    So this item is referring to our ground lease for our

21   Allston, Massachusetts facility.

22   Q    Okay.  Is a lease an asset or a liability?

23   A    A lease acts as both an asset and a liability.

24   Q    What was allocated in Item (ii) on the next page?

25   A    This is referring to the Allston building, which we had

1    owned at the time, as well as improvement -- capital

2    improvements made to that building.

3    Q    Okay.  So, in other words, there was a ground lease that

4    was allocated to Bedmar, LLC, as well as the building that

5    sat on that land, that Resilience US owned?

6    A    Correct.

7    Q    Is the building an asset or a liability?

8    A    The building serves as an asset.

9    Q    What was allocated in Item (iii)?

10   A    This is a lease agreement for our Marlborough,

11   Massachusetts facility.

12   Q    And we can look at Items (iv) and (v) together.  They

13   span two pages.  But what was allocated in those two items

14   (iv) and (iv)?

15   A    (iv) and (v) represent certain agreements associated

16   with the sale and leaseback of the Marlborough facility.

17   Q    What was allocated in Item (vi)?

18   A    Here is the lease associated with the Bedford,

19   Massachusetts site.

20   Q    And what about in Item (vii)?

21   A    This is the sublease for a portion of the Bedford,

22   Massachusetts space.

23   Q    And the last item, what was allocated in Item (viii) at

24   the bottom?

25   A    This is 33.2 million in the form of cash and a

1    receivable to the -- to the entity.

2    Q    Was 33 million allocated to Bedmar, LLC?

3    A    That was the amount of the calculated lease cap

4    rejection damages.

5    Q    And this states that the cash and receivable came from

6    the surviving company from reserved funds held by Resilience

7    SPV 2025, LLC.  Do you see that?

8    A    I do.

9    Q    What is that referring to?

10   A    That's referring to the bridge financing through the

11   sale of preferred shares to the S -- Resilience SPV.

12            MS. MARKS:  All right.  So we can take that down.

13   And let's look next at the plan of division for National

14   Resilience, LLC.  And this is Exhibit J-7, Bates-stamped

15   RES000572.

16   BY MS. MARKS:

17   Q    Is this the plan of division for National Resilience,

18   LLC?

19   A    It is.

20   Q    And are you familiar with this document, as well?

21   A    I am.

22   Q    Okay.  Let's look at Page 8.  And this contains the same

23   Schedule 1 in the allocations of assets and liabilities for

24   this division.

25            Is Section A on Page 8 -- does this again list the

1    allocations to National Resilience, LLC?

2    A    It does.

3    Q    And if we look on Page 9 at Section B, does this list

4    the allocations to Bedmar HoldCo, LLC?

5    A    It does.

6    Q    Okay.  Let's focus on the Section B.  And there's ten

7    items in here.  I'm not going to walk through each of them.

8         But focusing on the ones most relevant to this case,

9    what was allocated in Items 5 through 9?

10   A    These were parent guarantees on some of the

11   aforementioned leases.

12   Q    Okay.  If we looked at Item 10 at the bottom, what was

13   allocated in Item 10?

14   A    9.4 -- roughly 9.4 million in the form of cash and a

15   receivable.

16   Q    Why was that amount allocated to Bedmar HoldCo, LLC?

17   A    Again, this amount -- excuse me -- was meant to serve as

18   the lease cap rejection damages; ultimately, that's what that

19   amount is.

20   Q    Okay.  And I see the same reference here to the

21   Resilience SPV.  Did this amount of cash and receivable also

22   come from the bridge financing?

23   A    Yes, it did.

24   Q    Okay.  And to be clear, without the bridge loan, would

25   either Resilience US or National Resilience have had

1    sufficient liquidity to allocate 33 million and 9.4 million

2    respectively to Bedmar, LLC and Bedmar HoldCo, LLC?

3    A    No, we would not.  Again, at the time just before the

4    bridge financing, we had roughly $15 million in cash.

5    Q    And you would -- that would not have been sufficient to

6    make these allocations?

7    A    No.

8    Q    Okay.  Let's move on to step three of the corporate

9    transactions.  What happened in step three?

10   A    In step three of the corporate transactions, Bedmar

11   HoldCo, LLC was merged with Bedmar, LLC, with Bedmar, LLC as

12   the surviving entity.

13   Q    And that is the debtor in this case?

14   A    It is.

15   Q    Okay.  Why did they merge?

16   A    Ultimately, for administrative ease in -- in

17   effectuating the remaining steps of the corporate

18   transactions.

19   Q    What happened in step four of the corporate

20   transactions?

21   A    In step four, Bedmar Member, Inc. assigned a 51 percent

22   ownership in AGS HoldCo, LLC to Bedmar, LLC.

23   Q    And why was a 51 percent ownership stake in AGS HoldCo,

24   LLC assigned to Bedmar, LLC?

25   A    In order to effectuate step five in the process, which

1    we'll get to.  Ultimately, there needed to be a majority

2    ownership of that entity.

3        MS. MARKS:  Okay.  Let's look at demonstrative

4    Slide 4.

5    BY MS. MARKS:

6    Q    Does this chart reflect the corporate transactions that

7    took place in both steps three and four?

8    A    Yes, it does.

9    Q    And what happened in step five?

10   A    The -- the last step in the corporate transactions, what

11   we refer to as "step five," the Alachua pad lease was

12   assigned to Bedmar, LLC.

13   Q    And if we look at the next slide in the demonstrative,

14   does this chart reflect that lease assignment and the

15   corporate transactions in step five?

16   A    It does.

17   Q    Why was the Alachua lease assigned to Bedmar, LLC?

18   A    Again, ultimately, to effectuate the lease rejection and

19   to be able to pay the landlord the calculated lease cap

20   claims.

21   Q    Okay.  Okay.  So we've spoken about these transactions

22   in five steps.

23        Would any of these five steps have happened without the

24   other steps?

25   A    Potentially, step one could have happened on its own,

1    but the remaining steps are -- are all -- would not have

2    happened without the others.

3    Q    Okay.  Okay.  I want to turn back to the treatment of

4    the debt that Resilience had raised previously.

5         In the corporate transactions, what happened to the 2023

6    loan from the Department of Defense for which National

7    Resilience and Resilience US were initially liable; how was

8    that obligation allocated?

9    A    The obligation to repay that loan was allocated to

10   National Resilience, LLC and Resilience US, LLC.

11   Q    Okay.  And what about the 112 million in convertible

12   debt raised in 2024, which entity currently has the

13   obligation to repay that debt?

14   A    The convertible notes were allocated to the new HoldCo,

15   National Resilience HoldCo, Inc.

16   Q    Okay.  So there was no allocation of that liability to

17   the resulting LLCs?

18   A    Not for the convertible notes.

19   Q    And what about the bridge financing to the SPV?  Could

20   you remind us how the obligations on the secured loans made

21   to National Resilience and Resilience US from the bridge

22   financing were allocated in those divisions?

23   A    Those were allocated to National Resilience, LLC and

24   Resilience US, LLC.

25   Q    So were the obligations to pay back the Department of

1    Defense loan, the convertible debt, or the secured loans from

2    the bridge financing allocated to the debtor?

3    A     No, they were not.

4    Q     How would you describe the magnitude of the liabilities

5    that remained with the parent and the nondebtor LLCs

6    following the divisions?

7    A     The significant liabilities still reside with the

8    nondebtor affiliates -- affiliates and the parents, in light

9    of all that you had mentioned, as well as some additional

10   liabilities.

11   Q     Given how significant those liabilities are, why did

12   Resilience choose to allocate 42 million in cash and

13   receivables to the debtor?

14   A     Ultimately, to ensure that the debtor had the funds to

15   pay the lease cap damages, those funds were allocated.

16   Q     Okay.  What is your view as to how the debtor fared in

17   the divisions compared to the nondebtor LLCs?

18               MR. TECCE:  Objection, Your Honor.

19               THE COURT:  Sorry.  I can't hear you.  Can you --

20               MR. TECCE:  Objection, Your Honor.

21               THE COURT:  Can you get to a mic, please?  Thank

22   you.

23               MR. TECCE:  Objection, Your Honor.  He's not a

24   debtor officer, member or any -- he has no affiliation with

25   the debtor.

1          MS. MARKS:  Your Honor, he just -- we just walked

2     through the allocations of assets and liabilities to the

3     debtor.  As Chief Financial Officer of the initial LLC that

4     divided and allocated certain assets and liabilities to the

5     debtor, he has knowledge of exactly what was allocated to

6     which of the resulting LLCs, has personal knowledge, and has

7     a view.

8          MR. TECCE:  He's a financial officer of the

9     nondebtor entities and he's testified about the transactions

10    involving the nondebtor entities.  That's correct.

11         MS. MARKS:  Your Honor, I'm asking him about what

12    allocations happened before --

13         THE COURT:  Restate -- can you restate the

14    question, please, before you --

15         MS. MARKS:  Sure.

16    BY MS. MARKS:

17    Q    Before -- why don't I ask it this way?  Before this

18    Chapter 11 filing, what is your view as to how Bedmar, LLC

19    fared in the divisions compared to the four other nondebtor

20    LLCs?

21    A    In light of the liabilities that were allocated to the

22    nondebtor LLCs, my view is that the -- the debtor fared

23    better than the nondebtor affiliates.

24    Q    And why is that?

25    A    Again, ultimately, there are significant liabilities

1    that reside with the nondebtor affiliates, and the debtor was

2    allocated sufficient funds to cover its lease cap claims.

3            MS. MARKS:  Thank you, Your Honor.  That concludes

4    my direct exam.

5            THE COURT:  Excuse me.  Before we proceed any

6    further, were the parties all in agreement then?  Because I

7    want to make sure, while we're talking about it, that B-99,

8    J-1, J-8, and J-7 are admissible.

9        (Exhibit D/BMI-99 received in evidence)

10       (Exhibit J-1 received in evidence)

11       (Exhibits J-7 and J-8 received in evidence)

12            MR. TECCE:  Your Honor, no objection, yeah.

13            THE COURT:  Okay.

14            MR. TECCE:  Actually, you read my mind, because I'd

15   like to begin by just moving into evidence the exhibits I

16   intend to show the witness.  And I've shared them in advance

17   with -- well, first of all, there's no objection to our list,

18   but I've also shared them in advance with opposing counsel.

19   So if I could just move them into evidence right now, if that

20   makes --

21            THE COURT:  Okay.  Before you do that Mr. Tecce, I

22   just -- I don't know if this was intentional.  There were

23   demonstratives, but they weren't consistent with the B-99

24   that we were handed.  Is that accurate?

25            MS. MARKS:  Yes, Your Honor.

1          THE COURT:  Okay.

2          MS. MARKS:  They're entirely consistent.  There's

3    nothing new in them.  They're just a different way to show

4    the transactions that we felt was a little easier to

5    understand.

6          THE COURT:  Okay.  But you're not admitted into

7    evidence --

8          MS. MARKS:  Well --

9          THE COURT:  -- what was put on the screen.

10          MS. MARKS:  I mean, we would like Your Honor to

11    have them for your own sake, if you'd like to look at them.

12    So, if the other side doesn't object, we would submit them to

13    be part of the record, although they're not evidence, you

14    know, and understand they're not for the truth.

15          MR. TECCE:  No --

16          THE COURT:  Any objection to those --

17          MR. TECCE:  No.

18          THE COURT:  -- as demonstratives?

19          MR. TECCE:  No, no objection, Your Honor.

20          THE COURT:  Okay.

21          MS. MARKS:  Thank you.

22          THE COURT:  If we could get a copy of that, that

23    would be helpful.

24          MR. TECCE:  Okay.  Actually, do you -- if it's

25    these documents, I'd like you to have a hard --

1          THE COURT:  Pardon?

2          MR. TECCE:  Do you have a hard copy of this, Your

3    Honor?  Because I'm going to use it.

4          THE COURT:  Of what, what they just put on the

5    screen?

6          MR. TECCE:  Yeah, of the demonstrative.

7          THE COURT:  I do not.

8          MR. TECCE:  Okay.  So --

9          THE COURT:  That's why I asked.

10          MR. TECCE:  Do you have a copy of this for the

11    Judge of your demonstratives?

12          MS. MARKS:  I don't believe -- we will -- we're

13    happy to print one out at lunch.

14          MR. TECCE:  Okay.  Actually --

15          MS. MARKS:  Yeah, or we could -- I mean, we have it

16    -- we could reflect it on the screen.

17          MR. TECCE:  Can we put it on the screen?

18          THE COURT:  Yeah.  Could we put it back on screen?

19    And then, after lunch --

20          MR. TECCE:  We will.  Actually, my colleague here

21    will put it on the screen when I get to that part of my

22    presentation.

23          THE COURT:  Okay.

24          MS. MARKS:  And Your Honor -- Mr. Tecce, before you

25    start, I did just want to put a comment on the record.  The

1    parties have conferred over confidentiality issues.

2              THE COURT:  Uh-huh.

3              MS. MARKS:  We've agreed not to seal the courtroom

4    or anything like that.

5              However, certain of the exhibits that my colleague

6    intends to use do contain commercially sensitive client names

7    and investors, et cetera, and so we've agreed, you know, that

8    -- we've agreed to treat those sort of in a reasonable

9    manner.  They will not be displayed on the screen.  Mr. Tecce

10   has agreed not to read aloud those names.  So, hopefully,

11   that proceeds smoothly.

12             MR. TECCE:  That's accurate, Your Honor.  I just

13   need the binder back and we'll be good to go.

14        (Participants confer)

15             MR. TECCE:  We do have a witness binder -- actually

16   before, Your Honor, I would like to just move into evidence

17   the following exhibits which are in my binder, which, is for

18   the record: M-17, Joint Exhibit 1, M-22, M-23, M-39, M-15.

19        (Participants confer)

20             MS. MARKS:  We don't have an exhibit binder.

21             MR. TECCE:  Okay.  Let's --

22             THE COURT:  I was going to say I don't have any

23   binder.

24             MR. TECCE:  Well, let's do that.  Let's hand out

25   the binder (indiscernible)

1          THE COURT:  So I just am trying to type down the

2     exhibits you referenced.

3          MR. TECCE:  That's fine.  So we'll hand out --

4          THE COURT:  Is that the totality of them?

5          MR. TECCE:  I'm sorry?

6          THE COURT:  Is that all of them?

7          MR. TECCE:  Not in our entire exhibit list, just --

8          THE COURT:  No.  But for now?

9          MR. TECCE:  For now, yes.

10          THE COURT:  I just want to make sure I have --

11          MR. TECCE:  Oh, no, no, no.  I have a few more, so

12     let's get the binders out and I'll do it.  Your Honor, I'm

13     sorry.

14          THE COURT:  Okay.

15          MR. TECCE:  Thank you.  All right.  So do you --

16     does this gentleman have a binder?

17        (Participants confer)

18          THE COURT:  Do you have another binder?

19          MR. TECCE:  I do.

20          THE COURT:  Thank you.

21        (Participants confer)

22          THE COURT:  Does everyone have a binder?

23          MR. TECCE:  Okay.  Does everyone have a binder that

24     needs it?

25        (Participants confer)

98

1          THE COURT:  Mr. Tecce, can you give me one second

2    to mark what's admitted?  I just ...

3        (Pause in proceedings)

4          MR. TECCE:  Okay.  You ready?

5          THE COURT:  Yes.

6          MR. TECCE:  Okay.  So just doing this one more

7    time, I'd like to move the following exhibits into evidence:

8    M-17, Joint Exhibit 1, M-22, M-23, M-39, M-15, M-16, M-45, M-

9    27.

10          THE COURT:  I'm sorry, M-27?

11          MR. TECCE:  Yes, Your Honor.

12          THE COURT:  Okay.

13          MR. TECCE:  M-27.

14          M-14, M-12, M-50, M-58, M-55, M-56, M-57, M-49, M-

15    13, and M-43.

16          And there are three that are actually on the debtor

17    and/or nondebtor affiliates' list, which I would also like to

18    move into evidence for them, which I will be using, which are

19    their Exhibit 61 --

20          THE COURT:  B-61?

21          MR. TECCE:  Their -- it's, yes, D-61.

22          THE COURT:  Oh, D.  Okay.

23          MR. TECCE:  D, correct, Resilience pledge

24    agreement; D-62, the intercompany note; and D-97.

25          MS. MARKS:  I just need you to repeat the first

1    part of your list because the binder doesn't --

2              MR. TECCE:  Sure.

3              MS. MARKS:  -- the index doesn't say what exhibit

4    number it is --

5              MR. TECCE:  Sure.

6              MS. MARKS:  -- so it just took me a minute to --

7              MR. TECCE:  My apologies.  So D-61, your exhibit --

8              MS. MARKS:  No, your -- if you could start with the

9    M's, the first few M's that you're admitting.

10             MR. TECCE:  What's the first M that you have that

11   you're good with?

12        (Participants confer)

13             THE COURT:  Mr. Tecce?

14             MR. TECCE:  Yes.

15             THE COURT:  Just so you're aware, the binder I have

16   doesn't reference M numbers, or M letter numbers.

17             MS. MARKS:  Yes, that was my issue.

18             THE COURT:  I just -- I don't know if other parties

19   know what these are, but --

20             MR. TECCE:  So let me do it this way.

21             I'll move the following tabs into evidence.  Okay?

22             MS. MARKS:  Okay.

23             MR. TECCE:  Tab 4.  Tabs 4 through 26.

24             MS. MARKS:  No objections, Your Honor.

25             THE COURT:  So is that Tab 4 to 26 in this binder,

1    plus D-61, D-62 and D-97?

2              MR. TECCE:  It does, Your Honor.

3              THE COURT:  Okay.

4              MR. TECCE:  Because D-61 is Tab 24, D-62 is Tab 25,

5    and D-97 is Tab 26.

6              THE COURT:  Okay.  All right.

7              MR. TECCE:  Thank you very much.

8              THE COURT:  When -- at a break, when you do this

9    collective list of exhibits, can you identify it consistent

10   with other exhibits?

11             MR. TECCE:  Absolutely.

12             THE COURT:  Thank you.

13             MR. TECCE:  Thank you, Your Honor.  Appreciate your

14   indulgence on that.

15        (Exhibits M-12 through M-17 received in evidence)

16        (Exhibits M-22 and M-23 received in evidence)

17        (Exhibit M-27 received in evidence)

18        (Exhibit M-39 received in evidence)

19        (Exhibit M-43 received in evidence)

20        (Exhibit M-45 received in evidence)

21        (Exhibit M-49 and M-50 received in evidence)

22        (Exhibits M-55 through M-58 received in evidence)

23        (Exhibits D-61 and D-62 received in evidence)

24        (Exhibit D-97 received in evidence)

25                          CROSS-EXAMINATION

BY MR. TECCE:

Q    Okay.  Mr. Montone, good afternoon.

A    Good afternoon.

Q    Or good morning.

A    Good morning.  Both.

Q    The Resilience company was formed in 2020, correct?

A    That is accurate.

Q    And at the time, both Arch and 8VC were shareholders.
Is that correct?

A    In the initial rounds, yes.

Q    Which company were Arch and 8VC shareholders in, in
2020?

A    National Resilience, Inc.

Q    Both Arch Venture and 8VC are current shareholders
today, correct?

A    Correct.

Q    And in which company are they shareholders today?

A    National Resilience HoldCo, Inc., as well as the
Resilience SPV.

Q    And that's the Resilience 2025 SPV, correct?

A    Correct.

Q    That's the entity through which the bridge loan was
extended, correct?

A    Correct.

Q    And I believe -- is it fair to say that Arch and 8VC are

1   among the larger holders of equity?

2   A    Yes, that's fair.

3   Q    The National Resilience HoldCo, Inc. Board, are you a

4   member of that, Mr. Montone?

5   A    I am not a member of that board, no.

6   Q    Is Mr. Solomon a member of that board?

7   A    He is not.

8   Q    Is Mr. Marth a member of that board?

9   A    He is.

10  Q    Is Mr. Oetting a member of that board?

11  A    He is.

12  Q    And who is he affiliated with, Mr. Oetting?

13  A    8VC.

14  Q    Is Mr. Nelsen a member of that board?

15  A    He is.

16  Q    Who is he affiliated with?

17  A    With Arch Ventures.

18  Q    You're -- with respect to Bedmar Member, Inc., are you a

19  member of the board of directors of that company?

20  A    I am.

21  Q    Who else sits with you on the board of that company?

22  A    William Marth and Ori Solomon.

23  Q    You spoke earlier about the convertible notes.  Do you

24  remember that?

25  A    Yes.

1   Q    When were they extended?

2   A    The convertible notes were extended in June and July of

3   2024.

4   Q    And ho are the holders of the convertible notes?

5   A    The majority of those holders are Arch and 8VC; there

6   are, I believe, five or six total in total.

7   Q    But the majority are held by Arch and 8VC of the

8   convertible notes, correct?

9   A    Yes.

10  Q    They are unsecured obligations, correct?

11  A    The 2024 notes are unsecured, yes.

12  Q    Which entity originally issued the 2024 notes?

13  A    National Resilience, Inc.

14  Q    At the time that National Resilience, Inc. issued the

15  2024 notes, was National Resilience, Inc. also a guarantor of

16  the lease obligations?

17  A    It was of certain lease obligations, yes.

18  Q    Was it a guarantor of the Allston lease?

19  A    Yes, it was.

20  Q    Was it a guarantor of the Harvard lease?

21  A    That's the same lease.

22  Q    As the Allston lease?

23  A    Yes.  We refer to -- we own the building in Allston, and

24  Harvard was the landlord for the ground lease.

25  Q    After the corporate transactions, which entities are the

1    obligors under the convertible notes?

2    A    Bedmar, LLC.

3    Q    Bedmar, LLC is an obligor under the convertible notes?

4    A    Oh, sorry, sorry.

5    Q    That's okay.

6    A    I'm sorry.  That was in reference to the leases.

7         Can you please repeat the question?

8    Q    Sure.  Let me ask you the question again.

9    A    Sorry.

10   Q    Okay.  After the corporate transactions --

11   A    Yeah.

12   Q    -- which entities became the obligors under the

13   convertible notes?

14   A    National Resilience HoldCo, Inc.

15   Q    Are there any other entities that are obligors under the

16   convertible notes?

17   A    Not under the 2024 convertible notes, no.

18   Q    They don't have a claim against Resilience US, LLC, the

19   convertible notes?

20   A    No, the obligors are national -- are Resilience HoldCo,

21   Inc.

22   Q    And there are no lease obligations against National

23   Resilience HoldCo, correct?  Presently.

24   A    National Resilience HoldCo, Inc. does not have any lease

25   obligations.

1  Q    The discussion about Resilience 2.0, that starts in

2  April 2025.  Is that correct?

3  A    Correct.  That's when we prepared the management

4  presentation.

5  Q    And in connection with that, Latham & Watkins advised

6  the company.  Is that correct?

7  A    In March of 2025, Latham & Watkins was hired as one of

8  our advisors, yes.

9  Q    And Portage Point Partners was also hired.  Is that

10  correct?

11  A    Yes.

12  Q    Can I ask you to take a look at Tab 4 in your binder?

13  A    Yes.

14  Q    Do you see that document there, sir?

15  A    I do.

16  Q    And this is from Mr. Montone to Mr. Oetting, Mr.

17  Solomon, and Mr. Marth, correct?  An email?

18  A    Yes, it is.

19  Q    And the second sentence says:

20            "Note, there is nothing in the DR around the

21            divisive of merger yet given we are still waiting

22            on executed common interest agreements."

23       Do you see that?

24  A    Yes, I do.

25  Q    And the "DR" refers to the data room.  Is that correct?

1   A    That is accurate, yes.

2   Q    All right.  I'm sorry.

3        And so turn -- if you'd turn to Tab 5 in your binder,

4   Mr. Montone.  This is the Resilience 2.0 deck.  Was this --

5   was it attached to that email?

6   A    Yes, it was.

7   Q    And let's start on Page 2.  You talked about Cincinnati,

8   right?  What does it mean there, "End-to-end drug product,

9   800M plus year revenue"?  What does that mean?

10  A    That means the capabilities of that site, we do sterile

11  fill and finish for drug product.  That's what the --

12  ultimately, the capabilities of what that site, you know,

13  performs.

14       The 800 million year revenue, right underneath -- you

15  can -- can't see it, a little bit, it's kind of in -- says,

16  "800 plus year revenue potential."

17       Given the capacity of the buildings in the West Chester

18  and Blue Ash facilities, if we had capital to build out what

19  would be needed, that site could do upwards of 800 million a

20  year in annual revenue.

21  Q    When you refer to "Ohio," do you refer to West Chester?

22  There are two sites there in Ohio?

23  A    Two sites in Ohio, correct.

24  Q    And what are their names?

25  A    West Chester, Ohio, the owned facility; and Blue Ash,

1    Ohio, which is a leased facility.

2    Q    If you turn to Page 5, there are three bullet points

3    there, and the second one says:

4              "Restructuring costs include funding the lease cap

5              claims, costs to exit the leases, severance for

6              active employees at the respective facilities, and

7              other costs necessary to exit certain U.S.

8              facilities."

9    Do you see that?

10   A    I do.

11   Q    And this deck was prepared in connection with soliciting

12   bridge financing, correct?

13   A    Correct.

14   Q    So it's fair to say that the bridge financing was going

15   to be used to pay the lease cap claims, correct?

16   A    Yes.

17   Q    And the bridge financing came primarily from Arch

18   Ventures and 8VC, correct?

19   A    The initial bridge financing did.

20   Q    And that's $135 million, correct?

21   A    That was the initial financing, and we're up to 242

22   million today.

23   Q    When did that additional financing come in?

24   A    It came in between May and last week.

25   Q    Who provided that additional financing?

1    A    There were a couple of other existing investors provided

2    smaller amounts, and then one new investor.

3    Q    And so, in addition to -- so the series -- well, let me

4    just ask this.

5        The Arch Ventures and 8VC bridge funding came through

6    Resilience SPV 2025, LLC, correct?

7    A    Correct.

8    Q    And Arch Ventures and 8VC acquired preferred shares in

9    that entity, correct?

10   A    Correct.  Series A preferred shares.

11   Q    And in exchange, they extended cash into the SPV,

12   correct?

13   A    Correct.

14   Q    And that cash was to fund the lease cap claims among the

15   other things mentioned here on Page 5, correct?

16   A    A portion of that cash was used to fund the lease cap

17   claims, yes.

18   Q    What was the portion of that cash that was used to fund

19   the lease cap claims?

20   A    Of the bridge financing, we allocated about $65 million

21   for everything that's included in that second bullet; of that

22   amount, about 42 million was to cover the lease cap claims.

23   Q    And when you say "we," you mean Portage Partners came up

24   with that figure?

25   A    Portage Partners did the initial calculations, yes.

1    Q    So Portage Partners came up with the 64 million out of

2    $135 million.  Is that correct?

3    A    Correct.

4    Q    You mentioned the $64 million.  How much of that was

5    rated to the Chapter 11 cases?

6    A    Again, to cover the lease cap claims, 42 million.

7    Q    Okay.  What about the administrative costs of the

8    Chapter 11; how much of the sixty-four went to that?

9    A    I'd say the remaining amount of that amount was about 15

10   million for contingent reserve, and then I don't recall the

11   exact amount, but the rest were for administrative costs,

12   exit costs, and other wind-down costs.

13   Q    When you say "administrative costs," you mean in

14   connection with the bankruptcy, correct?

15   A    Correct.

16   Q    Okay.  So, of the 64 million, 42 million was for lease

17   cap claims and the balance was for the other costs for the

18   bankruptcy, correct?

19   A    Correct, including a contingent reserve.

20   Q    And of the 42 million, 33.1 was allocated to Bedmar,

21   LLC, correct?

22   A    I believe approximately 33.1, yes.

23   Q    And 9.4, approximately, was allocated to Bedmar HoldCo,

24   correct?

25   A    Correct.

1          (Pause in proceedings)

2     Q    Can I ask you to turn to Tab 6 in your binder, sir.

3     A    Yes.

4     Q    And this is the minutes of a meeting of the capital

5     alternatives committee on Sunday, May 4, correct?

6     A    Correct.

7     Q    And here Mr. Solomon reviews, if you see that discussion

8     section, the terms of the Series A preferred unit financing

9     of Resilience SPV 2025.  Is that correct?

10    A    Yes.

11    Q    Okay.  And if I can ask you to look to Tab 7 in your

12    binder.

13         This Project Osiris slide deck was also discussed at

14    that meeting, correct?

15    A    Yes, it was.

16    Q    And on Page 4 of this presentation, the second bullet

17    down, it says:

18              "The initial bridge financing of 150 million will

19              be used to fund operations, as well as partially

20              fund the LeaseCo restructuring."

21         Do you see that?  I don't want to rush you.  I see

22    you flipping your book there.

23    A    Yes.  Sorry.

24    Q    That's okay.  Take your time.

25    A    Yes, I do.

1   Q    And that LeaseCo restructuring, that's paying the lease

2   cap claims in Chapter 11, correct?

3   A    Yes.

4   Q    So it's fair to say that the size of the bridge loan was

5   based on the projections provided by Portage about the amount

6   of the cap claims.  Is that correct?

7   A    Not the size of the bridge loan, the size of the portion

8   of the bridge loan that would be allocated for the lease cap

9   claims in -- in the entire process.

10  Q    Okay.  And so do you remember you submitted a

11  declaration in connection with the motion to dismiss?

12  A    I do.

13  Q    Okay.  And in Paragraph 12 -- and it's in your binder if

14  you want take a look at -- but you said, quote:

15          "The investors conditioned the financing on

16          National Resilience, LLC and Resilience US, LLC

17          using a certain amount of the proceeds solely to

18          address the claims of underutilized sites through a

19          Chapter 11 process."

20      Do you remember saying that?

21  A    I do.

22  Q    When you say "the investors," that means Arch and 8VC,

23  correct?  The people who extended the bridge loan.

24  A    The initial portion of the bridge loan, yes.

25  Q    And they extended that conditioned on the proceeds being

1    used to address the claims in a Chapter 11 process, correct?

2    A    The general understanding was that a portion of the

3    claims would go to effectuate the process, yes.

4    Q    But you used the word "conditioned" in your declaration.

5    Is that correct?

6    A    Yes, I did.

7        MS. MARKS:  Your Honor, I'm just going to object at

8    this point.  I don't know if you're using this for

9    impeachment, but it was improper impeachment, and the

10   declaration is otherwise not admissible.

11       MR. TECCE:  Well, I can use -- I don't -- it

12   doesn't have to be in evidence to be used for impeachment.

13       MS. MARKS:  I object.

14       THE COURT:  Okay.

15       MS. MARKS:  It was improper impeachment.

16       THE COURT:  For impeachment.

17       MR. TECCE:  I'm sorry?

18       THE COURT:  She objected on the grounds that it's

19   improper impeachment.

20       MR. TECCE:  Your Honor, I don't know that I was

21   impeaching the witness.  I was just asking him to clarify

22   that the loans that were extended were conditioned on the

23   funding for the Chapter 11 lease cap.

24       MS. MARKS:  Your Honor, my position is he should

25   ask the witness that and he should not be reading from the

1    declaration --

2              THE COURT:  Right.

3              MS. MARKS:  -- when it's not in evidence.

4              MR. TECCE:  Fair enough.  You know what?  I'll --

5    fair enough.

6              THE COURT:  Can you --

7              MR. TECCE:  I can -- let me rephrase.

8              THE COURT:  Impeach the witness, if that's what

9    you're going to do.

10              MR. TECCE:  Okay.

11   BY MR. TECCE:

12   Q    The assumption at the time that the bridge loan was

13   extended was that the funds would be used to pay the lease

14   cap claims in a Chapter 11 case.  Is that correct?

15   A    A portion of the funds, yes.

16   Q    Okay.  And that's the 64 million we discussed, correct?

17   A    Yes.

18   Q    Can I ask you to turn to Tab 8 in your binder?

19   A    Okay.

20   Q    And this is the termsheet for the preferred unit

21   financing.  Do you see that?

22   A    Yes, I do.

23   Q    And you see down there, this Resilience SPV 2025, LLC,

24   that's the entity, correct?

25   A    Sorry.  Where are you referring to?

1    Q    Yeah.  It just -- it says, "Company: Resilience SPV

2    2025, LLC."  Do you see that?

3    A    Yes.

4    Q    And that is the entity who is preferred -- Series A

5    preferred units that Arch and 8VC purchased, correct?

6    A    Yes.

7    Q    It says in the closing date -- do you see down --

8         MR. TECCE:  We have to scroll down a little bit.

9    A    Yep.

10   A    Yes.

11   Q    It says the initial closing of the sale and issuance of

12   Series A preferred units occurred on May 12.  Is that

13   correct, sir?

14   A    That's correct.

15   Q    So the closing of the bridge loan occurred before the

16   divisions of the companies and their conversions to LLCs,

17   correct?  In your transactions.

18   A    That's correct.

19   Q    Okay.  And I'd like to -- I'd like to just focus on the

20   mechanics of this financing, if I could.

21        Resilience 2025 SPV, LLC, which entities originally did

22   that Resilience SPV entity advance the funds to?  What were

23   the names of those companies?

24   A    Initially, National Resilience, Inc. and Resilience US,

25   Inc.

1    Q    And that advancement was reflected by an intercompany

2    note.  Is that correct?

3    A    By an intercompany loan agreement, correct.

4    Q    That intercompany loan agreement, is that a secured or

5    an unsecured obligation?

6    A    For the bridge financing, that is secured.

7    Q    And is that obligation secured by assets at the Ohio

8    properties?

9    A    Certain personal -- yes, personal property at the Ohio

10   facility are included in that.

11   Q    So I understand that the personal property at the time

12   of the SPV loan was unencumbered.  Is that correct?

13   A    That is correct.

14   Q    And it became encumbered by virtue of the intercompany

15   note that we're talking about, correct?

16   A    That's correct.

17   Q    And I asked this earlier.  But could you give me a

18   little more color on what actually happens at these Ohio

19   properties?

20   A    Sure.  So our Ohio properties serve as end-to-end drug

21   product fill and finish, aseptic fill and finish.  So I'll

22   try not to divulge too much information.

23        We get a company's active pharmaceutical ingredient,

24   API, and then we fill and finish it into different forms.  An

25   example would be into syringe form, a vial form or, you know,

1  other forms.

2      That product is ultimately assembled and packaged, and

3  then ready to be shipped directly to the consumer.  That's

4  why we consider it end to end because we include the

5  packaging and assembly.

6  Q    During our deposition together, you mentioned -- you

7  used the phrase "blockbuster drug."  Do you remember that?

8  A    I do.

9  Q    What does that mean?

10  A    It means we have a customer at the Cincinnati facility

11  for which we do fill-and-finish work on a -- on a popular

12  drug.

13  Q    Can I ask you to turn to Tab 10 in your binder?

14  Actually I apologize.  Tab 9.

15  A    Tab 9?

16  Q    And you recognize this as a unanimous written consent

17  for the board of directors of National Resilience, dated May

18  9th, correct?

19  A    Yes.

20  Q    And there's a reference here to the :intercompany loan."

21  Do you see that?

22  A    I do.

23  Q    And is that the intercompany loan between Resilience

24  2025 SPV and, at this time, I believe it's Resilience US and

25  National Resilience, Inc.?  Is that correct?

1    A    Yeah.  It's Resilience US, Inc. and National Resilience,

2    Inc., yes.

3    Q    Thank you.

4         And if you turn to Tab 25 in your binder -- I apologize

5    for making you jump around, but this was the joint exhibit.

6    A    Sure.

7    Q    Do you see that National -- let's get to 25.

8    A    I'm here.

9    Q    Okay.  This is the National Resilience, Inc., Resilience

10   US, Inc. secured promissory note dated May 12.  Do you see

11   that?

12   A    I do.

13   Q    And is this the intercompany note that reflects the loan

14   from Resilience US, LLC to Resilience -- National Resilience,

15   Inc. and Resilience US, Inc.?

16   A    Yes, I believe it is.

17   Q    There's also -- for Resilience 2025, LLC, there's also a

18   subscription agreement, correct?  With respect to the Series

19   A preferred shares?

20   A    Yes, I believe there is.

21   Q    Okay.  And if you'd turn to Tab 10 in your binder -- can

22   you do that for me?

23   A    Tab 10?

24   Q    Yes, sir.

25   A    Okay.

1    Q    Is this the -- you have board minutes May 9, 2025.  Do

2    you see that?

3    A    I do.

4    Q    And you see three down -- it's four paragraphs down,

5    it's disclosed or made known to the board that the Arch and

6    8VC and BDT will be making -- will be purchasing the Series A

7    preferred.  Is that correct?

8    A    Yes, I see that reference.

9    Q    And again, I apologize for making you jump around, but I

10   just want to set the table for these documents.

11       If you'd turn to Tab 26 in your binder.

12   A    Yep.

13   Q    Is this the Series A preferred unit subscription

14   agreement that they were party to for the SPV?

15   A    Yes, I believe it is.

16   Q    Okay.  This financing closed on or about May 12th.  Is

17   that correct?

18   A    On or around that date.

19       (Pause in proceedings)

20   Q    Can you please turn to Tab 11 in your binder, sir?

21   A    Yes.

22   Q    And this is an email from Mr. Solomon to certain

23   individuals whose name I won't mention, but it says that:

24            "We have closed 175 million to date and expect the

25            next closing will be in the first half of June."

1          Do you see that?

2    A    I do.

3    Q    And has that closing happened yet?

4    A    So we've had some subsequent closings to the initial 135

5    million, yes.

6    Q    And what was that subsequent closing to the one thirty-

7    five?

8    A    There's been a series of -- of fundings.  Again, as of

9    today we're at 242 million in cash received.

10   Q    And is Arch and addition -- did Arch provide any of

11   those additional funds?

12   A    Yes, they did.

13   Q    How much?

14   A    Twenty-five million.

15   Q    Did 8VC provide any of those additional funds?

16   A    No, they have not.

17        (Pause in proceedings)

18   Q    And as -- do you remember your deposition?  I think it

19   was July 24, correct?

20   A    Last Tuesday.  So if that was July 24th, yes.

21   Q    Or July 22nd.  I apologize.

22   A    Okay.

23   Q    Okay.  Had that additional funding closed as of July

24   22nd?

25   A    We closed 75 million on July 23rd, so two forty-two less

1    the 75 million had closed.

2    Q    And 75 million closed on July 23rd.

3         And when did the balance of the two forty-two close?

4    A    Again, between the initial funding and the -- and when

5    that last 75 million came in.

6    Q    So between May 12th and that last seventy-five on July

7    23rd.

8    A    Yes.  Call it -- call it between May 12th and July 23rd,

9    yes.

10   Q    Can I ask you to turn to Tab 12 in your binder?

11   A    Yes.

12   Q    And his is an email exchange between Mr. Marth and Mr.

13   Nelsen.  Do you see that at the top?

14   A    I do.

15   Q    And then, below, Mr. Nelsen emails someone who I won't

16   name.  But that person is a shareholder, correct?

17   A    He's affiliated with an entity that is a shareholder,

18   yes.

19   Q    Thank you.

20        Mr. Solomon and Mr. Marth, copied on that email.  And

21   Mr. Nelsen tells them:

22             "After we clean up some of the money-losing assets

23             at Resilience, we should make 200 million in EBITDA

24             in 2028."

25        Do you see that?

1    A     I do.

2    Q     The company, if it does not reject the leases in this

3    bankruptcy, is not going to make 200 million in EBITDA in

4    2028.  Isn't that correct?

5    A     Well, assuming we still -- the company -- the nondebtor

6    affiliates still retain obligations under that, under the

7    leases, no, they would not make 200 million in EBITDA.

8    Q     And at the top Mr. Marth tells Mr. Nelsen:

9              "We get through this part and we can combine with"

10             -- names I won't mention -- "and synergize, and

11             that's a nice profitable franchise.

12         Do you see that?

13   A     I do.

14   Q     Is that possible if you don't reject the leases in the

15   Chapter 11 cases today?

16             MS. MARKS:  Objection.  I object to the use of

17   "you" and "company"?  Do you want to clarify which entities

18   are rejecting?

19             THE COURT:  Sustained.

20             MR. TECCE:  Fair enough.  Okay.   Is -- let me ask

21   the question.

22   BY MR. TECCE:

23   Q     Mr. Marth says:

24             "We get through this part and we can combine with"

25             -- X and X -- "to synergize, and it's a nice

1          profitable franchise."

2      Do you see that?

3  A    I do.

4  Q    And if Bedmar, LLC does not reject the Chapter 11 cases,

5  is that profitable franchise at risk?

6  A    Yes.  I'd separate the two.  Combining with X and Y is

7  one issue.  The, you know, profitable franchise would

8  certainly be at risk, yes.

9  Q    Let's take a look at -- let's take a look at Tab 13 in

10  your binder.

11      Do you see this is an email exchange, at the top,

12  between Mr. Nelsen and Mr. Oetting?

13  A    Yes.

14  Q    And Mr. Oetting says that he, in the second portion

15  down, just got asked by so-and-so if he could get the 8VC

16  writeup.  Do you see that?

17          THE COURT:  Can I interrupt you a second?

18          MR. TECCE:  Yeah.

19          THE COURT:  You realize you're referring to names

20  that are on screen; they're public?

21          MS. MARKS:  We would ask for the -- like these

22  don't need to be displayed on the screen, so if we -- if

23  everyone has a binder to use --

24          MR. TECCE:  That's fine --

25          MS. MARKS:  -- that would --

1          MR. TECCE:  If everyone -- that's fine.

2          THE COURT:  Okay.

3          MS. MARKS:  We -- yeah.

4          THE COURT:  I just want to make sure --

5          MR. TECCE:  No, we're fine.

6          THE COURT:  -- that --

7          MR. TECCE:  Okay.  I want to be --

8          MS. MARKS:  And just --

9          MR. TECCE:  -- sensitive to what they're doing.  I

10   hadn't thought about that, yeah.

11          MS. MARKS:  And just --

12          THE COURT:  And I hadn't either --

13          MR. TECCE:  Okay.

14          THE COURT:  -- until you just --

15          MR. TECCE:  Okay.

16          MS. MARKS:  And just --

17          THE COURT:  -- said it and --

18          MS. MARKS:  Just so it's clear, it's largely the

19   customer names, potential acquirers, so that's -- the

20   particular sensitivity would be --

21          MR. TECCE:  Okay.

22          MS. MARKS:  -- about that testimony, including

23   around Ohio.

24          MR. TECCE:  I just want to make my points without -

25   -

1          THE COURT:  Understood.

2          MR. TECCE:  You know?

3          THE COURT:  I just wanted --

4          MR. TECCE:  I appreciate you raising that issue,

5    Your Honor.  Thank you.

6          THE COURT:  And I apologize for --

7          MR. TECCE:  As long as everybody has the document

8    in front of them, we don't need to see it on the TV.

9          THE COURT:  I apologize for --

10         MR. TECCE:  Okay.  That's fine.

11         THE COURT:  -- the interruption.

12         MR. TECCE:  Thank you.  No, that's fine.

13   BY MR. TECCE:

14   Q    Okay.  So we were looking at this email.  And I was

15   asking you, it says, "Cool." That's the message at the top.

16    Do you see that?

17   A    I do.

18   Q    Okay. And then there's an interim email saying:

19              "Just got asked by" -- so and so "if he could get

20              the 8VC writeup on the rationale for the reorg."

21         Do you see that?

22   A    I do.

23   Q    And in the second para -- it says, "This is what I've

24   written."  And this is Mr. Oetting, correct?  He's --

25   A    Correct.

1   Q    And he's a member of the Board of Directors of National

2   Resilience HoldCo, Inc., correct?

3   A    Correct.

4   Q    And he's affiliated with 8VC?

5   A    Correct.

6   Q    And he says, in the second paragraph:

7            "After significant investigation with our legal and

8            financial advisors, it was determined the best

9            course of action was a divisive merger.  In plain

10           English, this means separating out the assets we

11           want to keep from the ones we don't.  Doing so

12           insulates the slimmed=down Resilience from claims

13           relating to selling or shuttering non-core

14           facilities."

15  Do you see that?

16  A    I do.

17  Q    And s it fair to say that Resilience shares the same

18  view that's reflected in this 8VC writeup?

19  A    What in particular?

20  Q    That in -- that one of the objectives of the reorg was

21  to insulate the slimmed-down Resilience from claims related

22  to selling or shuttering non-core facilities.

23  A    So one of our objectives with -- with the reorg was to

24  exit our underperforming leases through the corporate

25  transactions and Chapter 11 process, yes.

1   Q   And this email is dated May 21, correct?

2   A   I have Bob Nelsen's reply.

3   Q   Right.

4   A   I don't actually have the date of the original -- I'm

5   sorry.  Yes.  Right below "cool," it's May 21st.

6   Q   Okay.  And that's after the closing on the bridge

7   facility, correct?  Of May 12th?

8   A   The initial closing.

9   Q   I'd like to ask you about this document if I could, the

10  slide chart we talked -- we looked at.

11  A   The one we looked at earlier?  Yes.

12          MR. TECCE:  This we will have to pull up on the

13  screen because we don't have -- can we pull that one up,

14  actually?  Yeah, she's got it.  Thank you very much.  Okay.

15  BY MR. TECCE:

16  Q   So the first page -- this shows bridge financing, right?

17  A   Yeah, the creation of the Resilience SPV and then the

18  bridge financing.

19  Q   Okay.  And it says, actually, common units between SPV

20  and National Resilience, Inc.  But isn't that an intercompany

21  loan?

22  A   This -- what this is trying to signify is it was both

23  preferred-- preferred units that were sold in exchange for

24  cash, but when initially created, the common units were held

25  by National Resilience, Inc.

1    Q    And this snapshot in time, this is before the corporate

2    transactions turned these companies into LLCs and they

3    divided.  Is that correct?

4    A    That's correct.

5    Q    And at the time National Resilience, Inc. was a

6    guarantor of the leases, correct?

7    A    Of certain leases.

8    Q    Of certain leases, right?

9         And it was also the issuer of the convertible notes,

10   correct?

11   A    Yes, it was.

12   Q    And underneath, you have Resilience US, Inc.  Do you see

13   that?

14   A    I do.

15   Q    And that was a tenant under various leases, correct?

16   A    Yes.

17   Q    Okay.  It was also -- it also held, though, the Ohio

18   property, correct?

19   A    It was the acquirer of the Ohio property, yes.

20   Q    What do you mean it was the "acquirer"?  I'm not talking

21   --

22   A    We owned --

23   Q    Go ahead.

24   A    I'm just trying to clarify.  We owned Resilience US,

25   Inc. at this time, owned the facility in West Chester, Ohio,

1   and leased the facility in Blue Ash, Ohio.

2   Q    But to the extent that there was unencumbered property

3   at Ohio, that property would have been available to satisfy

4   the claims of the creditors of Resilience US, Inc. at the

5   time, correct?

6                MS. MARKS:  Objection.  Calls for speculation.

7                MR. TECCE:  Well, let me ask the question this way.

8   BY MR. TECCE:

9   Q    You mentioned the Department of Defense loan, correct?

10  A    Yes.

11  Q    Okay.  And Resilience US, Inc. was obligated on that

12  loan at this time, correct?

13  A    They were a co-borrower, yes.

14  Q    Co-borrower.

15       But they had not pledged personal property in favor of

16  the Department of Defense loan, correct?

17  A    Not personal property, no.

18  Q    So, to the extent that a creditor had a claim against

19  Resilience US, Inc., it would not have to compete with the

20  Department of Defense loan -- well, it was not -- let me

21  rephrase the question.

22       To the extent that a creditor had a claim against

23  Resilience US, Inc., it and the Department of Defense had

24  equal access to that unencumbered personal property.  Is that

25  correct?

1       MS. MARKS:  Objection.  Hypothetical situation and

2  calls for speculation.

3       MR. TECCE:  It's not hypothetical, Your Honor.

4  This company existed, it had collateral at the time, and it

5  had loans against it.  I'm asking about what happened, how

6  they interacted, the various creditors, what the

7  relationships were --

8       THE COURT:  I'm going to overrule the objection.

9       MR. TECCE:  I forgot my question.

10      THE WITNESS:  I remember it if you want me to

11  answer.

12      MR. TECCE:  Go ahead, yeah.  Thank you.

13      (Laughter)

14      THE WITNESS:  They -- I wouldn't say the Department

15  of Defense loan and other creditors were on -- had an equal

16  claim.  The Department of Defense loan was secured, they

17  ultimately kind of sat at the top, so I think they would get

18  priority.  But -- but yes, the -- otherwise, the personal

19  property would be available.

20  BY MR. TECCE:

21  Q    When you say they "sat at the top," what do you mean by

22  that?

23  A    They are a secured lender.

24  Q    But not with respect to the personal property --

25  A    No.

1    Q    -- at Ohio.

2    A    No.

3    Q    Okay.  So National Resilience, Inc. on this chart is the

4    issuer of the convertible notes and the guarantors of the

5    lease at this time, correct?

6    A    Of certain leases, yes.

7    Q    Certain leases.

8         And Resilience US, Inc. is obligated under certain

9    leases, correct?  At this time.

10   A    Is the tenant and obligor under certain leases, yes.

11   Q    But at the time, it's personal property of Ohio was

12   unencumbered, correct?

13   A    Before the issuance of the Series A preferred shares --

14   Q    I'm --

15   A    by the SPV in the loan?

16   Q    Yes.

17   A    Then yes.

18   Q    Okay.  You anticipated my next question.  Thank you.

19        So what happened when they issued the intercompany note

20   to the personal property at Ohio?

21   A    This personal property now became secured under that

22   intercompany loan.

23   Q    So the intercompany note had a senior right to that

24   personal property over the lease claims at this time,

25   correct?

1    A    Yes, the notes were collateralized against that personal

2    property.

3    Q    All right.  Now if I can ask you to go to your last --

4    the last slide.

5    A    Oh, yes.

6    Q    Is it fair to say this is the state of play after the

7    corporate transactions?

8    A    The only thing we're missing is the Resilience SPV, but

9    otherwise, yes.

10   Q    Okay.  Let's start with the Resilience SPV.

11   A    Sorry, let me clarify.  There are also some other

12   affiliates of National Resilience, LLC not on here.

13   Q    Where on this chart is Ohio?  Where would it be?  Where

14   would the personal property -- or the -- to whom on this

15   chart was the personal property at Ohio allocated in the

16   transactions?

17   A    Resilience US, LLC.

18   Q    So it's bottom, right there?

19   A    Correct.

20   Q    Okay.  And the secured promissory note relating to the

21   intercompany loan has a claim against that company, correct?

22   A    Against that personal property, yes.

23   Q    Against the personal property, right?

24   A    Yes.

25   Q    That's correct.

1    The -- there re are no longer any lease obligations at

2    that entity, correct?

3    A    That is not correct.

4    Q    And the convertible notes, do they have a claim against

5    that company?

6    A    No.  The convertible notes still reside at National

7    Resilience HoldCo, Inc.

8    Q    Okay.  Let's go up there.

9         So National Resilience HoldCo, Inc. on your chart.

10   There are no guarantee claims relating to leases at National

11   Resilience HoldCo, Inc., correct?

12   A    Correct.

13   Q    The convertible notes have a claim against that company,

14   correct?

15   A    Yes, they do.

16   Q    And SPV has a claim against that company, correct?

17   A    The SPV loaned to --

18   Q    Sorry, let me -- you're -- I asked the wrong question.

19        The intercompany note.  Does the intercompany note have

20   a claim against that company?

21   A    National Resilience HoldCo, Inc.?

22   Q    Yes.

23   A    No, I don't believe so.

24   Q    It has a claim against National Resilience, LLC,

25   correct?

1    A     Yes.

2    Q     Okay.  There are no lease claims at National Resilience,

3    LLC, correct?

4    A     No.

5    Q     The lease claims are on the bottom, left against Bedmar,

6    LLC, correct?  Of the seven leases in --

7    A     I believe to the ones you're referring to, yes.

8    Q     All right.  And there's no access to any property in

9    Ohio by Bedmar, LLC, correct?

10   A     Not that I am aware of.

11   Q     All right.  So when the guarantees -- strike that.

12         Prior to the transactions, going back to the first page,

13   the seven leases were creditors of Resilience US, Inc.,

14   correct?

15   A     Can you list the seven for me, please?

16   Q     Yeah.  So let's take Allston, for example, right?

17   A     Uh-huh.

18   Q     Allston was a creditor of Resilience US, Inc., correct?

19   A     Yes.

20   Q     And prior to the SPV transaction, the personal property

21   of Resilience US, Inc. was not encumbered, correct?

22   A     Prior to the issuance of the SPV preferred shares,

23   that's correct.

24   Q     Okay.  And at National Resilience, Inc., there were

25   guarantee obligations at that entity, correct?

1    A    There were some parent guarantees, yes.

2    Q    And the convertible notes were at that entity, correct?

3    A    Yes.

4    Q    Okay.  So, going back to the end -- all right.  The

5    convertible notes, which are obligations of National

6    Resilience HoldCo, Inc., there is no guarantee obligation

7    that competes with them at that entity, correct?

8    A    Not to my knowledge.

9    Q    No.

10        And with respect to the SPV loan at Resilience US, LLC,

11   there's no lease obligation that competes with the loan at

12   that entity, correct?

13   A    At which entity?

14   Q    At Resilience US, LLC.

15   A    Can you rephrase the question, please --

16   Q    Sure.

17   A    -- or ask it again?

18   Q    Sure.

19        Bedmar, LLC, the leases -- the seven leases have been

20   allocated to Bedmar, LLC, correct?

21   A    Correct.

22   Q    And so they don't have a claim against Resilience US,

23   LLC, correct?

24   A    Correct.

25   Q    And they can't look to the personal property of Ohio

1    anymore, can they?

2    A    No, they cannot.

3    Q    And that's where the blockbuster drug is being made,

4    correct?

5    A    That's where we are doing work for a customer there,

6    yes.

7    Q    And that's where a potential for $800 million in EBITDA

8    is, correct?

9    A    If we are able to secure a significant capital

10   investment, that plant has the ability to do 800 million

11   plus.

12   Q    Thank you.

13       (Pause in proceedings)

14            MR. TECCE:  Your Honor, can I take a five-minute

15   recess?  Because I'd like to go through my outline and see

16   what I can --

17            THE COURT:  Yes.

18            MR. TECCE:  Is that okay?

19            THE COURT:  Yes.  We'll take a five-minute recess.

20   We'll reconvene at 12:36.

21            MR. TECCE:  Thank you very much.

22            THE COURT:  Can -- before you leave the room, can

23   you remind me what time you need to break for the Judge

24   Silverstein matter?  Is that 3:30?

25            UNIDENTIFIED:  3:35 would be the time, Your Honor.

1          THE COURT:  Okay.  All right.

2          MR. TECCE:  Thank you very much.

3          THE COURT:  Thank you.  We'll be in recess for five

4    minutes.

5          (Recess taken at 12:31 p.m.)

6          (Proceedings resume at 12:44 p.m.)

7          (Witness resumes stand)

8          MR. TECCE:  Thank you, Your Honor I apologize for

9    that.  I promise I wasn't eating lunch.  I was actually

10   trying to cut my presentation down.

11   BY MR. TECCE:

12   Q    Okay.  Can I ask you, sir, to please turn to Tab 15 in

13   your binder.

14   A    Yep.

15   Q    Okay.  And this is entitled:

16          "Project Osiris, Toronto, West Chester Key Messages

17          and Rollout Plan."

18        Do you see that?

19   A    I do.

20   Q    Okay.  And Ms. Toub -- describe -- are you familiar with

21   Ms. Toub?

22   A    I am.

23   Q    What does she do; who does she work with?

24   A    She works for Kekst.

25   Q    And what is Kekst?

1    A    They are a PR and comms company.

2    Q    Was Kekst working with Resilience at the time?

3    A    They were.

4    Q    And what were they doing?

5    A    Helping us to develop, you know, communication plans,

6    both internally and externally.

7    Q    And in Ms. Toub's -- you see Mr. Marth's email at the

8    top, and there's an email immediately below that.  And Ms.

9    Toub says thank you for the feedback.  Do you see that

10   paragraph?

11   A    "Thanks, Susan, for the feedback"?

12   Q    Yes.  Thank you very much.

13   A    Yes.  Yeah.

14   Q    Okay.  And Ms. Toub says:

15           "We strongly believe that Chapter 11 needs to be

16           addressed up front in the press release and our

17           announcement messaging to stakeholders" --

18        Do you see that sentence?

19   A    I do.

20   Q    And did you understand that to mean the Bedmar, LLC

21   Chapter 11?

22   A    I did.

23   Q    And it says:

24           "-- with our color context around the filing

25           rationale, all in furtherance of new Resilience."

1          Do you see that?

2     A    I do.

3     Q    And it says:

4               "Regardless of what we do or don't say, once the

5               filing happens, the headline Resilience affiliates

6               file for Chapter 11 will be out there, and we need

7               to be the ones explaining that the Chapter 11 is a

8               key step in the company's optimization strategy,

9               and we should lean into, versus shy away from it."

10         Do you see that?

11    A    I do.

12    Q    And what did you understand that to mean?

13    A    Whether or not it should be explicitly mentioned in any

14    -- in any press release.

15    Q    And do you see Mr. Marth's email says:

16              "This is an important departure from LO" -- "LW,

17              who have specific reasons for their view."

18         Do you see that?

19    A    I do.

20    Q    And can you tell me what your understanding of that is?

21              MS. MARKS:  I'm just going to object here.  I would

22    ask the witness not to reveal any privileged communications

23    regarding legal strategy and advice from Latham & Watkins.

24              MR. TECCE:  Let me rephrase the question.

25    BY MR. TECCE:

1    Q    Without divulging any privileged conversations, can you

2    tell me what your understanding of what Mr. Marth is saying

3    there is?

4    A    My understanding is there may have been a different

5    viewpoint that needed to be vetted.

6    Q    Different viewpoint from what?

7    A    In terms of language and/or topics to be discussed or --

8    in the potential press release.

9    Q    Without revealing attorney/client communication, can you

10   tell me what the substance of that difference was?

11          MS. MARKS:  I don't believe the -- I don't believe

12   the witness would be able to do that, Your Honor, without

13   breaking privilege.

14          MR. TECCE:  I'll move on, Your Honor.

15          THE COURT:  Okay.

16          MR. TECCE:  It's all right.

17   BY MR. TECCE:

18   Q    Can we turn to Tab 17 in your binder?

19   A    Yes.

20   Q    And this is a series of emails -- again, you're copied

21   on these -- involving Ms. Toub.  Do you see them?

22   A    I do.

23   Q    And it says:

24          "A-3 is the attachment Project Osiris supplemental

25          Q&A, draft 4/25, 10 p.m."

1      Do you see that?  In the attachment section of the

2  email.  Let me make this --

3  A    4 -- I think it's "draft 6/4/25, 10 p.m."

4  Q    Yes.

5  A    Yes.

6  Q    I'm sorry.

7  A    Yep.

8  Q    I misspoke.

9  A    No, that's fine.

10  Q    Okay.  Do you see that?

11  A    I do.

12  Q    And f you turn to Tab 18 in your binder, do you see it

13  says:

14           "A3 Project Osiris supplemental Q&A, privileged and

15           confidential, draft 6/4/25, 10 p.m."

16      Do you see that?

17  A    Yes.

18  Q    Okay.  Was that attached -- was that attached to this

19  email, sir?  Do you understand if that was --

20  A    I believe this was the attachment that was attached to

21  that email, yes.

22  Q    And in this, Ms. Toub is asking mister -- first of all,

23  who is Mr. Solomon?

24  A    That is our Chief Legal and Administrative Officer.

25  Q    And Ms. Toub says, "Hi," in her email of 7:54 p.m.:

1           "Attached for review, particularly by Latham and

2           Osiris, the supplemental Q&A."

3      Do you see that?

4  A    I do.

5  Q    And it says, "Look forward to your feedback."  Do you

6  see that at the end of that -- at the end of that email, sir?

7      (Pause in proceedings)

8  A    Sorry.  I'm just looking for that --

9  Q    Take your time.

10 A    -- specific -- yeah.

11 Q    If you could just read her email before --

12 A    This is the last page of the email you're referring to?

13 Q    No, no, no.  The 7:54 p.m. email.

14 A    Okay.  Sorry, hang on.

15     (Pause in proceedings)

16 A    Yep, I have it now.

17 Q    Okay.

18 A    Thank you.

19 Q    And it says "look forward to your feedback" there at the

20 end.  Do you see that?

21 A    I do.

22 Q    And then Mr. Solomon emails Ms. Toub and says, "See

23 attached."  Do you see that?

24 A    I do.

25 Q    Okay.  And so if we go to Tab 18.  Okay.  And you'll see

1   this document has comment bubbles on the righthand side.  Do

2   you see that?

3   A     I do.

4   Q     And they say "OS," indicates that that's the author of

5   the comment bubble.  Do you see that?

6   A     I do.

7   Q     And do you have any reason to think that's not Mr.

8   Solomon's comments?

9   A     I do not.

10  Q     Okay.  In Paragraph 4 -- okay.

11  A     Sorry.  Question 4 --

12  Q     Question 4.

13  A     -- or paragraph --

14  Q     Thank you very much.

15        Question 4, it says, I read that -- this is -- by the

16  way, what was your understanding of what this document is,

17  supplemental Q&A?

18  A     So my understanding is this is potential questions that

19  a stakeholder or affiliate may ask, and then trying to work

20  on potential answers to those questions.  These -- I do not

21  believe these were actual questions asked.  It was, you know,

22  preparation for potential questions.

23  Q     Who would have received the supplemental Q&A at

24  Resilience?

25  A     Those copied on the email.

1   Q    Okay.  And was this intended for their use or Resilience

2   officers -- let me ask the question this way.

3        It says:

4              "For internal use by management only, not for

5              further distribution."

6        Do you see that?

7   A    Yes.

8   Q    Okay.  And what do you understand that to mean?

9   A    A select number of individuals involved in this process

10  within the Resilience management, not to be distributed

11  externally.

12  Q    And this document would be designed for them to use to

13  field questions, hypothetical questions, to the extent that

14  they fall within these categories.  Is that correct?

15  A    Yes.  These would serve as the basis to -- to answering

16  hypothetical questions.

17  Q    Do you see, in Question Number 4, it says, I read --

18  this is a hypothetical question, correct?  That you may --

19  that someone from management may receive, correct?

20  A    Correct.

21  Q    And it says, one is:

22              "If I read that Resilience couldn't obtain go

23              forward financing until it's nonoperational,

24              underutilized facilities were wound down because

25              they were depleting the company's resources, does

1              that mean that Resilience's ability to obtain the

2              financing it needs is tied to the success of the

3              Chapter 11 case?"

4        Do you see that?

5   A    I do.

6   Q    And what do you understand that to mean?

7   A    Meaning, again, a hypothetical question trying to

8   clarify would Resilience be able to obtain long-term

9   financing if a Chapter 11 process did not materialize.

10  Q    And Mr. Solomon's comment, he says:

11             "This is a complete non-answer.  I'm fine with that

12             if there isn't a way to really answer that.  I know

13             that we are sensitive to saying that financing is

14             conditioned on a confirmation order, but that seems

15             to be where this is headed."

16       Do you see that?

17  A    I do.

18  Q    What do you understand that to mean?

19  A    I understood that to mean he was not satisfied with the

20  answer that was given initially.

21  Q    The answer that's drafted underneath Paragraph 4,

22  correct?

23  A    Correct.

24       (Pause in proceedings)

25  Q    In paragraph -- in Question Number 22 -- do you see

1    that?

2    A    I do.

3    Q    Okay.  This is a hypothetical question, correct?

4    A    Correct.

5    Q    It says:

6              "I understand/see that Resilience filed paperwork

7              last week to move its lease liabilities into a new

8              legal entity before filing that entity for Chapter

9              11.  Isn't this what J&J and other companies have

10             done to ring-fence and shed liabilities without

11             having to file the whole company?  How is this a

12             proper use of the Bankruptcy Court?"

13        Do you see that?

14   A    I do.

15   Q    And Mr. Solomon's comment is:

16             "I would add here that all creditors and bank

17             entity are getting 100 percent."

18        Do you see that?

19   A    I do.

20   Q    What do you understand that to mean?

21   A    Meaning that the landlords would receive 100 percent of

22   their lease cap rejection claims.

23   Q    All right.  In Paragraph 26, a hypothetical question:

24             "Isn't this just a maneuver to allow Resilience's

25             investors to preserve their equity at the expense

1              of a creditor group landlords?"

2         Do you see that?

3    A    I do.

4    Q    Has anybody asked that question to you or anyone in

5    management, to your understanding?

6    A    Not -- not this question, no.

7    Q    Has anybody asked a similar question to that?

8    A    Not that I can recall to me, no.

9         (Pause in proceedings)

10   Q    Can I ask you to turn to Tab 22 in your binder?

11   A    Yes.

12   Q    And do you recognize this document, sir?

13   A    I do.

14   Q    What is it?

15   A    This was an all-employee email that our CEO sent on

16   Monday, June 9.

17   Q    And Monday, June 9th is also the day that Bedmar, LLC

18   filed for bankruptcy, correct?

19   A    Correct.

20   Q    And what was the purpose of -- what is your

21   understanding as to the purpose of why this email was sent?

22   A    I think, both the filing of Bedmar, as well as some

23   other cost-cutting measures, including some significant RIFs

24   at some of our -- reductions in force at some of our

25   facilities also happened that day.  So, you know, having the

1    CEO put out an employee-wide email kind of explaining what

2    was going on was really the purpose here.

3    Q    And to your point about the reduction in force, sir, I

4    believe you're referring to the second paragraph below

5    "Resilience's go-forward CDMO strategy," correct?

6    A    (No verbal response)

7    Q    As you say, in some instances -- or the document --

8    pardon me -- says:

9              "In some instances, that has meant tough, but

10             necessary action to move toward fewer sites and

11             adjust our workforce at several locations."

12        Correct?

13   A    Correct.

14   Q    And that's what you're referring to when you said

15   "reduction in force issue," correct?

16   A    These two sites specifically, and then we had reductions

17   elsewhere in the organization, as well.

18   Q    In the paragraph below that, Mr. Marth tells all

19   employees:

20             "As an important next step, facilities not being

21             fully utilized -- Bedford, Allston, Marlborough,

22             San Diego, Fremont, and Alachua -- will need to be

23             wound down promptly.  The most efficient way to do

24             this is through Chapter 11 legal proceedings

25             commenced today by the entity that holds the leases

1      for these sites."

2      Do you see that?

3  A    I do.

4  Q    Was there a concern at the time that the employees might

5  negatively react to the filing of that entity for bankruptcy?

6  A    I don't know that there was a concern that they would

7  negatively react, more so than just wanted to be transparent

8  and communicative with all employees.

9  Q    And in the next paragraph, Mr. Marth says:

10         "Importantly, Resilience itself and our go forward

11         operations are not part of the legal proceedings

12         and our manufacturing will continue to be anchored

13         by Cincinnati.  Our Toronto operations will also

14         continue to be a vital part of Resilience."

15     Do you see that?

16  A    I do.

17  Q    Was it your understanding that the employee -- well,

18  strike that.

19     To your mind, was it important to let the employees know

20  that the other Resilience entities would not file for

21  bankruptcy when Bedmar, LLC filed for bankruptcy?

22  A    I think it was important to be transparent with other

23  employees around what our -- what -- what we had planned to

24  do with all of our sites, yes.

25  Q    If you go to the next page of this document, it says

1  "financial support from existing shareholders."  Do you see

2  that?

3  A    I do.

4  Q    And here, it says:

5       "You should know that our shareholders believe in

6       the work we are doing and that our transformation

7       has their backing.  A consortium of our existing

8       investors have provided 250 million in bridge

9       financing to support this process.  By streamlining

10      our footprint now, we will be a more strongly

11      positioned CDMO as we pursue additional debt

12      financing to fuel our long-term growth plans."

13     Do you see that?

14  A    I do.

15  Q    Why was it important to signal to employees that you had

16  the support of existing shareholders of the company?

17  A    Again, I -- I think, in order to ensure employees and

18  others that there was some still liquidity available and that

19  was being provided by our shareholders.

20  Q    Okay.  Apologies for making you jump around, but can you

21  go back to Tab 13 in your binder?

22  A    13?

23  Q    Yes, sir.

24     This is the Robert Nelsen to Drew Oetting email dated

25  May 21, 2025?

1    A    Yes.

2    Q    Okay.  And this is with the Resilience restructuring

3    summary from 8VC.  Do you see that?

4    A    I do.

5    Q    Okay.  And 8VC is a shareholder, correct?

6    A    Yes, they are.

7    Q    And they're an investor that provided bridge financing,

8    correct?

9    A    Yes.

10   Q    Okay.  If you'd turn to Page 1502, the next page.  At

11   the bottom it says -- and this is what -- this part of the

12   8VC writeup for the rationale for the reorg.  It says:

13                "In summary, this initiative maintains all of

14                drivers of Resilience's intrinsic value, while

15                significantly reducing the amount of cash being

16                used/spent elsewhere.  It speeds up our time to

17                break even dramatically, giving us far more control

18                over our destiny and also cheaper cost of capital."

19        Do you see that?

20   A    I do.

21   Q    Do you have an understanding as to whether or not the

22   investors who provided the bridge loan think that, by

23   advancing that loan it will speed up their time to break even

24   in the Resilience enterprise with their equity value?

25                MS. MARKS:  Objection.  Objection, Your Honor.

1    Calls for speculation, lack of foundation.

2              MR. TECCE:  Its foundation is 8VC is a shareholder,

3    and that's the statement that it makes in its writeup in the

4    document, Your Honor.

5              MS. MARKS:  Your Honor, he is not a recipient or

6    author of this document, and he cannot speak to what Arch and

7    8VC would think.  There has not been a proper foundation laid

8    that he could testify to that.

9              THE COURT:  I'm going to sustain the objection.

10             MR. TECCE:  Okay.  Let's move on.

11   BY MR. TECCE:

12   Q    Can I ask you to turn to -- well, let me ask you this

13   question.

14        Earlier today, you testified about what kind of -- well,

15   I don't want to mischaracterize your testimony, so I just

16   want to make sure I understood what you were saying.

17        I think that you said that you needed to get an

18   additional 1.5 to $2 billion for there to be a recovery to

19   equity.  Do you -- did I remember that correctly?

20   A    I do.  I remember that.

21   Q    Can you just explain what you meant by that?

22   A    Sure.  So taking it step by step, the current terms of

23   our existing debt, the two-hundred-and-forty-six-million-

24   dollar loan with the DOD, 112 million of convertible notes

25   that pay out at 2X plus PIK'ed interest of 8 percent, and

1    then 242 million of the bridge financing preferred shares

2    that pay out at 3.5 percent -- sorry, 3.5X plus PIK'ed

3    interest.

4    Q    Okay.  Actually, so let me break that down a little bit.

5         So two forty-six for the DOD loan, that's dollar-for-

6    dollar, correct?  Two hundred and forty-six million, correct?

7    A    Plus any unpaid and accrued interest, but by and large,

8    yes.

9    Q    Okay.  And then when you say 112 million that pays out

10   at "2X," does that mean that in your -- when you get to your

11   two or 1.5 billion number, you're actually counting that as

12   $224 million?

13   A    One twelve at 2X, yes, plus a PIK'ed -- plus interest.

14   Q    Okay.  So two forty-six for the DOD, and two twenty-

15   four, 2X plus whatever the PIK is on top of that?

16   A    Yes.

17   Q    Okay.  And then you have 242 million on bridge financing

18   that you say pays out at 3.5X.  Is that is correct?

19   A    Three and a half X, yes.

20   Q    And of the two forty-two, certainly one forty -- is the

21   one forty-five included in that, the bridge financing?

22   A    What one forty-five are you referring to?

23   Q    The one forty-five that is -- was extended through

24   Resilience SPV 2025, LLC?

25   A    The two hundred and forty-two was the full amount extend

1   -- to date, extended through the Resilience --

2   Q    Through that.

3   A    -- that's -- yes.

4   Q    Okay.  And that's at 3.5X?  So that's --

5   A    3.5X.

6   Q    You have to do the math for me, sir.  I know you're -- I

7   know you're a financial person, so ...

8   A    Between 1.5 and 2 billion.

9   Q    Okay.  Thank you very much.

10  A    Again, you add it, all tolled, the reason for the range

11  is we're closer to 1.5 today.  If we sell additional

12  preferred units in the SPV up to three hundred or 325

13  million, you'd get closer to the 2 billion.

14  Q    And if -- either the convertible notes or the preferred

15  units, if they're recharacterized as equity, does that leave

16  only $246 million of debt at the Resilience entities?

17  A    Hypothetically, if they were recharacterized as equity,

18  we have 246 million in debt today, plus there's about 25

19  million in debt at our international subsidiary.

20  Q    Can I ask you to turn to Tab 23 in your binder, sir?  Do

21  you recognize this email?

22  A    I do.

23  Q    And this is an email from William Marth to a certain

24  person.  Is that correct?

25  A    That is correct.

1    Q    And here he says:

2              "I used the legal tool to rid Resilience of the

3              toxic sites.  Now I'm down to a profitable core

4              that will only grow from here, to me, the best path

5              to return value to shareholders absent a favorable

6              bid from" -- blank.

7         Correct?

8    A    Yes.

9    Q    Was the lease cap restructuring done to provide a return

10   value to shareholders?

11   A    The lease cap rejection was done in order to ensure land

12   -- the land -- to -- ultimately, the other alternative was a

13   full Chapter 11 process.  So we ultimately made this

14   decision, once we secured the bridge financing, for what we

15   believe is an optimal outcome for all, with the landlords

16   receiving 100 percent of their lease cap claims and the

17   nondebtor affiliates having a potential to raise long-term

18   financing that it still needs.

19   Q    One of the objectives is, at least according to Mr.

20   Marth, to return value to shareholders.  Isn't that correct?

21              MS. MARKS:  Objection.  Calls for speculation.  And

22   now we know Mr. Marth is going to be here, so I don't think

23   this is --

24              MR. TECCE:  I'll withdraw the question, Your Honor.

25   That's fine.

1      THE COURT:  Okay.

2  BY MR. TECCE:

3  Q    Is there a -- you mentioned the $64 million as the

4  portion of the one forty-five that's dedicated to financing

5  the Chapter 11.  Is that correct?

6  A    Yes.

7  Q    Okay.  Is there an obligation by anyone to extend more

8  money than that?

9  A    More than the sixty-five?

10  Q    Yes.

11  A    I do not believe there is an obligation by anyone to

12  extend more than that, no.

13  Q    And there -- is there -- there's no indemnification

14  agreement between -- in favor of Bedmar, LLC that the

15  Resilience entities have extended.  Is that correct?

16  A    I am not aware of one.

17  Q    And from your perspective, there are no requirements

18  that you're aware of to provide any additional money to

19  Bedmar, LLC, other than the $64 million that's been

20  allocated.  Is that correct?

21  A    I would say that's accurate, yes.

22  Q    Okay.  Thank you for your time, sir, I appreciate it.

23  Thank you very much.

24  A    Thank you.

25      (Participants confer)

1    MR. FOX:  Good afternoon, Your Honor.  May it

2    please the Court, Tim Fox on behalf of the United States

3    Trustee.

4    I conferred with Mr. Silverman and believe that I'm

5    going to go next.  I only have a few questions.  Mr.

6    Silverman has represented that he believes Mr. Tecce has

7    covered much of the ground he will cover.  So, hopefully, it

8    will be a few minutes from me and then maybe completely done

9    on the movants' side with respect to Mr. Montone's testimony.

10    THE COURT:  Okay.

11    CROSS-EXAMINATION

12    BY MR. FOX

13    Q    Good afternoon, Mr. Montone.

14    A    Good afternoon.

15    Q    With respect to the corporate transactions that are

16    central to the creation of Bedmar, LLC, can you describe the

17    individuals at National Resilience group, the collective

18    entities we've referred to, that were involved in the

19    decision-making process with respect to the formation of

20    Bedmar, LLC?

21    A    Yes, that would have been primarily Bill Marth, Ori

22    Solomon, and myself, from the management team.

23    Q    And in addition to the management team that you just

24    referred to in your response, were there any other parties

25    that were involved in formulating the corporate transactions?

1    A    We -- we did hire and -- and rely on advice from certain

2    advisors.

3    Q    And would those "certain advisors" be Latham & Watkins,

4    Portage Point Partners, and PricewaterhouseCoopers?

5    A    The first two, yes; the third one was not necessarily

6    involved in the formation of Bedmar.

7    Q    Okay.  And other than Latham & Watkins and Portage Point

8    Partners, was there any other advisor that you were referring

9    to in your previous answer?

10    A    No.

11    Q    And when thinking about the management team, did anyone

12    at the management team have any consultation or discussions

13    with the landlords that are the landlords allocated to

14    Bedmar, LLC prior to the filing of this Chapter 11 case?

15    A    I believe there were discussions with either landlords

16    or affiliates of landlords prior to the -- to the filing.

17    Q    And could you provide a little bit more specificity as

18    to the timing of those discussions?

19    A    It -- it varied.  I don't know the exact dates.  I

20    wasn't involved in -- in most of those communications.

21    Q    With respect to the corporate transactions, are you

22    aware if the independent manager was empowered to bargain on

23    behalf of the Debtor Bedmar, LLC before the effectuation of

24    those corporate transactions?

25    A    I don't believe so, before the effectuation of the

1   corporate transactions, no.

2   Q    And again, in terms of the time line, the corporate

3   transactions were effective as of June the 3rd, 2025?

4   A    I believe so, yes.

5   Q    And Mr. Montone, was the management team that you

6   referred to earlier responsible for the allocations that were

7   provided under the corporate transactions to the various

8   LLCs?

9   A    Can you define what you mean by "responsible for"?

10  Q    Would they be the authorized corporate representatives

11  empowered to provide assets and liabilities to those

12  entities?

13  A    Yes, we relied on calculations by our advisors to

14  ultimately allocate the assets and liabilities, yes.

15  Q    And as part of those calculations, that would refer to

16  the lease cap amounts that you referred to in your testimony

17  multiple times today?

18  A    Yes.

19  Q    Obviously, the focus of this hearing is Bedmar, LLC, who

20  is the Chapter 11 debtor.  But in addition to Bedmar, LLC,

21  there were also four other LLCs on that organizational chart

22  that we've looked at a similar level in  he corporate chart?

23  A    Yes, Resilience US, LLC was divided to five total LLCs

24  in step two of the process.

25  Q    Okay.  And one of those others is AGS HoldCo, LLC,

1    correct?

2    A     Yes.

3    Q     And are you aware of the status of AGS HoldCo, LLC, as

4    it relates to its operating subsidiary?

5    A     I'm aware of the status, yes.

6    Q     And is AGS HoldCo, LLC's operating subsidiary now a

7    Chapter 11 debtor, as well?

8    A     Yes, it is.

9    Q     With respect to the other LLCs, again, you mentioned

10   Resilience US, LLC.  There's also ENM, LLC, correct?

11   A     (No verbal response)

12   Q     And what was ENM, LLC allocated as part of the corporate

13   transactions?

14   A     ENM was allocated the lease for our East Norriton,

15   Pennsylvania facility, as well certain customer contracts.

16   Q     And would it be the management team's view that there is

17   potential value at that entity?

18   A     We are pursuing a separate strategy for that site, which

19   includes a potential sale and/or partnering.  There --

20   hypothetically, there could be value in the future.  However,

21   we do plan on either selling or partnering for that site.

22   Q     But it would be correct to say that it wasn't holding

23   leases that the management team viewed as a burden on go

24   forward operations.

25   A     No.  I'd say it was.  So we -- our ultimate plan would

1    be to exit that facility and no longer have the costs

2    associated with that facility hitting our P&L.  When we refer

3    to the 200 million in EBITDA for 2028, that site is not

4    included in that.

5    Q    But presumably, there wasn't a calculation done for a

6    lease cap amount and inclusion of that in a Chapter 11 filing

7    to deal with that location.  Is that fair to say?

8    A    That's correct.

9    Q    And then with respect to RTP Operating, LLC, could you

10   discuss the allocation of assets and liabilities to that

11   entity under the corporate transactions?

12   A    Yes, we allocated the Research Triangle Park lease --

13   again, both an asset and a liability -- as well certain

14   customer contracts to RTP Operating.

15   Q    And that entity isn't currently the subject of a Chapter

16   11 bankruptcy filing, correct?

17   A    It is not.

18   Q    And could you speak generally to the management team's

19   intent with respect to that entity on a go forward basis?

20   A    Yeah, we are in pretty deep negotiations to sell that

21   site.

22        MR. FOX:  That's all I have, Your Honor.  Thank

23   you.

24        THE COURT:  Thank you, Mr. Fox.

25        MR. SILVERMAN:  May I have one minute?

1     (Participants confer)

2          MR. SILVERMAN:  No questions, Your Honor.

3          THE COURT:  Okay.  Thank you.

4          Any further cross?

5     (No verbal response)

6          THE COURT:  Okay.  Redirect?

7     (Pause in proceedings)

8          MS. MARKS:  Just a little bit of redirect.

9                    REDIRECT EXAMINATION

10    BY MS. MARKS:

11    Q    Mr. Montone, I'm going to cover a few topics covered

12    with you on cross-exam.  And let's talk first about the 2024

13    convertible notes.

14         Do you remember that you were asked about the security

15    interests on those?

16    A    I do.

17    Q    Resilience US and National Resilience granted a security

18    interest to the lenders in exchange for cash, right?  In

19    other words, when the 2024 convertible notes were issued, who

20    granted a security interest?

21         MR. TECCE:  Objection, Your Honor.  I don't think

22    that's consistent with his testimony.

23         THE COURT:  I'm sorry.  I cannot hear you.

24         MR. TECCE:  It's not consistent with his testimony.

25    I think his testimony was that the notes were unsecured, the

1    2024 notes.

2              THE WITNESS:  Yes.

3              MS. MARKS:  I'm sorry.  Sorry, Your Honor.  Okay.

4              MR. TECCE:  I apologize.  Thank you.

5    BY MS. MARKS:

6    Q    So bridge financing -- my fault.

7    A    Thank you.

8    Q    Okay.  So moving forward.

9         So, in 2025, when the bridge financing was issued, there

10   was a security interest granted by National Resilience US and

11   Resilience US in exchange for cash, correct?

12   A    Correct.  National Resilience -- Resilience, LLC and

13   Resilience US, LLC, yes.

14   Q    And the assets were encumbered to the extent that a loan

15   was made?

16   A    Yes.

17   Q    The initial 135 million loan to Resilience US and

18   National Resilience US, who owes -- who has the obligation to

19   pay back that amount?

20   A    National Resilience US, LLC and Resilience US, LLC.

21   Q    And 42 million of that was allocated to the debtor?

22   A    42 million was -- of those funds, were allocated to the

23   debtor, yes.

24   Q    Does the debtor have to pay back 42 million to the SPV?

25   A    No, it does not.

1    Q    Do Resilience US and National Resilience US still owe

2    the obligation on the entire 135 million loan?

3    A    Yes, they do.

4    Q    Even though 42 million now sits with the debtor to be

5    distributed to the landlords for capped damages?

6    A    Correct.

7    Q    Do you remember you were shown an exhibit that was a

8    communication, I believe, from Mr. Marth to the employees at

9    the company?

10   A    Yes.

11   Q    I just wanted to ask you a little bit more about the

12   company because we didn't really talk about employees.

13        How many employees are employed by -- at the Resilience

14   enterprise?

15   A    Today, there are probably north of a thousand employees.

16   Q    And if the company were to run out of liquidity and

17   would have to liquidate, what would happen to many of those

18   jobs?

19   A    Most of those job would be eliminated.

20        MS. MARKS:  If we could pull up J-1?  This is the

21   map that we've looked at a few times.  And we -- I -- if we

22   could get permission -- yeah, we can share this one.  Okay.

23   BY MS. MARKS:

24   Q    I wanted to ask you some more questions about the

25   Cincinnati, Ohio and -- Cincinnati site and Ohio because

1   there were questions about that, and this 800 million revenue

2   potential figure.  Do you see that on the map?

3   A     Yes.

4   Q     Is this site -- has this site been profitable?

5   A     This site had its first month of profitability in May of

6   2025.

7   Q     Okay.  And before that?

8   A     It was not profitable.

9   Q     Okay.  In order to reach the profitability figure here,

10  800 million plus in revenue per year, what has to happen at

11  the site?

12  A     We need to secure long-term financing, spend north of

13  $350 million in CapEx, and also attract and retain a customer

14  base.

15  Q     Okay.  So how much in CapEx?

16  A     North of 350 million.

17  Q     So is 300 million or 300 million plus in CapEx required

18  to be spent in order to reach this revenue projection?

19  A     Yes.

20  Q     And in order to get 300 million to spend on CapEx, what

21  does the company have to do?

22  A     Ultimately, we need to reduce our current operating burn

23  and spend, particularly around the underperforming and

24  underutilized sites, in order to meet our projections, our

25  long-term projections of the aforementioned Resilience 2.0

1    network.

2    Q    Based on the company's experience in trying to raise

3    long-term fund raising to date, will long-term fund raising

4    be available to spend 300 million at this site to bring it to

5    profitability if the leases at issue in this case are not

6    exited?

7    A    Absolutely not.

8    Q    And what will happen in that scenario?

9    A    The likelihood is that, absent any other sale or

10   ultimately getting out of these sites, we would likely have

11   to pursue the other option that we were considering back in

12   March, would be a full company Chapter 11.

13   Q    Do any of the sites on this map have meaningful value

14   without long-term financing?

15   A    None of them.

16       We also require additional financing for CapEx

17   investment in Toronto as well.

18   Q    I also wanted to ask you briefly about -- there were

19   some questions about the 65 million from the bridge financing

20   that was allocated for this case.  Do you recall those

21   questions?

22   A    I do.

23   Q    And 42 million of that is for capped damages claims?

24   A    Yes.

25   Q    And do you recall that you were asked what the rest of

1   that money was for, if it was all for this Chapter 11 case?

2   A    Yes.

3   Q    Are some of those funds in the 65 million to be used to

4   exit the facilities, pay insurance, clean them up?

5   A    Yes.

6   Q    Okay.  So, in other words, if you tried to break down

7   that 65 million, could you break it down into what the

8   amounts are for within the 65 million?

9   A    Yes.  I don't recall the exact amounts, but again,

10  ultimately, 42 million for lease cap claims, and then there

11  were other monies allocated to site exit costs; a contingency

12  potential damages and other things associated; facilities

13  costs, you know, including removal of hazardous waste

14  material, and that was all included in the exit costs;

15  potential severance for impacted employees; and some

16  professional fees.

17  Q    Would the investors who provided the bridge financing

18  have been willing to lend those funds if there was not a

19  security interest in National Resilience and Resilience US?

20  A    I do not believe they would have.

21  Q    If we could just look at Tab 18 in the binder that you

22  were given by the landlords.  Do you have that in front of

23  you?

24  A    I do.

25  Q    If you could open it up and -- do you recall you were

1   asked about Question 4?

2   A    Yes.

3   Q    And you were asked about the comment to that?

4   A    Yes.

5   Q    And the answer to Comment 4 says:

6            "As we pursue additional financing to fuel our

7            longer term growth plans, it is important that we

8            work to remove the overhang of significant lease

9            obligations for facilities that are underutilized

10           and not part of the go forward Resilience."

11       And then there was a comment about that where --

12   A    Yes.

13   Q    -- Mr. Solomon says "this a complete non-answer."  He

14   says:

15           "I know that we are sensitive to saying that

16           financing is conditioned on a confirmation order,

17           but that seems to be where this is headed."

18       Do you recall that?

19   A    I do.

20   Q    So in your understanding, if there's not a confirmation

21   order here that approves the rejection of these leases, what

22   is going to happen to any potential for long-term financing?

23   A    Like the --

24           MR. TECCE:  Objection.  Objection.  I think he

25   testified on direct that he could not answer questions

168

1    related to that.

2              MS. MARKS:  No.  On direct, I objected to questions

3    about what the shareholders thought.  This is a different

4    question.  And he was asked directly about Question 4 and Mr.

5    Solomon's comments, so I'm now redirecting on it.

6              THE COURT:  I'm going to overrule the objection.

7              THE WITNESS:  Can you please repeat the question?

8    BY MS. MARKS:

9    Q    Sure.  So -- I'm not sure if I remember the question.

10        Is it your understanding that, if a confirmation order

11   is not entered in this case that approves the rejection of

12   these leases, that long-term financing will not be possible

13   to obtain?

14   A    Yes.

15             MS. MARKS:  Okay.  No further questions.

16             THE COURT:  Okay.  Okay.  Thank you very much, sir.

17   You're excused.

18             THE WITNESS:  Thank you.

19        (Witness excused)

20             THE COURT:  Why don't we take a lunch break now?

21   Who is the next witness?

22             MS. MARKS:  The next witness is good to be one of

23   the debtor's witnesses.  It's Rene Weidmer [sic].

24             MR. STEARN:  Ms. Weidman.

25             MS. MARKS:  Weidman.

1          THE COURT:  Weidman?

2       (Participants confer)

3          THE COURT:  Okay.  Why don't we take an hour break,

4    and we'll reconvene at 2:30.  Okay?  Thank you.

5          COUNSEL:  Thank you, Your Honor.  Thank you, Your

6    Honor.

7          THE COURT:  We're in recess.

8       (Luncheon Recess taken at 1:28 p.m.)

9                      AFTERNOON SESSION

10       (Proceedings resume at 2:32 p.m.)

11          THE COURT:  Please be seated.

12          Mr. Stearn.

13          MR. STEARN:  Good afternoon, Your Honor.  May it

14    please the Court, Bob Stearn from Richards, Layton & Finger

15    on behalf of the debtor.

16          We'd like to proceed with our witnesses, if we may,

17    and the debtor calls Ms. Rene Weidman.

18          THE COURT:  Okay.  Let me remind you to implement

19    the broadcast policy.

20          MR. STEARN:  Let me get something out of the way.

21    We have a small binder.  Why don't I go ahead and distribute

22    that?

23          THE COURT:  Okay.

24          MR. STEARN:  And then we'll doing the swearing in.

25       (Participants confer)

1          THE COURT:  Thank you, Ms. Steele.

2          THE ECRO:  Will you please raise your right hand?

3       RENE WEIDMAN, WITNESS FOR THE DEBTOR, AFFIRMED

4          THE ECRO:  Can you please state your full name and

5    spell your last name for the record?

6          THE WITNESS:  It's Rene Weidman, last name is W-e-

7    i-d-m-a-n.

8          THE ECRO:  Thank you.  Have a seat.

9                         DIRECT EXAMINATION

10   BY MR. STEARN:

11   Q    Good afternoon, Ms. Weidman.

12   A    Good afternoon.

13   Q    Ma'am, by whom are you employed?

14   A    Douglas Wilson Companies.

15   Q    If I refer to Douglas Wilson Companies as "DWC," will

16   you know what I'm talking about?

17   A    Yes, I will.

18   Q    Generally, what does DWC do?

19   A    We are -- we provide financial advisory, real estate

20   consulting, and accounting services.

21   Q    And what is your position at DWC?

22   A    I'm the financial controller.

23   Q    What -- and how long have you been the financial

24   controller at DWC?

25   A    Just over three years.

1    Q    And what are your responsibilities as the financial

2    controller of DWC?

3    A    I oversee all of DWC's accounting, and then I also

4    oversee the accounting on projects.

5    Q    And what kind of work do you do on projects?

6    A    On projects, I may prepare cash flow analysis, budgets,

7    financial statements, analyze financial statements, forensic

8    accounting, and things of that nature.

9    Q    Okay.  Let's pause for a second and go a little

10   backwards in time.

11        Do you have a degree, Ms. Weidman?

12   A    Yes, I do.

13   Q    And what is your degree in?

14   A    I have a business processing management, operations

15   management degree from the Kelley School of Business at

16   Indiana University.

17   Q    And when did you obtain that degree?

18   A    2004.

19   Q    Do you have any licenses or certifications?

20   A    Yes, I do.

21   Q    And what are those?

22   A    I have an active CPA license in the State of California,

23   and I'm certified in financial forensics.

24   Q    Is that by any particular institution?

25   A    Yes, the AICPA.

1   Q    Which, for those of us who aren't cool, that means what?

2   A    It's the American Institute of Certified Public

3   Accountants.

4   Q    Okay.  Ms. Weidman, when did D-W -- or excuse me -- when

5   was DWC contacted about this case?

6   A    Late May 2025.

7   Q    And when was DWC formally engaged?

8   A    June 5th, 2025.

9   Q    Did DWC start to do work on this matter before it was

10  formally engaged?

11  A    Yes, we did.

12  Q    And can you generally describe the type of work that DWC

13  has done in this case?

14  A    Yes.  We have reviewed the DIP budget, lease

15  obligations, lease abstracts, the schedules and statements,

16  monthly operating reports.

17  Q    Do you -- I'm sorry.  Were you done?

18  A    Oh, I -- that's what comes to mind right now.

19  Q    Okay.  Well, do you assist with the debtor's operations

20  at all, like bank accounts, books and records, things like

21  that?

22  A    Yes, we do.

23  Q    Okay.  And what type of financial analyses has DWC

24  performed?  You mentioned this a little bit, I just want to

25  make sure we hit them all.

1    A    Yes, we have reviewed the DIP budget.  We reviewed the

2    lease cap analysis and the shared services agreement and

3    schedules.

4    Q    And did you review the calculations in connection with

5    the shared services agreement, as well?

6    A    Yes, we did.

7    Q    Okay.  Ms. Weidman, I'm going to use a term that has

8    taken on some significance in this case.  It's the term

9    "corporate transactions."

10   A    Okay.

11   Q    And by "corporate transactions," I mean a series of

12   transactions, including divisions and allocations of assets

13   pursuant to the -- assets and liabilities pursuant to the

14   Delaware LLC Act, pursuant to which Bedmar, LLC came to hold

15   the leases at issue in this case.  Okay?

16        And my question to you is:  Did DWC play any role in the

17   corporation transactions?

18   A    No, we did not.

19   Q    So let's chat, if we can, about DWC's analysis of lease

20   liabilities.

21        MR. STEARN:  Your Honor, for our first exhibit,

22   which is J-9, behind Tab A, this is a native document, it's

23   in in an Excel spreadsheet.  And when you try to print it,

24   it's a disaster.  So I'm going to ask that it be put up on

25   the screen.

1          For the record, it is J-9, and has a -- even though

2     it is a multi-page spreadsheet, the slip sheet produced with

3     it bears the Bates Label BEDMAR-0006355.

4     BY MR. STEARN:

5     Q    So, Ms. Weidman, I've put that document on the screen,

6     again, because it's hard to review as a printout.  You may

7     recall -- and in fact, it is reflected on the first page of

8     this -- that this was marked as Exhibit 2 at your deposition.

9     Do you --

10    A    Correct.

11    Q    Do you recognize this document?

12    A    Yes, I do.

13    Q    And what is it?

14    A    This is a lease cap analysis schedule.

15    Q    Okay.  Now did DWC prepare this spreadsheet?

16    A    No, we did not.

17    Q    From whom did DWC receive the spreadsheet that is

18    Exhibit J-9?

19    A    We received it from Portage Point Partners.

20    Q    And did you review the document when it was received?

21    A    Yes, we have.

22    Q    For what purpose did you review the document that's been

23    marked as J-9?

24    A    We reviewed it for the accuracy of the lease cap claim

25    analysis.

1   Q    Were you seeking to verify the calculations reflected

2   therein?

3   A    Yes.

4   Q    Okay.  And now how did you go about reviewing the lease

5   liabilities to see if you agreed with the calculations

6   reflected therein?

7   A    We were provided leases and lease abstracts, so I

8   reviewed the lease abstracts and confirmed the -- the

9   location, the lease start dates, the term of the lease, as

10  well as the monthly rents, the escalation rents, and

11  confirmed that the life of the lease then followed through to

12  the schedule, and it goes on for many columns.

13            MR. STEARN:  Okay.  So let's -- if we could, I

14  would ask some assistance from the technology operator.  Can

15  you click on the short summary tab, please, at the bottom?

16  BY MR. STEARN:

17  Q    So now, Ms. Weidman, you'll see that this page on the

18  top, left is called "Summary of Estimated Damages Claims."

19       Can you -- what is your understanding of what the

20  "Summary of Estimated Damages Claims" page reflects?

21  A    This schedule reflects two important numbers; one of

22  them is the gross rent with the triple net for the length of

23  the leases, which is reflected in Column G.

24  Q    Can we pause on Column G for a second?  If you were

25  about to move on -- if you have anything else to say about

1    Column G, please do.

2    A    Go ahead.

3    Q    Okay.  And is there a -- so we see that number.  What

4    does 372 million and change represent on that page?

5    A    This would be the life of the lease, what the balance

6    would be owed on the leases.

7    Q    On the seven leases reflected on the lefthand side?

8    A    Correct.

9    Q    If that's seven.  Yes, seven.

10   A    Seven.

11            MR. STEARN:  So if we can click ...

12   Q    Is there sort of a tab that kind of builds up or shows

13   some of the detail behind this 372 million number?

14   A    Yes.  The cap claim calc.

15   Q    Okay.

16   A    That expands on what's included in that 372 million.

17   Q    So explain that for me and for the Court, if you would.

18   I do see 372 million referenced in Column Q.  Can you explain

19   what we see leading up to Column Q, please?

20   A    Yeah.  So Column H is just the base rent for the length

21   of the lease.  And then Columns I, K, M, N, O are additional

22   triple net operating real estate taxes and management fees,

23   in addition to the rent.

24   Q    And all of that leads us up to Column Q?

25   A    The 372 million, correct.

1    Q    Okay.  Great.

2              MR. STEARN:  If we could return to the short

3    summary tab, please, Mr. Operator.

4    BY MR. STEARN:

5    Q    And you said there were essentially two types of

6    calculations reflected on this page.  What is the other type?

7              MR. STEARN:  And maybe we could zoom out a bit,

8    because I'm losing a little bit on the right side.  Thank

9    you.

10              THE WITNESS:  Yes.  The other side of the

11    calculations are the estimated claim amount.

12    BY MR. STEARN:

13    Q    And can you walk us through that quickly?

14    A    Yeah.  So Column L is -- is the lease cap claim amount.

15    And then M, Column M is including the Columns I through K.

16    And then Column N is the interest for three months.  And then

17    Column O is the total damage estimate plus the interest.

18    Q    Now that Column O, does that reflect any offsets; for

19    example, the value of the Allston building?

20    A    No, it does not.

21    Q    Okay.  So did you reach any conclusions about the

22    calculations reflected in Joint Exhibit 9?

23    A    Yes, that the calculations were materially accurate.

24    Q    Was there anything you disagreed with in the

25    calculations?

1    A    There was one lease where the rent escalation predated

2    what it should have been, so it made an immaterial difference

3    of about $150,000 over the length of the lease in favor of

4    the landlords.

5    Q    Okay.  Thank you.

6         MR. STEARN:  So, at this time, Your Honor, I would

7    like to move in -- well, let me ask you another question --

8    well, I'll do it this way.

9         I'd like to move into evidence Joint Exhibit 9.

10        THE COURT:  Any objection?

11        MR. TECCE:  No objection.

12        MR. STEARN:  I would hope not with a joint exhibit.

13        THE COURT:  Just checking.

14        MR. STEARN:  Okay.

15        THE COURT:  But I don't have a copy of it.

16        MR. STEARN:  We're going to have to figure out a

17   way to get the Court a copy of the Excel version because it

18   is challenging to work with.  We -- I mean, we'll work this

19   out with your staff.  But the easiest way is just to email it

20   to somebody --

21        THE COURT:  Okay.

22        MR. STEARN:  -- because it's easier to see that

23   way.

24        THE COURT:  Okay.

25        MR. STEARN:  If that's okay.  And obviously, we'll

1    include opposing counsel on the email, so everybody can be

2    happy that it's the right document.

3              THE COURT:  Okay.

4         (Exhibit J-9 received in evidence)

5    BY MR. STEARN:

6    Q    Now you did refer to some lease abstracts as documents

7    that you reviewed in connection with your analysis of the

8    calculations reflected in Joint Exhibit 9.  Do you recall

9    that testimony?

10   A    Yes.

11   Q    Would you flip through Tabs B through H of your binder

12   and let me know if these are the lease abstracts that you

13   were referring to that you reviewed in connection with your

14   analysis of Exhibit J-9?

15   A    Yes, they are.

16             MR. STEARN:  So, Your Honor, I'll identify each of

17   them for the record.

18             They are exhibits -- we have an exhibit list that's

19   called Debtors/Bedmar Member, Inc. exhibit list, and these

20   are Exhibits 112 through 118 on that list.  Just for the

21   purposes of the record, I'll identify the Bates Number on the

22   first page of each one so we have it clear in the record.

23             So for 112, it's BEDMAR-4930.

24             For 113 -- at least I hope the number are lining up

25   -- it's BEDMAR-4939.

1          For 114, it's BEDMAR-4954.

2          For 115 -- and somebody tell me if I get my numbers

3     wrong -- for 115, it's BEDMAR-4963.

4          For 116, it's BEDMAR-4976.

5          For 117, it's BEDMAR-4984.

6          And for 118, it's BEDMAR-4994.

7          And I would like to move those into evidence, Your

8     Honor.

9          THE COURT:  Any objection?

10         MR. TECCE:  No objection.

11         THE COURT:  Okay.  They're admitted.

12       (Exhibits D/BMI-112 through D/BMI-118 received in

13    evidence)

14         MR. STEARN:  Thank you, Your Honor.

15    BY MR. STEARN:

16    Q    Ms. Weidman, I'd like to turn next to the debtor's

17    schedule of assets and liabilities.  This is Joint Exhibit 45

18    and it is behind the final tab, Tab I, in your binder.  Do

19    you recognize this document?

20    A    Yes, I do.

21    Q    Is this the debtor's schedule of assets and liabilities?

22    A    Yes, it is.

23         MR. STEARN:  Your Honor, I would move Joint Exhibit

24    45 into evidence.

25         THE COURT:  Any objection?

1          MR. TECCE:  No objection.

2          THE COURT:  It is admitted.

3          MR. STEARN:  Thank you.

4     (Exhibit J-45 received in evidence)

5     BY MR. STEARN:

6     Q    Ms. Weidman, does the debtor's schedule of assets and

7     liabilities reflect the debtor's assets and liabilities as of

8     a particular date?

9     A    Yes, as of the date of filing.

10    Q    As of the petition date?

11    A    Petition date, correct.

12    Q    And did you play any role in connection with the

13    preparation of schedules of assets and liabilities that is

14    reflected at Joint Exhibit 45?

15    A    Yes, I did.

16    Q    What role did you play?

17    A    I provided the -- or completed the Excel spreadsheets

18    with the financial information, and then provided the Excel

19    spreadsheets to Epiq to populate into the schedules here.

20    Q    Thank you.

21         So just because it's the easiest way to identify pages,

22    I'm going to use what we call the "ECF pagination" at the

23    very top of the page.  You'll see it there in the header.  It

24    starts 1 of 25.  I'm going to be using that to refer to page

25    numbers.  Okay?

1   A    Okay.

2   Q    So would you turn, please, to Page 8 of 25 of Joint

3   Exhibit 45?  And I'm going to ask you a few questions about

4   this page.

5       Part 1 near the top of the page, it says "summary of

6   assets."  And I'll ask you, what were the debtor's assets as

7   of the petition date, or how much were the debtor's assets as

8   of the petition date?

9   A    They were $41,451,730.81.

10  Q    And what did the debtor's assets consist of on the

11  petition date?

12  A    It was cash in the bank and a receivable.

13  Q    And let's look further down that page, if we could, in

14  Part 2, summary of liabilities.  You'll see a number down

15  there at the bottom of the page.  I won't make you read

16  it; I'll read it, $32,962,077.45.  What does that reflect?

17  A    Those are the capped claim amounts.

18  Q    And does that include June rent?

19  A    No.

20  Q    Does it include interest?

21  A    No.

22  Q    So let's turn to Pages 17 to 19, if we could, just

23  quickly.  But keep your finger on the page we're looking at.

24  And tell me when you're there.

25  A    I'm ready.

1    Q    Okay.  Are Pages 17 to 19, where we see specific

2    creditors and amounts of claims, is that the buildup to the

3    32.9 million number we see on Page 8?

4    A    Yes, it is.

5    Q    Because the numbers on Page 19 and 8, in fact, match,

6    don't they?

7    A    Yes, they do.

8    Q    So it's either a crazy coincidence or this is where you

9    got it, right?

10   A    (No verbal response)

11   Q    Let's turn to Page 9, if we could.  What -- there's only

12   one number on this page that I can see, it's about three-

13   quarters of the way down on the righthand side.  What is

14   reflected -- what -- that figure on Page 9, what is that?

15   A    This was cash that was held in the bank account as of

16   June 9th --

17   Q    And --

18   A    -- 2025.

19   Q    -- who has oversight of that account?

20   A    Douglas Wilson Companies.

21   Q    And let's turn to Page 14, if we could, again, using

22   those numbers at the top of the page.  I'm in Part 11.  And

23   you'll see, again, about three-quarters of the way down the

24   page, on the righthand side, there's a number 36.7 million

25   and change.  What is referenced there?

1    A    That is the receivable.

2    Q    The receivable that's owed to the debtor?

3    A    Correct.

4    Q    Okay.  And that receivable, at least according to the

5    schedules and statements, is from Resilience SPV 2025, LLC?

6    A    Yes, that's correct.

7    Q    Let's look at Pages 14 and 15 for just one more second;

8    I want to focus on Part 12.  It starts at the bottom of the

9    page.  And I think this supports some information you

10   provided earlier.

11        So we've got the thirty-six-million-dollar receivable

12   that we just talked about.  And then what's the number at the

13   bottom of the page there on Page 14, the 4.7 million?

14   A    That's the cash that was in the bank account.

15   Q    And then the figure on the next page, kind of in the

16   middle of the page, is that the aggregation of the debtor's

17   receivable and cash in the bank to come to total assets of

18   forty-one and a half million dollars?

19   A    Yes, that's correct.

20   Q    Okay.  I really only have, I believe, one more line of

21   questioning for you, Ms. Weidman.

22        Are you familiar with the term, quote, "financial

23   distress," as it applies in a bankruptcy case?

24   A    No.

25   Q    Have you ever been asked to opine in a bankruptcy case

1    whether a company was in financial distress?

2    A    No.

3    Q    Do you know what "financial distress" means in the

4    context of a bankruptcy case?

5    A    No.

6    Q    So when Cobalt's counsel asked you in your deposition

7    last week whether the debtor was in financial distress and

8    you said you didn't know, did you know what counsel meant by

9    "financial distress"?

10   A    No, I did not.

11         MR. STEARN:  No further questions.  Thank you, Ms.

12   Weidman.

13       (Pause in proceedings)

14         MR. APPLEBAUM:  Good afternoon, Your Honor.  Aaron

15   Applebaum from DLA Piper.  We also have a binder, mostly of

16   the same exhibits, but I think there is one different one.

17         THE COURT:  Okay.

18         MR. APPLEBAUM:  So my colleague is going to pass

19   those out.

20         THE COURT:  Thank you.

21         THE WITNESS:  Thank you.

22       (Participants confer)

23                      CROSS-EXAMINATION

24   BY MR. APPLEBAUM:

25   Q    Good afternoon, Ms. Weidman.

1    A    Good afternoon.

2    Q    You testified on direct examination that you did some

3    work for this debtor prior to DWC formally being engaged.  Is

4    that right?

5    A    That's correct.

6    Q    If you could turn in your binder to what has been marked

7    as Tab 2, which should be the retention application that was

8    filed by the debtor in this case.  Do you see that?

9    A    Yes.

10   Q    And then if we could go to -- and we'll use the same

11   pagination that Mr. Stearn was just using.  If we could go to

12   Page 4 of 14, and go to Paragraph 11.  It says that, in

13   anticipation of being --its engagement, DWC, and I quote:

14              "-- performed certain analyses, reviewed the terms

15              of the relevant documents, and engaged in

16              discussions with debtor's proposed counsel and

17              independent manager in connection with the

18              corporate transactions."

19        Do you see that?

20   A    I'm sorry.  What page was it?

21   Q    Page 4 of 14, Paragraph 11.  It's the first sentence.

22   A    I was on Page 11 of 14.  That's why I couldn't find it.

23   Q    No worries.

24   A    Okay.  I am there now.

25   Q    Do you see the paragraph that I just read?

1    A    Yes, I do.

2    Q    And it's really the first sentence.  And that ends with

3    "Corporate Transactions," and that's capital C, capital T.

4    Is that right?

5    A    Yes.

6    Q    And those are the same -- that's referencing the same

7    corporate transactions that Mr. Stearn just described so

8    eloquently regarding the divisions and the mergers and the

9    allocations of assets and liabilities that happened just

10   before the petition date.  Is that right?

11   A    Yes.

12   Q    And so, while the application said that DWC performed

13   certain analyses regarding the corporate transactions, what

14   DWC really did was review the DIP budget and the shared

15   services agreement and things relating to what would happen

16   during the Chapter 11 case.  Is that right?

17        MR. STEARN:  I would object to the form of the

18   question because the description of what the retention

19   application says about the corporate transactions doesn't

20   match the words in the actual application.

21        MR. APPLEBAUM:  I'm just asking what she actually -

22   - what DWC actually did.

23        THE COURT:  Why don't you reword the question?

24   BY MR. APPLEBAUM:

25   Q    Okay.  It's correct, Ms. Weidman, is it not, that what

1    DWC really did, prior to the petition date, was to review the

2    DIP budget, the shared services agreement, and maybe this --

3    the lease cap calculations?

4    A    We did review those items.

5    Q    You didn't review documents relating to the divisions

6    and the allocation of assets and liabilities that transpired

7    as part of those divisions.  Is that right?

8    A    Prior to the filing?

9    Q    That's correct.

10   A    No.

11   Q    Did you ever receive a balance sheet of Bedmar, LLC,

12   reflecting its financial condition immediately upon its

13   formation?

14   A    No.

15   Q    Did you receive a balance sheet of Bedmar, LLC

16   reflecting its financial condition immediately following the

17   merger of Bedmar HoldCo, LLC into Bedmar, LLC?

18   A    Not immediately following.

19   Q    DWC never performed any kind of a financial analysis

20   regarding the divisions and mergers that constitute the

21   corporate transactions, as was defined by Mr. Stearn.  Is

22   that right?

23   A    No.

24   Q    And you're not aware of DWC having performed any kind of

25   financial analysis of the effect of the merger of Bedmar

1    HoldCo into Bedmar, LLC.  Is that right?

2    A    No.

3    Q    No, it's not right; or, no, you didn't do it?

4    A    No, we did not do a financial analysis.

5    Q    And when testified at your deposition you were not aware

6    that Bedmar HoldCo was the result of a division under the

7    Delaware LLC statute.  Is that right?

8         MR. STEARN:  I'm sorry, Your Honor.  If he has a

9    question to ask her, that's fine.  But I mean, reference to

10   the prior deposition would be for impeachment purposes.  If

11   he wants to ask a question, that's fine.

12        THE COURT:  Can you rephrase?

13        MR. APPLEBAUM:  I can rephrase the question, Your

14   Honor.

15        THE COURT:  Thank you.

16   Q    You're not aware that Bedmar HoldCo is the result of a

17   division under the Delaware LLC statute.  Is that right?

18   A    That Bedmar HoldCo?

19   Q    Bedmar HoldCo.

20   A    No.

21   Q    And you're not familiar with the terms of the merger of

22   Bedmar HoldCo into Bedmar, LLC.  Is that right?

23   A    That's correct.

24   Q    And you're not aware of what the assets or liabilities

25   of Bedmar HoldCo are or were?

1   A     No, I'm not.

2   Q     DWC, which is the financial advisor to the debtor in

3   this case, has never analyzed whether Bedmar, LLC received

4   reasonably equivalent value in exchange for liabilities that

5   were allocated to it as part of the corporate transactions.

6   Is that right?

7           MR. STEARN:  I would object to the form of that

8   question.  "Reasonably equivalent value" is a legal term that

9   embodies a number of issues, so I don't think it's

10  appropriate to ask this witness.

11          MR. APPLEBAUM:  I think the witness can testify as

12  to whether they conducted an analysis or not.  Whether that

13  analysis relates to a legal conclusion is a different

14  question.

15          MR. STEARN:  Well, I don't --

16          THE COURT:  He asked if she ever -- if -- he said

17  you never analyzed.  She --

18          MR. STEARN:  Well, I mean, fundamentally,

19  reasonably equivalent value is decided under the totality of

20  circumstances test in this district, and there are multiple

21  elements that go into that, including legal analyses.  So

22  it's -- I think he's essentially asking the witness about a

23  legal question, so that's my objection.

24          MR. APPLEBAUM:  The question I asked was whether

25  she performed an analysis.

1    THE COURT:  Yeah, she can --

2    MR. APPLEBAUM:  That's the only --

3    THE COURT:  -- respond to whether or not she

4  performed an analysis, so I'm going to overrule the

5  objection.

6    MR. APPLEBAUM:  Thank you.

7    THE WITNESS:  Could you repeat the full question,

8  please?

9  BY MR. APPLEBAUM:

10  Q    The question was whether you ever performed an analysis

11  of whether Bedmar, LLC received reasonably equivalent value

12  in exchange for liabilities that were allocated to it as part

13  of the corporate transactions.

14  A    We reviewed the lease cap claims, but that, I mean -- to

15  that extent.

16  Q    Did DWC ever analyze whether Bedmar HoldCo received

17  reasonably equivalent value in exchange for liabilities that

18  were allocated to it as part of the corporate transactions?

19  A    No.

20  Q    Did DWC ever analyze whether Bedmar, LLC received

21  reasonably equivalent value in connection with its merger

22  with Bedmar HoldCo?

23  A    No.

24  Q    And is it safe to say that DWC similarly never performed

25  any kind of an analysis as to whether the corporate

1    transactions as a whole may have constituted fraudulent

2    conveyances?

3    A    No.

4    Q    And you testified on direct that one of the tasks for

5    DWC was to review that spreadsheet that DWC received from

6    Portage Point Partners.  Is that right?

7    A    That's correct.

8    Q    And that spreadsheet contained calculations of both

9    uncapped and capped lease liabilities.  Is that right?

10   A    That's correct.

11   Q    And DWC's job in reviewing that spreadsheet was to look

12   at the leases, look at the rents, look at these lease

13   abstracts, and then confirm that the calculations in the

14   Portage Point spreadsheet were correct.  Is that right?

15   A    That was the analysis that we did.

16   Q    And other than the hundred-and-fifty-thousand-dollar

17   deviation for the one lease on the gross uncapped

18   liabilities, you agreed with the calculations in the Portage

19   Point spreadsheet with respect to uncapped damages.  Is that

20   right?

21   A    Yes.

22   Q    Did you do any other independent diligence to

23   investigate whether any landlords would hold any additional

24   claims for reserved rent?

25   A    No.

1    Q    So you just relied on the information and the data that

2    was given to you by Portage Point.  Is that right?

3              MR. STEARN:  Objection.  No, that's not her

4    testimony.  She testified to what she looked at.

5    BY MR. APPLEBAUM:

6    Q    And my question is whether what you looked at, was it

7    received from Portage Point.

8    A    We reviewed the information from Portage Point, but we

9    also reviewed the leases and lease abstracts and shared

10   services agreement.

11   Q    And that spreadsheet calculated the total uncapped lease

12   liabilities that now all sit with Bedmar, LLC to be more than

13   $372 million.  Is that right?

14   A    Yes, that's correct.

15   Q    And are you aware that the landlords have filed proofs

16   of claim that assert claims that are larger than the amounts

17   on that spreadsheet?

18   A    Yes.

19   Q    You testified that you were involved in preparing the

20   schedules that were filed on behalf of the debtor in this

21   case.  Is that right?

22   A    Yes, it is.

23   Q    And you -- I think you testified on direct about the --

24   that the bankruptcy schedules reflect a receivable in the

25   amount of about $36.7 million that's owed from Resilience

1    SPV 2025, LLC.  Is that right?

2    A    Yes, that's correct.

3    Q    What's the nature of that receivable?

4    A    I just know it was a receivable that is owed to the

5    debtor and that the 36.7 million is also the lease cap claim

6    amount.

7    Q    You've never seen a document that says that Resilience

8    SPV 2025, LLC owes Bedmar, LLC $36.7 million.  Is that right?

9    A    No, I haven't.

10   Q    You've never seen a promissory note or similar document

11   to that effect.  Is that right?

12   A    No, I haven't.

13   Q    Do you know what the terms of collection are for that

14   receivable?

15   A    No, I don't.

16   Q    How did you determine that this was the correct amount

17   of the receivable to provide to Epiq to complete the

18   schedules?

19   A    The 36.7 million is also the amount of the lease cap

20   claim amount.

21   Q    I understand that that's maybe where the number comes

22   from.  But how did you know that that is the amount that is

23   owed to the debtor by Resilience SPV 2025, LLC?

24   A    It was just information that I was provided.

25   Q    And who provided you that information?

1    A    I don't remember.

2    Q    Now, you testified on direct that DWC has oversight of

3    the debtor's bank account.  Is that right?

4    A    That's correct.

5    Q    What does that mean that DWC has "oversight" of the

6    account?

7    A    We have the signing authority for the bank account and

8    we have complete control of it.

9    Q    Does Mr. Sontchi, as the independent manager, also have

10   control over that account?

11   A    No, he is not a signer on the account.

12   Q    Were you present in the courtroom earlier today when Mr.

13   Montone testified?

14   A    Yes, I was.

15   Q    So part of Mr. Montone's testimony was that $42 million

16   of the proceeds of the bridge loan that was between nondebtor

17   entities now sits with Bedmar, LLC.  Did you hear that

18   testimony?

19   A    Yes, I did.

20   Q    Since the petition date, has the receivable that's

21   referenced on the debtor's bankruptcy schedules, has that

22   been paid to the debtor?

23   A    No, it has not.

24   Q    Other than any DIP financing that the Bankruptcy Court

25   may have approved, has the debtor collected any amounts since

1    it filed for bankruptcy?

2    A    No.

3    Q    The assets of -- sorry.

4         The assets and liabilities of the debtor on the date

5    that it filed for bankruptcy, on June 9th, were substantially

6    the same as they were six days before when it was the debtor

7    was formed.  Is that right?

8              THE COURT:  Could you say that again?  I'm sorry.

9              MR. APPLEBAUM:  Sorry.

10   BY MR. APPLEBAUM:

11   Q    So the question was:  The assets and liabilities of the

12   debtor on the date of filing, June 9th, were substantially

13   the same as they were on June 3rd, when the company was

14   formed.  Is that right?

15   A    I can only speak to as of June 9th.

16   Q    All right.  Well, let me ask this.  You're not aware of

17   any sales of assets or other disposition of assets that

18   occurred after the debtor was formed, prior to the petition

19   date.  Is that right?

20   A    No, I'm not aware of any.

21   Q    You said that you were involved in the creation or the

22   review of the DIP budget.  Is that right?

23   A    That's correct.

24   Q    And that DIP budget doesn't provide for any ability for

25   the debtor to operate a business or continue paying rent.  Is

1   that right?

2   A    That's correct.

3   Q    And nor did the DIP budget contemplate that the debtor

4   would generate any revenue from operating a business.  Is

5   that right?

6   A    That's correct.

7   Q    So, as the debtor's financial advisor, you agree that

8   the debtor never intended to generate revenue.  Is that

9   right?

10  A    I had just said that there was -- in the DIP budget,

11  there was no revenue coming in.

12  Q    Are you aware of any intention by the debtor to generate

13  revenue from operating the business while in Chapter 11?

14  A    No, I am not.

15  Q    Do you understand that the debtor was also allocated

16  guarantee liabilities as part of these corporate

17  transactions?

18  A    No.

19  Q    You don't know?  So I guess then that means that you

20  don't -- you know wouldn't know why those guarantee

21  liabilities are not listed on the bankruptcy schedules.  Is

22  that right?

23  A    That's correct.

24          MR. APPLEBAUM:  I have no further questions, Your

25  Honor.

1    THE COURT:  Thank you.

2    Anyone else, cross?

3    MR. STEARN:  Just one second, Your Honor.

4    THE COURT:  Yes.

5    MR. STEARN:  Oh, I'm sorry, was there anybody else?

6    THE COURT:  I was waiting to see if there was

7    anyone -- I didn't see Mr. Tecce, I can't see his face.

8    MR. TECCE:  No questions, Your Honor.  Thank you

9    for asking.

10    THE COURT:  Okay.  All right.

11    MR. STEARN:  Bear with me one second.

12    REDIRECT EXAMINATION

13    BY MR. STEARN:

14    Q    Just one thing I was asked to clarify.

15    There was a -- may have been a misstatement in a

16    question about whether Bedmar owed a receivable.  It's your

17    understanding that Bedmar is owed the receivable, right?

18    A    It is owed.

19    MR. STEARN:  Okay.  Thank you very much.  That's

20    all.

21    THE COURT:  Thank you.  You're excused.

22    THE WITNESS:  Okay.  Thank you.

23    (Witness excused)

24    MR. STEARN:  Would it be possible for Ms. Weidman

25    to leave?  She could catch a six o'clock plane back to the

1    West Coast if we can set her free.

2              THE COURT:  I have no opposition to her departure.

3              MR. STEARN:  Speak now or hold your peace if

4    anybody objects.

5         (Laughter)

6              MR. TECCE:  No objection, Your Honor.

7              THE COURT:  I hear no one objects to your

8    departure.  Have a safe flight.

9              MS. WEIDMAN:  Thank you.

10             THE COURT:  I guess I should ask:  What's next?

11             MR. STEARN:  Mr. Sontchi?

12        (Participants confer)

13             MR. STEARN:  I think you're raising a good point

14   because it doesn't make a lot of sense for Mr. Sontchi to go

15   for 10 or 15 minutes.

16             THE COURT:  Right.  But I don't know what to expect

17   this afternoon with counsel departing.  Should I have waited

18   until 3:30 for lunch?

19        (Laughter)

20             MR. STEARN:  We would have had some of us lying on

21   the floor, Your Honor.

22        (Participants confer)

23             THE COURT:  Do you have an estimated time?

24             MR. BROWN:  Your Honor, Stuart Brown, DLA Piper for

25   the record.

1          There are some very unusual circumstances that are

2     before Judge Silverstein this afternoon at 3:30.  It could

3     be, as every status conference, ten minutes, or it could be a

4     little bit longer.  My expectation is it will be in the order

5     of about a half hour because there are things that were

6     filed, but not officially scheduled for today's setting

7     before her, and so it should just be about scheduling, so I

8     would expect 30 to 45 minutes at the most, if there are a lot

9     of people there.  But I don't know that she'll -- she will be

10     prepared to deal with substantive issues versus scheduling.

11          THE COURT:  How long do you expect Mr. Sontchi's

12     testimony to be?

13          MR. STEARN:  Tough to say.  He's such a chatty guy.

14     I mean, it's hard to stop him once he gets going.  Half hour

15     or so for direct probably, and then whatever my friends have

16     for their cross.  Obviously, we don't want to split him up if

17     we don't have to.  We'd like to get him on and off in a day.

18          THE COURT:  Agreed, agreed.

19          MR. TECCE:  I will say that cross examine -- it

20     depends on how long -- what happens in the direct, obviously

21     but it's not going to be -- I don't expect it would be as

22     long as the prior cross, so I would say that.

23          THE COURT:  Okay.  Well, what time is your hearing,

24     3:30?

25          MR. BROWN:  3:30, Your Honor.

1        MR. STEARN:  And I'm sorry.  Reminder, Your Honor.

2    What time do you stop, 5, 5:30?

3        (Laughter)

4        THE COURT:  I don't like stopping in the middle of

5    a witness.

6        MR. STEARN:  Right.  And then I'm just trying to

7    get a sense if you have a hard stop or if you just try to be

8    flexible and go to the end of the witness.

9        THE COURT:  I'd like to go to the end of the

10   witness, but it's not all about me.

11       MR. STEARN:  No, actually it is.

12       (Laughter)

13        THE COURT:  So -- no, it's actually not.  I am

14   more concerned about court staff who isn't --

15       MR. STEARN:  So --

16       THE COURT:  So it isn't about me.

17       MR. STEARN:  Well, when I say "you," I mean the

18   collective you.

19       THE COURT:  Right.

20       MR. STEARN:  So, I mean, if Mr. Sontchi goes on

21   today, we want to finish him today.

22       THE COURT:  Agreed.

23       You all weren't intending to be done at 3:15, were

24   you?

25       MR. STEARN:  That was not our intent.

1          (Participants confer)

2                THE COURT:  Can we just take one -- oh, go ahead.

3                MR. STEARN:  No.  Please.

4                THE COURT:  I'd like to --

5                MR. STEARN:  I think a good suggestion was just

6      made to me by Ms. Marks which is:  Why don't we just break

7      until 4:30?  And hopefully -- you know, look, I put him on at

8      4:30, he testifies until about 5, and hopefully, you know,

9      cross doesn't go forever and we wrap up.  I don't --

10               THE COURT:  Well, I would be happy to do that.  But

11     let me see about staffing here.

12               So, perhaps -- respectfully, you have other

13     colleagues here.  So maybe one of your colleagues could --

14     you could email them or text them in the middle of the

15     hearing and let us know whether it looks like it's going to

16     go a while.

17               MR. BROWN:  Absolutely, Your Honor.

18               THE COURT:  And if we have to be finished for

19     today, we will.

20               MR. STEARN:  Or I might send somebody down with a

21     basket to collect cash to bail me out.  I don't know.

22          (Laughter)

23               MR. TECCE:  I actually I have a suggestion, too.

24     Like can -- I don't know that we need until 4:30.  Like I

25     think maybe we should hedge at 4:15.  Does that ...

1          (Participants confer)

2                MR. STEARN:  Sold.

3                THE COURT:  Okay.  Why don't we do that?

4                MR. TECCE:  I just think it makes a big difference,

5     it's much more helpful.

6                THE COURT:  We can --

7                MR. TECCE:  And then we're not rushing.

8                THE COURT:  We can reconvene at 4:30.  If you all

9     aren't here --

10               MR. TECCE:  Right.

11               THE COURT:  -- then we'll know.

12               UNIDENTIFIED:  4:15?

13               UNIDENTIFIED:  4:15?

14               THE COURT:  Oh, 4:15.

15               MR. TECCE:  Yeah.

16               THE COURT:  I said 4:30.  And in the meantime, I'm

17    going to get a sense of availability --

18               MR. STEARN:  And Your Honor --

19               THE COURT:  -- because I can't ECRO my own hearing,

20    so --

21               MR. TECCE:  Thank you, Your Honor.

22               THE COURT:  And we also have court security here,

23    so it's about other people.  Okay?  So let's all reconvene --

24               MR. BROWN:  To your --

25               THE COURT:  -- at 4:15.

1          MR. BROWN:  To your point, Your Honor, one

2     housekeeping item?

3          THE COURT:  Yes.

4          MR. BROWN:  Through the day we've had a chance to

5     confer with Cobalt's counsel.  And the landlords,

6     collectively, do not feel the need to bother Mr. Marth and

7     cause him to be here beyond Zoom and withdraw the request to

8     have him testify.

9          THE COURT:  Okay.

10          MR. BROWN:  Thank you, Your Honor.

11          MR. STEARN:  Good news.  I have nothing else to

12     add.  We'll see Your Honor at 4:15.

13          THE COURT:  Okay.  All right.

14          MR. STEARN:  Thank you.

15          THE COURT:  We stand in recess.

16        (Participants confer)

17          MR. STEARN:  I'm sorry.  I spoke too soon.

18          THE COURT:  No, that's ...

19          MS. MARKS:  I'm sorry.

20          THE COURT:  No, no worries.

21          MS. MARKS:  I believe Mr. Marth is now on a flight

22     here and would like to testify.  So we would like to -- this

23     is the first we've heard of this, we just would like to

24     reserve our rights to circle up on that and see whether we

25     now want to put him on for a short direct in our case-in-

1    chief.

2              THE COURT:  Okay.  Well, I'm going to let you all

3    discuss it amongst yourselves before I say anything about

4    that.

5              MS. MARKS:  Okay.  Thank you.

6              THE COURT:  Okay?  We stand in recess.

7              COUNSEL:  Thank you, Your Honor.  Thank you, Your

8    Honor.

9         (Recess taken at 3:15 p.m.)

10        (Proceedings resume at 4:18 p.m.)

11             THE COURT:  Good afternoon, everyone.  Please be

12   seated.

13             Is everyone here?  I see -- no.

14             MR. STEARN:  My understanding is we don't have the

15   United States Trustee, Your Honor.  I don't know.  I heard

16   him say --

17             THE COURT:  Is he on Zoom?

18             MR. TECCE:  No, Your Honor.  I -- the hearing is

19   still going on.  I left.

20             THE COURT:  He's also in that hearing?

21             MR. TECCE:  He is, yeah.

22             MR. MARTIN:  Your Honor, Craig Martin from DLA

23   Piper.

24             THE COURT:  Yes.

25             MR. MARTIN:  I'm getting the one -- I'm the one

1    getting the texts.  At 4:15, Judge Silverstein was making

2    final comments; and, at 4:17, Mr. Brown has texted that they

3    are coming down now.

4              THE COURT:  Oh, okay.

5              MR. MARTIN:  So they've just finished and they're

6    on their way.

7              THE COURT:  Okay.

8              MR. STEARN:  So we can't beat real-time reporting,

9    Your Honor.

10         (Laughter)

11             MR. MARTIN:  So we had suggested that we might go

12   ahead, but it then dawned on us through, Mr. Sontchi, that

13   Mr. Fox was not here.  But I think, otherwise, the parties

14   would be prepared to proceed, but we --

15             THE COURT:  Okay.

16             MR. MARTIN:  If it's only another couple of minutes

17   --

18             THE COURT:  Do you --

19             MR. MARTIN:  -- I'll defer to you.

20             THE COURT:  Do the parties think, if we put Mr.

21   Sontchi on today, that we can get him done by 6:30, 6:45?

22             MR. STEARN:  If we can't, I think there will be

23   violence.

24         (Laughter)

25             THE COURT:  Okay.  All right.

1          MR. STEARN:  I mean, yes is the answer.

2          THE COURT:  Okay.  All right.  Then let's -- I

3    think it would be prudent to proceed with him today.

4       (Participants confer)

5          MR. BROWN:  Thank you, Your Honor.

6          THE COURT:  Do you need a break?

7          MR. BROWN:  No, Your Honor.  Thank you.  Do I look

8    like I need a break?

9          THE COURT:  Pardon?

10         MR. BROWN:  Do I look like I need a break?

11      (Laughter)

12         MR. STEARN:  He was walking a little slow.

13      (Participants confer)

14         THE COURT:  Mr. Fox, do you need a break?

15         MR. FOX:  If Your Honor needs a break, I do, but --

16         THE COURT:  I do not.

17         MR. FOX:  Okay.  Then let's get going.

18         THE COURT:  All right.

19         MR. FOX:  I think Ms. Quartarolo was on her way

20   down as well.

21         THE COURT:  Oh --

22         MR. FOX:  I don't know if --

23         UNIDENTIFIED:  We can start without --

24         COUNSEL:  We can start.  We can start.

25         MR. FOX:  Okay.  I just wanted to confirm with that

1   before we started, but, thank you.

2           THE COURT:  Okay.  I don't want to cut anyone out.

3           MR. STEARN:  Success, Your Honor.  You herded the

4   cats.

5       (Participants confer)

6           MR. STEARN:  I'll give Ms. Quartarolo just a second

7   to get settled.

8       (Pause in proceedings)

9       (Participants confer)

10          MR. STEARN:  Good afternoon again, Your Honor.  May

11  it please the Court, Bob Stearn from Richards, Layton &

12  Finger on behalf of the debtor.

13          The debtor calls Mr. Christopher Sontchi.

14          THE COURT:  Could you please implement the

15  broadcast protocol, please?  Thank you.

16          MR. STEARN:  And perhaps, before we do the

17  swearing, we can go ahead and hand out the binders.

18          THE COURT:  Yes.

19          MR. STEARN:  We have a small one, once again.

20          MS. STEELE:  May I approach?

21          THE COURT:  Yes, please.  Thank you, Ms. Steele.

22  Thank you.

23          THE WITNESS:  Thank you very much.  Okay.

24          THE ECRO:  Please raise your right hand.

25      CHRISTOPHER S. SONTCHI, WITNESS FOR THE DEBTOR, AFFIRMED

1          THE ECRO:  Can you please state your full name and

2     spell your last name for the record?

3          THE WITNESS:  Christopher S. Sontchi, S-o-n-t-c-h-

4     I.

5          THE ECRO:  Thank you.  Have a seat.

6          THE WITNESS:  Thank you.

7                      DIRECT EXAMINATION

8     BY MR. STEARN:

9     Q    Good afternoon, Mr. Sontchi.

10    A    Good afternoon, Mr. Stearn.

11    Q    Mr. Sontchi, I think everyone in the courtroom knows who

12    you are.  Typically, we would cover your background through a

13    declaration.  There's been a little bit of an allergy to

14    declarations in this case, so I'll just hit some highlights

15    or high points from your background.

16         Mr. Sontchi, do you have a juris doctor degree?

17    A    Yes.

18    Q    From what institution?

19    A    The University of Chicago Law School.

20    Q    And what year did you obtain that degree?

21    A    1992.

22    Q    What was your first job after law school?

23    A    I was a law clerk to Justice Joseph T. Walsh in the

24    Delaware Supreme Court for one year.

25    Q    And what was your next job after clerking?

1    A    I worked for Ashby & Geddes in Wilmington, Delaware from

2    1993 to 2006.

3    Q    And did your practice at Ashby focus on any particular

4    area of the law?

5    A    Almost exclusively bankruptcy.

6    Q    And what did you do after you left Ashby in 2006?

7    A    I was a U.S. Bankruptcy Judge in Delaware from 2006

8    until I retired in 2022.

9    Q    What did you do after you left the bench?

10   A    I formed a company called Sontchi, LLC, where I do

11   mediation, arbitration, independent fiduciary work, and

12   expert advisory work.

13        For a small -- for a short time, I was also affiliated

14   with Delaware ADR, but that stopped in May.

15        And a third job is, I have a -- I would call it a "part-

16   time job," but I am an International Judge with the Singapore

17   International Commercial Court.

18   Q    You said the -- just to provide some timing.  You said

19   that Delaware ADR stopped in May.  May of what year?

20   A    May -- May 2023.

21   Q    Okay.  Thank you.

22        Sir, do you currently have a position at the Debtor

23   Bedmar, LLC?

24   A    Yes.

25   Q    And what is your position at Bedmar, LLC?

1    A    Independent manager.

2    Q    When did you become the Independent Manager of Bedmar,

3    LLC?

4    A    Upon its formation, on June 3rd.

5    Q    What do you understand your responsibilities to be as

6    the Independent Manager of Bedmar, LLC?

7    A    I have sole responsibility for the management and

8    direction of the debtor.

9    Q    Including in its bankruptcy?

10   A    Yes.

11   Q    Are your responsibilities as the Independent Manager of

12   Bedmar, LLC reflected in a document?

13   A    Yes.

14   Q    What document is that?

15   A    That would be the limited liability agreement.

16   Q    Okay.  Well, let's look at the limited liability company

17   agreement.  If you would turn to Tab A of your binder.

18            MR. STEARN:  Your Honor, this is exhibit -- and the

19   way that we've come to call the exhibits, since there's three

20   lists.  This one we call Debtor/Bedmar Manager, Inc. -- I'm

21   sorry -- Bedmar Member, Inc. 108.  Sometimes we refer to it

22   as D/BMI 108.  But this is the debtor and Bedmar Member's

23   Exhibit 108.  It reflects Bates labels beginning at BEDMAR-

24   0002089.

25   BY MR. STEARN:

1   Q    Mr. Sontchi, my first question for you is going to be:

2   Do you recognize this document?

3   A    I do.

4   Q    And what is this document that we have marked as --

5   A    It is the limited liability company agreement of Bedmar,

6   LLC.

7   Q    At Debtor/BMI 108.

8        On the first page, there's just a couple of definitions

9   real quick.  You'll see, in the second line, that "Bedmar,

10  LLC" is defined as the "company."  Do you see that?

11  A    Yes, sir.

12  Q    And you see that Bedmar Member, Inc. -- good that it's

13  printed out there so I get it right -- is defined as the

14  "member"?

15  A    Yes.

16  Q    Do you see that?

17  A    Yes.

18  Q    And in the next paragraph, you'll see the Delaware

19  Limited Liability Company Act is defined as the "act."  Do

20  you see that?

21  A    I do.

22  Q    Okay.  So let's chat a bit about the LLC agreement for

23  Bedmar, LLC.

24       Can you turn to the second page, please?

25  A    Okay.

1   Q    Under Section 8, management, Subpart (a), I'm going to

2   read the first sentence, under independent manager:

3            "The business and affairs of the company shall be

4            managed by or under the direction of the

5            independent manager."

6       Mr. Sontchi, my question for you is:  Does anyone else

7   besides you have authority to manage Bedmar, LLC's business

8   and affairs?

9   A    No.

10  Q    Let's look at Section 8(b), hours.  I will read the

11  first sentence aloud:

12           "The independent manager shall have the power to do

13           any and all acts necessary, convenient, or

14           incidental to or for the furtherance of the

15           purposes described herein, including all powers,

16           statutory or otherwise, and has the authority to

17           bind the company."

18      My question for you, Mr. Sontchi, is:  Does this

19  sentence reflect your understanding of the nature and

20  authority -- excuse me -- the nature of your authority to

21  manage Bedmar, LLC's business and affairs?

22  A    It does.

23  Q    Does Bedmar, LLC's LLC agreement in any way mandate or

24  restrict your actions, *vis-a-vis* Bedmar's nondebtor

25  affiliates?

1   A     No.

2   Q     And is that reflected in the LLC agreement itself?

3   A     I believe so.

4   Q     Well, let's look at -- on Pages 2 to 3, you'll see

5   Section 8(d) carries over.  And I just want to read the last

6   sentence:

7               "Except as required by any mandatory provision of

8               the act, the member, in its capacity as member,

9               shall have no right to vote on, approve or

10              otherwise consent to any action by or any matter

11              relating to the company including, without

12              limitation, the merger, consolidation or conversion

13              of the company."

14        Does that sentence -- close quote.

15        Does that sentence reflect your understanding that

16   Bedmar Member has no ability to instruct your actions?

17   A     Yes.

18              MR. STEARN:  Your Honor, we would like to move the

19   Bedmar, LLC limited liability company agreement, Exhibit

20   Debtors/Bedmar Member, Inc. 108, into evidence.

21              THE COURT:  Any objection to the admission of the

22   document --

23              MR. TECCE:  No --

24              THE COURT:  -- into evidence?

25              MR. TECCE:  I'm sorry, Your Honor?

1              THE COURT:  Any objection to the admission of the

2     document into evidence?

3              MR. TECCE:  No, your Honor.  Thank you.

4              MR. STEARN:  Mister --

5              THE COURT:  I see everyone is shaking their head

6     no.  It's admitted.

7         (Exhibit D/BMI-108 received in evidence)

8              MR. STEARN:  Thank you, Your Honor.

9     BY MR. STEARN:

10    Q    And just in terms of your authority, Mr. Sontchi, just

11    to clean something up.  I think you heard some testimony from

12    Ms. Weidman about her having signatory authority for Bedmar,

13    LLC's checks.

14         My question to you is:  Can Ms. Weidman write any checks

15    on behalf of Bedmar, LLC without your approval?

16    A    No.

17    Q    Let's turn, Your Honor, to -- sorry -- whoops.  I keep

18    telling myself not to do that.

19         Let's turn, Mr. Sontchi, to how you came to be involved

20    with Bedmar.  And I'll  ask that question, Mr. Sontchi.  How

21    did you come to be the independent manager of Bedmar, LLC?

22    A    So I was -- I received a text message from Ms. Uhland in

23    mid-March just informally asking whether I did independent

24    fiduciary work.  I responded to the text with, yes, I do, and

25    --

1          MR. STEARN:  Bless you.

2          THE COURT:  Thank you.

3   A    -- gave two examples of current projects I had going on

4   in Delaware, which was the Wong case in front of Judge Owens,

5   and the SilverRock case in front of Judge Walrath.

6          I didn't hear from her for quite some time.  And then I

7   heard from her again in mid-May, which started a couple of

8   conversations about possibly serving in this role, which

9   ultimately led to a meeting that I asked for at Latham on May

10  21, where we had a lengthy meeting.  And I decided the next

11  day to accept the position, the assignment.

12  Q    So let's break that down a little bit.

13         Prior to the meeting, you know, what did you learn about

14  this potential assignment that became the independent manager

15  of Bedmar, LLC?

16  A    They were brief conversations.  It's not particularly

17  complicated to get your head around about what we've called

18  or I've called the "strategy," which has been talked about

19  earlier today; that the company, the broader enterprise, was

20  in financial distress; that they had lease liabilities that

21  they'd gotten over their skis on.  They needed to get rid of

22  those liabilities.  They were considering doing some

23  divisions to isolate them in a subsidiary that would then

24  file Chapter 11, but would be sufficiently financed to pay

25  all allowed claims in full.  And I said I was willing to talk

1    about it.

2    Q    And so you talked about a meeting in later May, I think

3    you said May 21?

4    A    I believe it was May 21.

5    Q    So did you ask for that meeting?

6    A    I did.

7    Q    And where was that meeting?

8    A    It was at Latham's offices in New York.

9    Q    And who was present?

10   A    Well, I was there, Mr. Merchant was there by Zoom, Ms.

11   Uhland was there with her team.  And the CEO, CFO, and

12   General Counsel of the debtor -- of -- excuse me -- of

13   Resilience was there.

14   Q    And did you have any goals or areas of focus for this

15   meeting?

16   A    Absolutely.  I -- there were three things I wanted to

17   clarify and make sure we were on board with:

18        First, I asked a lot of questions.  And I wanted, in my

19   own mind, to confirm what I had basically been told, which

20   was about the financial distress of the entire enterprise,

21   and I wanted to learn about the enterprise.  That

22   conversation was pretty lengthy, it was mostly with the CEO.

23        I then also wanted to stress and verify that I would

24   truly be independent or I wouldn't do it, and that included

25   being independent from the nondebtor affiliates.

1    And then the last thing I -- I was very focused on was

2    that the unsecured creditors -- the allowed unsecured claims

3    would be paid in full.  And by "allowed unsecured claims,"

4    actually all allowed claims, including the admin claims, but

5    also the unsecured claims, which would be whatever they were,

6    past due rent, any admin costs, and rejection damages subject

7    to the 502(b)(6) cap.

8    Q    And at or about the time of this May 21 meeting, did you

9    think about whether the landlords would do better in, say, a

10   Bedmar Chapter 11 versus a Resilience enterprise Chapter 11?

11   A    Yes, I did.

12   Q    And what did you think about it in that regard?

13   A    Well, I thought about it this way, which was, looking at

14   the Bedmar, LLC Chapter 11, as we had discussed it at that

15   meeting and the clarification I had gotten, they were getting

16   paid everything they were owed or would get paid everything

17   they were owed under the Bankruptcy Code; whereas, in a

18   Chapter 11 of the entire enterprise, they couldn't do better,

19   but they might do worse and, indeed, they might do much worse

20   because -- and I didn't have numbers on it at the time -- but

21   because of the description I had received and the

22   conversation we had received about the financial distress of

23   the enterprise as a whole.

24       So I thought it was sort of almost -- well, I won't say

25   it's a no-brainer because it's a tough situation.  But it

1    seemed that Bedmar, LLC Chapter 11 was their -- actually,

2    their best opportunity.

3    Q    So tell me what happened immediately after the May 21

4    meeting.

5    A    Well, I decided to use Richards, Layton & Finger as

6    counsel to Bedmar, LLC.

7         I decided to ask DWC, who I had experience with in a

8    previously -- in the SilverRock case, to be the financial

9    advisor for purposes of really running the nuts and bolts of

10   being in Chapter 11, as well as confirming the information we

11   had received or were going to receive through Latham and

12   Portage Partners.  So they began working in earnest to get

13   that together and start to plan the Chapter 11 filing.

14        And then I went to Europe.

15   Q    And just a reminder, when was Bedmar, LLC formed?

16   A    June 3rd.

17   Q    And you became independent manager on that date?

18   A    Yes, sir.

19   Q    Okay.  So, Mr. Sontchi, as a result of the diligence

20   that you had performed. which you described for us, did you

21   reach any conclusions about the financial condition of

22   Bedmar, LLC?

23   A    Yes.  In my mind, Bedmar, LLC is definitely in financial

24   distress, and it's for a couple of reasons:

25        One, there's a limited amount of money that is available

1    to Bedmar, LLC.  It is a combination of cash that was

2    contributed; as well as a receivable; and then, ultimately, a

3    DIP loan.

4        For the fact -- the fact for them not to be in financial

5    distress would be if everything went perfectly right.  We

6    were probably going to be able to confirm a plan that --

7    where the landlords would be unimpaired.  There were a lot of

8    conditions to getting that done.  And if there was any

9    hiccup, we did not remotely have the ability to pay, as -- as

10    Ms. Weidman testified earlier, three hundred and seventy-

11    something million dollars in claims.

12    Q    And did the debtor --

13    A    And we had no ability to run a business.  We had no

14    employees.

15    Q    No incoming cash flows?

16    A    Other than the DIP, no.

17    Q    Did you believe that the Chapter 11 filing was in the

18    best interests of Bedmar, LLC's creditors?

19    A    Yes.

20    Q    And why did you believe that?

21    A    Well, as I said before, because we had adequate funding,

22    if everything went right, to pay all admins in full and to

23    pay all allowed unsecured claims in full.

24    Q    Can the creditors do any better than a hundred-cent

25    plan?

1    A    Not that I'm aware of.

2    Q    Okay.  So let's -- all right.  We talked about what

3    you've done so far.  Let's talk about what you didn't do.

4         Mr. Sontchi, what's your understanding of how the leases

5    at issue came to be held by Bedmar, LLC?

6    A    The leases were -- there's two ways, or I guess three

7    ways.  There were a combination of allocations of two

8    different divisions, one of National Resilience and one of

9    Resilience US.  And for one, there was an assignment from

10   AGS.

11   Q    Now, as you know, sir, the landlords have taken the

12   position that the allocation of leases in this case violated

13   certain anti-transfer or similar provisions in their leases.

14   Is that an issue you personally evaluated?

15   A    No, I did not.

16   Q    Did you defer to your counsel to look into that?

17   A    Yes, I did.

18   Q    Okay.  And in fact, did you review the leases in any

19   detail prior to the allocation or rejection of -- attempted

20   rejection of those leases?

21   A    No.

22   Q    All right.  So, sir, at the tail end of the corporate

23   transactions, there was a merger between Bedmar HoldCo, LLC

24   and Bedmar, LLC, with Bedmar, LLC as the surviving entity.

25   Do you recall that?

1    A    I do.

2    Q    And did you approve that merger on behalf of Bedmar,

3    LLC?

4    A    I did.

5    Q    Can you take a look at the second document in your

6    binder, please, sir?

7         MR. STEARN:   Your Honor, this is Joint Exhibit 6.

8    It is an agreement of plan and merger, and it reflects Bates

9    Number RES-000604 as its first Bates Number, first Bates

10   Page.

11   BY MR. STEARN:

12   Q    And my question to you, sir, is:  Do you recognize the

13   document that is marked as Joint Exhibit 6?

14   A    I do.

15        And my second response is:  Please call me Mr. Sontchi.

16   Q    I will do that.

17        Did you approve the document, Mr. Sontchi, that is

18   marked as Joint Exhibit 6?

19   A    I did.

20   Q    Is that your, at least, electronic signature on the

21   final page thereof?

22   A    Yes.  I authorized it to be signed in that manner.

23   Q    Now why did you approve this merger?

24   A    Well, the primary reason was simply, it's not

25   convenience, it's efficiency and it's improved the

possibility of being successful in the case because, as a

result of the fact that we had two different divisions in

this -- in the strategy, the leases came from two different

companies, which means it was very difficult to sort of

figure out where those leases would be.  One went to Bedmar,

LLC and the other went to Bedmar HoldCo Company, I believe.

And -- did I get that wrong?  No, I didn't, okay.

I can't imagine -- given how this case has played out, I

think it was a great idea because I can't imagine anything

quite more complicated than in this case, as opposed to what

it is already, if I had two debtors; two debtors with

different debts, two debtors with different allocations of

assets, and trying to figure out how to do a case with two

debtors.  It just was easier and better and more efficient

and increased our likelihood of success if we had one

company.

Q    Thank you, Mr. Sontchi.

MR. STEARN:  Before I forget, Your Honor, I would

like to move Joint Exhibit 6 into evidence.

THE COURT:  Any objection to Joint Exhibit 6 being

admitted?

(No verbal response)

THE COURT:  Okay.  Hearing none, it's admitted.

MR. TECCE:  No objection.

(Exhibit J-6 received in evidence)

1    BY MR. STEARN:

2    Q    Now, Mr. Sontchi, you testified a little bit earlier

3    about the significance or importance to you of having sort of

4    complete independence.  Did that independence include the

5    right to conduct an investigation if you saw fit?

6    A    Yes.

7    Q    And what type of investigation were you -- did you

8    envision if you decided that you needed to conduct one?

9    A    Yeah.  What I was focused on -- and this is actually

10   reflected in a text message with Ms. Uhland -- was making

11   sure that I would have the ability to investigate what came

12   to be known as the "corporate transactions."

13   Q    Now you didn't conduct such an investigation before the

14   bankruptcy was filed, did you?

15   A    I did not.

16   Q    And why didn't you conduct that investigation

17   immediately upon being appointed Independent Manager of

18   Bedmar, LLC, and before making a decision to file for

19   bankruptcy?

20   A    Well, primarily for two reasons:

21        One was time.  We're talking we had basically, I think,

22   six days or so between the May 20th -- no, I'm going to get

23   that wrong.  We didn't have a lot of time.  We're talking

24   about going from May 21st to June 3rd, when the -- when

25   Bedmar, LLC was actually formed.  So it was not a lot of

1    time.

2         More importantly, I didn't think it was necessary at the

3    time.  I had done what I felt was sufficient due diligence in

4    my lengthy meeting with management, as well as by hiring RLF

5    and DWC to start the process of figuring out how the case

6    would work, that I was satisfied that -- and I was really

7    worried about this, but I was satisfied it would be a good

8    faith filing because one could certainly expect a case like

9    this to generate a motion to dismiss.

10        Between the financial distress of the Resilience

11   entities and the ultimate debtor, as well as the paying the

12   creditors in full, I felt that -- or thought that I had

13   sufficient information to file the case.

14        When I was thinking about the issue with regard to the

15   creditors being paid in full, what was informing my analysis

16   was simply the fact that, if there was a fraudulent transfer

17   here, I couldn't figure out what their damages would be.  So,

18   if you don't have damages, you're not harmed, you really

19   don't have a case.  That's how I felt after the meeting.

20        It was based on experience and what I had heard in --

21   orally in a meeting.  I didn't do a sophisticated analysis,

22   and that's why I didn't do it at that time.

23   Q    Ultimately, did you ask debtor's counsel to do a more

24   formal investigation of the corporate transactions?

25   A    I did.

1    Q    And why did you do that?

2    A    Well, I felt -- frankly, I read the landlords' papers.

3    I had had my deposition.  I was still comfortable with my

4    conclusion.  But I felt, as a fiduciary to them, that I

5    should actually have a more formal, nuanced investigation

6    performed to make sure that my preliminary beliefs and

7    justification for the filing were actually true, or at least

8    supported.

9    Q    So what did you instruct your counsel to do?

10   A    So I instructed Richards to investigate two things:

11        And one was whether the corporate transactions were

12   fraudulent transfers.

13        And the second was whether the divisions under the --

14   under the act had been done in compliance with Delaware law.

15   Q    And did counsel perform that analysis and report their

16   conclusions back to you?

17   A    Yes, after herculean effort, they reported their

18   decision --

19   Q    And what --

20   A    -- or their -- excuse me -- their conclusion.

21   Q    What conclusions did your counsel report back to you,

22   did the debtor's counsel report back to you?

23             MR. TECCE:  Your Honor, I just object to this.  And

24   to the extent that we get to the investigation, that

25   document, as well, it's been outstanding -- our position on

1   this is that whatever comes out of this has nothing to do

2   with the initial decision to file for bankruptcy, given the

3   timing and given the subject matter.

4          So we object to this line of questioning, as well

5   as any attempt to introduce the investigation.  It can't be

6   relevant to a decision that was made on June 9th,

7   particularly because it was prepared on July 23rd.

8          MR. STEARN:  So, Your Honor, I'd like to address

9   that two ways.  I mean, we are going to talk about the report

10  in just a moment.  I'm not going to ask the Court to look at

11  it or accept for its truth, simply the fact that it was done.

12         Second, we know that information that becomes

13  available post-petition, in fact, reflects on the debtor's

14  good faith in filing.  And there's a reason we know that and

15  it's because that's the landlords' position that they took

16  throughout discovery in this case.

17         Let me show you an email that contains several

18  cases cited by the landlords that go directly to that point,

19  and I'll share it with them and I'll show it to you.  I don't

20  have to do my own research, they did it for me.  Can I

21  approach, Your Honor?

22      (Participants confer)

23         MR. STEARN:  And Your Honor, I'm looking at an

24  email from Mr. Silverman on July 17th, 2025, and you'll see,

25  halfway down the page, there a paragraph that starts "first."

1          "First, the July 29th hearing will address the

2          motion to dismiss, which include issues concerning

3          debtor's good faith.  Post-petition documents and

4          communications have been held to be discoverable on

5          the issue of good faith."

6       They cite cases that say:

7          "Subsequent conduct may reflect back to the

8          promisor's state of mind; and, thus, may be

9          considered in ascertaining whether there was

10          fraudulent intent, explaining that a debtor's post-

11          petition misconduct is relevant in determining if

12          the Chapter 11 petition was filed in good faith,

13          and analyzing post-petition conduct to determine if

14          the Chapter 11 petition was filed in good faith."

15       This -- the report that Mr. Sontchi authorized was

16    one that he retained the right to do at the time he took on

17    his role as independent manager.  And he conducted it, he had

18    it conducted, and it was reported back to him.

19       And we're not asking you to accept it for its

20    truth.  We're asking you to consider it as it simply goes to

21    the independent manager's good faith in making the ultimate

22    decision to file this case.

23       MR. TECCE:  So if I may respond to that, Your

24    Honor?

25       THE COURT:  Yes.

1          MR. TECCE:  So, first of all, let's start with the

2     last one.  I don't know what it means to not accept the

3     report for its truth.  Okay?  If we're not going to accept

4     the report for its truth, then we're going to accept it for

5     what impact it has on the person who reviewed it, which

6     didn't happen until July 23rd and, therefore, is not relevant

7     to the decision to file.  That's the first point.

8          The second point is that it may be, as a matter of

9     law, that certain things that happened post-petition are

10    relevant to the good faith.  I have not reviewed these cases.

11         But let's go back as to the standard.  To be a good

12    faith filing, there has to be a valid bankruptcy purpose, the

13    debtor has to be in financial distress.  Those issues, if

14    there are documents to come out post-petition that are

15    relevant to those particular issues, they may be relevant,

16    but not to the investigation.

17         The third point about the investigation, Your

18    Honor, is that it may be relevant to whether the releases in

19    the plan are appropriate.  At some point in time, we may have

20    a confirmation hearing and so the results of the

21    investigation -- I don't agree with the proposition that

22    there was a -- for reasons that will come out in my cross-

23    examination of the witness, that there was a reservation to

24    conduct the investigation, for reasons I'll get to.  But even

25    if there is, it's relevant for confirmation.  It's not a

1   relevant issue about a decision that was made on June 9th.

2           If, after the fact, they conducted an

3   investigation, the timing has nothing to do with the original

4   decision.  And again, it might be relevant for confirmation,

5   it might be relevant for whether it's valid consideration in

6   the plan for the releases that were given to the nondebtor

7   affiliates.  It might be relevant to whether it was

8   appropriate to release fraudulent transfer claims, but has no

9   bearing on the decision to file for bankruptcy or whether or

10  not "good faith," as defined under the Third Circuit

11  standard, has been satisfied.

12          MR. STEARN:  So my friend Mr. Tecce is obviously

13  very excited about this issue.  And Your Honor, we think it's

14  a very simple point.  The case law, as provided to us by the

15  landlords themselves, says post-petition documents and

16  communications can reflect back on the debtor's good faith at

17  the time it made the filing.  That's a legal proposition

18  which we adopt.

19          Second, this goes directly to an issue that Mr.

20  Sontchi considered at the time of his appointment and at the

21  time of his filing, and it's confirmatory for him of his

22  original views.

23          As I say, we're not asking -- I mean, I didn't want

24  to get in a fight over whether the Court should accept it for

25  its truth.  I said I thought simply the matter that it

1   occurred was sufficient.  And that's the only reason that

2   we're seeking to introduce it.  I don't see how it could

3   prejudice anything.  This is a bench trial.

4            THE COURT:  Well, wait.  If the only purpose of it

5   is it occurred, can't the parties stipulate that it occurred?

6            MR. TECCE:  Yes.  They did an investigation and the

7   report was prepared by Richards, Layton & Finger on July

8   23rd.  I don't dispute those facts.

9            MR. STEARN:  And that it reached certain

10  conclusions.

11           MR. TECCE:  I'm sorry.  Say that again.

12           MR. STEARN:  And that it reached certain

13  conclusions, which I was about to ask him, and that's when

14  you stood up.

15           MR. TECCE:  The conclusions, now we're going into -

16  -

17           THE COURT:  But --

18           MR. TECCE:  -- the merit of it.

19           THE COURT:  Doesn't that go to the truth, which you

20  just told me you weren't having admitted for that purpose?

21           MR. STEARN:  Well, no.  It -- the fact that it

22  reached certain conclusions simply informs Mr. Sontchi's

23  view.  But we weren't going to ask Your Honor to read it and

24  accept it.

25           Look, I don't want to make this too big of an

1    issue, more than it has to be.  I mean, if where Your Honor

2    is comfortable is that the report was done at Mr. Sontchi's

3    request, then that's where we land.  I don't want to take up

4    too much time on this issue, Your Honor, if it's troubling

5    people.

6         It seemed to me that, if it's not coming in for its

7    truth, but the fact that it was done, that it doesn't really

8    raise an issue.  So that's our position.

9         MR. TECCE:  And Your Honor, just quickly, I add

10   that it's also hearsay and doesn't speak to anything about

11   good faith.

12        And finally, I always get excited, so please don't

13   misinterpret if I'm excited about this particular issue, that

14   it's any more significant than any other.

15        THE COURT:  Yes.

16        MR. SILVERMAN:  May I be heard?  This email is --

17        THE COURT:  Can you please get a mic?  I have

18   difficulty hearing --

19        MR. SILVERMAN:  Yes.

20        THE COURT:  -- up here.  Sorry.

21        MR. SILVERMAN:  Yes, Your Honor.

22        THE COURT:  There's noise behind me.

23        MR. SILVERMAN:  Marc Silverman, who authored this

24   email.

25        First, I would say that there's a difference

1  between discoverability and admissibility, as Mr. Stearn is

2  saying.  He's not offering it to be admitted; he's offering

3  it for the fact that it happened.  So you can't -- I mean, it

4  shouldn't even be admitted, it shouldn't be discussed.

5         And two, if it should, this is an issued that I

6  raised before about sword/shield and using documents that are

7  under privilege.  If this came in, we would need all the

8  discussions between them to understand what the factual

9  underpinnings are for this report.  And I'll stop there.

10        MR. STEARN:  It's all in the report, Your Honor.

11  But I mean, this is taking up more time than I had hoped it

12  would on a day when we are trying to get done.  So I'm not

13  going to say anything else, I'm just going to let Your Honor

14  rule.

15        THE COURT:  Okay.  Other than -- the parties will

16  stipulate that this report was done?

17        MR. TECCE:  I stipulate that the report was

18  prepared.  It was prepared by Richards, Layton & Finger, and

19  it was completed on July 23rd.

20        THE COURT:  Okay.  I'm not going to allow it for --

21  this report for the truth.  I'll allow the parties to

22  stipulate to that provision.

23        MR. STEARN:  Thank you, Your Honor.

24  BY MR. STEARN:

25  Q    And so then let's just wrap up, Mr. Sontchi, I think.

1    What is the primary purpose of Bedmar, LLC's Chapter 11

2    case?

3    A    Well, it's to administer the case, so that we can manage

4    the disposition of the assets, reject the leases, transfer

5    control of the leases back over -- premises back over to the

6    landlords, and pay all allowed claims in full.

7    Q    Do you believe the debtor's bankruptcy case was filed in

8    good faith?

9    A    I do.

10   Q    I think you've given a lot of testimony that goes to

11   this issue already.  But can you give us sort of a high-level

12   summary of why?

13   A    Yeah, two reasons:

14       One, I believe that -- I believed and still believe, at

15   the time of the filing, that the overall enterprise of the

16   various debt -- the debtor and the nondebtor entities was in

17   financial distress; that, even under the situation where we

18   should be able to pay allowed -- all allowed claims in full,

19   there was a significant risk that that wouldn't occur.  And

20   then, in that case, we would have no idea -- or no ability --

21   I'm sorry  to pay all claims in full.  So we were -- the

22   debtor was in financial distress.

23       And then the other thing was, going back again, that the

24   allow -- all allowed claims were going to be paid in full in

25   the case, and that included rejection claims subject to the

1    cap under 502(b)(6).

2         Those were the two most significant things to me that I

3    thought, in my own mind, satisfied the requirements for a

4    good faith filing, and that's why I authorized the filing.  I

5    wouldn't file a case I didn't think was going to be filed in

6    good faith under the Code.

7    Q    No further questions.  Thank you, Mr. Sontchi.

8    A    You're welcome.

9              MR. STEARN:  Thank you, Your Honor.

10             THE COURT:  Thank you.

11             MR. TECCE:  We have a binder for the witness, too.

12        (Participants confer)

13             THE COURT:  I need one.

14        (Participants confer)

15             THE COURT:  Excuse me.  I need one.  Sorry.  Thank

16   you.

17                     CROSS-EXAMINATION

18   BY MR. TECCE:

19   Q    Good afternoon, Mr. Sontchi.

20   A    Good afternoon.

21   Q    Good afternoon.

22        Now, in reference to the May 21st meeting at Latham in

23   New York --

24   A    Could you -- I can't --

25   Q    Oh, I'm sorry.

236

1      THE COURT:  Mr. Tecce, can you, yeah, you speak

2  up?

3      THE WITNESS:  If you use those mics ...

4      THE COURT:  We're not picking you up.

5      MR. TECCE:  I don't want to be too excited, but

6  yes.

7      (Laughter)

8      MR. TECCE:  Trying to keep my cool.

9  Q    There was a May 21st meeting in New York at Latham &

10  Watkins, correct?

11  A    Yes.

12  Q    You attended that meeting, correct?

13  A    Yes.

14  Q    And I believe you were told at that meeting about a

15  series of divisions, but you did not ask -- under the

16  Delaware LLC law, but you did not ask a lot of questions

17  about that at that meeting.  Is that correct?

18  A    About how the divisions would actually work?  No, I did

19  not.

20  Q    Did you know enough coming out of that meeting to know

21  that the divisions would result in the creation of Bedmar,

22  LLC?

23  A    Certainly not by name at that point.  The name they were

24  throwing around was, believe it or not, worse than "Bedmar,"

25  so I didn't know about that.

1        But I knew that the liability -- certain lease

2    liabilities, which had not been identified to me yet, but

3    certain lease liabilities would end up in the debtor that

4    would file Chapter 11, and it would be an LLC.

5    Q    The Bedmar LLC was formed on June 3rd, correct?

6    A    Yes.

7    Q    You were appointed independent manager on the same day,

8    correct?

9    A    Yes.

10   Q    Bedmar, LLC has no employees, correct?

11   A    Yes, correct.

12   Q    It has no operations, correct?

13   A    Correct.

14   Q    It does not generate income, correct?

15   A    Other than whatever interest we're making on the money

16   in the bank, no.

17   Q    It has been capitalized with approximately $41.4

18   million.  Is that correct?

19   A    Yes.

20   Q    In assets.

21       And you understand that that money came from a bridge

22   loan that was provided by shareholders to Resilience,

23   correct?

24   A    I do know that, yes.

25   Q    Was Bedmar Member, Inc. created in the corporate

1  transactions, Mr. Sontchi?

2  A    Yes.

3  Q    Okay.  And that is the DIP lender to Bedmar, LLC,

4  correct?

5  A    Yes.

6  Q    So neither one of those two companies existed prior to

7  June 3rd, 2025, correct?

8  A    I definitely know Bedmar, LLC did not.  I don't know

9  when the division occurred that -- the specific date where

10 the division occurred in connection with the creation of

11 Bedmar Member, Inc.  It could have been June 3rd; it could

12 have been earlier.  I don't know.

13 Q    Do you understand that Resilience engaged professionals

14 to calculate --

15 A    Actually, no, Bedmar Member, Inc. was not created in the

16 division, I apologize.  I think it was created as an

17 intermediate subsidiary, but I might be wrong on that, as

18 well.  I try to -- every day I try to figure out that

19 organization chart, and every day I start fresh.

20 Q    Is it fair to say, sir, that the amount of assets

21 allocated to Bedmar, LLC was arrived at by Resilience's

22 professionals?

23 A    Proposed by Resilience professionals, negotiated and

24 reviewed by Richards and DWC, and ultimately agreed upon.

25 Q    So Portage Partners proposed the figure initially,

1    correct?

2    A    That is correct.

3    Q    And the amount of liabilities allocated to Bedmar, LLC

4    of $372 million, that was a figure that was -- let me

5    rephrase that.

6         We have $372 million of lease liabilities that were

7    allocated to Bedmar, LLC pursuant to the corporate

8    transactions, correct?

9    A    Yes.  Well, it depends on whether you call them member -

10   - yes and no -- whether you call the merger part of corporate

11   transactions, I generally don't because I was actually

12   involved in that.  But some of those leases and liabilities

13   come from that merger.

14   Q    So let's -- we're not at the merger yet.  Okay?

15   A    All right.

16   Q    So let's just back up.

17   A    So if we're not there, yes.

18   Q    So, as part of the corporate transactions, Bedmar, LLC

19   comes into existence as a company, and $372 million of

20   liabilities are allocated to that entity on or about June

21   3rd.  Is that a fair statement?

22   A    Through the division and the creation through the

23   division and the merger, yes, that's true.

24   Q    And that company filed for bankruptcy on June 9th,

25   correct?

1    A    It did.

2    Q    And you became the independent manager on June 3rd.  Is

3    that correct?

4    A    Yes.

5    Q    To your mind, is the $41.4 million of assets allocated

6    to Bedmar, LLC sufficient to pay the lease cap claims?

7    A    That's based on the calculations that we had when we

8    filed, yes.  We always contemplated that there would be a bar

9    date where the landlords could assert their own rejection

10   damages.  That has happened.  I have not reviewed them in

11   detail, but that has happened.  And I -- and it's been

12   reported to that me that that exceeds the amount that we

13   initially assumed.  So we'll have to figure something out in

14   connection with that to make sure we have the money we need

15   to pay whatever those allowed claims are.

16   Q    The money that is there, though, to pay those allowed

17   claims came from the shareholders' loan into Resilience.

18   Isn't that correct?

19   A    It was -- it was -- yes, it's correct that it was loaned

20   to a nondebtor affiliate and then -- it's correct that it was

21   loaned to a nondebtor affiliate, and that the proceeds of

22   that nondebtor affiliates receiving those funds, those

23   proceed are reserved for us as a receivable.

24   Q    You mentioned that the pan -- the plan pays the claims

25   in full a hundred percent, correct?

1    A    Yes.

2    Q    And that's assuming that the statutory cap applies,

3    correct?

4    A    Of course.

5    Q    You mentioned the factors that were relevant to filing

6    Bedmar Member, LLC, and I believe you included the financial

7    distress of the enterprise.  Is that correct?

8          MR. STEARN:  I think you misspoke in the

9    identification of the entity that filed.

10          THE WITNESS:  You said Bedmar Member, LLC.

11          MR. TECCE:  Let me ask the question again.  It's in

12    my notes, I love that.

13    BY MR. TECCE:

14    Q    I believe you mentioned, your -- judge -- Mr. Sontchi,

15    that the -- one of the considerations that was relevant to

16    filing Bedmar, LLC for bankruptcy was that the broader

17    enterprise is in financial distress.  Is that correct?

18    A    It is.

19    Q    Okay.  And by that you mean the Resilience companies,

20    correct?

21    A    Yes.

22    Q    I think you mentioned that, at or about the May 21st

23    meeting, you had to your mind decided that this bankruptcy

24    was a better outcome than a bankruptcy for the broader

25    Resilience companies.  Is that correct?

1    A    I said that it couldn't be any worse -- or it couldn't

2    be any better, but it could have been worse, yes.

3    Q    And what was relevant to your mind in reaching that

4    conclusion?

5    A    Two things:  The information that I gathered about the

6    financial distress of the broader company; and the fact that,

7    in the strategy in the Bedmar, LLC bankruptcy, all allowed

8    claims to be paid in full.

9    Q    Did you consider whether or not any of the debt of the

10   broader Resilience enterprise might be subject to challenge

11   on recharacterization grounds?

12   A    I did not.  But I did know there was over $200 million

13   of secured debt.

14   Q    That's the government loan, correct?

15   A    Yes, it is.

16   Q    But beyond the $200 million in secured debt, are you

17   aware of any debt that is not related to the shareholders or

18   was extended by the shareholders, held by Resilience, the

19   enterprise?

20   A    I don't think so.  As I sit here today, I don't think

21   so.

22   Q    And you know that these shareholders funded the amount

23   that will be used to pay the lease capped claims, correct?

24   A    I know the preferred stock was -- was sold, and that

25   went to certain -- I think I heard 50 different people

1    participated in that, or maybe that's a different

2    transaction.  But yes, that was the source of the funds.

3    Q    Focusing just on Bedmar, LLC, the debtor.  Why is it

4    that you think that Bedmar, LLC, the debtor, is in financial

5    distress?

6    A    Well, there is a significant -- there's significant risk

7    associated with this case.  One, it could get dismissed, in

8    which case, the company would clearly be in financial

9    distress because it has insufficient assets to pay all of its

10   liabilities.

11        Second, even if it stays in bankruptcy, we'll have to

12   figure out what the actual rejection damages claims are, and

13   we'll have to figure out whether we have a source of funds to

14   pay for those.  I feel pretty confident that will happen, but

15   I don't have anything in writing that would assure me that

16   that could happen, anything I could enforce.

17        And third, we still have to confirm a plan.  And a lot

18   can go wrong -- a lot can go wrong from the petition date to

19   the effective date of a confirmed plan.

20        So there is significant risk and there's -- depending on

21   how that risk plays out, there's a significant -- well, it

22   would be assured in certain scenarios that we wouldn't be

23   able to pay all of our debts in full.  So, yes, I think this

24   company is in financial distress.  I have no source of income

25   other than interest on a DIP loan that's sitting in a bank.

1    Q    Taking the last point, you have no source of income.

2    But again, sir, this company came into existence on June 3rd

3    as part of a series of corporate transactions, correct?

4    A    Yes.

5    Q    It was formed for the purpose of filing for bankruptcy,

6    correct?

7    A    It was formed for the purpose of filing bankruptcy in

8    order to allow the leases to be rejected and the rejection

9    damages to be paid in full, yes.

10   Q    And as part of forming the company for bankruptcy, $372

11   million of liabilities were allocated to this entity,

12   correct?

13   A    That's pursuant to the transactions, the corporate

14   transactions and the divisions, yes, that's what occurred.

15        (Pause in proceedings)

16   Q    Going to the merger, Mr. Sontchi, of Bedmar HoldCo, LLC

17   and Bedmar Member -- or Bedmar, LLC -- I apologize.  You're

18   right about the names, by the way, stipulate to that.

19        You mentioned the administrative convenience of the two

20   companies merging together, correct?

21   A    Among other things, yes.

22   Q    And so -- well, let me ask a broader question.  Why did

23   you -- and that was your decision to merge the two companies,

24   correct?

25   A    It was proposed to me as part of the transaction or the

1    strategy, and I agreed with it.  But yes, I absolutely made

2    the decision to execute the merger.

3    Q    When it was proposed to you, what were you told?  First

4    of all, by whom was it proposed?

5    A    Well, I mean, it was --

6             MR. STEARN:  Let's go one question at a time.

7             MR. TECCE:  I'd like an answer.  Thank you very

8    much.

9             MR. STEARN:  Well, o, I want to make sure he

10   doesn't discuss --

11            MR. TECCE:  I --

12            MR. STEARN:  -- privileged information.

13            THE COURT:  Okay.  Wait.

14            THE WITNESS:  First of all, I don't know what the

15   question is.  But go ahead.

16            THE COURT:  I was going to say I don't either, at

17   this junction, so

18            MR. STEARN:  I'm sorry, Your Honor, I didn't mean

19   to interrupt counsel.  But it's the kind of question that

20   might elicit privileged information --

21            MR. TECCE:  I get it.

22            MR. STEARN:  -- so I'm asking that we go question

23   by question.

24            THE COURT:  Okay.

25   BY MR. TECCE:

1    Q    You mentioned that the merger was proposed to you,

2    correct?

3    A    That was probably an inaccurate word.  It was a step in

4    the transactions that had been put in place as part of the

5    strategy.  It was -- as far as I knew, from quite some time

6    back -- I can't tell you the time or the date -- that was a

7    piece or a final piece.  So that's what I mean by "proposed,"

8    it was as part of the strategy.

9        But I decided to sign those documents, that was me, that

10   was my authority.

11   Q    And what was the purpose -- well, how did you get

12   comfortable to go forward with the merger?  Why did you think

13   it made sense?

14   A    Well, I -- it made sense for the reasons I already said.

15   I felt that it would be much more efficient to have one

16   company in bankruptcy.  There were not just administrative

17   claims -- or administrative issues, but filing a case where

18   you've got two companies, different liability sets, different

19   assets sets, you're jointly administering them but not

20   substantively, it -- it would create significant difficulty

21   in getting the case done.  So I felt a merger made a lot of

22   sense.

23   Q    You mentioned different liabilities.  The -- Bedmar

24   HoldCo had been allocated guarantee obligations, correct?

25   A    I believe five guarantees, yeah.

1    Q    And Bedmar, LLC had been allocated the primary lease

2    obligations, correct?

3    A    No.  I -- I may be wrong, but I believe that there were

4    lease obligations allocated to both companies pursuant to the

5    divisions.

6    Q    So Bedmar HoldCo had lease obligations?

7    A    Yes.

8    Q    Okay.  But it also had guarantee obligations for

9    liabilities that were allocated to Bedmar Member -- Bedmar,

10   LLC, correct?  The debtor.

11   A    There were guarantees -- there were five guarantees that

12   were allocated to Bedmar HoldCo.  Those covered, both some

13   leases that Bedmar HoldCo had -- and I'm thinking of the two

14   San Diego leases, I believe, for example -- as well as

15   guarantee -- as -- as well as the guarantees.  So, yes, there

16   -- and then that was merged together.

17   Q    Okay. So that HoldCo, Bedmar HoldCo, there were

18   guarantees for leases that had been allocated to the debtor,

19   correct?

20   A    That's what I said, yes.

21   Q    It's not infrequent, though, that cases are jointly

22   administered, correct?

23   A    No.

24   Q    On the first day of the case, the debtor filed a motion

25   to reject the leases, correct?

1    A    Yes.

2    Q    Okay.  And on the first day of the case, the debtor --

3    or I'll stipulate to it, it's in your binder, if you want to

4    take a look at it.

5         The plan was filed on June 10th, correct?

6    A    I believe so.

7    Q    Okay.  And the plan contains releases that include the

8    nondebtor affiliates.  Isn't that correct?

9    A    Yes.

10   Q    And it would include releases for claims relating to the

11   corporate transactions, correct?

12   A    I believe so.

13   Q    Okay.  And there is no fiduciary out in those releases

14   in the plan, correct?

15   A    First of all, it's a plan.  I don't need a fiduciary out

16   on a plan.  I just change the plan.  It's not -- it's not a

17   contract.

18   Q    But the -- let's take a look at the release language, if

19   we could.

20   A    All right.

21        MR. STEARN:  Your Honor, if I could.

22   A    It's a plan.

23        MR. STEARN:  I let this go for a little bit, but

24   it's not relevant to today's hearing on the motion to

25   dismiss.  We're going to have confirmation, hopefully.

1          MR. TECCE:  Fair enough.  You know what?  Based on

2     the last colloquy that we had about it, we'll move on.

3     That's fine.

4          THE COURT:  Okay.

5          MR. STEARN:  Thank you.

6        (Pause in proceedings)

7     BY MR. TECCE:

8     Q    Just waned to close this out.  With respect to whether

9     or not the corporate transactions comply with the terms of

10    the leases, that's something that your counsel has reviewed,

11    not you personally.  Is that correct?

12    A    Yes, that is correct.

13    Q    And you're not capable of answering a question about

14    that absent divulging attorney/client communications.  Is

15    that right?

16    A    Yes.

17    Q    So you don't have your own view, separate and apart from

18    counsel, as to whether or not the corporate transactions

19    comply with the terms in the leases?

20    A    So I'm the manager, not the lawyer.  I hired lawyers.

21    They reviewed the leases, we discussed it.  They told me

22    their conclusions and I agreed.

23    Q    Thank you for your time.

24    A    You're welcome.  Thank you very much.

25          MR. TECCE:  No further questions.  Thank you.

1      (Pause in proceedings)

2              MR. SILVERMAN:  Your Honor, Marc Silverman for

3      Harvard, Alachua, and 92 Crowley.

4              We're passing along the witness binders for Mr.

5      Sontchi.

6              THE COURT:  Thank you.

7              THE WITNESS:  Thank you.

8                          CROSS-EXAMINATION

9      BY MR. SILVERMAN:

10     Q    Mr. Sontchi, you testified that you agreed to do this

11     because landlords would be paid in full.  Is that right?

12     A    Good afternoon.

13     Q    Good afternoon.

14     A    Yes, I did.

15     Q    If the capped claims are allowed in amounts in excess of

16     the funds available, did the parent or its investors agree to

17     fund all amounts needed to pay any allowed claims in full?

18     A    There's no written agreement or contract about that.

19     Q    Okay.  Were you in the courtroom earlier when Ms.

20     Weidman was testifying?

21     A    Uh-huh.  Yes.

22     Q    Do you recall her testifying that the DIP money

23     allocated never got paid to Bedmar?

24     A    No, that did not happen.

25     Q    Has the money been paid to Bedmar?

1  A    The DIP has been drawn in full.

2  Q    I'm sorry, has been what?

3  A    The DIP has been drawn in full.  We have the DIP.

4  Q    Okay.

5  A    All 10 million.

6  Q    Are there other monies or debts that Bedmar is expecting

7  to receive that it has not received yet?

8  A    Well, yeah.  Yes.  Right now, we have about 14 million,

9  that's the DIP plus the allocations that occurred prior.

10 However, we -- of course we have the receivable.  So, if and

11 when we confirm a plan and need to pay allowed claims, we

12 will get the money that has been -- that is under the

13 receivable.

14 Q    Do you know why the receivable has not been paid to

15 Bedmar yet?

16 A    Well, one, we haven't asked for it, but no.

17 Q    Do you have any knowledge --

18 A    It's -- it's for --

19 Q    Go ahead.

20 A    It's to pay the rejection -- it's to pay allowed claims

21 under a confirmed plan, so, when I have the confirmed plan,

22 we'll deal with it.

23 Q    And that receivable is how much?

24 A    I don't know as I sit here today, precisely.

25 Q    If the allowed claims are higher than what you expected

1    as the capped claims, would you be able to get more money

2    from the parent?

3    A    I will certainly do everything I can, starting by asking

4    and moving on from there.  I have a fair expectation that, if

5    the plan is confirmed as it's been proposed, that that money

6    will come, but I have no guarantee.

7    Q    And how much money do you expect to be available?

8    A    Whatever -- I don't -- the receivable is the receivable.

9    I don't know the amount left on it unpaid as I sit here

10   today.

11   Q    Okay.  I think you testified earlier about the purpose

12   of the merger.  Is that right?  The purpose of the division,

13   the corporate transactions, and the filing.

14   A    Yes.

15   Q    Is that right?

16   A    Yes.

17   Q    Okay.  Did you ever come -- is it your understanding

18   that the whole purpose of the division in the bankruptcy was

19   to put the leases into Bedmar, so that they could be capped?

20   A    No, that's not the whole purpose.

21   Q    Do you remember having a deposition in this matter?

22   A    Yes.

23        MR. SILVERMAN:  Okay.  Can we get to his

24   deposition?

25   BY MR. SILVERMAN:

1    Q    I'm going to hand you a copy of your deposition and I'm

2    going to hand it to the Court as well.

3         (Participants confer)

4    A    It's not in my binder.

5    Q    Yeah, we have a separate binder.

6    A    That's fine.  I see it up.

7    Q    And I want to go to Page 84.  I'll get you a copy.

8    A    Thank you.

9              THE COURT:  Thank you.

10   Q    And I want to go to Line 84/12.

11   A    Okay.

12        (Participants confer)

13   Q    And in the deposition the question was:

14             "Question:  So was the whole purpose of the

15   division to put the leases in there so that they could be

16   capped?"

17        And your answer was:

18             "Yes, I don't think we've hidden that."

19        Did I read that right?

20   A    Yes.

21   Q    Thank you.

22        You had testified earlier that you deferred to counsel

23   on whether the transfer of leases violated anti-transfer or

24   similar provisions in the leases.  Do you recall that?

25   A    Would you repeat the question, please?

1    Q    Yes.  You testified earlier, I believe, that you

2    deferred to counsel on whether the transfer of leases

3    violated anti-transfer or similar provisions in the leases.

4    Do you recall that testimony?

5    A    I would take issue with the word "transfer."  I would

6    say either division, merger, or assignment.  But yes, I

7    deferred to counsel.

8    Q    So you deferred to counsel on the division, assignment

9    -- what was the other one?

10   A    Well, if it happened through the merger.

11   Q    So what did counsel tell you regarding what you said in

12   the --

13            MR. STEARN:  Your Honor, do you want to make that

14   objection for me, or should I make it?

15            MR. SILVERMAN:  It's a waiver.

16            MR. STEARN:  It's not a waiver.  He's -- telling

17   someone you relied on advice of counsel doesn't waive it.

18            MR. SILVERMAN:  He's testifying to his

19   understanding of it today.

20            MR. STEARN:  No, he's not.

21            THE COURT:  He --

22            MR. STEARN:  He said he deferred to counsel to make

23   that decision.  Your Honor, this is not a waiver.

24            THE COURT:  That's --

25            MR. STEARN:  It's not even close.

1        THE COURT:  I'm going to sustain the objection.

2        MR. SILVERMAN:  Okay.

3   BY MR. SILVERMAN:

4   Q    Mr. Sontchi, were you in the courtroom earlier with Mr.

5   Montone's testimony?

6   A    Yes.

7   Q    Do you recall an email being put in front of him from

8   Mr. Marth to an investor -- I might have to give it to you,

9   since I can't really say the names.  So let me do that first.

10  A    I think we've shown a lot of emails, so ...

11  Q    So let's go to Tab 3, which is M-43.

12  A    Just give me a minute, please.

13       THE COURT:  This document was already admitted,

14  correct?

15       MR. SILVERMAN:  Correct, Your Honor.

16       THE WITNESS:  Tab 3?

17  BY MR. SILVERMAN:

18  Q    This is Tab 3.

19  A    Yes, sir, I see it.

20  Q    Yes.  It is Exhibit M-43 for the record.

21       Earlier, you had testified that you were satisfied that

22  the filing was in good faith.  Do you recall that testimony?

23  A    I recall saying that.

24  Q    And do you see the email that's in front of you from Mr.

25  Marth to an another individual dated June 9th, 2025?

1    A    Yes.

2    Q    In your discussions with Resilience on May 21st or any

3    time thereafter, did anyone from Resilience ever tell you

4    that it intended to use a legal tool to rid Resilience of the

5    toxic legal sites?

6    A    Well, no one used those words.

7    Q    And in the May 21st meeting and any time thereafter, did

8    anyone tell you that the best path to return value to the

9    shareholders was to use a legal path to rid Resilience of the

10   toxic sites?

11        MR. STEARN:  Are you just asking that generally?

12   Because you're not really quoting directly from the email.

13        MR. SILVERMAN:  Is that an objection?

14        THE WITNESS:  That's not what the email says.

15   BY MR. SILVERMAN:

16   Q    Did anyone ever tell you, prior to filing the

17   bankruptcy, to me, the best path to return value to

18   shareholders absent a favorable bid from blank?

19   A    No one used those words with me, no.

20   Q    Have you ever seen this email before?  Did you see this

21   email before you authorized the filing of this petition?

22   A    The first I ever saw this email was today.

23        MR. SILVERMAN:  Thank you.  No further questions.

24        MR. FOX:  Good evening.  May it please the Court,

25   Tim Fox on behalf of the United States Trustee.

1          CROSS-EXAMINATION

2    BY MR. FOX

3    Q    Mr. Sontchi, I just have a couple of questions; and

4    then, unless Mr. Stearn has a lot of redirect, we should be

5    out of here well in advance of 6:30, so I appreciate

6    everyone's patience and time.

7          So, Mr. Sontchi, in your testimony today you referred to

8    certain negotiations between Richards, Layton & Finger and

9    Latham as it related to elements of the corporate

10   transactions.  Did I hear that correctly?

11   A    Yes.

12   Q    And, Mr. Sontchi, your appointment as the Independent

13   Manager of Bedmar, LLC --

14   A    I'm sorry, I'm going to interrupt.

15         I -- actually, no, not to the corporate transactions.

16   Yes, to how those corporate transactions would be related to

17   the Bedmar bankruptcy and Bedmar's existence; so, for

18   example, what the receivables should be, if there was a

19   receivable, how much money we needed, what the provisions

20   should look like in the context of forming Bedmar and going

21   into the bankruptcy, but not, you know, necessarily in all

22   the divisions that occurred earlier.

23   Q    So, as a followup, in terms of timing, that was on or

24   about May 21st, in the meeting at the Latham offices that

25   certain of those discussions would be occurring?

1    A    No, that was just a preliminary meeting -- well, not

2    preliminary, it was a substantive meeting.

3         But what happened afterwards between, May 21st, June

4    3rd, and then June 9 was the discussions between Richards and

5    DWC and Latham and Portage Partners about how to effectuate

6    the path forward in a way that was fair to the debtor.

7    Q    And so if I understand your answer to my question

8    previous to that one, there wasn't any direct engagement by

9    Richards, Layton & Finger on behalf of Bedmar, LLC as to the

10   actual allocation of --

11   A    Well -- sorry.  No.  I apologize, Mr. Fox.

12   Q    I understand.  It's a complicated set of facts here.  So

13   let me re-ask.  And "allocation" may be a difficult word to

14   use, so let me try again.

15        So, during -- prior to Bedmar, LLC's formation on June

16   3rd under the corporate transactions, there weren't

17   negotiations between Richards, Layton & Finger as to what

18   Bedmar, LLC, as an entity, would look like with Latham &

19   Watkins as counsel to National Resilience?

20   A    All right.  So this is, I think -- let me try to restate

21   what I said before because I think it's confusing, and I

22   apologize.

23        So, after we had the meeting on May 21st, I engaged

24   Richards, Layton & Finger and I engaged DWC.

25        We had the broad outlines of what the path forward would

1    be that were given to me at the time of that meeting on May

2    21st.

3        During that period, going forward, Richards was

4    definitely involved in communications.  I don't know if they

5    were negotiations, per se, but there were certainly

6    communications about the process that would actually

7    effectuate the creation of Bedmar, the merger, and the

8    filing.  They were involved in that.

9        If it came to the point of like negotiating provisions

10   or not, I do not know.  They -- I do -- however, I was copied

11   on quite a bit of correspondence where people were engaged

12   in discussions.

13   Q    Thank you.

14   A    And I apologize for being confusing.

15   Q    No, no apologies necessary.

16       Would any of those communications, or if they were

17   reduced to writing, be items that were produced to the

18   parties in discovery, or would that be subject to the common

19   interest privilege or agreement that had been asserted by the

20   debtor and/or National Resilience at previous times during

21   this Chapter 11 case?

22       MR. STEARN:  Object to the question as, first of

23   all, very confusing.  And second, he's the client, he's not

24   the lawyers who were making privilege calls or things like

25   that.  That's not an appropriate question for the independent

1   manager.

2           THE COURT:  Mr. Fox?

3           MR. FOX:  The -- Your Honor, the nature of the

4   communications and whether or not they would be potentially

5   adverse between the debtor and National Resilience is central

6   to the case.  If the independent manager has awareness of

7   whether or not they were produced, he can testify to that.

8   He may not, but that -- it's still a proper question, and

9   then I can proceed accordingly.

10          MR. STEARN:  I'm sorry, Your Honor.  We're not

11  having yet one more discovery dispute, at least I don't think

12  we are.  I'm hoping we put discovery disputes behind us and

13  today we're focusing on good faith or not with respect to

14  this bankruptcy filing, so I would ask counsel to move on.

15          MR. FOX:  I don't think it's improper for me to

16  understand if testimony produced during the hearing creates

17  the need for additional document discovery.

18          Again, at the time that I sat down here this

19  morning, this was not an issue that was on the radar.  So,

20  again, I think it's a proper question to ask.  I'll try to

21  limit my time going forward --

22          THE COURT:  Well --

23          MR. FOX:  -- but I don't think it's a proper

24  objection.

25          THE COURT:  He can ask if the documents were

1    produced.

2    BY MR. FOX

3    Q    So -- sorry for that.  So, Mr. Sontchi, are you aware if

4    documents related to those communications between Bedmar, LLC

5    and the National Resilience enterprises were produced as part

6    of discovery?

7    A    I don't know.

8    Q    Thank you.

9         And Mr. Sontchi, did you ever directly negotiate with

10   members of the management team at National Resilience, as Mr.

11   Montone testified to that term during his testimony?

12   A    No.  I -- I had -- the only time I met the management

13   team was May 21.  I didn't speak to anyone from Latham

14   individually after that.  All of the communications going

15   forward were through DWC and Richards, obviously, in

16   consultation with me.

17             MR. FOX:  Thank you.  That's all I have, Your

18   Honor.

19             THE COURT:  Okay.  Thank you.

20             Any redirect?

21             MR. STEARN:  Just one or two questions, Your Honor.

22             Can I consult with my colleague?

23             THE COURT:  Yes.

24        (Participants confer)

25             THE COURT:  Mr. Sontchi, do you need a break?

1          THE WITNESS:  No, I'm fine, thank you, Your Honor.

2          (Participants confer)

3          MS. QUARTAROLO:  Your Honor, I -- this is Amy

4    Quartarolo on behalf of the nondebtor affiliates.

5          I would ask and I think it might be appropriate to

6    take a five-minute break because one of the issues, I think,

7    that we need to revisit before we break for the day is the

8    testimony of Mr. Marth.  We have not had a chance, because of

9    the back and forth of folks in the courtroom, to confer with

10   movants on that issue, and we'd like a chance to do so.  And

11   so, if -- now might be an appropriate time to take a break,

12   so that we could report to the Court before we break for the

13   day.

14         THE COURT:  Okay.  Let me see where Mr. Stearn is

15   on with questions.

16         (Participants confer)

17         MS. QUARTAROLO:  We can either do it before or

18   after the redirect.  I'll, in turn, defer entirely to mister

19   --

20         THE COURT:  It's a brief redirect?

21         MR. STEARN:  I think I have one or two questions.

22         THE COURT:  Okay.  Why don't we conclude with the

23   witness --

24         MR. STEARN:  Okay.

25         THE COURT:  -- and then we can address that issue.

1    MR. STEARN:  Thank you very much, Your Honor.

2                   REDIRECT EXAMINATION

3    BY MR. STEARN:

4    Q    Mr. Sontchi, I want to go back to your deposition where

5    you were asked a question in an attempt to impeach you.  And

6    do you have still have that deposition in front of you?  It

7    was page --

8    A    No, I don't.  Give me a moment.  I don't remember the

9    page.

10   Q    I'm shocked.  But 84.

11   A    Yes.

12   Q    So, on Page 84, Mr. Silverman asked you the question and

13   provided the answer at Lines 12 to 15.  Do you see that?

14   A    Yes.

15   Q    He asked you the question:

16          "Was the whole purpose of the division to put the

17   leases in there so that they could be capped?"

18          "Answer:  Yes, I don't think we've hidden that."

19       Right?

20       But were the reasons for doing the division and putting

21   the leases in to Bedmar, LLC so that damages could be capped

22   much broader than is reflected in this question and answer?

23   A    Yes.

24   Q    And have you testified at length today about the reasons

25   for doing so?

1    A    I believe so.

2              MR. STEARN:  Okay.  That's it for me, Your Honor.

3    Thank you.

4              THE COURT:  Okay.  Thank you.

5              Thank you, Mr. Sontchi.

6              THE WITNESS:  Thank you, Your Honor.

7              THE COURT:  You may --

8              THE WITNESS:  Whoops.  Sorry.

9         (Witness excused)

10             THE COURT:  Okay.  Do you want to take a break so

11   the parties can discuss testimony?

12             MR. STEARN:  I think the answer is yes, Your Honor.

13             THE COURT:  All right.  All right.  Let's take a

14   recess.  I'm not going to put a cap on your time -- well, I

15   will ultimately put a cap on your time.  But speak freely,

16   and then just let him know, and I'll be outside.

17             MR. STEARN:  We will Your Honor.

18             THE COURT:  Thank you.

19             MR. STEARN:  Thank you.

20             UNIDENTIFIED:  Thank you, Your Honor.

21        (Recess taken at 5:32 p.m.)

22        (Proceedings resume at 5:42 p.m.)

23             THE COURT:  Please be seated.  Okay.

24             MS. QUARTAROLO:  I guess it's appropriate to say

25   good evening now, Your Honor.  Amy Quartarolo of Latham &

1   Watkins, on behalf of the nondebtor affiliates.

2           As you know, based on the ruling this morning, we

3   promptly connected with Mr. Marth, had him get on a plane.

4   It was news to us when they indicated this afternoon that

5   they no longer intended to call him.  He is here now in

6   Delaware and is -- we indicated earlier we intend to call him

7   in our case.

8           We have conferred with counsel for the movants and

9   have agreed that he will go on first.

10          THE COURT:  Oh, okay.

11          MS. QUARTAROLO:  We will call him in the morning.

12  He will be subject to cross-examination following his direct

13  examination.  And then we will proceed with the remaining

14  experts in order; that should be Mr. Alhale, Mr. Madden, and

15  then I'm hopeful that we can move on to closings tomorrow

16  afternoon.

17          THE COURT:  Okay.  All right.  And if -- and just

18  so you know, if you can't, in terms of managing your

19  expectations and schedules, it would then have to be Thursday

20  morning and with it being completed before -- by noon.  Does

21  that make sense?

22          MS. QUARTAROLO:  Understood, Your Honor.

23          THE COURT:  Okay?  Otherwise, you're going to have

24  to come back Friday.

25          MS. QUARTAROLO:  I think we will all be ambitious

1    and hopeful that we can wrap up tomorrow.

2              THE COURT:  Okay.  Terrific.

3              All right.  Everyone have a great night.  Thank you

4    all for your time today.

5              MS. QUARTAROLO:  Thank you.

6              THE COURT:  We stand adjourned.

7              COUNSEL:  Thank you, Your Honor.  Thank you, Your

8    Honor.

9              UNIDENTIFIED:  Your Honor, it's okay to leave our

10   things in this courtroom?

11             THE COURT:  Yes.  Yes.  This is your courtroom.

12         (Proceedings adjourned to 7/30/25)

13         (Concluded at 5:44 p.m.)

14                             *****

15

16

17

18

19

20

21

22

23

24

25

267

1                          CERTIFICATION

2              I certify that the foregoing is a correct

3      transcript from the electronic sound recording of the

4      proceedings in the above-entitled matter to the best of my

5      knowledge and ability.

6

7

8

9      _____          August 1, 2025

10     Coleen Rand, AAERT Cert. No. 341

11     Certified Court Transcriptionist

12     For Reliable

13

14

15

16

17

18

19

20

21

22

23

24

25