1

2

3     IN RE:

4     BEDMAR, LLC,

5              Debtor.

6

7

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

.  Chapter 11
.  Case No. 25-11027 (JKS)
.
.  Courtroom No. 6
.  824 North Market Street
.  Wilmington, Delaware 19801
.
.  Wednesday, July 30, 2025
. . . . . . . . . . . . . . . . . . .  9:30 a.m.

8                    TRANSCRIPT OF HEARING
         BEFORE THE HONORABLE J. KATE STICKLES
9              UNITED STATES BANKRUPTCY JUDGE
                     **TRIAL - DAY 2**

10    APPEARANCES:

11

12    For the Debtor:        Michael Merchant, Esquire
                             Robert Stearn, Jr., Esquire
13                           RICHARDS, LAYTON & FINGER, P.A.
                             One Rodney Square
14                           920 North King Street
                             Wilmington, Delaware 19801

15

16    For the U.S. Trustee:  Timothy Fox, Esquire
                             UNITED STATES DEPARTMENT OF JUSTICE
17                           OFFICE OF THE UNITED STATES TRUSTEE
                             844 King Street, Suite 2207
18                           Lockbox 35
                             Wilmington, Delaware 19801

19    (APPEARANCES CONTINUED)

20    Audio Operator:        Sean Moran, ECRO

21    Transcription Company: Reliable
                             1007 N. Orange Street
22                           Wilmington, Delaware 19801
                             (302)654-8080
23                           Email:  gmatthews@reliable-co.com

24

25    Proceedings recorded by electronic sound recording,
      transcript produced by transcription service.

APPEARANCES (CONTINUED):

For President and
Fellows of Harvard
College, 92 Crowly
Owner (DE) LLC, and
CEGM Alachua, LLC:          Aaron Applebaum, Esquire
                           R. Craig Martin, Esquire
                           DLA PIPER LLP (US)
                           1201 North Market Street
                           Suite 2100
                           Wilmington, Delaware 19801

                           Marc Silverman, Esquire
                           DLA PIPER LLP (US)
                           1251 Avenue of the Americas
                           New York, New York 10020

For Cobalt:                James Tecce, Esquire
                           QUINN EMANUEL URQUHART
                             & SULLIVAN LLP
                           295 5th Avenue
                           9th Floor
                           New York, New York 10016

For Bedmar Member,
Inc.:                      Amy Quartarolo, Esquire
                           Elizabeth Marks, Esquire
                           LATHAM & WATKINS LLP
                           355 South Grand Avenue
                           Suite 100
                           Los Angeles, California 90071

                           Suzzane Uhland, Esquire
                           LATHAM & WATKINS LLP
                           1271 Avenue of the Americas
                           New York, New York 10020

1                                     INDEX

2   <u>MOTIONS</u>:                                              <u>PAGE</u>

3   Agenda
4   Item 3:  Cobalt PropCo 2020, LLC's Motion to
              Dismiss Debtor Bedmar, LLC's Chapter
5             11 Case Pursuant to Bankruptcy Code
              Section 1112(b) [Docket No. 92;
6             Filed June 24, 2025]

7   Agenda
    Item 4:  Motion of the United States Trustee
8             to Dismiss or Convert the Debtor's
              Chapter 11 Case [Docket No. 111;
9             Filed June 30, 2025]

10  Agenda
    Item 5:  Joint Motion of (I) President and
11            Fellows of Harvard College, (II) 92
              Crowley Owner (DE), LLC, and (III)
12            CEGM Alachua, LLC to Dismiss the
              Chapter 11 Case of Bedmar, LLC; and
13            Joinder to Cobalt PropCo 2020, LLC's
              and UST's Motion to Dismiss Debtor
14            Bedmar, LLC's Chapter 11 Case
              Pursuant to Bankruptcy Code Section
15            1112(b) [Docket No. 135; Filed July
              3, 2025]

16

17            Court's Ruling:  Matter Taken Under Advisement

18

19

20

21

22

23

24

25

1                                  INDEX

2    EXAMINATIONS:                                          PAGE

3    WILLIAM MARTH

4        Direct examination by Ms. Marks              17

5        Cross-examination by Mr. Silverman          36

6        Cross-examination by Mr. Tecce              83

7        Cross-examination by Mr. Fox                90

8        Redirect examination by Ms. Marks           96

9

10   MORRIS ALHALE

11       Direct examination by Ms. Quartarolo        100

12       Cross-examination by Mr. Applebaum          118

13       Redirect examination by Ms. Quartarolo      142

14

15   JOHN MADDEN

16       Direct examination by Mr. Applebaum         146

17

18

19

20

21

22

23

24

25

1    (Proceedings commenced at 9:32 a.m.)

2    THE COURT:  We're back on the record in Bedmar,

3    LLC, Case Number 25-11027.

4    MS. QUARTAROLO:  Good morning, Your Honor.  Amy

5    Quartarolo of Latham & Watkins on behalf of the non-debtor

6    affiliates.

7    I think there is one threshold issue that we

8    wanted to address before we proceed with testimony this

9    morning.  Apparently, there was some confusion arising from

10   Your Honor's ruling on the motions in limine, and it impacts

11   how we proceed with witness testimony. And it goes to, like,

12   the scope and effect of Your Honor's ruling.  We read Your

13   Honor's ruling indicating that while you excluded the

14   alternative scenario analysis, that the division analysis is

15   fair game.  And we understood that Your Honor made clear that

16   what was fair game was analysis related to fraudulent

17   transfers.

18   And as we addressed in the papers, the movants

19   have claimed that the corporate transactions were fraudulent

20   transfers, and they argue that it is relevant to whether

21   these cases were filed in good faith.

22   Your Honor, I'm sure, is well aware of your ruling

23   yesterday, but as we have read and now have the benefit of

24   the transcript, and I'll be reading from pages 16 and 17 of

25   yesterday's transcript.  Your Honor ruled that evidence

1  regarding whether there was a fraudulent transfer in the

2  formation of the debtor:

3        "The Court finds the report and testimony on this

4  topic relevant to the landlord objectors' arguments that the

5  corporate transactions resulted in a fraudulent transfer.

6  Evidence that the debtor manufactured its own financial

7  distress is part and parcel of the fraudulent transfer

8  argument and, therefore, relevant."

9        And I think the issue, Your Honor, is that the

10  landlords do not agree that what has been referred to as "the

11  division analysis," which is the second portion of Mr.

12  Alhale's analysis, is relevant to the fraudulent transfer

13  issue; and we want to explain to the Court why it is.

14        THE COURT:  I don't think I addressed division at

15  all, did I?

16        MS. QUARTAROLO:  So --

17        THE COURT:  I think I referred to enterprise

18  financial condition and I believe the alternative scenario;

19  is that correct?

20        MS. QUARTAROLO:  So, you certainly addressed the

21  alternative scenario.  And it may be just that what we are

22  referring to as "the division analysis" is Mr. Alhale's

23  comparison of the recoveries to Bedmar creditors immediately

24  prior to and after the divisions.  That's what we're

25  referring to as "the division analysis," and that is relevant

1  to fraudulent transfers.  And it brings us to the question

2  of, what is the relevant standard that the Court is to

3  consider on a fraudulent transfer under this fact pattern?

4        And the landlords want to focus narrowly on a

5  single point in the corporate transactions, the allocation of

6  the leases to the debtor and how much in gross liabilities

7  was transferred and what consideration was received in

8  exchange.

9        But the law is consistent in the cases that all

10 parties have cited that where there are multiple transactions

11 that are undertaken as part of one plan or one strategy, the

12 case law instructs that fraudulent transfer analysis looks at

13 the impact of those transactions taken together and, in

14 particular, the net effect of those transactions on recovery

15 to creditors.

16       And I can cite to you, and I'm happy -- I have

17 cases that are highlighted, I can bring them to you and hand

18 them out to other parties.

19       But in the DBMP case that was cited by movants in

20 their motions to dismiss as well as their replies, that was a

21 mass tort case involving asbestos claims.  And the Court

22 ruled:

23       "The proper question is for the rights of

24 creditors, here asbestos claimants in future demands,

25 materially affected by the merger and its asset and liability

1  allocations."

2          And in additional cases that we have cited and the

3  debtor has cited, the Frontier Bank case, the Court ruled:

4          "The proper focus is the net effect of the

5  transfers on the debtor's estates, the funds available to the

6  unsecured creditors.  As long as the unsecured creditors are

7  no worse off because the debtor and, consequently, the estate

8  has received an amount reasonably equivalent to what it paid,

9  no fraudulent transfer has occurred."

10         THE COURT cited a case from the Fourth Circuit,

11  the Jeffrey Bigalow case, that held:

12         "The primary focus of Section 548 is on the net

13  effect of the transaction on the debtor's estates and the

14  funds available to unsecured creditors."

15         And lastly, Your Honor, in the Mervyn's case that

16  the debtors cite in their papers, the Court ruled:

17     "The Court will take the totality of the circumstances

18  approach by looking at the overall economic consequences of

19  the 2004 sale."

20         So, we would submit that, based on the relevant

21  case law that all parties have cited in their briefs, that

22  whether or not the corporate transactions had a material

23  negative effect on the landlords' ability to recover on their

24  claims is a relevant legal standard.

25         And that is precisely what Mr. Alhale has done in

1  what we have referred to as his "division analysis."  He

2  looks at the net assets and liabilities pre- and post-

3  division to determine the net effect, including the net

4  effect on credit recoveries.

5          And for that reason, we believe that that aspect

6  of his expert analysis and opinions is fair game, is

7  consistent with Your Honor's ruling, and we think that we

8  should be able to process with it in terms of presentation of

9  evidence today.

10          I'm happy to, again, provide Your Honor with the

11  highlighted cases that I just referred to.  I'm also happy to

12  provide you with the particular demonstratives related to his

13  division analysis that set forth his division analysis, that

14  make clear that what he is doing there is determining and

15  assessing the net effect of the pre- and post-division and

16  the net effect on the recovery to creditors.

17          That's how this dispute crystallized last night

18  when we exchanged demonstratives, and there was an objection

19  to the demonstratives on that basis.

20          THE COURT:  Okay.  Well, I don't want to see the

21  demonstratives at this point.  I'd like to hear from other

22  parties, if you're complete.

23          MS. QUARTAROLO:  Unless Your Honor has questions,

24  I'm complete.

25          THE COURT:  Thank you.

1          MR. APPLEBAUM:   Good morning, Your Honor.   Aaron

2  Applebaum from DLA Piper.

3          Your Honor, we were the parties that raised the

4  issue once we saw the demonstratives and realized that there

5  was apparently not a meeting of the minds between the parties

6  as to the scope of Your Honor's ruling.

7          And to be clear, and I appreciate that the Court

8  noted when making the ruling that you had not seen the expert

9  report, and so you were basing it off of the

10 characterizations of the proposed expert testimony in the

11 motions.

12         The division analysis that is represented in the

13 expert report and that Mr. Alhale intends to testify about

14 today undertakes a comparison of hypothetical creditor

15 recoveries at a certain point in time if the divisions had

16 not occurred versus if the divisions had occurred.

17         Your Honor ruled that:

18         "Evidence of enterprise financial condition in the

19 alternative scenario and projected recoveries under such

20 hypothetical alternative scenario is not relevant, as well as

21 the financial condition of the pre-transaction entities to

22 understanding the independent manager's intent in approving

23 the bankruptcy filing."

24         Our position is that the -- both the alternative

25 scenario analysis and the division analysis are exactly the

1 type of hypothetical alternative reality analysis that the

2 Court excluded.

3          We agree that the Court said that testimony

4 regarding whether the transactions constituted fraudulent

5 transfers and whether the debtor manufactured its own

6 financial distress is relevant.

7          Impact on creditor recoveries based on a

8 hypothetical look-back of what may have happened if this

9 transaction had or had not taken place is not relevant to

10 whether the transaction was a fraudulent conveyance.

11          I appreciate that there are some cases under

12 Section 548 of the Bankruptcy Code that talk about impact on

13 creditors as being relevant to the analysis, but we're not

14 talking about a Section 548 fraudulent conveyance action

15 here.

16          We're talking about the Delaware LLC Act, which

17 has a specific carve-out for fraudulent conveyances, that's a

18 Delaware fraudulent conveyance action.  And there's no case

19 law suggesting that the case law -- that the standard for a

20 Delaware fraudulent transfer act is anything other than what

21 the statute says it is.

22          And the statute, which is actually similar to

23 Statute 548, asks you to look at whether the debtor was

24 insolvent or rendered insolvent by the transfer and whether

25 the debtor received reasonably equivalent value.

1          We look at the transfer that happened.  We look at

2    whether the debtor received reasonably equivalent value.  We

3    look at whether the debtor was insolvent or rendered

4    insolvent.

5          Fraudulent transfer cases don't involve this --

6    these complicated creditor recovery models that go back in

7    time and say, what if it hadn't happened, how would the money

8    have flowed through the enterprise or flowed through these

9    two entities -- two companies had they not divided into these

10   separate companies. But that's what Mr. Alhale is testifying

11   to.

12          THE COURT:  Are damages a relevant element -- an

13   element of fraudulent transfer?

14          MR. APPLEBAUM:  I believe that damages can be

15   relevant under Section 550 and under whether you're able to

16   bring the action and what the damage is and what the remedy

17   is.

18          But whether -- under the Delaware LLC Act, the

19   purpose of the question of whether or not there's a

20   fraudulent transfer is not about avoiding the transfer.  It's

21   not about assigning damages.  It's about determining whether

22   the other entities in the transaction remain jointly and

23   severally liable.  That's what the purpose is.

24          So, damages and harm in that case is not relevant

25   to the analysis, Your Honor.

1          THE COURT:  Thank you.

2          MR. APPLEBAUM:  Thank you, Your Honor.

3          MR. TECCE:  Your Honor, may I just follow up on

4    that, because I'm on this side?

5          THE COURT:  Yes.

6          MR. TECCE:  Do you mind, very briefly?

7          For the record, James Tecce, Quinn Emanuel.  We're

8    not taking the lead in this obviously, but I just want to

9    emphasize something because they continue to characterize the

10   legal argument that we're raising here.

11         I just want to remind everyone that our motion to

12   dismiss argues that it's not a good-faith filing.  That's

13   what we're arguing. We're not here to prove whether or not

14   these transactions are fraudulent transfers.  It's not our

15   burden.  It's the debtor's burden to prove the case was filed

16   in good faith.  And our argument is that those transactions

17   are indicia that are relevant to whether there's good faith.

18   That's the LTL case, GoodCo/BadCo.

19         So, I just want to be very precise.  We are not

20   taking on the burden of proving that these are fraudulent

21   transfers, and we don't have to.

22         It's the debtor's burden to show good faith, and

23   our argument is that those transactions are indicia that

24   would not help carry that burden.  That's all I wanted to

25   clarify, Your Honor.

1        Thank you.

2        MS. QUARTAROLO:  Just to respond very briefly,

3   Your Honor, Amy Quartarolo on behalf of the nondebtor

4   affiliates.

5        I think what you've just heard, in my mind, proves

6   our case as to why Mr. Alhale should be able to proceed with

7   this.

8        One, they have put fraudulent transfer at issue.

9   They have raised that in their papers, and the papers are

10  riddled with references to fraud and fraudulent transfer

11  here.  The relevant standard, whether it's relevant to

12  damages, certainly it is relevant to how courts have looked

13  at what is and isn't a fraudulent transfer in these sorts of

14  multistep transactions.

15       And so, what is relevant and what we are asking

16  the Court to be able to present evidence on is the net effect

17  of those transactions on creditors.  And we think that that

18  speaks directly to the case law and is entirely consistent

19  with Your Honor's ruling yesterday.

20       MR. STEARN:  Your Honor, if I may, may it please

21  the Court, Bob Stearn from Richards Layton & Finger on behalf

22  of the debtor.  I wasn't in the middle of this dispute.  I

23  wasn't even aware until this morning that it was happening.

24  But listening to it, I just had a couple of points that I

25  wanted to add, hopefully helpful.  Really frequent.

1      First of all, on fraudulent transfer, as Your Honor

2  would have seen in our sur-reply, whether creditors were

3  damaged is directly relevant to the question of whether there

4  was a fraudulent transfer at all; and that's what Mr.

5  Alhale's opinion goes to in this circumstance.

6          Second, what I understood Your Honor to do

7  yesterday was to exclude a specific portion of Mr. Alhale's

8  expert opinion.  And that was effectively a comparative

9  bankruptcy analysis of what a bankruptcy would have looked

10  like on an enterprise basis versus what a bankruptcy looks

11  like with Bedmar, LLC.

12          And, Your Honor, I did not hear to exclude

13  anything else.  The only other thing I heard Your Honor say

14  was that where the debtor had argued that there were three

15  reasons why Mr. Alhale's opinion was relevant, one of which

16  was fraudulent transfer; another of which was the related

17  issue of manufactured distress; and the third issue was it

18  sort of corroborated Mr. Sontchi's view at the time he

19  decided to file for bankruptcy that the affiliated entities,

20  the enterprise, was in financial distress, that you wouldn't

21  consider it for that third reason, that Mr. Sontchi's

22  decision about whether he thought the enterprise was in

23  financial distress was going to stand alone; but for the

24  other two reasons, it was relevant.

25          That's what I heard Your Honor to say.  I don't

1   want to put words in Your Honor's mouth.  But any effort

2   today to go beyond that, to say that Your Honor was excluding

3   some additional portion of Mr. Alhale's opinion is, in

4   effect, a closet re-argument that seeks to expand the scope

5   of Your Honor's opinion, which on the substance did not go

6   beyond, as I heard it, excluding a comparative bankruptcy

7   scenario. So, I just wanted to point out those three issues,

8   Your Honor.

9           Thank you very much.

10          THE COURT:  Well, my ruling yesterday was based on

11  my interpretations of the various letters.  I'm not sure that

12  I fully comprehended at the time, having never read the

13  report, this divisional analysis.  And hence, I didn't even

14  comment on it in the context of a ruling yesterday.

15          I'm going to take a few-minute break.  I will be

16  back within the next 10 minutes.  So, we're going to stand in

17  recess.

18       (Recess taken at 9:47 a.m.)

19       (Proceedings resumed at (9:58 a.m.)

20          THE COURT:  Yesterday I ruled that evidence

21  regarding fraudulent transfer in the formation of debtor was

22  relevant.  But based on this discussion today and not having

23  seen the report, I can't determine how relevant this

24  information is.

25          That said, I'm going to allow it in.  As the trier

1  of fact, I'll make the determination whether or not it's

2  relevant as we proceed.

3        And I'll reserve all my rights in that regard.

4        MR. STEARN:  Thank you, Your Honor.

5        MS. QUARTAROLO:  Thank you, Your Honor.

6        THE COURT:  Good morning.

7        MS. MARKS:  Good morning, Your Honor.  Again,

8  Betsy Marks from Latham & Watkins on behalf of the nondebtor

9  affiliates.

10        Your Honor, the first witness this morning will be

11  Mr. William Marth.

12        THE COURT:  Could we ensure we're implementing the

13  broadcast protocol.

14        Thank you.

15              WILLIAM MARTH, WITNESS, SWORN

16        THE CLERK:  Can you please state your full name

17  and spell your last name for the record.

18        THE WITNESS:  Sure.  William Stephen Marth, M-A-R-

19  T-H.

20        THE CLERK:  Thank you.

21              DIRECT EXAMINATION

22  BY MS. MARKS:

23  Q    Mr. Marth, it may be helpful if you lean in a little

24  bit towards the microphone. Just make sure everyone can hear

25  you.

1    A      Okay.

2    Q      Thank you very much.

3          Good morning, Mr. Marth.  Thank you for being here

4    today.

5          What is your role at Resilience?

6    A      I am the president and chief executive officer.

7    Q      Are you also a director of the company?

8    A      Yes, I am.

9    Q      When did you become chief executive officer?

10   A      December of 2024.

11   Q      When did you first join Resilience.

12   A      That was October 7th, 2023.

13   Q      And what title did you have when you first joined?

14   A      It was president of services.

15   Q      What is your understanding of why you were brought in

16   as president of services in 2023?

17   A      During the summer of 2023, I was contacted by several

18   members of the board of directors, and they had realized that

19   they had a situation where they were running a CDMO and they

20   did not have leadership that had any CDMO experience.

21   Q      And what is CDMO?  What does that stand for?

22   A      That's generally referred to as a contract developer

23   and manufacturing operation.

24   Q      And how does a CDMO differ from a pharmaceutical

25   manufacturer or a biotech company?

1  A     Yeah, it's really, you know, if you think about the

2  pharma companies, pharmaceutical companies, are really adept

3  at developing the medicines that we need and putting them

4  into a various modality to treat some disease state, so they

5  work very well with the medical community; and then

6  oftentimes in the past did all the manufacture for their own

7  products.

8       Over time these companies, CDMOs, really developed

9  around, you know, we'll manufacture for you; you do the

10 science; you do the research.  And it's a much more efficient

11 model in the long run.

12 Q     After you joined the company in 2023, what view did you

13 develop of the company's business model and its expansion

14 efforts to date?

15 A     Yeah, I joined on October 7th. And shortly thereafter,

16 we had a meeting of the executive team, if you will, out in

17 San Diego. And I flew out there.

18      What I saw was quite appalling to me, that it was a

19 company that really didn't understand its purpose.  And they

20 had gotten themselves into a series of a dozen acquisitions

21 over four years without looking at redundant capabilities.

22 You know, they -- nonperforming sites.  You know, hadn't

23 targeted the right customer base. It was, frankly, a mess.

24 Q     Why do you think the company made those poor decisions?

25                MR. SILVERMAN:  Object to this line of questioning

1   as irrelevant.  Mr. Marth is here to talk about the good-

2   faith filing to the extent it happened in June 2025 and not

3   why he was brought in in 2023 or the situation then or

4   anything up until basically March of 2025.

5           MS. MARKS:  Your Honor, we think it would be

6   helpful for the Court to understand how the company got to

7   where it is now with these very underutilized sites for which

8   it is trying to reject the leases.  So, you know, I'm going

9   to move pretty quickly --

10          THE COURT:  I'll give you a little latitude.  I

11  agree it's not really relevant to the issue, so you may have

12  some latitude.

13          But Counsel, let me remind you, when you're

14  speaking, please identify yourselves for the record.  And

15  please use the microphones; or, otherwise, you're not going

16  to get picked up the transcript, okay?

17          Thank you.

18  BY MS. MARKS:

19  Q    Mr. Marth, my question was, why do you think the

20  company had made those poor decisions before you joined?

21  A    Yeah, I think, you know, the company was formed under a

22  couple of, I think, really good themes around shortening

23  supply chains, bringing more to North America, and then

24  bringing more advanced manufacturing here to the United

25  States, all which were great themes.

1      But, unfortunately, the board of directors hired two

2  ex-pharmaceutical executives with absolutely no exposure or

3  history in CDMO.

4  Q    And do you have experience with CDMOs?

5  A    Yes.  I was the chairman of the CDMO Albany Molecular

6  Research then in -- and I joined that as a board director in

7  2012 and chairman of the board in 2013 and CEO in 2014, and

8  redeveloped that company from a couple of hundred million to

9  750 million; and then sold it in a transaction to private

10  equity for 1.65 billion.

11  Q    Can you tell us a little more about your work and

12  educational background.

13  A    Yes.  I'm a pharmacist by education.  MBA in finance.

14  Spent years, I worked for Bristol Myers Squibb right here

15  rather locally.

16      And then from there was recruited away to a company

17  called Teva.  I became president of Teva USA, then president

18  of North America, president of the Americas, and retired from

19  there in 2013.  I mean, I was running 12 billion of their

20  operations.

21      And then I joined Albany Molecular Research and from

22  there did that transportation.

23      Since -- I stayed on with Albany Molecular Research

24  2018 and thereafter left -- retired from there and joined --

25  I've worked for every large private equity you can generally

1  thinking of, you know, Carlyle, you know, Bain, Blackstone,

2  Apax, you name it.

3  Q    All right.  So, let's move on to issues that are more

4  relevant in this case.

5        Yesterday we heard Mr. Montone testify about the

6  company's liquidity challenges, including in 2023 when you

7  joined.

8        When you joined --

9            MR. SILVERMAN:  Objection; talking about testimony

10  that --

11            MS. MARKS:  I'm just trying to move quickly but

12  why don't I ask -- I'm happy to rephrase.

13  BY MS. MARKS:

14  Q    Mr. Marth, when you joined the company in October 2023,

15  what was the company's liquidity position?

16  A    We were cash poor.  The moment I joined --

17            MR. SILVERMAN:  Objection, again, to the

18  [inaudible] object to the question --

19            THE COURT:  Is there an objection?

20            MR. SILVERMAN:  -- of relevance again.  Marc

21  Silverman.

22            MS. MARKS:  Your Honor, we're now on the issues

23  that are relevant to this case, including the liquidity

24  challenge and why the leases were rejected to try to show

25  that this was not a scheme to enrich the creditors -- or

1  excuse me -- the equity holders as they allege in their brief

2  over and over.

3          MR. SILVERMAN:  Your Honor, again, her question

4  was back in 2023; and it is my position that it is not

5  relevant until March 2025.

6          THE COURT:  I'm going to allow it. But let's move

7  on.

8          MS. MARKS:  Just -- it's not a long direct, Your

9  Honor, so thank you very much.

10 BY MS. MARKS:

11 Q    Anyways, based on the -- I think you finished your

12 answer but I'm not sure.

13 A    Yes, I -- you know, the statement was and will always

14 be that we were cash challenged since the day I joined this

15 company.

16 Q    Okay.  And did you make any proposals to management

17 about what to do at that time?

18 A    Yes, I immediately went back to the board of directors

19 and management and we proceeded to consolidate some

20 operations, downsize some operations, unfortunately had to

21 lay off about 400 people immediately.

22 Q    So let's get to 2025.  Did there come a time when you

23 realized that Resilience was not going to be able to raise

24 long-term financing if it did not exit the underutilized

25 sites?

1    A     Yes, we had entered into a process with JPMorgan to try

2    to raise long-term financing for the company, went through a

3    long exercise with them.  And essentially, they came to the

4    realization and made -- of course came -- made me come to the

5    realization that we would not be able to raise any capital in

6    the state we were in.

7    Q     And why was that?

8    A     And that was because we had nonperforming sites,

9    redundant capabilities, lack of utilization, just way

10   overstaffed, just a poor operation.

11   Q     And when did the JPMorgan process conclude?

12   A     That concluded, exact date, I can't tell you, but it

13   was end of January/early February.

14   Q     Of this year?

15   A     Of 2025, yes.

16   Q     And you were CEO at that point?

17   A     I was.

18   Q     What did you do next, when you realized in February

19   that the effort with JPMorgan to raise long-term financing

20   would not be successful?

21   A     We did a couple of things, actually.

22         The first thing we did was hired Morgan Stanley to do

23   an exploratory exercise on selling our most valuable asset,

24   which was the West Chester site.  That was the first thing we

25   did.

1   And then we went and hired -- we went out and hired

2   Jefferies to sell our RTP site and our Alachua site, and both

3   were put up -- those were put up for sale; so, all three --

4   all three sites were out there to be sold in some way or

5   shape or form.

6   Q    And the West Chester site, that's the one in

7   Cincinnati, Ohio?

8   A    Yes.

9   Q    Were there any buyers interested in any of those sites?

10  A    No.

11  Q    We've heard a lot of --

12  A    Well, I want to correct that.  I would say on RTP we

13  actually do have two bidders at the moment.  One -- well, we

14  have -- we're on exclusivity with one and we have a potential

15  deal for single digit millions.

16  Q    We heard a lot of testimony yesterday about West

17  Chester, the Ohio site?

18        MR. SILVERMAN:  Objection to what we heard about

19  yesterday.

20        THE COURT:  Can you rephrase the question.

21  BY MS. MARKS:

22  Q    Mr. Marth, why was no one interested in buying the Ohio

23  site?

24  A    Well, you know, I can't speak for them, but what I can

25  speak from over 40 years of industry knowledge and being in

1 this business, there's really three or four factors.

2      The first factor is the amount of CAPEX that needs to

3 go into that building, over $325 million to facilitate the

4 contract with our very large pharma partner.  And there's a

5 bit of a Sword of Damocles, if you will, with that because if

6 we don't execute, we breach and they could cancel the

7 contract; or worse yet, there could be damages that accrue

8 from that.  So that was a real issue.

9      Then there's the real practical issue of actually doing

10 $325 million worth of CAPEX in a physical site while you're

11 trying to manufacture product; very, very difficult.

12      Then there's another factor and that factor actually is

13 the execution factor, you know, you've got to be -- as I

14 said, you're doing all this CAPEX and then you are

15 manufacturing at the same point in time.

16      This is a team, although a fantastic team, love these

17 people, they work very, very hard every day, but they have

18 never worked at this scale before; so, there is an

19 executional risk and any buyer would be taking that on, and

20 you've got a contract behind that with penalties.

21      And then the -- probably the fourth factor in that is

22 the concentration risk, the fact that, you know, 90 percent

23 of the revenue from this facility, you know, in that range is

24 coming from a singular customer.

25      And so all of those things kind of combined for people

1  to not be interested.

2  Q     Okay.  You mentioned breach. What happens if Resilience

3  cannot meet the CAPEX requirements at the Ohio site?

4  A     Well, three things.

5        You know, A, cancel the breach -- they call breach,

6  they cancel the contract.  There are penalties affixed within

7  the work papers and contract to that.

8        And then there's a third piece, in the third piece they

9  can sue us for damages. So, it's pretty onerous.

10 Q     Given the inability to sell the sites, understanding

11 there's some interest with RTP, what did you do next?

12 A     Well, in my past being on the board of directors of a

13 NASDAQ pharma company from New Jersey, I've been through --

14 somewhat through this restructure process and had a

15 relationship with Portage Point Partners.

16       So, we reached out to get a restructuring agent.  So,

17 we did a sweep across the fields, speaking all to different

18 restructuring agents.  We had Latham as our counsel.  We then

19 hired a restructuring partner, and then, of course, we hired

20 Jefferies, yet again, in order to raise the long-term decks.

21       So, we would restructure and then do the --

22              (Temporarily lost courtroom Zoom feed.)

23       -- and then get the Capital.

24              THE COURT:  Okay.  Could you -- my apologies, Mr.

25 Marth.  I wanted to make sure -- I know there is an

1  unofficial court reporter, and I just wanted to make sure

2  they were continuing.

3            MS. MARKS:  Thank you.

4  BY MS. MARKS:

5  Q     This was in March of this year?

6  A     Yes, that was in March.

7  Q     So what strategic alternatives did you, the company and

8  the advisors consider?

9  A     Well, of course, we tried a sale, right, we tried

10  selling what we could, what we considered the most valuable

11  assets, and that didn't work.

12        So, we really looked -- there was really only two

13  courses of action for us; and that was a HoldCo bankruptcy,

14  Chapter 11, or this divisive merger.

15        And so, we looked at both, and, you know, from where I

16  sit, where I sit today, the divisive merger was absolutely

17  the way to go. It returned value to, you know, to the -- in

18  this case, the landlords, 100 percent of the cap claim.  I

19  preserve over 1500 jobs, and, you know, and I have a shot;

20  not a sure thing, but I have a shot, a good shot at the

21  future.

22        And so, weighing all those things, you know, we did

23  choose divisive merger.

24  Q     In a HoldCo bankruptcy filing, couldn't the company

25  have sold assets and generated value for the creditors,

1  including the landlords, that way?

2  A     Well, that's a fair point.  But the reality of the

3  situation, we already tried to sell these sites, and nobody

4  was really interested in offering, you know, a large pool of

5  capital for that.  We got no offers at all.  A minimal offer

6  for RTP.

7        And then, you know, we talked about the value of West

8  Chester and it is valuable, but, you know, if you lose that

9  contract, you breach, you lose that contract. Just to operate

10 that site, it costs 120-plus million a year just to run it.

11 And so, this is not a plant you want not occupied.

12 Q     And what has to happen at Ohio for it to become

13 valuable, as you said?

14 A     Well, the value really accrues from the deployment of

15 this capital.  You know, I need to -- you know, first of all,

16 I need to get my money from my shareholders in order to

17 facilitate this process.  And then I need to get -- you know,

18 I need to get long-term financing so that I could put the 325

19 million plus of CAPEX in this site, and I've got to operate

20 the business along the way.

21       And then, if all that goes well and the execution risk

22 and all of that plays out in my favor, then somewhere down

23 the road, five years maybe, you know, we become profitable

24 with a huge burden of debt, of course.  But maybe there's a

25 sale in our future there.

1  Q      So when you decided to undertake the divisive merger

2  strategy, did you believe that these landlords would recover

3  more than if the entire company filed for bankruptcy?

4  A      I believed that then.  I believe this now.  I'm

5  surprised that we're here.

6  Q      Do you believe that this strategy disadvantaged the

7  landlords over other creditors?

8  A      No.  We've -- you know, I'm quite -- you can never be

9  certain until you get there.  But I am, at least in my mind,

10 quite certain that they'll get pennies on the dollar if we

11 ever go to a HoldCo.

12        Besides the fact that, you know, if you do a HoldCo

13 bankruptcy -- and we considered this, that, you know, as a

14 pharmaceutical -- a manufacturer for pharmaceutical companies

15 are their most precious assets.  Your reputation is so

16 damaged.  I have never in my 40 years in this business known

17 of any large-scale manufacturer that recovered from a Chapter

18 11 -- CDMO.

19 Q      What about the shareholders? Doesn't this strategy

20 benefit the shareholders at the expense of the landlords?

21 A      I think that's absurd, you know, for a whole lot of

22 reasons.  But, you know, the landlords get a cap claim at 100

23 percent.  Whatever that number works out to be, they get 100

24 percent.

25        The shareholders end up with a hope, a prayer that, you

1   know, I can sell this company five years from now with a

2   mountain of debt on it, well over -- obligations at least,

3   you know, that I can see, over a billion and a half.

4   Q    And when you were considering whether to do this

5   divisive merger strategy or the HoldCo filing, were there

6   other stakeholders you considered as well?  For example,

7   employees, customers?

8   A    Well, you know, yeah.  I mean, when you think about

9   this -- I thought this was why these laws were created.  At

10   the end of the day, I feel the landlords get their due, but

11   we keep people employee employed.  We keep getting medicines

12   that are made for our pharmaceutical partners for the US

13   market.  We're trying to keep manufacturing here in the

14   United States. There's just so many beneficiaries of this

15   strategy.  I just don't understand why people don't see that.

16   Q    Okay.  I would like to show you an exhibit.  This was

17   introduced into evidence yesterday.  It's Exhibit M43.  This

18   had some confidentiality in it, so we're not going to display

19   it.  But I do have hard copies to pass out.

20           THE COURT:  Yes, please.  Thank you.

21           I was going to say if you tell me what binder --

22   but thank you.

23           MS. MARKS:  So, for the record, this is Exhibit

24   M43, RES002544.

25   BY MS. MARKS:

1  Q     Mr. Marth, have you had a chance to take a look at the

2  email?

3  A     Yes, I have.

4  Q     Is this an email that you sent on June 9th, 2025?

5  A     Yes.  It was a response to an email that was sent to me

6  by a friend.

7  Q     Is that the same day that Bedmar, LLC, filed for

8  Chapter 11?

9  A     Yes, it is.

10 Q     Okay.  And you said, "I used a legal tool to rid

11 Resilience of the toxic sites."

12       Do you see that?

13 A     I do.

14 Q     What did you mean by "legal tool"?

15 A     Well, you know, I'm writing to a friend.  This

16 gentleman, who is a COO of a large other CDMO that I've known

17 for many, many years and visit with socially, you know, sent

18 me our filing or some excerpt from it.  And basically, I

19 described this as a legal tool.  I wasn't going to say I used

20 divisive merger instead of HoldCo bankruptcy, therefore,

21 because of -- I'm writing to a friend.  It's an email to

22 somebody I know.

23       So, yes, I used the term "legal tool."

24 Q     What did you mean by "toxic sites"?

25 A     Again, I could say, well, I have underperforming sites

1  and underutilized sites, redundant capabilities.

2      I am writing to a friend.  So, emails are supposed to

3  be brief.  I'm brief.  So, it is more casual conversation for

4  sure.

5  Q     In the next line, what did you mean when you said, "I

6  am down to a profitable core"?

7  A     Yeah, well, that's pretty hopeful.  But, yeah, it's

8  true, though.  I'm down to a profitable core if, you know --

9  if my divisive merger works; if, you know, I raise 300

10 million from my shareholders; if, you know, I get out and

11 borrow another half a billion dollars-ish; and if I get all

12 of that put in; and if my large pharma company doesn't, you

13 know, fire me.

14     But, he's a friend, and, you know, I'm tweaking him a

15 bit.

16 Q     So to be clear, if this Chapter 11 case is confirmed,

17 would Resilience become profitable on day one because the

18 leases are rejected?

19 A     God, no.  No, no, no.

20     But we do become profitable over time; right?  And so -

21 - and if, you know, I get all the shareholder money in and,

22 again, if I'm successful getting, you know, a loan, whether

23 private credit or some other way, you know, for a substantial

24 amount of money and get all that capital deployed and keep my

25 customer happy, yeah, then we become a -- you know, then we

1  have a shot.

2       That's what it's all about, trying to give us a shot,

3  trying to keep my people employed, trying to, you know, do

4  the right thing.

5  Q    What did you mean in the next line when you wrote, "To

6  me the best path to return value to the shareholders"?

7  A    Yeah, it's the only path. I mean, if we get -- I won't

8  repeat all those things I just said.  But if we do all of

9  those things and it all happens right, maybe five years from

10 now, you know, we can sell this company for a decent

11 multiple.  And if we can do that, then, you know, you look at

12 the waterfall; maybe the shareholders get their money back.

13 I don't know.

14       I certainly know, you know, in a HoldCo, nobody

15 wins.

16 Q    Was returning value to the shareholders the only or

17 even the primary factor you considered when deciding whether

18 to pursue this divisive merger strategy?

19 A    No, no.  Certainly not.  I mean, I've been in this

20 business a long time.  I -- you know, started here in '23,

21 and I'm working through this.  I never wanted to be CEO.  I

22 never asked to be CEO.

23       I am here doing this thing, and I've, you know,

24 become attached to these people and what they're trying to

25 do.  I'm trying to keep them employed.  I'm trying to do the

1  right thing.  I'm trying to do the right thing for the

2  market.  I'm trying to do the right thing for the partners.

3  I'm trying to do the right thing for patients and

4  prescribers.  That is my primary purpose.

5       Yes, I have a fiduciary responsibility to my

6  shareholders, and I will try to get them their money back or

7  a little better.  But there's a lot of factors.  They're not

8  the primary concern.

9            MS. MARKS:  Thank you.

10            No further questions from me at this time.

11            THE COURT:  Thank you.

12            MR. SILVERMAN:  Your Honor, can I have one minute

13  to consult with my team?

14            THE COURT:  Yes.

15       (Pause.)

16            THE COURT:  Do the parties need a five-minute

17  break?

18            MR. SILVERMAN:  No.  We're --

19            THE COURT:  I'm not rushing you.  I'm just asking.

20            MR. SILVERMAN:  No.  Thank you, Your Honor.  We're

21  ready.  Marc Silverman for landlords Harvard, Alachua, and 92

22  Crowley.

23                    CROSS-EXAMINATION

24  BY MR. SILVERMAN:

25  Q    Good morning, Mr. Marth.  Thank you for coming here

1  today.

2       You spent some of your testimony talking about your

3  history, and you had mentioned you worked for Carlyle and

4  Bain; is that right?

5  A    Yep.   Yes.

6  Q    You're a financing guy; right?

7  A    No.

8  Q    No?   Financing is not important to you?

9  A    That wasn't the question.

10 Q    Is financing important to you?

11 A    Being a CEO, finance is important.

12 Q    And what you were doing was trying to sell a -- get a

13 deal for multiples, I think you had said at the end that that

14 would be a good outcome in the future, if you could sell the

15 company for multiples?

16 A    Yeah, if we could IPO the company, sell the company to

17 a larger CDMO or a sponsor or something, yes, I mean -- yes.

18 Q    Okay.  I'm going to give some binders out, and I may

19 use documents in here.

20      While those binders are being passed out, I think you

21 had mentioned that you're in this business to do the right

22 thing; is that right?

23 A    Yes.

24 Q    Isn't it true that in April 2025, you entered into an

25 agreement with Resilience as an inducement to you to stay

1  with the company to maximize the value of financing where you

2  would get a bonus of up to $4 million?

3  A     Yes.

4  Q     So you have a financial interest as well?

5  A     I haven't needed to work for 20 years, but I do expect

6  to be paid for my services.

7  Q     Okay.  And did you reject the offer to give you a $4

8  million bonus?

9  A     No, although I may never get it.

10 Q     Did you enter into an agreement that says as an

11 inducement to the executive, meaning you, to maximize the

12 value of the financing and remain with the company, that you

13 would only do so under these conditions?

14 A     No, I didn't say I would only do so under these

15 commission -- under this.

16 Q     So I'd like to show you your Executive Incentive and

17 Retention Bonus Agreement.

18      Mr. Marth, is this your Executive Incentive and

19 Retention Bonus Agreement?

20 A     Well, I'd have to read it all to make sure it's mine,

21 but I will respectfully submit to you that it is.

22 Q     And this was dated April 30th, 2025?  You see in the

23 first paragraph?

24 A     Yes.

25 Q     And it is between you and the Company, and you are

1  identified as Executive?

2  A     Yes.

3  Q     And do you see the third whereas, it says:  "As an

4  inducement to Executive to maximize the value of the

5  financing and remain with the company during this period, the

6  Company is willing to provide Executive with two separate

7  bonus opportunities."

8        Do you see that?

9  A     Yes.

10  Q     And do you see that the bonus opportunities included a

11  $4 million bonus if, capital P, Proceeds -- well, the bonus

12  range is from 1.125 to 4 million depending on whether you got

13  $300 million to $625 million Proceeds; is that right?

14  A     That's correct.

15  Q     And Proceeds included -- if you look on the next page,

16  1661, it's the first paragraph in the middle of the page at

17  the left. And it says:  "Proceeds means the net proceeds of

18  asset sales, the aggregate committed principal amount of debt

19  financing and the aggregate committed gross proceeds of the

20  sale of equity securities."

21        Do you see that?

22  A     Yes.

23  Q     So this agreement is all about incentivizing you to

24  increase financing; is that correct?

25  A     Well, it's incentivizing me to get the job done,

1  because if we didn't raise this capital, we can't execute

2  this plan.

3       But I never said I wouldn't have done it if they didn't

4  offer me this.  Because frankly, I would have done it either

5  way.  But they did offer it to me, so why wouldn't I take it?

6  Q    And you accepted it?

7  A    Of course.  Wouldn't you?

8  Q    Did you tell them they could keep the money?

9  A    I might yet.

10 Q    Did you?

11 A    I didn't.

12 Q    I'm sorry?

13 A    I didn't.

14 Q    You did not?

15 A    I did not tell them that.

16 Q    Let's go to -- do you recall in March, late March 2025,

17 giving a presentation to the board of directors?

18 A    I don't remember a particular one on a particular date,

19 but if you want to show me something.

20           MR. SILVERMAN:  Sure, let's go to Exhibit 1.

21           By the way, Your Honor I'd like to move to admit

22 the Executive Incentive document.

23           THE COURT:  Any objection?

24           MS. MARKS:  No, Your Honor.  Just but for clarity

25 for all of us, is it on the exhibit list?

1    MR. SILVERMAN:  It is not.  It is not on the

2   exhibit list.

3    THE COURT:  All right.  We're going to admit this,

4   because it was objected, but I need you to add this to the

5   exhibit list that's going to be filed with the Court.

6    Does anybody know what your last exhibit was for

7   purposes of marking this?

8    MR. SILVERMAN:  No, Your Honor, but we will find

9   that information for you and put it on the record as soon as

10  we do.

11    THE COURT:  I see Ms. Steele is responding.

12    M70?

13    MR. SILVERMAN:  M70.

14    THE COURT:  Okay.  It is so marked and admitted.

15    MR. SILVERMAN:  Thank you.

16  BY MR. SILVERMAN:

17  Q    So, Mr. Marth, we were talking about a meeting -- a

18  board meeting on March 25th, 2025.  Can you go to Tab 1 in

19  the binder you were given.

20  A    Are you going to put it up on the screen or do I have

21  to go through here to do this?

22  Q    It's up on the screen.

23  A    Oh, okay.

24  Q    This is Exhibit M21, for the record.  It's Bates-

25  stamped RES001923. Mr. Marth, when I say "Bates-stamped" and

1  I reference those numbers, if you're following in your

2  binder, you will see them on the bottom of the page.

3       So, if you look at this document, do you see that it is

4  minutes of a meeting of the board of directors from Tuesday,

5  March 25th, 2025?

6  A    Yes.

7  Q    And do you see at the bottom of the page there's a

8  bolded line that says, "CEO presentation?"

9  A    Bolded line?

10      Okay, yes.

11 Q    Yes, you see that?

12 A    Yeah.

13 Q    Were you the CEO at this time?

14 A    Yes.

15 Q    And you will see that it starts to say, "Mr. Marth

16 provided an overview of the current situation of the

17 company."

18      Do you see that?

19 A    Yes.

20 Q    I wanted to direct you to the middle of the paragraph

21 where it's the sentence that starts:  "Mr. Marth provided an

22 update on the progress of the previous decisions to divest

23 the RTP and Alachua sites and to shut down R&D activities

24 apart from the KONA platform."

25      Do you see that?

1  A      I do.

2  Q      When was it decided to divest the RTP and Alachua sites

3  and to shut down the R&D activities from the Kona platform?

4  A      When we reported that to the board in March, I did that

5  as quickly as I could.  I actually started to reduce R&D back

6  in 2023.  We further reduced it in April of 2024. And then

7  really began to cut everything in R&D right about the first

8  of the year in 2025.

9      This is all part of, you know, cost savings, trying to

10  wind down things that they shouldn't be doing within

11  Resilience, trying to keep this company afloat.  You can see

12  in here where I've noted to the board, you know, that we're

13  on an unsustainable path.

14  Q      Yeah.  And then in the next sentence you say, "He

15  noted" -- that's you; right?

16  A      Yes.

17  Q      "He noted that the chances of the company" -- that's

18  Resilience; right?

19  A      Yes.

20  Q      "He noted that the chances of the company securing

21  financing without addressing its liabilities are remote."

22      Do you see that?

23  A      Yes.

24  Q      Why was it remote?

25  A      Because we couldn't sell anything and we weren't

1  getting any interested -- it's a tough time in the

2  pharmaceutical markets, you know, interest rates have gone

3  the wrong way, not a lot of money being spent on biotech; and

4  so, it is fundamentally a tough time.  And so, although we

5  had assets to sell, we didn't see a whole lot of interest in

6  them.

7  Q      Gotcha.

8         And you were concerned with securing financing without

9  addressing liabilities; right?

10 A      Absolutely correct.

11 Q      And in the next sentence it says, "He then," and then

12 it lists a bunch of things, and one of them is, "3," which

13 says, "Exiting all underperforming sites and operations."

14        Do you see that?

15 A      Yes.

16 Q      By "exiting all sites and operations," you meant you

17 wanted to get rid of the sites with the leases that have been

18 now placed in the leaseholder Bedmar and put under bankruptcy

19 today; right?

20 A      They are part -- they are part of it.

21 Q      You couldn't get financing without dumping those

22 leases; right?

23 A      We couldn't get financing without reducing the -- doing

24 exactly what I said here: Reducing the operations, getting

25 rid of the underperforming sites, yes, that's correct --

1  Q      Gotcha.

2         So, when did you come up with Resilience 2.0?

3  A      We came up with Resilience 2.0 -- once we -- when we

4  had this, you know -- this more or less learning and then we

5  hired our advisors, we knew we needed to raise money

6  internally in order to, you know, facilitate this filing.

7         So, we had to create at least a narrative for our

8  shareholders to raise money in order to do this, because if I

9  don't get -- if I didn't get that initial money from the

10 shareholders, then the only, you know -- the only way we

11 could go is a HoldCo bankruptcy.

12 Q      Gotcha.

13        So, let's go to Tab 2 in your binder.  This is M34,

14 RES0023117.

15        And I'm also going to -- with it, Tab 3, M35,

16 RES0023118, which is a PowerPoint attached to this email.

17        Mr. Marth, do you see this email?

18 A      Yes.

19 Q      Is this an email from you to Mr. Nelsen, Mr. Oetting,

20 Mr. Solomon with attachments Resilience -- I'm sorry, the

21 subject line says, "Latest Resilience 2.0 Materials"?

22 A      Yes.

23 Q      Did you create the PowerPoint that's in the next tab,

24 Tab 3?

25 A      No.

1   Q     Who created it?

2   A     Someone within our corp dev group who are no longer

3   with us because we had to lay them off.

4   Q     Did you work with that person in preparing this slide?

5   A     Yeah.

6   Q     And did you give this slide presentation to anyone?

7   A     Oh, yes.

8   Q     Who?

9   A     Groups of -- many groups of our inside investors,

10  current investors, in order to raise the capital to

11  facilitate the filing, fund the operations moving forward,

12  keep pace with the CAPEX, because if we don't at least keep

13  pace with the CAPEX, then we breach the contract and that

14  whole cascade happens.

15  Q     So you gave this to investors.  You said "inside

16  investors."  Did you give it to investors who had not

17  invested yet?

18  A     I would have to clarify that.  I believe there might

19  have been one or two, but I can't say.

20  Q     Maybe one or two.  And do you remember their names and

21  -- I'm going to ask you not to say the names in court, but

22  I'm asking if you recall their names.

23  A     No, I do not.

24  Q     All right.  So, let's go to the slide deck.

25         So, this is a presentation that you gave to

1  investors; right?

2  A     Yes.

3  Q     And on page -- and it says "Resilience 2.0"; right?  On

4  the first page?

5  A     That's correct.

6  Q     And this is a rebranding effort?

7  A     Yeah, I guess you'd call it rebranding.  But, you know,

8  it was more to -- again, this was directed to our

9  shareholders.  And they had really looked at Resilience one

10 way, and we now needed to show it to them in a slimmed-down

11 fashion and what would we look like in the future and, you

12 know, how can we redevelop the company.  So, yeah, it's a bit

13 of a rebranding.

14 Q     So let's look at page 2 of the slide deck.  To do that

15 slim-down, part of the process was to exit all

16 underperforming assets; right?

17 A     As many underperforming assets as we could, yes.

18 Q     And those assets included the Harvard property, the

19 Alachua property, the 92 Crowley property and the Cobalt

20 property?

21 A     Yes.

22 Q     I think you talked about before a lot of what you did

23 to try to sell the sites; is that right?

24 A     Yes.

25 Q     That process didn't work; right?

1  A     Yeah, no, it did not.  And, in fact, it was kind of

2  interesting because we approached several major banks about

3  selling the facilities.  And we ended up with Jefferies.

4  But, frankly, were turned down by a number of other very

5  large, notable banks that didn't even want to engage in

6  selling properties.

7  Q     Right.  So, April you're trying to rebrand; you're

8  trying to sell.

9        Around mid-May, it's not working; is that right?

10 A     Yeah, it's not working; that's correct.

11 Q     Let's go to Tab 4 in your --

12        THE COURT:  Counsel, can I stop you right there.

13 What you just had on screen is not consistent with what's in

14 my binder.  What's in my binder says "Future State" at the

15 top of that diagram.  And what you had there, I think, said

16 "Current State."  It's not the same document.

17        MR. SILVERMAN:  I think what was put on the screen

18 is different -- you say your binder doesn't have that

19 document?

20        THE COURT:  It wasn't the same document that's in

21 my binder.  I don't know about other people's binders, but my

22 binder doesn't have the same document.

23        MR. SILVERMAN:  Can we see your binder, Your

24 Honor.

25        THE COURT:  Yes, of course.

1                MS. MARKS:  I think they all say "Future State."

2                THE COURT:  Yeah.  That's not what was written on

3  the screen.  What was on screen?

4                THE WITNESS:  That was on the screen.

5                THE COURT:  I don't know if there are any other

6  differences, but --

7                MR. SILVERMAN:  I think this is the same document.

8  What I was pointing to was exiting all underperforming

9  assets.

10               The screen was wrong.

11               THE COURT:  Okay.  All right.  No worries.  I just

12 wanted to --

13               MR. SILVERMAN:  Thank you, Your Honor.

14               Let me get my bearings.  Thank you.

15               THE WITNESS:  Should we go back to that because I

16 was answering off a different slide.

17 BY MR. SILVERMAN:

18 Q     No.  Had the same words on it, as to exiting all

19 underperforming assets.

20 A     That wasn't on my screen.

21 Q     Do you want to see it again?  It's in the binder, so

22 why don't we open up your binder.

23 A     That's just harder for me.  I have visual problems.

24 It's better for me on the screen.

25 Q     Gotcha.

1  A      I'm visually impaired.

2  Q      Give me one second.

3         It's M35, RES2318.

4         It's on your screen now, Mr. Marth?

5  A      Okay.

6  Q      I think the question I had asked you was, to slim down,

7  you wanted to exit all underperforming assets; right?

8  A      As many as we could.

9  Q      Right.  And that included the Harvard, Alachua, CEGM 92

10 Crowley and Cobalt leases; right?

11 A      Yes, yes, amongst anything else we could.

12 Q      And you were giving this presentation to investors to

13 assure them that you were going to exit those sites, right,

14 so that they could invest?

15 A      That's not quite right.  We were giving this

16 presentation to investors that this is what we wanted to do,

17 always knowing that, you know, it might not happen.

18        You know, the reality was their funds were going to

19 enable us to do this particular filing and, you know,

20 potentially move to the other side and inure to some benefit.

21 Q      And then we started to talk about -- I'm sorry --

22 before we got sidetracked that you had testified about your

23 efforts to sell; right?

24 A      Yes.

25 Q      Around mid-May, that was becoming very unlikely; right?

1  A      Yes.

2  Q      By the way, in your efforts to sell, did you talk to

3  the landlords?

4  A      Our general counsel has spoken to many of the

5  landlords.  I can't tell you exactly which ones.  Oftentimes

6  about, you know, exiting sites, getting out some different

7  way.  You know, we've tried to sublease.  We've tried, you

8  know, just about everything we could think of.

9  Q      Did Resilience negotiate with the landlords and offer

10  them any money to exit the sites?

11  A      Not that I know of.

12  Q      Okay.  Tab 4, this is Exhibit M28, RES002220.

13         Mr. Marth, do you see the email on the screen?

14  A      Yes, I do.

15  Q      This is now mid-May.  This is an email called "Site

16  Inquiry" from you to Mr. Montone and Mr. Solomon.  Do you see

17  the sentence you wrote.

18         "A see card, another Indian guy with no money that

19  wants to buy MBO.  Shall I just send him Chris Middlebury, or

20  do we have a broker?"

21         Do you see that?

22  A      "Or do we still have a broker?"

23  Q      "Or do we still have a broker?"

24  A      Because we engaged several brokers to try to sell the

25  Marlborough site. And I think PwC, a number of people, nobody

1  could sell that site.

2  Q    What did you mean by "another Indian guy with no money

3  that wants to buy MBO"?

4  A    Yeah.  Again, this is an email to my group, so it's a

5  little bit casual.  But, you know, the reality is -- and, by

6  the way, I'm a director of an Indian company as well, so I

7  have a lot of respect for my Indian colleagues.

8       But the fact of the matter is, fundamentally, the

9  business is different there. We could build a site in India,

10  manufacturing site, for fractions of what we can build one

11  here in the United States.  And we can operate it for so much

12  cheaper than we can.

13       And so, unfortunately, where I could build the site

14  there for 25 million and it costs me a quarter of a billion

15  when you build one here, I often get Indian colleagues to

16  come here and think it's going to be the same; and it's just

17  not.

18       And so that being said, I do believe we did refer this

19  individual to the site.  And, of course, you know, there was

20  no interest.

21  Q    How did you know he had no money?

22  A    I just postulated that he might not because of the

23  reality of what my Indian colleagues spend in India and then

24  what they have to spend to be here, which, by the way, is

25  much of the topic that's going on today in our society about,

1  you know, manufacturing here in the United States.

2  Q    Who is Chris Middlebury?

3  A    He's a project manager, and he's helped out with a

4  number of the sites.

5  Q    Project manager, he works at Resilience?

6  A    Yes.  He might be laid off now unfortunately, but --

7  Q    And who was the broker you're referring to?

8  A    I think I just mentioned that before.  I believe it was

9  PwC that we were using to sell the site.  But, again, I

10  wasn't sure, because we had actually hired a number of people

11  to try to sell the site.  So, I didn't know who was still

12  under exclusivity or how that works, you know, who right now

13  had to show it to him other than ourselves.

14  Q    And did you do a follow-up with Chris Middlebury or PwC

15  to see if this man had any money to buy MBO?

16  A    No.  I think that would be to my direct reports to take

17  care of, as I'm basically telling them to please handle it.

18  Q    All right.  So, this is mid-May; right?  May 15th.  I

19  want you to go to Tab 15.  We'll put it on the screen for

20  you, Mr. Marth.  Tab 5, this is M14, RES001501.

21        Mr. Marth, you'll see this is an email from Mr. Nelsen

22  to Mr. Drew Oetting and copying you.

23        Do you recall this email?

24  A    No, I don't recall it, but --

25  Q    Okay.  Do you know who Mr. Nelsen is?

1   A      Yes.

2   Q      Who is he?

3   A      He is the leader of Arch investments.  He's basically

4   our chairman.

5   Q      Of the board, of Resilience?

6   A      Yes.

7   Q      And Mr. Oetting?

8   A      He's also a member of the board of directors.

9   Q      And you are a member of the board?

10  A      Yes.

11  Q      And Mr. Solomon, who is copied here, is --

12  A      General counsel.

13  Q      General counsel.  Is he a member of the board?

14  A      No.

15  Q      You'll see that on May 21st -- this was just a few days

16  after your email before -- Mr. Oetting says:  "Just got asked

17  by Bo if he could get the 8VC write-up on the rationale for

18  the reorg."

19         Do you see that?

20  A      Yes.

21  Q      Who is Bo?

22  A      I have no idea.

23  Q      Then it says:  "This is what I have written, let me

24  know if you are comfortable with me sharing with him."

25         Then it says, "Resilience corporate restructuring

1  summary."

2          Do you see this?

3  A     I see it, yes.

4  Q     I want you to look at the second paragraph.  It says:

5  "After significant investigation with our legal and financial

6  advisors, it was determined that the best course of the

7  action was a divisive merger."

8          Do you see that?

9  A     Yes.

10 Q     Did you agree with that at this time?

11 A     Yes, the best course of action was absolutely a

12 divisive merger.

13 Q     And it then says:  "In plain English, this means

14 separating out the assets we want to keep from the ones we

15 don't."

16          Do you see that?

17 A     I do.

18 Q     And the "we" is Resilience; right?

19 A     Yes.

20 Q     Do you agree with that?

21 A     Well, I agree that we should get rid of the

22 nonperforming assets and the leases and buildings we didn't

23 occupy, the underperforming sites, so yeah --

24 Q     And the only way to do that --

25 A     -- for sure.

1  Q     And the only way to do that was the divisive merger,

2  right, to put them there and then bankrupt that company?

3  A     We followed the divisive merger tactic because that was

4  the best course of action.  It returned, you know, 100

5  percent of the cap claims to the landlords, keeps people

6  employed.  You know, gives the company a potential future if

7  we execute on all of the things that we need to do.  So yes.

8  Q     And did you do that to, the next sentence -- as the

9  next sentence says, "insulate the slimmed-down Resilience

10 from claims relating to selling or shuttering noncore

11 facilities"?

12 A     I don't know if it -- I can't really comment on that

13 whether it really insulates us.  I really don't know.

14 Q     Did you --

15 A     What I know is, is that I had a choice between two bad

16 options.  One that would most certainly signal the death of

17 the corporation, and the landlords in this case, your

18 clients, would get pennies on the dollar, or I had the

19 opportunity to get them 100 percent, and, again, save jobs,

20 manufacturing, keep pharma -- the pharma pipeline -- the

21 supply chains robust, keep manufacturing here in the United

22 States, you know, keep the team together.

23       Yeah, yeah, I -- that was the best course of action.  I

24 can't imagine the alternative.

25 Q     So you had two options.  One was bankrupting the entire

1  company; right?

2  A      Yep.

3  Q      And then the other was to slice off the leases, put

4  them in a HoldCo, bankrupt that HoldCo; right?

5  A      Yeah, to do the divisive merger.  I don't, you know --

6  I don't want to comment on the legal sequence because I'm not

7  a lawyer, but I would say that I had two choices, both

8  unsavory.

9       But I could bankrupt the entire company and basically

10  signal the -- in my view, the death of the company; or I

11  could give your clients 100 percent of their cap claim, and I

12  could preserve the corporation, I could preserve jobs, I

13  could preserve manufacturing here in the United States, yeah,

14  yep.

15  Q      Let me ask -- yeah, where in this email does it say

16  that you are giving the landlords the 100 percent of their

17  cap claim and that that was your intent?

18  A      I didn't write it so --

19  Q      Did you respond to this?  He asked for your comments.

20  A      I don't know.

21  Q      Let's go to that --

22  A      Can you produce it, my response to it?  I don't know

23  that I responded to it.

24  Q      Let's go to the email your counsel put in front of you

25  earlier.

1        Do you have that?  It's Tab 9.  We can put it up on the

2   screen.

3        We can't display that?  All right.  We can't display

4   it, but you were handed a document and you read from it

5   before.

6        Do you remember that?

7   A    I was handed a couple of documents so which one?

8   Q    It was a short email and it said, "I used a legal tool

9   to rid Resilience of the sites."

10  A    Yes.

11  Q    Yeah, you remember that one; right?

12  A    I got it.

13  Q    Where in that email does it say that you are going to

14  give creditors 100 percent of what they are due?

15  A    I don't think that was relevant to the email, I was

16  writing, you know -- I was responding to a friend.

17  Q    Yeah, but this email was to a friend where you were

18  casual and you were talking to him.  He was responding to you

19  about a news feed of Resilience bankruptcy; right?

20  A    That's incorrect.

21  Q    Well, he was responding to you about news; right?

22  "Greetings from Shanghai. Read the news on the

23  restructuring."  Right?

24  A    Yeah, he wasn't responding to me.  He picked something

25  up in the news -- I want to be quite clear.  He reached out

1   to me.  I did not reach out to him.

2   Q    Right.  And you responded because you wanted to tell

3   him what happened; right?

4   A    I responded because he's a friend.  If I didn't respond

5   to him, he would think there was something wrong.

6   Q    Okay.  And you were explaining what you did?

7   A    I explained -- yeah.

8   Q    In a conversation with a friend; right?

9   A    In a conversation with a friend.

10  Q    Who you were honest with?

11  A    Of course.

12  Q    Of course.  And -- but there's nothing in here that

13  talks about creditors; right?

14  A    There's nothing in here about --

15  Q    It's a yes or no, is there anything in here that talks

16  about creditors?

17  A    Excuse me, I can say what I want to say when I'm on the

18  stand.

19  Q    It's a yes-or-no question:  Is there anything here that

20  talks about creditors?  Yes-or-no question.

21  A    To me it's pretty obvious there's nothing about here --

22  about creditors.

23  Q    All right.  Thank you.

24       Let's go back to the other exhibit, Tab 5, M14.

25       And here we were talking about the divisive merger plan

1   on March -- May 21st.  We were talking about the sentence

2   that says, "Doing so insulates the slimmed-down Resilience"?

3   A     Wait.  Could you go back to the top again.

4   Q     Sure.

5   A     Yeah, because I want to see -- okay, this is the Robert

6   Nelsen email that he wrote.

7   Q     Yeah.

8   A     Yes, thank you.

9   Q     Again, is it -- there's nothing in here about creditors

10  and doing this for their benefit; right?

11  A     Again, I didn't write the email, so I don't see

12  anything in here.

13  Q     Mr. Nelsen responded, "Cool," up top; right?

14  A     He did.

15  Q     He was one of your fellow board members?

16  A     He is.

17  Q     He had responsibilities for the company?

18  A     He does.

19  Q     And he was agreeing with this email; correct?

20        MS. MARKS:  Objection; calls for speculation.

21        THE WITNESS:  You would have to ask him.

22        THE COURT:  I'm going to sustain her objection.

23  BY MR. SILVERMAN:

24  Q     At the bottom of this, after talking about all this

25  divisive merger plan, it says, "After completion," at the

1  bottom, "Resilience looks far stronger than ever."

2       Do you see that?

3  A    I do.

4  Q    And then the next page has a bunch of bullets about why

5  it's stronger.

6       Do you see that?

7  A    Yes.

8  Q    And part of that was, the first bullet is:  "Revenues

9  are largely unchanged because the noncore facilities

10 represent less than 10 percent of the overall top line."

11      Do you see that?

12 A    Yes.

13 Q    Do you agree with that?

14 A    Yes.

15 Q    And the second one says:  "Overall cash burn from

16 facilities is reduced by 100 million per year."

17      Do you agree with that?

18 A    Yes.

19 Q    The third one says:  "Operating costs will be reduced

20 by 20 million as we right-size our corporate overhead

21 functions to the smaller, more focused facility network."

22      Do you agree with that?

23 A    Hopefully.  It's an approximate.

24 Q    The next one says:  "The company will be EBITDA

25 profitable in 2026, approximately 6 percent margins and FCF

1   positive in 2027."

2         Do you see that?

3   A    I do.

4   Q    What does "FCF positive" mean?

5   A    Free cash flow.

6   Q    And do you agree with that statement?

7   A    Maybe.

8   Q    Maybe?

9   A    I mean -- yeah, maybe.

10  Q    Why do you say "maybe"?

11  A    Well, maybe because we, again, have to raise the 300

12  million from the internal shareholders, which we haven't done

13  yet.  We still have to be successful on the Jefferies

14  financing because we have to get that money in order to

15  continue the CAPEX.  And we have to complete the CAPEX, and

16  we have to execute.

17        So, all those things need to come together for, you

18  know, Mr. Nelsen's -- his -- you know, whatever you want to

19  call this, his theory to be correct.

20  Q    Right.  And this was all about the divisive merger that

21  would lead to this; right?

22  A    The divisive merger would enable it.  Wouldn't lead to

23  it.  It would enable the potential to do this.

24        You have to understand, he's a board member.  He also

25  tries to raise capital for us.  So, yeah, you know, he's

1  definitely reflecting from the positive side.

2  Q    Right.  And do you agree with the next bullet that

3  says:  "Far greater ability to raise additional capital for

4  capital expenditures"?

5  A    Yeah, yes, I do.

6  Q    And do you agree with the last bullet that says that

7  the -- speaking of the divisive merger:  "It will be an

8  attractive equity to use as currency for strategic M&A."

9       Do you see that?

10 A    I see it.

11 Q    And the strategic M&A --

12 A    I don't necessarily concur with it, but I can see it.

13 Q    Okay.  What do you disagree about that?

14 A    I don't know that we'll be an attractive equity for

15 some time, and we need a lot of things to go right.  But Mr.

16 Nelsen is always optimistic.

17 Q    Were you not optimistic?

18 A    I'm a realist.

19 Q    Were you not optimistic at this point?

20 A    I don't know.  We'll find out.  You know, we've got to

21 be successful on many, many fronts.

22 Q    Were you not optimistic at this point?

23 A    I think I just answered.

24 Q    You did not.

25 A    I did.  That's my answer.

1  Q     You answered what possibly could happen.  And my

2  question is:  Were you optimistic from doing the divisive

3  merger on May 21st, 2025?

4  A     I'm a realist.  There's a chance I can make this

5  happen, but I don't know.

6  Q     The only chance to make that happen, get the

7  investments was to slice off the leases and then put that

8  entity into bankruptcy, right, well, saving Resilience?

9  A     It's just not that simple.  That's -- that is one

10 piece.  That is one small piece, getting that done, getting -

11 - again, I could do the divisive merger, but if I don't raise

12 the money internally to pay for the divisive merger, then

13 that doesn't happen.  If I don't raise the capital from

14 Jefferies, then I can't fund the CAPEX and that doesn't

15 happen.  So, it's not black and white.

16 Q     Let's go to Tab 6.  This will be M27, RES002153.

17       Mr. Marth, what you see on the screen is an email with

18 a potential investor, and it's a chain of an email with a

19 potential investor -- maybe it was an investor.  I'm trying

20 to be vague.  And then your response on top.

21       Do you see that?

22 A     Yes.

23 Q     Okay.  So, I want to point you to the email in the

24 middle of the first page, 2153.  There is an email from Mr.

25 Nelsen again.

1        Do you see that?

2   A    I do.

3   Q    Mr. Nelsen was a board member; correct?

4   A    Yes.

5   Q    Speaking for Resilience?

6   A    Yes.

7   Q    And he says:  "After clean up some of the money-losing

8   assets at Resilience, we should make 200 million in EBITDA in

9   2028.

10        Do you see that?

11  A    I do.

12  Q    Do you agree with that?

13  A    I agree with that if everything happens exactly as

14  planned.  We have a potential to hit 200 million of EBITDA in

15  2028 but then also be saddled with a mountain of debt.  Yeah.

16  Q    And the money-losing assets were the leases; correct?

17  A    They're part of what was money-losing assets; and, you

18  know, underperforming sites were as well.  But leases are,

19  you know, a nice chunk.

20  Q    And then you responded:  "We get through this part, and

21  we can combine with X and Y" -- I am replacing the names with

22  X and Y -- "we can combine with X and Y, synergize, and it's

23  a nice, profitable franchise."

24        Do you see that?

25  A    Yes.

1  Q      Did you write that?

2  A      I absolutely did.

3  Q      Did you believe that on May 2025?

4  A      I believe that we could do some combinations, you know,

5  down the road if we clean all this up.  We'll have a mountain

6  of debt, but there are small -- young companies that would

7  like to become part of our group.

8         I did it before at Albany Molecular Research.  And I

9  believe I could do it again, given the right circumstances.

10 Create value for shareholders and, you know, jobs for

11 employees and create a good business.

12 Q      What did you do before?  You mentioned you had done

13 this before at another company?

14 A      Yes.

15 Q      What had you done before?

16 A      I took Albany Molecular from a small, $200 million CDMO

17 and grew it to 750 million in four years doing seven

18 acquisitions, all accretive; and then sold it to Carlyle for

19 1.65 billion.

20 Q      Got it.  So, you do make entities more profitable, and

21 then you sell it to another entity and make money; right?

22 A      I make money.

23             MS. MARKS:  Objection to form.  Objection; calls

24 for speculation.

25             MR. SILVERMAN:  I asked him what he does.

1        MS. MARKS:  It was -- it was a hypothetical.

2        THE COURT:  You can ask him what he does.

3  BY MR. SILVERMAN:

4  Q    Mr. Marth, do you make entities more profitable so that

5  you could sell them to another entity?

6  A    Well, I make entities more profitable, yes, I do that.

7  And then the board of directors decides what to do with

8  those.  I don't in isolation.

9  Q    And you make millions off of that; right?

10 A    I have made money in the past.

11 Q    In the previous way you did this, did you ever use a

12 divisive merger tactic?

13 A    No.

14 Q    How come?

15 A    Never heard of it before.

16 Q    Go back to the email, 21 -- I want to go to the second

17 page, 2154.  This is an email from Mr. Nelsen in the same

18 chain where he says:  "Hi.  Probably good for you all to get

19 an update from Bill under NDA and I am happy to explain."

20      Do you see that?

21 A    Yes.

22 Q    Do you understand what he means by "getting an update

23 from Bill under an NDA"?

24 A    Yeah.  Again, we needed to raise money from

25 shareholders in order to do the divisive merger, and not do

1  the HoldCo bankruptcy.  And so, therefore, we were advised to

2  always do so under some form of NDA.

3  Q    And did you enter into an NDA with this -- is it an

4  investor or potential investor?

5  A    I don't know -- it doesn't show me on here who it was.

6  Q    I don't want to say the name, but it's in that cc line?

7  A    Oh, I see where -- I gotcha.  I gotcha.

8        Yeah, I'm sure we have an NDA with them.

9  Q    Or my question was, are they -- this is -- is this an

10  investor or a potential investor?

11  A    No.  They would be an investor.

12  Q    They were an investor.

13        So, they were already an investor, but you entered into

14  an NDA with them; right?

15  A    Yes.

16  Q    And the purpose of that was so that you could share the

17  details of the divisive merger strategy; right?

18  A    That's correct, yeah.

19  Q    And did you share those details with this investor?

20  A    I believe we did.

21  Q    And were they pleased that you were going to remove the

22  leases from Resilience and then put an entity into bankruptcy

23  and it would not be Resilience?

24        MS. MARKS:  Objection; lack of foundation, calls

25  for speculation.

1             MR. SILVERMAN:  I'll rephrase.

2   BY MR. SILVERMAN:

3   Q     Did you tell this entity, after you entered into an

4   NDA, that you were planning on entering into a divisive

5   merger and then bankrupting the company that was the result

6   of the divisive merger?

7   A     I don't believe we told them we were -- we explained

8   what a divisive merger would be, and that is the path that we

9   would like to pursue.  And we thought that it was the best

10  course of action, rather than a HoldCo bankruptcy.

11        That's what I believe we told them.

12  Q     And did they respond to that?  Were they pleased?

13  A     You would have to ask them.

14            MS. MARKS:  Objection; same objection, calls for

15  speculation and lack of foundation.

16            THE COURT:  I'm going to sustain it.

17  BY MR. SILVERMAN:

18  Q     Did they respond?

19  A     I don't recall.

20  Q     Do you remember this conversation?

21  A     No, not really.

22  Q     All right.  So, middle of May now.  I want to go to Tab

23  7, M50, RES005641.

24        Mr. Marth, this is now May 26th, 2025?  This is an

25  email from you to a number of people, including Sherri Toub

1   from Kekst.

2         Do you see that?

3   A     I do.

4   Q     And Sherri Toub and Kekst is a public relations firm;

5   is that right?

6   A     Yes.

7   Q     Do you see your email that says:  "This is an important

8   departure from LW who had specific reasons for their view.

9   It needs to be vetted."

10        Do you see that?

11  A     Yes.

12  Q     And were you responding to an email from Mrs. Toub

13  below?

14  A     Yes.

15  Q     And in that email Mrs. Toub says:  "We strongly believe

16  that Chapter 11 needs to be addressed upfront in the press

17  release with color, context" -- and I am excerpting as I walk

18  through -- "color, context around the file rationale all in

19  furtherance of new Resilience.  Regardless of what we do or

20  don't say, once the filing happens, the headline Resilience

21  affiliate files for Chapter 11 will be out there."

22        And she goes on to say that this -- "Explaining this

23  chapter is a key step that you should lean into rather than

24  shy away."

25        Do you see that?

1  A     Yes.

2  Q     And so when you said, "This is an important departure

3  from LW," what did you mean there?

4          MS. MARKS:  Your Honor, we had this same email

5  asked about yesterday, and I would instruct the witness not

6  to reveal privileged information about LW's strategy.

7          THE WITNESS:  Yeah, I don't, you know -- again,

8  this is a conversation with -- that involves my lawyers.  I

9  don't know that legally I should speak about it.

10 BY MR. SILVERMAN:

11 Q     Okay.  Okay.  So, by the way, this email chain, do you

12 remember this email chain around this time you were having

13 discussions with the PR firm --

14 A     Yeah, yes, I do.

15 Q     -- on how to respond to inquiries about the Chapter 11

16 that would come up?

17 A     Yes.

18 Q     Okay.  Let's go to Tab 8, M57, RES005838 -- sorry,

19 005803.  This also includes many attachments which are in the

20 binder as well, but let me start with the email.

21        Mr. Marth, this is an email from June 8th from Dan

22 Hoadley from Kekst to a number of people, including you.

23        Do you see that?

24 A     Yes.

25 Q     Dan Hoadley is from Kekst, the PR firm; correct?

1  A      That's what it says on here.  I don't know Daniel.

2  Q      The subject line is, "Osiris, final comms package."

3         Do you see that?

4  A      Yes.

5  Q      Do you understand this to be the final communications

6  package given to you on June 8th to prepare for the June 9th

7  bankruptcy filing?

8  A      I believe it's the final.  From this I can't tell you

9  if it was final, final.

10  Q      It says "final."

11         Do you see that?

12  A      Yeah.

13  Q      Do you remember saying this is not final at any time?

14  A      No, I don't even believe I read it.

15  Q      You didn't read this?

16  A      I don't believe I did.

17  Q      You never looked at any of the PR communications?

18  A      I didn't say that.

19  Q      So what -- I'm sorry.  What did you not read?

20  A      This is a culmination of all of the iterations that

21  went on, which I had already previously read; so, when this

22  came out, I don't believe I read the whole thing.

23  Q      Gotcha.

24         So, all the previous iterations you had a part of, you

25  read, you commented on; right?

1  A      Yes.

2  Q      You were comfortable with them?

3  A      No, I wouldn't say I was comfortable with them.  I'm

4  not comfortable with the process.  I'm not comfortable being

5  here today.  I'm not comfortable with what we have to do.

6         But, you know --

7  Q      I meant more --

8  A      -- I did --

9         MS. MARKS:  I would ask that the witness be

10 allowed to finish his answer, please.

11         THE WITNESS:  Yeah, so, you know, I'm not

12 comfortable with any of this situation, you know.  But, you

13 know, we did the best we can with the communications package,

14 just like we did with everything else, we chose the better of

15 the two bad options.

16 BY MR. SILVERMAN:

17 Q      Got it.

18        You were uncomfortable, understood.  But did you agree

19 with all the lines that you had commented on in these PR

20 responses and that you would give them?

21 A      See --

22         MS. MARKS:  I have to just assert an objection.

23 The question is confusing to me.  This is a very long

24 document.  It looks like hundreds of pages.  I don't think

25 it's a fair question.  Maybe you could --

1    THE COURT:  I'm going to sustain the objection,

2  ask that you reword the question.

3    MR. SILVERMAN:  What was the latter part of what

4  you said, Your Honor?

5    THE COURT:  Can you please reword the question.

6  BY MR. SILVERMAN:

7  Q    We can move on.  I'm going to show you something in

8  particular from here, okay, and that will, I think, be

9  helpful.

10    So, what I'm showing you is what's called "Resilience

11  Supplemental Q&A."  Is this document familiar to you?

12    MS. MARKS:  What page number?

13    MR. SILVERMAN:  5862.

14    THE WITNESS:  It's one of the many documents that

15  came out.

16  BY MR. SILVERMAN:

17  Q    And do you recall having back and forth on this and

18  commenting on it with the public relations firm?

19  A    I don't recall on this particular document.  There were

20  hundreds of documents.

21  Q    Gotcha.

22    Let's look at Question 1.  Do you see that it says, "Is

23  Resilience in financial distress or not?"

24    Do you see that?

25  A    I do.

1  Q    And the answer says:  "We play a critical role in an

2  extremely challenging and highly technical world of advanced

3  therapeutics but we need to evolve so that we can be

4  financially as well as operationally successful."

5       And then it says, "To advance our transformation plan"

6  -- by the way, "our" is Resilience; right?

7  A    Yes.

8  Q    "To advance our transformation plan, it became clear

9  that certain sites needed to be wound down through Chapter 11

10 proceedings commenced by a leaseholder affiliate."

11      Do you see that?

12 A    Yes.

13 Q    Is that accurate?

14 A    Yes.

15 Q    Do you agree with that?

16 A    Yes.

17 Q    And then it says:  "Resilience, which is not included

18 in those legal proceedings, is on track to become a

19 financially stronger enterprise."

20      Do you see that?

21 A    I do.

22 Q    Do you agree with that?

23 A    Potentially we can become a financially stronger

24 enterprise.  But, you know, this is a PR firm.  Their job is

25 to tell a story.

1  Q      Well, this document was for you to respond to

2  questions; right?

3  A      Yes, and Kekst is a PR firm who is hired to tell a

4  story.

5  Q      For you to tell the story, to give you words; right?

6  A      To give us or themselves, because they represent us.

7  Q      Well, these were words for you; right?

8  A      It was for management, not for me; for management in

9  general.

10 Q      You're CEO?

11 A      Yeah.

12 Q      And president?

13 A      Yes.

14 Q      Are you not management?

15 A      I didn't say that.  I said --

16        MS. MARKS:  Your Honor, at this point I object,

17 he's badgering the witness on this.

18        MR. SILVERMAN:  I'll move on.

19        THE COURT:  Let's move on, please. Thank you.

20 BY MR. SILVERMAN:

21 Q      Let's go to 5865.  And I want to direct you to where it

22 says, "Tough media questions on Bedmar's Chapter 11 filing."

23        Do you see that?

24 A      Yes.

25 Q      Do you understand this to be questions that you or

1  others at Resilience might get that you would have to respond

2  to?

3  A    Yes.

4  Q    And that they would be tough questions?

5  A    Yes.

6  Q    Question 18 says, "Why were the Court proceedings

7  commenced?"

8       Do you see that?

9  A    I do.

10 Q    And it has a similar answer as to what we talked about

11 before, and in the second sentence it says, "To advance our

12 transformation."

13      Do you see that sentence?

14 A    I do.

15 Q    Again, that's Resilience; right?

16 A    Yes.

17 Q    And, by the way, the question is, "Why were the Court

18 proceedings commenced" -- actually, strike that.  I want to

19 go back to Question 1, 5862.

20      This question said, "Is Resilience in financial

21 distress or not?"

22      Do you see that?

23 A    Yes.

24 Q    That is a yes-or-no question.  Yes; correct?

25           MS. MARKS:  Your Honor, at this point I'm going to

 1  object.  This document speaks for itself.  He doesn't need to

 2  confirm with the witness what it does or doesn't say.  He's

 3  also not the author of the document.  He received it.  So,

 4  I'm just not sure what we're doing with this since everyone

 5  can read the document.

 6        MR. SILVERMAN:  Your Honor, we offered not to have

 7  Mr. Marth testify.  They wanted - after, you know, this

 8  document had came in yesterday, through Mr. Montone, they

 9  insisted on having him and directing him; and so, I believe

10  that it's fair to question him on this.

11        MS. MARKS:  Your Honor, I did not use this

12  document, so they are choosing to use it on cross-exam and

13  they're reading from the document.  Again, I just reiterate

14  that the document speaks for itself.

15        MR. SILVERMAN:  I'm also asking what he -- I'm

16  sorry -- if he agrees.

17        THE COURT:  I want to hear your argument because

18  I'm failing to see what you're asking that's not in the

19  document.

20        MR. SILVERMAN:  Well, I'm asking if he agrees with

21  these as well, because these were words given to him to say

22  to people.  And I want to know if he agrees with them, one,

23  and has said them to people.

24        THE COURT:  Okay.  Well, those are different

25  questions than what you had asked.  So --

1          MR. SILVERMAN:  Okay.

2          THE COURT:  -- I'm going to overrule the objection

3  with the warning I just gave you.

4  BY MR. SILVERMAN:

5  Q    So I won't just ask him what it says.

6       Mr. Marth, can we look at Question 19.  Do you see

7  where it says, "Given that there is no need for every legal

8  entity to file TO be part of the Chapter 11 proceedings"?

9       Do you could agree with that?

10         THE COURT:  Where you are?  Sorry.

11         MR. SILVERMAN:  Question 19 and the response.

12         MS. MARKS:  I would object.  That's not what I

13  have as Question 19.

14         THE COURT:  Me neither.  That's not what's on the

15  screen.

16  BY MR. SILVERMAN:

17  Q    Question 19 says:  "How can leases be rejected and

18  certain sites wound down through a Chapter 11 filing without

19  filing the entire company?"

20       Do you see that?

21  A    Yes.

22  Q    Okay.  And the second sentence of the answer says,

23  "Given that" -- why don't I read the whole thing.  I'm trying

24  not to read, but I don't see how else to ask him if he

25  agrees.

1        The answer says:  "The leases for the underutilized

2   sites that need to be addressed all reside in one legal

3   entity, which is an affiliate of Resilience and not

4   Resilience itself.  Given that, there is no need for every

5   legal entity to file or be part of the Chapter 11

6   proceedings."

7        Do you see that?

8   A    I do.

9   Q    Do you agree with that?

10  A    I'm not a lawyer.  I can't tell you.

11       What I can tell you is that I had two choices.  I could

12  HoldCo the whole company, which, again, is bad for everyone,

13  pennies on the dollar for your clients, causes loss of jobs,

14  couldn't sell sites, can't raise money, destroys the company;

15  or I could give you your capped claims for your clients and

16  then, you know, get a shot at funding the company, preserving

17  the jobs, preserving the manufacturer, you know, keeping

18  supply here in the United States, keeping drugs on the

19  market.  Yeah, that was the choice I was given.

20       I don't know how this question speaks to that.  I'm not

21  a lawyer.

22  Q    Sorry.  My question was:  Do you agree with that

23  statement that's written here?

24            MS. MARKS:  Objection; asked and answered.

25            MR. SILVERMAN:  I don't think he did.

1          THE WITNESS:  I believe I did.  It's the only

2   answer I can give:  I'm not a lawyer.  I don't know if it's

3   the only way.  Is this the only way to Wilmington?  I don't

4   know.

5   BY MR. SILVERMAN:

6   Q    The question says:  "Given that there's no need for

7   every legal entity to file or be part of the Chapter 11

8   proceedings."

9          Do you see that?

10  A    I do.

11  Q    This is in a public relations document for you to say

12  to people; right?

13         MS. MARKS:  Objection to form.  At this point it's

14  badgering the witness.  It's speaking to a document that

15  speaks for itself.

16         THE COURT:  Move on.  He's answered the question.

17         MR. SILVERMAN:  Let's just go back to Tab 9.  This

18  was the email about the legal tool to get rid of the toxic

19  sites.

20  BY MR. SILVERMAN:

21  Q    Earlier you said it would be absurd that the best path

22  was to give value to the shareholders.  Is that what you

23  testified earlier?

24  A    I would have -- you'd have to read back the question

25  and my whole answer because you're asking parts of something.

1  I'm not sure what the context is.

2  Q     When you said to me the best path to return value to

3  shareholders absent a favorable bid from X, were you talking

4  about the bankruptcy?

5  A     Favorable -- again, where are you asking from?

6  Q     Tab 9 -- I'm sorry.  It's the paper that you had, the

7  email paper.

8  A     Okay.

9  Q     When you said to me "the best path to return value to

10 shareholders absent a favorable bid from X," were you meaning

11 the best path to return value to shareholders was the legal

12 tool to rid Resilience of the toxic sites?

13 A     I'm basically saying here that, you know -- again, we

14 tried to sell the sites.  If somebody wants to buy them,

15 potentially that could return capital to everyone.  But

16 absent that, doing the divisive merger is the best option as

17 opposed to a HoldCo bankruptcy.

18 Q     Last question:  When you said "just kidding," what did

19 you mean?

20 A     I'm tweaking a friend.

21            MR. SILVERMAN:  Okay.  Thank you.

22            No further questions.

23            MR. TECCE:  Very briefly, Your Honor.

24            THE COURT:  Let me ask:  Do you parties need a

25 break?  Does the witness need a break?

1         THE WITNESS:  I'm fine.

2         THE COURT:  You may proceed.

3         MR. TECCE:  I'm going to be short.

4         THE COURT:  Okay.

5                    CROSS-EXAMINATION

6  BY MR. TECCE:

7  Q    Good morning.  My name is James Tecee.  I'm an attorney

8  at Quinn Emanuel, and we represent Cobalt.  It's nice to meet

9  you in person.

10 A    Nice to meet you.  Could you speak up.

11 Q    Sure.  Sorry.  Can you hear me now?

12 A    Better.

13 Q    It's nice to meet you in person.

14      I think you mentioned that when you were brought on to

15 the company, you were contacted by members of the board of

16 directors.  Is that correct?

17 A    That is correct.

18 Q    Was Mr. Nelsen one of the people that reached out to

19 you?

20 A    One of them, yes.

21 Q    And Mr. Nelsen is associated with Arch Ventures; is

22 that correct?

23 A    Yes.

24 Q    He's a member of the board of directors of National

25 Resilience HoldCo as well; is that correct?

1  A      Yes.

2  Q      And he's also -- Arch, rather -- Arch also has acquired

3  the Series A preferred units to make the bridge financing

4  loan; is that correct?

5  A      Yes.

6  Q      With respect to the facilities where the leases are

7  being rejected, okay, I believe that there are -- I think

8  there are seven facilities, or is it six?  Do you know?

9  A      I thought there were seven, but it may be down to six.

10 We settled with some parties.

11 Q      But actually is it -- let me -- is it Bedford,

12 Massachusetts; Allston, Massachusetts; Marlborough,

13 Massachusetts; San Diego, California --

14 A      Yeah.

15 Q      -- Fremont and Alachua; is that correct?

16 A      Yeah, but we have settled with a couple of those.

17 Q      But I just -- settlements I understand.  Which

18 properties where the leases are being rejected?  Are there

19 two in San Diego? Is that how we get to seven from the six

20 names I mentioned to you?  Do you know?

21 A      I believe one is a warehouse.

22 Q      Okay.  When -- is it -- when the -- when the leases or

23 the properties are wound down, do the people that work at the

24 properties, do they lose their jobs?

25 A      Frankly, most of them lost their jobs before this.

1  Q     Okay.  But the -- when you wind down a facility and

2  you're not in the facility anymore, the people that work at

3  the facility no longer have a job there; is that correct?

4  A     But what you're saying, they work in the facility; but

5  they've already been laid out, so they don't work in the

6  facility.  They've already been gone because we couldn't

7  afford to keep them there in the first place, so it's an

8  empty facility.

9  Q     So you've laid off facilities, and you've left seven

10 properties completely vacant with no employees, not a single

11 one?

12 A     Not all of them.  Marlborough is vacant.  In San Diego,

13 we shut down R&D and then transferred that to someone so

14 that's vacant.  The warehouse is vacant.  Bedford was never

15 occupied.  Allston only had, I think, 34 employees left in

16 it.  So, Alachua probably had the most, about 90.

17 Q     And when those facilities are wound down the people

18 that work there lose their jobs, is that correct?

19 A     Those that remain, they're likely going to lose their

20 job in a HoldCo bankruptcy anyways, so -- yeah.

21 Q     But as a consequence of this restructuring, of this

22 bankruptcy filing, those people have lost their jobs; is that

23 correct?

24             MS. MARKS:  Objection; asked and answered.

25

1          THE WITNESS:  Again, my answer would be the same:

2   Whether I do a HoldCo, they're going to lose their job; or I

3   do this, they lose their job.

4          But the benefit is that 15 -- can I answer?  1500

5   other people keep their jobs.  We still continue to

6   manufacture drugs for the US market.  We are still an

7   important -- and we give an opportunity for the future.

8   BY MR. TECCE:

9   Q    Speaking of the HoldCo bankruptcy, I think you referred

10  to a billion and a half in debt or something.  Was that the

11  number that you gave earlier that Resilience has?

12  A    I would say the burden is about a billion and a half,

13  but it could rise to over 2.

14  Q    And so in that number, that includes the $112 million

15  in convertible notes; is that correct?

16  A    Yes.

17  Q    And that -- those are convertible notes that are held

18  by Arch Ventures and 8VC; is that correct?

19  A    I believe there's other investors in that 112 as well.

20  Q    But they're the principal holder; isn't that correct?

21  A    Yes.

22  Q    In your 1.5, do you double that 112 to 224 based on the

23  way the note works; is that how you get to your total?

24  A    I would stipulate to you it's a substantial sum.  I

25  don't know exactly how it converts.  We would have to ask --

1  I think Andrew would know or Ori would know exactly what the

2  number is.

3  Q    Okay.  And in your 1.5 billion, are you including funds

4  that were advanced as part of the bridge financing recently

5  from the shareholders?

6  A    Yes, there is payback for those bridge notes.

7  Q    Okay.  And do you know what that number is?

8  A    It's 3-1/2 times.

9  Q    So it's 3-1/2 times and the total debt is -- or the

10 bridge financing is $240 million, it's 3-1/2 times -- I'm not

11 going to ask you to do that math, sir.  Although you seem

12 like the kind of guy that could probably do it in your head,

13 but it's 3-1/2 times 242; is that right?

14 A    Yeah.

15 Q    Okay.  You've mentioned many times about a HoldCo

16 bankruptcy.  Have you ever considered that in a HoldCo

17 bankruptcy the creditors in that bankruptcy might try to

18 recharacterize those loans as equity?

19 A    I am not skilled in the art of bankruptcy, thank God.

20 Q    Have you ever considered in a HoldCo bankruptcy whether

21 or not equity might be wiped out?

22 A    Yes.  I mean, you know, I think it is very likely since

23 we couldn't, you know -- that I tried to sell everything I

24 can; and nobody has come to the table to buy things.

25       And, of course, in a bankruptcy, everybody thinks they

1  get a deal.  So, if they weren't going to offer me anything

2  before, you know, I think it only gets worse from here.  So

3  yeah, I think everybody gets, you know -- you guys get

4  pennies on the dollar, and everybody gets wiped out.

5  Q    So you have considered whether or not equity would get

6  wiped out in a HoldCo bankruptcy; is that correct?

7  A    Yes, it's not my primary concern.  I mean, I have a

8  fiduciary responsibility so, yeah, I know -- to my

9  shareholders; but the reality is, you know, everyone gets --

10  is in a bad state.

11       And, you know, frankly, that's why these notes have to

12  be this rich.  These people are taking huge risk.

13  Q    "These notes," you mean the bridge financing; is that

14  what you're talking about?

15  A    Yeah.  Yes.  You know, I would have guaranteed them

16  less money if I could have gotten away it, frankly, I

17  couldn't.

18  Q    Do you think that they would have invested in

19  Resilience 2.0 if they didn't see an opportunity for growth?

20  A    You'd have to ask them.

21  Q    Well, it is true that they did put their money in; is

22  that correct?

23  A    They did.

24  Q    Okay.  You said that you have two choices between the

25  bankruptcy or a divisive merger, the HoldCo bankruptcy or a

1  divisive merger.

2      Of those two options, to your mind, sir, which is the

3  one that could preserve value for equity holders?

4  A     For equity holders?  I think, again, the best

5  opportunity for everyone, including your clients, is the

6  divisive merger.  They get 100 percent of their cap claims.

7  Shareholders get a huge amount of debt but a shot at an

8  eventual outcome that's positive.

9  Q     My question was, though, was to equity in particular,

10 sir.  Of the two choices between the HoldCo bankruptcy and

11 the divisive merger, which one is the one that might preserve

12 value for equity holders?

13 A     Then in that case it would be the divisive merger.  It

14 gives them a shot, a hope, which we had to pay them dearly

15 for.

16          MR. TECCE:  Thank you for your time, sir.

17          THE WITNESS:  Thank you.

18          MR. FOX:  May it please the Court, Tim Fox on

19 behalf of the United States Trustee.  I just have a couple of

20 questions as well.

21                    CROSS-EXAMINATION

22 BY MR. FOX:

23 Q     Good morning, Mr. Marth.

24 A     Good morning.

25      And, Mr. Marth, I'm going to try to focus on some of

1  your testimony that you gave previously.  Again, I know you

2  don't have the benefit of seeing your responses and answers,

3  so I'll do my best to be general.  But if you have a question

4  that needs clarification, please feel free to stop me and ask

5  that.

6  A     Sure.

7  Q     And so, Mr. Marth, I wanted to ask regarding timing of

8  Resilience -- and when I refer to "Resilience," I mean

9  National Resilience and its other affiliates other than

10 Bedmar, LLC -- as it relates to the sales process you

11 described previously.

12 A     Okay.

13 Q     And, Mr. Marth, I believe you mentioned that you had

14 hired Jefferies to perform certain services.

15       Do you have an approximate time of when Jefferies was

16 engaged by Resilience?

17 A     Yeah, which Jefferies?  There were two Jefferies'

18 teams; right.  So -- and I don't remember the exact date.  I

19 believe we -- there were multiple parties -- so we hired

20 Morgan Stanley, I think that was back in December, that had

21 to do with West Chester.  And then we hired Jefferies to sell

22 the Alachua site and the RTP site.  It's in the first

23 quarter.  It had to be after February, so it was probably in

24 that March time frame.

25       And then, of course, the second Jefferies team, which

1   would raise the capital, was done shortly after we brought

2   on, you know, Latham and Portage Point, et cetera.

3   Q     Thank you.

4         And so, to follow up on that, there was a Jefferies

5   team engaged in early March or sometime end of February,

6   early March relating to asset sales of RTP and Alachua?

7   A     Yes.  Yes.

8   Q     And then in the May time frame, is that when the second

9   Jefferies team that was responsible for the cap raise was

10  engaged?

11  A     It's about that time, yeah.

12  Q     And to be clear, the marketing of RTP and Alachua, that

13  was specific to assets; there wasn't any other scope of

14  services as to capital raise or alternative transactions?

15  A     The other team was to do the capital raise; right?  So,

16  the second team does the capital raise.  And, of course, you

17  couldn't do the capital raise, right, unless you were able

18  to, you know, get to the other side, to get -- you know, some

19  debt relief.

20  Q     And so then in terms of timing again, the marketing of

21  the physical assets for RTP and Alachua, that would have

22  ended in approximately May of 2025 in terms of how --

23  A     No.

24  Q     No?  Okay.

25  A     It did not end then.  It still continues; right?  We're

1   still trying to sell the RTP site.  That is continuing.

2         The Alachua site, of course, you know, we did have to

3   file when -- you know, Jefferies came back to us and said,

4   just -- there's no way.  And so, you know, after Bedmar was

5   done, later than that we then filed Alachua.

6   Q     And consistent with that, when Jefferies approached and

7   said, we have to file the Alachua entity to further market

8   that, did the management team at Resilience have any direct

9   discussions with buyers about preferences for purchasing

10  assets either in Chapter 11 or outside of Chapter 11, to your

11  knowledge?

12        MS. MARKS:  I just object.  I think the question

13  got a little jumbled.  You asked if Jefferies --

14        THE WITNESS:  Yeah.

15        MS. MARKS:  -- Jefferies suggested they had to

16  file.  If you could rephrase.

17        MR. FOX:  Appreciate it.  Sorry.  Let me focus on

18  the management team at Resilience.

19  BY MR. FOX:

20  Q     Did the management team at Resilience have any

21  discussions with buyers regarding preferences as to

22  purchasing assets inside of a Chapter 11 or outside of a

23  Chapter 11?

24  A     Not that I recall.

25        First of all, anyone who was interested in the site, we

1   had discussions with them.  We had interactions with many

2   parties, both foreign and domestic; didn't get a single one

3   to visit the site.

4        And, you know, then Jefferies suggested to us -- never

5   -- they didn't suggest the bankruptcy.  They suggested that,

6   you know, we just can't sell this thing.  And then we made

7   the decision, there is no other recourse for us.

8   Q    And so just to close this loop and before I move on to

9   a couple of smaller matters, Jefferies' activities are still

10  ongoing in terms of both of those workstreams, the capital

11  raise team is still looking at issues for Resilience as an

12  enterprise, and the asset sale teams are still undertaking

13  activities with respect to sale of RTP and Alachua?

14  A    So the Jefferies team is -- one team is still trying to

15  raise capital.  That is ongoing.  The second team is still

16  trying to sell RTP.

17       The -- that team that is trying to sell RTP and was

18  doing Alachua, you know, they're not trying to sell Alachua

19  now.  I think Jefferies is involved with -- that's a separate

20  filing and is involved with that filing.

21  Q    Thank you, Mr. Marth.

22       I believe in your earlier testimony you discussed a

23  concept of reputational harm as it might relate to a HoldCo

24  bankruptcy filing.

25       Do you recall your testimony on that point?

1  A      Yes.

2  Q      Could you explain to what extent Resilience and

3  management at Resilience was concerned with respect to its

4  reputation if it filed a HoldCo bankruptcy.

5  A      Yeah.  I guess we could call it reputational, right.

6         But the issue is a HoldCo bankruptcy -- I mean, when

7  you're manufacturing drugs for a pharmaceutical company,

8  these are their most precious assets; right?  You know, where

9  they make disproportionate margin.  And the worst thing that

10 can happen to them is continuity of supply.

11        And so, you know, if they believe that you're in, you

12 know, bankruptcy, you're just not going to get that business.

13 It's just very, very difficult to get that business.  And

14 that's why we're very sensitive about the HoldCo bankruptcy.

15        It's my belief that, you know, it will destroy this

16 company, and that's my belief.  And that's -- I think most of

17 the management holds that same belief.

18 Q      In forming that, was there at all a concern among

19 members of the Resilience management team that it would

20 reflect poorly on the management team as individuals if they

21 had to file a HoldCo bankruptcy?

22 A      No, I don't think so.  Because many of the -- if you

23 look at the management team today, most of it has been

24 replaced.  Luckily, we were able to retain Andrew and Ori.

25 But all of the other members of the senior team now are

 1  people who worked with me in the past at Albany Molecular and

 2  actually know how to run a CDMO.

 3          MR. FOX:  Thank you.

 4          That's all I have.

 5          THE COURT:  Thank you.  We're going to take a

 6  five-minute break before you do redirect.

 7          Sir, I'm going to advise you or direct you not to

 8  speak to anyone during the break.  But we're going to take a

 9  break.

10          So, we're going to break for five minutes or

11  thereabouts.

12      (Recess taken at 11:44 a.m.)

13      (Proceedings resumed at 11:51 a.m.)

14          THE COURTROOM DEPUTY:  All rise

15          THE COURT:  Please be seated.

16          MS. MARKS:  Just a few questions on redirect.

17                      REDIRECT EXAMINATION

18  BY MS. MARKS:

19  Q    Mr. Marth, do you remember on cross-exam you were asked

20  about whether you spoke to the landlords to try to offer them

21  some money to get out of the sites?

22  A    Yes.

23  Q    And on the Allston lease, is Harvard the landlord on

24  the ground lease for that site?

25  A    Yes.

1  Q     And this is the site where Resilience owns the building

2  on the site?

3  A     Yes.

4  Q     Did you speak to Harvard, the landlord on the ground

5  lease?

6  A     Yes.

7  Q     And what did you discuss?

8  A     We discussed conveying the site back to them and, you

9  know, on just about any terms.

10 Q     Were you basically offering to sell the site back to

11 them?

12 A     Yes, I did.

13 Q     And what did they say in response?

14 A     They didn't want it.

15 Q     Did you basically offer to give them back the site?

16 A     Yes.

17 Q     And what did they say in response?

18 A     They didn't want it.

19 Q     Okay.  I'd like you to take a look at Tab 5 in the

20 binder.  This is -- it's going to be Exhibit M14.

21       Do you have that handy?

22 A     Are we going to --

23 Q     Yeah.  Let's pull it up.  It's M14.

24       Thank you very much.

25       Mr. Marth, do you remember being asked about this

1  exhibit on cross-exam?

2  A     Yes.

3  Q     And I wanted to point you -- we're going to focus on --

4  it's the second paragraph in that narrative.

5        Yes, thank you very much.

6        Do you see near the bottom, the second-to-last

7  sentence, it states:  "To complete this restructuring, each

8  legal entity must be deemed solvent based on assets and

9  statutory liabilities"?

10 A     Yes.

11 Q     And I know you're not a lawyer, but generally was that

12 your understanding?

13 A     Yes, that was --

14 Q     And was the purpose of this document that was being

15 drafted, was the purpose to send this to the shareholders?

16 A     Yes.

17 Q     And was the purpose to raise funding from the

18 shareholders so that assets, cash and receivables could be

19 allocated to the debtor so that it would be solvent and able

20 to pay the capped damages here?

21 A     Yes.  Those were all the steps that needed to be done

22 in order to facilitate this.

23 Q     And the company needing funding from the shareholders

24 to do that?

25 A     Absolutely.  Without that, we just would run out of

1  cash.  I mean, at one point we were down to $15 million.  You

2  know, I was worried that we can't make payroll.  There's a

3  lot of people that depend on us.

4  Q    And if the shareholders had not put in that bridge

5  financing, would there have been any cash available to

6  allocate to the debtor to pay the cap damages?

7  A     No.  No capital for the debtors or the landlords or

8  whomever; and potentially nothing for the employees.

9           MS. MARKS:  Thank you.

10           THE COURT:  Okay.  Thank you.

11           MS. MARKS:  No further questions for the witness.

12           Mr. Marth, thank you very much.  You can step

13  down.

14           THE COURT:  Thank you very much, Mr. Marth, for

15  your time.

16           THE WITNESS:  Thank you.

17           THE COURT:  Okay.  This looks like a natural time

18  for a break.

19           MS. QUARTAROLO:  I was going to suggest as much,

20  Your Honor.  Amy Quartarolo on behalf of the nondebtor

21  affiliates.

22           Our next witness will be Mr. Alhale.  I'm happy to

23  call him after the lunch break, if that's what you would

24  like.

25

1          THE COURT:  I think that makes more sense.  So why

2   don't we take an hour break.  Why don't we reconvene at 1

3   o'clock.

4          MS. QUARTAROLO:  Thank you, Your Honor.

5          THE COURT:  And you may leave your materials here.

6   We'll ask that the courtroom be locked.

7          MS. QUARTAROLO:  Thank you, Your Honor.

8          THE COURT:  Thank you.  We stand in recess.

9       (Recess taken at 11:55 a.m.)

10      (Proceedings resumed at 1:02 p.m.)

11          THE COURTROOM DEPUTY:  All rise.

12          THE COURT:  Please be seated.

13          MS. QUARTAROLO:  Good afternoon, Your Honor.  Amy

14   Quartarolo of Latham & Watkins on behalf of the nondebtor

15   affiliates.

16          We would call our next witness, Mr. Morris Alhale.

17          THE COURT:  Okay, thank you.  Please implement the

18   broadcast protocol.

19          Thank you.

20          MS. QUARTAROLO:  We have binders, I'm not sure

21   that we will use them, but they have the demonstratives and

22   his depo transcript in case it's necessary; but we will

23   distribute those with the Court's permission?

24          THE COURT:  Yes, please.  Thank you.

25              MORRIS ALHALE, WITNESS, SWORN

1        THE CLERK:  Can you please state your full name

2   and spell your last name for the record.

3        THE WITNESS:  Morris Alhale, A-L-H-A-L-E.

4                   DIRECT EXAMINATION

5   BY MS. QUARTAROLO:

6   Q    Good afternoon, Mr. Alhale.  I just want to remind you,

7   make sure to try to speak into the microphone.  I know

8   sometimes people in the back have trouble hearing, given the

9   AC here.

10       Mr. Alhale, where are you employed?

11  A    Portage Point Partners.

12  Q    And at a high level, can you briefly describe what

13  Portage Point Partners is.

14  A    Yes, Portage Point Partners is a financial advisory

15  firm that provides turnaround and restructuring, investment

16  banking, performance improvement, turnaround services, as I

17  mentioned, as well as transaction advisory and execution

18  services and office and CFO services.

19  Q    And what is your current position at Portage Point?

20  A    I'm a managing director.

21  Q    And as a managing director, what is your role?

22  A    My principal role is leading engagement teams,

23  primarily within the turnaround and restructuring practice.

24  Q    How long have you worked at Portage Point?

25  A    I was -- I've been employed since March.

1   Q      March of 2025?

2   A      Correct.

3   Q      And how long have you worked in the restructuring field

4   overall?

5   A      A little over 15 years.

6          Prior to joining Portage Point in March, I was at

7   AlixPartners for approximately nine years.  I left as a

8   partner there.

9   Q      And what are your academic credentials?

10  A      I received my bachelors of science in business

11  administration from Boston University.

12  Q      And through your work, have you developed any

13  particular areas of focus or expertise?

14  A      Yes, specifically within turnaround and restructuring

15  services, both in court and out of court.

16  Q      And have you previously served as an expert in

17  connection with any bankruptcy matters?

18  A      While at AlixPartners, I was involved with a number of

19  engagements that required expert services; but this is my

20  first time testifying.

21  Q      Do you have experience analyzing or helping companies

22  prepare financial statements?

23  A      Yes.

24  Q      Do you have experience in preparing bankruptcy

25  schedules for Chapter 11 debtors?

1   A      Yes.

2   Q      Do you have experience calculating and estimating

3   unsecured and secured claims in and out of bankruptcy?

4   A      Yes.

5   Q      And do you have experience in helping companies

6   evaluate potential restructuring alternatives in and out of

7   bankruptcy?

8   A      Yes.

9          MS. QUARTAROLO:  Your Honor, I'd like to tender

10  Mr. Alhale as an expert in financial analysis and calculating

11  recoveries.

12         THE COURT:  Any objection?

13         MR. APPLEBAUM:  No objection, Your Honor.

14         THE COURT:  You may proceed.  He's qualified.

15         MS. QUARTAROLO:  Thank you.

16  BY MS. QUARTAROLO:

17  Q      Mr. Alhale, what role has Portage Point played with

18  National Resilience?

19  A      Portage Point was retained by National Resilience and

20  its affiliates to provide services related to liquidity

21  management, business plan review and development, as well as

22  assessing strategic alternatives, including evaluating and

23  calculating lease cap claims.

24  Q      When was it that Portage Point was engaged by National

25  Resilience?

1  A    March of 2025.

2  Q    And have you been involved for the full duration of

3  that engagement?

4  A    Yes.

5  Q    Do you oversee that engagement?

6  A    Yes.

7  Q    What has been your scope of work with respect to the

8  Bedmar Chapter 11 case?

9  A    I was asked to provide expert analysis in relation to

10 the motions to dismiss in the case.

11 Q    Okay.  And more specifically, what analysis have you

12 undertaken?

13 A    It's assessing the assets and liabilities before and

14 after the corporate transactions and recoveries to unsecured

15 creditors.

16 Q    And did you prepare slides that set forth your

17 analysis?

18 A    I did.

19         MS. QUARTAROLO:  And, Your Honor we'd ask to put

20 those up on the screen.  I understand from counsel that

21 there's no objection to those being used as a demonstrative

22 for his testimony today.

23         THE COURT:  Okay.

24 BY MS. QUARTAROLO:

25 Q    Do you see the slides in front of you?

1   A     I do.

2           THE COURT:  Before you proceed, can whoever -- can

3   you avoid the split screen so that this document is the

4   entire screen?

5           Thank you.

6           MS. QUARTAROLO:  Thank you, Your Honor.

7   BY MS. QUARTAROLO:

8   Q     And are these the slides you prepared, Mr. Alhale?

9   A     Yes.

10  Q     And what was your role in preparation of the analysis

11  that is set forth in these slides?

12  A     I prepared the analysis in the slides here.

13  Q     We can turn to Slide 2.

14        Is this the area of analysis that you just referenced a

15  moment ago?

16  A     Correct.

17  Q     Can you read it out loud.

18  A     "I have been asked to provide analyses and opinions

19  reached based on such analysis as it relates to whether the

20  recoveries of unsecured creditors of National Resilience and

21  Resilience US respectively immediately prior to divisions

22  would have been less than the recoveries to unsecured

23  creditors of Bedmar HoldCo and Bedmar, LLC respectively

24  immediately after the divisions."

25  Q     Okay.  And we can go to the next slide.  I want to take

1   a step back for a minute.

2       Were you present in court yesterday?

3   A    Yes.

4   Q    And I assume you'll recall testimony from several

5   witnesses about who it was who calculated the lease rejection

6   damages?

7   A    There was a lot of references to Portage Point

8   yesterday.

9   Q    And so my question for you is, prior to Bedmar's

10  Chapter 11 filing, were you involved in calculating the

11  amount of potential 502(b)(6) damages claims?

12  A    Myself and my team, yes.

13  Q    Have you done that before in other matters?

14  A    Yes.

15  Q    And here, did counsel or anyone provide you with any

16  assumptions in terms of how to go about calculating 502(b)(6)

17  damages claims?

18  A    Yes.  Specifically, around the confirmation of the

19  formula used for 502(b)(6) claims and the analysis there, as

20  well as that unsecured -- rejection damages claims or

21  unsecured claims.

22  Q    Okay.  We can go to the next slide.  This slide is

23  titled "Total Outstanding Obligations Under the Lease

24  Agreements."

25      Mr. Alhale, what is this and how does it fit into your

1 analysis?

2 A    So this is the uncapped damages, so essentially the

3 total obligations under the respective leases from beginning

4 to end, or sort of from the point in time of June to the end

5 of the term date of the lease itself.

6      In developing this we looked at all of the leases, as

7 well as lease abstracts, to understand the total obligations

8 that were contractually required under the leases.  That

9 would include the base rents, utility charges, insurance,

10 taxes, common area maintenance charges, to the extent

11 applicable, for each of the leases.

12      So here -- so is the -- so essentially the gross claim

13 amount or damages under the life of the lease.

14 Q    And did the numbers that are on this chart go into your

15 analysis of the 502(b)(6) claims?

16 A    So this was the basis of calculating the rejection

17 damages; but these are gross claims here.

18 Q    Okay.  And if we can turn to the next slide.

19      What does this slide show, Mr. Alhale?

20 A    So this slide here shows the calculation of Section

21 502(b)(6) claims.  This is the greater of one year or 15

22 percent of the remaining lease term capped at three years.

23      So essentially what we've done here is sort of show

24 that calculus step by step. So off to the very left, you'll

25 see the one-year rents under each of the leases.  Then the

1  next sort of set of columns here reflect a 15 percent of the

2  remaining term of the lease capped at 36 months or three

3  years.  And then you get the greater of the 12 months or the

4  15 percent.

5       Next column over shows the additional claims, and these

6  are specifically the pro-rated amounts between June 1st and

7  June 9th on a pre-petition basis -- June 9th being the filing

8  date.

9       And where applicable, to the extent that the rejection

10 date was passed the filing date, certain facilities or

11 certain properties -- excuse me -- there would have been

12 admin, sort of post-petition rents due until the rejection

13 date.

14 Q    And did you share these calculations with regard to

15 502(b)(6) claims with the Bedmar independent manager and/or

16 his advisors?

17 A    We share this analysis, the supporting detail behind

18 it, as well as the leases and lease abstracts.

19 Q    And did you have any discussions with them about it?

20 A    Yes.  We had a number of phone calls to review the

21 analysis, address questions and comments that they had.

22 Q    For what purpose did you calculate potential 502(b)(6)

23 claims?

24 A    At the time, the company did not have sufficient

25 liquidity on hand to fund the lease cap claims themselves and

1   fund the operations of the business.  So, we needed to

2   understand the size of the claims in order to go seek

3   financing related to the funding of this scenario.

4        In addition, the cap claims would have been useful in

5   assessing the alternative scenario, which was the HoldCo

6   filing, as there would have been rejection there.  And

7   estimates of rejection damages would have been applicable in

8   HoldCo as well.

9   Q    Were the lease cap claims factored into the allocation

10  of assets as part of division?

11  A    Yes.  It was used to assess the assets that would have

12  been sort of allocated as part of the divisions to ensure

13  that there were sufficient funds to pay the cap claims in

14  full.

15  Q    And, Mr. Alhale, I've been asked to ask you to slow

16  down.

17  A    I'm sorry.  It's my first.

18  Q    Which I'm sure will -- I know we all want to get out of

19  here at some point today, and -- but I think I want to make

20  sure that the Court and everyone here can --

21            THE WITNESS:  I apologize.

22            THE COURT:  You were fine for me.

23            MS. QUARTAROLO:  As long as the Court is keeping

24  up, but, yes, I would ask you to just please slow down a

25  little bit.  Thank you.

1          Let's go to the next slide.

2  BY MS. QUARTAROLO:

3  Q    So, Mr. Alhale, I next want to talk with you about

4  what's been referred to as your division analysis.  In your

5  own words, can you describe for the Court what it was you

6  were attempting to determine in this analysis.

7          MR. APPLEBAUM:  Objection, Your Honor.  Before we

8  go, I'd just like to make, if the Court will allow it, a

9  standing objection with regard to division analysis for the

10 same reasons that we discussed earlier.  I understand that

11 the Court's ruling.  The Court is going -- we would like to

12 just make a standing objection to this testimony to preserve

13 the record.

14         THE COURT:  It is noted.

15         MR. APPLEBAUM:  Thank you, Your Honor.

16 BY MS. QUARTAROLO:

17 Q    I'll ask my question again, Mr. Alhale.

18 A    Thank you.

19 Q    In your own words, can you describe for the Court what

20 it is that you were attempting to determine under this

21 analysis.

22 A    Yeah.  We were assessing the assets and the liabilities

23 before and after the corporate transactions, as well as the

24 recoveries to unsecureds before and after the corporate

25 transactions.

1  Q      And what information did you use for this analysis?

2  A      For the analysis here, I relied on the May 31st balance

3  sheet for the respective entities as that was the best proxy

4  of the best time of the corporate transactions including the

5  divisions.

6  Q      And just to orient us in time, what was the starting

7  point for this analysis?

8  A      So the "before the corporate transactions" entailed

9  before any of the corporate transaction steps took place,

10 including the divisions.

11 Q       We can go to the next slide.

12         Mr. Alhale, this is titled "Resilience US Pro Forma

13 Balance Sheet as of May 31st, 2025."

14         Do you see that?

15 A      Yes.

16 Q      What does this slide show?

17 A      So this is the balance sheet for Resilience US, the

18 entity; and this reflects -- I realize there's a lot of

19 numbers here, so I'll help the Court orient.

20         So going from across the top here, this shows

21 Resilience US, LLC's balance sheet prior to any divisions.

22 Then there's an allocation of assets and liabilities that

23 were taken place as Court of the corporate transactions,

24 specifically allocations to Bedmar, LLC.

25         And then there was allocations to the ENM and RTP

1  entities -- specifically that was the Philadelphia site and

2  the Durham site in North Carolina.

3       After you've allocated those assets and liabilities,

4  you get to the "Post-Division Resilience US Balance Sheet."

5  Compare that to the last column.  That is the "Bedmar, LLC,

6  Post-Division Balance Sheet."

7       So now coming down the rows here, you'll see that

8  there's the allocation of the cash to Bedmar as well as

9  restricted letters of credit and security deposits that were

10  held by the landlords, as well as allocation of the PP&E.

11  And the leases here are valued -- there both an asset and a

12  liability in accordance with GAAP in which the company

13  reports.

14       You see the right of use asset here as well as the

15  operating lease liabilities down below.  The liabilities here

16  are reported in accordance with GAAP on a present-value

17  basis.

18       So, you kind of see the allocations, the pre-division

19  and post-division balance sheets of the entities related to

20  Resilience US.

21  Q    And were there any liabilities that were not allocated

22  as part of the division and remained at what you're referring

23  to as RUS, Resilience US?

24  A    Yes.  If you kind of look to the bottom right there,

25  you'll see under the liabilities, all of the liabilities were

1  retained by Resilience US on a post-division basis.  So that

2  includes the trade payables for vendors, deferred rents under

3  contractual customer obligations, the debts that are --

4  Resilience US is the obligor, and then the remaining lease

5  liabilities that were not allocated to Bedmar.

6  Q    And if we turn to the next slide.  This is titled

7  "National Resilience Pro Forma Balance Sheet as of May 31st,

8  2025."

9       What does this slide show, Mr. Alhale?

10  A    So this is similar analysis to the one we just

11  discussed, but this specifically focuses on National

12  Resilience, the entity.

13       So, again, kind of going from left to right, you see

14  the pre-division balance sheet of the National Resilience,

15  LLC entity, the allocation of assets and liabilities to

16  Bedmar HoldCo to get to your post-division National

17  Resilience balance sheet compared to Bedmar HoldCo, LLC's

18  post-division balance sheet.

19       Again, you'll notice that there is the allocation of

20  the cash PP&E, right-of-use assets.  The other assets are the

21  security deposits and then as well as the lease liabilities

22  here.

23       So specifically, you'll notice that the lease

24  liabilities here reflect the three leases where National

25  Resilience is the primary obligor.  It does not account for

1  contingent guaranteed claims.  In accordance with GAAP, those

2  are not reported on the balance sheet.

3           MS. QUARTAROLO:  And if we can go to the next

4  slide.

5  BY MS. QUARTAROLO:

6  Q    What does this slide show, Mr. Alhale?

7  A    Again, I relied on the May 31 balance sheet that we

8  just walked through for the two entities.

9           So, this now shows sort of the assets that are

10 available for recoveries to creditors of Resilience US from a

11 pre-division perspective.  So, there are the sources of

12 recovery are the assets.  Here we satisfy secured claims.

13 And then the residual value is available to satisfy unsecured

14 claims as they're reported on the balance sheets of

15 Resilience prior to the divisions.  You'll notice that the

16 recoveries to unsecured creditors prior to the division are

17 26 percent to 36 percent.

18 Q    And what does that mean in terms of 26 percent to 36

19 percent?  Is that a range of recoveries?

20 A    That is a range of recoveries under this analysis,

21 assuming on a pre-division basis.

22           MS. QUARTAROLO:  We can go to the next slide.

23 BY MS. QUARTAROLO:

24 Q    Mr. Alhale, now, this slide is titled "Division

25 Analysis, National Resilience Recoveries, Pre-Division."

1    What does this slide show in terms of the steps in your

2  analysis?

3  A    Similarly, we looked at the assets of National

4  Resilience that would be available for recovery of the

5  National Resilience creditors.  Specifically, here, it

6  relates primarily to cash on hand, recovery on intercompany

7  receivables or to the extent any equity in subsidiary

8  entities.

9    You satisfy secured claims, and then there's a

10  satisfaction of the unsecured claims.  The recoveries to

11  unsecureds at National Resilience prior to the division is

12  assumed to be 9 to 11 percent.

13  Q    And that's based on your analysis?

14  A    That's correct.

15    MS. QUARTAROLO:  If we can go to the next slide.

16  BY MS. QUARTAROLO:

17  Q    Now, bringing these pieces together, what does this

18  slide show?

19  A    So, this is intended to show a comparison of the pre-

20  division recoveries that we just discussed compared to the

21  recoveries to unsecured creditors on a post-division basis

22  related to Bedmar HoldCo and Bedmar, LLC.

23    Specifically on a post-division basis, the assets that

24  are available for sort of recovery are assumed here to be the

25  cash and the receivables only, compared to the lease

1  liabilities in accordance with how the company reports it,

2  which is a present value of the lease liabilities.

3      You'll see that the post-division recoveries to

4  unsecured creditors is 11 percent at Bedmar HoldCo compared

5  to 10 percent to unsecured creditors pre-division.

6  Similarly, at Bedmar, LLC, unsecured recoveries post-division

7  are 36 percent compared to 31 percent prior to the division.

8  Q    And I see on the slide that you focused on the

9  midpoint.  Why did you look at the midpoint?

10 A    I did not do a probability weighting.  The high

11 scenario is just as likely as the low scenario; so, I believe

12 that the midpoint was appropriate.

13 Q    Do you believe you could have done a probability

14 weighting analysis?

15 A    Honestly, I don't know where I would have started here.

16          MS. QUARTAROLO:  We can go to the -- actually,

17 let's stay on that slide if we can go back one.

18 BY MS. QUARTAROLO:

19 Q    Did you use the lease cap claims for the subject leases

20 under this analysis?

21 A    No.  I don't believe it would have been appropriate.

22 This was intended to show the recoveries before and after the

23 corporate transactions on an out-of-court basis. The lease

24 cap claims would only have been applicable in court.

25 Q    And why wouldn't you value the lease claims at the

1   total remaining lease obligations, as we saw in the slide

2   earlier?

3   A      These are long-term leases, some of which go 20, 30

4   years, so I believe a present value of that lease liability

5   is appropriate. It's also in accordance with how the company

6   reports on its balance sheet.

7   Q      Do you view your division analysis as set forth on this

8   chart and throughout these slides as conservative or

9   aggressive?

10  A      I believe they are -- it's conservative.  Again, the

11  recoveries here on a post-division basis focus specifically

12  on the cash and receivables.  However, there were other

13  assets that were allocated to the entities, specifically the

14  plant property and equipment, as well as the right-of-use

15  assets.

16        In addition, under the lease liability of Bedmar

17  HoldCo, there is a guarantee related to RTP that was assumed

18  in the liability.

19        However, the source of recovery in the asset related to

20  that guarantee claim was not accounted for in the asset.  It

21  is actually a contingent reserve under the DIP; so, had I

22  included the asset as well as the liability, the recoveries

23  on a post-division basis for Bedmar HoldCo would have been

24  higher than what I show here.

25  Q      And how did you go about accounting for the lease

1  guarantees?

2  A     These are contingent guarantees. I have assumed that

3  they are asserted against National Resilience.  These types

4  of claims do recover from other sources of claims as well.

5  They would have recovered as against the primary obligor of

6  Bedmar, LLC.

7  Q     And have you factored the lease guarantee claims into

8  your analysis despite the fact that you said earlier they're

9  not accounted for on the balance sheets under GAAP?

10  A     Correct.  Yeah, even though they are not accounted for

11  on the balance sheet in accordance with GAAP, I did account

12  for them in my analysis.

13          MS. QUARTAROLO:  If we can turn the page, turn the

14  slide.

15  BY MS. QUARTAROLO:

16  Q     And based on all of this analysis, Mr. Alhale, what

17  conclusions and opinions have you reached?

18  A     It is my opinion that the recoveries to unsecured

19  creditors of National Resilience and Resilience US

20  respectively immediately prior to the divisions would have

21  been less than the expected recoveries to unsecured creditors

22  of Bedmar HoldCo and Bedmar, LLC respectively immediately

23  after the divisions.

24          MS. QUARTAROLO:  Thank you, Mr. Alhale.  I pass

25  the witness.

1                          CROSS-EXAMINATION

2   BY MR. APPLEBAUM:

3   Q      Good afternoon, Mr. Alhale.

4   A      Good afternoon.

5   Q      Aaron Applebaum from DLA Piper on behalf of 92 Crowley,

6   Harvard, and CEGM Alachua.

7          Mr. Alhale, Portage Point advised National Resilience

8   on the corporate transactions as it related to the assets and

9   liabilities that were being allocated; is that right?

10  A      We are one of the advisors to National Resilience, yes.

11  Q      And that's true both with respect to the allocations

12  that resulted in Bedmar, LLC as well as the allocations that

13  resulted in Bedmar HoldCo, LLC?

14  A      Yes, we assisted with the assessment and the analysis.

15  Q      And is that also true with respect to the merger of

16  Bedmar HoldCo into Bedmar, LLC?

17  A      That was more of a legal step that we -- I honestly was

18  not really involved with.

19  Q      And the specific work that Portage Point did was to

20  help size the assets that were being transferred in relation

21  to the liabilities that were moving; is that right?

22  A      Yes.

23  Q      And that's true about both the division for Bedmar, LLC

24  as well as the division for Bedmar HoldCo?

25  A      Correct.

1   Q      So just to be clear, the expert opinion that you gave

2   today, that relates to the validity of the transaction that

3   you and your team worked on; is that right?

4   A      Yes, we were involved.

5   Q      To the extent -- let me rephrase that.

6          This analysis regarding how creditors faired in the

7   pre-division versus post-division scenario, was that

8   conducted before or after the transactions took place?

9   A      It was done in relation to the case in matter here.

10  Q      Did you perform the transactions before or after June

11  3rd, 2025?

12  A      Sorry, when you say "transactions," what do you mean?

13  Q      When you performed the analysis?

14  A      The --

15  Q      The analysis of the pre- -- the pre- versus post-

16  division analysis, was that conducted pre- or post-June 3rd,

17  2025?

18  A      After.

19  Q      I think you testified on direct that your team was

20  involved with calculating the total amount of contractual

21  obligations under the leases that were being allocated to the

22  debtor; is that right?

23  A      I did, yes.

24  Q      And the result of that work was reflected in that

25  Microsoft Excel spreadsheet that Portage Point ultimately

1  shared with the debtor's financial advisor Douglas Wilson

2  Company?

3  A     Yes.

4  Q     We're going to display a copy of that spreadsheet.

5  It's not on paper just because of the nature of the

6  spreadsheet.

7  A     I get it.

8  Q     It's already been admitted into evidence as

9  BEDMAR0006355.

10        Is this a copy of the spreadsheet -- does it appear to

11  be a copy of the spreadsheet that Portage Point created to

12  calculate those uncapped and capped lease obligations?

13  A     This looks very familiar, yes.

14  Q     That does not include other items that may fall within

15  the definition of reserved rent under the leases; is that

16  right?

17  A     So our team did our best to assess and make sure we've

18  accounted for all the contractual obligations under the

19  leases; so, we went through each of the leases to understand

20  what was a contractual obligation, so what we have here is

21  our best determination of that.

22  Q     With respect to the Allston lease, you only looked at

23  rent, you did not look at real estate taxes; is that right?

24  A     So that would be paid separately.

25  Q     So the real estate taxes were not included in the

1  calculations for Allston?

2  A      Not in the damages claims, no.

3  Q      If we look at the tab that's marked "Cap Claim Count,"

4  and we see Column Q here is the column for Total Uncapped

5  Damages; is that right?

6  A      Yep.

7  Q      And that adds up base rent plus NNN, which means triple

8  net; is that right?

9  A      That's my understanding.

10 Q      And what did Portage Point look at, what data did

11 Portage Point look at to determine what was the triple net

12 contribution?

13 A      I believe, as I previously just said, we looked at all

14 the leases and lease abstracts to organize all of the

15 obligations related to each lease, which is what's reflected

16 here.

17 Q      And the result of this was that your team calculated

18 the total uncapped damages for these seven leases to be a

19 little over $372 million; is that right?

20 A      That's right.

21 Q      Would that constitute an accelerated amount of damages

22 for these leases, assuming a June 9th default?

23 A      No.

24 Q      Sorry, was that yes?

25 A      No, it did not assume an acceleration.

1    Q      And these lease liabilities all now sit with Bedmar,

2    LLC; is that right?

3    A      Yes.

4    Q      And they got there as a result of the corporate

5    transactions?

6    A      Yes.

7    Q      And some were allocated directly to Bedmar, LLC from

8    Resilience US, and the rest were allocated first to Bedmar

9    HoldCo and then merged into Bedmar, LLC; is that right?

10   A      That's my understanding.

11   Q      As the financial advisor for the Resilience entities,

12   are you familiar with the assets and liabilities of those

13   entities as opposed to the Bedmar entities?

14   A      Sorry, do you mind just specifying what you mean by

15   "these entities"?  Sorry, I lost track.

16   Q      Are you familiar with the assets and liabilities of the

17   Resilience enterprise?

18   A      Of the entire enterprise?

19   Q      Yes.

20   A      I have familiarity with certain entities, yes.

21   Q      And you agree that prior to the corporate transactions,

22   the liabilities under the leases sat with entities that are

23   now part of the National Resilience enterprise; is that

24   right?

25   A      Do you mind rephrasing that question?  Sorry.

1   Q     Prior to the corporate transactions, liabilities under

2   these leases sat with entities within the National Resilience

3   group; is that right?

4   A     Yes.  I mean, that was reflected in the balance sheets

5   we walked through earlier.

6   Q     And as a result of the corporate transactions, none of

7   the remaining National Resilience entities believe that they

8   are liable for these lease liabilities at this point; is that

9   right?

10          MS. QUARTAROLO:  Your Honor, I'm going to object.

11  Lack of foundation.  I think the witness is not here to speak

12  to what other entities believe or -- I think he's asking them

13  what they believe, and I don't think that's what the witness

14  testified --

15          THE COURT:  Can you rephrase the sentence.

16          MR. APPLEBAUM:  I can rephrase the question.

17          THE COURT:  Thank you.

18  BY MR. APPLEBAUM:

19  Q     Is it your understanding that liabilities for these

20  leases are no longer reflected on the books and the records

21  as liabilities of the remaining National Resilience entities?

22  A     For the seven -- yes.  For these seven.

23          THE COURT:  I'm sorry.  I didn't --

24          THE WITNESS:  For these seven.  Sorry.

25  BY MR. APPLEBAUM:

1  Q     And Portage Point was involved in determining the

2  amount of cash or receivables that would be allocated to

3  Bedmar, LLC, and to Bedmar HoldCo, LLC, as part of the

4  corporate transactions; is that right?

5  A     Yeah.  We calculated the lease -- the estimated lease

6  cap claims to understand what the assets to be allocated to

7  ensure that there was a full payment.

8  Q     And those assets consisted of cash and receivables; is

9  that right?

10  A     That was the primary allocations, but there were other

11  allocations of assets.

12  Q     And with respect to receivables, what did you

13  understand those receivables to consist of?

14  A     It's an obligation and sort of -- and to me, frankly,

15  it was -- it merits cash that's available for Bedmar and

16  Bedmar HoldCo -- or Bedmar.  Excuse me.

17  Q     Is there a current obligation of the SPV entity to pay

18  the amount of that receivable to Bedmar, LLC?

19  A     Yes.

20  Q     Is that obligation subject to any conditions?

21  A     I'm not aware of conditions.  I know it's related to

22  the confirmation.

23  Q     So the Chapter 11 plan in this case has to be confirmed

24  in order for Bedmar, LLC, to get that money?

25  A     Well, it would be available to make cap claim payments

1  in accordance with the plan.

2  Q     But if the case were converted to Chapter 7, would that

3  money be available to a Chapter 7 trustee to pay the

4  landlords?

5  A     I have not assessed that scenario.

6  Q     If the independent manager demanded the SPV to pay it

7  now, would there be any penalty or interest that would accrue

8  for nonpayment?

9  A     I'm not aware of him demanding that, nor am I familiar

10  with any penalties or damages that would have been provoked.

11  Q     The face amount of the cash in these -- this receivable

12  that was allocated adds up to about $33.1 million; is that

13  right?

14  A     Yes.

15  Q     And that's just for Bedmar, LLC; is that right?

16  There's another 9 million for Bedmar HoldCo?

17  A     Yes.

18  Q     And that correlates to Portage Point's calculation of

19  the capped lease damages of being around $42 million; is that

20  right?

21  A     So there was actually two components of the sort of

22  understanding as to what needed to be funded.  It was

23  predominantly related to the cap claims; but then there was

24  also an understanding that the company needed cash prior to

25  the filing, so that was also part of the calculus.

1  Q      So Portage Point's calculation of the total amount of

2  uncapped liabilities that was being allocated to Bedmar, LLC,

3  and Bedmar HoldCo was just over $372 million; and the amount

4  of cash and receivables allocated to those entities was just

5  over $42 million.

6         Do you agree with that?

7  A      No.

8  Q      No.  Which part of that do you disagree with?

9  A      The liability that you are using is the gross amount.

10 Q      But all of the liabilities that underlie that gross

11 calculation were signed to those entities; is that right?

12 A      The leases and the obligations under them were

13 assigned, yes.

14 Q      Now, the Alachua lease was separately assigned to

15 Bedmar; is that right?

16 A      That's my understanding.

17 Q      It wasn't allocated under one of the plans of division?

18 A      I don't believe so.

19 Q      And do you understand that in connection with the

20 assignment, Alachua Government Services, which is a debtor in

21 another case now, paid to Bedmar approximately $5.8 million

22 in connection with that assignment?

23 A      Yes.

24 Q      And does that correlate to the amount that Portage

25 Point calculated as the projected Alachua lease capped

1  rejection damage claim?

2  A    I believe they are trying later around the same amount,

3  yes.

4  Q    Do you know why that cash payment was not reflected in

5  any of Bedmar's disclosures in this case?

6  A    I did not prepare any of the disclosures, so I can't

7  speak to that.

8  Q    We've talked lease liabilities that are reflected on

9  this Portage Point spreadsheet, but this spreadsheet doesn't

10  say anything about guarantees; is that right?

11  A    Nope.

12  Q    Portage Point didn't make a separate spreadsheet

13  somewhere that addresses claims by landlords on account of

14  their guarantee claims; is that right?

15  A    You have to be more specific on what other spreadsheets

16  you're referring to.

17  Q    I'm asking whether Portage Point created a spreadsheet

18  relating to guarantee claims of these landlords.

19  A    Again, it's very broad.  We had a number of

20  spreadsheets.

21  Q    So these guarantee claims were allocated to Bedmar

22  HoldCo, and they now sit with Bedmar, LLC, as a result of

23  that merger; is that right?

24  A    Do you mind repeating the question.

25  Q    So the guarantee claims that were allocated under these

1  plans of division, they were originally allocated to Bedmar

2  HoldCo and then merged into Bedmar, LLC; is that right?

3  A     That's my understanding.

4  Q     That merger obligates Bedmar, LLC, for five guarantees;

5  is that right?

6  A     That's my understanding.

7           MS. QUARTAROLO:  I'm going to object because I

8  think it calls for a legal conclusion.

9           THE COURT:  About how many guarantee claims there

10 were?

11          MS. QUARTAROLO:  No.  About whether or not

12 something obligates an entity to do something.

13          MR. APPLEBAUM:  I can use the term "allocate."

14 That's fine.

15 BY MR. APPLEBAUM:

16 Q     Just to be clear, the merger allocated five guarantee

17 claims to Bedmar, LLC; is that right?

18 A     That's my understanding.

19 Q     And at the same time, there were only four leases

20 associated with those guarantee claims that sit with Bedmar,

21 LLC; is that right?

22 A     Correct.

23 Q     So prior to the corporate transactions, landlords had

24 rights under their leases as to the tenant entities; and then

25 they had separate rights against National Resilience, Inc.,

1  under the guarantees; is that right?

2  A     They had contingent guarantee claims, yes.

3  Q     As a result of the corporate transactions, as we see in

4  these calculations, Portage Point assumes that the guarantees

5  just go away and there's just one claim; is that right?

6  A     No, that's not what I said in my analysis.  My analysis

7  included the value of the guarantee claim.

8  Q     The analysis that you did on this spreadsheet that was

9  given Douglas Wilson Company?

10 A     I apologize.  I thought you were referencing the prior

11 analysis.  This is not -- this is only the claims or lease

12 obligations under the leases.  It does not reflect anything

13 related to guarantees.  The guarantee would be embedded in

14 the underlying lease.

15 Q     So for purposes of this calculation, which was used to

16 help inform how much cash is going to be put into Bedmar,

17 LLC, and Bedmar HoldCo, LLC --

18 A     Yeah.

19 Q     -- you just looked at the lease obligations and you

20 didn't consider separate guarantees; is that right?

21 A     No, I don't believe the way you're setting that up is

22 correct.

23       So, we looked at the lease obligations.  The guarantee

24 relates to that lease obligation.  I don't believe you would

25 have double recovery on a lease obligation and the lease

1  liability here.

2  Q    My colleague is going to pass out the exhibit binders

3  real quick.

4  A    Sure.

5  Q    We're going to take a look at Tab 4 in the binder,

6  which is Exhibit J7, which is the "National Resilience, Inc.,

7  Plan of Division."

8       I believe my colleague is putting it up on the screen

9  as well.

10  A    I'll try to rely on the screen.

11  Q    And we're going to flip to Schedule 1, which is several

12  pages in, which is the allocation of assets and liabilities

13  of the dividing company.  And that's the part that Portage

14  Point would have had some input on; is that right?

15  A    Specifically which part?  I'm sorry.

16  Q    Schedule 1, the allocation of assets and liabilities.

17  A    So this is a legal document.  The only input would have

18  been the numbers, I believe, that's within this Schedule 1 --

19  Q    Right.

20  A    -- which is the 9 million.

21  Q    So the -- really, all the legalese in the first part --

22  not Portage Point. But the numbers that are on here, Portage

23  Point may have advised on?

24  A    Yes.

25  Q    Okay.  And so, if we go to Part B here, that's the part

1  that addresses what assets and what liabilities are being

2  located to Bedmar HoldCo.  And we've got these -- if we go

3  down to Roman numeral v, we see a guarantee of the lease to

4  my client, which is now CEGM Alachua.

5       Do you see that?

6  A    Yes.

7  Q    So that's the guarantee of the Alachua lease that was

8  assigned to Bedmar HoldCo and then merged into Bedmar, LLC;

9  is that right?

10 A    This is specifically the allocation to the Bedmar

11 HoldCo.

12 Q    So that guarantee was allocated to Bedmar HoldCo?

13 A    It was allocated to Bedmar HoldCo, yes.

14 Q    And that spreadsheet that you provided to Douglas

15 Wilson Companies doesn't include any capped or uncapped claim

16 for this guarantee; is that right?

17 A    Can we go back to the spreadsheet?

18 Q    Sure.

19 A    Do you mind scrolling to the left?  So, you see Alachua

20 is on the last line.

21 Q    Yeah.  So that's a claim under the lease, right,

22 against the -- for Bedmar, LLC?

23 A    Yes.

24 Q    My question was whether there's a separate entry on

25 here for the guarantee?

1   A      I believe I answered that previously.  In my opinion,

2   there is -- the guarantee relates to the underlying

3   obligation under the lease.

4        This was -- this specifically outlines the lease

5   liabilities into which the guarantee would be asserted.

6   Again, I don't believe you would have a double claim or a

7   double recovery.

8   Q      And I assume that you're going to have the same answer

9   for Harvard and 92 Crowley, which is the Allston and

10  Marlborough facilities; is that right?

11  A      Yeah, you would be calculating the total obligation

12  under the lease and whether or not that's asserted against

13  the primary obligor of the lease or the guarantee, it's the

14  same.

15  Q      You can go back to J7 really quick. And I want to look

16  at number -- or letter 8 -- sorry -- number viii.

17       So Romanette viii here it says, "that certain guarantee

18  in favor of 1733 TW Alexander Owner (DE) LLC."

19       Do you see that?

20  A      Yes.

21  Q      So that is also from my client an entity called 1733 TW

22  Alexander Owner (DE) LLC.  And do you agree that this plan of

23  division and merger says that this guarantee was also

24  allocated to Bedmar HoldCo, LLC?

25  A      Yes.

1  Q     And that lease relates -- I'm sorry, that guarantee

2  relates to a lease for 1733 TW Alexander Drive in Durham,

3  North Carolina.

4        Are you familiar with that site?

5  A     The RTP site, yes.

6  Q     Now, that RTP site was not allocated to Bedmar, LLC; is

7  that right?

8  A     The lease was not allocated, no.

9  Q     And it was -- it was allocated under the plan but it

10 was allocated to RTP Manufacturing LLC; is that right?

11 A     I don't remember the specific full name of the entity,

12 but the RTP entity, yes.

13 Q     So that lease isn't part of this bankruptcy, the

14 Bedmar, LLC bankruptcy; is that right?

15 A     The lease is not.  The lease guarantee is.

16 Q     The lease guarantee is.  And do you agree that the

17 landlord would have a claim in relation to that guarantee?

18 A     Upon a termination or a rejection of the lease.

19 Q     Would you say that's at least a contingent claim?

20 A     That's correct.

21 Q     And 1733 TW Alexander, that's not referenced anywhere

22 on the spreadsheet that you gave to DFC; is that right?

23 A     That's correct.

24 Q     And do you know if the debtor scheduled that claim

25 anywhere or provided any treatment of that contingent claim

1  in its bankruptcy case?

2  A    Yes, so there was actually a contingent reserve under

3  the DIP for $15 million as it relates to the potential

4  rejection damages claims; but again, that lease has not been

5  rejected.

6  Q    But that lease wasn't specifically scheduled in the

7  bankruptcy schedules in this case, was it?

8  A    The lease itself, no.

9  Q    I'm sorry, the guarantee claim?

10 A    I don't -- I can't speak to this, what was prepared in

11 the schedules.  I did not prepare them.

12      Sorry, which -- when you say "schedules," are you

13 referring to the schedules --

14 Q    The bankruptcy schedules --

15 A    -- and statements of theirs?

16 Q    Yes.

17 A    No, I did not prepare those.  Sorry.

18 Q    Have you reviewed them?

19 A    Yes, and -- at some level.

20 Q    Do you recall if there was a claim scheduled for this -

21 - the entity that's -- the counterparty to this guarantee?

22 A    I don't recall.

23 Q    And since that lease is not held by a debtor in

24 bankruptcy, that lease can't be rejected; isn't that, right?

25              MS. QUARTAROLO:  Objection; calls for a legal

1  conclusion.

2         THE COURT:  Reword the question.

3         MR. APPLEBAUM:  I will --

4         THE COURT:  Okay.

5  BY MR. APPLEBAUM:

6  Q    Liability on that guarantee would not be subject to a

7  cap; is that right?

8         MS. QUARTAROLO:  Objection; calls for a legal

9  conclusion.

10        MR. APPLEBAUM:  Mr. Alhale has been qualified as

11 an expert, and he's testified that part of his job here was

12 to calculate 502(b)(6) claims; so, I believe he's qualified

13 to testify as to what would fall within a lease cap or not,

14 Your Honor.

15        MS. QUARTAROLO:  We certainly would agree, Your

16 Honor, that he's qualified to calculate the 502(b)(6) claims;

17 but I think his question goes beyond that in terms of whether

18 or not leases can be rejected.

19        THE COURT:  Can you --

20        MR. APPLEBAUM:  I can --

21        THE COURT:  I am going to sustain her objection,

22 but you can re-ask -- you can reword the question.

23        MS. QUARTAROLO:  And I think looking at the real

24 time -- sorry -- the question also goes to whether leases can

25 be capped.

1  BY MR. APPLEBAUM:

2  Q    Mr. Alhale, are you aware that 1733 TW Alexander Owner

3  filed a proof of claim for more than $48 million under that

4  guarantee in this bankruptcy case?

5  A    I saw a schedule of filed claims.  I did not review

6  them.

7  Q    Now, your expert testimony today regarding fraudulent

8  conveyances and this division analysis, that relied on a

9  comparison of what creditors would have received either

10 before the divisions or after the divisions; is that right?

11 A    Yes.

12 Q    You didn't perform any analysis of a bankruptcy case

13 versus an out-of-court consensual workout; is that right?

14 A    No.

15 Q    Did you consider any scenario other than bankruptcy and

16 capped damages versus full liquidation or full breach

17 damages?

18 A    So when we were evaluating alternatives, we looked at

19 whether or not we would be able to implement the strategies

20 set forth with the divisions in the corporate transactions.

21      The alternative was a whole company filing.  I don't

22 believe it was credible or realistic to be able to try and

23 negotiate with a number of parties out of court, given the

24 liquidity runway that the company had; nor did it have

25 sufficient liquidity to be even be able to negotiate

1  settlements out of court, so I did not evaluate that

2  scenario.  I did not evaluate a liquidation.

3  Q     So you didn't think it was reasonable to try to

4  negotiate with seven parties out of court?

5  A     Again, at the point in time that we were referring to,

6  we did not have the sufficient liquidity to be able to run

7  that process out; nor would we really have been able to

8  secure financing to -- for a hope that we can settle with all

9  parties in a manner -- in a timely manner, frankly.

10 Q     So in your division analysis, when you consider

11 landlord recoveries, you're not using that $372 million

12 uncapped damages amount; is that right?

13 A     I testified that I did not believe it was appropriate

14 to use that.

15 Q     You're using a present value of liability; is that

16 right?

17 A     I am using what's reported on the company's balance

18 sheet, which is in accordance with GAAP, which is done on a

19 present-value basis.

20 Q     But for purposes of doing a creditor recovery

21 waterfall, which is what you did --

22 A     Yeah.

23 Q     -- for this analysis, don't you have to look further

24 than just what's on the books and the records for GAAP; don't

25 you have to look at what the actual claims would be in some

1  kind of a liquidation scenario.

2  A    I believe you can look at what all the claims are and

3  I've accounted for them.  I don't agree with your statement

4  around the liquidation, no, I don't -- I didn't quite

5  understand that.

6  Q    If you're analyzing creditor recovery --

7  A    Okay.

8  Q    -- you're assuming that -- don't you have to assume

9  that you've breached the leases and that you're paying the

10 landlords on account of that breach?

11 A    So the breach that I believe you are speaking to would

12 be a rejection damages.

13 Q    Well, no, because we're not -- this is -- your division

14 analysis --

15 A    Correct.

16 Q    -- doesn't assume a bankruptcy; is that right?

17 A    So at the point in time of the analysis, there was no

18 breach.  This was -- this was done before the corporate

19 transactions.

20 Q    So in what scenario can you analyze creditor recovery

21 and you're paying out money to landlords without there having

22 been some kind of a breach or termination of the lease?

23 A    I'm not understanding the question.

24 Q    I'm trying to understand how or why present-value

25 analysis is relevant to lease liabilities in a creditor

1  recovery model.

2  A      So for purposes of the analysis, we needed to size and

3  estimate the claims.  I did not find it appropriate to use a

4  total gross, uncapped claim amount that has 20- to 30-year

5  long-term leases.

6        I believe it was more realistic that these are long-

7  term leases; they should be present-valued.  So, I used the

8  present values as the company records them.

9  Q      The company borrowed approximately $135 million in

10 bridge financing back in May; is that right?

11 A      That's my -- yes.

12 Q      And a large portion of that, maybe about half, was used

13 to fund the corporate transactions; is that right?

14 A      Yes.

15 Q      And some amount of that was used to fund or reserve for

16 the payment of the allowed lease rejection damages claims in

17 this bankruptcy case?

18 A      I think it's part of your initial allocation that you

19 just asked me about.

20 Q      And in your division analysis, you compare recoveries

21 with the corporate transactions having taken place versus not

22 having taken place; is that right?

23 A      I compare recoveries looking at unsecured recoveries

24 before and after the corporate transactions.

25 Q      So if we say before, that would be the same as saying

1  as if they had not happened?

2  A     It is prior to them occurring.

3  Q     But in both scenarios, you still assume that the $135

4  million secured debt had been taken out; is that right?

5  A     Both scenarios, which scenarios are you referring to.

6  Q     And both the pre- and post-division analysis.

7  A     So on the pre-division, I do account for the $135

8  million of bridge, because that's also a source of recovery

9  in the form of cash.

10        On the post-division analysis, the secured claim does

11  not come into play because that was not allocated to the

12  Bedmar or Bedmar HoldCo entities.  However, the cash was

13  allocated as related to the bridge.

14             MR. APPLEBAUM:  I don't have any further

15  questions, Your Honor.

16             Thank you, Mr. Alhale.

17             THE WITNESS:  Thank you.

18             THE COURT:  Is anyone else cross-examining?

19             MR. TECCE:  Not from us.

20             THE COURT:  Any redirect?

21             MS. QUARTAROLO:  Yeah.  One second, Your Honor.

22             Just very briefly, Your Honor.  For the record,

23  Amy Quartarolo of Latham & Watkins on behalf of the nondebtor

24  affiliates.

25                      REDIRECT EXAMINATION

1  BY MS. QUARTAROLO:

2  Q    Mr. Alhale, you were asked earlier by counsel when you

3  performed the analysis.

4        Do you recall that?

5  A    Yes.

6  Q    And I think you said you performed it after June 3rd;

7  is that correct?

8  A    Correct.

9  Q    If you had prepared your analysis earlier in time,

10 would you have prepared it any differently?

11 A    No.

12          MR. FOX:  Objection, Your Honor.  Calls for

13 speculation.

14          MS. QUARTAROLO:  May I respond?

15          THE COURT:  Yes.

16          MS. QUARTAROLO:  I don't think that calls for

17 speculation.  I'm asking if he would have done anything

18 differently if he had done it at a different point in time.

19          MR. FOX:  Your Honor, Tim Fox from the Office of

20 the United States Trustee.

21          It calls for speculation because of the events

22 that occurred post filing that requires Mr. Alhale's

23 testimony at this hearing.

24          If he wasn't contemplating a motion to dismiss,

25 there wouldn't have been any reason to do that type of

1  analysis.  And so, again, it calls for speculation.

2          MS. QUARTAROLO:  Again, I don't think it calls for

3  speculation.  I'm asking if he would have done anything

4  differently if he had done it at a different point in time.

5  It's based on his present understanding.

6          THE COURT:  I'll allow it.  I'll give it the

7  weight that it deserves.

8  BY MS. QUARTAROLO:

9  Q    Let me ask you the question again, Mr. Alhale, so we

10  get a clean record.

11        If you had prepared the analysis that you testified to

12  today at an earlier point in time, is there anything that you

13  can think that you would have done differently?

14  A      No.

15  Q    And do you have any reason to believe that your

16  analysis or ultimate conclusions would have come out any

17  differently if you had prepared that analysis earlier in

18  time?

19  A      No.

20          MS. QUARTAROLO:  No further questions.

21          THE COURT:  You are dismissed.

22          MS. QUARTAROLO:  Your Honor, I think Ms. Marks

23  would just like to address the exhibits.

24          THE COURT:  Okay.  The exhibits with respect to

25  all the exhibits or --

1            MS. MARKS:  Yes.  Your Honor, I wanted to provide

2  a status update on that joint exhibit list we were compiling.

3            I believe not all the landlords have signed off on

4  it yet.  But as of this afternoon, we have one compiled joint

5  exhibit list of everything that the parties have agreed to.

6            It took a little extra time because of -- I think

7  there was a new exhibit this morning added.  So, at this

8  point, I would like to move everything in.  It's not been

9  filed yet, so I'm not quite sure how to do this logistically.

10 But I did want to make sure that the debtor and nondebtor

11 affiliates' exhibits are moved in before we close our case.

12            THE COURT:  I have two comments on the exhibit

13 list.

14            First of all, I don't know what the other parties'

15 position is, but there are Bates numbers and there are some

16 exhibit-marked.  I don't have any exhibits that are marked on

17 the exhibits themselves except Bates, because they all have

18 the index.

19            So, I want a clear list that encompasses both the

20 Bates and the extent that they are marked so there isn't any

21 confusion.  And I don't know what I'm moving in because I

22 don't have a list in front of me. And I don't know that they

23 know what you're moving in because -- do you all have a list

24 of what they're moving in?

25            MS. MARKS:  Your Honor, this is the draft, and

1  this does include Bates numbers and exhibit numbers.  This

2  should be complete.  I know the US Trustee has signed off on

3  it.  They've received it.  They just need to sign off on it.

4  It's what they've already agreed to.

5        THE COURT:  Why don't we take a break and knock on

6  the door when you're ready.

7        MS. MARKS:  Thank you.

8     (Recess taken at 1:59 p.m.)

9     (Proceedings resumed at 2:13 p.m.)

10        THE COURTROOM DEPUTY:  All rise.

11        THE COURT:  Please be seated, everyone.

12        MS. MARKS:  Your Honor, we are still working on

13  the final exhibit list.  The moving parties have agreed that

14  we won't be prejudiced if we move on with the case.  So, we

15  will revisit this later.  We can turn to their witness now.

16        THE COURT:  We'll hold it open for purposes of

17  hearing.

18        MS. MARKS:  Yes.  Thank you.

19        MR. APPLEBAUM:  Aaron Applebaum from DLA Piper.

20  Your Honor, our next witness is John Madden.

21        THE COURT:  Can you please implement the broadcast

22  protocol.  Thank you.

23        JOHN MADDEN, WITNESS, SWORN

24        THE CLERK:  Can you please state your full name

25  and spell your last name for the record.

1          THE WITNESS:  John Patrick Madden, M-A-D-D-E-N.

2          THE CLERK:  Thank you.  Have a seat.

3                      DIRECT EXAMINATION

4  BY MR. APPLEBAUM:

5  Q     Good afternoon, Mr. Madden.

6        Can you tell the Court by whom you are employed.

7  A     Emerald Capital Advisors.

8  Q     What is your position there?

9  A     I'm the president, founder, managing partner.

10 Q     Can you tell the Court how you came to be engaged as an

11 expert witness in this case.

12 A     I was contacted by DLA Piper, who engaged me in

13 connection with their engagement with the three landlords.

14 Q     And are you retained directly by the landlords or by

15 DLA Piper?

16 A     DLA Piper.

17 Q     And have you or Emerald ever been retained directly by

18 any of the three landlords that are represented by DLA Piper

19 in this case?

20 A     No.

21 Q     Have any of these landlords promised any other

22 retentions to you or to Emerald beyond your services for this

23 case?

24 A     No.

25 Q     What is your educational background?

1   A      I have a bachelor of science, business administration,

2   from Georgetown University, with concentrations in finance

3   and accounting.

4   Q      Do you have any certifications?

5   A      Yeah.  I'm a certified insolvency and restructuring

6   advisor.  I previously held a CPA, which is currently

7   inactive.  And I previously had the Series 7, 63 and 79

8   certifications; when I worked at FINRA, registered

9   broker/dealer.

10  Q      Where did you work before you founded Emerald?

11  A      I worked from 2004 to 2012 at Chanin Capital Partners,

12  which during my tenure there was acquired by Duff & Phelps.

13  So, at some point, our branding switched from Chanin to Duff

14  & Phelps.

15  Q      What did you do when you were at Chanin and then Duff &

16  Phelps?

17  A      Restructuring work, mostly from the investment banking

18  side of restructuring; so M&A, valuation, capital raises,

19  expert reports, expert testimony, represented both debtors,

20  creditors, other parties in interest, both in and out of

21  court.

22  Q      And where did you work before Chanin and Duff & Phelps?

23  A      I worked at Zolfo Cooper from 1999 until 2004.  Zolfo

24  also was acquired during my tenure there by Marsh McLennan,

25  eventually; and there I did more interim management, crisis

1  management, mainly debtor roles, again, both in and out of

2  court, but, you know, on-site interim management for

3  distressed companies.

4  Q    Have you ever been appointed as a liquidating trustee

5  or equivalent to that position?

6  A    Yeah, many times.

7  Q    And in what kind of roles?  Can you describe that for

8  the Court?

9  A    Sure.  I've been both liquidating trustee or a

10 litigating trustee, or whatever it might be, based on the

11 trust that was formed, you know, post-confirmation, as is

12 done quite requently in our world today.

13       I've also done, when there isn't a trust formed as a

14 vehicle, to, you know, get recoveries to general unsecured

15 creditors.  I've also done plan administrator roles for

16 liquidating debtors.  And I've probably done two dozen of

17 them, you know, starting first one back in 2012/2013 time

18 frame.  I've probably got three or four of them going on

19 right now.

20 Q    How many bankruptcy cases would you say you've been

21 involved in during your career?

22 A    I don't know if it's 100 but it's got to be close.  You

23 know, more than 75 for sure.  Maybe more than 100.

24 Q    And beyond your direct work, have you ever given any

25 presentations or speeches that would demonstrate your

1  expertise in the field?

2  A    Yes.

3  Q    And how many would you say you've given?

4  A    I don't know.  A handful, maybe a half a dozen through

5  the years.

6  Q    Have you authored any articles or papers in

7  publications?

8  A    Yes, I have.

9  Q    Can you give any examples of those?

10 A    Sure.  I did a chapter in a book on contested valuation

11 specifically as it related to comparable company analysis.

12       I've done an article on credit bidding.  And also, I've

13 done an article on key employee incentive plans and key

14 employee retention plans, just a few examples.

15 Q    Have you ever been qualified as an expert witness by a

16 Court?

17 A    Yes.

18 Q    Have you ever been qualified by -- as an expert witness

19 by a bankruptcy court?

20 A    Yes.

21 Q    And on any specific subject matters?

22 A    Yeah, a number; valuation, plan feasibility, tech

23 capacity, what I just mentioned, KEIPS and KERPS, key

24 employee incentive plans and key employee retention plans.

25       Asset allocation models, just to name a few things.

1  Q      Do you recall being qualified as an expert by the

2  Delaware Bankruptcy Court in connection with the Mallinckrodt

3  bankruptcy case?

4  A      Yes.

5  Q      And do you remember on what subject areas you were

6  qualified as an expert in that case?

7  A      It was a valuation, specifically entity-by-entity

8  valuation, and allocation of value to those entities; and

9  resulting recoveries on an entity-by-entity basis based on

10 claims pooled analysis.

11 Q      Can you describe for the Court the scope of work in

12 which you were engaged for this case.

13 A      Yeah.  Initially we were asked to look at the proofs of

14 claim of DLA's three clients, which we did.  And then

15 subsequent to that, we were asked to prepare an expert report

16 or a report based on our understanding and analysis of the

17 corporate transactions and the results of those corporate

18 transactions.

19 Q      Were you asked to give a report about the value of the

20 assets and liabilities that were allocated as part of the

21 corporate transactions?

22 A      Yes, that was part of our analysis, part of our review

23 of the corporate transactions.

24 Q      Were you asked to opine as to whether the allocation of

25 assets and liabilities resulted in the debtor receiving

1 | reasonably equivalent value?

2 | A     Yes.

3 | Q     And were you asked to provide an opinion as to whether

4 | it was likely that the allocations of assets and liabilities

5 | may have constituted a fraudulent transfer?

6 | A     Yes, I'd say it just as you did. So in my professional

7 | opinion, not my legal opinion but my professional opinion

8 | whether they were likely to have created a, you know,

9 | fraudulent transfer; correct.

10 | Q     And just for clarification, you understand that any

11 | disputes regarding the calculation of rejection damages

12 | claims are not being addressed as part of this hearing today?

13 | A     Understood.

14 | Q     And were you in the courtroom today when Mr. Alhale

15 | testified?

16 | A     For almost all of his testimony. I did step out for

17 | five minutes.

18 | Q     And if asked, do you believe you could provide your

19 | opinion as to his conclusions and his methodologies?

20 | A     Sure.

21 | Q     Were you able to review the plans of division and

22 | merger that led to the creation of Bedmar, LLC and Bedmar

23 | HoldCo, LLC?

24 | A     Yeah, I review the plans of divisions of both, we'll

25 | call it National Resilience and Resilience US, those two

1  plans of divisions.

2  Q    And have you developed opinions and conclusions

3  regarding those allocations?

4  A    Yes.

5  Q    And do you have experience designing, reviewing and

6  implementing creditor recovery models such as the ones that

7  Mr. Alhale testified about?

8  A    Yeah, I've done it many times, both as a debtor

9  financial advisor or investment banker and also from the

10 creditors side.

11        MR. APPLEBAUM:  Your Honor, based on the

12 foregoing, I do ask that the Court accept Mr. Madden as an

13 expert witness in the subject matters of value allocation and

14 asset credit -- creditor recovery model.

15        THE COURT:  Any objection?

16        MS. QUARTAROLO:  No objection, Your Honor.

17        THE COURT:  You are accepted as such.

18        THE WITNESS:  Thank you.

19        MR. APPLEBAUM:  Thank you Your Honor.

20 BY MR. APPLEBAUM:

21 Q    Mr. Madden, with respect to the allocation of assets

22 and liabilities, can you tell the Court what you did in order

23 to prepare your opinions?

24 A    Yeah, as I just mentioned, I and my team both looked at

25 a number of things.  One thing I just mentioned, the plans of

1  division, I looked at proofs of claim filed in the case,

2  specifically by DLA's three clients.

3       I looked at the plan and disclosure statement.  I

4  looked at other documents, such as the written consent of the

5  sole member, as an example.  Also the objection by Bedmar

6  Member to the motion to dismiss.

7       I looked at some schedules that were provided by the

8  debtor or the Resilience affiliates with regard to the

9  outstanding amount of the leases.

10      And, you know, also looked at the leases that were

11  attached to the proofs of claim.

12  Q    As a general matter, what conclusions did you reach

13  regarding the allocations of assets and liabilities in the

14  corporate transactions?

15  A    I concluded that there was, you know, for the most

16  part, you know, $42 million dollars of cash and receivables

17  that were contributed 9 million to Bedmar HoldCo, 33 million

18  to Bedmar, LLC.

19      And there were hundreds of millions of dollars

20  remaining -- or lease obligations which are the remaining

21  amounts on the leases that were contributed both to Bedmar

22  HoldCo and Bedmar, LLC, which were eventually merged.

23      So I concluded that the liabilities far exceeded the

24  assets, thereby rendering the entities or their final entity

25  insolvent.

1    There wasn't reasonably equivalent value received for

2 the contribution of the liabilities; and, therefore, again in

3 my professional opinion, it's -- that likely constitutes a

4 fraudulent transfer.

5 Q    Did you hear Mr. Alhale's testimony where he said that

6 for purposes of valuing allocations, he didn't think it was

7 appropriate to look at the full life of the lease but only a

8 present value of the lease liabilities?

9 A    Yes.

10 Q    And do you agree with that?

11    Strike.

12    Let me rephrase that.

13    Do you agree with that in this case?

14 A    No, I don't agree with it with regard to a creditor's

15 claim in a bankruptcy case.

16 Q    And why don't you agree to that conclusion in this

17 case?

18 A    These leases were contributed to the Bedmar entities

19 with no intent to ever perform on them.  They were going to

20 be breached however they were going to be breached.

21    I don't feel that a landlord's claim should be capped

22 in any way, you know, and even specifically as the way

23 companies account for leases according to Generally Accepted

24 Accounting Principles; those are apples and oranges.

25    I think that a claim is a claim.  When you breach a

1  lease, the landlord has the right to collect on the remaining

2  contractual obligation of the lease.

3  Q    And do you have an understanding, at the time when the

4  leases were allocated to Bedmar, LLC, or assigned in the case

5  of Alachua, do you have an understanding as to whether the

6  debtor had any capability of performing its obligations under

7  those leases?

8  A    Based on what I know, they had no capability.  I mean I

9  know what assets were contributed.  There were no operations.

10 I mean I think it's pretty clear that from the minute of the

11 transfer and/or the allocation, the debtor had no ability to

12 perform on those leases.

13 Q    Now, you mentioned a moment ago that you also reviewed

14 the -- some of the proofs of claim that were filed, including

15 by DLA's clients; is that right?

16 A    Yeah.

17 Q    And do you have an understanding as to whether those

18 proofs of claim are consistent with the debtor's or Portage

19 Point's calculations of uncapped damages, which are

20 approximately $372 million dollars?

21 A    They exceed those amounts.

22 Q    Do any of your conclusions regarding solvency,

23 reasonably equivalent value, do any of those conclusions

24 depend on whether you use the Portage Point calculation of

25 uncapped damages versus the landlord's own calculations?

1  A     No.  In either case, the total liabilities remaining on

2  the lease, you know, are hundreds of millions of dollars.  So

3  the -- the use of either the proofs of claim or the Portage

4  Point analysis, as you called it, you know, it doesn't

5  matter, regardless of which one you use.

6  Q     And when you were doing your analysis as to the value

7  of the liabilities, the calculation of the liabilities that

8  were received as part of the corporate transactions, did you

9  consider what the amount of capped damages would be under the

10 Bankruptcy Code?

11 A     No, I did not do my own calculation.

12 Q     And did you believe it was appropriate to use capped

13 damages or uncapped damages for purposes of valuing the

14 transfer at the time of the corporate transactions?

15 A     Certainly uncapped.  You know, I -- the use of

16 502(b)(6) pursuant to the code is not available to a

17 nondebtor.  So, no, I don't believe that looking at the

18 capped claims at the time of the transfer is appropriate.

19 Q     I'd like you to --I'd like to quickly walk through the

20 amount of liabilities that ended up with Bedmar, LLC.

21        MR. APPLEBAUM:  And we have a demonstrative that

22 we'd like to put up to help with that.

23        Go to the second slide.

24 BY MR. APPLEBAUM:

25 Q     So we've put up on the screen a demonstrative.  This is

1  a chart from part of your expert report.

2      Do you see that?

3  A    Yeah, I see it.  I'll see it better in a second here.

4      All right.  I see it.

5  Q    Got your glasses on?

6  A    Yeah.

7  Q    Can you -- can you tell me what's shown on this chart.

8  A    So I think this is what we've been, you know, referring

9  to as a schedule that Portage Point put together.  It's an

10 excerpt really.  But it lists the seven leases that

11 eventually ended up in Belmar [sic] Bedmar, sorry -- Bedmar,

12 LLC, you know, after all the corporate transactions were

13 completed.

14     It has a column for total remaining lease liability

15 over the life of the lease, plus it has a column for some

16 additions related to leases if they're triple net, things

17 that should be in there like there utilities and common area

18 maintenance, property taxes.  Those are typically the types

19 of things you see in there.

20     And then last, some pass-through or unpaid arrearages

21 and then totals.  Those seven leases in terms of outstanding

22 liability are $374 million dollars or approximately $375

23 million dollars.

24 Q    And so whether these leases originally came into

25 Bedmar, LLC, or went first to Bedmar HoldCo and then were

1  merged into Bedmar, LLC, it's your understanding that all of

2  these lease liabilities are now sitting with Bedmar, LLC; is

3  that right?

4  A    That's my understanding.

5  Q    And do you understand that the Portage Point

6  spreadsheet has a pretty similar amount to this?  It's around

7  $372 million dollars?

8  A    Yeah.  I believe that's right.

9  Q    And do you understand -- I think we mentioned this

10 before.  But it's your understanding that the landlords

11 assert that the amount of the total liability under these

12 leases is actually even higher; is that right?

13 A    Based on the proofs of claim, yes.

14 Q    And do you have an understanding of what those proofs

15 of claim assert?

16 A    I'm sorry.  Can you repeat that, Mr. Applebaum.

17 Q    Do you have an understanding of what the landlord

18 proofs of claim assert as the total outstanding liability?

19 A    Yeah.  You know, I think it's, you know, in the

20 neighborhood of double this.  So 700 million.  I didn't -- I

21 didn't really -- I definitely looked at it, but I don't have

22 the number, you know, right here on the top of my head.

23 Q    Again, does it matter for any of the conclusions that

24 you've reached today which number you're using, whether it's

25 370, 500, 700?

1  A     No.  I mean, for the conclusions I'm reaching, which I

2  think are fairly black and white, you know, it doesn't

3  matter.

4          MR. APPLEBAUM:  So let's take a look at the assets

5  that went into Bedmar, LLC, so going to the next page of

6  this.

7          Maybe you can zoom out a little bit so we can see

8  the whole thing.  There we go.

9  BY MR. APPLEBAUM:

10 Q     Al right, do you see that?

11 A     I see it.

12 Q     Right.  And this is -- it says, "Consideration received

13 by the debtor," at the top.  And this is from page 18 of your

14 report.

15        Can you tell the Court what's being shown on this page?

16 A     Yeah.  So these are, you know, based on our review of

17 the plans of division.  I think, you know, Schedule 1 to the

18 plans of division, I believe, if I'm recalling.

19        These are, the top, the liabilities, list the

20 liabilities that were put into Bedmar HoldCo.  So you see

21 five guarantees plus, you know, a few leases and a sublease,

22 right.

23        And then the assets that were contributed, be it in

24 cash or receivable, as has been discussed in court now for a

25 couple of days.

1          And then down below, the same thing for Bedmar, LLC.

2    Again, listing the five, you know, leases there -- one

3    sublease, contributed.  And then the assets again, those

4    assets being some combination of cash and/or receivable.

5    Q    And you see on here in the Bedmar HoldCo side, there's

6    a guarantee in favor of Durham, North Carolina landlord.

7          Do you see that?

8    A    On the Bedmar HoldCo, is that what you said?

9    Q    Bedmar HoldCo.  I think it's the fifth one down.

10   A    Yes.  Yeah, yeah, I see it.

11   Q    And is it your understanding that the lease relating to

12   that guarantee was not allocated to Bedmar, LLC, or Bedmar

13   HoldCo, LLC?

14   A    That's my understanding.

15   Q    And do you recall seeing any calculations from Portage

16   Point or anything else in what you reviewed allocating any

17   value to a claim relating to that guarantee?

18   A    No.

19   Q    What was the amount of cash or receivables that was

20   allocated to Bedmar, LLC, under its plan of division?

21   A    Bedmar, LLC?

22   Q    Yes.

23   A    Approximately 33 million.

24   Q    And what was the amount of cash or receivables

25   allocated to Bedmar HoldCo?

1  A      Approximately 9 million.

2  Q      As a bankruptcy professional, someone who has been

3  involved in all these bankruptcy cases, if the debtor is a

4  guarantor of a lease, does that guarantee represent a

5  liability of the estate for purposes of bankruptcy schedules

6  and plans and things like that?

7           MS. QUARTAROLO:  Your Honor, I think that calls

8  for a legal conclusion.  We would object.

9           MR. APPLEBAUM:  I can rephrase the question.

10          THE COURT:  Okay.

11  BY MR. APPLEBAUM:

12  Q      In your experience as a bankruptcy professional, if the

13  debtor is a guarantor on a lease, would you expect that

14  guarantee obligation to be represented on a schedule

15  somewhere or dealt with in the bankruptcy case?

16  A      I'll answer this way.

17       So I've prepared in my prior days, when I was younger,

18  many schedules and statements.  And I reviewed a lot

19  recently.  So if there's a situation where one debtor is the

20  lessee or the obligor on the lease and there's another debtor

21  that's the guarantor, yes, we would, we would list that

22  guarantee obligation in the schedules of assets and

23  liabilities.

24  Q      So even if there was no value attributed to the Durham,

25  North Carolina lease and even if you put no value on the

1  guarantees from the debtor and National Resilience's

2  perspective, what's the minimum number of -- minimum amount

3  of liability that was placed into Bedmar, LLC, as a result of

4  these corporate transactions?

5  A    I'd say the number we've already discussed,

6  approximately, you know, $370 million dollars.

7  Q    And what's your understanding of the total amount of

8  assets that ended up with Bedmar, LLC, as a result of the

9  corporate transactions?

10  A    So we just discussed these two contributions, right,

11  which total, you know, over 42 million, but about 42.5

12  million.  There's also some furniture, fixtures and equipment

13  that I believe on the schedules were listed with a book value

14  of about 20 million; but kind of a market-realizable value of

15  undetermined or something.

16       So I've -- I don't know if it has much value, but I

17  know that also was contributed.  It's my understanding that

18  it's de minimis value.

19       Other than -- you know, those are the assets that I

20  know to have been contributed.

21  Q    So from reviewing these transactions, reviewing the

22  amount of assets that were allocated and comparing that to

23  the amount of liabilities, what are your conclusions?

24  A    Well, I think I'll just -- probably just repeat what I

25  said before.  I think that it's my opinion -- again, this

1  isn't earth shattering -- is that the liabilities contributed

2  far exceed the assets.

3      As such, I don't believe reasonably equivalent value

4  was received by the Bedmar entities, and that they were

5  immediately rendered insolvent.  I don't think I'm saying

6  anything shocking.

7      And, therefore, it's my professional opinion that these

8  transactions, corporate transactions, as we've been calling

9  them, likely constitute a fraudulent transfer.

10  Q    I'd like to ask you just a couple of questions about

11  the division analysis testimony that Mr. Alhale presented

12  earlier.

13      In the pre-division versus post-division analysis that

14  Mr. Alhale testified about, his conclusion was that landlords

15  would do better with the post-division versus the pre-

16  division.  Did you understand that testimony?

17  A    I heard it.

18  Q    And do you agree or have any opinions with respect to

19  his analysis in making that opinion?

20  A    Well, first I'd say the analysis of the pre-division

21  recoveries for landlords, you know, has a number of

22  assumptions that I would question, starting with the value

23  available at both National Resilience and Resilience US.

24      The amount -- I also question the amount of secured

25  debt that's listed at both entities.

1    And then also, you know, the liability that's reflected

2  for the leases in the -- I mean, I'll call it a waterfall, I

3  think it's been called a waterfall by others, and kind of the

4  waterfall analysis.

5  Q    Did you look at the total dollars that were estimated

6  to be available for unsecured creditors, including landlords,

7  in the pre-division and post-division scenarios in Mr.

8  Alhale's report?

9  A    Yes, I did.

10  Q    And what conclusions did you draw from that review?

11  A    Well, I -- based on -- if you lay the two analyses side

12  by side, the dollars available for landlords in the pre-

13  division analysis ranges from 57 to $77 million.

14    The dollars available for landlords in the post-

15  division analysis is $42 million dollars.

16    So I know the analysis shows percentage recoveries that

17  factors in both the numerator, which is dollars available,

18  and the denominator.

19    I noted that the denominator wasn't consistent across

20  the analyses.  The denominator was much lower in the second

21  analysis, the analysis of the post-division recoveries, which

22  is a way to make the percentage recovery look better.

23    But where I focused was the dollars available, not

24  necessarily the claims pool, because they weren't consistent.

25  So the dollars available in the pre-division analysis far

1  exceeded -- which ranged from 57 to 77 million, far exceeded

2  the dollars available for landlords in the post-division

3  analysis, which was 42 million.

4  Q    And that 42 million is the amount that was allocated to

5  Bedmar, LLC and Bedmar HoldCo under their plans of division;

6  is that right?

7  A    That's correct.

8  Q    And so just, so I understand, when you look at the

9  charts that Mr. Alhale prepared, in your view, it actually

10 shows that landlords would do better without the corporate

11 division than with the division?

12 A    Yeah, again, I'm more focused on the dollars available

13 as opposed to the percentage recovery, because we're not

14 looking at an apples-to-apples analysis, because the

15 denominator is very different in the two analyses, which

16 skews the percentage recoveries.

17          MR. APPLEBAUM:  I have no further questions, Your

18 Honor.  Thank you.

19          THE COURT:  Thank you.

20                    CROSS-EXAMINATION

21 BY MS. QUARTAROLO:

22 Q    Mr. Madden, good afternoon.  It's nice to meet you in

23 person.

24 A    Same, likewise.  Good afternoon.

25 Q    You've been involved in this case for approximately two

1  weeks; is that correct?

2  A      The 14th, so, yeah.  Yeah.  A little more.

3  Q      And you didn't help -- you spoke earlier on direct with

4  your counsel that -- about the proofs of claim.  Do you

5  recall that?

6  A      Yes.

7  Q      You didn't help in preparation of any of those proofs

8  of claim, did you?

9  A      No, I did not.

10  Q      And you don't know how many of those proofs of claim or

11  the amounts contained therein were calculated; right?

12  A      No, I just reviewed them.  I did not perform any of the

13  calculations.  So, no, I do not -- I saw some backup but I

14  did not do the calculations.

15  BY MS. QUARTAROLO:

16  Q      You didn't talk to any of the landlords about how they

17  calculated the numbers in their proofs of claim?

18  A      Not me personally, no.

19  Q      And you didn't ask any of the landlords to provide

20  backup for the numbers that were in the proof of claim;

21  correct?

22  A      Not me personally.  Like I said, I believe there was

23  some backup provided to us; but given the timing, you know,

24  it was just kind of reviewing for what I would -- I would say

25  could be like glaring errors or -- ones I'd make, and nothing

1  popped out to me.

2       So to answer your question directly, no, I did not.

3  Q    You've not done any independent work to determine if

4  any aspects of the leases constitute assets; correct?

5  A    I am not sure what you mean by that.  I consider a

6  lease to be an asset when it's under market and can be sold,

7  right.  So if, if a party to a lease, you know, has gotten a

8  good deal and, you know, can find a replacement tenant and

9  they can move the lease and get compensated for it, you know,

10 that's when it's an asset, when it's under market.

11 Q    You have not done any work to value the leases at issue

12 here; correct?

13 A    No, I have not.

14 Q    And you have not done any independent work to calculate

15 the total obligations under the leases; correct?

16 A    No, as I said, I'm relying on the schedule that I

17 received, which were, I guess we're calling the Portage Point

18 schedule, as, as kind of the remaining obligation.

19 Q    You have not done any work to value the lease cap

20 claims for any of the leases --

21 A    No.

22 Q    -- correct?

23 A    I'm sorry for speaking over you.

24      No, I have not.

25 Q    And you haven't even looked at the company's balance

1  sheets; correct?

2  A     I mean I looked at the schedules and statements, but,

3  no, I have not looked at the Bedmar, LLC or Bedmar entities'

4  balance sheets, I'm not focused on that, no.

5  Q     Or the pre-corporate transaction balance sheets of

6  Resilience US or National Resilience, right, you didn't look

7  at those either?

8  A     No, I did not.  Not in connection with my report, no.

9  Q     Or in connection with any other work in this

10 engagement; right?

11 A     Correct.

12 Q     Do you know how the landlord claim would be determined

13 in the states at issue here?

14 A     I'm sorry --

15            MR. APPLEBAUM:  Objection; calls for a legal

16 conclusion.

17            MS. QUARTAROLO:  I'm asking if he knows.

18 A     Can you -- I'm sorry, I didn't -- I missed part of the

19 question, if you could -- I don't know what's going to happen

20 with the objection, but I didn't hear the question.

21            THE COURT:  Let him hear the question and then

22 I'll hear from Mr. Applebaum.

23            MS. QUARTAROLO:  Sure.

24 BY MS. QUARTAROLO:

25 Q     My question for you is, Mr. Madden, do you know how a

1  landlord's claim would be determined in the states at issue

2  here?

3  A     The states --

4            THE COURT:  Go ahead, Mr. Applebaum.

5            MR. APPLEBAUM:  Let me remake my objection in part

6  because I don't understand what it means for the landlord --

7  for a lease to be determined.  But to the extent she's asking

8  for how it would be dealt with under the law of a particular

9  state, that would call for a legal conclusion.

10           MS. QUARTAROLO:  So my question for him is only if

11 he knows.  If he doesn't know --

12           THE COURT:  If he knows how to calculate?

13           MS. QUARTAROLO:  Yeah.  Do you know how a

14 landlord's claim would be determined under any of the states

15 that are at issue for the leases here?

16           THE COURT:  Wait.  Any state, is that what you

17 said?

18           MS. QUARTAROLO:  The states where the leases are

19 at issue.

20           MR. APPLEBAUM:  I still don't understand the

21 question that it needs to be calculated in the states.  Does

22 that mean like -- I am not sure if you are just asking, like,

23 how claims are dealt with in different bankruptcy courts in

24 different locations?  I don't understand the question, I'm

25 sorry, Your Honor.

1    THE COURT:  Neither do I, which is why I asked the

2  question.

3    MS. QUARTAROLO:  Okay.  How about I rephrase, Your

4  Honor?

5  BY MS. QUARTAROLO:

6  Q    Mr. Madden, is it your understanding that a landlord's

7  claim, to the extent it asserts a claim, is calculated in

8  accordance with state law in that jurisdiction?

9  A    So outside of bankruptcy if there's a breach of a

10  lease, is that what you're saying?

11  Q    Correct.

12  A    Yeah, they'd have to exercise the remedies and, you

13  know, go to state court, I suppose.

14  Q    And do you know how those are calculated

15    MR. APPLEBAUM:  Objection; calls for a legal

16  conclusion.

17    THE COURT:  I'm going to sustain his objection.

18  BY MS. QUARTAROLO:

19  Q    Do you know whether a court would take into account the

20  time value of money in assessing a landlord's claim?

21    MR. APPLEBAUM:  Objection to the extent, again, it

22  calls for a legal conclusion, asking what a court would take

23  into account.

24    THE COURT:  Do you want to respond to that?

25    MS. QUARTAROLO:  I'm just asking what the witness

1 knows.  And so if he doesn't know -- but I don't think I'm

2 asking for a legal conclusion, based on the question.

3          MR. APPLEBAUM:  Your Honor, I don't think that

4 just restating the question responds to the objection.

5          But I think the question does call for a legal

6 conclusion, which is what would a Court do or what would --

7          THE COURT:  I'm going to sustain the objection.

8 BY MS. QUARTAROLO:

9 Q    Do you know if, in calculating a landlord's claim, they

10 would consider mitigation of that claim?

11          MR. APPLEBAUM:  Objection.  Again, I'm not sure

12 who "they" is.  But, again, if it's talking about how a Court

13 is going to value what the allowed amount of the claim is.

14 That's still calling for legal conclusion.

15          THE COURT:  Yeah.  This whole line of questioning

16 is asking his interpretation or understanding of what I

17 believe to be "they," state law, which he's already responded

18 to.

19          MS. QUARTAROLO:  Thank you, Your Honor.  I'll move

20 on.

21 BY MS. QUARTAROLO:

22 Q    Mr. Madden, you're not offering an opinion here --

23 actually let me back up.

24      You are not saying that the transfers at issue here,

25 the corporate transactions, were a fraudulent transfer, are

1 | you?

2 | A     No.   I'm saying what I said, that it's my professional

3 | opinion, not my legal opinion, based on the facts that they

4 | likely are a fraudulent transfer.   And I'm not saying they

5 | are, and I think they warrant further investigation.   That's

6 | all I'm saying.

7 | Q    I want to cover a few of the slides that you covered on

8 | direct with counsel.

9 |      MS. QUARTAROLO:   If we could pull up the

10 | demonstratives that were used.

11 |      Yeah.   Slide 2, focusing on Column C.

12 | BY MS. QUARTAROLO:

13 | Q    What is Column C here, unpaid rent arrears?

14 | A    My understanding, it's past-due rent.

15 | Q    And isn't it true that that's the June rent from 2025

16 | that went unpaid?

17 | A    I'm not positive, so I don't want to see yes.   But I'll

18 | take your word for it.

19 | Q    Do you know where those numbers came from?

20 | A    Came from the Portage Point schedule we received.   I

21 | don't know more than that.   I haven't dug in on it.   It's a

22 | schedule I received.

23 | Q    And if you look at Column A, do you know the starting

24 | point for the calculation in the total remaining base rent

25 | liability?

1  A      I assume it's the lease.

2  Q      Sorry.  Let me rephrase.

3        Do you know the starting point in time for the total

4  remaining base rent liability?

5  A      I don't know the exact starting point.  I assume it's

6  at the date of the schedule.  So this was done what, you

7  know, recently, so somewhere recently.

8  Q      And this number here where it says "Outstanding

9  Liability, A plus B plus C plus D," that is a calculation

10  that you prepared; correct?

11  A      Yeah.  That's why it's in green. So anything in green,

12  you can be assured it belongs to me.  But, yeah, those are

13  just formulaic additions across; correct.

14  Q      And you didn't calculate what's under Column A, the

15  total remaining base rent liability.  You didn't calculate

16  that yourself, did you?

17  A      No, I did not.

18  Q      And so if that calculation under Column A includes the

19  June rent, you shouldn't also include Column C, which is the

20  June rent; correct?

21  A      If it includes -- if they both include the June rent,

22  then, yes, you're correct.

23  Q      And you -- sitting here today, you don't know under

24  Column A if that includes June rent; is that your testimony?

25  A      Yes, that's my testimony.

1          MS. QUARTAROLO:  Okay.  We can flip to the next

2    slide.

3    BY MS. QUARTAROLO:

4    Q     Mr. Madden, this information that is on this slide,

5    these are not calculations that you prepared; correct?

6    A     No.

7    Q     And you didn't calculate the amount of the liabilities

8    or assets for either Bedmar HoldCo or Bedmar; correct?

9    A     No.

10   Q     And if you look at the second line up from the bottom,

11   it lists under liabilities for Bedmar a Bedmar -- excuse me -

12   - a Bedford, Massachusetts sublease.

13          Do you see that?

14   A     Yes, I do.

15   Q     And you would agree with me, Mr. Madden, that a

16   sublease is not appropriately characterized as a liability;

17   correct?

18   A     Well, I know it was contributed. So, you know, this is

19   just listing what was in the plans of division as what was

20   contributed to Bedmar, LLC, prior to Bedmar HoldCo and

21   Bedmar, LLC, merging.  So that's the purpose of this.

22   Q     But you would agree with me, generally, that a sublease

23   is not a liability; right?

24   A     Yeah, I'm not familiar enough with this one.  But, yes,

25   in general.  I'll give you a, you know, a general answer:  If

1   you're -- a sublease would not be necessarily a liability.

2          MS. QUARTAROLO:  We can go to the next slide.

3          MR. APPLEBAUM:  Your Honor, I'd just object that

4   we didn't actually use this slide during Mr. Madden's direct

5   examination.  It's one of our demonstratives that we didn't

6   actually use.

7          MS. QUARTAROLO:  Your Honor, it's one of their

8   demonstratives.  I think I'm allowed to use it and I --

9          THE COURT:  It's not an exhibit; correct?

10          MR. APPLEBAUM:  It's not an exhibit.

11          MS. QUARTAROLO:  It is not an exhibit.  It is --

12          THE COURT:  And so the Court does not have the

13   demonstratives.  The Court does not have any of these

14   demonstratives that you used this afternoon.  They're not

15   exhibits.  They're not part of the record.

16          MS. QUARTAROLO:  Understood.

17          Mr. Madden testified from these demonstratives

18   narratively.  He was speaking, and so I have a question for

19   him -- this is a -- this is a chart that was actually in our

20   demonstrative as well.  I'm happy to pull it from there if

21   that would be better for the Court.

22          THE COURT:  Yes.  If you're going to use it -- if

23   it's -- he hasn't testified about this on direct?

24          MR. APPLEBAUM:  He testified about the subject

25   matter that relates to that chart, but we didn't actually use

1  that demonstrative during his direct examination. That's my

2  point.

3          MS. QUARTAROLO:  And I think, if I may respond,

4  Your Honor, the fact that he testified to it means this is

5  appropriate cross.  Even if he didn't use the demonstrative

6  itself, he testified to the subject matter of this slide.

7          MR. APPLEBAUM:  Your Honor, if it would help the

8  witness answer the questions, then I'm fine with it.  But I

9  think, otherwise --

10          THE COURT:  I was going to say, I don't know what

11  this slide looks like.  I don't know that this -- he

12  testified about it.  But if it's something that was, in fact,

13  addressed on direct, I'll permit it.

14          MR. APPLEBAUM:  I'll withdraw the objection.

15          THE COURT:  Okay.

16          MS. QUARTAROLO:  This -- let's back up.  Just the

17  whole slide, please.

18  BY MS. QUARTAROLO:

19  Q    This is the titled pre-division chart from the Alhale

20  report.

21      Is this what you testified to with counsel on direct?

22  A    Yeah, part of it.

23  Q    Okay.  And your testimony, if I may paraphrase, was

24  that you should focus on the total dollars and not the

25  percentages; is that correct?

1   A      Yes.

2   Q      Okay.  So if we just focus on the last line under the

3   liabilities, the operating lease liability -- do you see that

4   line?

5   A      Yes, I do.

6   Q      Do you know which leases were included in the 167

7   million of estimated liabilities there, or the recoveries in

8   connection therefrom?

9   A      Yeah, I mean, I don't know exactly.  I know it's all

10  leases, not just the leases that were -- I don't want to use

11  the wrong term here -- transferred or -- you know, pursuant

12  to the plans of division, which my understanding that the

13  vast majority of the lease obligations are leases that were,

14  again, transferred, or whatever the proper terminology is,

15  pursuant to the plans of division.

16  Q      And -- but sitting here today, you don't know of that

17  167 million that's listed here which ones -- what amounts

18  from that number are associated with leases that were

19  allocated to Bedmar and which ones were not; correct?

20  A      I don't know the exact breakdown. Like I said, I've

21  looked at a high level.  And my understanding is, based on

22  what I looked at, the vast majority are the ones that were

23  allocated; however, no, I do not know the exact breakdown.

24  Q      And so if you were just to focus on the absolute

25  dollars from the pre-division scenario, those dollars are

1   associated with liabilities that were not allocated to

2   Bedmar; correct?

3   A     That is correct.

4        MS. QUARTAROLO:  We can take that down.

5   BY MS. QUARTAROLO:

6   Q     Just a few last questions, Mr. Madden.

7        You would agree with me that Bedmar, the debtor here,

8   is under financial distress; correct?

9   A     Well, we're in Chapter 11.

10       MR. APPLEBAUM:  Objection Your Honor.  That calls

11  for a legal conclusion.

12       MS. QUARTAROLO:  I think he testified to

13  insolvency and fraudulent transfer, a number of other issues,

14  and he testified to this at his deposition.

15       MR. APPLEBAUM:  And I think that he's --

16       MS. QUARTAROLO:  -- without objection.

17       MR. APPLEBAUM:  He's talked about insolvency, but

18  I don't think he testified about financial distress.  And I

19  don't think that they're the same.

20       MS. QUARTAROLO:  Mr. Madden testified to this at

21  his deposition without objection.

22       MR. APPLEBAUM:  Your Honor, I don't think that not

23  asking a question -- not raising an objection at a deposition

24  is the same thing, that precludes me from objecting here

25  today, but I've made my objection.

1          THE COURT:  What was the question again?

2          MS. QUARTAROLO:  You would agree with me that

3   under -- excuse me.

4          You would agree with me that Bedmar, the debtor

5   here, is under financial distress?

6          THE COURT:  Is that not a term of art?

7          MS. QUARTAROLO:  It may be a term of art, but it

8   is also a term of art that I believe the witness in

9   deposition was familiar with and testified to.

10          THE COURT:  He is qualified here to testify about

11   insolvency.  The issue wasn't raised on direct.  And whatever

12   happened in a depo is for purposes of impeachment here today.

13   So I'm not going to allow it.

14          MS. QUARTAROLO:  Thank you, Your Honor.

15   BY MS. QUARTAROLO:

16   Q    Mr. Madden, for your analysis, you ultimately simply

17   compare the total remaining lease obligations over the life

18   of the leases on the one hand to the cash and to the

19   receivables allocated to Bedmar; right?

20   A    That's correct.

21   Q    And you're not offering any opinions on what the

22   relevant legal standard is for a fraudulent conveyance;

23   right?

24   A    Legal opinion, no.

25   Q    And you've never been involved in a divisive merger

1  under the Delaware code; correct?

2  A    No.

3  Q    And you didn't do any work to analyze the net effect of

4  the corporate transactions on the recoveries to unsecured

5  creditors, did you?

6  A    No.

7        MS. QUARTAROLO:  That's it.

8        Thank you, Your Honor.

9        MR. APPLEBAUM:  No redirect, Your Honor.

10        THE COURT:  Thank you very much, Mr. Madden.

11  You're excused.

12        THE WITNESS:  Thank you Your Honor.

13      (Witness excused)

14        MS. MARKS:  Your Honor, I think the exhibit list

15  was finally filed.

16        TE COURT:  Is that what was handed to me?

17        MS. MARKS:  It's Docket Number 325.

18        THE COURT:  I have a copy.

19        MR. APPLEBAUM:  Your Honor, I can confirm that the

20  -- at least the DLA landlords don't have any further

21  witnesses to call.

22        THE COURT:  Okay.  So is everyone in agreement

23  with this final joint exhibit?

24        SPEAKER OFF CAMERA:  We are, Your Honor.

25        THE COURT:  Okay.

1          MR. APPLEBAUM:  Yes, Your Honor.

2          MS. MARKS:  Your Honor, may we consider all of

3  those exhibits moved into evidence?

4          THE COURT:  Yes.  I was just going to say, no one

5  objects to admission into evidence of all these exhibits?

6       (No response.)

7          THE COURT:  Okay.  They are all admitted.

8          I'd ask for one consolidated copy of these for

9  chambers.

10          MS. MARKS:  Yes, Your Honor. Thank you.

11          THE COURT:  So both parties are closing their

12  cases?

13          MR. TECCE:  Yes.

14          THE COURT:  Okay.  I am inclined to do closings

15  tomorrow morning.  Does anybody -- as I recall, you

16  anticipate an hour 45 minutes for closings; is that right?

17  That was the time set aside?

18          MR. TECCE:  It's an hour and a quarter a side.

19          THE COURT:  Okay.

20          MR. TECCE:  And we'll do whatever you like.

21  We're, from our perspective, good to go now.  I think we

22  could end this.  I know you had a shortened schedule

23  tomorrow.  I thought we could clear your calendar.  But,

24  obviously, whatever you'd like to do.

25          MR. MERCHANT:  Speaking for the debtor, Your

 1  Honor, we're in the same boat.

 2            THE COURT:  You're in the same boat.

 3            MR. MERCHANT:  We're prepared to go forward now,

 4  but we'll defer to the Court's preference.

 5            THE COURT:  Could we take like a 15-minute break?

 6            MR. TECCE:  Be helpful, actually, yes.  Yeah,

 7  sure.

 8            THE COURT:  Is it warm in here?

 9            MR. TECCE:  No.  I just tend to get nervous -- I'm

10  just kidding.

11            THE COURT:  I need to get into some air

12  conditioning, because I think it's hot in here.  So let's

13  take a 15-minute break, and then we'll finish closings.

14            MR. TECCE:  Thank you very much, Your Honor.

15       (Recess taken at 3:05 p.m.).

16       (Proceedings resume at 3:28 p.m.).

17            THE COURT:  Please be seated.  Just give me one

18  second.

19            Are the parties timing the respective sides?

20            Yes.

21            THE COURT:  Okay.  Thank you.

22            MR. TECCE:  Thank you very much, Your Honor.  So

23  for the record, James Tecce of Quinn Emanuel on behalf of

24  Cobalt.

25

1          Your Honor, I'll begin.  I think everyone will say

2    this.  And I'll be the first, but I'm sure I won't be the

3    last.  And I'm sure the sentiment is shared by all present,

4    that this has proceeded at an extremely quick pace.  And you

5    and your staff have made yourself available to us for

6    hearings and the like, and your time is very much appreciated

7    and your attention to this matter.

8          THE COURT:  You're welcome.

9          MR. TECCE:  Thank you.  We have just some -- a

10   handful slides.  May she approach?

11         THE COURT:  Yes.

12         Thank you.

13         MR. TECCE:  And that is Lin Zhu from my law firm,

14   Your Honor.

15         THE COURT:  Oh.  Nice to meet you.

16         MR. TECCE:  Your Honor, the Third Circuit has made

17   very clear what it expects a debtor to show to avail itself

18   of the protections and the redistributive provisions of the

19   Bankruptcy Code.

20         I respectfully submit, Your Honor, that the trial

21   did not show that here.  The trial did not involve a company

22   displaced by market forces, a company distressed by liquidity

23   constraints, a company with a rehabilitative purpose for

24   itself.

25         What we've seen is a company that was engineered

1   into existence by professionals, lawyers, and financial

2   advisors; a Chapter 11 case that was funded by contributions

3   from long-time Resilience shareholders, Arch Ventures and

4   8VC.  They gave the new company just enough money to pay

5   lease cap claims and administer a bankruptcy case.

6           We saw a company whose financial distress was

7   manufactured by those same advisors when they created the

8   company on purpose.

9           And we saw a company that has no purpose other

10  than to cap lease rejection damages claims to funnel value to

11  nondebtor equity owners.

12          And I want to be clear, Your Honor.  We have never

13  said and we will never say that any of this was,

14  quote/unquote, nefarious.  That word appeared at our

15  openings. We've never said any person acted badly.  We never

16  said anything was concealed.  To the contrary, I think the

17  positions are quite transparent.

18          What we said is that under 1112(b), we can move to

19  dismiss a case, and the case law uses the phrase "good

20  faith," and the opposite of that is bad faith.  But we never

21  said anybody acted badly.  And I want to be very clear about

22  that.  We're not casting aspersions on any person.

23          We are arguing what the case law says.  Those are

24  the terms that the case law uses, good faith and bad faith.

25          And even in the context of fraudulent transfer,

1   it's bankruptcy fraudulent. We're not accusing anyone of

2   fraud.  Are we clear?  So I want to get very clear about

3   that.

4          Stated simply, Your Honor, the debtor, Bedmar,

5   LLC, has no valid bankruptcy purpose for purposes of 1112(b).

6   The plan all along has been a Resilience enterprise plan, the

7   LeaseCo restructuring as they call it.  File one company to

8   improve the financial performance of nondebtors.

9          But the only entity that's relevant is the debtor.

10  The purposes of nondebtor entities are not relevant to the

11  debtor's bankruptcy purpose.  And the stated purposes from

12  the evidence for Bedmar was to improve the financial

13  condition of the Resilience enterprise.

14         I believe the independent manager testified that

15  that was a consideration in filing, was the financial

16  distress of the Resilience enterprise.

17         And to do that, Your Honor, Arch Ventures and 8VC,

18  the long-time shareholders of the company, funded -- same

19  entities that funded the convertible notes in 2024 purchased

20  preferred units in Resilience SPV 2025, LLC, to fund what

21  they call the LeaseCo restructuring and cap lease claims for

22  the filing of the company.

23         I think Mr. Marth's testimony today confirms --

24  and I'll speak to that -- that whether or not this case

25  survives a motion to dismiss is a free option for the

1  shareholders of the company and that this was done to accrete

2  value to the shareholders.

3          So if I could start with Slide 8.

4          We heard a lot about Ohio, Cincinnati, Ohio, here

5  on the map, Ohio having a lot of promise.  One of the

6  documents, M57, refers to Ohio as the anchor of the

7  Resilience strategy.

8          And the corporate transactions, to our mind -- and

9  this is what I said this morning, and I'll say it again.

10  They're indicative of a lack of good faith.  We're not going

11  to get into, I'm not going to get into fraudulent transfer of

12  the transactions.

13          Their very occurrence -- and I'll speak to it

14  because it goes to LTL -- is indicative of a lack of good

15  faith.  And let's just review what we learned about, at a

16  high level, what the process of the corporate transaction

17  was.

18          And, again, this is Ohio, this is where they are

19  making a blockbuster drug.

20          And so let's go to Slide 11.

21          This is the demonstrative that was handed out to

22  you, but I annotated it in two ways.

23          This is the pre-corporate transactions, step one

24  of the corporate transactions it says.  And you'll see there

25  that Resilience US, LLC we had Ohio, and we had our leases at

1  the predecessor entity of that LLC.  Before that company, we

2  had -- Resilience Boston, Inc. was our -- was our obligor,

3  and that entity had access to unencumbered Ohio property.

4         That's where the leases were, and at the --

5  National Resilience, LLC was a company called National

6  Resilience, Inc., the notes had been issued by that company

7  and that entity was the guarantor under the leases; and so

8  those two obligations competed at that entity.

9         And if you go to Slide 12 -- this is the end

10  result -- here's where we are.  The convertible notes are at

11  National Resilience HoldCo, Inc.  There are no guaranteed

12  claims at any of those companies.

13         The SPV intercompany note that relates to the

14  Resilience SPV loan is secured by personal property of Ohio,

15  which is at Resilience US, LLC, you see that over there on

16  the right, and the leases are over here on the left with

17  Bedmar, LLC.

18         And we have just enough money to pay statutory

19  capped claims and the costs of the bankruptcy because that is

20  what was allocated to that entity by way of the shareholder

21  loan.

22         And that was the plan; that's the LeaseCo

23  restructuring plan.

24         And if you go to Slide 9, you can see that this

25  was the presentation deck for the funding.  And it was

1   restructuring costs include funding the lease capped claims,

2   cost to exit the leases, severance for active employees and

3   other costs.  That's what the 135, $145 million dollar loan

4   was for.

5           And it was funded by long-time shareholders Arch

6   and 8VC.

7           I also think that it bears emphasizing that when

8   you consider that --

9           MR. TECCE:  You can take the slide down

10          When you consider that the only unsecured class at

11  Bedmar, LLC are the landlords, I do think it's fairly

12  characterized as a two-party dispute.

13          The class is unimpaired because it's all the

14  landlords.  It's a two-party dispute in the sense that -- and

15  I'm using this phrase loosely, but it is a two-party dispute

16  between the landlords and the Resilience enterprise.

17          So I'm not going to dwell on it too much, but

18  we're the only type of unsecured claim.  There are

19  administrative claims in the Bedmar, LLC claim, yes, but

20  they're professional claims, okay.  They have to pay

21  insurance for the properties, understood.  Okay, so it's not

22  100 percent.  But we're -- we are the creditor class in that

23  case, the one that matters, and the one for whom the company

24  was formed to cap our claims.

25          Much has been said about whether a valid

1   bankruptcy purpose is served if creditors do worse in a

2   hypothetical Chapter 11 case of the enterprise.

3           Respectfully that's irrelevant and it's an attempt

4   to change the standard under 1112(b).  It's not the test

5   under any case law that we have to prove that we would do

6   better in -- that we don't have to prove -- we don't have to

7   disprove the negative that we would do better in a Chapter 11

8   case of the enterprise.

9           The courts focus on the valid purpose of the

10  debtor and whether the debtor is in financial distress.

11          Nondebtor distress is irrelevant as a matter of

12  law.  And in this case, the concept of a hypothetical Chapter

13  11 for the enterprise is speculative; and no one can predict

14  what would happen in a Resilience HoldCo bankruptcy.

15          Who will the DIP lenders be?  Will existing equity

16  advance more money to protect their position as DIP lender?

17  We see that quite frequently.  Will a creditors committee try

18  and recharacterize the $112 million dollar convertible note

19  or the now $242 million dollars in shareholder funding?

20          I asked the witnesses, Mr. Montone and Mr. Marth,

21  how they arrived at their $1.5 billion dollar number ; and a

22  large portion of that are loans that are related to the

23  shareholders.  224 million comes from the $112 million

24  dollars in convertible notes being doubled;  And I did the

25  math.  797 million is 3.5 times $242 million of the

1  shareholder loan; that's a huge swath of the debt.

2           I asked Mr. Montone what debt would be left over

3  if they were recharacterized as equity, and he referred to

4  the Department of Defense loan, which I think is 246 million;

5  plus I think he mentioned another $25 million dollars.  So

6  you don't know what's going to happen in the alternative

7  bankruptcy.

8           I understand we had an issue about whether an

9  expert would testify to it.  But the fact witnesses testified

10 to it, and you don't know what happens.  And it's not -- but

11 the first point, and 1 through 9 out of 1 to 10 is not

12 legally relevant as a matter of law what the financial

13 condition of a nondebtor is.

14          Now going to the Third Circuit directly.  Let's go

15 to Slide 2, if we could.

16      We start with the Integrated case, Your Honor, which is

17 where we started our motion to dismiss.

18          It says very clearly, you can't file solely to

19 take advantage of a provision in the Bankruptcy Code that

20 limits claims on long-term leases.  That is unequivocally

21 clear, that's the 502(b)(6) cap claim.

22          And in this particular case, this company was

23 actually a real operating company that filed for this

24 purpose.  Our company is not like that, and to my mind, Your

25 Honor, I respectfully submit that makes our facts even harder

1   to get around Integrated.

2          We have a company, a synthetic company, that was

3   created for this single purpose.  This case deals with, oh,

4   if you file your company just because -- your existing

5   company just because you want to take advantage of the cap,

6   that's not good.  How about if you create a company to file a

7   company to take advantage of the cap, then you're really on

8   the wrong side of Integrated.

9          I think -- let's go to Slide 3, if we could.

10          This is LTL, Your Honor.

11          And this is important.

12          LTL it involves the creation of a GoodCo and a

13   BadCo.  And we submit that's what happened here.  Bedmar, LLC

14   is the BadCo; and the Resilience entities are the GoodCos.

15   And unencumbered personal property Ohio is just one asset

16   that was moved around beyond our reach.

17          Again, the convertible note now has a better line

18   of sight in its entity without guarantee obligations.  The

19   leases are no longer impeding the loan's line of sight to an

20   entity that has access to Ohio property.  That is the

21   GoodCo/BadCo structure in this case that happened.

22          If we go to Slide 14, Your Honor.

23          It was understood that this is what was going to

24   happen.  In plain -- when referring to the reorg -- and this

25   is an exchange between Mr. Nelsen and Mr. Oetting, Mr. Nelsen

1  of Arch Venture and Mr. Oetting of 8VC, and this is the 8VC

2  write-up describing the reorg:

3            "In plain English, this means separating out the

4  assets we want to keep from the ones we don't.  Doing so

5  insulates the slimmed-down Resilience from claims related to

6  selling or shuttering the core facilities."

7            This is the GoodCo/BadCo that LTL dealt with; and

8  it's not permissible under that case.

9            Now, the debtor would have you say, Well, we have

10  a Delaware LLC statute, a splitting statute that says this is

11  okay.

12            But LTL does not rise or fall on the Delaware LLC

13  Act.  LTL was a Texas Act case, okay.  And whether you do it

14  under the Texas Act or the Delaware Act, the point is you

15  can't separate assets out to take them away from creditors in

16  a bankruptcy.  And that's what happened here.

17            And -- and the Delaware LLC Act can't make LTL

18  inapplicable or any less relevant.

19            The other argument we hear from the debtor is

20  that, Well, there's a remedy in the Delaware LLC Act; right?

21  You have 18-217(l)(4), which says you can't make a transfer

22  or a split that's a fraudulent transfer.  And in (l)(5) it

23  tells you, if that's what happens, then there is just joint

24  and several liability.

25            But respectfully, Your Honor, the question for

1  today is whether the debtor filed the company in good faith.

2  And the question is, is it good faith or bad faith?

3         And whether outside of bankruptcy if there was a

4  fraudulent transfer or other aspects of the Act were not

5  satisfied and whether there are remedies within that Act to

6  address those circumstances, that's all well and good.

7         But we are in bankruptcy asking whether the debtor

8  filed for bankruptcy in good faith or bad faith, and they

9  used the statute to bring about a GoodCo and a BadCo.  And

10 LTL says whether you do that under Texas law, and we submit

11 here under Delaware law, it's not a permissible use of the

12 code.

13        On the question of financial distress, the assets

14 and liabilities -- and this is LTL -- of the nondebtor are

15 not relevant.  Let's talk about LTL for a second because the

16 debtors and the nondebtor affiliates submit that LTL actually

17 makes the assets and liabilities of the nondebtor relevant.

18        THE COURT:  You're on page, page 110 or 116 is the

19 basis for that finding?

20        MR. TECCE:  I'm sorry, I didn't hear you.

21        THE COURT:  In LTL -- yes, I -- they make that

22 argument.  I think they cite that LTL maybe 110 or 116 -- go

23 ahead, I do want to hear your argument on that.

24        MR. TECCE:  Sure, sure.  So I just want to find

25 the page.

1           Slide 6, my apologies.

2           Okay.  So LTL, there is a funding agreement, an

3   actual funding agreement to fund liabilities from toxic tort

4   claims.  So, first of all, LTL is in -- this is what I was

5   talking about the other day, it's a mass tort case.

6           First, let's not bury the lead.  LTL found no good

7   faith, so let's not forget what the outcome of the case was;

8   all right?  So that is kind of important, start there.

9           Now, how did it get there?  What road did the

10  Court walk down?  Okay.  So it looked -- first it makes this

11  observation.  Again, we're in the mass tort context and it

12  says:

13          "For us, the financial state of LTL, a North

14  Carolina limited liability company formed under state law and

15  existing separate from its predecessor company, old consumer,

16  and it's duly incorporated counterpart company, new consumer,

17  should be tested independent of any other entity."

18          That means we focus on the assets, liabilities

19  and, critically, the funding backstop it has in place.  So

20  there's the funding backstop as a reference.

21          But, again, the starting proposition is the

22  nondebtor financial condition is not relevant.  Here the

23  Court actually looked at it because we had an agreement in

24  that case that we do not have in this case.  You have the

25  shareholder alone that was paid to the minimum amount

1   necessary to pay capped claims and administer the cases.

2          There's no agreement to provide anything more.

3   There's no funding agreement to pay toxic tort claims in this

4   case.  There's no indemnification.

5          So the financial condition of the Resilience

6   enterprise is irrelevant as a matter of law.  And, again, it

7   bears emphasizing:  LTL finds no good faith.

8          Now, the financial distress of the debtor,

9   focusing on the debtor's financial distress, heard that the

10  debtor has $372 million dollars in leased liabilities and

11  $41.1 million dollars in assets and it's distressed.  That

12  was by design.

13         The company was created that way on purpose to cap

14  the claims.  It's manufactured distress.  The 41.4 is a

15  plugged number, calculated by Portage Point Partners to pay

16  lease cap claims.

17         It's done as part of Resilience 2.0.  It's the

18  divisive merger.  It's the lease company and restructuring.

19  Call it whatever you want.  That was on purpose.

20         And the shareholders agreed to fund $64 million

21  dollars to do that.

22         It was understood that they would file that

23  company for bankruptcy to take advantage of the cap.

24         We also heard concerns about financial distress

25  because there was concerns by the independent manager that

1    there may not be enough money in the company to fund the

2    case.

3          The case was funded by the shareholder alone and

4    the number calculated to be the administrative -- the minimum

5    amount.

6          That's -- if there's not enough money to fund the

7    case, that was a manufactured number.  And it's manufactured

8    into a position where it doesn't have enough money to fund

9    its case.  So, respectfully, Your Honor, that -- the

10   financial distress element has not been satisfied.

11         It's not market distress.  It's not operational

12   distress.  It's not the kind of distress that the Third

13   Circuit Court of Appeals expects to show good faith.

14         And the distress of reliance [sic] as an

15   enterprise is not a substitute.

16         LTL, the gift that never gives from our legal side

17   of the aisle, Your Honor.

18         At page -- Slide 5, if I could.

19         LTL also says how important it is that in

20   bankruptcy case, state law rights are protected; creditors'

21   rights are protected.

22         Yes, creditors can be impaired in a bankruptcy

23   case.  Yes, the debtor has powers to take actions or reject

24   leases, cram down secured creditors, you know, confirm a

25   plan.  There's a whole panoply of rights.  That's true.

1        But the bottom line here is, Your Honor, the

2    leases, Section 1101 and 1104 of our lease, are being

3    violated by what's going on here.

4        We did not consent to the transfers of our leases

5    to another entity, and that right is being trampled.  You can

6    say it's under the Delaware LLC Act, but our leases are

7    governed by Massachusetts law.  And we put this in our reply.

8        You can't -- so bankruptcy itself is being used to

9    walk on our rights.  And that's not a permissible use per

10   LTL.

11       They want to reject our leases.  They want to

12   escape litigation over the leases by the various landlords in

13   state court.  You want to do all those things?  File your

14   company for bankruptcy.  File Resilience for bankruptcy.  Get

15   the automatic stay.  That's what you're supposed to do.  Not

16   backdoor an evisceration of our state law rights by taking

17   the statute and dividing the companies up and then filing the

18   company for bankruptcy.  It's not consistent with the

19   instruction of LTL.

20       Go to Slide 4, Rent-A-Wreck. Judge Silverstein,

21   Your Honor.

22       This is a very important point that Judge

23   Silverstein makes.  She picks up on the language in

24   Integrated:  You cannot get the redistributive provisions of

25   the Bankruptcy Code simply because you're willing to fund the

1  cost of administering a case.

2          That is not good faith, and that is exactly what

3  happened here.

4          Shareholders made a loan.  A portion of the loan

5  was contributed to the SPV to cap the claims and to provide

6  enough money to administer the cases.

7          And that's what they did.  They paid to administer

8  a Chapter 11 to get the cap when integrated says you can't

9  just file to get a cap, and this case observes you can't file

10 just to pay the cost of the freight to get the cap.

11         We've argued, Your Honor, extensively that this

12 was done to benefit the shareholders of the company, that

13 this is a free option for them.

14         And that is what Rent-A-Wreck says, and I'm just

15 going to take it off my list of reasons why we think that's

16 true, based on the evidence.

17         First, Your Honor, the bridge loan, as it's

18 called, was provided by the long-time equityholders 8VC and

19 Arch.  They also contributed $112 million dollars in the

20 convertible notes.

21         And if you look at the way those instruments work

22 where they convert to 2 times and 3-1/2 times their Philly

23 equity, no one has considered whether or not -- no witness

24 considered whether or not in a HoldCo restructuring, that

25 might be wiped out or subordinated by a creditor's committee.

1   No one has considered that.  That tells me that people are

2   not focused -- or maybe they are -- on the extent to which --

3   well, let me rephrase that.

4           These are clearly equity contributions.  There was

5   ring-fencing.  So these are -- I'm just going through the

6   list of reasons why we think we have demonstrated this was

7   done for the benefit of the shareholders.

8           I first described the extent of their investment,

9   the type of their investment.

10          Secondly, if you look at the ring-fencing that

11  took place, the intercompany loan has a lien on previously

12  unencumbered property that no longer competes with lease

13  liabilities.

14          The ring-fencing gives the convertible

15  noteholders, who are also the shareholders for the bridge

16  loan, a new obligor with no competing guarantee obligations.

17          We've shown you the emails talking about -- I'm

18  not going to go over them again -- how the CEO said that this

19  was a way to create shareholder value.  Shows you an email

20  from Mr. Nelsen saying, "After we clean up the sites, we get

21  $200 million dollars in EBITDA."  You may have remembered

22  that.

23          I asked Mr. Montone, "If you don't reject the

24  leases, do you get $200 million dollars in EBITDA?

25          "You don't."

1          Obviously, the shareholders are the beneficiaries

2   of that.

3          I just showed you Mr. -- the 8VC write-up which

4   says, "We moved assets away from creditors."

5          That clearly is to the benefit of shareholders.

6          If you look at the Q&A -- let's go to Slide 17.

7          This was the document we went over this morning.

8   It's Mr. Marth.  And these are Q&A, samples from the Q&A.

9   And if you look at some of the considerations, this was

10  clearly on somebody's mind.

11         Look at 26.  Isn't this just a maneuver to allow

12  Resilience investors to preserve their equity at the expense

13  of a creditor group?

14         Somebody thought of that.  Somebody thought of

15  that as a consideration.  They did it for a reason.  Look at

16  the other things that they went over.

17         Is it a Texas two-step?

18         Is Johnson & Johnson implicated?

19         So these were clearly there on their mind.

20         And then if you look at the testimony we heard

21  from Mr. Marth this morning -- let's go to Slide 21 -- I

22  asked him:

23         "What's better?  You had two options in your mind.

24  What's the better path forward to create value for

25  shareholders, the divisive merger or what's happening or a

1  HoldCo restructuring?"

2          And he said, "The divisive merger."

3          He conceded that point.  So I'm running out of

4  time.  I do have to make two more points, too, Your Honor.

5          The first one is I want to talk about fraudulent

6  transfer.

7          And t's important because it's not been precisely

8  defined -- you can take the slide down -- our position has

9  not been precisely defined.

10          We, as the movants, do not have to prove

11  fraudulent transfer.  We don't have to prove it to prevail

12  under 1112(b).  The debtor has the burden of proving that

13  they filed the case in good faith.

14          And there's been a lot of effort to focus on the

15  corporate transactions and whether they were fraudulent

16  transfers.

17          There was an expert submitted by the nondebtor

18  affiliates.  There's -- there was an -- the -- the attempt to

19  make that the focus has pushed.  But, again, we don't have to

20  disprove.  We don't have to show that those transactions are

21  not fraudulent transfers to prevail.  We have to show the

22  case was filed in good faith.

23          And our position has been from the beginning and

24  remains to this day that you cannot show good faith because

25  of the integrated decision, saying you can't file just to get

1   the cap because of LTL, which says you can't split GoodCo

2   into BadCo.  That's an indicia of good faith.

3          LTL doesn't meaning the phrase "fraudulent

4   transfer."  Doesn't come up.  It's not relevant.

5   GoodCo/BadCo, I don't have to prove fraudulent transfer when

6   it's obvious that they split the companies in half.

7          That clearly happened here.

8          PPI, which is the debtor's case, there's no

9   discussion of fraudulent transfer in that case.  It's a pre-

10  integrated decision of an existing operating business, and

11  it's a discussion about statutory impairment versus plan

12  impairment.  It's not a justification for the filing.

13         So we can stop there.  You can rule on the motion

14  to dismiss by looking at those cases and never thinking about

15  whether or not a fraudulent transfer has happened here. The

16  case would be dismissed on those authorities alone.

17         Our point has always been that in addition to all

18  of that, you have one other fact that makes this case even

19  more on the other side of those decisions; and that is from

20  the Cobalt perspective, look at the financial condition of

21  the company when it was engineered into existence, and look

22  at 372 versus 41.4.

23         Those numbers are way out of whack.  You want to

24  call that a fraudulent conveyance, call it a fraudulent

25  conveyance.  You want to say it is manufactured financial

1  distress, say it is manufactured financial distress.

2          You don't -- you don't ever have to get to whether

3  it's a fraudulent transfer. You have so much authority before

4  that.  But it's worth mentioning that you have an additional

5  bad fact here that that could be a fraudulent conveyance.

6          And if it is, that means you file for bankruptcy

7  to bring it into kilter.  So it's an additional issue, but

8  you never have to get there.  Look at Integrated, look at

9  LTL, look at Rent-A-Wreck, and on that basis alone you can

10  dismiss the case.

11          And I'm going to close with this, Your Honor.  I

12  just think -- not to read laboriously from a case, but I

13  think Judge Silverstein nailed it in the first paragraph of

14  her decision, and I'm going to close with that.

15          Because I asked you in -- I said in the beginning

16  I think this case should be prior for a proposition, and I

17  just -- she says in Integrated -- and I'm reading 580

18  Bankruptcy Reporter, 364 at 366 -- and this is the last thing

19  I'll say.

20          It says:

21          In Integrated Telecom Express, the Third Circuit

22  theorized and rejected the idea that any entity willing to

23  undergo a bankruptcy proceeding could lawfully take advantage

24  of the redistributive provisions of the United States

25  Bankruptcy Code.  The Court recognized that provisions like

1  the capping of claims, the discharge of debts and avoidance

2  powers can only be used by financially distressed debtors

3  whose goals further the structure and the purpose of the

4  code.

5          After examining the record in this case under the

6  good-faith standard enunciated in this Circuit, I conclude

7  that these bankruptcy cases are concrete examples of the

8  hypothetical cases envisioned by the Third Circuit, debtors

9  filed these cases because they could.  These privately owned

10  debtors are not in financial distress, or at least they have

11  not proven they are, and they seek to use 11 USC 365 to

12  redistribute value from a long-time adversary to enrich their

13  ultimate shareholder.  Accordingly, I grant the motions to

14  dismiss."

15          So it's pretty close to being on point here, we

16  are the landlords, we are not a long-term adversary.  And the

17  point that really resonates is, this case was filed because

18  they could.  It's an opportunity that the shareholders have

19  taken to try and create value, and it should be dismissed.

20          Unless you have any question for me, Your Honor, I

21  cede the podium.

22          THE COURT:  Thank you.

23          MR. TECCE:  Thank you very much for listening.

24          MR. FOX:  Good afternoon.  May it please the

25  Court, Tim Fox on behalf of the United States Trustee.

1          As Your Honor might have noticed, we changed the

2     batting order from opening statements, this way I'm not at

3     the tail end and asking for more time.

4          I -- I don't expect to take as much time as Mr.

5     Tecce or Mr. Martin will, who will follow up after me, but I

6     did want to start with the point that Mr. Tecce just raised,

7     and that's that in deciding Rent-A-Wreck, that was a case

8     that I was also personally involved in, the facts there at

9     the outset were very different than what you might see here,

10    where it's clear that the parties have identified that

11    Bedmar, LLC is an entity born to file bankruptcy.

12         That involved an operating company that at least

13    had a plausible sheen of needing to restructure business

14    operations.  And that's not something that is in the fact

15    that Your Honor has to consider with respect to Bedmar, LLC.

16         I'll start with the proposition that the code

17    doesn't define good faith for us, and so that is why we must

18    focus on the decisions from the Third Circuit and other

19    controlling law to inform what should be the result here on

20    these motions to dismiss.

21         The Third Circuit identifies that there are two

22    lines of inquiry for the Court. The first is whether or not

23    there was a valid bankruptcy purpose; and the second is if

24    the cases were filed to obtain a tactical litigation

25    advantage.

1          With respect to Bedmar, LLC, the valid bankruptcy

2   purpose prong is not satisfied.  As discussed at length in

3   Mr. Tecce's argument, Integrated Telecom provides that using

4   Section 502(b)(6) in order to cap lease damages is not on its

5   own a valid bankruptcy purpose.

6          When you look at filing to obtain a tactical

7   litigation advantage, I think that is also implicated by the

8   facts here in that this is an orchestrated maneuver in order

9   to cleanse the liabilities of Bedmar, LLC and the National

10  Resilience enterprise more generally as it recalls to these

11  seven landlord locations that are sought to be paid through

12  the 502(b)(6) lease cap.

13         A further issue that gets added on to that is the

14  inclusion of the guarantees through the merger of Bedmar

15  HoldCo, LLC, which implicates whether or not this case is

16  improperly seeking to avoid Section 524(e) in providing a

17  discharge to parties beyond the Chapter 11 debtor.

18         As the Supreme Court in Harrington v. Purdue

19  identified, it is the debtor that can win a discharge of its

20  debts if it proceeds honestly and places virtually all of its

21  assets on the table for its creditors.

22         Bedmar, LLC, again, was born in order to deal with

23  these liabilities and was funded a predetermined amount in

24  order to satisfy the capped amount under 502(b)(6), nothing

25  more, nothing less.

1          The debtor, again, is not preserving any going-

2    concern value for Bedmar, LLC.  The relevance of National

3    Resilience and its concerns about its ongoing business

4    operations, while informative, are not controlling as to

5    whether or not Bedmar, LLC was filed in good faith.

6          The testimony during this trial is that the value

7    for the debtor is finite and was determined by its affiliates

8    who seek the benefit of the debtor's filing to their own

9    objectives.

10          Integrated Telecom already stands for the

11    proposition that seeking to use a particular provision of the

12    code doesn't on its own establish good faith.  And the

13    equitable limitations of Chapter 11 are identified as being a

14    gating issue as to whether or not a particular strategy would

15    qualify as being good faith.

16          That is similar to the Third Circuit's decision in

17    SGL Carbon, which was also informative.  And in LTL, the

18    Third Circuit, once again, cited approvingly Integrated

19    Telecom identifying that those principles hold true even when

20    faced with a newer flavor to this exercise in light of the

21    divisive merger that has created Bedmar, LLC with respect to

22    this Chapter 11 debtor.

23          In opening statements, Mr. Merchant had identified

24    whether or not Primestone, as an analytical framework, had

25    survived the Third Circuit's decision in LTL.  The US Trustee

1   would contain [sic], contend, excuse me, that Primestone is

2   still well in effect.

3            Again, when looking at LTL, you're faced with a

4   concern on the GoodCo/BadCo dynamic as well as the funding

5   agreement, which calls into question financial distress.

6            Determining good faith for a Chapter 11 filing is

7   identified as being a non-exhaustive exercise where the Court

8   can entertain a number of factors.  Judge Walrath, in looking

9   at those in Primestone, contended with the various issues in

10  terms of filing on the eve of foreclosure or otherwise

11  frustrating the efforts of creditors.

12           But as indicated in paragraph 37 of my office's

13  motion, we think on balance those factors do apply here, and

14  apply to the result that the petition was not filed in good

15  faith.

16           In LTL, the Third Circuit approvingly cited Bepco

17  or 15375 Memorial Court, which also approvingly identifies an

18  examination of the totality of facts and circumstances; and

19  identifies a concept of looking at a case filing on a

20  spectrum of those clearly acceptable to those that are

21  patently abusive.

22           Again, while we understand that the professionals

23  on the other side believe that this was a path that they

24  could pursue and don't call into question any of the personal

25  motivations of the parties that have commenced this Chapter

1  11 case, when looking at the circumstances, the finite assets

2  of the debtor, the use of Section 502(b)(6) as a sword, the

3  benefit to nondebtor affiliates, the US Trustee contends that

4  this is more clearly on the spectrum towards patently abusive

5  than it could be considered to be clearly acceptable.

6          Again, there's no specific test for financial

7  distress that was set out.  And, again, in looking at LTL, as

8  some of Mr. Tecce's comments identified, the outgrowth of

9  that decision is now that parties that are looking to

10 creatively solve problems with the Chapter 11 filing aren't

11 going to place unlimited funds in the debtor's possession to

12 satisfy claims in full because, as the Third Circuit

13 identified, that's a ticket to dismissal.

14         Here again, this finite pool is targeted and

15 pegged specifically to lease cap rejection damages, as

16 multiple witnesses testified throughout the proceedings of

17 the trial.  And the outcome, again, is that this is

18 manufactured distress.

19         There was a purse string that was oosened to a

20 certain extent for the debtor, and the creditors of this

21 estate, the seven landlords were told, You get what you get

22 under the code and you don't get upset.

23         I further note that some of the assets contributed

24 to Bedmar, LLC, the debtor here, are a receivable that has

25 not yet been funded to the debtor.  Those funds remain at the

1  whims of the nondebtor affiliates.

2           Based on the various bits of testimony that

3  touched on that, while there hasn't been a request for the

4  payment of those funds yet by the debtor, the implication

5  from certain testimony from Mr. Montone or Mr. Marth suggests

6  that unless the outcome of this Chapter 11 case is a

7  disposition of the leased liabilities through the proposed

8  plan or some modified version of that, that those funds may

9  never come available to the debtor; and as a result, again,

10 the outcome should be that this petition was not filed in

11 good faith.

12          Your Honor, unless you have any specific questions

13 about the arguments in my office's motion or any of the other

14 points raised in my comments here this afternoon, I'm happy

15 to cede the podium and allow others to respond.

16          I don't know how long Mr. Martin will take.  If

17 there is any time left in our hour and a quarter, we'll just

18 reserve whatever is remaining for rebuttal.

19          THE COURT:  Understood.  Thank you.

20          MR. FOX:  Thank you, Your Honor.

21          THE COURT:  Mr. Martin.

22          MR. MARTIN:  Hello, Your Honor. I think I've only

23 briefly appeared to talk about what was happening in the

24 other hearing.

25          So Craig Martin from DLA Piper on behalf of the

1  landlords that have been identified by Mr. Applebaum,

2  Harvard, Crowley, and CEGM, or the DLA landlords, as they've

3  been referred to in the pleadings.

4          As Your Honor may recall, I learned how to be a

5  trial lawyer in Texas.  And we were taught that when speaking

6  to a jury, we should always make three points and end with a

7  poem.

8          I'm going to make three points and end with a flow

9  chart, because there's no jury and I think a flow chart would

10 be more useful to you.  So we have those slides here.

11         And the first one, it's all going to be what I

12 submit to you is the analysis that the Court should perform

13 in considering the motions and the responses.

14         Certainly have heard much on LTL and the financial

15 distress.  Before diving into what LTL says specifically, I

16 think it's worth noting as an initial point and somewhat in

17 line with how Mr. Tecce opened that the good-faith finding in

18 the Third Circuit is an objective one.

19         And, in fact, if you look at Footnote 8 in the

20 accompanying text of LTL, the Third Circuit observed that one

21 of the reasons they had the case is because all of the

22 divisional merger cases were being filed in a district in

23 North Carolina where a single judge presided, Judge Craig

24 Whitley, a very good judge.  He is now retired.

25         And Judge Whitley finally decided that maybe it

1  was time for another Court to look at those issues, and he

2  transferred LTL from North Carolina to the District of New

3  Jersey.

4          And in addressing the significance of that, the

5  Third Circuit said that the standard in the Fourth Circuit

6  permitted dismissal only for a lack of good faith and on the

7  debtor's subjective bad faith and the objective futility of

8  any possible reorganization, which is a much more stringent

9  standard for dismissal.

10          And so, the Third Circuit had said, not

11  surprisingly -- that's where all those asbestos cases were

12  filed -- but we have a different standard.

13          And that's why Mr. Tecce said that we're not

14  accusing anyone of any wrongdoing.  We're looking at what the

15  facts and circumstances are under the standard of the Third

16  Circuit case.

17          Turning to LTL, in that case, J&J, Johnson &

18  Johnson, the equivalent of National Resilience, stated goal

19  was to isolate talc liabilities in a new subsidiary so the

20  entity could file for Chapter 11 without subjecting the old

21  company and the entire operating enterprise to bankruptcy

22  proceedings. And two days later, LTL filed the petition for

23  Chapter 11.

24          The evidence here shows a very similar goal, but

25  the purpose was to isolate the lease liabilities to a

1  separate entity to protect National Resilience from them; and

2  six days later, the evidence showed today, the bankruptcy

3  filing occurred.

4       In the LTL case, they went through the different

5  steps that led to the creation of LTL, concluding that the

6  most important step, the merger, allocated LTL responsibility

7  for essentially all liabilities of the old company for talc-

8  related claims.

9       I think the evidence has shown here that, no

10 matter how clear or confusing to people in the room, the

11 steps chart and all the different charts that we have seen,

12 the end result is that Bedmar, LLC, had liabilities that were

13 no longer the responsibility of other National Resilience

14 companies.

15      In LTL, there was something called a funding

16 agreement which the parties entered into.  And that funding

17 agreement was actually in evidence, which allowed the Court

18 and the parties that were litigating the good-faith motion to

19 understand its terms and ts funding.

20      Here, unfortunately, we have a receivable that's

21 listed on the schedules.  The debtors have not -- the debtor

22 has not put into evidence that actual agreement.  We don't

23 know the terms and conditions on which that receivable is

24 collectible.

25      All we heard was some testimony that it is

1  potentially payable on, I think, the effective date or at

2  confirmation, sometime around then.

3         We also don't know what happens if there's an

4  insufficient amount under that funding agreement, other than

5  the independent manager's testimony that it would be his

6  intent to seek to get additional funds to fund any

7  liabilities that were not covered by the initial agreement

8  under the funding agreement.

9         Now, the Third Circuit called that being able to

10 access the ATM, so I think the testimony in this case is very

11 similar to the testimony in LTL.

12        Ultimately, as Mr. Tecce indicated, LTL became, in

13 bankruptcy talk, BadCo and the new consumer became the good

14 company.

15        I think Your Honor asked about -- oh, sorry.

16        In LTL the Court ruled -- the bankruptcy court

17 ruled that the filing served a valid bankruptcy purpose

18 because it sought to resolve talc liability by creating a

19 trust for the benefit of claimants under 524(g) of the

20 Bankruptcy Code.

21        So LTL was filed for the express purpose of taking

22 advantage of 524(g), the channeling injunction.  Bedmar, LLC,

23 was formed for the express purpose of taking advantage of the

24 lease cap liability.

25        I want to turn to the issue related to the

1  financial condition of the debtor and not its affiliate

2  entities.

3          And there is a section, Section D -- I'm using the

4  slip opinion because I like to see it the way Judge Ambro

5  wrote it.  But I think it was on page 110 of the published

6  decision, which talks about only LTL's financial condition is

7  determinative.  And it has a two- or three-page discussion

8  that concludes only the former is in bankruptcy and subject

9  to good-faith requirements.  So only the debtor's financial

10  condition is determinative.

11          That said, the Court does say that when you

12  consider the -- when you consider the financial condition of

13  the debtor, you must consider -- you only consider the

14  affiliated companies' entity for understanding how the assets

15  got to that entity and whether those assets are sufficient to

16  fund the liabilities covered here.

17          And so I think for the purposes of this Court's

18  findings, I think it's appropriate for the Court to find that

19  as the debtor's theme has been throughout this case is that

20  this is going to be a, quote, full-pay case.  That's their

21  intent.

22          The testimony was that because it is a full-pay

23  case, they, therefore, have acted in good faith; and the

24  reason they are a full-pay case is because they have a

25  receivable from affiliated entities that they believe is

1  sufficiently available to fund that full payment.

2           So that is exactly what the funding agreement

3  provided in LTL.

4           So I submit that to the extent that you consider

5  that portion of National Resilience's financial wherewithal,

6  it actually supports a finding that the case was not filed in

7  bad faith for the exact same reason the Third Circuit

8  concluded in LTL that that case was not filed, because of the

9  funding commitment from the new consumer company that was

10 identified in that case.

11          So, Your Honor, essentially, the -- we submit that

12 step one in the flow chart is:  Was this debtor in financial

13 distress?

14          The answer to that is, no, based on the evidence

15 that has been submitted.  And we submit that that could be

16 the end of the Court's analysis; and you could, therefore,

17 dismiss for lack of good-faith finding.

18          If you disagree with us, then you go to the next

19 step in the flow chart.  And that question asks whether there

20 was a valid bankruptcy purpose.

21          I think Mr. Tecce covered the Integrated Telecom

22 case, and it was mentioned by Mr. Fox.  But in that situation

23 -- the -- sorry.  I'm just getting my notes.

24          The look in that case was whether the valid

25 bankruptcy purpose.  Fortunately for our benefit, the case

1  has two points that we'd like to highlight.

2         The first is that it actually deals with

3  502(b)(6).  And it says that filing a case to access the

4  502(b)(6) bankruptcy cap is not a valid purpose.  So pretty

5  well on point there from the Third Circuit.

6         The other benefit of the case is that it spent

7  significant time at length discussing why in a situation like

8  this, and like in Integrated Telecom, the PPI case does not

9  stand for the proposition that you can't take advantage of

10 502(b)(6) as good faith.  And it distinguishes PPI by noting

11 that, number 1, it was at the time of plan confirmation, and

12 so the analysis was a good-faith finding under 1129, not

13 under 1112(b), and that that case stood for the proposition

14 that the debtor can file a Chapter 11 to maximize value and

15 sell its assets to satisfy creditors, while at the same time

16 availing itself of landlords -- of the 502(b)(6) landlord

17 cap.  That's at 123 -- page 123 in the PPI decision.

18        So, in other words, in -- in this case, the

19 evidence shows quite plainly that there are no employees.

20 There are no assets, other than what were allocated.  There

21 are no liabilities, other than what were allocated. There's

22 no business purpose.  There's no need to reorganize.

23        The plan that was proposed disenfranchises the

24 creditors by saying that they're deemed to accept because

25 they're being paid in full.  And if we ever get to the plan,

1    we will identify additional infirmities for Your Honor which

2    suggest that it's, in fact, not a full pay and that there is

3    impairment.

4           But taking the debtor at their words today, the

5    plan is full pay on day one, a plan that nobody votes on,

6    that's deemed to be accepted, and you're going to get more

7    than what you would get outside of state court.

8           And we submit that under Integrated Telecom, that

9    is simply not a good-faith basis to file.  And the Third

10   Circuit was relatively clear on that in the Integrated

11   Telecom case.

12          I think that case has been discussed at length in

13   the briefs.  And, obviously, I'm sure Your Honor will read it

14   and see that it is very precedent to this situation.

15          So, finally, then, Your Honor, if you find that

16   there is some valid bankruptcy purpose to this case and you

17   decide not to dismiss it, which we submit you should, then

18   there's case law that talks about or there are other facts

19   that militate against good-faith finding.

20          If you find that there are, again, you would find

21   that there's not a good-faith finding and you would dismiss.

22          Those cases are -- Mr. Tecce talked about Rent-A-

23   Wreck.  There's another Third Circuit case called Bepco,

24   which talks about some of these issues relatively forcefully.

25

1            That case is interesting because it actually talks

2    about some complex litigation against the debtor and an

3    alterego claim against the parent; and a filing of the debtor

4    bankruptcy case to protect that affiliated entity from

5    potential liability associated with the litigation

6    allegations in the alterego claim.

7            And the Third Circuit says that the funding of

8    money by that parent, contributed by that parent, was not

9    sufficient in a lot of their systemic use of the debtors to

10   protect themselves from litigation liabilities that far

11   exceed their contribution.

12           The evidence here shows if you just take

13   everything on its face value that $372 million dollars is

14   being compromised for roughly 41 -- I apologize if I don't

15   get the precise number, it's in the record.  But the idea is

16   that the contribution here is far less than the ultimate

17   liabilities.

18           And in essence that court -- the Third Circuit

19   again found that the use of the bankruptcy there was the

20   equivalent of a litigation tactic to protect the affiliated

21   nondebtor entities.

22           Bedmar, that Mr. Tecce spoke to, also covers some

23   pretty significant ground -- sorry.  I said Bedmar.  I meant

24   Rent-A-Wreck, I apologize.  I got myself there.

25           And the interesting thing about Rent-A-Wreck,

1  another very good decision written by Judge Silverstein

2  upstairs, is she first talks about financial distress.  I

3  think she did it before LTL.  This is not surprising because

4  she's, I think, been always upheld on appeal.

5          But she then has a section where she talks about

6  the nonfinancial evidence not supporting a finding of good

7  faith.  This is kind of where the flow chart comes from.

8  She's saying that the Third Circuit focuses on whether the

9  petition serves a valid bankruptcy purpose and whether the

10 petition is filed to obtain a tactical advantage.  But the

11 focus does not in any way limit consideration of other facts

12 and circumstances.

13         In that case, she said that the debtor's apparent

14 argument was that the rejection of the agreements under

15 Section 365 that would permit them to stay in business

16 satisfies the bankruptcy-purpose prong of the good-faith

17 analysis.

18         She says she disagrees.  The debtor misconstrues

19 the Third Circuit's words; they left out a portion of

20 Integrated Telecom, and that the relevant inquiry for good-

21 faith purposes is a desire to maximize the value of the

22 debtor's assets.

23         I think it boggles my mind to say that you could

24 engineer a divisional merger, pick which assets and

25 liabilities you put into it, file a bankruptcy case to

1  achieve a prepackaged plan for an entity that will not emerge

2  and not even be liquidated, and in order to take advantage of

3  not maximizing the debtor's assets but simply to take

4  advantage of a capped claim for the purposes of benefiting

5  the other party -- the affiliated debtor's shareholders.

6         The evidence that has come into this trial, it's

7  quite plain, Mr. Tecce went through some of it.  This was

8  done for the purpose of benefiting shareholders.

9         The National Resilient chief executive -- or

10 president, I'm sorry if I get his title wrong -- Mr. Marth,

11 testified that he believed he had a fiduciary duty and that

12 he needed to look out for his shareholders.

13        There were pressed talking points that came into

14 evidence to say that this was the way to preserve value and

15 that somehow this was not like LTL.  There were emails

16 between the private equity sponsors and funders that this was

17 the best way to maximize value for shareholders.

18        The evidence is, in fact, overwhelming that the

19 purpose of this bankruptcy filing is to benefit National

20 Resilience, not benefit Bedmar.

21        Now, certainly they say that they -- that the --

22 that they're actually doing us a favor, that we should just

23 say thank you and like some kind of patriarch, we have been

24 taken care of.  As I heard the testimony National Resilience

25 made the policy determinations.  They decided which creditors

1  would be valued and benefited going forward.

2        They decided that the landlords were not part of

3  that, that the landlords that were assigned to Bedmar, LLC

4  were the ones that should bear the loss so that employees

5  could stay employed so that they could continue to serve

6  their customers, so that they could value their shareholders.

7        That's what the purpose of bankruptcy is.  If

8  National Resilience had filed a full Chapter 11 case, then

9  the creditors collectively, with the Court's oversight and

10  the input of the Office of the United States Trustee, would

11  have collectively made the proper policy decisions based on

12  the law as enacted by Congress.  Not an engineered structural

13  proceeding that allows them to take advantage of only one

14  provision of the Bankruptcy Code.

15        So, Your Honor, that's what I submit is the flow

16  chart.  Was the debtor in financial distress?  If they were

17  not, and I submit they were not, then you should dismiss. If

18  you disagree, is there a valid bankruptcy purpose?

19        I think there's pretty clear case law that trying

20  to take advantage of a single code provision for the benefit

21  of the affiliate is an improper basis to file and is not

22  determined to be found in good faith.

23        LTL referenced 524(g), that was the one they

24  filed.  Integrated, 502(b)(6). Rent-A-Wreck, 365.  Bedmar,

25  502(b)(6).

1        So I think the -- and those are all from Third

2   Circuit cases other than Rent-A-Wreck, and it's pretty

3   overwhelming to me that they would submit that their efforts

4   now somehow in this case is different.  The fact that they

5   want to take advantage of 502(b)(6) to benefit National

6   Resilience is somehow distinguishable from all of these other

7   cases from the Third Circuit over the last 10 or 15 years.

8        But let's look at the evidence and see what we've

9   learned from the evidence.

10        So the first witness was Mr. Montone.  He

11   testified quite clearly that National Resilience came up with

12   this full strategy.  That it was their purpose to achieve

13   National Resilience 2.0, and to take all of the value and

14   benefit from the leases in Ohio and a few other places that

15   they thought would generate somewhere between 800 and 1.2

16   billion in EBITDA, and to preserve that for the benefit of

17   the shareholders.

18        And that the -- and that the nonperforming leases

19   should be rejected and that the only way for them to do this

20   was to put it in bankruptcy.

21        We then have the independent manager who took the

22   stand and said that he signed up to this agreement because he

23   too believed that it would be a full-pay case.  But we

24   learned from him that there have been claims filed in this

25   case to suggest that, in fact, perhaps there's not going to

1   be a full pay; and that while he intends to try to get money

2   to make it a full-pay case, if that doesn't happen, there

3   could be risks and issues that arise going forward in this

4   case.

5           And although no one asked him, I sometimes wonder

6   if he would have made the same conclusion regarding good

7   faith had he known it was, in fact, potentially not a full-

8   pay case.

9           And by the way, Your Honor, I think we also heard

10  the independent manager say that he determined that it was a

11  good faith filing and that he thought it would pass muster.

12          I think it's very important to acknowledge again

13  that the subjective intent of the independent manager is

14  irrelevant to the inquiry.  The Court is the one that makes

15  the determination about whether the facts in this situation

16  satisfy the good-faith requirements.

17          And the Third Circuit has said that that

18  conclusion is the ultimate conclusion of law and they would

19  review that -- they review that on a plenary basis, not on an

20  abuse-of-discretion basis.

21          So while I certainly appreciate and have great

22  respect for the independent manager, I don't think his

23  conclusion about what -- whether this file was filed in good

24  faith or not is relevant to the Court's inquiry.

25          We then had Mr. Marth who testified -- I think it

1  was overwhelming from his testimony -- that he did this to

2  preserve value for his shareholders and to preserve

3  employment for employees.

4         He said that he had a bit of a confusing testimony

5  on -- that this was the best way to do this.  He kept saying

6  this was the best way to do this; and in the alternative, if

7  we filed Chapter 11, we would never survive.  We just

8  couldn't survive.

9         I know all of us in this room have heard that

10  argument before.  It was something that was said with great

11  force for General Motors, Chrysler, which has filed twice,

12  American Airlines, TWA.  Pick your major industry that says,

13  if we file, the consumers won't continue to do business with

14  us, that have, in fact, filed Chapter 11, used the multiple

15  tools and the balancing of rights with its creditors to

16  emerge as a stronger and better company.

17         In fact, American Airlines who filed said -- and,

18  you know, there was concern whether they could survive, they

19  ended up merging with US Airways in Philadelphia, and they're

20  now one of the strongest airlines in the market.

21         So I'm not sure that Mr. Marth's testimony added

22  much beyond clarifying that the purpose of this was done to

23  benefit shareholders.

24         I think we learned from those three witnesses that

25  the entire divisional structure, including the last-step

1   merger which merged the guarantees with the underlying

2   leases, was a National Resilience plan.

3           And although the independent manager that

4   testified that he, in fact, signed the merger documents and

5   that he signed off on that and is the one that made the

6   decision to merge it, I think it was pretty clear from Mr.

7   Montone's testimony that the merger was always part of the

8   steps plan.

9           And so I think it's fair to say that the evidence

10  has shown that National Resilience came up with this

11  divisional merger strategy for the purposes of using 502(b)

12  and capping claims; and that Third Circuit case law

13  overwhelmingly says that is not a good-faith basis for

14  filing.

15          We then had two experts, Your Honor.  We had Mr.

16  Alhale and Mr. Madden. And what I took away from those --

17  that expert testimony is that -- and this is something else

18  that overwhelms me a little bit, is that in transferring the

19  assets, they transferred one guarantee without a matching

20  lease.

21          And so, they have a guarantee that will not be

22  capped because there's no lease corresponding with it to be

23  rejected, because it's currently owned by a nondebtor; and

24  yet, none of the analyses includes the cost or value of that

25  claim that has been filed in these cases.  That's the 1733

1  guarantee.

2          And then I heard the testimony from Mr. Alhale

3  that he used the value of the leases on the balance sheet.

4  He did not include the Crowley guarantee.  And then he went

5  ahead and included the secured debt that was used to fund

6  these cases in the scenario where there would not be a

7  bankruptcy filing to come up with an 11 percent recovery

8  outside of bankruptcy instead of a 32 percent recovery inside

9  of bankruptcy.

10          I think those assumptions are deeply flawed, and

11  do not fairly represent what the actual comparison would be.

12  And I think that the analysis was not credible and did not

13  aid the Court in actually determining whether the case was

14  filed in good faith.  And I respectfully submit that you

15  should severely discount that comparison.

16          Now, I know we made a standing objection to it.

17  And we don't think it should be included at all.  But to the

18  extent that you do include it, I would submit that it should

19  be disregarded.

20          So that's where we are at the end of the evidence.

21  Where does that leave us?  I still think it leaves us

22  primarily with the financial distress factor.  And looking at

23  LTL, there is additional evidence and the Rent-A-Wreck case.

24  Financial distress, there's a line in LTL that says financial

25  distress is not insolvency.  Financial distress is a lot of

1  different factors.

2          And the Court was critical of the bankruptcy court

3  for not considering what it called the debtor's successes in

4  dealing with the LTL litigation.

5          What did the evidence show here?

6          The evidence showed here that there were

7  originally seven leases assigned, but two have been settled.

8  Another settlement was announced at the beginning of these

9  hearings.

10          So if you look at LTL and you consider financial

11  distress, you have to consider more.  The debtor has actually

12  worked out certain of its leases, although the testimony says

13  it would have been impossible to work out leases.

14          They've had some successes.  There's no testimony

15  that there's any litigation commenced by any of the

16  landlords.  There's speculation that there may have been

17  litigation commenced.

18          The only testimony was that there was no

19  consideration of any effort to have an out-of-court workout.

20          I think all the professionals in the room have

21  been involved in very difficult situations.  We've gotten

22  restructuring support agreements.  We've gone to large groups

23  of creditors.  And we've solicited ideas and concepts to get

24  restructuring support agreements signed up that would support

25  a plan.

1          I don't think there's sufficient evidence in the

2  record for the debtor to show that they did not have a valid

3  reason to not try that, that they actually tried it and

4  failed, and that there is an imminent financial distress

5  pending.

6          And that was another thing that was very important

7  in the LTL case, is that the filing was premature.  And the

8  interesting thing is the Court said, maybe some day LTL could

9  have filed.  But they have this funding agreement.  They have

10  this litigation that they're winning.  They have all the

11  successes on settlement.  There's no proof that this

12  litigation is actually bogging them down.

13          And so this is just not a case for bankruptcy.

14  It's really not designed to achieve anything, other than a

15  manufactured cabining of liabilities for the purposes of

16  taking advantage of a single Bankruptcy Code provision,

17  524(g).  So I'm going to find that it was not in good faith.

18          I submit that what I just said stands true, maybe

19  even more in this case, and that it should, I hope, would be

20  a relatively straightforward decision for Your Honor.  I

21  don't want to say "easy" because I've not sat in your chair.

22  But I can only imagine that it's difficult.

23          You have very powerful advocates arguing very

24  difficult concepts that have significant policy implications.

25  From our standpoint, the idea that the 502(b)(6) cap and

1  divisional mergers are going to be paired up and going

2  forward, our leases are going to always be subject to a

3  prepack plan where we don't even get to vote because

4  liability can simply be limited to the 502(b)(6) cap.  You

5  can imagine how that would ripple through the real estate

6  capital markets.

7            And I want to close where Mr. Tecce started in his

8  opening argument, which 600is:  What do we think this case

9  should be cited for?  What do we want in a year, two years,

10  10 years, people to say, In Re:  Bedmar, LLC, the Delaware

11  Bankruptcy Court held as follows, and that allows me to do as

12  follows?

13            Do we want that case to be cited for a proposition

14  that in -- when the evidence matches LTL, Integrated Telecom,

15  Bepco, three well-established Third Circuit cases, that the

16  debtor is not found to have acted in good faith -- has been

17  found not to have filed its case in good faith?

18            It's interesting.  Integrated Telecom says I don't

19  have to find that you acted in bad faith.  I only have to

20  find that you didn't act in good faith.  And the burden is on

21  the debtor to show that they acted in good faith.

22            And I think when you cite this case for that

23  proposition, it follows in a long line of well-reasoned

24  decisions.

25            The contrary citation would be that by finding

1  that this was a good-faith filing, that debtors can now take

2  different kinds of liabilities and put them into a special-

3  purpose entity under the Delaware divisional statute, put in

4  just enough money to fund a restructuring -- not a

5  restructuring -- fund some type of payment to those creditors

6  that is more than they would have gotten in some hypothetical

7  analysis that we have an expert take the stand and say is

8  more than they would have gotten and that the otherwise-

9  significant value of a business enterprise is going to be

10  used by the business and its shareholders while those

11  creditors are flushed out of the system, I think that's a

12  very dangerous precedent.

13          And I would urge the Court not to make it, and I

14  would urge the Court to instead follow LTL, Integrated

15  Telecom, Rent-A-Wreck, SGL Carbon, 1735 Bepco and dismiss

16  this case for not having been filed in good faith.

17          Unless Your Honor has any questions, I'm at the

18  end of my time, and I would cede the podium to the debtor.

19          THE COURT:  Thank you.

20          MR. MERCHANT:  Good afternoon, Your Honor.

21          THE COURT:  Good afternoon.

22          MR. MERCHANT:  Michael Merchant of Richards,

23  Layton & Finger, again, on behalf of Bedmar, LLC.

24          I would like to echo Mr. Tecce's appreciation for

25  Your Honor and your staff and how accommodating you've been

1  over the last month and a half.  We do appreciate it.

2          THE COURT:  Certainly.

3          MR. MERCHANT:  In an effort to make best use of

4  the Court's time, Ms. Uhland, who is counsel to Bedmar

5  Member, Inc., and certain of the nondebtor affiliates, and I

6  have coordinated with respect to our arguments in an effort

7  to avoid duplication.  I'll bat lead-off and address the

8  Third Circuit standard in considering whether a Chapter 11

9  petition was filed in good faith, an application of the

10 relevant facts to such standard.  I'm sure there'll be some

11 overlap in the arguments, but we'll try and do our best.

12         As I mentioned in my opening statement, the Third

13 Circuit standard for assessing whether a Chapter 11 petition

14 was filed in good faith is straightforward.  There's going to

15 be a lot of overlap here.  I think we all kind of agree what

16 the standard is; we just have differences on how it plays out

17 under the facts here.

18         THE COURT:  The application.  Understood.

19         MR. MERCHANT:  But the Court must determine

20 whether the petition serves a valid bankruptcy purpose and,

21 two, whether the case was filed merely to obtain a tactical

22 litigation advantage.

23         Being able to demonstrate a valid bankruptcy

24 purpose under Third Circuit law assumes that the debtor is in

25 financial distress.

1        And while many of the arguments raised by the

2   moving parties has made the financial condition of the entire

3   Resilience enterprise at issue, we know from LTL that the

4   Court should only look to the debtor's financial distress in

5   assessing the factor.

6        So for purposes of assessing financial distress,

7   the only relevant inquiry should be the financial situation

8   of Bedmar, LLC, as of the petition date.  We believe that the

9   evidence clearly demonstrates that the debtor was in

10  financial distress as of the petition date.

11       Indeed, it's uncontroverted that the debtor's

12  assets as a result of the divisions consisted of 42 million

13  in cash and receivables and no less than 372 million in rent

14  reserve liabilities over the life of the leases.

15       This is supported by the testimony of Ms. Weidman

16  and Mr. Sontchi.

17       Each testified as to the amount of the debtor's

18  lease liabilities outside of bankruptcy, exceeding the amount

19  of available cash and receivables.

20       Indeed, Mr. Sontchi testified that based on the

21  limited amount of money available to Bedmar, it did not

22  remotely have the ability to pay the $370 million dollars in

23  liability.  And that's on page 253 of the transcript, lines 1

24  and 4.

25       Mr. Sontchi further said:  "In my mind, Bedmar,

 1  LLC, is definitely in financial distress."  That's on page

 2  252.

 3       And I know there was some discussion as to whether

 4  the independent manager's subjective motivations are relevant

 5  here.  I believe -- I'll discuss that a little bit later.

 6       But I think under the Primestone factors, to the

 7  extent that that is persuasive to Your Honor, that is one the

 8  exact elements under that standard.

 9       Ironically, the moving parties refute that these

10  figures demonstrate a showing of financial distress but

11  flaunt them in support of their overly simplistic view that

12  the divisions constitute potential fraudulent transfers.

13       The evidence also showed the debtor's operations

14  are limited to winding down the underutilized and unoccupied

15  sites and, therefore, has no ability to generate additional

16  income.

17       Mr. Sontchi and Ms. Weidman both acknowledged this

18  in their testimony.  As Mr. Sontchi testified, "I have no

19  source of income other than the interest on the DIP loan."

20  And that's on page 281 of the transcript.

21       The debtor's liabilities consist of contractual

22  liabilities under seven long-term leases.  The debtors

23  stopped paying rent pre-petition under these leases and

24  surrendered possession of each site to their respective

25  landlord.  Accordingly, these are actual noncontingent

1  liabilities with the only uncertainty being disputes between

2  the parties as to the allowed amount of the rejection damages

3  claims.

4          These are not the equivalent of the types of

5  contingent and unmatured talc-related claims that were facing

6  the debtor in LTL.  Liabilities which the Court noted it

7  could not see the debtor having to pay in the foreseeable

8  future.

9          And while we're discussing LTL, it's important to

10 note that the evidence here confirmed that there is no

11 additional funding arrangement in place to provide the debtor

12 with cash beyond the current available cash and receivables

13 amount, funding that would otherwise be available to cover

14 lease obligations above and beyond the capped amounts outside

15 of bankruptcy.

16         The receivable here is intended to fund the cap

17 claims, it's not of an unlimited amount as was -- it's not of

18 the -- surely not in the amount that was available in LTL,

19 and not in an amount sufficient to cover the full rent

20 reserved under the leases.

21         Mr. Montone stated, in support of this, "I do not

22 believe that there is an obligation by anyone to extend more

23 than that."  And that's on page 177 of the transcript.

24         Mr. Montone also confirmed that there is no

25 indemnity agreement in front of -- in favor of Bedmar by the

1  Resilience entities.  That's on page 177 of the transcript.

2         And Mr. Sontchi confirmed that, "There is no

3  written agreement or contract to provide additional funding

4  if the cap claims are allowed in excess of the capped claim

5  amount."  And that appears in multiple spots, page 289 and

6  page 281.

7         So LTL says, look solely at the debtor in

8  assessing financial distress, and that's what we just

9  discussed.

10         But the moving parties say, Oh, no, you can't do

11  that because the debtor's financial distress is a fiction.

12  It's something that was manufactured in connection with the

13  divisions.

14         As an initial matter, the moving landlords are

15  asking this Court to do something that the Third Circuit did

16  not do in LTL: Disregard the effect of the corporate

17  divisions that were performed in accordance with applicable

18  state law.

19         In other words, disregard the allocations of

20  assets and liabilities that was done in accordance with the

21  corporate divisions under Delaware law because we really

22  don't like how that plays out under the test for determining

23  good faith.

24         But what did the Court say about the pre-petition

25  divisional merges in LTL?  The Third Circuit specifically

1  noted on page 105 of its opinion, "No one doubts that the

2  state law divisional merger passed talc liabilities to LTL."

3  That's on page 105 of the decision.

4          The court then went on to state that:

5          "The general expectation of state law and of the

6  Bankruptcy Code is that courts respect entities' separateness

7  absent compelling circumstances calling equity into play."

8          The moving parties use the term "manufacture"

9  implying that the Resilience entities, and not the debtor

10 because it did not exist at the time, created financial

11 distress where it did not previously exist.

12          In other words, the Resilience entities were

13 ringing the bell, but they decided to create this BadCo

14 simply for purposes of unloading these seven burdensome

15 leases.  This is not the narrative that they want the Court

16 to believe, but the evidence couldn't be more the opposite.

17          Mr. Montone provided a lot of evidence on this --

18 a lot of testimony in this regard.  He testified that:

19          "Before acquiring the bridge financing necessary

20 to consummate the corporate transactions, the Resilience

21 entities had only about 15 million in cash."

22          That appears on page 84 in the transcript.

23          He also stated that:

24          "Absent the bridge financing, we would have had to

25 on with the other alternative, which would have been a full

1   Chapter 11 filing for the entire company."

2         That appears on page 84.

3         Moreover, the testimony reflects that the

4   nondebtor Resilience entities had to obtain additional bridge

5   financing in order to, among other things, just pay the

6   amount of the capped rejection damages claim and fund the

7   receivable here.

8         Mr. Montone testified that, "The corporate

9   transactions were predicated upon raising the bridge

10  financing."  That appears on page 84.

11        He again said, "We need to raise the money in

12  order to facilitate the filing," or -- I'm sorry, that was

13  Mr. Marth, which appears on page 48.

14        Thus, the evidence supports exactly what I alluded

15  to in my opening statement.  This is not a situation of

16  creating a GoodCo and a BadCo.  This was a case of a

17  DistressCo forming a slightly less DistressCo.

18        As Mr. Marth stated this morning:

19        "I could bankrupt the entire company and basically

20  signal, in my view, the death of the company, or I could give

21  the landlords 100 percent of their cap claims, and I could

22  preserve the corporation, I could preserve jobs, I could

23  preserve manufacturing here in the United States."

24        And that appears on page 63 of the transcript.

25        Indeed, Bedmar, LLC's financial distress was a

1  direct reflection of the financial distress that existed

2  throughout the entire Resilience enterprise; and not

3  something that was created out of whole cloth for purposes of

4  passing legal muster.

5         The moving parties have not submitted any credible

6  evidence to the contrary.

7         Having demonstrated that the debtor was in

8  financial distress as of the petition date, the Third Circuit

9  standard next requires that the Court determine that the

10  Chapter 11 petition serves a valid bankruptcy purpose.

11        As discussed in my opening statement, we think

12  this element is inextricably intertwined with the showing of

13  financial distress.  As each of the seminal cases where the

14  Court found a lack of proper bankruptcy purpose involved an

15  insolvent debtor.

16        For example, the outcome in LTL was based upon a

17  complete financial distress.  Indeed the funding agreement in

18  place in LTL gave the debtor the right outside of bankruptcy

19  to cause a highly solvent parent to pay it cash up to $61.5

20  billion dollars.

21        As the Court noted:

22        "The agreement provided LTL a right to cash that

23  was very valuable, likely to grow and minimally conditional.

24  And the right was reliable as J&J and new consumer were

25  highly creditworthy counterparties (an understatement) with

1  the capacity to satisfy it."

2          And that appears on page 106 of the opinion.

3          Also weighing heavily into the Court's decision

4  was the fact that the Court found the company's contingent

5  talc liabilities too attenuated and could not foresee the

6  debtor having to pay such amounts in the foreseeable future.

7          And then there is Integrated, where the Court

8  found that the debtor was not in financial distress at the

9  time that it filed its petition.  Rather, the debtor had

10 105.4 million in cash and 1.5 million in other assets

11 available as of the petition date.  The landlords' proof in

12 that case listed a present discounted value of Integrated's

13 lease obligations at approximately $26 million dollars.

14         Their schedules also listed miscellaneous

15 liabilities of approximately $430,000 dollars.  And there was

16 an IPO class action liability but the debtor's liability

17 under that was capped at 5 million because of available

18 insurance.

19         Accordingly, the debtor and Integrated Telecom had

20 cash and other assets of approximately 107 million, and less

21 than 35 million in aggregate liabilities.  As the Court

22 noted, "Thus, Integrated was highly solvent and cash rich at

23 a time of the bankruptcy filing."  That appears on page 124.

24         Indeed every aspect of the Integrated opinion

25 harkens back to the lack of financial distress.  As

1  previously discussed, here the debtor was clearly in

2  financial distress at the petition date.  This is a crucial

3  distinguishing factor between this case and the examples from

4  LTL and Integrated.

5          As we submit that the existence of financial

6  distress is so critical because it creates the basis for the

7  debtor's proper bankruptcy purpose here.

8          In the absence of bankruptcy relief and the

9  implementation of the automatic stay, there likely would have

10  been a race to the courthouse to be first in line to obtain a

11  judgment against the debtor's limited assets.

12          This is exactly what the bankruptcy process was

13  intended to address: Distribution problems arising when

14  individual creditor remedies harm the creditors as a whole,

15  because there's not enough assets to go around.

16          The filing of this case allows for an orderly

17  process of addressing disputes related to purported rejection

18  damage claims; and implementing a distribution structure

19  where all claimants will be paid their full cap claim

20  amounts.

21          As Mr. Sontchi testified, his:

22          "intent in authorizing the filing was to

23  administer this case so that we can manage the disposition of

24  assets, reject leases, transfer the premises back to the

25  landlords and pay all allowed claims in full."

1          That appears on page 270 of the transcript.

2          He further stated:

3          "I was satisfied it would be a good-faith filing.

4  Between the financial distress of the Resilience entities and

5  the ultimate debtor as well the paying creditors in full, I

6  felt that or I thought that I had sufficient information to

7  file the case."

8          That appears on page 259 of the transcript.

9          The objecting landlords, however, argue that there

10 is no evidence of any landlord declaring an event of default

11 or walking up to the courthouse steps.

12         Your Honor, it's unreasonable for anyone to

13 believe that the landlords would sit on their rights here,

14 especially given how they've advocated their positions in

15 connection with this case.

16         But this is not LTL.  These are not contingent and

17 unmatured tort liabilities that may not arise in the future.

18 They are difficult to estimate, and that is one of the

19 purposes of Section 502(b)(6) of the Bankruptcy Code.  But

20 they are noncontingent contractual obligations under written

21 release agreements.

22         Moreover, applicable law does not require a

23 prospective debtor to wait until its creditors are on the

24 courthouse steps before it commences a bankruptcy proceeding.

25         As noted in Integrated, the Court said the

1  drafters of the code envisioned that a financially

2  beleaguered debtor with real debt and real creditors should

3  not be required to wait until the economic situation is

4  beyond repair in order to file a reorganization petition.

5          In LTL, the Court noted although the debtor need

6  not be in extremis in order to file, it must at least face

7  such financial difficulty that if it did not file at the

8  time, it could anticipate the need to file in the future.

9  And we submit that that's clearly the case here.

10         Your Honor, moving on to the next prong in the

11  Third Circuit standard, the second prong is a determination

12  of whether the case was filed merely to obtain a tactical

13  litigation advantage.

14         As I said in my opening statement, we submit that

15  this factor is not relevant here because this case does not

16  involve a two-party dispute.  And this is not the product of

17  a tactic taken in connection with any pre-petition

18  litigation.

19         Moreover, the Court in In Re: Sacks Weston stated,

20  where a valid bankruptcy purpose exists, as is the case here,

21  the Court not need to look to this factor.

22         However, in support of this factor, the moving

23  parties have for the most part recycled their prior arguments

24  in asserting that the filing of the case to take advantage of

25  the 502(b)(6) cap was a litigation tactic and indicative of

1  bad faith.

2          But that simply cannot be the case in light of the

3  Third Circuit's ruling in PPI.  In PPI, the bankruptcy court,

4  Judge Walsh, found that the primary purpose of the petition

5  was to cap a single landlord's claim using Section 502(b)(6).

6          The bankruptcy court went on to state, because

7  PPI's intention to cap Solo's claim using Section 502(b)(6)

8  was not a use of the code for a purpose for which it was not

9  intended.  Indeed, PPI was using Section 502(b)(6) for

10  exactly its intended purpose.  PPI's filing does not violate

11  the good-faith filing doctrine.

12          The Third Circuit, in reviewing this ruling, held

13  that the bankruptcy court did not abuse its discretion.

14          If the PPI acknowledges that filing a case to take

15  advantage of the 502(b)(6) cap with regards to a single

16  landlord did not constitute bad faith, it cannot be that the

17  filing of the case here to address a much larger universe of

18  lease obligations constitutes an impermissible litigation

19  tactic.

20          Your Honor, that really should be the end of the

21  inquiry.

22          Was the debtor in financial distress as of the

23  petition date?

24          Yes.

25          Was there a proper bankruptcy purpose?

1        Yes.

2        Was the filing of the case merely a litigation

3 tactic?

4        No.

5        The movants, however, have raised a few additional

6 theories that I would like to address before conceding the

7 podium to Ms. Uhland.

8        One such theory devised by the moving landlords is

9 that the bad faith exists or an indicia of bad faith exists

10 because the debtor is attempting to use the bankruptcy filing

11 to remedy what otherwise are fraudulent transfers.  There's a

12 multitude of issues with regards to this argument.

13        Perhaps mostly -- first of all is that this is not

14 an issue that should be addressed in connection with the

15 motions to dismiss.  The existence or nonexistence of

16 fraudulent transfer claims is an issue that only need to be

17 addressed at confirmation in connection with the proposed

18 plan releases.

19        But to understand why the fraudulent transfer

20 issue is totally a plan issue, we need to talk a little bit

21 about the applicable LLC statutes that the moving landlords

22 have flipped on their heads a bit. And we're talking about

23 Section 18-217(l)(4) and (l)(5) of the Delaware LLC Act.

24        And I'm not going to burden the Court with reading

25 these provisions in full.  But essentially what they provide

1   is what we saw in LTL:  that the allocations effectuate a

2   proper allocation of the assets, and only the resulting party

3   is liable.  And the surviving or other division parties are

4   not liable unless or for so long as the division does not

5   constitute a fraudulent transfer under applicable law.

6         And then Section 18-217(l)(5) really provides the

7   remedy in the event that that is the situation.

8         And that section provides, In the event -- well,

9   I'll read that one in full.

10        "In the event that any allocation of assets,

11  debts, liabilities, and duties to division companies in

12  accordance with the plan of division is determined by a court

13  of competent jurisdiction to constitute a fraudulent

14  transfer, each division company shall be jointly and

15  severally liable on account of such fraudulent transfer,

16  notwithstanding the allocations made in the plan of division,

17  provided, however, that the validity and effectiveness of the

18  division are not otherwise effected thereby.  Thus, the

19  Delaware division statute makes clear that property allocated

20  under a plan of division is validly bested as allocated.  If

21  allocations are later determined by a Court of competent

22  jurisdiction to have been fraudulent transfers, there can be

23  joint and several liability amongst the dividing and

24  resulting company."

25        So in the event that the allocations are

1    subsequently found to be fraudulent transfer, the debtor

2    would remain liable for such amounts.  The moving creditor

3    would just have the ability to go after the dividing company

4    as a jointly and severally liable party.

5           Accordingly, the fraudulent transfer issue is not

6    a motion to dismiss issue.  It only becomes an issue by

7    confirmation in connection with the Court's consideration of

8    whether the proposed estate releases are appropriate.

9           To the extent Your Honor disagrees and believes it

10   is a today issue, we submit the divisions and related

11   corporate transactions did not constitute fraudulent

12   transfers for the reasons set forth in our sur-reply, and as

13   supported by the testimony of Mr. Montone and Mr. Alhale.

14   Specifically, the divisions cannot constitute transfers if

15   affected creditors were not harmed because their available

16   recoveries actually improve post- versus pre-divisions.

17          The moving parties, however, oversimplify the

18   fraudulent transfer analysis inappropriately issued their

19   arguments.  It is not as simple as stating that the allocated

20   assets were X and the allocated liabilities were more than X.

21   And that appears to have been the sole purpose of Mr.

22   Madden's testimony, in addition to acknowledging that he did

23   not perform an in-depth analysis of whether the divisions

24   constituted fraudulent transfers.

25          Your Honor, the last item I would like to touch on

1   are the Primestone factors.

2          And I heard Mr. Fox in his closing, and he

3   acknowledged my statements in my opening.  We do believe that

4   sort of the application of the Primestone factors have been

5   superseded by Third Circuit precedent.  But then,

6   nevertheless, I'm happy to go through them.  And I do think

7   that they actually favor denying the motions to dismiss in

8   this case, based on the evidence that's been presented in

9   connection with these proceedings.

10          The first factor, is it a single-asset case?

11          This is not a single-asset case. The record

12  reflects as of the petition date, the debtor had cash and

13  significant receivables, leasehold interests in the sites and

14  a 51 percent membership interest in AGS HoldCo.

15          Few unsecured creditors.

16          The debtor has more than a few creditors.  They

17  have seven landlords, two subtenants, a guarantee claim

18  relating to a nondebtor lease.

19          The petition, was it filed on the eve of

20  foreclosure?

21          That's not applicable here.

22          Is this a two-party dispute which could be

23  resolved in pending state court action?

24          This is not a two-party dispute, as was the case

25  in Primestone.  In fact, the district court in Primestone

1    specifically distinguished the case -- the Primestone case

2    from the relationship between PPI and its unsecured creditor,

3    claiming lease rejection damages claims under 502(b)(6),

4    thereby suggesting that the use of Section 502(b)(6) in PPI

5    to address a single lease was appropriate.

6              I know Mr. Tecce argued that the landlords are

7    essentially a single entity here, so this is a two-party

8    dispute, but that just don't hold muster.

9              In fact, they're not acting in unison, as shown by

10   the fact that we've been able to resolve certain of the

11   landlord claims.  They are each separate creditors in their

12   own regard.

13             Another factor:  No cash or income.

14             Well, as of the petition date, the debtor had

15   around $5 million dollars as well as a significant

16   receivable.

17             No pressure from nonmoving creditors.

18             Well, there's no pending litigation as of the

19   petition date, but the debtor had not paid June rent and had

20   notice to surrender each of its seven sites to the landlords.

21   Given the vigor in which the landlords have refuted such

22   efforts in connection with the Chapter 11 case, it's clear

23   that there would have been significant pressure from the

24   landlords had there been a delayed filing.

25             Also, as previously discussed, applicable case law

1  makes clear that a prospective debtor need not wait until the

2  situation is hopeless to seek Chapter 11 relief.

3           Was there a previous bankruptcy petition?

4           No, there wasn't.

5           Was there pre-petition conduct that was improper?

6           The landlord's allegation of improper conduct does

7  not concern the conduct of the debtor.  They relate to the

8  corporate transactions effectuated before the debtor was

9  formed.

10          And as we've argued throughout, we believe that

11  those transactions were consistent with Delaware law and not

12  improper conduct.

13          No possibility of reorganization.

14          Well, the debtor is not trying to reorganize here.

15  There are liquidating cases filed all the time, and clearly

16  the rule cannot be that the case -- that any case that does

17  not involve a reorganization has been filed in bad faith.

18          Was the debtor filed solely to create the

19  automatic stay?

20          No one has alleged that the debtor filed solely to

21  take advantage of the automatic stay.

22          The United States Trustee argues that the filing

23  to take advantage of the 502(b)(6) cap is equivalent, but

24  that interpretation is completely inconsistent with the

25  Court's ruling in PPI, and the Primestone Court acknowledged

1   as much in its ruling.

2              And then finally, subjective intent of the debtor.

3              Notwithstanding argument from my friends, this is

4   relevant under the Primestone factors.

5              And, again, the focus here is on the intent of the

6   debtor, Bedmar, LLC, which is managed by its independent

7   director, Mr. Sontchi.

8              Mr. Sontchi's intent was clear from his testimony.

9   He testified regarding the three things that were most

10  important to him in considering whether to take his role as

11  an independent manager:  Independence; confirming the

12  financial distress of the entire enterprise; and making sure

13  all claims would be paid in full in accordance with the

14  Bankruptcy Code.

15             Moreover, he repeatedly testified regarding his

16  view that:

17             "The Chapter 11 case was the best opportunity for

18  creditors." Because of his view that, "One, there was

19  adequate funding to pay all allowed unsecured claims in

20  full."

21             That appears on page 253 of the transcript.

22             And that:

23             "Creditors were being paid everything they are

24  owed under the Bankruptcy Code, and but for the filing, it

25  was likely that they could be -- they could do far worse, and

1  certainly could not do any better."

2          That's his testimony on page 279 of the

3  transcript.

4          And perhaps the clearest indication of Mr.

5  Sontchi's subjective intent was his testimony that, "I

6  wouldn't file a case I didn't think was going to be filed in

7  good faith under the code."  And that appears on page 271 of

8  the transcript.

9          Your Honor, before ceding the podium to Ms.

10  Uhland, there is one clarification I would like to make

11  regarding something I said on the record in connection with

12  my opening statement.

13          Mr. Martin was kind enough to talk to me during

14  one of the breaks about the Padda decision that I brought --

15  the Padda case that I brought to Your Honor's attention, and

16  I told him I would clarify it on the record because my

17  recollection was slightly off.

18          That case did not involve divisions under the LLC

19  statute under Delaware law.  What it did involve was, they

20  were corporations and it was very similar transactions under

21  Section 251(g) of the Delaware corporate code.

22          And basically what happened there was the

23  liabilities ended up in one entity as a result of sort of a

24  Delaware two-step transaction.  So that was my recollection,

25  which was slightly off, but I didn't want the record to be

1  incorrect.

2          THE COURT:  Okay.  Thank you.

3          MR. MARTIN:  With that, Your Honor, I'll cede the

4  podium.

5          THE COURT:  Just one other point.  I just want you

6  to know that -- you've made many references to transcripts --

7  the Court has no access to those transcripts.

8          MR. MARTIN:  Okay.

9          THE COURT:  I just want you to know that.

10          MR. MARTIN:  Yeah.  And just for point of

11  clarification, and maybe that's an unofficial transcript --

12          THE COURT:  Well, we don't have any, so that's all

13  I wanted you to know.

14          MR. MARTIN:  Those were my references.  To the

15  extent they mean nothing to the Court, ignore them.

16          THE COURT:  I mean, if you would want to provide

17  the Court with the unofficial transcript, that's fine, but

18  I'm just telling you, I don't have it.

19          MR. MARTIN:  Understood. Appreciate that, Your

20  Honor.  Thank you.

21          MS. UHLAND:  Good afternoon, Your Honor.  Almost

22  evening.  Suzanne Uhland of Latham & Watkins, counsel for

23  Bedmar Member, Inc. and the nondebtor affiliates.

24          At this point of the day I think I'll stop using

25  the nameless, faceless moniker "nondebtor affiliates" and

1  just call it National Resilience.

2          They are, as you know, are -- Mr. Marth flew here

3  yesterday and he's in the courtroom, as is Mr. Montone, and

4  we are very proud of the company, and let's go -- we're going

5  to show you a little bit just so you know.

6          Again, this is not -- this is a company that makes

7  medicine.  It is not a company that -- these guys are not

8  balance-sheet engineers.  They're manufacturers.  They have

9  lots of employees, 1500 employees, in the manufacturing

10 business.

11         Now, they were founded during COVID because this

12 was an agreement during COVID -- or an understanding -- a

13 realization by the investors and the United States Government

14 that most drug manufacturers were halfway around the world,

15 and that was not in the best interests of the United States.

16         So they raised a lot of money, everyone was very

17 excited about this.  And as Mr. Marth testified, maybe it

18 wasn't the best leadership, and we know what happened.  It

19 was a good idea, but National Resilience overextended, became

20 saddled with leases it couldn't afford and ran out of money.

21         Now, once the movants realized that my clients

22 were broke, they became very adamant that my client's

23 financial condition not be considered by this Court.  And

24 we're not going to disagree with them.

25         But I would like to point out Your Honor that the

1   LTL case that is -- we're all citing that says that the

2   financial distress of the debtor is relevant, in that case,

3   the Court made that decision because the argument was that

4   the nondebtor affiliates in that case were financially

5   healthy, and the Court said, I'm not going to consider that.

6         So I just want to put that in context, Your Honor,

7   that, yes, their distress is not relevant to the specific

8   standard that I'm going to talk about in a minute, but it

9   really came from a very different place.

10        Now --

11        THE COURT:  So let me ask, you would argue that

12  you should expand LTL?

13        MS. UHLAND:  I am -- I would argue that under the

14  -- well, what LTL told us is, okay, financial distress of the

15  debtor is what matters.  I agree with that.  This Court

16  considers the totality of the circumstances.

17        In that case, the financial condition of the

18  nondebtors informed the Court about the support agreement.

19  And I think in this case, the financial condition of the

20  nondebtors can inform the Court about the lack of any support

21  agreement.

22        So I do think it is relevant to the totality of

23  the circumstances.  That doesn't change what the test is.

24  The test is the financial condition of the debtor but it's

25  not irrelevant to where we are today.

1       So there is a clear and simple standard in this

2   case.  And, Your Honor, after the discovery disputes, the

3   depositions, the last-minute flights, it turns out that there

4   is actually radical agreement on the relevant legal standard

5   here.

6       And let me go to the next slide.

7       The first words out of Mr. Tecce's mouth

8   yesterday:

9       "Your Honor, we have moved to exclude Mr. Alhale's

10  testimony because in our mind -- to our mind the hearing

11  today is to consider the debtor's good-faith filing, and so

12  the relevant question is whether the debtor has a legitimate

13  bankruptcy purpose, and among those considerations is the

14  debtor's financial distress."

15      And we agree with that.  He said that.

16      Mr. Merchant explained why this debtor's

17  bankruptcy case passes and meets that legal standard.

18      The debtor was in financial distress when it filed

19  because it was insolvent.  It simply did not have the revenue

20  to meet its financial obligations.  We would pose, Your

21  Honor, that it was both balance-sheet and equitably

22  insolvent.

23      And the filing served a valid bankruptcy purpose

24  because it prevented the loss of value that would come from

25  the system of piecemeal litigation over rejection damages,

1  and it maximized the value for the landlords who would have

2  recovered far less in any other scenario.

3           Now, the movants can't seriously dispute that this

4  test is met, so they do five other things.

5           First, they misstate the actual holdings of the

6  Third Circuit cases.

7           They create new requirements for what's good

8  faith.

9           They also come up with some new theories about

10 interpreting why the debtor's insolvency doesn't count in

11 this situation.

12          A grab bag of issues that I won't spend too much

13 time about, on other issues that are, at best, plan

14 confirmation.

15          And last, concerning -- they actually engage in

16 scare tactics, Your Honor, suggesting that this Court is

17 going to you know, taint your legacy by the finding of this

18 Bedmar case.

19          Bedmar, Your Honor, you know, not the prettiest

20 word, it's just Bedford and Marlborough, because those were

21 the two leases we knew were going in.  Allston we were hoping

22 to do a transaction with Harvard, and it didn't happen.

23          There was no -- the story that we're hearing, the

24 narrative of this financially healthy company that's dumping

25 assets to manufacture bankruptcy, that's not what went on

1  here.  It was a company that was in severe financial

2  distress, and as Mr. Marth said, he had two bad decisions.

3          Put the entire company in bankruptcy or engage in

4  a more-targeted, value-maximizing, not just for the

5  shareholders, value-maximizing set of transactions for all

6  the creditors.

7          And that is the option that he took.

8          All right.  Now, let's -- I'm going to go very

9  briefly and hit a couple of things about the legal standard.

10 I think Mr. Merchant walked through this.

11         We know on the good faith, the first issue is

12 financial distress.

13         Again, there have been different interpretations

14 of whether they were in distress or not, whether they were

15 perfectly solvent at the time of the division -- let's just

16 say they were perfectly solvent because their assets

17 perfectly balance with liabilities.  Well the next minute,

18 guess what.  They start incurring expenses.  They had

19 property taxes.  They had, you know, hazardous materials that

20 had to be removed from their sites.

21         So they had expenses starting day, one and they

22 didn't have the cash to generate them.

23         It was and is insolvent.  And the hard truth is

24 that the debtor only has the ability to operate because there

25 is a DIP loan that will be forgiven in connection with the

1  plan confirmation.

2            I'll get back to that.  Because that's the equity

3  minus recovery in this case as opposed to the equity benefit

4  of this case.  They've got to put in the money and then

5  forgive it.

6            Now, there is no ATM-like support from National

7  Resilience like there was --

8            THE COURT:  So let me just ask you, then.  So if

9  the debtor doesn't have enough money to pay lease cap claims,

10  what happens?

11            MS. UHLAND:  Well, they have a -- part of the DIP

12  that has not been proved by the Court is an additional $15

13  million dollars that can be used, can be borrowed by debtor

14  and used for the plan -- or claim -- claim reserves or

15  expenses.  They have an incremental amount that can be

16  borrowed that would be forgiven in connection with the plan.

17  It goes above 15.  I think everyone is -- that's where the

18  debtor is.

19            But there's no -- there wasn't just a loosening of

20  the purse strings.  There's no massive financial support, not

21  the least because, you know, -- Resilience doesn't have the

22  money to fund this type of unlimited funding.

23            There's -- the debtor also -- I'm sorry.

24            The movants also point out at one point there's a

25  support agreement.  That support agreement, the Court has

1  actually heard about that in a couple of these cases.  That's

2  being provided.  That's really just an allocation of the

3  property insurance and the some of the services to remove the

4  hazardous waste.

5            The debtor pays the parent entity that actually

6  gets the insurance for the group.  And I'm not sure Mr.

7  Martin was suggesting that this case was like LTL in that

8  regard, but I think that that's supported by none of the

9  evidence.

10            Now, on the valid bankruptcy purpose, Mr. Richard

11  pointed this out as well.  You don't have to be reorganizing.

12  Liquidating companies can have a valid bankruptcy purpose,

13  and Integrated makes that clear.

14            And it sets it out, and I think in a nice way.

15  And I've got this up on the screen here, saying this is what

16  -- in the case of a liquidation, here's how you can get to a

17  valid bankruptcy purpose.

18            And the first one -- and this is the one that I

19  really do like -- is that the basic problem the bankruptcy

20  law is designed to handle, both as a normative matter and a

21  positive matter, is that the system of individual creditor

22  remedies may be bad for creditors as a group when there are

23  not enough assets to go around.

24            They're talking about the system, Integrated is

25  talking about the system of creditor revenues.  It doesn't

1 require that landlords have evicted you or they're dragging

2 you to state court.  It's the litigation system when there's

3 not enough assets to go around.

4          And the other point that Integrated says, well,

5 are you preserving value that would be lost outside

6 bankruptcy?

7          And, again, that's where we are here.

8          If there were no bankruptcy here, one, we don't

9 know that they would even get the funding.  But we have this

10 -- the preservation of value, the company got the funding.

11 They were allocated the money with no obligation to repay it.

12 They've got -- this amount, the 40 million, was allocated to

13 this entity.  And the other surviving entities have to pay it

14 back.

15          So that is a critical amount of value that is

16 being provided here.

17          I won't address the Primestone factors.  I think,

18 you know, I think that they're met in this case.

19          And, again, we think that the Third Circuit has

20 moved on from them.  But, again, we believe that they're met

21 here.

22          Now, let me go on to my next -- the issue that --

23 I read and reread cases.  Maybe I should have other hobbies.

24 But, you know, the LTL case, every time I hear that this is

25 just like the LTL case because it involves a GoodCo and a

1  BadCo and division, I, you know, I go back to exactly the

2  language that Mr. Merchant read.  That wasn't the basis on

3  which LTL was decided.  It absolutely wasn't the basis on

4  which LTL was decided.

5        And there is no per se rule against using division

6  statutes.

7        So let's go to the next slide.

8        So what Cobalt has said is, as if that is not

9  enough of a barrier to Chapter 11, the Third Circuit

10 prohibits corporate machinations to isolate liabilities and

11 protect assets held by nondebtors from bankruptcy.

12       That is the same GoodCo/BadCo that LTL decreed

13 impermissible.

14       But that's not what LTL held.  LTL held that state

15 law should be respected.  And they're talking about the state

16 law of the division statutes, that courts respect the

17 separateness and the property rights established by corporate

18 law.

19       And one of the other things, he says:  It is

20 especially hard to ignore J&J's pre-bankruptcy restructuring

21 -- the ring-fencing talc liabilities and the forming of the

22 basis of this filing -- depended on courts honoring this

23 principle.

24       He goes on to say:

25       "Creative crafting in the law can at times accrue

1    to the benefit of all, or nearly all, stakeholders.  Thus, we

2    need not lay down a rule that no nontraditional debtor could

3    ever satisfy the Code's good-faith requirement."

4             It says the opposite.

5             Now, the truth is that LTL dismissed the case for

6    the reason that the newly formed debtor was not in financial

7    distress.

8             That's what LTL standards for.  And that is not

9    the situation here.

10            Next, the movants distort the analysis in

11   Integrated.  Let's look at this one.

12            All right.  Since the Integrated decision, the

13   Third Circuit has forbidden what the debtor and nondebtor

14   affiliates are asking the Court to countenance.  A filing

15   just to invoke Section 502(b)(6) of the code is not done in

16   good faith.

17            Now, what 502(b) -- what Integrated told us is,

18   okay, if it's just for 502(b)(6), that's not enough.  What

19   PPI tells us is using 502(b)(6) isn't lack of good faith.

20            Now, I got to tell you when I was trying to

21   reconcile this and figuring out how to parse through it, I

22   remembered -- you remember geometry?  You have those proofs

23   and geometry?  And I remember I hated them at the time, and

24   then I had to relearn them when my kids were in middle

25   school.

1          All right.  So I tried to figure that out that

2  way.

3          So why don't we go to the next slide.

4          So -- all right.

5          So PPI says cap is not equal to bad faith, right?

6  PPI is like, okay, we can use our cap.  That's not a bad-

7  faith item.  And equity can benefit.

8          Integrated said, well, if you're only filing for

9  the cap, that's not good faith.

10          But I feel like the movants are going back to the

11  opposite of what PPI said and saying that the cap equals bad

12  faith.

13          That's not right.

14          The reality is the cap is not enough.  You've got

15  to have the cap, valid bankruptcy purpose, financial

16  distress.  You have to have those things.  But just because

17  the cap is there doesn't throw you out of the good-faith

18  formula.

19          Now, the other thing that troubles me is what I'll

20  describe as just sort of the articulation of the Third

21  Circuit's decisions regarding 502(b)(6).

22          And, like I said, I read a lot of cases.  And

23  there's a case that's really -- it's the make-whole case with

24  Hertz, right?  It's not a 502(b)(6) case.  But one of the

25  things I was reading it for other reasons, I got to the end

1 of it, like, gosh, here there's this reference to PPI.

2        What we're hearing from the movants is that

3 502(b)(6) in the Third Circuit can only benefit creditors.

4 That's what they keep telling us.  And that's not the law of

5 this circuit.

6        The law of this circuit is that 502(b)(6) can be

7 used for the benefit of equity.

8        If you want to go to the next slide, let's look at

9 what we have.

10        So in the movants' cases, their assertions, they

11 say, okay, we're here from the DLA landlords.  PPI is

12 factually and legally distinguishable, right because we don't

13 have creditors here.  The debtor has -- here the debtor has

14 no other creditors to maximize value for.

15        And, again, in Cobalt, same argument.  Both

16 objectors rely heavily on PPI with controlling Third Circuit

17 case law. Post-PPI has distinguished that decision on a way

18 that sheds light on the bad-faith filing.

19        But now we go to Hertz, right?

20        Hertz, if you remember, had to do with -- it was a

21 solvent case.  And Judge Ambro said, You know, I'm going to

22 say that this -- you shareholders are getting such a good

23 deal, you've got to pay the make whole, right, even though

24 502(b) -- another 2, I believe -- says no.

25

1        And then he has to reconcile his decision with

2   PPI.  And he says that PPI is -- 502(b)(6) is statutory, not

3   plan apparently.  It's statutory.

4        And that's where he says this.  And this

5   difference explains why PPI, which held that creditors are

6   not impaired when a bankruptcy plan gives them everything

7   they could receive, is consistent with our decision.

8        Now, if you go back to the footnote and he starts

9   talking about it, he says the limitation on damages in

10  502(b)(6) is absolute.

11       And when you go on, he says, at the end here, and

12  that's Hertz in their litigation:

13       "Cannot rely on PPI a decision affirming the

14  capping of lease termination damages against a solvent debtor

15  under 502(b)(6) to argue that our narrow holding there

16  automatically cuts off the solvent debtor's obligation on the

17  post-petition interest."

18       PPI's holding and Hertz confirming it is that you

19  can use the lease cap claim to cap for the benefit of a

20  solvent debtor, for the benefit of equity effectively.

21       Now, this isn't just a theoretical answer.  This

22  isn't like something they just say; right?  Maybe -- this

23  isn't -- these are not the only two cases where this

24  happened.

25       If you want to show the next slide, please.

1          We just did a quick, not exhaustive search, right,

2     okay, but we have PPI, and -- and, like, again, look quickly,

3     you've got other cases in this district on a quick search

4     where you have lease rejection claims that are subject to the

5     cap and recoveries for equity.

6          We've got the Filene's Basement, the Diesel USA

7     case, which is actually very similar to the Bedmar case, they

8     had same scheduled and, of course, Hertz Corporation where

9     they did reject leases, those were capped.  And unlike the

10    make-whole interest, that cap stuck in Hertz.

11         So if you want to take that down.

12         So one of the things that occurred to me when I

13    was reading the reply brief and -- the Cobalt brief said, you

14    know, they have had weeks to come up with countervailing

15    authority to LTL and Integrated, and they found -- or they've

16    cited none, I was thinking, well, why would I cite anything

17    but LTL and Integrated?  LTL and Integrated are my best

18    cases, they give you the cite.

19         They, you know, they we're in good faith, they set

20    out the standard.  Of course we're not going to find other

21    authority, those are the authority.

22         They set out the standard.  The standard is:

23    Financial distress and bankruptcy purpose.

24         All right.  Now, let's talk about these other

25    standards, all right, that are being created here.

1          The first one I'm going to call the gumption

2     standard.  I want to go ahead, I think I've got my gumption

3     standard case up there.

4          We've heard in the opening argument, in the reply

5     brief that -- no, I'm sorry, maybe I don't have my gumption

6     standard case yet.  You can take that one down.

7          That the -- you can't file bankruptcy unless every

8     entity in your organization files bankruptcy, that there's

9     this new requirement that if you put a subsidiary in and the

10    parent isn't in, that's bad faith.

11         That is not the law, Your Honor.  There is no

12    requirement toward, you know -- a requirement of having every

13    single entity in your corporate structure file for

14    bankruptcy.

15         And, again, I'll find the right flag number.

16         We did a very quick, you know, check of the

17    Delaware recent cases, and hopefully they didn't delete it --

18    well, I could represent to you that there are many cases

19    where the parent entity does not file and other entities

20    file.  Subsidiary bankruptcy cases happen all the time, and

21    there's no -- there's not a financial, like -- it makes sense

22    to maximize value sometimes that you don't put every entity

23    in.

24         And I thought one of the things that was

25    interesting when Mr. Martin was arguing, he's, like, Well,

1   you know, when -- you could put all the entities in and, you

2   know, maybe this is like American Airlines and they do okay.

3          Or, you know, then the creditors could help you

4   out.

5          Well, Your Honor, that's not the way Chapter 11

6   works.  That's not the way this country works.  The debtor is

7   in charge of deciding whether to file bankruptcy.  It's a

8   debtor in possession; right?

9          And it's not for the creditors of its subsidiary

10  to substitute their business judgment, or the debtor's

11  management, or the debtor's affiliates, that's not what this

12  is about.  They made the -- the affiliates made the business

13  judgment decision to take certain steps, and then the

14  independent manager made his decision.

15         But there's no blanket requirement of, like I

16  said, this gumption standard that you've got to put every

17  single entity in.  You can have a targeted filing, and

18  moreover, what does that have to do with the good-faith

19  standard?

20         The next standard -- and it's, like, we have kind

21  of gone all over on this one is, like, the whole fraudulent

22  conveyance question.

23         So the first thing we said was a fraudulent

24  conveyance, well, that seems like maybe it's a plan issue,

25  because maybe there are releases in the plan.

1           I don't even know if it's still a plan issue since

2    every single landlord opted out of the releases so now

3    nothing is getting released.

4           But so the fraudulent conveyance, well, they say

5    they don't have to prove fraudulent conveyance.  Well, that's

6    because there's no case out there that says a pre-petition

7    avoidance -- avoidable transfer pre-petition disqualifies you

8    from Chapter 11.

9           If that happened, how many debtors engage in --

10   because they're out of money and they're broke and they have

11   to engage in transactions for which they don't get enough

12   value.  That doesn't disqualify you from Chapter 11.  That's

13   a large percentage of Chapter 11 cases.

14          There's no relevance to good faith with respect to

15   fraudulent conveyance.

16          Now, in his opening and in his papers, the Cobalt

17   -- Cobalt is taking the position that they have this gotcha

18   argument that either if we admit we're -- you know, if the

19   debtor is insolvent and admits it is insolvent, that it's

20   necessarily a fraudulent conveyance and then the case has to

21   be dismissed.

22          But being insolvent doesn't create a fraudulent

23   conveyance.  Being insolvent is one part.  And, you know, the

24   standard has to do with reasonably equivalent value, and

25   whether there are assets available for distribution.

1          So they're citing the wrong standard, reaching the

2     wrong conclusion; and they're just wrong.

3          And the facially fraudulent conveyance argument,

4     I'm not sure what a facially fraudulent conveyance is, but,

5     you know, 372, 42 equals a fraudulent conveyance.

6          You know, fraudulent conveyance is a very, like,

7     legally and factually intensive analysis.  There's no such

8     thing as a facial fraudulent conveyance.  And there's no

9     evidence about this issue.

10         Now -- despite, you know, now they are trying to

11    take the tone, we're not saying anybody did anything bad.

12    You know, we're not -- you know, bad faith is just the legal

13    standard because it's not good faith.

14         But Your Honor the Cobalt reply mentions the word

15    "fraudulent" 33 times, and the DLA landlords mentions it 11

16    times.  If they weren't trying to create the atmospherics of,

17    you know, badness, right, in connection with this analysis,

18    why go that far?

19         Now, the last new rule is the one that I find kind

20    of the most stunning, and that was one is that you've got a

21    Chapter 11 case involving a division, it should be limited to

22    mass torts.

23         All right.  Now, so he's suggesting, if I

24    understand this, that tortfeasors should be treated better

25    under the Bankruptcy Code than entities that can't pay their

1  lease obligations.  You know, where does that come from?

2         So you've got, like, okay in our situation we've

3  got the people that caused the injuries and -- should be

4  treated better than the people who make the medicine to fix

5  the injuries.  So it's so illogical that -- anyway I'll just

6  stop there.  There's no -- like I said, there's no preference

7  for tortfeasors in the bankruptcy system that I'm aware of.

8         The next part of this is that the debtor's

9  insolvency somehow just doesn't count.

10         So one of the ones I heard today was, it has to be

11  due to operations or market conditions.

12         Okay.  What about these tort bankruptcies?  That's

13  not market conditions or operations; right?  That's because

14  they have lawsuits.

15         So that's kind of one question there.

16         And then the other question is, like, what do we

17  mean that you are -- your distress was manufactured?  That's

18  not a term of art.  That's not anything I've ever heard in

19  any case.  And I guess this is what I'll call this -- maybe

20  this is another requirement that you can only have

21  organically grown insolvency to file for Chapter 11.  That's

22  another one that doesn't exist.

23         Now, they don't say exactly what "manufactured"

24  means or "engineered" means.  I think this is just another

25  way to use a pejorative way of describing what they, you know

1   -- what they are describing.  But we take it to mean that you

2   took a solvent entity and you made an allocation and it was

3   unfair.

4           They also uses the word "dump liabilities."  We

5   hear all that.  But we have provided in expert testimony that

6   if you compare the assets and liabilities before and after,

7   the debtor entities actually got the better end of the stick;

8   and it's largely because of the allocation of the secured

9   debt and the absence of any debt on the Bedmar entity.

10          Now, I'm going to stop here just because it's not

11  that important to anything that this Court is deciding, but

12  it just sort of drives me crazy.

13          Counsel for Cobalt keeps saying that the fact that

14  the HoldCo ended up with the convertible debt, that somehow

15  that's a bad thing.  Whenever debt moves from an operating

16  company to a holding company, it becomes junior, we call it

17  structurally junior, because now it doesn't have any assets

18  available for collection unless all the creditors at that

19  lower level are satisfied.  That's the only time that money

20  gets to flow up.

21          So by moving the debt up to the operating -- up to

22  the HoldCo from the operating entities, we were benefiting

23  all of our trade creditors and everybody else.  That wasn't a

24  bad thing.  It was a great thing for the other creditors.

25          It sort of did exactly what Mr. Tecce was

1  suggesting could happen.  It kind of subordinated all of that

2  debt that has come in except for, you know -- there is a

3  secured intercompany note, that's only one time collected.

4  The 135 is just a secured intercompany note, that's -- the

5  only way we can get the money was collateral.

6           But these other amounts are all up at the HoldCo.

7  They're not the operating companies.  They're not hurting the

8  creditors.

9           Now, just on the -- like I said, on the -- what

10 I'll call the grab bag category, you know, the -- we've got

11 this -- the argument that the divisions constitute fraudulent

12 conveyances; therefore, they're not divisions.  Again, that

13 has nothing to do with anything before the Court today.

14          They're wrong about the division statute, and LTL

15 and DBMP that they quote say the Court should look to the

16 state law with respect to the validity of the corporate

17 transactions.

18          Now, on this one here, let's go ahead and put that

19 up.

20          This -- simple, you know, grammar on this one.

21          So in this statute, 18-217(l) says, Debts,

22 liabilities, duties of the dividing company shall be

23 allocated in a manner -- in such manner and basis as provided

24 in the plan of division, and no other division company shall

25 be liable therefore, so long as the plan of division does not

1   constitute a fraudulent conveyance under applicable law.

2           So the phrase "so long as the plan of division"

3   refers to -- right, that's a proviso -- no other division

4   company shall be liable therefore.  So it's talking about a

5   liability issue.  It's not a gating item to engage to have a

6   valid transaction.

7           Now, if that's not enough, 217(l)(5) -- we'll go

8   to the next slide -- makes it absolutely clear, right?

9           In the event that there's an allocation and it's

10  determined by a court of competent jurisdiction to determine

11  a fraudulent transfer, each division company shall be jointly

12  and severally liable on account of such transfer, not

13  withstanding the allocations made in plan of division;

14  provided, however, the validity and effectiveness in the

15  division are not otherwise affected thereby.

16          If you read them together, it is clear:  There's

17  no gateway to doing a division of proving there's no

18  fraudulent conveyance.

19          That's not it.  And it's like, what would the

20  Secretary of State of Delaware do with that requirement?  I

21  mean, they get the forms.  They're filled out.  They record

22  it if it's done properly.

23          You can take that down.

24          Now, the other arguments about their contract

25  language overriding corporate law, that one is another --

1  that's another very challenging transaction.

2         They seem to ignore that there's two kinds of

3  transactions.  There's kind of third-party transactions, like

4  a lease.  And then there's like organic transactions, like

5  related to the formation of an entity, like a merger, a

6  conversion, a division.

7         Those are governed by the state of organization of

8  or formation of that entity.

9         And LTL and DBMP tell us exactly that:  You look

10  to that state law.

11         Now, this may be one of the first cases about the

12  Delaware division statute.  But it's certainly not the first

13  case that is dealing with the effect of a Delaware conversion

14  or merger or division on a contract with third parties.

15  There's an entire set of cases in the -- developed in the

16  Chancery Court.

17         And what they have to do with is, like, okay, was

18  this reverse merger a change of control in someone's

19  contract?

20         You know, was this -- you know, did you have to --

21  was this different type of transaction?  Well, did that

22  trigger a default under the contract?

23         Yes, there are those cases.  And most of them turn

24  on language that is expressed.  They're right there.

25         But what does it mean if there is a change of

1  control default as a result of a merger?

2          It means the contract is in default.  It doesn't

3  undo a corporate merger.

4          The corporate merger happens as a result of

5  Delaware corporate law.

6          Now, you may have a default in the contract, so

7  you don't get the benefit of it.  But it doesn't -- it's not

8  another, like, criteria for a division.  You don't have to

9  disprove that you're -- you know, that there's some -- that

10  you're not in default of any contract in order to have your

11  liabilities allocated in accordance with corporate law.

12          Now, I -- and then, you know, Cobalt then says

13  that the fact that, you know, that there was a breach of the

14  contract, well, that goes into the good-faith finding.  They

15  threw that in in their reply.

16          And this is another one, Your Honor.  If every

17  debtor who had a violation of a contract before they filed

18  got kicked out of bankruptcy, you'd be out of a job.

19          All right.  Now, let me pause and take a minute

20  about the merger and the guarantees.

21          All right.  In the first place, the US Trustee got

22  up again, and they keep talking about, you know, this is

23  being done to eliminate guarantees.

24          How many cases have you been involved with, Your

25  Honor, where you have a multidebtor case where you have a

1  tenant and a guarantor who are both debtors?  It happens all

2  the time.

3           That's, you know, if you have two entities, and

4  that's what could have happened here.  There could have been

5  a Bedmar HoldCo and, you know, and a separate Bedmar, and you

6  would have had the two different debtors.

7           And if anything, this question about the effect of

8  the merger, that's a claim issue.  The question is like,

9  okay, maybe the remedy would be that they have two claims.

10 Maybe they have two -- they would argue that they have two

11 capped claims instead of one capped claim.

12          That's not a good-faith issue.

13          But now, because Ivanhoe is one of my favorite

14 cases and I've done some writing on it, so if you'll bear

15 with me for a minute.

16          So we have Ivanhoe, our lovely Supreme Court case

17 from the '30s.  And I applaud the debtors for finding the

18 LightSquared case because the Ivanhoe case is very terse and

19 hard to read.  And Judge Chapman in the LightSquared case

20 broke it down a little bit better.

21          But the basic rule is this:  If you have a claim

22 against multiple obligors -- it's the same claim, but it's

23 against multiple obligors, you can assert that full claim in

24 each case subject to a single satisfaction.

25          So, Your Honor, if you had three debtors jointly

1  and severally liable for a hundred-dollar debt, you could

2  assert claims in each case, but you don't get to collect $300

3  dollars.  It's one debt.  It's one -- you made a loan for a

4  hundred dollars.  Three people are on the hook.

5          That's what Mr. Holly was trying to say there.

6  There's one damage from a lease termination.  There's a lease

7  termination, and then there's an amount of money that's the

8  663damage, right?

9          And maybe you have two sources of recovery, but

10  it's one claim with two sources of recovery.

11          So what would happen like in a case that wasn't

12  full pay?  Let's say you had a case where the tenant had a

13  30-cent case and the guarantor had a 40-cent case.

14          Well, you'd be entitled to 70 cents because you

15  get to apply -- you have to go in both cases.

16          But if one of the obligors is paying 100 cents,

17  which is the effect of PPI and Hertz, you don't get a double

18  100-cent recovery.

19          And in this circuit, the cap claim is full

20  satisfaction.

21          That's why they would have been in the same place

22  before or after this merger.  They get their claim.

23          They have a single claim.  They have two sources

24  of recovery, but they're paid in full.

25          Now, lastly, Your Honor, it's disturbing to hear

1  this, like, resorting to scare tactics about what's the

2  legacy going to be of the Bedmar case --

3          THE COURT:  Before you get there --

4          MS. UHLAND:  What?

5          THE COURT:  I want to ask you -- I'm sorry to

6  interrupt you -- but one follow-up question with respect to

7  the guarantee issue.

8          MS. UHLAND:  The which one?

9          THE COURT:  The guarantee issue and only having --

10 being able to recover on one claim.  What about -- is it RTP

11 in this case?  That's just a guarantee?

12         MS. UHLAND:  So in that case, in the situation

13 here, the -- in the division, there are -- Resilience US

14 actually divided into five.  So Resilience US, one of the

15 lease -- the lease that went into Resilience US was the Blue

16 Ash lease.  The Philadelphia lease went into ENM.  And the

17 RTP lease, Durham, went into a separate LLC.

18         And the reason those two leases were in their

19 other LLCs is because the company is hopeful that they're

20 going to be able to do a transaction to assign it.

21         So that lease is in full.  They're paying full,

22 and they think that they're going to be able to assign it and

23 the new entity will --

24         THE COURT:  But as things stand right now, if I

25 only look at the debtor, that debtor only has the guarantee;

1  correct?

2        MS. UHLAND:  Right, but it's a contingent claim.

3  You're right.  That is a contingent claim against your

4  debtor.  That is completely true.

5        And so that is another reason we thought, well,

6  you know, we put a lease on the rejection claim or whatever

7  the scheduled claim.  We put zero because it's contingent.

8  They filed a proof of claim.

9        So if you get to confirmation and maybe that lease

10 isn't completely assigned at the time of confirmation, you

11 would have -- you may have to reserve, right, for that claim.

12 That is a possibility.  And that's another reason that the

13 DIP provided that amount.

14       So -- and the other -- the case at law is also

15 clear:  If the guarantor is in bankruptcy, the cap applies to

16 that guarantor.  If just a lease guarantor is in, then the

17 claim against that guarantor is capped, the guarantor debtor

18 of the lease.

19       THE COURT:  And that claim at this juncture, I

20 believe the testimony was it's like $40 million dollars?  Is

21 that right?

22       MS. UHLAND:  The guarantee?  The cap claim is 13.

23 So that would be what would be owed.

24       So that would be -- so, Your Honor, like I said,

25 that's one of the reasons that we thought, okay, maybe

1  there's -- if they don't have it fully assigned, that you may

2  have to address that contingent claim.

3        So.   Now, this isn't a cookie-cutter case; right?

4  But with these -- you're being asked to do, Your Honor, is

5  you're being asked to take a debtor that is insolvent, that

6  its affiliates are insolvent, and that has a valid bankruptcy

7  purpose for filing and basically decide that it's in bad

8  faith because it involved a corporate division, which is not

9  the basis on which LTL was decided; that it involved a cap,

10 which is not the law of this circuit.

11       So who is being asked -- you know, by denying the

12 ability of this debtor to avail itself of Chapter 11, that --

13 that is the more extreme position.

14       If you want to go ahead and put up the last slide.

15       You know, it is -- and I'm going to go back to

16 some of the language that we have cited before in LTL.

17       What they're saying -- what we're hearing them

18 saying is, like, you know, a nontraditional debtor, we don't

19 like the way this smells because there was maybe a fraudulent

20 conveyance, but we don't have to prove it.  It involved a

21 division, and it doesn't involve a tort -- like I said, that

22 one just throws me, how that could be better.

23       And then we looked at what LTL, you know -- what

24 Judge Ambro said.  He said, "We mean not to discourage

25 lawyers from being inventive and management from

1  experimenting with novel solution.  Creating crafting in the

2  law at times can accrue to the benefit of all, or nearly all

3  stakeholders.  Thus, we need not lay down a rule that no

4  nontraditional debtor could ever satisfy this code's good-

5  faith requirement."

6            And, Your Honor, as Mr. Marth testified, it isn't

7  just the shareholders who would lose in a HoldCo bankruptcy.

8  The creditors, these very creditors would lose.  And

9  certainly they could not -- as Mr. Sontchi said, they could

10  not do better than 100 percent on their cap claims.

11            And as Mr. Marth testified, they would likely do

12  much worse.

13            So remember, Your Honor, corporate division

14  statutes are not immoral.  Delaware, following the footsteps

15  of three other states, you could read their legislative

16  history, they wanted to be on the cutting-edge of corporate

17  law because that is important to the state of Delaware.

18            And courts in this district -- although the Padda

19  case was a little bit different, but it was a ring-fencing

20  transaction, it was using another provision, a creative

21  provision of Delaware law, had found, yes, you can use these;

22  you can file in good faith based on this.

23            And good faith is a legal determination but you

24  need to consider all -- a totality of the facts and

25  circumstances.  And based on the actual facts and the actual

1  circumstances here, this filing was clearly in good faith,

2  and we respectfully submit that the Court should deny the

3  motions to dismiss.

4           Thank you.

5           MR. TECCE:  Your Honor, what's our time?

6           THE COURT:  We have five minutes.

7           MR. TECCE:  I'm not going to be five minutes, Your

8  Honor.  I might be one minute.

9           THE COURT:  Okay.  Let me just ask, are multiple

10  people speaking?  I have no problem with that.  I just want

11  to know.

12           MR. TECCE:  I think between myself and Mr. Martin,

13  we're going to split the five -- I assume we're going to take

14  [inaudible].  And this is going to be, like, very quickly.

15           First, Your Honor, I think there has been a lot of

16  discussion of LTL.  At some point -- I'm sure you've read it

17  recently, you'll read it again.

18           The point -- the additional point I'll make

19  without -- that I haven't made before previously is that our

20  arguments is that -- are that this arrangement has the

21  components of LTL and Integrated.

22           And the difference in LTL, the company that was

23  created here walks right into Integrated.  This company was

24  created for the purpose of capping the lease rejection

25  damage, and that's not disputed.  That's the testimony.

1          And if you read -- you'll read LTL or Integrated,

2   and it says, if you file solely to invoke that provision of

3   the code, that they don't find that's good faith.

4          So in this particular case, unlike LTL, the

5   company that was created was -- we move into another layer of

6   problem, which is it was created solely to take care of the

7   cap.

8          And then we have another problem, and I say it's

9   Rent-A-Wreck, but it was created to take advantage of the

10  redistributive provisions of the code.  And that's our

11  argument because, to our mind, it's designed to preserve

12  shareholder value.

13         The second point I'd make, Your Honor, is that I

14  am familiar with structural subordination.  So the -- it is

15  not our argument as it relates to the convertible notes that

16  pre- and post-transaction they went from being, you know --

17  the structural subordination of them changed.

18         It's more nuanced than that.  The notes were

19  issued originally -- and these are the notes that were held

20  by the shareholders, originally issued by National

21  Resilience, Inc.  So they were already structurally

22  subordinated.  They were at the top of the company; all

23  right?

24         My point is more subtle, which is that at the

25  time, they competed with guarantee obligations for whatever

1  was -- value made it to that entity.  And post-transaction,

2  the guarantees are gone.

3         So they're still structurally subordinated.

4  They're still at the top co. They just don't compete with the

5  -- that's my point; all right?  So I'm not saying structural

6  subordination change.

7         And that Resilience Boston no longer had access to

8  Ohio.

9         Again, it's not a structural subordination

10  argument.  It's -- the question is, what are you competing

11  with in terms of competing creditors before and after the

12  transaction?  And our leases have been taken out and the

13  guarantees are put somewhere else.  So that's the point

14  there.

15         On the gumption argument, I -- that's mine.  I

16  almost chuckled.  It's -- I'll own it, that's fine.  I've

17  said the word several times.

18         The presentations to the -- that were made, you

19  know, by the individuals of the companies, very thoughtful.

20  I mean, there's no question about that; right?

21         Even the history, learning the history of the

22  business, all very thoughtful.  But it -- it sounds to me

23  like the First Day hearing for a Resilience bankruptcy case,

24  okay, and that's not what it is.  It's the Bedmar bankruptcy

25  case.

1        And so, you know, the -argument we heard that the

2   landlords will go to the courthouse, and this has to be on

3   the stop that, but by the same time, we're not doing this as

4   a litigation tactic; right?  And I said it is a two-party

5   dispute, and I stand by that.

6        But about Resilience, Your Honor, the shareholders

7   -- and when there's an equity contribution to a company,

8   that's a huge sign that there's value in that company, they

9   clearly see value in Resilience 2.0, and that's why they put

10  money into this business.

11        And if that is so, they're not filing it for

12  bankruptcy to see where that option goes; and that's not a

13  permissible use of the code.

14        The last point, it's a technical one, Your Honor,

15  but it's -- because I'm running out of time.

16        A lot of discussion about PPI.  Your Honor, I refer

17  you to page 14, Footnote 35 of our brief.  Because PPI relies

18  on a case -- distinguishes a case called Caroline, which

19  involves what they call the, quote/unquote, dummy company

20  that was created on the eve of bankruptcy.  I would ask you

21  to pay close attention to that when you're considering these

22  matters.

23        But thank you very much.

24        THE COURT:  Thank you.

25        MR. MARTIN:  Your Honor, on Ms. Uhland's last

1 point -- Craig Martin, for the record, on behalf of DLA

2 Landlord -- she indicated that the Third Circuit did not

3 create a rule, and, indeed, the language on the screen is in

4 the decision.

5        And they, in fact, did not create a rule, but they

6 did create a standard, and that's the standard that we've

7 been litigating and applies.

8        And, in fact, in LTL the Court says that:

9        "While LTL inherited massive liabilities, its

10 column and the assets upon them exceeded any reasonably

11 projections available on the record before us. The attenuated

12 possibility the talc litigation may require to file for

13 bankruptcy in the future does not establish its good faith as

14 of the petition date.  At best the filing was premature."

15        And then Footnote 18, which I would urge the Court

16 to read, then says, if, in fact, the funding later was

17 insufficient, then the question is, did they engage in a

18 fraudulent transfer.

19        And so, the statute that they're relying on 18-217

20 mentions fraudulent transfers, so the fact that we mentioned

21 it 17 and 11 times in our briefs I don't think changes any of

22 the arguments that Mr. Tecce and I made.

23        And finally, I agree with him that you can't have

24 it both ways; you can't say that we're not filing this to

25 avoid litigation, but if we didn't file it, there would be

1  lots of litigation.

2          I think it's pretty clear that as of right now,

3  from a financial distress standpoint, there's no litigation.

4  To the extent that the reason they filed is to stop that

5  litigation, then that's a litigation tactic.

6          And that's just my flow chart: Financial distress,

7  improper purpose, other reason behind it.

8          So I would urge the Court to review that flow

9  chart, think hard about the Third Circuit cases and dismiss

10 these cases for not having been filed in good faith.

11         Thank you.

12         THE COURT:  All right.  Thank you all very much

13 for your arguments.  I appreciate the time and attention

14 you've given this.  I will take it under advisement.  If

15 counsel wants to get me a copy of the transcript, please

16 coordinate with Mr. Lugano.

17         There is one open housekeeping matter, and that

18 has to do with sur-sur-replies.

19         Have the parties discussed that?

20         MR. APPLEBAUM:  Yes, Your Honor. Aaron Applebaum

21 from DLA Piper.  We discussed that with Mr. Stearn, and we

22 agreed that to the extent we need to file a sur-sur-reply, we

23 would file it by the end of the day on Friday.

24         THE COURT:  Okay.

25         Mr. Stearn.

1          MR. STEARN:  Yes, Your Honor. For the record, Bob

2    Stearn from Richards, Layton & Finger on behalf of the

3    debtor.

4          Just to fill out the discussion that I had with

5    Mr. Applebaum on this, and we -- very friendly discussion on

6    this.

7          Obviously, we're fine with them filing the sur-

8    sur-reply to the extent that it addresses the law.

9          But our position was simply, look, to the extent

10   that you address anything that happened at the trial in

11   connection therewith, then, in effect, it is a post-trial

12   brief; and we simply want to address the piece that of their

13   sur-sur-reply that addresses the trial.

14         So I'm hopeful that doesn't happen, because if

15   they file that on Friday and I leave the country over the

16   weekend, that means I'm going to have to work while I'm away.

17         But, nonetheless, we would simply like an

18   opportunity to address any piece of the sur-sur-reply that

19   actually talked about trial.

20            THE COURT:  Mr. Applebaum?

21            MR. APPLEBAUM:  That's fine, because we're not

22   going to address the trial.  It's not a post-trial brief.

23            THE COURT:  I'm going to tell you -- I think I

24   would -- I'm going to tell you what.  I think

25            SPEAKER OFF CAMERA:  I'll commit to the same, Your

1  Honor.

2          THE COURT:  Okay.  Thank you.  I think I was very

3  clear in my ruling.

4          MR. APPLEBAUM:  To the extent that there's new law

5  raised in the sur-reply, we'll address that.  That's it.

6          THE COURT:  Okay.  All right.  Thank you.

7          MR. APPLEBAUM:  Thank you, Your Honor.

8          MR. STEARN:  That would make both me and, more

9  importantly, my wife very happy on vacation.  Thank you, Your

10 Honor.

11         THE COURT:  Okay.  I will just say the longer it

12 takes -- the more you add to this, the longer it's going to

13 take me to rule.

14         MR. STEARN:  Trust me; we're very cognizant of

15 that, Your Honor.

16         THE COURT:  So, I just want to be managing

17 expectations.

18         I thank you all for your time today.  Have a safe

19 travels home, and we'll stand in adjournment.

20         MR. APPLEBAUM:  Thank you, Your Honor, and your

21 staff as well.  Thank you.

22     (Proceedings concluded at 6:04 p.m.)

23

24

25

1                        CERTIFICATION

2            We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                    August 1, 2025

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                    August 1, 2025

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17

18

19

20

21

22

23

24

25