<pre>
1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2
                                  .   Chapter 11
3   IN RE:                        .   Case No. 25-11027 (JKS)
                                  .
4   BEDMAR, LLC,                  .
                                  .   Courtroom No. 6
5                                 .   824 North Market Street
               Debtor.           .   Wilmington, Delaware 19801
6                                 .
                                  .   Thursday, July 24, 2025
7   . . . . . . . . . . . . . . . .   2:00 p.m.

8              TRANSCRIPT OF STATUS CONFERENCE HEARING
9            BEFORE THE HONORABLE J. KATE STICKLES
                 UNITED STATES BANKRUPTCY JUDGE
10
    APPEARANCES:
11
    For the Debtor:          Robert Maddox, Esquire
12                           Robert Stearn, Jr., Esquire
                             RICHARDS, LAYTON & FINGER, P.A.
13                           One Rodney Square
                             920 North King Street
14                           Wilmington, Delaware 19801

15

16

17
    (APPEARANCES CONTINUED)
18
    Audio Operator:          Sean Moran, ECRO
19
    Transcription Company:   Reliable
20                           1007 N. Orange Street
                             Wilmington, Delaware 19801
21                           (302)654-8080
                             Email:  gmatthews@reliable-co.com
22

23  Proceedings recorded by electronic sound recording,
    transcript produced by transcription service.
24

25
</pre>

<u>APPEARANCES (CONTINUED)</u>:

For President and
Fellows of Harvard
College, 92 Crowly
Owner (DE) LLC, and
CEGM Alachua, LLC:          Marc Silverman, Esquire
                           DLA PIPER LLP (US)
                           1251 Avenue of the Americas
                           New York, New York 10020

For Bedmar Member,
Inc.:                      Elizabeth Marks, Esquire
                           LATHAM & WATKINS LLP
                           355 South Grand Avenue
                           Suite 100
                           Los Angeles, California 90071

1                                INDEX

2   MOTIONS:                                              PAGE

3   Agenda
    Item 2: Letter from Debtor to the Honorable J.          5
4           Kate Stickles dated July 21, 2025
            Regarding the Objections and Responses
5           to Discovery Requests of the President
            and Fellows of Harvard College, 92
6           Crowley Owner (DE) LLC, and CEGM
            Alachua, LLC [Docket No. 275; filed
7           July 21, 2025] (the "Debtor July 21
            Letter")
8
            Court's Ruling:                               71
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings commence at 2:06 p.m.)

2           THE COURT:  Good afternoon, everyone.  This is

3  Judge Stickles.  We're on the record in Bedmar, LLC, Case

4  Number 25-11027.  This is the time set aside for discovery

5  disputes.

6           So, I will start with the -- Agenda Item 1 is

7  resolved, correct?

8           MR. STEARN:  That is correct, Your Honor.  May I

9  please the Court, Bob Stearn from Richards, Layton & Finger

10 on behalf of debtor, Bedmar, LLC.

11          We were able to resolve Agenda Item 1.  I would

12 like to thank Mr. Tecce, who reached out to me, took the

13 initiative to do so, so that we could resolve the matter and

14 we were able to do so.

15          So, we can move onto Agenda Item 2, which is the --

16 which was commenced by a letter from the debtors to the Court

17 regarding a discovery dispute we have with the DLA Landlords.

18 And then just to round out what I think is our agenda, there

19 is a matter which does not have an agenda item given its -- I

20 guess that it was recently brought to the Court's attention

21 by a letter late last night and also this morning. There is a

22 discovery dispute between our non-debtor affiliates and the

23 DLA Landlords.

24          With that, I would like to turn it over to my

25 colleague, Mr. Maddox, who will handle the debtors dispute

1  with the DLA Landlords.

2          THE COURT:  Okay, terrific.  Thank you, Mr. Stearn.

3          Good afternoon, Mr. Maddox.

4          MR. STEARN:  Thank you, Your Honor.

5          MR. MADDOX:  Good afternoon, Your Honor.  May I

6  please the Court, Robert Charles Maddox from Richards, Layton

7  & Finger on behalf of Bedmar, LLC, the debtor.

8          Your Honor, I rise today in support of the debtors

9  July 21st, 2025 letter to the Court concerning the DLA

10  Landlords discovery deficiencies and to address their July

11  22nd, 2025 letter response; obviously, as addressed through

12  our letter sent to the Court last night.

13          Does Your Honor have a copy of the letter that we

14  provided last night as well?

15          THE COURT:  I do have a copy.

16          MR. MADDOX:  Okay.  Your Honor, the entities that I

17  will refer to as the DLA Landlords are the President and

18  Fellows of Harvard College, 92 Crowly Owner (DE) LLC, and

19  CEGM Alachua, LLC.  Those parties, the DLA Landlords, have

20  failed to proceed in good faith and discovery in this matter.

21  And let me explain why the debtors feel that way and why its

22  necessary to bring this Court into it today.

23          As reflected in the debtors letter to the Court,

24  what remains at issue are just four interrogatories that

25  relate to the upcoming hearing on the DLA Landlords motion to

1  dismiss the debtors case.  The DLA Landlords are required,

2  under Rules 26 and 33 to respond to those interrogatories and

3  under Your Honor's order providing for expedited discovery in

4  this case.

5        Let's be clear about what the DLA Landlords are

6  asking for from Your Honor.  They're asking for you to give

7  them a total pass on their obligation to respond to the

8  interrogatories but the DLA Landlords have not provided a

9  justification for relieving them of their obligations to

10  comply with the rules nor would relieving them of their

11  obligations comply with the rules.

12        Some background, Your Honor.  On July 7th, when the

13  debtor issued these requests, the DLA Landlords had only

14  recently filed their objections to the debtors rejection

15  motions and their joint motion to dismiss, which was filed on

16  July 3rd.  So, we got these out within four days of receiving

17  the motion to dismiss.

18        The objections and joint motion contain multiple

19  overlapping factual assertions that were levied in support of

20  the DLA Landlords arguments.  So, the debtor did what every

21  litigant does or should do, it looked carefully at what those

22  assertions were, what was disputed and it drafted its

23  discovery based on those specific assertions made by the DLA

24  Landlords in an attempt to understand exactly what was at

25  issue in these cases, what documents and information the DLA

1  Landlords would rely on in making their case with respect to

2  those points.

3         So, let's look at those requests, Your Honor.  Does

4  Your Honor have a copy of the July 21st, 2025 letter from the

5  debtor handy?

6         THE COURT:  I do.  Its -- I do have your letter,

7  yes.

8         MR. MADDOX:  Thank you, Your Honor.  And if you

9  could go to the first exhibit, Exhibit 1, the Harvard

10 response, which is at about page 4, and you will see at the

11 top it says, "President and Fellows of Harvard College's

12 responses and objections to debtors first set of

13 interrogatories."  Are you there with me, Your Honor?

14         THE COURT:  Yes.

15         MR. MADDOX:  Okay.  And if you will go to page 5 of

16 that document, which his about two pages in, you will get to

17 our first interrogatory that is at issue.  Is Your Honor

18 there?

19         THE COURT:  I am.

20         MR. MADDOX:  Identify and describe in detail the

21 basis for your contention that the debtors affiliated

22 companies are "an otherwise solvent enterprise."  The debtor

23 cites two of the DLA Landlords, in this case Harvard's

24 objection at paragraph 1.

25         Now if Your Honor could flip forward about three

1  pages to page 10, you will see interrogatory seven and eight,

2  which are substantially similar but one deals with the leases

3  and the other the guarantee.  They say identify and describe

4  in detail all of the factual and legal basis for your

5  contention that the lease was transferred to the debtor in

6  violation of the lease, that's seven, or, eight, the same but

7  in violation of the guarantee.

8         Last one, I promise, Your Honor.  Flip forward one

9  more page to interrogatory nine, that is if you contend that

10  some or all of the corporate transactions constituted

11  fraudulent transfers then identify and describe in detail the

12  factual and legal basis for your contention including the

13  relief which you believe you are entitled to as a result.

14         Those are the four requests that are at issue.  And

15  it's important to note that none of these are improper

16  interrogatories. They go directly to the issues that have

17  been raised in the DLA Landlords papers and specifically

18  quote for or take from them in order to ask specific

19  questions.

20         Requests one, seven and eight are not improper and

21  they're not contention interrogatories but I'm going to start

22  with interrogatory number one which, you may recall, asked

23  the DLA Landlords to explain the basis for their own

24  contention of fact that they asserted as a matter of fact

25  that the debtors affiliated companies are an, otherwise,

1  solvent enterprise.

2          As we note in our papers, Your Honor, the DLA

3  Landlords must have had a basis for making this contention

4  when they did and they could have simply answered this

5  interrogatory by now and it would have been much more

6  convenient and less expensive for the parties then having to

7  convene this proceeding with the Court.  They did not.  They

8  chose, instead, to proceed by delay.

9          Likewise, interrogatories seven and eight, fairly

10 read, ask the DLA Landlord to provide the debtor with the

11 factual legal basis for their affirmative assertion in their

12 motion to dismiss that the leases and guarantees had been

13 transferred in violation of those documents.  In the letter

14 response, the DLA Landlords state, "The landlords positions

15 are outlined at length in the landlords objections. And the

16 motion to dismiss, based on information provided to the

17 landlords and the debtors filings, at that point in the

18 debtors Chapter 11 case."

19         First, Your Honor, if, in fact, the DLA Landlords

20 positions and everything the DLA Landlords relied on or

21 intended to rely on was included in its papers it would have

22 been a simple task for it to extract that information from

23 its papers, put it into its response and have its client

24 certify those responses. It would be much less expensive and

25 burdensome then the exercise we're going through today.  And

1  it would not have been the first time that a counter party

2  has taken the information and explanations in its pleadings

3  and copied them into interrogatories but the landlord -- the

4  DLA Landlords did not even do that.  Instead, they simply

5  objected.

6          Rule 33 requires attorneys to sign for objections.

7  It requires the client to sign for responses.  And I will

8  note to Your Honor there were no certifications provided with

9  these interrogatory responses, a point I will get to later.

10         Next point, the DLA Landlords assert, in their

11  letter, that the debtor can find answers to these

12  interrogatories in the DLA Landlords papers; see their letter

13  at page 2 and 3.  But the case law is clear, Your Honor, see,

14  for example, Goddard Systems v. Gould, that is at 2018

15  Westlaw 5919742 at Star 1, District of Delaware case from

16  2018, where they say it is improper to respond to

17  interrogatory requests by simply referring to other papers

18  filed in the case.

19         Indeed, Your Honor, the case law goes beyond that

20  to say you can't even respond with deposition transcripts and

21  other papers.  And the DLA Landlords have tried to do that.

22  They improperly invoke Rule 33(d), for example, in responses

23  to seven and eight, to "answer," I'm putting that in quotes,

24  Your Honor, the interrogatory by reference to documents that

25  have been produced in the action or otherwise are going to be

1  produced at some future time.  That is completely improper.

2         Rule 33 permits parties to respond with reference

3  to business records and there can be no dispute the legal

4  motions and pleadings are not business records. Likewise, the

5  reference has to be specific. It does not permit the

6  responding party to point to a pile of documents and say, in

7  fact or essence, go find it but that is what they did.  They

8  didn't even point to documents that had been produced.  They

9  pointed to documents that would be produced in the future.

10        So, the DLA Landlords have violated both

11 requirements, didn't refer to business records, it didn't

12 specify which documents in which we could find the answers.

13 So, to the extent that these could be considered answers to

14 seven and eight they violate the rules.

15        Now taking a step back, much of the DLA Landlords

16 objection is that these are improper contention

17 interrogatories, and I will address that, Your Honor.

18        THE COURT:  Okay.

19        MR. MADDOX:  But here, even if you assume that

20 these are contention interrogatories, which we dispute,

21 courts have held repeatedly a contention interrogatory calls

22 for a narrative response, not a listing of documents.  As

23 IOEngine LLC v. PayPal Holdings stated, the case cited by the

24 DLA Landlords, 2021 Westlaw 12160836 at Star 4, Rule 33(d)

25 has not place in a response to contention interrogatory.  The

1  reason for that is simple, Your Honor, the rules require a

2  narrative response to the interrogatory that is certified by

3  the party.

4        The interrogatory responses are admissible

5  statements; they are not hearsay.  Papers filed with the

6  Court, that the DLA Landlords referred to in their responses,

7  are not admissible; they are hearsay and they are not

8  evidence.  That is an important distinction between having

9  the interrogatory response that provides a narrative and is

10 certified by the plan and having an objection that merely

11 points to other documents.

12       Going back to what I said earlier, Your Honor, if

13 the answer to this interrogatory or others was already laid

14 out in the landlords papers at the time, it could have easily

15 set that out in narrative form and provided that response to

16 the debtor. If it needed to revise later, due to additional

17 information developed in fact discovery, then so be it. The

18 rules provide for and, indeed, require that; Federal Rule of

19 Civil Procedure 26(e).

20       It's worth noting, contrary to the DLA Landlords

21 assertion, the debtors did not seek for them to continuously

22 update their responses.  Rule 26(e) requires updates where,

23 one, there is a material change to a response such that it is

24 incorrect or incomplete or, two, corrective information that

25 has not, otherwise, been produced is not available to the

1  receiving party.  If either of those two were true then the

2  DLA Landlords are required to update their responses. The

3  debtors were not asking for more then that.

4       Now as I mentioned, in response, the landlords main

5  complaint is that these are improper contention

6  interrogatories.  To be fair, Your Honor, we do not believe

7  that they are at least for three of them; number one, number

8  seven and number eight in the Harvard request.  They

9  specifically ask for the facts that support the contentions

10 that were made in the motion to dismiss.  We were looking for

11 a factual support and explanation.

12      Facts are not contention interrogatories and facts

13 supporting them are not contention interrogatories. So, these

14 requests, read fairly, are not contention interrogatories but

15 assuming that they are --

16      THE COURT:  Well, you asked for, right, all of the

17 factual and legal basis.

18      MR. MADDOX:  That support their contention. And by

19 contention, we could have substituted the word "assertion"

20 there.  We weren't really trying to find out what they were

21 contending.  We knew what they contended. We wanted to know

22 what the basis was for the contentions that they made in

23 their papers.  That is why we think they aren't contention

24 interrogatories.  Frankly, Your Honor, based on the case law

25 it doesn't matter because even if they are contention

1  interrogatories, the DLA Landlords are still required to

2  respond.

3         I will give you an example. In expedited

4  litigation, Your Honor, it's important that we get to the

5  meat of accusations quickly.  So, in Fisher Bros. v. Phelps

6  Dodge Industries, that's 614 F.Supp 377 at pages 380 to 81,

7  Eastern Pennsylvania case (1985), later affirmed by the Third

8  Circuit, the plaintiff had filed a motion in late April to

9  enforce a clause of a settlement agreement. The Court

10  scheduled an evidentiary hearing a month later in May.  Prior

11  to that hearing, the Court permitted discovery including

12  contention interrogatories.

13         That makes sense. In expedited litigation the

14  parties need to discern very quickly what the real issues

15  are, what the facts are that are going to support them and

16  they need to address them to the Court.  And the debtor here

17  hasn't engaged in no stone left unturned discovery in this

18  expedited manner.  The debtor asked reasonable pointed

19  explanations from the DLA Landlords for facts and law that

20  they rely on.

21         The DLA Landlords, in response, say, oh, we can't

22  give you these responses because there has not been

23  substantial discovery. That is simply not true,  Your Honor.

24  The debtors completed production of documents over a week

25  ago.  The debtors affiliates have completed production of

1 their documents.  Yes, there are still depositions ongoing

2 and, yes, there are still potential depositions to be had but

3 that doesn't mean discovery isn't near completion.

4    Importantly, what they rely on are cases that say

5 you can't seek "early answers" with contention

6 interrogatories but we're not in early discovery, Your Honor.

7 We're not on the onset of the case.  We're in an approximate

8 month and a half long expedited litigation. It's quite the

9 opposite of the cases they have cited where you have a one

10 year, two year or three-year horizon on discovery and

11 interrogatories are issued at the onset of that litigation.

12    It makes sense then for the Judge to say, okay,

13 wait until we get more information and documents in before

14 you respond to them.  And if you look at the cases they cite,

15 United States v. Education Management or Jordan v. Mera

16 (phonetic), that is the case. These are long-legged cases

17 where contention interrogatories were asserted early in the

18 case and the Judge said you're going to have to wait on

19 those.  Again, we are not --

20    THE COURT:  Well, the time for this case is of your

21 client's making, is it not?

22    MR. MADDOX:  It is.  The timing is of our making. I

23 don't disagree with that, Your Honor.  But also, the rules

24 still apply to this proceeding and interrogatories are still

25 permitted. And we are not asking for them to move heaven and

1  earth. We are simply asking for the interrogatory responses

2  to which we are entitled.  Frankly, the other part that the

3  DLA Landlords continue to push is that this won't materially

4  limit the action but it will, Your Honor.

5         In fact, when we issued these discovery requests

6  and interrogatories we had only the initial pleading and

7  motion filed by the DLA Landlords.  Now, as of yesterday, we

8  have their reply which adds a substantial amount of argument

9  and alleged facts to go with these arguments.  All of it

10  could have been --

11        THE COURT:  With that being said, how would

12  responses at this juncture contribute materially or advance

13  the progress of the case?

14        MR. MADDOX:  Right, and so the -- first, let me

15  step back, Your Honor.  What you are citing is the standard

16  for early contention interrogatories.  Again, we disagree

17  that that is the applicable case law here.  But the answer to

18  your question on how it will materially progress these cases

19  it will prevent the debtors from being surprised at the trial

20  that is coming up on Tuesday with new theories, new facts or

21  new information that the DLA Landlords come up with somehow

22  between now and then.  This why the responses are certified

23  and why they count as evidence.

24        Generally, the potential alternative is something

25  like a 30(b)(6) deposition.  Frankly, the debtors could

1  choose to proceed with a 30(b)(6) deposition but the choice

2  of which to go with is the debtors, the parties asking for

3  the discovery.  Honestly, the choice is between and the

4  interrogatories we pose, we think that the more efficient,

5  less expensive way to get this information is to simply have

6  them draft responses to the questions.  That complies both

7  with Rule 33 and with Rule 26.

8       Let me be clear, Your Honor, Rule 33 permits

9  contention interrogatories. It says, "An interrogatory is not

10 objectionable merely because it asks for an opinion or

11 contention that relates to fact or the application of law to

12 fact."  Here is the important line, Your Honor, but the Court

13 may order that the interrogatory need not be answered until a

14 designated discovery is complete or until pretrial conference

15 or some other time.

16      What it doesn't say is the Court can say they never

17 have to answer it because that is a different rule, Your

18 Honor, that is Rule 26 requires a protective order and

19 requires proof, right, that the burden outweighs the cost.

20 Here, the alternative, potentially, is a 30(b)(6) deposition

21 which the debtor has noticed. In fairness, Your Honor, that

22 would be substantially more expensive and time-consuming then

23 having these entities simply answer the interrogatories as

24 posed.

25      So, Your Honor, with that I will say the debtors

1  requests are proper. The DLA Landlords haven't actually

2  objected to the substance of the requests in their

3  objections, only the timing. These will materially advance

4  the case because they will provide sworn answers as to what

5  the landlords positions are and what the documents are they

6  are going to rely on.

7          This is a basic part of discovery, limiting and

8  assuring that what is being presented to the Court is known

9  to all the parties and is ready to be presented.  We think

10  its fair and if it is, in fact, true what the DLA Landlords

11  say that their positions and documents are already in their

12  papers it's really not that much of a burden,  Your Honor.

13          THE COURT:  So, essentially --

14          MR. MADDOX:  And so unless --

15          THE COURT:  Let me just ask, because I want to make

16  sure I understand you correctly, so, for example, with

17  respect to interrogatories six and seven, which relate to the

18  leases and guarantees, in the motion to dismiss, at

19  paragraphs 39 and 46, DLA Landlords address this contention,

20  right? Its under the heading "Corporate transactions violate

21  the leases and guarantees."  It's your position that you

22  would want them to take the answer or the language that is in

23  that pleading and put it as an answer to interrogatories six

24  and seven?

25          MR. MADDOX:  I'm saying that -- I'm sorry, Your

1  Honor, I didn't mean to cut you off.

2         THE COURT:  No, that is what you would -- the

3  debtors would -- that would be your request in terms of

4  response.

5         MR. MADDOX:  No, not completely, Your Honor. If, in

6  fact, it is the case that those are the DLA Landlords

7  positions, those are the facts on which the DLA Landlords are

8  going to rely, and the debtor client will sign to that, yes,

9  if there are additional facts or information which they have

10  not yet disclosed to us those would be included in an

11  interrogatory.

12         THE COURT:  When is it the debtors anticipate that

13  all the discovery is going to be complete with respect to the

14  motion to dismiss?

15         MR. MADDOX:  Its my understanding that the last

16  deposition likely will occur on Monday.

17         THE COURT:  Okay.

18         MR. MADDOX:  Unless Your Honor has further

19  questions, I am happy to address the DLA Landlords position

20  with respect to the privilege issues as well.

21         THE COURT:  Okay, yes.

22         MR. SILVERMAN:  If I could, Your Honor, I think it

23  might be helpful for us to respond, DLA, to what has been

24  said and then for DLA, who raised the issue of the privilege,

25  to go first on that.

1          THE COURT:  Okay, that's fine.

2          MR. SILVERMAN:  So, I will be quick on the debtors

3   to us.  I think Your Honor  put your finger on the point when

4   you asked how does it advance this case.  Debtors counsel

5   said they disagree with you on the law but if you look at

6   their document letter, Document 275, at page 3, they cite the

7   law that contention interrogatories are appropriate where

8   responses would contribute meaningfully to the case or

9   clarify issues and narrow the scope.

10          There is no question. They know what our

11   contentions are.  Their interrogatories use the word

12   "contention." Its really hard for, I think, debtors to say

13   these are not contention interrogatories and we have

14   explained our theories and we will explain our theories. They

15   served these interrogatories a few weeks ago and I don't know

16   if Your Honor ever got a chance to look at our letter but we

17   asked for an extension to that.  They did not agree.  So, we

18   put in a response on the 18th, on the day they asked for

19   which was like seven days after.  At that time proofs of

20   claim had not been in, we had not received discovery yet.

21          So, to ask us to put our finger on every single

22   document about their solvency and their fraudulent transfers,

23   I think, is just make-work and designed to distract us from

24   lots and lots of work we are all doing this week.  So, the --

25          THE COURT:  What about your response to their

1 | argument with respect to, one, that these are contention
2 | interrogatories, and I think I understand your answer to
3 | that, but, secondly, that because of the timing here its
4 | meaningful contribution or facts supporting or advancing the
5 | progress isn't relevant.
6 |       MR. SILVERMAN:  Well, I think if it would advance
7 | that we would do that and we can do what Your Honor said and
8 | cite them to our papers.  We did that in seven and eight, as
9 | you see in our answers.  We also provided verifications, by
10 | the way.  Mr. Maddox is just incorrect on that.
11 |       THE COURT:  Okay.  You have provided verifications?
12 |       MR. SILVERMAN:  Yes.  They are on D.I. 275 -- 27 --
13 | it comes right after our responses, before our document
14 | responses.  Yeah, 275-1 at page 16, for example.
15 |       THE COURT:  Okay.
16 |       MR. SILVERMAN:  I'm sorry, Your Honor, I lost your
17 | other question.
18 |       THE COURT:  Well, I wanted you to address that and
19 | then I guess the other question is, and I'm paraphrasing Mr.
20 | Maddox, but why should you get a pass?
21 |       MR. SILVERMAN:  Oh, yes, I wanted to address this.
22 | This is not a pass.  Its their burden to issue proper
23 | interrogatories. This is not a proper interrogatory. It seeks
24 | a purely legal conclusion. Solvency and their fraudulent
25 | conveyance, that is just legal conclusion.  We don't want to

1  put those words in our clients mouth. If the Court wants us

2  to do that, we can do and cite to our papers but we didn't

3  think it would be proper to put a legal conclusion in our

4  clients mouths until we got documents that we could -- from

5  them that we could cite to.

6          I think Cobalt did the same thing.  They cited to

7  their papers.  They have apparently now resolved that issue

8  with debtors. I have no idea.  I was surprised to see that

9  because no one reached out to me to discuss that. I assume we

10 could have came to a similar resolution.

11         So, I really think -- you know, and they are, I

12 believe, contention interrogatories which we have already

13 discussed.  So, Your Honor, I think we have spent enough time

14 on this and I am happy to answer any questions that you have.

15         THE COURT:  Okay.  I want to keep moving because I

16 want to rule at the end on all of these issues.

17         Let me ask, Mr. Maddox, if you wanted to -- he

18 looks like he wants to say something further.

19         MR. MADDOX:  Yes, Your Honor. I needed to correct a

20 couple of things.  Two mistakes so far.  It won't be my last,

21 I'm sure, today.

22         First, the last deposition is Friday I have been

23 told.  So, discovery will be done tomorrow.

24         THE COURT:  Okay.

25         MR. MADDOX:  Second,  I see now where those

1  verification are.  That is my mistake.  I am used to seeing

2  them at the end. I missed that; however, since there are non-

3  responses to these interrogatories, it's unclear what that

4  certification is actually certifying to.  As I said,

5  attorneys certify to objections the client to actual

6  responses. These are not actual responses, Your Honor.

7      With that, I -- (Audio stops) -- and either address

8  the privilege issue, if Your Honor would care to hear it.

9      THE COURT:  Yes.  Sorry, I just want to make --

10     MR. SILVERMAN:  Your Honor, I would request that --

11     THE COURT:  I think Mr. Silverman -- go ahead.

12     MR. SILVERMAN:  Thank you, Your Honor. I think we

13  moved on this through letters, so thank you for letting us go

14  first.

15     I would like to cut to the chase on this.  There

16  has been a lot of paper on it. The real issue here is waiver.

17  Debtor has had conversations with Resilience in the same

18  conversation, in the same email, where it says I am adverse

19  to you and we have a common interest.  That you cannot do.

20  Not a single case they cite shows a court approving of two

21  parties who are adverse to each other having one conversation

22  in the same sentence that they have another conversation in

23  which they are adverse to each other.

24     In fact, if you look at Amyris, which they cite, in

25  a related Amyris decision the Court says to the extent that

1  the parties communicate about matters on which they hold

2  opposing interests, those communications lose any privilege.

3  And, of course, the sharing of non-privileged information or

4  documents gains no protection merely because the parties have

5  a common interest. That is 221 Westlaw 12302368 at 1.  In a

6  footnote, the Court also says it is confused about using the

7  word "adversary" because "Preparing for litigation with your

8  adversary is the antithesis of the doctrine."  Debtors put

9  the same in a single sentence.

10         And, Your Honor, can I ask if -- could we put

11  documents on the screen?  Would that be helpful for you?

12         THE COURT:  Yes, it would but I need to make sure -

13  - who -- are you going to put them on the screen, Mr.

14  Silverman?

15         MR. SILVERMAN:  My associate, Roxanne, will do

16  that.

17         THE COURT:  Okay.

18         MR. SILVERMAN:  Now, before she does that, Your

19  Honor, these have been marked confidential by the other

20  parties. So, I don't know if the --

21         THE COURT:  Well, I don't know who has access to

22  this Zoom.  There are, at least, 34 people on Zoom including

23  conference --

24         MR. SILVERMAN:  So, maybe we --

25         THE COURT:  -- and I can't seal the courtroom on

1   this issue.

2           MR. SILVERMAN:  So, perhaps I point you to the

3   documents by the ECF number.

4           THE COURT:  Yes.

5           MR. SILVERMAN:  Its in our letter. The examples are

6   in the back.  I will explain them to you and I will --

7           THE COURT:  Okay.

8           MR. SILVERMAN:  -- not reveal any confidential

9   information there.

10          THE COURT:  Okay.

11          MR. SILVERMAN:  If I do someone, please, stop me.

12  That is not my intention.

13          THE COURT:  Okay.  Mr. Maddox, you had your hand

14  raised. I want to make sure that --

15          MR. MADDOX:  Yes, Your Honor.  Thank you.

16          I just wanted to make sure we weren't going to be

17  throwing up any confidential documents on the screen.

18          THE COURT:  Okay.

19          MR. SILVERMAN:  Your Honor, before we do that, I

20  would like to also point you to 10X Genomics, 505 S.Supp.3d

21  334, "To the extent that the parties communicate on matters

22  on which they hold opposing interest, those communications

23  lose any privilege."  And this is another quote from later in

24  the opinion, "The sharing of non-privileged information or

25  documents gains no privilege merely because the parties have

1   a common legal interest."  The rest of their cases, not a

2   single one allows the cutting in a single email into adverse

3   and common interest; not a single one.

4           Your Honor, if you look at example one, in our --

5           THE COURT:  Okay.  Bear with me a second.  I need

6   to get there.

7       (Pause)

8           THE COURT:  Okay.

9           MR. SILVERMAN:  Your Honor, example one, you will

10  see a sentence, the beginning, I believe, starts with the

11  word "Mike," okay, I don't think that's confidential, but

12  then the first sentence is completely blacked  out.  Do you

13  see that?

14          THE COURT:  Yes.

15          MR. SILVERMAN:  And then there's a comma and then a

16  sentence that's not blacked out.  I don't know how you have a

17  comma that is not talking about the rest of the sentence and

18  how you could have one portion of that sentence be common

19  interest and another portion not common interest.

20          The next one, I think its in example one under

21  Bedmar 2728.  Your Honor, this is an email from --

22          THE COURT:  I'm sorry, could you say that again?

23  What page is it?

24          MR. SILVERMAN:  The next example --

25          THE COURT:  Do you have an ECF number at the top?

1           MR. SILVERMAN:  I think they're sealed, so there's

2    not ECF numbers, Your Honor.

3           THE COURT:  Okay.  All right.

4           MR. SILVERMAN:  I think it comes right after the

5    one I just showed you. So, the Bates on it is --

6           THE COURT:  I have no Bates on mine.  So, what is -

7    - can you say it again what identifying information you

8    provided?

9           MR. SILVERMAN:  Give me one second so I can find

10   the exact page for you.

11      (Pause)

12          MR. SILVERMAN:  All right, so that was example,

13   one, right, which you were with me and that was the first

14   page right after the page that said, "example one."

15          THE COURT:  Yes.  If you identify a date, time

16   sender, perhaps.

17          MR. SILVERMAN:  Yeah, if you turn two more pages,

18   it's at the bottom of a page and it says "Bedmar 2727."  It

19   starts with an email from an LW.com account to an RLF

20   account.  And the only thing on the bottom of the page is

21   that it says Mike Mandy (phonetic).

22          The top of the next page is what I wanted to show

23   you.  There is a black bar that is about a sentence and a

24   half.

25          THE COURT:  Okay.

1          MR. SILVERMAN:  So, this is on Bedmar 2728. This is

2    six pages after --

3          THE COURT:  Right, I see it.

4          MR. SILVERMAN:  -- where I did the pages for the

5    example.

6          THE COURT:  I see it.

7          MR. SILVERMAN:  Thank you.

8          You will see this sentence, again, cuts right in

9    the middle.  There is a but, again, an adjoined clause. I do

10   not see how you could say that one part of that sentence is

11   privileged but the next is not.

12         Your Honor, example three. The page that says,

13   "Example three" and then one, two pages its an email that

14   starts "Thanks, Mandy."

15         THE COURT:  Yes.

16         MR. SILVERMAN:  The Bates is Bedmar 2960.

17         THE COURT:  Yes, I'm there.

18         MR. SILVERMAN:  You will see in this one there is

19   cups in the beginning of the second paragraph and then a

20   hyphen and it says "How," and then there's some more language

21   that's unredacted. Then there is some more redactions.  Now I

22   could keep going, there is more examples in our papers, but

23   that is the point on that, on the waiver in the same emails.

24         Now, the second issue has to do with swords an

25   shields but let me stop there if you want to ask questions.

1          THE COURT:  No, I would like to hear your argument.

2    I'm following you so far.

3          MR. SILVERMAN:  Thank you, Your Honor.

4          The debtor has also selectively redacted things. I

5    mean, you just saw some of that.  Their principle response is

6    that because they have not introduced these documents or said

7    they were going to use them at trial, they can selectively

8    redact them.  That is not the law.

9          If you look at Welded Construction there is -- they

10   talk about sword and shield. The issue is in whether they

11   need to produce it in discovery. We do not have to wait until

12   we are surprised at trial that they're using a part of this

13   and not another part.  We have to see the whole thing.  And I

14   can walk you through examples on this as well.

15         This is -- let me start with saying they have a

16   common interest in.  Debtors say they have a common interest

17   as to, one, the winding down and lease issues; two,

18   organizational documents; and, three, the Chapter 11 case.

19   Yet, you will see in example four, Your Honor, an email that

20   talks exactly about the Chapter 11 case and a PowerPoint

21   about the divisive merger steps that they did not redact,

22   that they did not withhold as privilege.  So, apparently,

23   they want to use this as a sword but shield any other

24   documents regarding the Chapter 11 case.  That they cannot

25   do.

1      Exhibit 5 is another one that goes to winding down.

2  There is a lot in here that is not redacted but some that is.

3      Exhibit 8 goes to winding down and leases.  Again,

4  redactions.

5      THE COURT:  Mr. Silverman, does it make a

6  difference the date of these documents?  Is that relevant?

7      MR. SILVERMAN:  Well, I am not sure it is.  First,

8  on waiver and the fact that they're in the same email it

9  doesn't make a difference.  Two, on selective sword/shield,

10  I'm not sure how I see it makes a difference.

11      Your Honor, again, those are the examples that we

12  have there.  Example nine is another one on winding down

13  which has all of the common interest, yet that is not

14  redacted.

15      THE COURT:  Well, I guess the reason I asked you

16  that is because they're dated before the debtor was created.

17  Does that make a difference here?

18      MR. SILVERMAN:  So, in other words, there was no --

19  there wasn't even a second party to have an interest with.

20  So, its just a straight third-party.  So, yes, Your Honor, to

21  the extent that the debtor did not exist and they are sharing

22  these with straight  third parties, that is just a straight

23  waiver.  So, any documents before June 3rd they could not

24  have a common interest in with a third party being a debtor

25  that did not exist. I will stop there on sword/shield.

1          The only thing left was further discovery

2    deficiencies.  So, if you would like me to stop there, I can

3    do that. They're minor, but privilege issue I have now

4    argued.

5          THE COURT:  Okay.  Right now, I don't have any

6    questions.  Thank you, Mr. Silverman.

7          MR. SILVERMAN:  Do you want me to move onto the

8    other remaining issues or do --

9          THE COURT:  No. You know what, I would like to hear

10   from Mr. Maddox, if I could.

11         MR. SILVERMAN:  Thank you.

12         MR. MADDOX:  Good afternoon, Your Honor. Once

13   again, Robert C. Maddox, Richards, Layton & Finger, on behalf

14   of the debtor.  May I please the Court.

15         I am going to go a little out of order but I am

16   going to address Mr. Silverman's arguments. I will start with

17   his first one that selective redactions in documents somehow

18   operate as a waiver because they are both privileged and non-

19   privileged information within the same document.  Your Honor,

20   that is not surprising to anyone who has ever done discovery,

21   that is how you do it.  Privileged communications are

22   redacted, non-privileged communications are not.  That is as

23   true as for a community of interest or common interest

24   privilege assertion as it would be for a run of the mill

25   attorney/client privilege assertion.

1          The community of privilege interest, as Teleglobe

2    tells us, is a privilege of a community that is a group

3    against the world; that is the privilege is outfacing, not

4    inward.  There is no internal privilege waiver that would

5    occur between parties to a common interest privilege.  It is

6    as if you are discussing in one moment the sale of your car

7    with someone and then in the next with your -- you are

8    discussing the sale of your car with your attorney,

9    completely not privileged information in an email, and then

10   you discuss the terms of the purchase of the car and the

11   terms in it. Part of that is privileged, part of its not,

12   there is no waiver of the privileged part because you didn't

13   redact the unprivileged part.

14          THE COURT:  So, let me just -- I want to make sur

15   that we're clear on this point.  So, is it your position that

16   the DLA Landlords -- and by use of that term I am not -- I am

17   just grouping it.  It's just a term, don't read into that.

18   But by reference to Amyris, where Amyris says to the extent

19   the parties communicate matters on which they hold opposing

20   interest, those communications lose any privilege.

21          MR. MADDOX:  Yeah, those --

22          THE COURT:  You think that they're reading that

23   statement incorrectly?

24          MR. MADDOX:  I think they are reading that

25   statement entirely too broadly, right. It is the specific

1  statements on which the parties are adverse and that is

2  precisely what the debtors have done here. It conforms with

3  practice in this jurisdiction and with discovery generally.

4  The topics that are subject to privilege, and here we have

5  listed them, and he has said what the -- pardon me, what each

6  of the categorical privileges asserted were.

7        If it touched on any of those three categories

8  they're redacted or withheld.  If it touched on the

9  categories where the debtor was adverse  with Resilience, and

10 that includes the DIP agreement where they were specifically

11 negotiating for money from their parent, the services

12 agreement where they were specifically negotiating for

13 services from their parent, and the lease, sale and use

14 agreement, again, where they specifically negotiated with

15 their parent.

16       We can look.  Let's go to the examples that Mr.

17 Silverman was showing us.  We can go back and I can show you

18 exactly what that is.  For ease --

19       THE COURT:  I have marked the pages, so --

20       MR. MADDOX:  Sure.  Let's go to example two.  Here

21 we have an email between counsel that includes advisors and

22 its specifically discussing the amounts of money to be paid

23 and used under the services agreement, right.  The debtors

24 have not asserted privilege over this topic because its not

25 privileged. The parties were adversarial with respect to

1  negotiating these.  So, they did not redact any of this email

2  until you get to page 4 where you will see the big black

3  boxes that are covering over, what YOur Honor might recall is

4  a WIPC, a work in progress chart.

5         Now if you look what is unredacted its services

6  agreement, lease support, and use agreement, and, on the next

7  page, DIP, DIP motion, order, etc.  The remaining boxes are

8  bankruptcy filings and pleadings through which the debtor and

9  their parent, and related entities, Resilience, share a

10  common interest per the debtors assertion because they were

11  not adversarial.  Thus, those have been redacted and that has

12  been true for each of the documents and redactions you see,

13  whether it is a partial sentence redaction, a full paragraph

14  redaction or anything in between.  Where there are redactions

15  its because there are discussions of items that are within

16  the common interest privilege.

17         The debtors were very careful, Your Honor.  We

18  wanted to ensure that we weren't withholding anything that

19  would be not common interest privilege. This took hours,

20  Your Honor. This was not an easy task.  And we could have

21  gone the wrong way and simply withheld these documents and

22  said, no, they're privileged.  They never would have seen or

23  known but we didn't.  We disclosed what is not privileged and

24  that is the appropriate way to do it under controlling law.

25  Those cases are cited in our letter, and I can dig them up if

1 Your Honor would like, but that is the way that these things

2 are done.

3         If you look further in the examples, Your Honor,

4 two, for example, the email on May 16th, that is an email

5 communication between counsel to Resilience and the

6 independent manager without any other counsel on it.  It is

7 not a privileged communication and, therefore, it was

8 produced.  We would have preferred having, frankly, to

9 withhold this document just because it lays out the steps of

10 this merger agreement that has been -- we made such a big

11 deal about it but we didn't, we produced it because it's not

12 privileged communications that have a panoply of common

13 interest parties on it.

14         Likewise, the following example, which they

15 provide, example five, it doesn't actually contain privileged

16 information, which is why it was produced. It simply provides

17 that there is going to be a meeting with the board of

18 directors and explains facts relating to when the meeting is

19 going to occur.  There is no privileged information to

20 withhold; thus, no sword and shield.

21         So, going back to Your Honor's question, tis the

22 debtors position that they redacted these properly because

23 they have.  They have disclosed the communications where the

24 parties were adversarial and this means as, again, Teleglobe

25 says community of interest privilege applies not only in

1 litigation, it applies in situations where parties are

2 engaging in transactional or other sorts of legal

3 enterprises. That necessarily means, Your Honor, the cite he

4 made to the Judge being confused that there would be an

5 adversarial position where parties would be in litigation and

6 doesn't understand how that relates to the common interest

7 privilege but its clear, we're not talking about litigation

8 adversarial in nature; we're talking about adversarial as in

9 making a deal between two parties so that they can get that

10 done.

11      Now, I will point out one case, Your Honor, and

12 that is AgraFresh, Inc. v Essentiv LLC; that's 2019 WL

13 4917894.  And there, two parties had been engaged in

14 discussions about forming a joint venture and an LLC related

15 thereto.  After formation of the joint LLC down the road,

16 certain aspects were challenged and the challenging party

17 said, Oh, your pre-LLC, pre-joint venture communications

18 aren't privileged because you weren't actually in an entity

19 yet; you didn't have an agreement.  And the magistrate judge

20 initially agreed, but the District Court overturned, holding

21 that, in fact, the magistrate was incorrect.  That the

22 companies, in fact, did share a common legal interest prior

23 to the creation of the LLC, because they had determined to

24 work together in order to create that LLC and had done so

25 with their attorneys working together through a common-

1  interest privilege.

2         All right.  I believe I've responded to his

3  points, Your Honor.  If I've missed one, please let me know;

4  if not, I can, I will give the rest of the debtor's

5  presentation, if I may.

6         MR. SILVERMAN:  Your Honor, can I respond --

7         THE COURT:  Yes --

8         MR. SILVERMAN:  -- quickly and very briefly?

9         THE COURT:  -- yes, Mr. Silverman.  Uh-huh.

10        MR. SILVERMAN:  I think Counsel said something

11 very telling.  You said they could have done it wrong and we

12 would have never known what we have never seen or known.

13 That is the exact problem with this sword and shield that

14 they're using.  He's pointed you to a document that shows

15 what they wanted to show us and while we have numerous others

16 that we don't know about that are being hidden or redacted.

17        As to the email point that he began with, I think

18 he misses the point.  You can, of course, have privileged

19 communications and non-privileged communications.  Now, the

20 way we normally see that is you have an email between

21 opposing parties -- I want to buy somebody's car and then I

22 email that to my lawyer and I ask him a question.  So now,

23 the second email and above get redacted.  It doesn't work the

24 other way around where you have an email with your counsel

25 that you then flip to an opposing party.  That waives the

1  privilege of the email with your counsel.

2          And we just think it's pretty -- we just think

3  it's completely wrong that you can share information with an

4  adverse party in an email, the same email, and many times,

5  the same sentence, but redact other portions of it.

6          THE COURT:  So, let me --

7          MR. SILVERMAN:  So, Your Honor, that was the

8  response.

9          THE COURT:  -- make sure I understand your

10  position.  So your position is you cannot have -- one email

11  cannot have privileged and non-privileged information,

12  because if it has non-privileged information in the email,

13  you've waived it?

14          MR. SILVERMAN:  In a party, in an email with an

15  adversary, yes; the same email, yes, that is our position.

16  And I think the cases say that.

17          None of the cases deal with this situation.  Not a

18  single case deals with cutting a sentence into two with an

19  adversary.

20          MR. MADDOX:  Your Honor, if I may?

21          THE COURT:  Yes.

22          MR. MADDOX:  First, the idea that parties in a

23  community of interest are adversaries within the same

24  community of interest is just wrong, as a matter of law.

25  Teleglobe says it:  It is a community of interest against

1  others and the fact that they may be adverse on some issues

2  does not, then, suddenly render the other issues on which

3  they share a common interest not privileged as to the rest of

4  the world.

5          There is an exception and that is if they actually

6  engaged in litigation against each other on those points and

7  tried to assert privilege.  Well, then, there is an exception

8  to those privileged communications potentially coming out,

9  but again, it's still as between those parties, not to the

10  rest of the world.

11          I'm sorry that Counsel is simply wrong on this

12  point, and we do have multiple cases cited in our letter,

13  which I will grab if Your Honor will give me a moment?

14      (Pause)

15          MR. MADDOX:  Your Honor, if you look at <u>Andor</u>

16  <u>Health</u>:

17    Where documents, particularly, emails or email chains

18    contain both privilege and non-privileged portions, the

19    producing party should redact the privileged portions and

20    produce the rest.

21          That is 2022 WL 605347, at 2, or if you look at

22  <u>Bruckel v TAUC Holdings, LLC</u>:

23    Documents that are only partially privileged should not be

24    withheld in their entirety.

25          Which is what we've done; the privileged portion

1  of the document as to the rest of the world are the parts

2  where we are adversarial.  The parts that aren't privileged,

3  we produced.

4         Moving on, Your Honor -- unless Your Honor has

5  other questions?

6         THE COURT:  No, you may move on.

7         MR. MADDOX:  Thank you, Your Honor.

8         MR. SILVERMAN:  Are you moving to the last sort of

9  discovery issues that we raised with you all?

10        MR. MADDOX:  No, I was going to address your

11 sword-and-shield argument briefly.

12        MR. SILVERMAN:  Okay.

13        MR. MADDOX:  And also, Your Honor, as a point, I

14 would like to add, for the parties not having to be in

15 complete accord for the privilege to apply, right, which

16 would also mean, then, that their communications that are not

17 in complete accord also could be redacted appropriately, you

18 can look to In re Tribune, 2011 WL 386827, at 4:

19        Even though DCL plan proponents' interests are not

20 completely in Accord, they share the common legal interest of

21 obtaining approval of their assessment and confirmation of

22 the DCL plan, thereby resolving the legal disputes between

23 and among them.

24        There, we had partial, not total confluence of

25 interests.  Second other example is Leslie's -- Leslie

1  Controls.  Judge Sontchi held that parties who shared

2  information regarding preserving and maximizing insurance

3  available to pay asbestos claims during the plan-negotiation

4  process shared the common interest with respect to maximizing

5  the value pool and not other things.  And so, to the extent

6  that "other things" are not covered by the privilege, they,

7  then, would be required to disclose them to the extent they

8  aren't privileged, but had a privilege for the ones on which

9  they shared the interest.  And that's the point, Your Honor,

10  the parties do share an interest on the categories we've

11  provided.

12          Finally, Your Honor, with respect to sword and

13  shield, respectfully, again, the DLA landlords have it wrong.

14  Sword and shield applies when a client voluntarily waives the

15  privilege as to some documents it considers not damaging and

16  asserts the privilege as to others it considers to be

17  helpful.

18          The debtors have not done that here.  The debtors

19  have assiduously tried to redact only the documents that have

20  the three categories, redact documents that only have the

21  three categories they've asserted privilege over and not the

22  three categories where they are adverse with Resilience.

23  That's what they have done, and there's no subject matter

24  overlap between those that would create the implication that

25  somehow the debtors are using a sword and shield or somehow

1  are misusing the discovery process.

2          And the Court can look at Hercules, Inc. v Exxon,

3  434 F.Supp. 136, 156 for a good description of how that

4  works, or Duplan Corp. v Deering Milliken; that's at 397

5  F.Supp. 1161.

6          The debtor did not intentionally produce any

7  privileged documents and if it did, Your Honor, and it

8  becomes aware of them, it will claw them back, consistent

9  with the parties' agreement and the order entered by this

10 Court, which clearly provides if we had, in fact, produced

11 privileged information, it is not and does not constitute a

12 waiver; in fact, we can claw it back and reclaim our

13 privilege without waiver.  Respectfully, Your Honor, we

14 submit we do not believe that we have done that, but to the

15 extent that we become aware or counsel to the DLA landlords

16 make us aware of documents that they believe are privileged,

17 we certainly will claw those back so that there's no question

18 about it, Your Honor.

19          Finally, Your Honor, there's no waiver with third

20 parties.  It's not been raised, but I just want to be clear,

21 the presence of third parties on these emails does not waive

22 the privilege at all and we stand on our papers on that

23 point.

24          And with that, Your Honor, unless Your Honor has

25 questions --

1         THE COURT:  I do --

2         MR. MADDOX:  -- I rest.

3         THE COURT:  Okay.  I do not.

4         Does anyone else want to be heard on those issues?

5         Mr. Silverman, any closing comments?

6         Yes?

7         MS. MARKS:  Good afternoon, Your Honor.

8         Betsy Marks from Latham & Watkins on behalf of the

9  non-debtor affiliates.

10         THE COURT:  Okay.  Are we there yet?  I just want

11 to make sure we close out this issue.

12         MS. MARKS:  So, Your Honor, I agree, we do, we

13 have our own separate fight on common interest --

14         THE COURT:  Right.

15         MS. MARKS:  -- but I did want to briefly join in

16 to Mr. Maddox's argument regarding the common interest

17 between the debtor and the non-debtor affiliates.  You know,

18 the arguments have gone on a long time.  I'm definitely not

19 going to repeat any of the arguments that have been made; I

20 did want to very briefly weigh in on the Imerys case.

21         THE COURT:  Uh-huh.

22         MS. MARKS:  Your Honor, Latham & Watkins was

23 counsel to the debtor in the Imerys case and we worked on the

24 very privilege issue that Mr. Silver -- sorry --

25 Mr. Silverman raised Imerys -- and we worked on the very

1  privilege issue that we described to the Court.  And I just

2  wanted to point out that he did not correctly summarize the

3  Court's opinion.

4          In that case, in <u>Imerys</u>, the privileged documents

5  at issue were PowerPoints and similar types of documents

6  where some portions of the document were privileged and some

7  were not.  The Court, Judge Silverstein held that portions of

8  a single document as to which the parties were adverse were

9  subject to production, while portions of the very same

10  document that dealt with strategy and Chapter 11 planning

11  were appropriately subject to the common interest privilege

12  and could be redacted, so I just wanted to correct the record

13  on that front.

14          THE COURT:  Okay.  Thank you.

15          MS. MARKS:  Thank you, Your Honor.

16          THE COURT:  Mr. Silverman, did you want to say

17  anything further?

18          MR. SILVERMAN:  Yes, I'm sorry, Your Honor.  Just

19  responding --

20          THE COURT:  No --

21          MR. SILVERMAN:  -- to his point on clawback,

22  they've had these documents for now, you know, since we filed

23  this letter on Sunday and Monday.  I'd like you to point --

24  I'd like to point you to example 8, which is an email between

25  Rene Weidman and Morris Alhale chain; it's call Bedmar lease

1  analysis.  Now, this would presumably fall within their joint

2  privilege of winding down leases, yet if you look, some of it

3  is redacted -- disclosed and some of it is redacted.  And so,

4  with that, I have nothing more on this.

5              THE COURT:  Okay.

6              MR. SILVERMAN:  Your Honor, the last thing on the

7  DLA landlords' issues with debtor, Counsel, I think in their

8  response, was right; the data room issue is not theirs --

9              THE COURT:  Okay.

10             MR. SILVERMAN:  -- so, I apologize for that.  What

11 does remain is two issues:  the independent manager's

12 investigation into the corporate transactions and financial

13 analysis from Doug -- DWC, the independent manager's

14 investigation documents.  Concerning what we have not

15 received, what they sent last was an advocacy piece written

16 by Richards; that is a report to the independent manager of

17 Bedmar, not a report of the independent manager of Bedmar.

18 The report also says nothing about good faith.

19             And, Your Honor, we did actually run a compare of

20 the report and the opposition and they appear to have,

21 basically, the same points except for good faith.  So it's

22 just another brief.  We asked the Court to compel them to

23 produce all Mister -- the independent investigator's

24 investigation, that not only includes a report, but anything

25 that he's looking at factual, and the report, itself, if he's

1  making one, which we had thought they were, based on previous

2  assertions, including those in their objection that said the

3  independent manager is doing his own investigation.

4          Second, the financial analysis, I think they

5  pointed to one document of the spreadsheet.  We still don't

6  have the underlying documents; in fact, there was a

7  deposition of Rene Weidman this morning and she was unable to

8  testify, really, about anything as to the underlying

9  documents or who was looking at them and/or what analysis

10  they did.  And I believe she testified that the spreadsheet

11  was not theirs.  And so, that's all on that issue.

12          THE COURT:  Okay.  So, wait.  What is your last

13  request, with respect to financial documents?  I just want to

14  make sure --

15          MR. SILVERMAN:  All financial documents, all

16  financial analysis done by Douglas Wilson or any other

17  consultant, that includes factual information and the

18  supporting documents that these people looked at.

19          MR. MADDOX:  Your Honor, may I respond --

20          THE COURT:  Yes, please.

21          MR. MADDOX:  -- briefly, and I may ask Mr. Stearn

22  to help me out, because I was not in that deposition this

23  morning; as you might have imagined, I was preparing for this

24  argument.

25          With respect to the underlying documents referred

1   to -- again, I wasn't in the deposition, so, perhaps

2   Mr. Stearn knows more -- but to the best of my knowledge, the

3   debtors have collected and produced or withheld for

4   privilege, all of the analyses that was produced by Douglas

5   Wilson and we stated such in the letter that we provided to

6   the Court in response.

7            Second, with respect to the investigation, it was

8   attached and provides that all of the documents have was used

9   in it have been produced and cites to the production numbers

10  of those documents, all of which the DLA landlords --

11           THE COURT:  Okay.  I have not seen that, so I

12  think your representation is that it indicates that all the

13  documents have been produced.  Okay.

14           MR. MADDOX:  It does not say that in words;

15  instead, every citation in it is to a document that has been

16  produced.

17           THE COURT:  Okay.

18           MR. MADDOX:  And I'd ask Mr. Stearn if I had

19  missed anything, with respect to the deposition this morning.

20           MR. STEARN:  Suddenly when I went live, I started

21  freezing.

22           Can everyone hear me okay?

23           THE COURT:  Yes, you're not frozen.

24           MR. STEARN:  All right.  So, Your Honor, I just

25  want to respond to a couple points.  I did defend

1  Ms. Weidman's deposition this morning.  I have a very

2  different point of view than the one, respectfully, that my

3  colleague, Mr. Silverman, just stated.

4        Bottom line is -- and we don't need to argue about

5  what Ms. Weidman did or didn't say; she was there as

6  a 30(b)(6) witness on the debtor's financial statements, not

7  on the document production, so she wasn't proffered for that

8  purpose -- but when asked about questions about what was

9  produced, she said what she knew, including that, you know,

10 they collected what they were asked to collect and they

11 provided it to us.

12       But as Mr. Maddox states in his letter, we have

13 produced all financial analyses, after requesting them from

14 DWC, Douglas Wilson Company.  So, respectfully, to

15 Mr. Silverman, what you heard is his speculation that there

16 must be more, but that is directly contrary to what we have

17 said to the Court in our letter; that we did what we were

18 supposed to do.

19       We reached out to the folks who might have

20 documents.  We told them what we needed.  They collected

21 them.  They put them in a folder.  They sent them to us.  We

22 reviewed them, we processed them, and we produced it, period,

23 full stop.  There is no issue here; it's, yet, one more

24 strawman that the DLA landlords have erected and asked you to

25 accept.

1          Another thing I just want to address about the

2    independent manager report.

3          THE COURT:  Yes.  Is there a report?

4          MR. STEARN:  Look, there's a report attached to

5    the letter.  It was, and I'll just say it, it was my idea to

6    attach it.  I was reluctant to do it; it's not the kind of

7    thing I wanted to put in front of the Court.

8          The only reason we attached it, and I assumed Your

9    Honor probably wouldn't read it, but the only reason we

10   attached it was to say it's now a non-issue, we produced it

11   as soon as we could, and everything that the report relies on

12   is reflected in the report.  And the important point you're

13   going to see, for example, about documents, is every one has

14   a Bates number.  So there's not some hidden, further

15   information that needs to be produced.

16         What was relied upon, excuse me, for purposes of

17   the report is reflected therein and the only thing I heard

18   from Mr. Silverman was a disagreement with the name of the

19   report.  This is the report of the independent manager.  It

20   was prepared by counsel and reviewed by the independent

21   manager; that's what this is.  There is no other or

22   further --

23         THE COURT:  Okay.

24         MR. STEARN:  -- report.

25         THE COURT:  So --

1        MR. STEARN:  And he can disparage it how he wants,

2   but that's what it is.

3        THE COURT:  Okay.  I just want to make sure

4   there's no separate report, because he's asked me to

5   compel --

6        MR. STEARN:  There's no --

7        THE COURT:  -- production.

8        MR. STEARN:  There's no other report that

9   Mr. Silverman speculated might exist.

10       THE COURT:  Okay.

11       MR. STEARN:  Again, another strawman.

12       THE COURT:  Okay.

13       MR. STEARN:  Thank you, Your Honor.

14       THE COURT:  Uh-huh.

15       Mr. Silverman, anything further on these issues?

16   I just want to make sure I get all these issues so when I go

17   to rule, I can rule all at once.

18       MR. SILVERMAN:  Yeah, Your Honor, thank you.

19       I think what I heard was Counsel said they asked

20   DWC to give them documents and they got a folder.  And I

21   accept Counsel's representation that he gave what he thought

22   was proper or all of it.  And perhaps we need to subpoena

23   DWC, because I would be surprised that only a spreadsheet

24   comes from nothing and no underlying financial data.

25       MR. STEARN:  Your Honor, if I could respond to

1  that briefly?

2           Ms. Weidman's testimony on that was clear.  For

3  certain -- we have nothing to hide on this -- for certain of

4  the analyses that were performed, spreadsheets were provided

5  to DWC by Portage Point.  That is the financial advisor for

6  the non-debtor affiliates.  And then, essentially, what DWC

7  did was review, analyze, and vet those spreadsheets to

8  determine whether or not they agreed with, essentially, the

9  calculations and points of view reflected therein.

10          So it's not surprising that there's not some other

11 information demonstrating how these spreadsheets were

12 created.  But Ms. Weidman did testify, clearly, as to what

13 she looked at, for example, when she reviewed these

14 spreadsheets; things like lease abstracts, other documents,

15 things like that.  Again, there's no real strawman here.  It

16 is just, it's just a strawman; there's no real issue here.

17 And there's certainly no evidence in front of Your Honor that

18 there's an issue.

19          THE COURT:  Okay.

20          Mr. Silverman, anything further?

21          MR. SILVERMAN:  In a normal litigation, I think I

22 would ask for leave to subpoena PBP, subpoena DWC, and

23 subpoena Portage -- PricewaterhouseCoopers, which I think was

24 also involved.  I just don't know that we have time, Your

25 Honor, and that's all I'll say on that.  And I'll reserve on

1  asking for it, I guess, but I'm not asking you right now.

2          THE COURT:  Oh, wait.  Say that again.  You're not

3  asking for it?

4          MR. SILVERMAN:  Well --

5          THE COURT:  I just want to make sure I close the

6  loop on the issue.

7          MR. SILVERMAN:  -- I'm not sure that there's

8  enough time --

9          THE COURT:  You're reserving the right?

10          MR. SILVERMAN:  What's that?

11          THE COURT:  You're reserving the right?

12          MR. SILVERMAN:  Well --

13          THE COURT:  I want to make sure I heard you

14  correctly.

15          MR. SILVERMAN:  -- I wanted to consult with my

16  team to see if the expense and Your Honor's time in

17  addressing that response is worth it, unless Your Honor

18  would, on the basis of the argument right now, would like to

19  order a subpoena, in which I would ask and then we would just

20  send it out.

21          MR. STEARN:  Well, and we would oppose that, Your

22  Honor, if it was requested.  There's no reason for it.  We

23  reached out to DWC and asked them for their documents and we

24  produced them.  There's no reason for a separate subpoena.

25  There's no evidence that DWC failed to comply with the

1  request.

2          THE COURT:  Have you guys met and conferred about

3  this issue offline?

4          MR. STEARN:  This was the first time it was raised

5  and I don't think it's properly raised before the Court now.

6          MR. SILVERMAN:  I -- that's not accurate.  We've

7  raised issues about the underlying documents, especially with

8  DWC before, which is obviously in front of the Court.  But I

9  would put a pin in this, because I will stop, and I'm not

10  asking for the Court to grant leave to subpoena those

11  entities right now.

12          THE COURT:  Okay.

13          MR. STEARN:  We've not heard about a subpoena

14  before.  We've not heard about a subpoena before, Your Honor,

15  is my point.

16          THE COURT:  Okay.  Next issue?

17          MR. STEARN:  I believe that completes our friendly

18  little sparring match with the DLA landlords on behalf of the

19  debtors and I think that now leaves the friendly little

20  sparring match between the DLA landlords and our non-debtor

21  affiliates.

22          Mr. Maddox, you can correct me if I have skipped

23  over something that pertains to the debtor.

24          MR. MADDOX:  No, Mr. Stearn; you're correct.

25          MR. STEARN:  Okay.  Your Honor, round two?

1          Thank you very much.

2          THE COURT:  Uh-huh.

3          MR. SILVERMAN:  Your Honor, I think this is,

4  again, our issue that we brought to the Court.  This is a

5  similar privilege issue with the Resilience productions, of

6  which I think, you know, we're still receiving.  We got a

7  privilege log, I believe, Monday night and on Tuesday

8  morning, we sent a deficiency letter and we understood that

9  Counsel would not withdraw the privilege assertions to assert

10 to Categories 5 and 7 and so, you know, that is why -- what

11 brings us here today.

12         Categories 5 and 7 --

13         THE COURT:  The investors and the consultant; is

14 that where we are?  Are we at investors and consultant,

15 communications with consultant?

16     (No verbal response)

17         THE COURT:  Okay.  I just wanted to --

18         MR. SILVERMAN:  That is Category 5, Your Honor;

19 yes.

20         THE COURT:  Okay.

21         MR. SILVERMAN:  So the issue with Category 5 is

22 that it is with investors.  This is Docket 290, our letter.

23 The first issue is that there is no attorneys on both sides,

24 okay.  That's just a threshold problem.  The second is that

25 the interest between Resilience and investors was primarily,

1  if not completely, commercial.

2         Resilience provides no support that deals with

3  investors regarding a potential bankruptcy, gives rise to a

4  common interest on commercial parties.  They were clearly

5  seeking an investment from outside investors.  It was a

6  process run by an independent consultant.  They made

7  recipients sign NDAs because they recognized that there was

8  no, otherwise, confidentiality to the parties.  And the fact

9  that they were going to apply it to a potential bankruptcy

10 does not avoid that it was a commercial discussion.

11         10x Genomics, I think, again, speaks to this, 505

12 F.Supp.3d at 338, the Court says, quote:

13         And, of course, that makes sense when it says they

14 were talking about -- this is my parenthetical -- commercial

15 interests, as Celsea and Bio-Rad were not engaged in legal

16 strategy sessions, but instead, were negotiating a commercial

17 transaction from the opposite sides of a bargaining table.

18         And that's what the investors and Resilience were

19 doing.  And if you look at the examples in our letter, again,

20 this shows the commercial nature of the disputes.  This one

21 is really hard to see, and I apologize to Your Honor.  It

22 would be helpful if I could put it on the screen and blow it

23 up, but I know I can't do that, so I will explain it to you

24 if that's all right?

25         THE COURT:  Uh-huh.

1          MR. SILVERMAN:  The first example in our Exhibit C

2   of 290 shows a side-by-side email.  It is from a Mr. Nelson

3   to a Mr. Solomon with a bunch of other people on it, as well.

4   The left shot -- side shows a sentence that is redacted on

5   the first sentence.  The right side shows -- and I'm trying

6   to be careful to not divulge the confidentiality or, you

7   know, what is a confidential document, which we reserved the

8   right on whether this was marked "confidential" properly --

9   but it talks about getting an update from the CEO to explain

10  what appears to very much be a commercial deal.

11          The second is another discussion with the CEO.

12  There's a huge box redaction on the left side.  There's no

13  redaction on the right side.  I think you'll see that that

14  relates to commercial interests.

15          The third row of our spreadsheet shows, again, a

16  side-by-side where there's a black in the middle of the

17  sentence and then a redaction box of more.  And you'll see

18  that from the big redaction box of the below, it's just

19  talking about names of investors going to site visits and

20  diligence.  The top one just talks about financing.

21          The fourth one has a redaction of four words

22  concerning insurance.

23          And the fifth shows an email that says:  See the

24  below summary of commercial terms.  And in that summary of

25  commercial terms, it's hugely blacked out.

1          All right.  And those are that relate to that

2  first issue.  We don't think a confidentiality agreement *post*

3  *hoc* or a, quote, common interest agreement, can be used as

4  justification for common interest where there is none in the

5  first place.  These are arm's-length negotiating parties.

6          The second issue I have is with the PR firm --

7          THE COURT:  Uh-huh.

8          MR. SILVERMAN:  -- if Your Honor would like me to

9  go to that or stop here?

10          THE COURT:  You may proceed.

11          MR. SILVERMAN:  Thank you.

12          So, I don't think the parties dispute that

13  ordinary public relations advice is not legal and the fact

14  that a law firm hires one does not make those communications

15  legal.  If you look at Exhibits E and F, Exhibit F explicitly

16  is a response from Resilience that says -- it's a response

17  from a black-box email that says:  My suggestion is

18  commercial.  I don't think it gets any clearer than that,

19  that what is in that black box is commercial and is regular,

20  ordinary, run-of-the-mill public relations advice.

21          Now, I know, counsel -- the last thing I'll say

22  about all this -- is I appreciate counsel has said that they

23  will re-review.  In an ordinary situation, we would let that

24  play out. As Your Honor knows, we have to be in front of the

25  Court Tuesday with these arguments and that is why we brought

1    it to the Court.  Thank you.

2              THE COURT:  Okay.  Thank you.

3              MS. MARKS:  Good afternoon, again, Your Honor.

4              Again, Betsy Marks, Latham & Watkins, representing

5    the non-debtor affiliates.

6              So the DLA landlords make two objections to the

7    non-debtor affiliates' privilege log and they argue for a

8    wholesale production of all documents withheld or redacted as

9    privileged that would fall within either of those two

10   categories.  I think Your Honor is now familiar with the

11   categories.  The Category 5 covers documents that are

12   otherwise attorney-client privileged and that were shared

13   with certain investors, pursuant to common interest

14   agreements.  Category 7 covers documents that are attorney-

15   client privileged and where that privilege is not broken,

16   just because the PR firm engaged for this matter is copied on

17   that.

18             As we explained in our letter filed earlier today

19   at Docket 292, we have told the landlords that we will re-

20   review the documents covered by these two categories to

21   confirm if they are, indeed, privileged and if any are

22   downgraded, we will produce them.  What we don't agree with

23   is their position that the categories, in their entirety, are

24   not entitled to any production at all.

25             And I'm going to talk about the two categories a

1  little more, but before we get there, we previously told the

2  debtors on Monday evening when we served our privilege log

3  that as a part of our creation of the privilege log, we were

4  going to be downgrading certain documents.  And anyone who

5  has done an e-discovery production knows that's typical, that

6  as you study the log and put it together, you may come across

7  overzealous redactions, you know, or withholding that you,

8  then, remove, downgrade, and produce.  Again, we told them

9  that on Monday.

10         Every single email attached to the brief that they

11  filed last night has already been downgraded and is going out

12  in a production either today -- it's either already gone out

13  or it will.  We already downgraded those before they filed

14  their letter.  So, you know, unfortunately, this is another

15  example, really, of a sort of waste of the Court's time that

16  could have been avoided with debtor conferring.

17         In any event, I do want to address --

18         THE COURT:  And that's with everything attached to

19  what was filed last night?

20         MS. MARKS:  So the examples -- they have exhibits

21  to --

22         THE COURT:  Right.

23         MS. MARKS:  -- their letter that are emails --

24         THE COURT:  Uh-huh.

25         MS. MARKS:  -- with redactions.

1          THE COURT:  Right.

2          MS. MARKS:  Every single email on there with a

3    redaction is being produced --

4          THE COURT:  Okay.

5          MS. MARKS:  -- is being downgraded and produced in

6    some form.  I think there was one email that did not have

7    redactions that's not on our list.  I don't know why they

8    attached that one; maybe that was an example to show why the

9    discussions were commercial.  But in any event, anything with

10   a redaction was already reduced and decided to be produced.

11         THE COURT:  Okay, thank you.

12         MS. MARKS:  Sure.  You're welcome.

13         So, to turn to their letter and the legal

14   precedent they rely on, they rely on Teleglobe from the Third

15   Circuit.  As a threshold matter, the Teleglobe case relies on

16   Delaware Rules of Evidence 502, which sets out the State's

17   version of the "community of interest" privilege and

18   incorporates language that for the privilege to apply,

19   clients' attorneys must be copied on the communications, but

20   communications between non-attorneys don't qualify for the

21   common interest privilege.  Delaware Rule of Evidence -- or

22   sorry -- Federal Rule of Evidence 502 is different.  It does

23   not have the same language about the "community of interest"

24   privilege and attorneys only.

25         Here, we are operating under the Federal Rules of

1  Evidence, not the Delaware Rules, wherein, Bankruptcy Court,

2  the substantive issue being litigated, whether this case was

3  filed in good faith, squarely is a bankruptcy issue, and so

4  federal law applies.

5         Teleglobe was applying state law.  It's not

6  applicable.  In support of that proposition, I would point

7  you to TC Tech v Sprint Corp., 218 U.S. Dist. LEXIS 210714,

8  at 4-6, where Judge Andrews found that Teleglobe applied

9  state law and is not controlling authority in a case like

10 this.

11        In TC Tech, the Court further found that requiring

12 separate counsel is too narrow of an application of the

13 common interest doctrine and that the doctrine does not

14 strictly require that communications be between separate

15 attorneys.  And there are many other cases in the Third

16 Circuit holding the same, some of which are actually cited in

17 the debtor's letter to the Court on the issue of common

18 interest.

19        So, next, next I'll move on to whether or not

20 there was a common legal interest here with the investors.

21 And so, again, to clarify, we are -- the documents they

22 flagged in their letter are being produced.  There are some

23 other documents with investors that we are continuing to

24 withhold as privileged.

25        After the non-debtor affiliates decided earlier

1  with their advisors earlier this year to pursue the corporate

2  transactions that preceded the filing of this Chapter 11

3  case, they raised bridge financing in April to fund, in part,

4  the strategy.  The investors who agreed to provide that

5  bridge financing understood that part of the financing would

6  be used to provide the debtor, here, with sufficient cash and

7  receivables to satisfy the capped lease rejection damages in

8  the bankruptcy case.

9          Now, the bridge financing was used for other

10 purposes, as well, including operational costs and capital

11 expenditures for other facilities, but the investors would

12 not have invested, but for a legal strategy to alleviate the

13 burden of the underutilized sites that are at issue in this

14 case.  Given that their funding was necessary to implement

15 the strategy, these investors entered into common interest

16 agreements with the non-debtor affiliates so that they could

17 better understand and be kept informed of the legal strategy

18 and advice regarding the very transactions that are being

19 litigated in this case.  The communications that we've

20 withheld or redacted as common interest involved this legal

21 strategy and weren't furtherance of it.

22         And, you know, just for clarity, we did not

23 withhold communications with the investors about the bridge

24 financing terms or the negotiations over the financing; some

25 of that is what we have now downgraded and will be producing

1   today.  The common interest agreements weren't even in place

2   at that point of the negotiations.  We agree those would not

3   be privileged.

4           So, switching gears now to the PR firm --

5           THE COURT:  Well, before we head -- get there --

6           MS. MARKS:  Sure.

7           THE COURT:  -- let me just ask, did you produce

8   the NDA or the confidentiality agreement between or those

9   agreements with the investors?

10          MS. MARKS:  Your Honor, so to clarify, there were

11  both NDAs -- the company entered into NDAs first so these

12  potential investors could diligence the bridge financing and

13  then for the actual investors who agreed to provide the

14  financing, there were subsequent common interest agreements

15  entered into.  We've not produced those because they've not

16  been requested; the landlords did not ask for those.

17          THE COURT:  Okay.

18          MS. MARKS:  Shall I move on to the PR firm --

19          THE COURT:  Yes, my apologies.

20          MS. MARKS:  -- or did you --

21          THE COURT:  I thought that I read differently, so

22  thank you.

23          MS. MARKS:  Okay.  And just so it's clear, we're

24  not withholding anything subject to the NDA; of course, we're

25  only withholding documents pursuant to the common interest

1  agreement, specifically.

2        So our position as to the PR firm is not that

3  these are common interest privileged or not that we have a

4  common interest with the PR firm.  Our position is that these

5  communications are attorney-client privileged and that the

6  addition of the PR firm does not break the attorney-client

7  privilege.

8        As we cited in our letter, the In re Riddell

9  Concussion case recognized that communications with a PR

10  consultant are appropriately withheld if they're made in

11  connection with an ongoing or anticipated litigation and if

12  the advice is directed at supporting the client's litigation

13  position.

14        Here, Latham & Watkins directly engaged Kekst in

15  order to advise Latham and the non-debtor affiliates on

16  press, both internal and external press, related to this

17  Chapter 11 case.  Kekst does not act as the company's PR firm

18  for other general purposes and as far as I know, it's not

19  advised the company on any other issues outside of the very

20  issues that are now being litigated.

21        Again, we've agreed to re-review these emails.

22  This review is underway.  It's been underway all day.  There

23  may be some downgrades from that review, as well, but as a

24  general matter, you know, we do not believe that Kekst breaks

25  the privilege and that it's appropriate to withhold those

1  emails, especially in this context where the PR firm was

2  engaged within the context of a bankruptcy filing and

3  potential litigation, you know, exactly where we find

4  ourselves now.

5           Thank you, Your Honor.  I'm happy to answer any --

6           THE COURT:  So, well --

7           MS. MARKS:  Yeah?

8           THE COURT:  -- I may have a question here.

9           MS. MARKS:  Sure.

10          THE COURT:  I'm trying to formulate it in my head,

11  but, so the argument here isn't that the PR firm was for

12  legal advice.  The argument is that the PR firm provided

13  press statements in anticipation of the bankruptcy and any

14  litigation pursued?

15          MS. MARKS:  That's right, Your Honor.

16          And, you know, I've reviewed some of these

17  correspondence myself, personally.  The correspondence really

18  were between Latham, the PR firm, and the company in terms of

19  how to describe these corporate transactions in the

20  bankruptcy filings.  And there were instances where, for

21  example, the PR firm was confused about what the transactions

22  were and got it wrong and we had to correct it.

23          So, really, these communications are about the

24  very issues that are now being litigated and, you know, the

25  best way that those should be disclosed to and described

 1 externally and internally within the company.

 2              THE COURT:  Okay.  Thank you.

 3              MS. MARKS:  Nothing further from me at this time,

 4 Your Honor.

 5              THE COURT:  All right.  Thank you.

 6              Mr. Silverman?

 7              MR. SILVERMAN:  Yes, Your Honor.

 8              First, we did ask -- it's in Exhibit G in our

 9 email -- we said in that paragraph, it's on page 3 of

10 Exhibit G, page 290:

11              "To the extent you intend to support your

12 privilege assertions based upon these agreements, we request

13 that you produce copies of each or at least one

14 representative sample."

15              As far as the PR firm --

16              THE COURT:  That's with regard to the investors,

17 right?

18              MR. SILVERMAN:  I'm sorry?

19              THE COURT:  That's with respect to the investors,

20 correct?

21              MR. SILVERMAN:  Yes.

22              THE COURT:  Okay.  All right.  I just want to --

23 thank you.

24              MR. SILVERMAN:  With respect to the PR firm, my

25 understanding of the law is that the consulting must be

1   necessary for the lawyer to give advice, okay.  It's not just

2   that the lawyer hires them or that the lawyer needs to

3   correct a consultant who is doing work.  The advice from the

4   PR firm needs to be for the lawyer to render advice to the

5   client.  That's Kovacs from the Second Circuit from the 1960s

6   all the way through now.  Multiple courts have adhered to

7   that principle and that line on consultants and we don't

8   dispute that.

9     What we dispute is that the PR firm did anything that was

10    necessary for Latham and -- L & W to give legal advice, and

11    what I think Counsel said is, it went the other way.  So

12    that's what I would say there.

13          THE COURT:  Well, there's a distinction in Riddell

14   from Senior Housing, right, because Riddell does talk about

15   press statements in anticipation of litigation being

16   privileged, as opposed to the other cases talking about

17   communications that are necessary for counsel to render legal

18   advice.  That's a distinction.

19          MR. SILVERMAN:  So, if it work -- yeah, I hear

20   you, Your Honor, but I think to accept that, then they --

21   we'd have to accept that they were anticipating litigation at

22   that time and that this third party, it somehow falls under

23   the privilege.  It's not what they're saying, which was that

24   they engaged them, as necessary, to provide their advice.

25          And I think, Your Honor, just as a general point,

1  is the continuous downgrading of documents that are coming,

2  it just shows that what we're saying is right; they have been

3  hiding things behind privilege and we're trying our best to

4  get them and we really just cannot wait.  And we think as a

5  wholesale category, 5 and 7 are wrong.  Thank you, Your

6  Honor.

7        THE COURT:  Okay.  Thank you.

8        MS. MARKS:  Your Honor, just if I may, briefly?

9        I don't think I said that we, Latham & Watkins,

10 engaged Kekst to provide us with legal advice.  I don't think

11 that makes sense.  We are the attorneys, not the PR firm.

12 But we did advise them to provide advice in the context of

13 making disclosures about the transactions, the Chapter 11

14 filing, you know, and the potential litigation that might

15 arise.

16        I think this situation is analogous to other cases

17 where the PR firm is considered to be within the privilege

18 because the communications are, you know, made in advance of

19 expected litigation.

20        There are other cases where the PR firm is

21 providing sort of general PR advice, consulting on commercial

22 issues that are not about litigation where, you know, those

23 legitimately may not be privileged at all.

24        THE COURT:  I mean, essentially, the PR firm

25 controls the narrative.

1         So I guess my question to both of you is:

2    Assessing the privilege is a very fact-intensive inquiry; is

3    this something that requires the Court to look at these

4    documents with respect to this PR firm?

5         I'm not inviting it, necessarily, I'm just -- and

6    I may have to take a few minutes to go re-focus on this,

7    because I think that, well, obviously, you're looking at it

8    from two separate, very different perspectives.

9         MR. SILVERMAN:  Thank you, Your Honor.

10        I can't answer that, because I don't know what's

11   in them.  I think their explanation is insufficient and the

12   burden is on them and they haven't satisfied their burden,

13   so -- and can I say one last thing -- I'm sorry -- in their

14   privilege log -- and I could put this on the screen, it says

15   on Category 7:

16        "Communications and documents to/from/among people

17   of the non-debtor affiliates and the public relations firm

18   Kekst CNC (engaged by Latham & Watkins)."

19        So I think when Counsel said that they did not

20   engaged Latham & Watkins, that's contrary to what the

21   privilege log says.

22        MS. MARKS:  Mr. Silverman, I said we did not

23   engage them to provide us with legal advice; we did engage

24   them.

25        THE COURT:  What is the universe of documents

1  related to the communications consultant?

2          MS. MARKS:  Your Honor, because we are re-

3  reviewing all of them today for potential downgrades, I

4  believe it's more than 75, but less than a 100, and there may

5  be some downgrades from that, but it's within that range.

6          THE COURT:  Okay.  All right.

7          I'm going to take break.  I've -- well, let me

8  ask:  was there anything further?

9          I'm sorry, I didn't want to cut anybody off.

10      (No verbal response)

11         THE COURT:  All right.  I'm going to take a break.

12  I have the list of issues.  I want to look at a few things

13  that were cited to me this afternoon, but I want to rule

14  today, because I do think time is of the essence.

15         Let me ask:  Would the parties take a break for an

16  hour and then get back on line?

17         MR. SILVERMAN:  Yes, Your Honor.

18         THE COURT:  You can use the same Zoom.

19         Does that work for everyone?

20         MS. MARKS:  Yes, Your Honor.

21         MR. SILVERMAN:  Absolutely.

22         THE COURT:  And let me just say, to the extent

23  that -- and I do -- look, I appreciate everybody is "drinking

24  from a fire hose" here and that things are moving very

25  quickly and things are fluid, but I do think it's important

1  that parties communicate and to the extent that documents are

2  downgraded and produced and, you know, situations change,

3  that you all remain in contact.

4        But let me take a break.  I want to look at a few

5  things that were cited to me, different than what I have seen

6  in the papers, and we'll get back on line in one hour at a

7  quarter of 5:00.

8        MR. STEARN:  Thank you, Your Honor.

9        MS. MARKS:  Thank you, Your Honor.

10        MR. SILVERMAN:  Thank you, Your Honor.

11        THE COURT:  Thank you, all.

12        We stand in recess until 4:45.

13     (Recess taken at 3:42 p.m.)

14     (Proceedings resumed at 4:56 p.m.)

15   THE COURT:  Good afternoon, everybody.

16        We're back on the record in Bedmar, LLC, Case

17  Number 25-11027.

18        This is the Court's rulings, with respect to the

19  discovery disputes that we discussed this afternoon.  With

20  respect to the debtor's objections to the DLA landlords, at

21  issue are the four interrogatories that seek facts and law

22  upon which the DLA landlords base their contention; more

23  specifically, the contention interrogatories seek information

24  regarding the insolvency of the enterprise, the transfer of

25  the leases, the transfer of the guaranty, and the corporate

1  transactions that the landlords allege constituted fraudulent

2  transfers.  I am going to overrule the debtor's objections;

3  compelling answers to these questions will not clarify the

4  issue or limit the scope of this dispute or advance the

5  progress of these cases at this point, particularly since

6  these issues are in the hands of the debtor and the debtors

7  have the burden of proof.

8        Furthermore, with respect to these issues, having

9  reviewed the pleadings, the facts and arguments that are set

10 forth in the DLA landlords' motion to dismiss, and reply,

11 see, specifically, the motions to dismiss at Docket 135 at

12 paragraphs 39 to 46 and 47 to 53.  Further, I note that at

13 the hearing, it was established that these responses were

14 verified and so this also replies to the related document

15 production with respect to these four issues.

16       With respect to privilege, the common interest

17 doctrine does not require complete unity of interests, but

18 it's limited by the scope of the parties' common interests.

19 To the extent the parties communicate about matters on which

20 they hold opposing interests, those communications lose any

21 privilege.

22       I conclude the debtor has met its burden of

23 establishing a common legal interest between it, non-debtor

24 Resilience, and the financial advisor.  They share a common

25 legal interest with respect to the three addendum -- issues

1   identified on the record this afternoon:  the corporate

2   transactions, the plan, and the Chapter 11 filing.

3          To the extent that those parties communicate about

4   matters which they hold opposing interests, such as the

5   debtor-in-possession or the servicing agreement, those

6   portions of the communication lose any privilege.  Similarly,

7   this privilege does not apply to solely commercial matters.

8   So a producing party can redact privileged portions of any

9   document and produce the remainder of the document.

10          With respect to the independent manager report and

11   the underlying financial documentation, based on counsel's

12   representation this afternoon that those documents have been

13   produced, we will proceed forward and we will deal with the

14   consequences of those issues if issues arise during the

15   trial.  I would encourage the parties to continuously review

16   and downgrade all the documents attached that they are

17   referenced to, as this is an evolving situation.

18          With respect to Category 5, communications with

19   investors, there's no identified common legal interests with

20   the investors.  The parties share a common financial or

21   commercial interest; here, an economic arrangement, not a

22   legal interest.

23          Use of confidentiality agreements or NDAs do not

24   protect or otherwise permit these documents to be privileged,

25   so I'm going to require a production of these documents with

1  the investors, as they're not protected by the common-

2  interest privilege.

3          With respect to Category 7, the communication

4  consultant engaged by Latham & Watkins, the parties are

5  required to produce ordinary public relations communications,

6  because such documents are not privileged.  For example, a

7  media campaign, press release, media strategy to bolster a

8  party's public image or reputation is not privileged.  But in

9  accordance with Riddell, if the consultant provided

10 information needed by the attorneys for the attorneys to

11 render legal advice, then such communications are privileged;

12 for example, such as an email requesting legal insight.

13         So, those are the Court's rulings.  I hope that

14 narrows the issues for the parties and shapes their discovery

15 going forward.  Are there any questions?

16         MR. STEARN:  None from the debtor, Your Honor.

17 Thank you for taking the time to address and resolve the

18 parties' disputes.

19         THE COURT:  All right.  Thank you, all.  Have a

20 good afternoon.  We stand adjourned, and I will look forward

21 to receiving any further pleadings that we might have over

22 the weekend.  Thank you.

23         COUNSEL:  Thank you, Your Honor.

24     (Proceedings concluded at 5:01 p.m.)

25

1                        CERTIFICATION

2            We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                      July 25, 2025

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                      July 25, 2025

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17

18

19

20

21

22

23

24

25