# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BEDMAR, LLC, | Case No. 25-11027 (JKS) |
| Debtor. | **Related D.I. Nos. 92, 111, and 135** |

## OPINION

Before the Court are three motions to dismiss (collectively, the "Motions to Dismiss")

this chapter 11 case for lack of good faith under section 1112(b) of the Bankruptcy Code, filed

by (i) Colbalt Propco 2020 LLC[1] ("Cobalt"); (ii) the United States Trustee[2] ("U.S. Trustee"); and

(iii) President and Fellows of Harvard College, 92 Crowley Owner (DE) LLC, and GEGM

Alachua, LLC[3] (collectively, the "HCG Landlords" and together with Cobalt and the U.S.

Trustee, the "Movants"). The Movants assert that the chapter 11 petition was not filed in good

faith because the newly-formed debtor was not in financial distress, and had no intent to preserve

a going concern or to maximize the value of the estate, but rather to take advantage of section

502(b)(6) of the Bankruptcy Code and cap lease liabilities for the benefit of non-debtor affiliates

and shareholders. The debtor Bedmar, LLC[4] (the "Debtor") and its parent Bedmar Member,

---

[1] D.I. 92 (Cobalt PropCo 2020, LLC's Motion to Dismiss Debtor Bedmar, LLC's Chapter 11 Case Pursuant to Bankruptcy Code Section 1112(b)).

[2] D.I. 111 (Motion of the United States Trustee to Dismiss or Convert the Debtor's Chapter 11 Case).

[3] D.I. 135 (Joint Motion of (I) President and Fellows of Harvard College, (II) 92 Crowley Owner (DE) LLC, and (III) CEGM Alachua, LLC to Dismiss the Chapter 11 Case of Bedmar, LLC; and Joinder to Cobalt Propco 2020, LLC's and UST's Motions to Dismiss Debtor Bedmar, LLC's Chapter 11 Case Pursuant to Bankruptcy Code Section 1112(b)).

[4] D.I. 219 (Debtor's Omnibus Objection to (I) Motions to Dismiss the Chapter 11 Case filed by (A) Cobalt PropCo 2020, LLC, (B) the President and Fellows of Harvard College, 92 Crowley Owner (DE) LLC and CEGM Alachua, LLC, and (C) the Office of the United States Trustee for the District of Delaware, and (II) Joinders Thereto filed by (A) Orchard Therapeutics North America, and (B) ARE-SD Region No. 23, LLC). Orchard Therapeutics North

Inc.[5] ("BMI" and together with the Debtor, the "Objectors") oppose the Motions to Dismiss arguing that the Debtor, a properly formed Delaware limited liability company, was in financial distress when it filed for chapter 11 protection for the purpose of administering an orderly winddown and payment of all allowed liabilities, which would not be possible outside of bankruptcy.

Having considered the record[6] and arguments of counsel, and guided by applicable Third Circuit precedent, the Court concludes that the Debtor has not established by a preponderance of the evidence that the petition was filed in good faith.[7]  For the reasons discussed herein, the Court finds, based on the totality of the facts and circumstances, that the bankruptcy petition does not serve a valid bankruptcy purpose and was filed for a tactical advantage.  Consequently, the Motions to Dismiss will be granted and the chapter 11 case dismissed.

---

America reached a resolution with the Debtor and non-debtor affiliates.  *See* Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 43:21–43:3.  ARE-SD withdrew its joinder to Cobalt's Motion to Dismiss.  *See* D.I. 320.

[5]  D.I. 221 (Bedmar Member, Inc.'s Objection to: (1) Cobalt PropCo 2020, LLC's Motion to Dismiss Debtor Bedmar, LLC's Chapter 11 Case Pursuant to Bankruptcy Code Section 1112(b); (2) Motion of the U.S. Trustee to Dismiss or Convert the Debtor's Chapter 11 Case; and (3) the Joint Motion of (I) President and Fellows of Harvard College, (II) 92 Crowley Owner (DE) LLC, and (III) CEGM Alachua, LLC to Dismiss the Chapter 11 Case of Bedmar, LLC.

[6]  The HCG Landlords and Cobalt filed replies (D.I. 285 and D.I. 286, respectively); the Debtor filed a sur-reply (D.I. 302); and Cobalt filed sur-sur reply (D.I. 331); all which were also considered by the Court.  The Court held an evidentiary hearing on July 29 and 30, 2025; s*ee* D.I. 334 and 335; and heard the testimony of fact witnesses: (i) Andrew Montone, Senior Vice President, Chief Financial Officer, and Treasurer of Resilience US, LLC, (ii) Rene Weidman, Financial Controller, Douglas Wilson Companies, (iii) Christopher Sontchi, Independent Manager of the Debtor, and (iv) William Marth, President and Chief Executive Officer of National Resilience, Inc.; and expert witnesses: (i) Morris Alhale, Managing Director, Portage Point Partners, and (ii) John Madden, Managing Partner of Emerald Capital Advisors.  The Court also reviewed numerous exhibits that were admitted into evidence.  *See* D.I. 325.  The Court will refer to the trial testimony and exhibits as marked by the parties.

[7]  The following constitutes the Court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.

## INTRODUCTION

The Debtor is part of a family of entities (the "Enterprise" or "Company"), the ultimate

parent of which is National Resilience Holdco, Inc. ("Holdco" or "NRH").[8]  BMI is the sole

member of the Debtor and an indirect wholly-owned subsidiary of Holdco.[9]  Holdco was formed

on June 3, 2025, when National Resilience, Inc. (the "Original Parent" or "NRI") and a

subsidiary were converted to limited liability companies.[10]  Thereafter, Holdco and certain

subsidiaries (including the Original Parent) underwent divisions pursuant to section 18-217 of

the Delaware LLC Act (the "Corporate Transactions" as described in the attached Addendum).[11]

The Corporate Transactions ultimately resulted in the formation of the Debtor, a

Delaware limited liability company.[12]  As a result of the Corporate Transactions, the Debtor was

allocated the following: (1) leasehold interests in seven Sites;[13] (2) lease guaranties for five

properties (including the guaranties related to the four Leases (as defined below));[14] (3) $41.4

million in cash and receivables;[15] and (4) a 51% membership interest in AGS Holdco, LLC.[16]

The Debtor's liabilities consist of approximately $372 million of contractual liabilities under the

---

[8]  *Id.* at ¶¶ 8-9.

[9]  *See* D.I. 6 (Declaration of Chistopher S. Sontchi, Independent Manager of the Debtor, in Support of Chapter 11 Petition and First Day and Other Pleadings (the "Sontchi First Day Dec.")) at ¶ 9.

[10]  D/BMI86 and D/BMI89.

[11]  Delaware Limited Liability Company Act, tit. 6, ch. 18, §§ 101–1208 ("Delaware LLC Act").

[12]  D.I. 6 (Sontchi First Day Dec.) at ¶¶ 9 and 22.  *See also* D/BMI182, D/BMI190, and M3. Bedmar Holdco, LLC and Bedmar, LLC subsequently merged to form the Debtor.

[13]  The Debtor's Lease Sites (the "Sites") are located in Bedford, Allston, and Marlborough, Massachusetts; San Diego (two sites) and Freemont, California; and Alachua, Florida.  D.I. 6 (Sontchi First Day Dec.) at ¶ 13.

[14]  *See* J7 at Sch. 1; J8 at Sch. 1.

[15]  D.I. 6 (Sontchi First Day Dec.) at ¶ 22.

[16]  D.I. 6 (Sontchi First Day Dec.) at ¶¶ 21 and 22.

3

long-term leases for the Sites.[17]  The Debtor does not have any employees, incoming cash flow,

or ability to run a business.[18]  Upon formation of the Debtor, Christopher S. Sontchi, was

appointed its independent manager ("Independent Manager").[19]

Six days after its formation, on June 9, 2025 (the "Petition Date"), the Debtor filed for

relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case") "to administer the

orderly winddown of and satisfy all allowed liabilities in connection with Debtor's underutilized

manufacturing, laboratory, and office [S]ites."[20]  To that end, the Debtor filed, concurrently with

its chapter 11 petition, a motion seeking to reject the leases for the Sites.  The following day, the

Debtor filed a plan[21] that provides for full payment of creditors' allowed claims, including lease

rejection damages claims for the Sites as limited by section 502(b)(6) of the Bankruptcy Code.

The Plan provides that the Landlord claims (the only unsecured class of claims) are not

impaired.[22]

---

[17]  Tr. Hr'g Jul. 30, 2025 (D.I. 335) at 120:17–20 (Alhale); *see also* D.I. 82 (Debtor's Omnibus Reply in Support of Rejection Motion and DIP Motion); M67 (Crowley's Sealed Objection to Debtor's Motion to Reject Leases); M68 (CEGM Alachua's Sealed Objection to Debtor's Motion to Reject Leases); M69 (HCG Landlord's Sealed Objection to Debtor's Motion to Reject Leases).

[18]  Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 220:13–16 (Sontchi).

[19]  Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 210:22–211:4 (Sontchi); D/BMI 108.

[20]  D.I. 6 (Sontchi First Day Dec.) at ¶ 7.

[21]  J44. D.I. 7 (Prepackaged Plan of Reorganization of Bedmar, LLC Under Chapter 11 of the Bankruptcy Code (the "Plan")).

[22]  Although not approved by the Court (and not admitted for the truth of the matter asserted), the Debtor's Disclosure Statement provides: "All Claims against and Interests in the Debtor are Unimpaired under the Plan, and their Holders are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims and Interests, regardless of which Class such Claims or Interests are classified into, are not entitled to vote on the Plan, and the votes of such Holders shall not be solicited."  M61 (Disclosure Statement for Prepackaged Plan of Reorganization of Bedmar, LLC Under Chapter 11 of the Bankruptcy Code) at p. 21.  The Debtor maintains that the Plan can be approved without the Landlord's approval.

Within days, the Movants opposed the rejection of Leases and filed the Motions to Dismiss. Expedited discovery was commenced and was followed by a two-day evidentiary hearing. With this general overview, the Court examines and discusses the totality of the facts and circumstances leading to its determination that the petition should be dismissed for lack of good faith.

## JURISDICTION

A motion to dismiss a bankruptcy case arises under section 1112(b) of the Bankruptcy Code and falls within this Court's jurisdiction under 11 U.S.C. §1334(a) and (b). The District Court has referred cases within the jurisdiction to this Court pursuant to 28 U.S.C. § 157(a) and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012. A motion to dismiss the bankruptcy case is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A). Venue is proper in this Court pursuant to 28 U.S.C. § 1408.

## BACKGROUND

**1. History of the Enterprise.**

NRI, and certain subsidiaries, were formed in 2020 in response to the COVID-19 pandemic for the purpose of "enhancing capabilities to support the U.S.-based manufacturing of pharmaceuticals and introducing innovation into biomanufacturing."[23] From late 2020 through early 2022, NRI attracted substantial equity investments and used that capital to purchase and lease sites (both directly and through the acquisition of subsidiaries) that would become

---

[23] D.I. 6 (Sontchi First Day Dec.) at ¶ 24.

manufacturing plants, process development facilities, and laboratories throughout the United States.[24]

After 2020, NRI realized that the biotech industry did not have the demand that NRI and its affiliates created.[25]  It became apparent that the $2 billion in initial equity funding would not be sufficient.[26]  By mid-2022, NRI faced difficulties securing financing.[27]  The Company assessed strategies for additional financing and to exit underperforming sites.[28]  To "raise liquidity, a subsidiary of NRI engaged in certain sale-leaseback transactions for three previously owned facilities, including the site in Marlborough, Massachusetts."[29]  Efforts to sell or sublease sites were not successful.[30]

In March 2023, the United States Department of Defense (the "DoD") provided financing to improve certain sites and entered into a financing agreement to provide up to $410 million in loans;[31] however, the DoD only advanced $246 million due to NRI's inability to meet certain

---

[24]  D.I. 6 (Sontchi First Day Dec.) at ¶ 26.  *See also* Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 58:2–7; 65:10–25 (Montone).  Resilience was initially funded with preferred equity of about $2 billion.  There are over 50 institutional investors, the primary being Arch Ventures and 8VC.  *See also* Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 58:16–59:9 (Montone).

[25]  Tr. Hr'g. Jul. 29, 2025 (D.I. 334) at 63:4–13 (Montone).

[26]  Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 65:23–25 (Montone).

[27]  Tr. Hr'g Jul. 30, 2025 (D.I. 335) at 24:1–10 (Marth).

[28]  Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 66:1–12 (Montone).

[29]  Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 59:3–6 (Montone).

[30]  Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 66:10–12 (Montone).

[31]  Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 66:17–19 (Montone).

operating and financial milestones.[32]  Certain manufacturing facilities ultimately never became operational.[33]

Thereafter, in the end of 2023 and into early 2024, the Original Parent explored alternative financing options, that were unsuccessful.[34]

In 2024, NRI received $112 million from certain existing shareholders (the principal holders being Arch Ventures and 8VC) in the form of convertible notes (the "Convertible Notes").[35]  The Convertible Notes were intended to be a short-term financial solution, with the expectation that NRI would obtain long-term financing, but long-term financing never materialized.[36]

Following the infusion of the convertible notes, in August 2024, the Company hired JPMorgan as an advisor.[37]  Fundraising efforts with JPMorgan were unsuccessful.  According to Mr. Montone, the funding did not materialize for "the same reasons and feedback that we had

---

[32]  Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 66:13–67:9 (Montone).  The remainder of the DoD loan ($164 million) was not funded because the second tranche of the loan was tied to certain revenue achievements that were not achieved. Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 67:5–9 (Montone).

[33]  D.I. 6 (Sontchi First Day Dec.) at ¶ 28.  Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 61:44–62:3 (Montone) ("[A] . . . We've settled for both of our sites in the San Diego area, what we refer to as Merryfield and Roselle, as well as our site in Fremont, California. [Q] Did all of the sites on this map become operational? [A] No, they did not."); and 62:2–11 (Montone) ([Q] Did all of the sites on this map become operational? [A] No, they did not. [Q] And focusing on the sites at issue in this case on the eastern side of the map, which ones are not operational? [A] Marlborough and Bedford never became operational.  Allston was operational as a manufacturing facility for a period of time and then transitioned to do some minor process and analytical development work.  And Alachua was operational as a process and analytical development lab.").

[34]  Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 67:13–68:3 (Montone).

[35]  Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 68:4–23 (Montone).  Tr. Hr'g Jul. 30, 2025 (D.I. 335) at 85:14–21 (Marth).

[36]  Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 68:4–69:6 (Montone).  Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 68:21–23 (Montone) ("It was purely meant for a much needed cash infusion on a short-term basis, while we still pursued long-term financing.").  The terms of the Convertible Notes contain a 2x multiple, plus PIK interest at 8 percent. Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 151:22–25 (Montone).  The pay-out multiple means the convertible notes are paid back at $224 million plus interest.  Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 152:9–13 (Montone).

[37]  Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 69:19–21 (Montone).

received on the first funding that did not materialize; we had too much operating cost and too much operating burn from our underutilized sites."[38]

In mid-March 2025, recognizing that long-term financing was proven to be next to impossible, NRI hired three advisors to help assess and strategize potential options and next steps.[39]  At that time, the Company had approximately $100 million in cash which would provide approximately two to three months of liquidity.[40]

After implementing measures to address liquidity, and an 18-month unsuccessful effort to obtain financing, NRI concluded that the only way to remain operational was to winddown nonoperational and/or underutilized facilities.[41]

The Company ultimately considered two strategic alternatives: (i) a chapter 11 filing for the entire Enterprise, and (ii) the Corporate Transactions (divisive merger).  The Company pursued the later only after verbally securing additional funding to effectuate the process.[42]

---

[38]  Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 69:19–70:4 (Montone).

[39]  Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 70:14–23 (Montone).  The three firms: (i) Latham & Watkins LLP to assist in legal advisory and restructuring services; (ii) Portage Point Partners LLC to assist with the development of long-term financing projections in cash liquidity scenarios; and (iii) Jefferies LLC as investment banker to investigate additional long-term financing.

[40]  Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 70:24–71:6 (Montone).

[41]  Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 66:5–9 (Montone) ("One was a strategy to seek additional financing. And the other was strategies to try exit our underperforming sites, initially trying to sell and/or sublease, and in certain cases we were able to terminate some of our leases."); Tr. Hr'g Jul. 30, 2025 (D.I. 335) at 32:24–33:1 (Marth) ("[Q]What did you mean by 'toxic sites'? [A] Again, I could say, well, I have underperforming sites and underutilized sites, redundant capabilities.").

[42]  Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 71:7–72:13 (Montone).  Tr. Hr'g Jul. 30, 2025 (D.I. 335) at 28:12–23 (Marth) ("[T]here was really only two courses of action for us; and that was a [National Resilience] Holdco bankruptcy, Chapter 11, or this divisive merger.  And so we looked at both, and from where I sit, where I sit today, the divisive merger was absolutely the way to go.  It returned value to, you know – to the – in this case, the landlords, 100 percent of the cap claim, I preserve over 1500 jobs, and, you know, and I have a shot; not a sure thing, but I have a shot, a good shot at the future.  And so weighing all those things, you know, we did choose divisive merger.").

### 2. Resilience 2.0 and the Corporate Transactions.

The Company determined that the Corporate Transactions strategy, a divisive merger whereby the Company divested of liabilities to insulate the slimmed down Resilience from claims,[43] followed by a chapter 11 filing of a single entity, was the best case scenario for all parties involved because it allowed the Company "to pay calculated lease cap claims for the rejection damages, as well as gave the remaining Resilience affiliates the opportunity to potentially raise long-term financing that was much needed for the other sites."[44]

The Corporate Transactions strategy was predicated on raising bridge financing to effectuate the process.[45]  In April 2025, the Company commenced bridge financing efforts.[46] The Debtor prepared a presentation to several of its shareholders entitled "Resilience 2.0" which rebranded a slimmed down Enterprise, maintaining upside and exiting all underperforming leases.[47]  This right-sized Enterprise would "preserve value, accelerate[] EBITDA breakeven, and strengthen[] [the Enterprise's] financial position."[48]  "Resilience 2.0" was projected to be profitable in 2026.[49]

---

[43] Tr. Hr'g Jul. 30, 2025 (D.I. 335) at 55:3–7 (Marth).  Tr. Hr'g Jul. 30, 2025 (D.I. 335) at 54:3–24 (Marth).  *See also* M14 ("After significant investigation with our legal and financial advisors, it was determined that the best course of the action was a 'divisive merger' - in plain English, this means separating out the assets we want to keep from the ones we don't.").

[44] Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 71:23–72:7 (Montone).  *See also* Tr. Hr'g Jul. 30, 2025 (D.I. 335) at 31:10–15 (Marth) (". . . I feel the landlords get their due, but we keep people employee employed.  We keep getting medicines that are made for our pharmaceutical partners for the US market.  We're trying to keep manufacturing here in the United States.  There's just so many beneficiaries of this strategy.").

[45] Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 72:8–13 (Montone).

[46] Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 72:14–16 (Montone).

[47] J1.

[48] J1 at p. 3.

[49] J1 at p. 3.

Prior to effectuating the Corporate Transactions, in May 2025, the Company created

Resilience SPV2025, LLC, a Delaware Limited Liability Company ("SPV2025").  SPV2025

sold NRI common units in exchange for cash to certain existing investors (the "Bridge Loan").[50]

SPV2025 then loaned funds to NRI and RUS from the funds raised from investors in SPV2025.[51]

SPV2025 raised approximately $135 million in financing (of the available $242 million in Series

A preferred units).[52]  The initial $135 million in bridge financing was provided primarily by two

existing shareholders, Arch Ventures and 8VC,[53] in order to effectuate the process of winding

down the Sites and implementing the Corporate Transactions.[54]  SPV2025, NRI, and RUS

entered into an intercompany loan agreement.[55]  The Bridge Loan is secured by the

unencumbered personal property throughout the remainder of the Enterprise,[56] primarily

personal property at the West Chester, Ohio facility.[57]

---

[50] Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 74:24–75:4 (Montone) ("So, you know, again, prior to any of our corporate transactions, the company created a special purpose vehicle named Resilience SPV2025, LLC, where the common units were owned by National Resilience, Inc.  And we sold Series A preferred units in exchange for cash to certain existing investors.") and 76:9–18 (Montone) ("[A] My understanding was, in order to help effectuate the process of winding down the sites and the corporate transactions, they were willing to provide that funding.  [Q] Okay. Was this Chapter 11 filing and the lease rejections a formal condition of the bridge financing?  [A] It was not formal in the sense of -- it was not written into the loan doc -- to the, you know, preferred sale documents.  However, it was generally understood that a portion of these funds would used to -- would be used to effectuate the process.").

[51] Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 74:22–75:4 (Montone).

[52] Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 75:8–12 (Montone).  The pay-out multiple means the full amount of bridge loan is paid back at $847 million plus interest.  Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 152:17–153:8 (Montone).

[53] Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 76:3–11 (Montone).

[54] Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 75:20–76:2 (Montone); Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 76:7–77:22 (Montone).

[55] Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 75:8–19 (Montone).  The terms of the Bridge Loan provided for repayment at a 3.5x multiple plus PIK interest.  Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 151:25–152:3 (Montone).

[56] Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 130:21–131:2 (Montone) ("[A] This personal property now became secured under that intercompany loan. [Q] So the intercompany note had a senior right to that personal property over the lease claims at this time, correct? [A] Yes, the notes were collateralized against that personal property.").

[57] Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 75:13–19 (Montone).

Approximately $65 million of the bridge financing was earmarked for the Corporate

Transactions that proceeded the filing of the Chapter 11 Case, and the remainder was for

operations and capital expenditures.[58]

The Enterprise continues to raise bridge financing through SPV2025.[59]

In early June 2025, the Company implemented the Corporate Transactions strategy.

Certain of the Parent's subsidiaries underwent divisions pursuant to sections 18-217 of the

Delaware LLC Act.  The Debtor is a resulting entity from a division of one such subsidiary.  As

explained in further detail in the attached Addendum, the process consisted of five independent

but interrelated steps.

### 3.  Leasehold Obligations.

Prior to the Corporate Transactions, NRI and its affiliates were parties to various leases.

The following four leases, among others, were allocated to the Debtor in the Corporate

Transactions, and are at issue in the Motions to Dismiss (collectively, the "Leases"):[60]

- On September 8, 2021, Cobalt entered into a lease agreement (the "Cobalt Lease")
  with Resilience Boston, Inc., a subsidiary of NRI, located at 28 Crosby Drive,
  Bedford, Massachusetts.[61]  NRI agreed to guaranty the lease payments of Resilience
  Boston, Inc. for the duration of the Cobalt Lease (the "Colbalt Lease Guaranty").[62]
  The Cobalt Lease terminates in September 2032.

- On June 1, 1992, the Massachusetts Turnpike Authority entered into a lease
  agreement (the "Harvard Lease") with Allston Landing Limited Partnership as tenant
  and Genzyme Corporation as guarantor for property located at 500 Soldiers Field

---

[58]  Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 75:20–76:2 (Montone).

[59]  Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 72:14–18 (Montone).

[60]  The Debtor has resolved disputes with Orchard Therapeutics North America (*see* Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 42:21–43:3) and ARE-SD Region No. 23, LLC (*see* D.I. 319).

[61]  D/BMI109.

[62]  D/BMI110.

Road, Allston, Massachusetts.[63]  On October 22, 2002, the President and Fellows of Harvard College ("Harvard"), as a successor in interest to the Massachusetts Turnpike Authority, entered into an agreement with Allston Landing Limited Partnership and Genzyme Corporation.[64]  On March 1, 2021, Harvard and Allston Landing Limited Partnership entered into assignment and assumption agreements with Resilience Boston, Inc., as tenant, and NRI as Guarantor.[65]  NRI entered into a guaranty agreement with Harvard (the "Harvard Lease Guaranty").[66]

- On October 26, 2022, 92 Crowley Owner (DE) LLC ("92 Crowley") entered into a lease agreement (the "92 Crowley Lease") with Resilience US, Inc., as tenant.[67]  On October 22, 2022, NRI entered into a guaranty agreement with 92 Crowley (the "92 Crowley Lease Guaranty").[68]  The 92 Crowley Lease terminates on October 31, 2037.[69]

- On November 6, 2020, Alachua Copeland Park Investments II, LLC entered into a lease agreement (the "Alachua Lease") with Ology Bioservices, Inc., as tenant for a property located in Alachua, Florida.  CEGM Alachua, LLC ("Alachua") is the successor in interest to Alachua Copeland Park Investments II, LLC.[70]  On December 15, 2021, NRI entered into a guaranty agreement with Alachua (the "Alachua Lease Guaranty").[71]  On June 3, 2025, AGS HoldCo LLC was created in Delaware while the Independent Manager "purported to take assignment of the Alachua Lease pursuant to an assignment agreement."[72]

---

[63] J33.

[64] J30.

[65] J34.

[66] J36.

[67] J24.

[68] J26.

[69] J24 at §1.04.

[70] J14.  Ology Bioservices, Inc. changed its name to Resilient Government Services, Inc. and on May 21, 2025, Resilient Government Services, Inc. was renamed Alachua Government Services, Inc. ("AGS") and is wholly owned by AGS Holdco, LLC.  D.I. 6 (Sontchi First Day Dec.) at ¶ 21; D.I. 221 (BMI Objection to Motions to Dismiss) at ¶13; Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 59:7–9 (Montone); *see also See In re Alachua Gov't Servs., Inc.*, Case No. 25-11289 (JKS), D.I. 16 (Declaration of Janet R. Naifeh, Chief Restructuring Officer of the Debtor, in Support of Chapter 11 Petition and First Day and Other Pleadings) at ¶ 8.

[71] J20.

[72] D/BMI41 and D/BMI106.  AGS filed for chapter 11 relief in this Court on July 6, 2025.  *See In re Alachua Gov't Servs., Inc.*, Case No. 25-11289 (JKS).

### 4. The Bankruptcy Filing.

On June 9, 2025, the Debtor filed for relief under chapter 11 of the Bankruptcy Code and moved to reject all of the Debtor's unexpired nonresidential real property Leases and subleases (the "Rejection Motion").[73]  The following day, the Debtor filed its proposed Plan,[74] which classifies all claims including equity holders, as unimpaired,[75] and proposes, among other things, to (i) pay in full allowed general unsecured claims, including lease rejection damages claims that are limited by section 502(b)(6) of the Bankruptcy Code,[76] and (ii) reinstate allowed interests. The Debtor was authorized to enter into a debtor-in-possession Credit Agreement ("DIP Credit Agreement") and borrow up to $10 million in principal amount from BMI, as lender, subject to the right to request authority to borrow additional funds pursuant to the DIP Credit Agreement.[77]

### LEGAL STANDARD FOR A MOTION TO DISMISS

Section 1112(b) of the Bankruptcy Code, provides that the court shall dismiss a chapter 11 case "for cause" absent "unusual circumstances establishing . . . [dismissal] is not in the best

---

[73] *See* D.I. 4.

[74] J44 (filed on June 10, 2025).

[75] J44 at Art. III(A).  The Court established a bar date of July 16, 2025, with respect to lease rejection damages claims.  D.I. 132.  Any disputes as to these claims have not yet been adjudicated.

[76] J44 at Art. V(D).  *But see* Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 250:15–18 (Sontchi) ("[Q] If the capped claims are allowed in amounts in excess of the funds available, did the parent or its investors agree to fund all amounts needed to pay any allowed claims in full? [A] There's no written agreement or contract about that."); 251:25–252:6 (Sontchi) ("[Q] If the allowed claims are higher than what you expected as the capped claims, would you be able to get more money from the parent? [A] I will certainly do everything I can, starting by asking and moving on from there.  I have a fair expectation that if the plan is confirmed, as it has been proposed, that . . . money will come, but I have no guarantee."); Tr. Hr'g Jul. 30, 2025 (D.I. 335) at 30:22–24 (Marth) ("But the landlords get a cap claim at 100 percent.  Whatever that number works out to be, they get 100 percent.").

[77] *See* D.I. 14 (DIP Motion), 15 (Declaration of Christopher S. Sontchi in Support of DIP Motion), and 115 (DIP Order).  Tr. Hr'g Jul. 29, 2025 (D.I. 331) at 251:3–5 (Sontchi) ("The DIP has been drawn in full.  We have the DIP . . . all 10 million.").

interests of creditors and the estate."[78]  The Third Circuit recognizes that a "lack of good faith" constitutes cause for dismissal of a chapter 11 petition.[79]  The "good faith" standard is based in the "equitable nature of bankruptcy" and the "purposes underlying chapter 11."[80]  A good faith standard "prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefiting them in any way."[81]  Bankruptcy courts, as courts of equity, "patrol the line between 'accomplishing the objectives of rehabilitation and reorganization, and the use of these statutory provisions to destroy and undermine the legitimate rights and interests of those intended to benefit by this statutory policy.'"[82]

Two factors are relevant to the good faith inquiry: "(1) whether the petition serves a valid bankruptcy purpose" and "(2) whether [the petition] is filed merely to obtain a tactical litigation advantage."[83]  "Whether the good faith requirement has been satisfied is a 'fact intensive inquiry' in which the court must examine 'the totality of facts and circumstances'[84] and

---

[78]  11 U.S.C. § 1112(b)(1)-(2).

[79]  *LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint (In re LTL Mgmt., LLC)*, 64 F.4th 84, 100 (3d Cir. 2023).  "Because the Code's text neither sets nor bars explicitly a good-faith requirement, we have grounded it in the 'equitable nature of bankruptcy' and the 'purposes underlying Chapter 11.'"  *Id.* (quoting *Off. Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 161–62 (3d Cir. 1999)).  A good faith obligation is imposed upon the filing of a chapter 11 petition.  *See In re SGL Carbon Corp.*, 200 F.3d at 160 ("[W]e make clear what we implied in *[In re Brown*, 951 F.2d 564, 571 (3d Cir. 1991)] – Chapter 11 bankruptcy petitions are subject to dismissal under 11 U.S.C. § 1112(b)(6) unless filed in good faith.").

[80]  *LTL Mgmt., LLC*, 64 F.4th at 100 (citing *In re SGL Carbon Corp.*, 200 F.3d at 159-62).

[81]  *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 119 (3d Cir. 2004).

[82]  *In re Rent-A-Wreck of Am., Inc.*, 580 B.R. 364 (Bankr. D. Del. 2018) (citing *In re SGL Carbon Corp.*, 200 F.3d at 160–162).  "Good faith is the gatekeeper of the equity court. Bankruptcy courts are equity courts with powerful tools at their disposal to interfere with or disrupt traditional laws. Were there no good faith limits on the invocation of these powers, they could easily cause injustice and thwart useful social policy." *In re HBA E., Inc.*, 87 B.R. 248, 263 (Bankr. E.D.N.Y. 1988).

[83]  *LTL Mgmt.*, 64 F.4th at 100–101 (citing *In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605, 618 (3d Cir. 2009)).

[84]  *Primestone Inv. Partners L.P. v. Vornado PS, L.L.C. (In re Primestone Inv. Partners L.P.)*, 272 B.R. 554, 557 (D. Del. 2002).

determine where a 'petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.'"[85]  "The focus of the inquiry is whether the petitioner sought 'to achieve objectives outside the legitimate scope of the bankruptcy laws' when filing for protection under Chapter 11."[86]

A valid bankruptcy purpose "assumes the debtor is in financial distress."[87]  "Good faith necessarily requires some degree of financial distress on the part of a debtor."[88] As the Court explained in *In re Rent-A-Wreck of America, Inc.*, "good faith is a predicate to a debtor's ability to use provisions of the Bankruptcy Code, and financial distress is a part of—if not itself a predicate to—a good faith analysis."[89]

A valid bankruptcy purpose includes preserving a going concern or maximizing the value of the estate.[90]  In *In re SGL Carbon Corp.*, the Third Circuit explained:

> It is easy to see why courts have required Chapter 11 petitioners to act within the scope of the bankruptcy laws to further a valid reorganizational purpose.  Chapter 11 vests petitioners with considerable powers—the automatic stay, the exclusive right to propose a reorganization plan, the discharge of debts, etc.—that can impose significant hardship on particular creditors.  When financially troubled petitioners seek a chance to remain in business, the exercise of those powers is justified.  But this is not so when a petitioner's aims lie outside those of the Bankruptcy Code.[91]

---

[85]  *In re Integrated Telecom Express, Inc.*, 384 F.3d at 118.

[86]  *In re Primestone Inv. Partners L.P.*, 272 B.R. at 557 (quoting *In re SGL Carbon*, 200 F.3d at 165).

[87]  *See LTL Mgmt.*, 64 F.4th at 101 (quoting *Integrated Telecom*, 384 F.3d at 128).  A debtor is not in financial distress if "there is no evidence that [it] . . . had difficulty meeting its debts as they came due, that it had any overdue debts, or that it had defaulted on any debts."  *In re SGL Carbon Corp.*, 200 F.3d at 166.

[88]  *In re Integrated Telecom Express, Inc.*, 384 F.3d at 121 (citation omitted).

[89]  *In re Rent-A-Wreck of Am., Inc.*, 580 B.R. at 375.

[90]  *In re SGL Carbon Corp.*, 200 F.3d at 165–66.

[91]  *Id.*

Courts also consider the following *Primestone* factors when making a good faith determination:

> (a) Single asset case; (b) Few unsecured creditors; (c) No ongoing business or employees; (d) Petition filed on eve of foreclosure; (e) Two party dispute which can be resolved in pending state court action; (f) No cash or income; (g) No pressure from non-moving creditors; (h) Previous bankruptcy petition; (i) Prepetition conduct was improper; (j) No possibility of reorganization; (k) Debtor formed immediately prepetition; (l) Debtor filed solely to create automatic stay; and (m) Subjective intent of the debtor.[92]

The Movants have challenged the Debtor's good faith. The Debtor has the burden to establish that the petition was filed in good faith.[93]

## SUMMARY OF THE PARTIES' ARGUMENTS

The Movants seek to dismiss the Debtor's Chapter 11 Case for lack of good faith. Specifically, they argue the petition was not filed for a valid bankruptcy purpose because the Debtor (a) was not in immediate financial distress or, alternatively, the financial distress was manufactured in preparation for the filing; and (b) has no intent to reorganize or to maximize value of the estate. Further, they contend the petition was filed as a litigation tactic because it seeks to, among other things, extinguish contractual rights and take advantage of section 502(b)(6) of the Bankruptcy Code and cap lease liabilities for the benefit of non-debtor affiliates and shareholders. They maintain that there are no "unusual circumstances" to overcome the Debtor's lack of good faith.

---

[92] *See In re Primestone Inv. Partners L.P.*, 272 B.R. at 557.

[93] *See LTL Mgmt.*, 64 F.4th at 100. Good faith is "at issue" when a party "calls into question the debtor's good faith" and when evidence is submitted "sufficient to impugn that good faith."

The Objectors[94] argue that, on the Petition Date, the Debtor was in financial distress. They maintain that the bankruptcy filing serves a valid bankruptcy purpose, is in the best interest of the Enterprise and its stakeholders, and necessary to preserve value and avoid Landlords racing to the courthouse to pursue state law remedies.  They argue that the Corporate Transactions and the commencement of the Chapter 11 Case was intended to leave landlords better off than they would have been if the entire Enterprise filed for chapter 11 relief.  They contend that the landlords are not entitled to recover on both their lease and guaranty claims and that an Enterprise bankruptcy would result in the impairment of the landlords' section 502(b)(6) claims.  The Objectors argue, alternatively, if the Court finds the case was not filed in good faith, the unusual circumstances exception applies.

## ANALYSIS

### 1.  The Petition Does Not Serve a Valid Bankruptcy Purpose.

#### a.  The Debtor is Not in Immediate Financial Distress.

A debtor who is not in financial distress cannot establish that its petition serves a valid bankruptcy purpose supporting good faith.[95]  Financial distress must be "genuine financial distress."[96]  Financial distress must also be "apparent" and "immediate" to justify a filing.[97]  "Economic difficulties" standing alone do not establish financial distress.  The parties dispute the

---

[94]  For ease of reference, the Court refers to the Objectors collectively even though, in limited circumstances, certain arguments were raised by a single Objector.

[95]  *In re LTL Mgmt., LLC*, 64 F.4th at 101.

[96]  *In re Integrated Telecom Express, Inc.*, 384 F.3d at 120 (citing *Furness v. Lilienfield*, 35 B.R. 1006, 1013 (D. Md. 1983) ("The Bankruptcy provisions are intended to benefit those in genuine financial distress.  They are not intended to be used as a mechanism to orchestrate pending litigation.").

[97]  *In re LTL Mgmt., LLC*, 64 F.4th at 102.

Debtor's financial distress.[98]  As discussed below, the facts demonstrate that the Debtor's financial condition was "manufactured," and therefore, the financial distress is not bona fide and does not meet the good faith standard.[99]

The Movants argue that the Debtor has not shown financial distress.  They emphasize that, in conjunction with the Corporate Transactions, the Debtor was capitalized with just enough cash and receivables to fulfill its only mission—to winddown the Sites, discharge the lease and guaranty liabilities, and pay professional fees.  To that end, the Debtor was allocated the Leases, guaranties, cash and receivables, and does not face financial distress in connection with the rejection damages flowing from the rejection of the Leases.  It is undisputed that the Leases were not in default, nor subject to litigation, as of the Petition Date.  Further, they argue that any financial distress that may exist was manufactured as a pretext for filing the bankruptcy case and does not establish good faith.

The Objectors argue that the Debtor is in financial distress because its liabilities amount to more than $372 million, overshadowing the value of its approximate $50 million in assets.[100]  They note because the Debtor does not generate any cash, continuing Lease obligations further deplete the already insufficient assets.  Further, they argue the Enterprise was facing a severe liquidity crisis caused by, among other things, an aggressive expansion strategy that led to leasing various manufacturing plants, process development facilities and laboratories that were ultimately underutilized or never became operational.

---

[98] *In re Integrated Telecom Express, Inc.*, 384 F.3d at 124.

[99] *Id.* at 120.

[100] Debtor's Omnibus Objection to Motions to Dismiss (D.I. 219) at ¶ 5 ("[T]he Debtor has been in significant financial distress, with lease liabilities of $372 million and assets of approximately $50 million.").

In *Integrated Telecom,* the Third Circuit held that "good faith necessarily requires some degree of financial distress on the part of the debtor."[101]  In *LTL Management*, the Third Circuit expanded its rationale: "The theme is clear: absent financial distress, there is no reason for Chapter 11 and no valid bankruptcy purpose."[102]  An analysis of financial distress is a fact specific inquiry and courts consider such facts as:

> solvency; cash reserves; recent financial performance and profitability; the proportion of debt owed to insiders; realistic estimates of actual or likely liability; the threat of litigation; whether a debt is fixed, substantial, and imminent; current cash position or current liquidity; ability to raise capital; and overdue debts or the ability to pay debts as they come due.  Any given case may touch on one or more of these factors.[103]

The Debtor's Schedules of Assets and Liabilities (the "Schedules"),[104] and the testimony of the Debtor's financial advisor, establish that as of the Petition Date, the Debtor's assets included $41,451,730.812[105] in cash and receivables, and its liabilities were $32,962,077.45 consisting of capped lease rejection damages claims.[106]  The Independent Manager testified he did not think the liabilities would exceed the statutory cap.[107]

---

[101] *In re Integrated Telecom Express, Inc.*, 384 F.3d at 121 (citation omitted).

[102] *In re LTL Mgmt., LLC*, 64 F.4th at 101.

[103] *In re Rent-A-Wreck of Am., Inc.*, 580 B.R. at 375–76 (footnotes and citations omitted).

[104] J45, D.I. 162.

[105] J45; Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 182:5–12 (Weidman) (confirming the assets as of the Petition Date were approximately $41.5 million).

[106] Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 182:13–183:7 (Weidman) (confirming the liabilities as of the Petition Date were approximately $32.9 million).  The Court notes that the lease liability would not be statutorily capped until the leases are rejected.  11 U.S.C. § 502(b)(6).  Although such relief has been sought by the Debtor (D.I. 4) the relief has not been granted.  Therefore, the amount of capped lease rejection claims is in dispute.

[107] Tr. Hr'g (Jul. 29, 2025) (D.I. 334) at 240:5–8 (Sontchi) ("[Q] To your mind, is the $41.4 million of assets allocated to Bedmar, LLC sufficient to pay the lease cap claims? [A] That's based on the calculations that we had when we filed, yes."); *see also Id.* at 194:4–20 (Weidman) ("[A] I just know it was a receivable that is owed to the debtor and that the 36.7 million is also the lease cap claim amount. [Q] You've never seen a document that says that Resilience SPV 2025, LLC owes Bedmar, LLC $36.7 million. Is that right? [A] No, I haven't. [Q] You've never seen a promissory note or similar document to that effect. Is that right? [A] No, I haven't.  [Q] Do you know what

In *SGL Carbon*, the debtor's financial disclosure documents gave no indication the company needed to reorganize under chapter 11.[108]  In that case, the Third Circuit held that a debtor who does not suffer from financial distress cannot demonstrate its chapter 11 petition serves a valid bankruptcy purpose supporting good faith.[109]  Like *SGL Carbon*, in this case, the Debtor's Schedules (the Debtor's financial disclosure documents), do not indicate financial distress as of the Petition Date.  Rather, as of the Petition Date, the Schedules reflect the Debtor's assets exceeded its liabilities and it was not facing immediate financial difficulty.  Based on the financial disclosure documents, the Court cannot conclude that the Debtor was in financial distress on the Petition Date.

The Court notes that testimony established that the contractual amount of all lease liability, as well as filed proofs of claim (which reflect claim amounts as of the Petition Date), exceeded the Debtor's scheduled amount.[110]  That said, the Court must look beyond the financial documents.

Indeed, the Objectors argue that the $372 million in lease liabilities and approximately $50 million in assets, demonstrates significant financial distress.[111]  They argue that the financial

---

the terms of collection are for that receivable?  [A] No, I don't.  [Q] How did you determine that this was the correct amount of the receivable to provide to Epiq to complete the schedules?  [A] The 36.7 million is also the amount of the lease cap claim amount.").

[108] *In re SGL Carbon Corp.*, 200 F.3d at 166 ("Prior to filing, SGL Carbon had assets of $400 million and liabilities of only $276 million, or a net worth of $124 million. In addition, there is no evidence that SGL Carbon had difficulty meeting its debts as they came due, that it had any overdue debts, or that it had defaulted on any debts. Nor is there any evidence that SGL had any difficulty raising or borrowing money, or otherwise had impaired access to the capital markets.").

[109] *Id.* at 169.

[110] *Compare* Tr. Hr'g Jul. 30, 2025 (D.I. 335) at 153:17–21 (Madden) *and* J44 (Plan) at Sch. A (Schedule of Rejection Damages Claims).

[111] While the Debtor's petition (D.I. 1) and Schedules (J45; D.I. 162) identify the Landlords' claims in the capped lease rejection amount; for the first time in the Debtor's Omnibus Objection to Motions to Dismiss, the Debtor

distress was evident both before (with respect to the Enterprise) and after (with respect to the

Debtor) the Corporate Transactions. The Movants, on the other hand, argue that the Debtor's

assets and liabilities were manufactured for purposes of the bankruptcy filing, thus the financial

distress is a fiction, and the filing is not in good faith.

The objective of the Corporate Transactions was to ensure that only the Debtor, Bedmar,

LLC, was subject to a chapter 11 bankruptcy, and not the Enterprise. Bedmar, LLC is a new and

separate entity, with a distinct legal status. In *LTL Management*, the Third Circuit explained:

> Even were we to agree that the full suite of reorganizational steps
> was a "single integrated transaction," this conclusion does not give
> us license to look past its effect: the creation of a new entity with a
> unique set of assets and liabilities, and the elimination of another.
> Only the former is in bankruptcy and subject to its good-faith
> requirement.[112]

The Third Circuit further counseled in *LTL Management* that a parent's financial

condition is only relevant to the financial distress inquiry when the parent has guaranteed

substantially all of the obligations of the chapter 11 debtor.[113] Here, there is no such guaranty or

backstop; as a result, the Debtor's financial state "should be tested independently of any other

entity."[114] As a consequence, and importantly, this Court does not evaluate the predecessor

---

asserts the total contractual liability for the Leases. D.I. 219 at ¶ 5 ("[T]he Debtor has been in significant financial distress, with lease liabilities of $372 million and assets of approximately $50 million."). At the evidentiary hearing, the Debtor presented a spreadsheet reflecting the capped rejection damages claims which also contained the full contractual liability under the Leases. *See* J9. Additionally, no documentary evidence was presented establishing the amount of the filed proofs of claim, the testimony establishes that proofs of claim exceed the calculated uncapped lease liabilities. *See* Tr. Hr'g Jul. 30, 2025 (D.I. 335) at 153:17–21 (Madden).

[112] *In re LTL Mgmt., LLC*, 64 F.4th at 105.

[113] *Id.* at 106 ("[T]he financial condition of Old Consumer is relevant only to the extent it informs our view of the financial condition of LTL itself."); *Id.* at 109 ("LTL has a funding backstop, not unlike an ATM disguised as a contract, that it can draw on to pay liabilities without any disruption to its business or threat to its financial viability.")

[114] *Id.* at 105 (citation omitted) (finding that "the creation of a new entity with a unique set of assets and liabilities, and the elimination of another. Only the former is in bankruptcy and subject to its good-faith requirement.").

entity's financial distress or the business goals of the Enterprise for purposes of assessing financial distress.  The Court focuses on the financial health of the Debtor.

In *LTL Management*, the Third Circuit discussed what degree of financial distress justifies a debtor's bankruptcy filing and determined "we need not set out any specific test to apply rigidly when evaluating financial distress.  Nor does the Code direct us to apply one."[115] Rather, the "good-faith gateway asks whether the debtor faces the kinds of problems that justify Chapter 11 relief."[116]

Further, in *LTL Management*, the Court noted it could not "predict all forms of financial difficulties that may in some cases justify debtor's presence in Chapter 11."[117]  It observed: "[s]o many spokes can lead to financial distress in the right circumstances that we cannot divine them all.  What we can do, case-by-case, is consider *all relevant facts* in light of the purposes of the Code."[118]

Examining the facts and circumstances of the instance case, the Court finds that although the Debtor may have been allocated greater liabilities than assets, the financial health of the Debtor was not authentic, but rather structured, by design, by the Enterprise in conjunction with the Corporate Transactions to facilitate the bankruptcy filing and jettison lease liabilities.  More specifically, the record reflects:

---

[115] *Id.* at 102.

[116] *Id.*

[117] *Id.*

[118] *Id.* (emphasis added).

- The Corporate Transactions strategy, including the allocation of assets and liabilities and anticipated bankruptcy filing, was planned prior to the creation of the Debtor.[119]

- The Debtor was specifically created as part of the Corporate Transactions strategy to file bankruptcy for the purpose of limiting lease and guaranty liabilities by invoking section 502(b)(6) of the Bankruptcy Code.[120]

- As a result of the Corporate Transactions, "toxic" lease Sites and related guaranties were removed from the non-debtor affiliates and allocated to the Debtor.[121]

- On the Petition Date, the Debtor had seven unsecured creditors all designated as "landlords."[122]

- As of the Petition Date, the Lease payments were current, and no prepetition actions were pending with regard to the Leases or guaranties (i.e., no Landlord had filed any state court actions or sought alternative remedies).[123]

- On the Petition Date, the Debtor had "no material secured debt" and its "accrued and unpaid obligations [were] limited almost exclusivity to certain outstanding lease obligations with respect to the Sites."[124]

- As a result of the Corporate Transactions, the Debtor received: (1) Site Leases;[125] (2) lease guaranties;[126] (3) $41.4 million;[127] and (4) a 51% membership interest in AGS Holdco, LLC.[128]  The Debtor also received liabilities related to the Leases.[129]  In other words, the Debtor was allocated only enough funds to pay the capped lease liabilities and professional fees.  The actual calculation of the Landlords' asserted claims remains to be seen.

---

[119] Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 215:19–219:18 (Sontchi); M7.

[120] Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 221:4–10 (Sontchi); 246:23–25 (Sontchi).

[121] M43.

[122] D.I. 1 (List of Creditors Who Have the 20 Largest Unsecured Claims and are Not Insiders).

[123] D.I. 163 (Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy) at part 3.

[124] D.I. 6 (Sontchi First Day Dec.) at ¶ 11.

[125] The Lease Sites are located in Bedford, Allston, and Marlborough, Massachusetts; San Diego (two sites) and Freemont, California; and Alachua, Florida.  D.I. 6 (Sontchi First Day Dec.) at ¶ 13.

[126] *See* J7 at Sch. 1; J8 at Sch. 1.

[127] D.I. 6 (Sontchi First Day Dec.) at ¶ 22.

[128] D.I. 6 (Sontchi First Day Dec.) at ¶¶ 21 and 22.

[129] *Compare* J9 (spreadsheet of Lease liabilities created by Portage Point Partners LLC) *and* Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 174:17–178:4 (Weidman) *with* J45 (Schedules of Assets and Liabilities).

- The Debtor's Independent Manager was appointed to serve in a corporate structure with a predetermined bankruptcy edict as part of the Enterprise's go-forward strategy.[130]

- Absent the bankruptcy filing, the shareholders would not have funded the Bridge Loan necessary to fund the Corporate Transactions and the bankruptcy. The Enterprise's ultimate goal was to eliminate lease liabilities and return a right-sized business to the Enterprise's shareholders.[131]

- The Independent Manager was not involved in the Corporate Transactions strategy or evaluation of the allocation of assets and liabilities to the Debtor.[132]

- The Debtor was created six-days prior to its bankruptcy filing.[133]

- The Debtor has no employees.[134]

- The Debtor has no business operations.[135]

- The Debtor has no source of income.[136]

- The Debtor is reliant on the non-debtor affiliates for all corporate services.[137]

---

[130] Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 258:15–259:8 ("[Q] . . . prior to Bedmar, LLC's formation on June 3rd under the corporate transactions, there weren't negotiations between Richards, Layton & Finger as to what Bedmar, LLC, as an entity, would look like with Latham & Watkins as counsel to National Resilience? . . . [A] So, after we had the meeting on May 21st, I engaged Richards, Layton & Finger and I engaged DWC. We had the broad outlines of what the path forward would be that were given to me at the time of that meeting on May 21st. During that period, going forward, Richards was definitely involved in communications. I don't know if they were negotiations, per se, but there were certainly communications about the process that would actually effectuate the creation of Bedmar, the merger, and the filing.").

[131] Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 76:12–22 (Montone) ("[Q] Was this Chapter 11 filing and the lease rejections a formal condition of the bridge financing? [A] It was not formal in the sense of -- it was not written into the loan doc -- to the, you know, preferred sale documents. However, it was generally understood that a portion of these funds would used to -- would be used to effectuate the process. [Q] Okay. To your knowledge, would the bridge investors have been willing to invest in Resilience in May if there wasn't some strategy to exit the underutilized sites? [A] Not without a strategy, no.").

[132] Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 221:18–21 (Sontchi) ("[Q] And in fact, did you review the leases in any detail prior to the allocation or rejection of -- attempted rejection of those leases? [A] No.").

[133] Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 146:17–19 (Montone) and 211:2–4 (Sontchi).

[134] Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 237:10–11 (Sontchi).

[135] Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 237:12–13 (Sontchi).

[136] Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 237:14–16 (Sontchi).

[137] D.I. 6 (Sontchi First Day Dec.) at ¶ 12.

- The Debtor has surrendered the Sites and moved to reject the Leases.[138]

"At its most basic level, the Bankruptcy Code maximizes value by alleviating the problem of financial distress," and in order for a petition to be filed in good faith, a debtor must be experiencing "some degree of financial distress."[139]  A showing of good faith requires bona fide financial distress and such distress must be "genuine financial distress."[140]  As reflected in the facts outlined above, Bedmar did not face any of the operational, managerial, market, financial, economic, legal, or other challenges that generally cause a debtor genuine financial distress.  The newly created Debtor never conducted business, nor was it formed for the purpose of conducting business, that would have resulted in genuine financial distress.  As a result, the facts of this case are not representative of a typical chapter 11 case addressing financial distress.

The facts demonstrate that the Debtor's financial health was created by design by the Enterprise as part of the Corporate Transactions.[141]  The Enterprise orchestrated the divisions that ultimately created the Debtor, and allocated assets and liabilities to the Debtor deeming it "financially distressed" to take advantage of the provisions of the Bankruptcy Code.  The financial distress was not organic or genuine, it was manufactured.

---

[138]  D.I. 4 (Motion of Debtor for Entry of an Order (I) Authorizing (A) Rejection of Certain Unexpired Leases of Nonresidential Real Property and (B) Abandonment of Any Remaining Personal Property Located at the Leased Sites, and (II) Granting Related Relief).

[139]  *In re Integrated Telecom Express, Inc.*, 384 F.3d at 121.

[140]  *Id.* at 120 (citing *Furness v. Lilienfield*, 35 B.R. at 1013 ("The Bankruptcy provisions are intended to benefit those in genuine financial distress.  They are not intended to be used as a mechanism to orchestrate pending litigation.").

[141]  Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 239:6-13 (Sontchi) ("[Q] We have $372 million of lease liabilities that were allocated to Bedmar, LLC pursuant to the corporate transactions, correct?  [A] Well, it depends on whether you call them member - yes and no -- whether you call the merger part of corporate transactions, I generally don't because I was actually involved in that.  But some of those leases and liabilities come from that merger.").

Furthermore, financial distress must "apparent," "immediate," and "imminent" enough to justify a filing.[142]  The Debtor's Independent Manager testified that the Debtor had $14 million and receivables.[143]  On the Petition Date, the Debtor's only function was to hold the Leases and guaranties, in a dormant state, and seek confirmation of its plan.  There is no element of immediacy whereby the Debtor was "teetering on the verge of a fatal financial plummet."[144]

This case presents one of the unpredictable "financial difficulties" acknowledged by the Court in *LTL Management*.[145]  The obstacles (i.e., the allocation of assets and liabilities) imposed on the newly-formed Debtor as a result of the Corporate Transactions, created financial circumstances that were a fiction – purportedly the financial distress necessary to justify chapter 11 relief.  In other words, the financial distress was concocted with an end-goal of ridding the Enterprise of its Lease liabilities for the benefit of its shareholders; not to maximize the value for the Debtor's creditors.  As the Court stated in *Rent-A-Wreck*, "Debtors cannot fabricate the basis of a good faith filing by their desire to avoid the results of their own provocative actions."[146]  Bona fide financial distress is a predicate to good faith;[147] and in this instance, the

---

[142]  *In re LTL Mgmt.*, 64 F.4th at 103, 108.

[143]  Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 2541:8–22 (Sontchi) ("[A] . . . right now we have about 14 million.  That's the DIP plus the allocations that occurred prior.  However, we – of course we have the receivable.  So if and when we confirm a plan and need to pay allowed claims, we will get the money that has been – that is under the receivable. [Q] Do you know why the receivable has not been paid to Bedmar yet? [A] Well, one, we haven't asked for it.  But no . . . it's to pay the rejection, it's to pay allowed claims under a confirmed plan.  So when I have the confirmed plan, we'll deal with it.").

[144]  *In re LTL Mgmt.*, 64 F.4th at 103.

[145]  *Id.* at 102.

[146]  *In re Rent-A-Wreck of Am., Inc.*, 580 B.R. at 387.

[147]  *In re Integrated Telecom Express, Inc.*, 384 F.3d at 120.

"manufactured" financial distress does not meet the good faith standard and is an abuse of the
bankruptcy process.

This Court acknowledges that in *LTL Management*, the Third Circuit did not intend to
"discourage lawyers from being inventive and management from experimenting with novel
solutions. Creative crafting in the law can at times accrue to the benefit of all, or nearly all,
stakeholders."[148] Here, the Debtor acknowledges that it "used a novel solution for the benefit of
all of the Debtor's stakeholders" and argues that the case "represents precisely what the Court
envisioned in *LTL [Management]*."[149] Like *LTL Management*, the Debtor's belief that the
chapter 11 filing creates the best possible worlds for the Debtor, the Enterprise,[150] and the
Landlords[151] is not enough,[152] no matter how sincerely held. Moreover, although the Delaware
LLC Act may provide for the division and creation of entities, the Bankruptcy Code dictates
whether an entity's bankruptcy petition has been filed in good faith.[153]

---

[148] *In re LTL Mgmt., LLC*, 64 F.4th at 111.

[149] D.I. 219 (Debtor's Omnibus Objection to Motions to Dismiss) at ¶7.

[150] Tr. Hr'g Jul. 30, 2025 (D.I. 335) at 28:16–23 (Marth) ("[T]he divisive merger was absolutely the way to go. It returned value to . . . the landlords, 100 percent of the cap claim, I preserve over 1500 jobs, and, . . . I have a shot; not a sure thing, but I have a shot, a good shot at the future."); 31:11–13 (Marth) ("[W]e keep people . . . employed. We keep getting medicines that are made for our pharmaceutical partners for the US market. We're trying to keep manufacturing here in the United States.").

[151] Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 218:13–219:2 (Sontchi) ("[L]ooking at the Bedmar, LLC Chapter 11 as we had discussed it at that meeting and the clarification I had gotten, [the Landlords] were getting paid everything they were owed or would get paid everything they were owed under the Bankruptcy Code. Whereas, in a Chapter 11 of the entire [E]nterprise, they couldn't do better, but they might do worse, and, indeed, they might do much worse because, and I didn't have the numbers on it at the time, but because of the description I had received and the conversation we had received about the financial distress of the [E]nterprise as a whole. So I thought it was sort of almost – well, I won't say it's a non-brainer because it's a tough situation, but it seemed that Bedmar, LLC Chapter 11 was . . . actually their best opportunity.").

[152] *See, e.g., In re LTL Mgmt., LLC*, 64 F.4th at 111.

[153] The Court need not construe the Delaware LLC Act, whether the Delaware LLC Act supersedes state law governing the Leases, or whether the Corporate Transactions are compliant with the Delaware LLC Act. The issue is whether the Debtor's case was filed in good faith and for a valid bankruptcy purpose, which the Court finds it was not.

The Court expressly limits its findings to the facts of this case and does not attempt to predict what alternative facts and circumstances would lead to a different result.

### b. The Bankruptcy Filing Does Not Preserve a Going Concern or Maximize Value of the Estate.

The Movants argue that the petition does not serve a valid bankruptcy purpose because the Debtor has no intent to reorganize or rehabilitate its business for the simple reason that the Debtor has no employees, and no business operations, or objectives other than to winddown the leases and mitigate its liabilities to statutorily capped damages.

The Objectors argue that Bedmar's filing serves a valid bankruptcy purpose because it maximizes the value of the Debtor's estate for its creditors.  They maintain that outside of bankruptcy, each landlord would have to bring a separate collection action, precipitating a race to the courthouse for the Debtor's limited funds and a depletion of those funds due to the costs of piecemeal litigation.  Further, they argue that the approximate $40 million allocated to the Debtor from the Bridge Loan was lent specifically for the purpose of paying the capped lease rejection damages claims, which would not have been available to the Landlords had the Debtor not filed for bankruptcy.

Good faith requires "'some relation' between the filing and the 'reorganization-related purposes that [Chapter 11] was designed to serve.'"[154]  A bankruptcy filing serves a valid bankruptcy purpose either by "preserving a going concern" or by "maximizing the value of the

---

[154] *In re Coastal Cable T.V., Inc.*, 709 F.2d at 764 (citations omitted); *In re SGL Carbon Corp.*, 200 F.3d at 165 (citations omitted).

debtor's estate" through preserving "some value that otherwise would be lost outside of bankruptcy."[155]

### i. The Bankruptcy Does Not Preserve a Going Concern.

It is undisputed that the Debtor was created for the purpose of filing for bankruptcy and winding down lease obligations incurred by other entities.[156] The Debtor does not have, nor did it ever have, any employees, business operations, or cash flow. It relies on certain non-debtor affiliates for its limited corporate needs.[157] The Debtor is "unquestionably 'out of business'"[158] with no future prospect of rehabilitation, reorganization or liquidation under the Bankruptcy Code. The bankruptcy filing is not intended, nor could it, preserve a going concern. Courts have recognized that if a debtor "has no need to rehabilitate or reorganize, its petition cannot serve the rehabilitative purpose for which Chapter 11 was designed."[159]

---

[155] *Employee Plaintiffs v. AIG Fin. Prods. Corp. (In re AIG Fin. Prods. Corp.)*, No. BR 22-11309-MFW, 2024 WL 3967465, at *9 (D. Del. Aug. 28, 2024) (citing *In re Integrated Telecom Express, Inc.*, 384 F.3d at 119–20). *See also Freeman v. California Franchise Tax Bd.*, No. 18-CV-04501-CRB, 2019 WL 3412938, at *8 (N.D. Cal. July 29, 2019) (citations omitted) (holding that when a "debtor files for bankruptcy, her purpose must be legitimate, valid, and honest. The purposes of bankruptcy are generally to (1) enable a 'fresh start' for the debtor, and (2) ensure equity among creditors.").

[156] *See* D.I. 221 (BMI's Objection to the Motions to Dismiss) at ¶ 1 ("The purpose of the Chapter 11 Case is to administer an orderly winddown and fully pay all allowed liabilities. . . .").

[157] D.I. 6 (Sontchi First Day Dec.) at ¶12.

[158] *In re Integrated Telecom Express, Inc.*, 384 F.3d at 120 (citations omitted).

[159] *In re SGL Carbon Corp.*, 200 F.3d at 166 (citations omitted).

### ii.    The Bankruptcy Does Not Maximize Value of the Estate.

The Court next considers whether the bankruptcy filing maximizes the value of the estate for creditors.[160]  The Leases have been surrendered and are being rejected.[161]  The Debtor's only other assets, cash and receivables (allocated through the Corporate Transactions), are reserved to satisfy rejection damages claims, guaranty claims, and professional fee claims.[162]

The Objectors argue the bankruptcy maximizes the estate by preventing a race to the courthouse that would have resulted had each Landlord commenced litigation in the various jurisdictions in which the Sites are located.  The Court finds that while avoiding a race to the courthouse could be a valid bankruptcy purpose, in this instance, there is no evidence to support this assertion.[163]

The Objectors also contend "bankruptcy created value for the landlords that would not have been available" absent the Debtor's filing.[164]  The Objectors argue that the Landlords "fare better under the current situation because, once the Debtor's Plan is confirmed, they will receive

---

[160]  *In re Integrated Telecom Express, Inc.*, 384 F.3d at 120. "As the Bankruptcy Court recognized, Integrated is unquestionably 'out of business,' and therefore has no going concern value to preserve in Chapter 11 through reorganization or liquidation under the Bankruptcy Code.  The question becomes whether Integrated's petition might reasonably have 'maximized the value of the bankruptcy estate.'"  *Id.* (quoting *Toibb v. Radloff*, 501 U.S. 157, 163 (1991)).

[161]  *Compare* Tr. Hr'g Jul. 30, 2025 (D.I. 335) at 110:11–13 (Alhale) ("[lease are] both an asset and a liability in accordance with GAAP in which the company reports") *with* 165:5–10 (Madden) ("I consider a lease to be an asset when it's under market and can be sold, right.  So if, if a party to a lease, you know, has gotten a good deal and, you know, can find a replacement tenant and they can move the lease and get compensated for it, you know, that's when it's an asset, when it's under market.").

[162]  Although no documentary evidence regarding the receivable was presented, the testimony reflects that the receivable is not held by the Debtor and not available until confirmation of the plan.  *See* Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 251:10–22 (Sontchi) ("[A] . . . However, we -- of course we have the receivable. So, if and when we confirm a plan and need to pay allowed claims, we will get the money that has been -- that is under the receivable. [Q] Do you know why the receivable has not been paid to Bedmar yet?  [A] Well, one, we haven't asked for it, but no. [Q] Do you have any knowledge – [A] It's -- it's for – [Q] Go ahead.  [A] It's to pay the rejection -- it's to pay allowed claims under a confirmed plan, so, when I have the confirmed plan, we'll deal with it.").

[163]  D.I. 163 (Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy) at part 3.

[164]  D.I. 221 (BMI's Objection to Motions to Dismiss) at ¶ 47.

the full amount of their statutorily capped claims in the near term."[165]  The Objectors urge the

Court to consider Debtor's corporate family and argue the only alternative to this Chapter 11

Case is an Enterprise bankruptcy.  This Court can only consider the facts before it and the

potential outcome of an Enterprise's hypothetical bankruptcy filing is not before the Court.

Finally, the Objectors argue the instant case mirrors the facts of *PPI*[166] and that the Third

Circuit in *PPI* made clear that "an insolvent debtor can file under Chapter 11 in order to

maximize the value of its [] asset[s] to satisfy its creditors, while at the same time availing itself

of the landlord cap under § 502(b)(6)"[167] and that is what the Debtor proposes in this case.

The Objectors' reliance on *PPI* falls short.[168]  The PPI debtor was insolvent and filed a

chapter 11 petition for four reasons: to conclude its indirect corporate parent's winddown in a

foreign jurisdiction; liquidate; sell its sole asset; and limit lease termination damages under

section 502(b)(6) of the Bankruptcy Code.[169]  In addition to the landlord's claims, the PPI debtor

had unsecured claims of approximately $54.6 million, overshadowing the value of its only asset.

*PPI* is factually distinguishable from the present case because, here, the Debtor is not in financial

distress, has no other assets, was specifically created to cap lease rejection damages claims for

---

[165]  D.I. 221 (BMI's Objection to Motions to Dismiss) at ¶ 44 ("By contrast, had the entire enterprise filed for chapter 11 protection, the landlords would have been forced to compete with many more unsecured creditors for insufficient assets and likely would not have been paid in full and would not have been paid for months, if not years, after the filing.").

[166]  *In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197 (3d Cir. 2003).

[167]  *In re Integrated Telecom Express, Inc.*, 384 F.3d at 123 (emphasis added).

[168]  As the courts in *Rent-A-Wreck* and *Derma Pen* observed, *PPI* has been limited as noted in *Integrated Telecom. Express, Inc.  See In re Rent-A-Wreck of Am., Inc.*, 580 B.R. at 374 n. 143 (Bankr. D. Del. 2018); *In re Derma Pen, LLC,* Case No. 14-11894(KJC), 2014 WL 7269762 at *8 (Bankr. D. Del. 2014).

[169]  *In re PPI Enters. (U.S.), Inc.,* 324 F.3d at 201.

the benefit of non-debtor affiliates (none of whom are in insolvency proceedings), and it has no

other bankruptcy purpose.

Moreover, subsequent to *PPI*, the Third Circuit, in *In re Integrated Telecom Express,*

*Inc.*, examined *PPI* and rejected the idea that any entity undergoing a bankruptcy proceeding

could lawfully take advantage of the redistributive provisions of the Bankruptcy Code.  In

*Integrated Telecom*, the Third Circuit held:

> To be filed in good faith, a petition must do more than merely
> invoke some distributional mechanism in the Bankruptcy Code.  It
> must seek to create or preserve some value that would otherwise be
> lost–not merely distributed to a different stakeholder–outside of
> bankruptcy.  This threshold inquiry is particularly sensitive where,
> as here, the petition seeks to distribute value directly from a
> creditor to a company's shareholders.[170]

As discussed above, the evidence establishes that this case was filed to take advantage of the

distributional mechanism set forth in section 502(b)(6) and limit lease rejection damages and

guaranty claims so that value is preserved for the benefit of the Enterprise and its shareholders.

This is not permitted under *Integrated.*[171]  By rejecting leases and capping claims under section

502(b)(6), the Debtor seeks to distribute value to different stakeholders–outside of bankruptcy.

Although the Bankruptcy Code contains provisions that have the effect of redistributing value

from one interest group to another, this redistribution is not the Bankruptcy Code's purpose.[172]

Here, the purpose of the Debtor's case is to benefit the shareholders of the Enterprise[173]—which

---

[170]  *In re Integrated Telecom Express, Inc.*, 384 F.3d at 129.

[171]  *Id.* at 129-130.

[172]  *Id.* at 128-129 (holding that "the purposes of the Code are to preserve going concerns and to maximize the value of the debtor's estate.").

[173]  Tr. Hr'g Jul. 30, 2025 (D.I. 335) at 34:8–12 (Marth) ("But if we do all those things and it all happens right, maybe five years from now, we can sell this company for a decent multiple.  And if we can do that, then, you know, you look at the waterfall; maybe the shareholders get their money back."); 34:25–35:25 (Marth) ("I'm trying to do

is outside the purpose of the Bankruptcy Code and not done in good faith.  As the Court

observed in *Rent-A-Wreck*:

> As the Third Circuit has made clear, a debtor's desire to invoke the powers conferred by the Bankruptcy Code does not establish good faith, nor does it constitute a valid bankruptcy purpose.  While the desire to use provisions of the Bankruptcy Code to one's advantage does not constitute a bad faith filing, it also does not constitute a good faith filing.  If it did, any entity willing to bear the cost of a bankruptcy filing could use the Bankruptcy Code's redistributive mechanisms to its advantage, a concept "antithetical to the structure and purposes of the Bankruptcy Code."[174]

Here, the Enterprises' shareholders who made the Bridge Loan are paying the freight of the

bankruptcy case to take advantage of the Bankruptcy Code's redistributive provisions.[175]  The

Enterprise and its shareholders do not get the benefits of the Bankruptcy Code provisions absent

an Enterprise bankruptcy filing.[176]

The Debtor has failed to establish that this Chapter 11 Case serves a valid bankruptcy

purpose.

---

the right thing.  I'm trying to do the right thing for the market.  I'm trying to do the right thing for the partners.  I'm trying to do the right thing for patients and prescribers.  That is my primary purpose."); 35:5–7 (Marth) (" . . .I have a fiduciary responsibility to my shareholders, and I will try to get them their money back or a little better."); 65:10–311 (Marth) ("Create value for shareholders and, you know, jobs for employees and create a good business."); 87:7–9 (Marth) (" . . . I have a fiduciary responsibility . . . to my shareholders . . .").

[174] *In re Rent-A-Wreck of Am., Inc.*, 580 B.R. at 374–75 (citations omitted).

[175] *Id.* at 386 ("These cases are a prime example of the situation the Third Circuit warned against: the use of the Bankruptcy Code—and, in particular, its redistributive provisions—when a party is willing to pay the freight of a bankruptcy case . . . . Here, Debtors are simply continuing their prepetition litigation in another forum.").  *See also Matter of Levinsky*, 23 B.R. 210, 216 (Bankr. E.D.N.Y. 1982) (cleaned up) ("It has long been recognized that the organization of an entity for the "express purpose of taking advantage of reorganization provisions, in connection with other circumstances, justifies dismissal of the petition as not having been filed in good faith.").

[176] In reaching this decision, the Court is not suggesting that an entire enterprise must always file bankruptcy to satisfy the good faith standard.

## 2. The Debtor Filed the Bankruptcy Petition for a Tactical Advantage.

The Movants argue that the case is essentially a two-party dispute filed for a tactical advantage. They assert that the Corporate Transactions hinder and delay creditors because it took assets away from entities liable to the landlord-creditors and handicapped their rights. In addition, they argue the Corporate Transactions are fraudulent transfers (or at least facially or plausible fraudulent transfers) which would unwind such transactions under the Delaware Limited Liability Act.

The Objectors dispute that the Chapter 11 case was filed for a tactical purpose or a litigation advantage. They contend that taking advantage of a Bankruptcy Code provision is not a tactical advantage or bad faith.

The "filing a Chapter 11 petition merely to obtain tactical litigation advantages is not within 'the legitimate scope of the bankruptcy laws,' and courts have typically dismissed Chapter 11 petitions under these circumstances as well."[177]

### a. The Corporate Transactions and Bankruptcy Filing Were Made for a Tactical Advantage.

The Objectors argue that the bankruptcy filing was not for a tactical advantage because neither the Independent Manager nor his professional were involved in implementing the Corporate Transactions. They note that *LTL Management* did not address whether such similar prepetition transactions were a tactical advantage.

The Court in *LTL Management* declined to address whether that debtor used the prepetition transactions for a tactical litigation advantage because it determined the petition had

---

[177] *In re Rent-A-Wreck of Am., Inc.*, 580 B.R. at 374 (internal citations omitted).

no valid bankruptcy purpose.[178]  Here too, the Court finds that the petition has no valid

bankruptcy purpose.  That said, the Corporate Transactions were a precursor to the formation of

the Debtor and defined the Debtor's assets and liabilities.  The bankruptcy filing was used to

obtain a tactical advantage—namely, to invoke section 502(b)(6) and cap liabilities for the

purpose of eliminating the non-debtor affiliates' liabilities and to benefit shareholders.

This Court has found that the Debtor's financial distress is not genuine, and the Debtor

has no valid bankruptcy purpose (i.e., no going concern and no value to maximize).  The Debtor

was formed solely to file bankruptcy and rid the Enterprise of liabilities for the benefit of the

Enterprise's shareholders.  Indeed, the evidence establishes that the Enterprise carefully

orchestrated the Corporate Transactions that led to the Debtor's bankruptcy filing.

This is further demonstrated by Mr. Marth's email which states: "I used a legal tool to rid

Resilience of the toxic sites.  Now I'm down to a profitable core that will only grow from here.

To me the best path to return value to shareholders . . . ."[179]  The Corporate Transactions and

bankruptcy filing were used, in Mr. Marth's own words, to get rid of the "toxic Sites" and cap

lease liability.  The bankruptcy filing was used as a tactical advantage to eliminate the non-

---

[178] *In re LTL Mgmt., LLC*, 64 F.4th at 110 n. 19 (cleaned up; citations omitted) ("Because we conclude LTL's petition has no valid bankruptcy purpose, we need not ask whether it was filed 'merely to obtain a tactical litigation advantage.'  Yet it is clear LTL's bankruptcy filing aimed to beat back talc litigation in trial courts. Still 'it is not bad faith to seek to gain an advantage from declaring bankruptcy—why else would one declare it?' While we ultimately leave the question unaddressed, a filing to change the forum of litigation where there is no financial distress raises, as it did in *SGL Carbon*, the specter of 'abuse which must be guarded against to protect the integrity of the bankruptcy system.'").

[179] M43.  Tr. Hr'g Jul. 30, 2025 (D.I. 335) at 32:1–34:15 (Marth).

debtor affiliates' Lease liabilities and to preserve the Enterprise for the benefit shareholders, to

the detriment of the Landlords.[180]

### b. The Corporate Transactions and Bankruptcy Filing May Deprive Landlords of Contractual Rights and Potential Claims and Causes of Actions.

The Landlords argue that the "allocation" of their Leases to the Debtor as part of the

Corporate Transactions violates the terms of their respective Leases and guaranties.  Further,

they argue that the Corporate Transactions and subsequent chapter 11 filing eliminates their

contractual rights and potential claims and causes of action.  Prior to the Corporate Transactions,

the Landlords had long-term Leases and separately held guaranties related to the Leases as

detailed above.  As a result of the Corporate Transactions and the chapter 11 filing, the Leases

and guaranties are now held by the Debtor and the Debtor contends the lease rejection damages

and guaranty claims are collectively capped under section 502(b)(6) of the Bankruptcy Code.

By way of example, *prior to the Corporate Transactions[181] and bankruptcy filing*, Cobalt

had a lease valued at more than $44.5 million over a 15-year term *and* a guaranty from the

---

[180] In *Little Creek Development Co. v. Commonwealth Mortgage Corp.*, 779 F.2d 1068 (5th Cir. 1986), the Fifth Circuit emphasized that determining whether the debtor's filing is in good faith depends "largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities."  *Id.* at 1072.  The Fifth Circuit held that the bankruptcy court's finding that "cause" existed to lift the automatic stay pursuant to 11 U.S.C. § 362(d)(1) based solely on the remarks of counsel for the debtor that the bankruptcy petition was filed in order to escape the necessity of posting a substantial bond in an ongoing state court proceeding was clearly erroneous and that more evidence was necessary to support the bankruptcy court's conclusions.  *Id.* at 1070.

[181] *Prior* to the Corporate Transactions, Cobalt, as landlord, had (i) a 15-year lease with Resilience Boston, Inc., a subsidiary of National Resilience, Inc. (D/BMI1109) and (ii) a guaranty from National Resilience, Inc.  D/BMI110. Cobalt Lease and the Cobalt Guaranty permit transfers but only with consent or by satisfying various conditions. Cobalt asserts that failure to comply with either process renders the transfer voidable by Cobalt. D/BMI109 at §11.01 ("Any Transfer in violation of this Section shall, at Landlord's option, be deemed a Default by [Resilience] as described in Section 16.01, and shall be voidable by Landlord.").  Approximately $44,513,077 is owed under the remaining term of the Colbalt Lease.  *See* J9.  *After* the Corporate Transactions, both the Colbalt Lease and the Cobalt Lease Guaranty reside at the Debtor and the Debtor's proposed Plan caps Cobalt's claim at $6,533,109.85 ("Proposed Cobalt Capped Amount").  J44 at Sch. A.  The Debtor's Schedule does not list the full amount obligated under the Cobalt Lease or Cobalt Guaranty as of the Petition Date but rather combines the liability in the Proposed

National Resilience, Inc., the entity holding the Enterprise's most valuable assets (the Ohio Sites)[182] *and after the Petition Date,* a claim capped by section 502(b)(6) of the Bankruptcy Code of approximately $6.5 million against a newly formed company,[183] and no separate legal entity holding the guaranty (or a separate claim) — all while purportedly in violation of the Cobalt Lease.  Other Landlords have similar arguments.[184]  The guaranties are contractual rights that are protected in bankruptcy.[185]

As conceded by the Objectors, whether the Landlords have separate claims for their Leases and guaranties (and whether both claims are collapsed and capped by section 502(b)(6)) has not been addressed by the Third Circuit.  However, in *In re Arden*, the Ninth Circuit held that the plain reading of section 502(b)(6) "underscores that it is the claim of the lessor, not the status of the lessee – or its agent or guarantor – that triggers application of the [lease rejection cap]."[186] The court found that the only two predicates to application of the damages cap were a (i) "claim

---

Cobalt Capped Amount.  J45.  *See also* Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 181:6–183:7 (Weidman).  *But see* Tr. Hr'g Jul. 30, 2025 (D.I. 335) at 159:17–23 (Madden) (stating that where one debtor is the lessee/obligor on the lease and another debtor is the guarantor on that lease, the guaranty obligation would be listed separately in the schedules of financial liabilities).

[182] Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 64:1–64:13 (Montone) (The Ohio and Toronto sites had "either an existing customer base or visibility into signing customers that would ultimately lead to a potential path for profitability at both of those sites.").

[183] Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 237:10–16; 243:24–25 (Sontchi) ("I have no source of income other than interest on a DIP loan that's sitting in a bank.").

[184] The Leases contain anti-assignment provisions.  *See* J33 (Harvard Lease) at §5.1.11 and J36 (Harvard Lease Guaranty) at § 5; J24 (92 Crowley Lease) at § 11.01 and J26 (92 Crowley Lease Guaranty) at § 4; J14 (Alachua Lease) at §24(A)-(C) and J20 (Alachua Lease Guaranty) at p. 2.  As the anti-assignment provisions are not relevant to the Court's ruling, the Court does not address the provisions of each Lease.

[185] *See, e.g., In re Integrated Telecom Express, Inc.*, 384 F.3d at 119 (citation omitted) ("[A] common theme and objective underlying the reorganization provisions [is] avoidance of the consequences of economic dismemberment and liquidation and preservation of ongoing values in a matter which does equity to and is fair to the rights and interests of the parties effected. But the perimeters of this potential mark the borderline between fulfillment and perversion; between accomplishing objectives of rehabilitation and reorganization, and the use of these statutory provisions to destroy and undermine the legitimate rights and interests of those intended to benefit from this statutory policy").

[186] *Arden v. Motel Partners (In re Arden)*, 176 F.3d 1226, 1229 (9th Cir. 1999).

of a lessor" and (ii) "damages resulting from the termination of a lease of real property."[187] Although the Ninth Circuit held that the lease cap applied to a chapter 11 debtor-guarantor it did not address whether the landlord *also* had a claim against chapter 7 debtor-tenant lessee.[188] Whether a landlord has a separate claim against a lessor and guarantor is not a matter of settled law.

It is not necessary to rule on the "single-satisfaction rule" because the Leases have not been rejected, the proposed Plan has not been confirmed (nor has confirmation been scheduled), nor has any amount been paid to the Landlords on behalf of their rejection damages claims.  It is premature to adjudicate whether the Landlords could recover separately under each Lease and guaranty.[189]  While this argument is not ripe, it demonstrates that the bankruptcy filing was used as a tactical litigation advantage.

Further, the bankruptcy filing (without the remainder of the Enterprise) strips the Landlords of potential claims, causes of action, and remedies (such as recharacterization of the Convertible Notes or the Bridge Loans).[190]  Again, while this argument is premature, it demonstrates the bankruptcy filing was used as a tactical litigation advantage.

---

[187] *Id.* at 1229.  *See also Carlyle Fortran Tr. v. nVidia Corp.*, No. C 05-00427 JW, 2007 WL 9733757, at *4 (N.D. Cal. May 15, 2007) (holding that guarantor's claim was not capped under section 502's damages cap because the guarantor was a solvent third party).

[188] *In re Arden*, 176 F.3d at 1229.

[189]  In *Ivanhoe Building & Loan Ass'n of Newark, N.J. v. Orr*, 295 U.S. 243 (1035), the United States Supreme Court held that a creditor was permitted to assert the full value of its claim against a debtor co-obligor, unreduced by the stipulated value of the collateral, subject only to the "single-satisfaction rule" that the creditor could not retain value beyond payment in full.  *Id.* at 245–46.  *See also In re LightSquared Inc.*, No. 12-12080 (SCC), 2014 WL 5488413, at *5 (Bankr. S.D.N.Y. Oct. 30, 2014).  *But see In re Number Holdings, Inc.*, Case No. 24-10719 (JKS) (Bankr. D. Del. Jan. 24, 2025) (D.I. 1733, Ex. 1); *In re Meier's Wine Cellars Acquisition, LLC,* Case No. 24-11575 (MFW) (Bankr. D. Del. Feb. 26, 2025) (D.I. 826, Ex. A).

[190]  Based on the testimony, recharacterization if successful on both the Convertible Notes and Bridge Loan would mean the Holdco would have approximately $246 million of debt (plus $25 million in debt at an international

### c.    This is Not a Two-Party Dispute.

"Where a debtor's filing serves only to create a litigation advantage, a forum shopping device, and/or to resolve what is essentially a two-party dispute the court may find petition was not filed in good faith."[191]   The Landlords allege this case is essentially a two-party dispute – Debtor vs. Landlords.   Although this case has some indicia of a two-party dispute because the dispute is between the Debtor and Landlords (all of whom share similar claims and legal arguments), the Leases and guaranties have different terms and are governed by different state laws.[192]   As such, this is not a two-party dispute.

### d.    The Claims for Alleged Fraudulent Transfer are Not Before the Court.

As mentioned, the Movants assert that the transfer of approximately $372.5 million in lease and guaranty liabilities[193] to the Debtor in exchange for approximately $46.5 million in assets, should be investigated as a fraudulent transfer.   Although the Movants did not seek to prove a fraudulent transfer at the hearing on the Motions to Dismiss, the Movants assert that the Corporate Transactions result from a fraudulent transfer.[194]   Additionally, the Delaware LLC Act

---

subsidiary) instead of the $1.5-2 billion debt at Holdco through the Corporate Transactions, Convertible Notes, and Bridge Loan.  Tr. Hr'g Jul. 29, 2025 (D.I. 334) at 153:8–19 (Montone) ([A] Resilience Holdco is "closer to 1.5 today.  If we sell additional preferred units in the [SPV2025] up to 300 or 325 million, you'd get closer to the 2 billion. [Q] And if either the convertible notes or the preferred units, if they're recharacterized as equity, does that leave only $246 million of debt at the Resilience entities? [A] Hypothetically, if they're recharacterized as equity, we have 246 million in debt today, plus there's about 25 million in debt at our international subsidiary.").

[191]  *In re Sacks Weston LLC*, No. 23-12540 (PMM), 2024 WL 2152115, at *2 (Bankr. E.D. Pa. Apr. 25, 2024) (citation omitted; cleaned up).

[192]  B/BMI109 (Cobalt Lease) at §21.03(Massachusetts); B/BMI110 (Cobalt Lease Guaranty) at p. 2 (Massachusetts); J33 (Harvard Lease) at § 10.4 (Massachusetts); J36 (Harvard Lease Guaranty) at § 7 (Massachusetts); J24 (92 Crowley Lease) at § 22.03 (Massachusetts); J26 (92 Crowley Lease Guaranty) at § 12 (New York); J14 (Alachua Lease) at § 55 (Florida); J20 (Alachua Lease Guaranty) at p. 3 (Florida).

[193]  J9.

[194]  All arguments related to claims for fraudulent transfer are expressly preserved, including the arguments under the Delaware Limited Liability Company Act, 6 Del. C. § 18-217.

contains restrictions that the plan of division cannot be a fraudulent transfer.[195]  The Court does not need to address this issue as it is not germane to the good faith finding.

### 3.  There are No Unusual Circumstances.

Section 1112(b)(2) of the Bankruptcy Code provides that the Court may deny dismissal of a case if the Court finds and specifically identifies unusual circumstances establishing that dismissal is not in the best interests of creditors and the estate.[196]  In addition to establishing that dismissal is not in the best interest of the estate and creditors, a debtor must also establish that (a) "there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) …";[197] and (b) "the grounds for dismissal include an act or omission" (1) "for which there exists a reasonable justification" and (2) "that will be cured within a reasonable period of time."[198]

The Objectors argue that unusual circumstances exception applies that obviates dismissal. Specifically, they claim "dismissal is not in the best interest of creditors and the estates" because the alternative, an Enterprise bankruptcy, would result in creditors not being satisfied in full and not being paid until completion of a lengthy claims reconciliation process.  Further, they argue if there was an act or omission it will be cured.  This Court has determined that the case should be dismissed for lack of bona fide financial distress.  In *LTL Management,* the Third Circuit dismissed for lack of financial distress and ruled:

---

[195]  *See* Del. LLC Act. §18-217(1)(4).

[196]  11 U.S.C. § 1112(b)(2).

[197]  11 U.S.C. §1112(b)(2).

[198]  *In re LTL Mgmt., LLC*, 64 F.4th at 110 (cleaned up).

> Our ground for dismissal is LTL's lack of financial distress.  No
> "reasonable justification" validates that missing requirement in this
> case.  And we cannot currently see how its lack of financial
> distress could be overcome.  For these reasons, we go counter to
> the Bankruptcy Court's conclusion that "unusual circumstances"
> sanction LTL's Chapter 11 petition.[199]

On these facts, no unusual circumstance can overcome the manufactured financial distress.

### 4.  The *Primestone* Factors

The U.S. Trustee urges the Court to dismiss the case based on application of the *Primestone* factors.  The Debtor argues the *Primestone* factors weigh in favor of good faith.

The Delaware District Court, in the *Primestone* case identified factors to consider in determining whether a case is filed in good faith.[200]  "The focus of the inquiry is whether the petitioner sought 'to achieve objectives outside the legitimate scope of the bankruptcy laws' when filing for protection under Chapter 11."[201]  "No single [*Primestone*] factor is determinative of a lack of good faith in filing a petition."[202]

As discussed above, the Court finds the following *Primestone* factors support dismissal for lack of good faith:

- The Debtor has few unsecured creditors (seven unsecured creditors as identified in the Petition).

- The Debtor does not have any ongoing business or employees.

- The Debtor does not have any income.

- There is no pressure from the affected landlords; no pre-petition defaults or pending litigation under the Leases.

---

[199] *Id.* at 110.

[200] *In re Primestone*, 272 B.R. at 557; *see supra* n. 92 for a list of the factors.

[201] *Id.* (citations omitted).

[202] *Id.* at 558 (cleaned up; citations omitted).

- There is no possibility of reorganization.  The Independent Manager states: "The primary purpose of the Chapter 11 Case is to administer the orderly winddown of and satisfy all allowed liabilities in connection with the Debtor's underutilized manufacturing, laboratory, and office sites . . . ."[203]

- The Debtor was formed six days prior to the Petition Date.

- The Debtor's petition was filed solely to take advantage of 11 U.S.C. § 502(b)(6) and cap lease rejection damages.

The *Primestone* factors weigh in support of dismissal.

**CONCLUSION**

"Good faith is the gatekeeper of the equity court"[204] and a prerequisite to a chapter 11 petition.  Based on the totality of the facts and circumstances, the Court finds that the Debtor has not met its burden of establishing good faith.  Accordingly, the Court will grant the Motions to Dismiss.  An order will issue.


Dated:  August 29, 2025

_____
J. Kate Stickles
United States Bankruptcy Judge

---

[203] D.I. 6 (Sontchi First Day Dec.) at ¶ 7.

[204] *In re HBA E., Inc.*, 87 B.R. at 263.

**Addendum**
**Corporate Transactions**[1]

**The Corporate Transactions and Formation of the Debtor.**

From 2021 through April 2025, the structure of the Enterprise consisted of "stacked" C-Corporations, as follows:



### a. Step 1[2]

The initial step, prior to the Divisions under the Delaware LLC Act, was the creation of Holdco as a pure holding company. National Resilience, Inc. and Resilience US, Inc. were then converted from Delaware corporations to Delaware limited liability companies[3] (National Resilience, LLC ("<u>NR</u>") and Resilience US, LLC ("<u>RUS</u>"), respectively). BMI was formed to serve as the sole member of RUS.[4]

In connection with these transactions, all shares and convertible notes in NR were converted into shares and convertible notes in Holdco.[5]

### b. Step 2

In the second step, RUS and NR underwent divisions pursuant to section 18-217 of the Delaware LLC Act. These divisions occurred on June 3, 2025.

---

[1] To explain the Corporate Transactions, the Court refers to, and includes, charts prepared by the Debtor and its professionals that depict the organizational structure.

[2] In its planning stages through execution, the series of Corporate Transactions was referred to as "Project Osiris" (*see, e.g.*, M3, M7, M8, M23, M40, M41, M42, and M50).

[3] D/BMI86 and D/BMI89.

[4] D/BMI46.

[5] D/BMI43.

### i.    The RUS Division

Prior to its division, RUS operated the following sites: Allston, Bedford, and Marlborough, Massachusetts; Durham, North Carolina ("RTP"); East Norriton, Pennsylvania; and West Chester and Blue Ash, Ohio (collectively, the "Ohio Sites").[6]

In addition, AGS, which RUS acquired in 2021, operated sites in Alachua, Florida; Alameda, California; and Frederick, Maryland.

RUS divided into five entities.[7]  To facilitate the intended transfer of the East Norriton, Pennsylvania and RTP sites, the leases and the contracts corresponding to those sites were placed in two of the five resulting limited liability companies: ENM, LLC[8] and RTP Operating, LLC.[9] The equity of AGS was placed in a third limited liability holding company, AGS Holding, LLC.[10]  The remaining assets and liabilities were allocated to the final two limited liability companies: Bedmar, LLC[11] and RUS.[12]

Bedmar, LLC was allocated (i) three of the remaining four leases of RUS: Allston, Bedford, and Marlborough, Massachusetts; [13] and (ii) $33,155,497 in cash and a receivable from RUS.[14]

RUS was allocated, among other things, the (i) Ohio sites, (ii) the liability associated with the DOD loan (approximately $246 million), and (iii) the obligation to repay the secured bridge financing.[15]

### ii.    The NR Division

Prior to its division, NR operated or held the following sites: Fremont and San Diego (Merryfield and Roselle sites), California.

Prior to its division, NY operated or held the following sites: (i) Fremont, California; and (ii) San Diego, California (Merryfield and Roselle sites).

NR divided into two entities on June 3, 2025: (i) NR; and (2) Bedmar Holdco, LLC.[16]

---

[6]  The Ohio Sites are the centerpiece of Holdco's business plan after Bedman's bankruptcy.  J1 ("Future State: Resilience 2.0 focus on growing Cincinnati and Toronto, maintaining upside in Cell Therapy, and existing all underperforming assets" at p. 2; "Targeting EBITA breakeven in 2026" at p. 4); Tr. Hr'g July 29, 2025 (D.I. 334) at 116:6–12 (Montone).

[7]  D/BMI90.

[8]  D/BMI90, Sch 1(B).

[9]  D/BMI90, Sch.1(C).

[10]  D/BMI90, Sch. 1(E).

[11]  D/BMI90, Sch. 1 (D).

[12]  D/BMI90, Sch. 1(A).

[13]  D/BMI90, Sch. 1(D)(i–vii).

[14]  D/BMI90, Sch. 1(D)(viii).

[15]  D/BMI90, Sch. 1(A)(iv–ix).

[16]  D/BMI82.

Bedmar Holdco was allocated the following: (a) the Merryfield lease; (b) the Fremont lease; (c) the Roselle lease; and (d) the Roselle sublease.[17]  In addition, Bedmar Holdco was allocated the following contingent obligations: (a) the lease guaranty of the Bedford lease in favor of the landlord; (b) the lease guaranty for the Marlborough lease in favor of the landlord; (c) the lease guaranty for the Allston lease in favor the landlord; and (d) the lease guaranty for the RTP lease in favor of the landlord.[18]  Bedmar Holdco was also allocated the lease guaranty in favor of the prior owner of the Alachua leased facility.[19]  Bedmar Holdco was also allocated $9,420,012 in the form of cash and a receivable from NR from reserved funds held by the SPV.[20]

NR was allocated the interests in subsidiaries, including BMI, NR's joint and several obligations (as co-borrowers) under the $246 million DoD Loan, and NR's joint and several obligations under the secured bridge financing.[21]

After "step 2" the corporate chart is as follows:



---

### c.  Step 3

Bedmar Holdco and Bedmar, LLC were merged.[22]  This was achieved by contributing Bedmar Holdco to BMI and merging the entities.  After "step 3" the corporate chart is as follows:



### d.  Step 4

BMI transferred a 51% membership interest in AGS Holdco, LLC to the Debtor.[23]

---

[22] M3.

[23] D/BMI42.

### e. Step 5

The Alachua lease was assigned to Bedmar, LLC in accordance with the lease terms for consideration of a payment of $5,889,542 to Bedmar, LLC from AGS.[24] AGS borrowed this amount from RUS, which amount was transferred to Bedmar, LLC in connection with its cash allocation.[25] After "step 5" the final corporate structure is as follows:



---

[24] D/BMI106.

[25] D/BMI94.